```
 1   UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF NEW YORK

 3   ---------------------------------------------------------

 4   JOHN GORMAN,

 5                    Plaintiff,

 6        -against-              Civil Case No. 1:14-cv-434

 7   RENSSELAER COUNTY, SHERIFF JACK MAHAR,
     ANTHONY PATRICELLI, UNDERSHERIFF PATRICK
 8   RUSSO, COUNTY HUMAN RESOURCES MANAGER,
     TOM HENDRY, COUNTY EXECUTIVE KATHLEEN JIMINO,
 9
                     Defendants.
10
     ---------------------------------------------------------
11

12             STENOGRAPHIC MINUTES OF EXAMINATION BEFORE

13   TRIAL conducted of Plaintiff, JOHN GORMAN, pursuant to

14   Notice, on the 15th day of June, 2016, at the law office

15   of Patrick Sorsby, PLLC, 1568 Central Avenue, Albany, New

16   York, commencing at 10:08 a.m.; before THERESA L. KLOS,

17   Certified Shorthand Reporter, Registered Merit Reporter

18   and Notary Public within and for the State of New York.

19

20

21

22

23

24
```

```
 1    APPEARANCES:

 2    ON BEHALF OF PLAINTIFF:

 3            LAW OFFICE OF PATRICK SORSBY, PLLC

 4                 1568 Central Avenue, First Floor
                   Albany, New York  12205
 5                 518.456.4529

 6            BY:  PATRICK SORSBY, ESQ.
                   Sorsbylaw@gmail.com
 7

 8

 9    ON BEHALF OF DEFENDANTS:

10            MARTIN & RAYHILL, P.C.

11                 421 Broad Street, Suite 10
                   Utica, New York  13501
12
              BY:  KEVIN G. MARTIN, ESQ.
13                 Kmartin@martinrayhill.com

14

15

16

17

18

19

20

21

22

23

24
```

1                    S T I P U L A T I O N S

2            IT IS HEREBY STIPULATED AND AGREED by and between

3    the attorneys for the respective parties hereto, that

4    filing, sealing and certifications are hereby waived;

5            IT IS FURTHER STIPULATED AND AGREED that all

6    objections, except as to the form of the question, shall

7    be reserved to the time of the trial;

8            IT IS FURTHER STIPULATED AND AGREED that the

9    within Deposition may be signed before any Notary Public

10   with the same force and effect as though subscribed and

11   sworn to before this Court.

12

13

14                    ***    ***    ***

15

16

17

18

19

20

21

22

23

24

*JOHN GORMAN – June 15, 2016*                    4

```
 1    Thereupon
```

 2                          **JOHN GORMAN**,

 3                  (Being duly sworn by the Notary Public, was

 4            examined and testified as follows:)

 5            EXAMINATION BY COUNSEL FOR DEFENDANTS

 6    BY MR. MARTIN:

 7        Q.    Mr. Gorman, we are going to be asking you some

 8            questions about your second amended complaint and

 9            if you don't understand my question, please tell

10            me.  It's the same rules as last time when we

11            spoke on the 50-H.

12                  I sort of want to start maybe with the

13            damages issues.  And I wanted to know if you're

14            currently working.

15        A.    Yes.

16        Q.    Where do you work?

17        A.    Beacon Health Options.

18        Q.    And what do you do there?

19        A.    I'm a claims processor.

20        Q.    Is it a full-time job?

21        A.    Yes.

22        Q.    Is it salary or hourly?

23        A.    It's 40 hours a week.

24        Q.    Okay.  Are you paid by the hour or --

*JOHN GORMAN – June 15, 2016*                    5

```
1     A.   By the hour.

2     Q.   What's the rate?

3     A.   $12.

4     Q.   Do you receive any kind of commission on sales or

5          anything like that?

6     A.   No.

7     Q.   How about bonus?

8     A.   No.

9     Q.   Do you receive any benefits of any kind?

10    A.   No.

11    Q.   Do you get any things like vacation even,

12         anything like that?

13    A.   I earn one day a month vacation.

14    Q.   How long have you been working at Beacon?

15    A.   Since October 29th of 2014.

16    Q.   Have you been working steadily 40 hours for them

17         since that date?

18    A.   Unless I take a day off for a deposition or

19         something, yes.

20    Q.   Do you have any other source of income besides

21         your work at Beacon?

22    A.   I'm not sure what -- do I have another job?  No.

23    Q.   No other job.  Do you have any other source of

24         income, like disability or insurance payment or
```

*JOHN GORMAN - June 15, 2016*                    6

```
 1            Worker's Compensation?

 2     A.    Occasionally, I get money from Workman's

 3            Compensation, but I have not received any kind of

 4            regular benefit to date.

 5     Q.    Did you receive unemployment insurance after you

 6            left your employment with the Rensselaer County

 7            Sheriff's Department?

 8     A.    Only for a five-week period and that was

 9            unrelated to Rensselaer County Sheriff's

10            Department.

11     Q.    Did you apply for unemployment after you left

12            Rensselaer County Sheriff's?

13     A.    I was uneligible.

14     Q.    You did not apply?

15     A.    I applied.  I was told I was not eligible.

16     Q.    When you received the five weeks of unemployment

17            insurance after you left Rensselaer County

18            Sheriff's Department, what was that unemployment

19            insurance claim related to?

20     A.    United States Post Office.

21     Q.    Maybe the easiest thing to do is if you could

22            just tell me from the time that you left

23            Rensselaer County up to October 29, 2014, if you

24            were employed.
```

*JOHN GORMAN - June 15, 2016*                    7

```
 1    A.    Once I was terminated by the Sheriff's Department

 2          or once I found out I was being terminated or had

 3          no money coming in, I applied for 127 jobs.  I

 4          worked at Cargill for a few weeks and due to PTSD

 5          symptoms and my Workman's Comp issue from

 6          Rensselaer County, I was not able to keep that

 7          job.

 8                I then immediately was hired at the post

 9          office and, again, what they call a job failure

10          due to my disability.

11                I also then went to Express Scripts for a

12          short period of time and had the same issues.

13          And then I finally ended up at Beacon Health.

14    Q.    Okay.  You said Cargill for a few weeks.  Do you

15          remember when you first started at Cargill?

16    A.    I don't know the exact date.  I would say the

17          month would be some time in July.

18    Q.    Of 2014?

19    A.    Yes.

20    Q.    What was the date of your termination again from

21          the Rensselaer County Sheriff's Department?

22    A.    I don't know the exact date.  I know it was

23          October of 2014, which is why I was not eligible

24          for unemployment.
```

```
 1      Q.   And what was the location of the Cargill facility
 2           where you were working?
 3      A.   Port of Albany is the best I got for you.
 4      Q.   How about the U.S. Post Office?  Which one of
 5           their facilities did you work at there?
 6      A.   Glenville.
 7      Q.   Was there an incident that led to your
 8           termination from Cargill after a few weeks?
 9      A.   There wasn't a termination.  I resigned based
10           upon the recommendation of my physician.
11      Q.   How about at the Post Office?
12      A.   Same thing.
13      Q.   And how about at Express Scripts?
14      A.   The same.
15      Q.   You tried to work at each one of these places but
16           it just wasn't working?
17      A.   There are multiple factors that triggered
18           additional PTSD symptoms and was unable to
19           function.
20      Q.   Can you explain that to me, what the factors were
21           and what happened to result in your deciding to
22           cease employment?
23      A.   All those jobs had great demands, driving a
24           forklift very fast, delivering thousands of
```

*JOHN GORMAN - June 15, 2016*                9

1          pieces of mail in a truck, entering scripts via

2          quota.  All were a demand, a job demand.  And it

3          was determined that I could not function while

4          taking Xanax and multiple medications without

5          having my hands shaking, you know, chest pain,

6          all of those symptoms that are related to PTSD.

7               Does that -- did I give you enough?

8     Q.   Is that everything?

9     A.   Pretty much.

10    Q.   Okay.  Is there a difference between what you're

11         doing at Beacon compared to these other jobs that

12         allows you to continue for around 18 months with

13         Beacon?

14    A.   Beacon is absolutely horrific and I survive

15         Beacon by taking Xanax all day long along with my

16         other prescribed medications.

17              Given accommodation, I only have to work 40

18         hours because I can't handle more than 40 hours.

19         After 40 hours, I can't take Xanax anymore.

20         Without that medication, all my symptoms are

21         overwhelming to the point where I can't function

22         and do the job.  Beacon is also quota driven.

23    Q.   So there's pressure on you to perform.  Is that a

24         fair statement?

```
 1    A.   Yes, not only quantity but quality.  You have to
 2         have a hundred percent accuracy and you have to
 3         process so many claims per hour.
 4    Q.   Have all of your medical expenses been covered by
 5         Worker's Compensation?
 6    A.   As far as psychologically, up to this point, yes.
 7    Q.   Do you have any out-of-pocket expenses that
 8         you've incurred as a result of the incidents that
 9         you claim in this case?
10    A.   Having to do with medical as far as, you know,
11         not having an income for over a year --
12    Q.   Related to medical, just related to medical.
13    A.   No, short of a mileage claim.
14    Q.   So you have a claim for mileage?
15    A.   Outstanding benefits that were ordered to be paid
16         to me by Rensselaer County that have not been
17         paid.
18    Q.   You're expecting that they'll be paid?
19    A.   I really don't know what to expect.  The Judge
20         ordered them to pay.  Now, Meditech has not paid.
21         So whether or not that will get paid or not,
22         we'll have to wait and see but they...
23    Q.   Assuming they do pay and in accordance with the
24         order, then that would cover your mileage claim?
```

1      A.    As of May 5th of 2016, yes.

2      Q.    Let's just take a quick detour on to the Worker's

3            Compensation case.  My understanding was that

4            there was an appeal.  I know we've gone back and

5            forth on this.  Do you know what the status is

6            right now of that case?

7      A.    Yes.  Rensselaer County lost their appeal and

8            they're ordered to pay.

9      Q.    When did that decision come down?

10     A.    June 23rd of 2016.  I'm sorry --

11     Q.    May.

12     A.    -- May 23rd, 2016.  I apologize.

13     Q.    Very good.

14     A.    By the way, that appeal is just solely based upon

15           how much money I would get, not based upon the

16           medical condition.  That issue was resolved in

17           2015.

18     Q.    Is there any kind of 401-K or pension related

19           benefit at Beacon?

20     A.    Not that I know of.

21     Q.    We can shift gears towards your medical

22           condition.  Since we last spoke, you were

23           treating with a mental health professional.  The

24           name escapes me at the moment.  Who is your

```
 1          doctor?

 2     A.   I currently treat with two, Dr. Camperlengo who

 3          is a psychiatrist and Dr. Thalmann who is a

 4          psychologist, and I see them both once a month.

 5     Q.   How long have you been on a once per month

 6          schedule with Dr. Thalmann and Dr. Camperlengo?

 7     A.   Pretty much, the entire three years.

 8     Q.   And what medications are you currently on?

 9     A.   I'm on Xanax.  Do you need to know the dosage and

10          all of that or just the names?

11     Q.   Just the names for now.

12     A.   Wellbutrin XL.  And right now, we're doing Prozac

13          so we're also experimenting with different

14          medications like Cymbalta, because the Prozac is

15          not working.

16     Q.   How is the -- what's the dosage for the Prozac?

17     A.   60 milligrams.

18     Q.   Daily?

19     A.   Daily.

20     Q.   And the Cymbalta experiment, how are you doing

21          that?

22     A.   60 milligrams once a day.  And the Wellbutrin XL

23          is 150 per day.

24     Q.   What is the Wellbutrin?  I'm not familiar with
```

```
 1              that one.  Is that also an antianxiety --
 2      A.      Antidepressant anti anxiety.  It also is meant to
 3              counter-dict (phonetic) some of the effects of
 4              the Cymbalta or Prozac depending on which one I'm
 5              taking.
 6      Q.      Do you have any side effects from any of these?
 7      A.      A whole lot of side effects.
 8      Q.      What side effects are you experiencing?
 9      A.      Sleep.  I do sometimes take a sleep aid.
10      Q.      So you have insomnia?
11      A.      I do.
12      Q.      How often do you have bouts of insomnia?
13      A.      Oh, every day.
14      Q.      So you take a daily sleep aid?
15      A.      I try not to because it's addictive.
16      Q.      What sleep aid do you take?
17      A.      I knew you were going to ask me that question.
18              It's a little purple pill.  It's on TV.  It's a
19              very common one.  I'm sorry, I don't recall the
20              name at the moment.
21      Q.      All right.  And you sort of take that as needed
22              but you need it quite a lot.  Is that a fair --
23      A.      Yes.  There are times when I try to take Xanax
24              because Xanax will sort of calm me enough to get
```

1              a couple hours of sleep.

2      Q.    Maybe I should ask:  What is the dose of Xanax,

3              60 milligrams and then 150 of these other ones?

4      A.    .5 milligrams four times a day.  I've opted not

5              to go higher because, again, that's a very

6              addictive medication.

7      Q.    Do your doctors allow you within that to go two

8              times a day or just sort of do as needed on the

9              Xanax?

10     A.    Dr. Camperlengo recommended I take it on a

11             regular basis.  I take it every four hours

12             starting from the time I get up in the morning.

13             If I do sleep, generally, it's 5:00 o'clock, then

14             go every four hours, every three to four hours to

15             survive work.

16     Q.    All right.  I interrupted you on the side

17             effects.  You have insomnia.  What other side

18             effects have you been experiencing?

19     A.    My hands still shake, chest pain.  There are

20             certain sexual side effects, being unable to

21             perform which I had before, which has made it

22             worse, weight gain, fatigue.

23     Q.    Had you treated with a mental health professional

24             prior to the incidents in this case?

*JOHN GORMAN - June 15, 2016          15*

```
1    A.   No.

2    Q.   How would you describe your health, let's start

3         with mental health, prior to the incidents in

4         this case?

5    A.   No mental health issues whatsoever.

6    Q.   And how about just your physical health prior to

7         the incidents in this case?

8    A.   Very good physical health.  No problems.  Saw my

9         general practitioner once a year for a physical

10        and, you know, other than exposure to poison ivy

11        while doing yard work, you know, no issues.

12   Q.   And could you describe for me how your daily

13        activities have changed as a result of the

14        incidents in the complaint?

15   A.   Do you want to go back to when it first started

16        or --

17   Q.   Yeah, I guess --

18   A.   Can you be more specific?

19   Q.   Maybe I can ask -- I like to get sort of a

20        picture in my mind of what your life was like

21        before the incidents in this case and what it is

22        now and what those differences are, the things

23        that you may have lost out on as a result of it

24        all.
```

*JOHN GORMAN - June 15, 2016          16*

```
 1              So we're sort of -- I'm doing this backwards
 2         a little bit looking at sort of your damages kind
 3         of claims now.
 4              How has this impacted your life, I guess,
 5         would be the question?
 6    A.   It would probably be easier if I start with what
 7         I did before.
 8    Q.   Sure.
 9    A.   Very active member of my church.  I worked at
10         Rensselaer County Jail for six years and I never
11         missed a day of work.  I got the $1,500 check
12         that they gave everybody every year as a member
13         of the Masonic organization.  I attended regular
14         meetings.
15              I also sing classical music, opera.  I went
16         to college for it.  So I often did concerts, sang
17         at church, did weddings, all kinds of things like
18         that.
19              After I experienced the initial diagnosis
20         and then leading up to the chronic PTSD, I didn't
21         leave the house.  I didn't go to church.  I
22         didn't go to the masons.  I didn't sing for
23         years.
24    Q.   The singing, if I could just stop you for one
```

1                 second, did you do that for pay, by any chance?

2       A.    I have done that for pay.

3       Q.    And you're not doing that now for pay?

4       A.    I have not done that since.

5       Q.    In an average year, how much money would you earn

6             through your singing, would you say?

7       A.    Not a lot.  I mean, not enough to claim on my

8             taxes if that's what you're asking.

9       Q.    All right.  So we talked about being a member of

10            the church, a member of the masons, your singing,

11            and I interrupted you.  Can you continue?

12      A.    Activities with my children, playing out in the

13            yard, just basically doing yard work.  I mean, I

14            didn't even want to do any of that.

15                  I have hobbies where I paint miniature

16            knights and make dioramas and all that stuff.

17            Stopped.  I haven't done that in years since I

18            got sick.

19      Q.    And it would be your contention that the reason

20            you're not doing these things is because of the

21            diagnosis?

22      A.    That is correct.

23      Q.    Okay.  Anything else besides the hobbies,

24            dioramas, household chores, singing, things we

```
 1            talked about?

 2     A.     I think that's quite a bit, plus working.  By the

 3            way, the last year I worked at the jail, I worked

 4            almost 600 hours of overtime so I made $67,000 on

 5            a basic salary of $42,000.  So I had spent a lot

 6            of time working.  So it's a lot to do what I just

 7            described, plus work those hours.

 8     Q.     Was the last year that you worked at the

 9            Sheriff's Department?  Was that a big year for

10            overtime, though, the 600?

11     A.     I don't know.  What do you mean by --

12     Q.     Was it a lot more than the prior five years in

13            terms of overtime?

14     A.     That I did?

15     Q.     Yes.

16     A.     That was probably my biggest year, but it was

17            also serving as a sergeant.  So it was a

18            different situation than being an officer.

19     Q.     What is your prognosis right now in terms of what

20            the doctors are telling you going forward?

21     A.     They really don't know.  I've stayed unchanged.

22            If you're looking for am I at maximum medical

23            improvement?  No, I'm not.

24     Q.     The plan medically is sort of continue as we are;
```

```
 1              is that a fair statement?
 2    A.    I would say that's fair.  I would say we're
 3          trying different medications to see if we can
 4          relieve some of the symptoms.
 5    Q.    I think we talked about side effects.  Have we
 6          gone over everything; the hands shaking, weight
 7          gain, fatigue?
 8    A.    Headaches.
 9    Q.    Anything else?
10    A.    I can think of headaches.
11    Q.    Are the headaches the side effects or is that
12          more the PTSD itself or maybe it doesn't matter?
13    A.    I don't know.  I know that I regularly every day
14          take Excedrin Migraine, you know, maximum dose
15          every single day.  So whether that is a symptom
16          of the PTSD or the medication, I don't know.
17    Q.    What other symptoms are you experiencing from the
18          PTSD diagnosis if we haven't talked about them
19          already?
20    A.    I mean, the anxiety is what's causing the hand
21          shaking and all that.  I think that's it.
22          Cottonmouth.  There's all kinds of symptoms when
23          you take medications.
24    Q.    We talked about your Worker's Compensation case.
```

 1              I just want to make sure there's nothing pending

 2              on the union side of things, any grievances or

 3              appeals related to the union.  Is that correct?

 4     A.       The union basically told me they wouldn't help

 5              me, nothing they could do for me after the due

 6              process hearing.  And since I wasn't working and

 7              I wasn't paying dues, then nor did they have to.

 8     Q.       So let's go back to sort of the start of all this

 9              in October of 2013, I believe it was.

10     A.       2012.

11     Q.       2012, excuse me.  Maybe I can ask you a question

12              about your relationship with Patricelli prior to

13              that time.  How would you describe your

14              relationship with Sergeant Patricelli prior to

15              October of 2012?

16     A.       Didn't really have a relationship with him.  See

17              him occasionally at work.  That was it.

18     Q.       Okay.  He didn't come to any Gorman family events

19              with Kim or anything of that kind?

20     A.       Very rarely.  Never in my house.  Very rarely

21              would he come.  And if he did, he'd be there for

22              an hour or less.

23     Q.       At various times, I've seen documents or claims

24              that Patricelli thought that he helped you to get

```
 1          your job.  Would you agree with that

 2          characterization?

 3     A.   No.  I took the test like everybody else.  I

 4          interviewed, I did the background, I did the

 5          psychological.  I went through everything that

 6          anybody else did.

 7     Q.   Did he do anything to help you get the job?

 8     A.   He even refused to give me a reference.

 9     Q.   How about your brother?  Did he help your brother

10          get his job?

11     A.   You'd have to ask my brother, but not that I know

12          of.

13     Q.   And as I understand it, Sergeant Patricelli was

14          living with your sister Kim; is that correct?

15     A.   Yes.

16     Q.   How long did the two of them live together?

17     A.   I know that they were together for 27 years.  How

18          many of those years they actually lived together,

19          I don't know.

20     Q.   And they had children together?

21     A.   One son.

22     Q.   What's the name of the son?

23     A.   Zachary.

24     Q.   And how old is he now?
```

1    A.    I believe he's 16.

2    Q.    Prior to October of 2012, did you have any

3          discussions with your sister Kim about Sergeant

4          Patricelli?

5    A.    Can you be more specific?  What do you want?

6    Q.    Did she ever tell you about how their

7          relationship was going or anything about Sergeant

8          Patricelli that you can recall?

9    A.    We didn't discuss their relationship.  I know she

10         called me a few times when she first had her son

11         come over and help her, because he had colic and,

12         you know, how to change diapers and get used to

13         the bottle and all of that, you know, help her

14         with those kinds of things, because he refused.

15         He didn't come up in a lot of conversations.

16   Q.    Okay.  So October, 2012 comes along and you

17         received a -- strike that.

18              Did you ever have any discussions with your

19         sister Kim about Sergeant Patricelli having an

20         affair with someone else?

21   A.    We're talking about October of 2012?

22   Q.    Prior to that, I guess.

23   A.    No.

24   Q.    Were you aware if Patricelli was having an affair

```
 1          with someone?

 2    A.    I heard rumors.

 3    Q.    What were the rumors that you heard?

 4    A.    That he was having affairs with different people.

 5    Q.    Were any names thrown out?

 6    A.    Sure.  Co-workers at the jail.

 7    Q.    What were the names?

 8    A.    Wendy Vega, Dawn Drose (phonetic), all kinds of

 9          names.

10    Q.    Can you remember any others besides Wendy Vega

11          and Dawn Drose?

12    A.    Off the top of my head, that's it.

13    Q.    Did you ever tell your sister that you had heard

14          these rumors that Patricelli was having an affair

15          with someone else?

16    A.    I don't really talk about rumors.  You listen and

17          that's about it.

18    Q.    Good idea.  In October of 2012, you allege in

19          your complaint that you were at work and received

20          a phone call when you were in Sergeant Ryan -- I

21          believe it was in his office.  Is that correct?

22    A.    Yes.

23    Q.    Why don't you just tell me in your own words what

24          happened on that day?
```

```
 1    A.   I was working training to be the transport

 2         officer and I received a call from control that I

 3         had an outside phone call.  And I picked up the

 4         phone and it was Patricelli.  And he said, "Thank

 5         your wife, thank your brother, thank you, you'll

 6         pay".  And I said, "I don't -- what are you

 7         talking about?"  And he hung up the phone.

 8    Q.   When you say they told you it was an outside

 9         phone call, does that mean Patricelli was not at

10         the facility that day and was calling from

11         outside?

12    A.   That is correct.  And I wrote down the number

13         that showed up on the caller ID.

14    Q.   And was that his cellphone or something?

15    A.   That was his Sheriff's Department-issued

16         cellphone.

17    Q.   In October of 2012, what was your work schedule?

18         What was your shift?

19    A.   To the best of my knowledge, I would say I was on

20         days, because I was training with Sergeant Ryan

21         and he only worked days.  He was the transport

22         sergeant, he was retiring.

23    Q.   What would be the hours?  Was that the B line?

24    A.   That was B line.  That would be 7:15 for roll
```

```
 1              call to 3:30.
 2        Q.    Was Sergeant Patricelli working the B line as
 3              well?
 4        A.    He was assigned to the day shift.
 5        Q.    And that's the same time, 7:15 --
 6        A.    He didn't work those hours.  He worked whatever
 7              hours he wanted to work in that position he held.
 8        Q.    And do you guys have to punch a time clock or
 9              fill out a time card?
10        A.    I don't know about him but I had to, yes, both.
11        Q.    What was the next conversation that you had with
12              Sergeant Patricelli after this phone call in
13              Sergeant Ryan's office?
14        A.    I think you might have missed a conversation.
15              Prior to that phone call, a conversation took
16              place in his office about a sheriff -- I worked
17              on the Sheriff's campaign to help him get elected
18              and there was a party afterwards.  And he was
19              there with a woman, I don't know who it was.  And
20              lots of rumors were around the jail at that time,
21              I mean more so than just rumors but allegations.
22                   So I went to his office out of respect and
23              said, "Just so you know, this is what's going on
24              and I just want to let you know."
```

*JOHN GORMAN - June 15, 2016        26*

```
 1              And he started yelling and screaming at me

 2         that he wanted to know who was telling me those

 3         things and that I need to bring them in.  I said,

 4         "I'm not going to get involved in that.  This is

 5         your business.  I'm just letting you know that

 6         this is going on and that you should take care of

 7         it."

 8    Q.   When you say this is going on, you were telling

 9         about the rumors that you were hearing?

10    A.   Right.  That's one of the only times that -- and

11         it was more allegations than rumors at that

12         point, because it was at a party that he did this

13         where there was hundreds of Sheriff's Department

14         employees.

15    Q.   Right.  And the woman that he was with at the

16         event?

17    A.   I have no idea who it was.  It was at Panichi's

18         Restaurant.

19    Q.   Was she law enforcement, though?

20    A.   I have no idea.

21    Q.   Do you remember when this meeting took place?

22    A.   Prior to the October phone call.  That's all I

23         know.

24    Q.   Like months from it?
```

*JOHN GORMAN - June 15, 2016        27*

```
 1      A.   Weeks prior.

 2      Q.   The election, I guess, would be November, right?

 3           So it would be some time in the fall?

 4      A.   I'm guessing the timing.  In my mind, that's the

 5           timing.

 6      Q.   Okay.  And this meeting took place in

 7           Patricelli's office, you say?

 8      A.   Yes, sir.

 9      Q.   Was there anybody else there?

10      A.   No.

11      Q.   So you had the conversation with Patricelli in

12           his office regarding the rumors?

13      A.   Yes.

14      Q.   And he was upset about that, right?

15      A.   Yes.

16      Q.   Then, you got the phone call was the next

17           conversation you had with him in Ryan's office?

18      A.   Yes.

19      Q.   When was the next conversation?

20      A.   The night before I took the sergeant's exam,

21           mid-October, where he called my cellphone.  He'd

22           never called my cellphone number before.  I

23           assume you want to know the details.  Sorry.

24      Q.   Absolutely, no.
```

*JOHN GORMAN - June 15, 2016        28*

```
 1    A.   And he begged me to help him get my sister back,

 2         because he cared about her and he wanted to get

 3         her back.  And I said, "I don't understand how I

 4         can help you with that.  I have nothing to do

 5         with your relationship.  You need to talk to her

 6         and figure out what it is you're going to do,"

 7         where he yelled, he continued to yell that I'm

 8         her brother and I need to help him and I should

 9         care about what happens to her and my nephew.

10         And that was pretty much all I can remember of

11         that.

12              The next morning, the day of the sergeant

13         exam, I got a call from my sister just letting me

14         know that she had given him my cellphone number.

15    Q.   Did she say why?

16    A.   There was some fighting and arguing and threats

17         about -- you know, to her that it was my fault

18         and, you know, I'm responsible for all this and

19         he wanted to talk to me about it.

20    Q.   After you received the call in Sergeant Ryan's

21         office, did you speak with Kim about the call?

22    A.   What I did first was report it to supervisors.

23    Q.   And that was a verbal report; correct?

24    A.   That was a verbal report, because that's what
```

1    they requested.  Sergeant Rankin requested I do a

2    verbal at this point.  Sergeant Rankin or, excuse

3    me, Sergeant Ryan encouraged me to do a written

4    report.

5         I ultimately went to Sergeant Dunham who I

6    reported to a lot and he said he thought it was

7    best to just make a verbal report and see how

8    things went.

9         (Discussion off the record.)

10   BY MR. MARTIN:

11   Q.   What did Sergeant Rankin do with your verbal

12        report regarding this incident?

13   A.   He told me that I needed to be patient, that he

14        would look into it and discuss it with Captain

15        Smith and they would follow up with me.

16   Q.   And did Sergeant Rankin ever follow up with you?

17   A.   No, he did not.

18   Q.   How about Sergeant Dunham?  To your knowledge,

19        what did he do after you made the verbal report

20        of the October 8 incident, telephone incident?

21   A.   He told me that I was provisional sergeant and

22        that if I wanted to keep my provisional sergeant

23        status that I would be quiet and just be patient.

24   Q.   Eventually, you filed a written incident report;

```
 1            is that correct?
 2      A.    That is correct.
 3      Q.    And we've already marked it in one of the
 4            previous depositions as Exhibit 57.  Is that the
 5            incident report?
 6      A.    Yes, it is.
 7      Q.    And it has your signature on it?
 8      A.    Yes, it does.
 9      Q.    Why did you wait to file a written report of this
10            incident til February 25th, 2013?
11      A.    I already answered that.
12      Q.    What was the answer?  You were waiting for --
13      A.    I reported it verbally and they all advised me a
14            particular course of action, so that's why I
15            didn't do a written.  I mean, if a sergeant tells
16            you -- gives you a suggestion and they've been
17            there 20 years, you're going to probably listen
18            to their suggestion.  So that's what I did.
19      Q.    So why did you do a written report at all in
20            February of 2013?
21      A.    Because in February, 2013 was after the incident
22            of workplace violence and I was advised to put
23            all incidents on a piece of paper by then Chief
24            of Corrections Ruth Vibert and Captain Hal Smith,
```

*JOHN GORMAN - June 15, 2016*          31

```
 1              which I did.
 2     Q.    So there's several incident reports that were
 3              done around that time; is that correct?
 4     A.    They're all dated -- well, they're not all dated.
 5              They're all similarly dated, if that's what you
 6              mean.
 7     Q.    Yeah.  And it was because of the workplace
 8              violence report and Chief Vibert's suggestion
 9              that --
10     A.    And Captain Hal Smith's, yes.  Each incident was
11              verbally reported to the individuals prior on the
12              day it happened, the day after it happened.
13              Policy dictates that if something happens, you
14              verbally report it first and then write it and
15              then in writing, if told to.
16     Q.    Do you know if anyone spoke with Sergeant
17              Patricelli about the October 8th phone call
18              incident?
19     A.    I have no idea.
20     Q.    Do you know if Sergeant Rankin -- strike that.
21                 Did you speak with Captain Smith as well
22              about the October 8th phone call?
23     A.    I did.
24     Q.    Was that later when you spoke to him or was it
```

JOHN GORMAN - June 15, 2016          32

```
 1          soon after?

 2     A.   I'm pretty sure it was the same day.

 3     Q.   What did Captain Smith say?

 4     A.   That he would look into it.

 5     Q.   Do you know if he ever did look into it?

 6     A.   I have no idea.

 7     Q.   When was the next time that you had spoke with

 8          Sergeant Patricelli after the October 8th

 9          incident?

10     A.   I don't have exact dates.

11     Q.   This was the phone call that he made to you, the

12          number that Kim had given him?

13     A.   This is my cellphone.

14     Q.   Right.

15     A.   After that phone call, I don't recall.  I know

16          there was an incident that took place outside in

17          the parking lot where he approached me, said no

18          hard feelings, that he still needed my help to

19          get my sister back and that he wanted to work

20          things out.

21     Q.   Was this at the end of shift?

22     A.   I don't know if it was at the end of shift or

23          during a break, if I went out to make a phone

24          call to home or --
```

1    Q.   What did you respond to him when he --

2    A.   Same as I always did.  I didn't mean to interrupt

3         you, I'm sorry.  I couldn't help him, that it

4         was, you know, none of my business, that I wasn't

5         involved in his relationship, you know, things

6         like it's always best to tell the truth and

7         communicate and work through it.

8              And again, he wasn't happy with that answer

9         because he wanted me to tell her, hey, you should

10        stay with him.

11   Q.   To your knowledge, were they still living

12        together at this point?

13   A.   I want to say yes.

14   Q.   All right.  What happened next with Sergeant

15        Patricelli?

16   A.   You know, after that point, within the

17        correctional facility, it was I saw him every

18        day, he would come to where I was working, what

19        unit I was working or whatever detail I was on.

20        There would be daily calls to Sergeant Rankin

21        about where I was spending too much time

22        throughout the facility.

23   Q.   How do you know that there were daily calls to

24        Sergeant Rankin?

*JOHN GORMAN - June 15, 2016          34*

```
 1    A.   Because I was told by Jeff Rankin or Sergeant
 2         Dunham would say, "Hey, Patricelli is watching
 3         you."  And eventually, and I don't remember what
 4         time when this happened, but I was told that I
 5         needed to get permission from Sergeant Rankin
 6         before I went anywhere in the facility so that I
 7         could be protected from Patricelli so I wasn't
 8         written up for issues.
 9    Q.   Did Sergeant Patricelli ever write you up for
10         anything?
11    A.   Not directly, but he played a role in having me
12         written up for a firearm log during my training
13         as a transport sergeant and then him and his best
14         friend, Sergeant Maselli.  Typically, when
15         someone's written up, the person training them
16         and a direct supervisor who was Sergeant Rankin
17         write them up.  Neither of those individuals were
18         involved in that write-up other than Sergeant
19         Rankin who issued the write-up.
20    Q.   And what role did Patricelli play in the write-up
21         regarding the firearm?
22    A.   You want to know my knowledge of it?
23    Q.   Yes.
24    A.   My knowledge of it is that Sergeant Maselli saw
```

*JOHN GORMAN - June 15, 2016         35*

```
 1              that I hadn't signed the log.  Sergeant Maselli
 2              went to Patricelli.  Patricelli told him to go to
 3              Captain Smith and if Captain Smith didn't have me
 4              written up that to come back -- Maselli is to
 5              come back to see Patricelli and that Patricelli
 6              would go to the Sheriff and he would see that I
 7              got written up.
 8      Q.      And this conversation between Maselli and
 9              Patricelli, you were not a witness to that;
10              correct?
11      A.      No.  But there is a document, there is an
12              incident report that states that.  It should be
13              in one of these evidence books.
14      Q.      It states that Maselli consulted with Patricelli?
15      A.      Yes.
16      Q.      Is it your contention that the write-up was not
17              justified?
18      A.      It is my contention that per policy, the write-up
19              was not justified, because during training, an
20              individual is learning and that there's some
21              leeway given to that individual to learn the
22              processes and the policies without discipline.
23                    And again, it was a verbal warning so,
24              technically, it wasn't formal discipline.  But as
```

*JOHN GORMAN - June 15, 2016*          36

```
 1        a -- during the time I served as a sergeant, I
 2        followed the policy and I wouldn't write somebody
 3        up.  I would just have a discussion with them if
 4        it was a first-time violation.
 5    Q.  You indicated that after the October 8th
 6        telephone conversation and then the conversation
 7        when your sister Kim passed along your cellphone
 8        number that Sergeant Patricelli would check on
 9        you excessively.  Is it your testimony that he
10        wouldn't -- that he didn't check on you prior to
11        this October time frame?
12    A.  That is correct.
13    Q.  Okay.  So there was a change in behavior where he
14        was excessively monitoring what you were doing?
15    A.  That is correct.  I never saw him on details.  I
16        worked for years on a transport detail,
17        transition detail, key detail, fixing computers,
18        coming in out of uniform to fix computers and not
19        once had I ever seen or heard any comments that
20        he was watching me or that I should be
21        disciplined.  I mean, it was to the point where
22        my logs where I go around and sign logs were
23        being checked.
24    Q.  How do you know that he was checking your logs?
```

*JOHN GORMAN - June 15, 2016        37*

```
1    A.    Because I saw him and I was also told by an
2          officer who was running a housing unit named
3          McDonald, Barry McDonald.  That write-up issue is
4          Exhibit 58 where I wrote an incident of what I
5          said happened the same week that it happened.
6    Q.    Other than the write-up regarding the firearm
7          issue, did Sergeant Patricelli play a role in any
8          other discipline or adverse employment action
9          taken against you at the jail?
10   A.    I never received any discipline, but I was told
11         by both Ruth and Sergeant Rankin, Ruth Vibert,
12         the Chief at that time, and Sergeant Rankin that
13         he had attempted to write me up several times.
14   Q.    Did they tell you what the subject matter was?
15   A.    They did not discuss those details, which is when
16         they came up with the rule that I had to get
17         permission before I went anywhere in the
18         facility.
19   Q.    And did Ruth and Sergeant Rankin meet with you
20         together or were these separate meetings?
21   A.    They met with me together and separately, both.
22   Q.    When did these meetings occur?
23   A.    Exact dates, I have no idea.  I know that
24         multiple times, I met with Jeff Rankin in the
```

 1      watch commander's office about how he wasn't

 2      going to let Patricelli write me up and that I

 3      didn't have to worry about it and I met with Ruth

 4      multiple times, Ruth Vibert, multiple times as

 5      well, but I don't know the exact dates.

 6  Q.  Would it be in the early 2013 time frame?

 7  A.  It would be prior to the February workplace

 8      violence incident; how about that?

 9  Q.  Okay.  We're roughly up into the late 2012, early

10      2013 time frame and you've helped me understand

11      the calls that were made by Patricelli and then

12      the excessive monitoring as you describe it.

13          Was there anything else during that time

14      frame that Patricelli was doing to you that was

15      related to his relationship with his sister --

16      your sister?  Excuse me.

17  A.  I'm not sure what you're asking.  You asked about

18      incidents at work and then you asked about

19      relations with my sister.  I'm not sure what

20      you're asking.

21  Q.  I just want to know what happened after

22      Patricelli called you on your cellphone using a

23      number that Kim had given him.

24  A.  Okay.

 1    Q.    And you've already described that he started to

 2          show up and monitor you and check your logs.

 3          What else did he do?

 4    A.    Sure.  I mean, I put a few of them in writing.

 5          There's a report from November.  It's called

 6          "West Hall" where he ends up in the west hall

 7          with -- what you have to understand about

 8          Patricelli is he was not assigned in the jail.

 9          He was assigned outside the jail.  It was a gang

10          detail.

11              He would come to the jail to get inmates or

12          interview inmates and I'd never seen him in the

13          jail but, now, I see him on a regular basis.  So

14          I'm assigned to the west hall, the west side of

15          the jail.  I'm a sergeant and, now, he's

16          questioning what I'm doing in the hallway, why

17          I'm there, you know, shouldn't I be doing

18          something.

19              You know, that incident took place with

20          Chris LaFountain, there was an incident in

21          January, I don't recall the specifics but it was

22          at this point -- and we can look at the incident

23          report if you like.  I think that might have been

24          the key detail where he tried to have me removed

```
 1              from my entire key job which I had been doing for

 2              years without incident.  He --

 3      Q.      Let's stop there.  Let's talk about that in more

 4              detail, the key issue.  What happened there?

 5      A.      He alleged I had a key to his office.  The way

 6              the keys worked is that I was in charge of

 7              programming the key, it's called a watchman and

 8              keys would be kept in there.

 9                   If a key broke or a new key needed to be

10              assigned to a particular area in the jail that an

11              officer used, the request went to Sergeant Dunham

12              and then it came to me and I did the job.  And we

13              were the two people that had access to the keys.

14              I made the keys, I taught myself how to make

15              correctional keys.  It's just simple as a lock

16              key all the way up to a brass $150 -- they paid

17              $150 a key to have them made.  I made them for

18              $10 a key.  It was exciting to do that.

19                   I never had access to keys without process.

20              When he claimed I had one of his keys to his

21              office and I carried it around, I got it whenever

22              I wanted it, that is 100 percent untrue.  He

23              would call me and say, "I locked my keys to the

24              car and my house in my office.  Could you get the
```

```
 1            key to my office and get my keys and meet me

 2            outside?"

 3                 Whether he called me or not, I didn't just

 4            go get the key to his office and go into his

 5            office.  I would go to Sergeant Dunham or call

 6            Sergeant Dunham at home if he wasn't there to say

 7            this is the request, am I authorized and he would

 8            authorize it and I would do it.

 9                 I never took a key out or made a key without

10            either paperwork that was signed by Marcelle,

11            Jack Mahar's Executive Assistant or was approved

12            by Sergeant Dunham.

13                 So when I met with Ruth --

14       Q.   This is in January, 2013, right?

15       A.   Yeah.  Her thing was that I never should have

16            been given that responsibility as an officer and

17            that I should have the entire detail taken away

18            and that they had a complaint from Patricelli and

19            her intent was that I would have that detail

20            taken away.

21                 Then, I met with Sergeant Dunham who said

22            that's not going to happen, and it didn't happen.

23            So the allegation that I had unwatched access to

24            his key to his office is not true.  That never
```

1        happened.

2              You know, each key has a combination, each

3        key has a series of numbers that tells you how to

4        make it.  That was in a lock safe.  When the

5        Internal Affairs lieutenant was there, I had to

6        get them from him and he would get them out of

7        the safe and give them to me.  Also, the blanks

8        were there.  When he left, the process changed a

9        little bit.

10             All I had to do was send an e-mail to

11        Sergeant Dunham and say I'm accessing the key

12        combination, that I'm making this key for this

13        purpose and then he would authorize it and then

14        it would be done.  There's always a check and

15        balance in place.

16   Q.   Did you have any face-to-face conversation with

17        Patricelli about the key issue?

18   A.   No.  There was no discipline.  There was nothing

19        that I did wrong.  All of a sudden, one day, I'm

20        being told that this detail should be taken away

21        for no reason.

22   Q.   And how long did you continue to keep the key

23        detail?

24   A.   Until I left --

1    Q.   Okay.

2    A.   -- on July 14, 2013.

3    Q.   All right.  What other things did Sergeant

4         Patricelli do as a result of the relationship

5         with Kim?

6    A.   I'm a little confused about what you're asking.

7         Are you asking about what happened at work?

8    Q.   Yes.  Well, actually outside, too.  I mean,

9         eventually, we get to February.  We're getting up

10        to February.

11   A.   I never saw this individual outside of work.

12   Q.   Okay.

13   A.   Just like prior, our prior conversation.  I had

14        no contact or social interaction with this

15        individual outside of work.  Very rare.  And

16        certainly, after these things happened, I had no

17        contact.  In work, he would show up in the

18        cafeteria and sit right at the table next to me

19        and stare at me the entire time.  Not eat.  Just

20        sit there and stare.

21             In all of the years I worked there, he never

22        ate.  And I guess what we have to talk about is

23        my schedule was Thursday/Friday off.  He worked

24        Monday to Friday.  So my Monday through Wednesday

*JOHN GORMAN - June 15, 2016          44*

```
 1            was the contact I had with him and all of these
 2            incidents happened within those three days a
 3            week.
 4       Q.   So did you go Saturday, Sunday, Monday, Tuesday,
 5            Wednesday, that was your --
 6       A.   Yes.
 7                 (A short break was taken.)
 8   BY MR. MARTIN:
 9       Q.   I think we were talking about actions that
10            Patricelli took as a result of the breakup of the
11            relationship with Kim.  And the last thing I've
12            got here is that he would come into the cafeteria
13            and stare at you and that was something that he
14            had never done before.  Is there anything else
15            that he did?
16       A.   Sure.  I mean, he would -- you know, the west
17            hall incident, I think I described it in the
18            incident report.  It talks about, you know,
19            shaking his head and smiling and, you know, he
20            would go -- even in the cafeteria, he would just
21            sit there and smile and shake his head.  It
22            seemed innocent to you, but to me, knowing the
23            individual and knowing the things that he did in
24            the past, knowing the threats that he already
```

1     made to my sister and, you know, just the

2     atmosphere that you work in in a correctional

3     facility where he had a lot of power, he was

4     unchecked.  He had cameras.  He'd follow me

5     around on the cameras.

6          I don't know if we previously talked about

7     that, just how Rankin would get -- I'd be in the

8     office as a sergeant after I did my rounds and I

9     didn't have any key details or I was talking to

10    Rankin about what I was going to do for the day

11    and he would get a call, it would be Patricelli,

12    and he wanted to know why I'm spending so much

13    time in the office, why I'm not doing rounds, why

14    I'm on -- you know, one time I got called by

15    Sergeant Rankin, wanted to know why I was in

16    Dunham's office for so long.  I was in there for

17    an hour, what was I doing in there for an hour.

18         That was very intimidating.  You know, you

19    have enough supervisors.  Now, you have this guy

20    that never checked up on you before, is looking

21    for reasons to write you up, looking for reasons

22    to figure out why you are where you are.  Because

23    people would be written up for being out of

24    place.  And that threat was there every day.

JOHN GORMAN - June 15, 2016          46

```
 1   Q.   You indicated that you knew something about what
 2        Patricelli had done in the past and things that
 3        he had said to your sister.  What do you mean by
 4        that?
 5   A.   I know that when he got hired at the jail, he
 6        failed his first psych exam and he actually sued
 7        the jail.  And this is when they put in place the
 8        policy that once you fail your psych exam, you
 9        can't sue the jail.  You sign a document.  He's
10        the reason for that document.
11             I know for a fact that he was at a party and
12        I wasn't there, I was told by people that were
13        there that this was fact, Sergeant Dunham was a
14        good friend of mine at the time, that he was at a
15        party, and he got --
16   Q.   Sergeant Dunham told you this?
17   A.   Yes.  He got into a disagreement.  There's also
18        evidence to this that's been released in this
19        case to support it.  He left the party after he
20        had the disagreement with the co-worker.  He went
21        home and got his gun, went back to the bar and
22        put it up to that person's head and threatened
23        them.  He had his gun taken away and he was
24        suspended during the investigation.
```

1           So this is not a normal individual.  That is

2      not something I'd ever do or ever have done.  And

3      that was a fear, you know, this individual had

4      guns.  He was on the ESU team where he had access

5      to, you know, semiautomatic weapons or whatever

6      he wanted.  He carried a gun every day on his

7      special detail.

8           So there was to me a possibility of an

9      imminent threat from him, not to mention this was

10     a career I liked, I enjoyed, I was good at.  I

11     was on the job for two years.  I was put on a

12     special detail.  I was given the trust of the

13     keys which wasn't given to anybody else.  A

14     regular officer.  I repaired and, you know, was

15     in charge of computers.

16          These aren't things that anybody else did

17     and it meant a lot to me.  So my reputation and

18     my work ethic is that I don't want to be written

19     up, because that shows bad on your work, how you

20     do your job.  And here, this individual was

21     attacking my career and my future.  There was

22     nothing I could do about it.

23   Q.   All right.  So we're up to the workplace violence

24        incident in February, 2013.  Can you tell me what

1          happened then?

2     A.   I think you should -- I mean, prior to that, I

3          helped my sister move out.  You asked about other

4          incidents I can recall.  I just recalled I helped

5          her move out of her house at her request.  My

6          brother and I helped her find an apartment.

7               My parents and my brother and I paid for

8          that apartment, because when she left, she had

9          nothing, she took nothing, and she was out there

10         on her own.  She needed people to help her.  She

11         couldn't take her son with her because she was

12         threatened by Patricelli, because after she gave

13         birth, she had postpartum depression and she

14         sought help at Samaritan Hospital for a few days

15         and he used that against her.

16              His quote was no court would give a crazy

17         woman custody of a child.  And, you know, my

18         brother and I tried to encourage her to go to

19         family court and let them decide, that we felt he

20         was wrong.  So we supported my sister and, you

21         know, the more I supported her, the more events

22         and the more things happened at the jail.

23    Q.   At this time, was your brother still working at

24         the --

JOHN GORMAN - June 15, 2016        49

 1    A.    My brother worked midnights with the Sheriff's
 2          Department.  He was a deputy.  So I had no
 3          exposure to my brother at work nor did
 4          Patricelli.  My brother ultimately sought other
 5          employment with another department because
 6          Patricelli did make attempts to intervene on his
 7          career as well but, fortunately, he had
 8          supervisors that wouldn't allow that.
 9    Q.    Now, why don't you describe those attempts by
10          Patricelli to --
11    A.    I don't have details.  I just know what my
12          brother told me and that -- I can't recall his
13          supervisor's name at the moment.  Captain Pyle is
14          his name, made a statement to my brother and I
15          one day when I was preparing keys, because I did
16          keys for the correction facility.  I did keys for
17          Sergeant Mark St. Germain and all of the people
18          on the Sheriff's Department side as well.
19                 And he pulled us aside one day, I think I
20          was working overtime and he told us "don't worry,
21          I'll protect Mark the best I can.  He won't go
22          through what you're going through."
23    Q.    And because my brother worked midnights, he
24          wasn't able to paint my sister's apartment or fix

```
 1              as many things as he would have liked.  So his

 2              involvement was -- with her and setting her up in

 3              her apartment was not as much as mine.

 4       Q.     Okay.  Anything else up to the time -- up to the

 5              February, 2013 time frame?

 6       A.     I want to say there was an incident in January,

 7              but I don't recall if that was the key incident

 8              or what that was.  I don't recall.  I don't know.

 9              Do you have an incident report or anything?  I

10              feel like there was an incident report in

11              January.

12                  MR. SORSBY:  John, are there documents?

13                  MR. MARTIN:  Do you want to just take a look

14              at those and see if you want to refresh your

15              recollection? (Handing the witness)

16       A.     The west hall was in January, okay.

17                  MR. SORSBY:  Can we go off the record for a

18              moment?

19                  MR. MARTIN:  Sure.

20                  (Discussion off the record.)

21      BY MR. MARTIN:

22       Q.     So Mr. Gorman, you indicated that there was an

23              incident in the west hall and we've touched on

24              it.  But was there something else that you wanted
```

*JOHN GORMAN - June 15, 2016       51*

1          to add about what happened there?

2    A.   Yeah.  I reviewed the incident report and I

3          didn't remember all the details and Patricelli

4          talks about how "what's the matter, you can't say

5          hello anymore?"  And he was very aggressive about

6          the whole thing.

7               And you know, I said good morning but he

8          continued to be aggressive.  "What's wrong?

9          What's your problem?"

10              And you know, a correctional facility, if

11         somebody is aggressive and, for me, the best

12         thing was always to de-escalate, not escalate.

13         That's what we're taught.  And he was trying to

14         escalate.  He was trying to bait me.  And he just

15         kept saying "What's wrong with you?  You can't

16         answer me?  You don't like me anymore?"

17              You know, that whole rant went on, that

18         whole tirade went on with him until I finally,

19         you know, just walked away.  And Chris O'Connell

20         was right there in the hallway and that is a

21         video recorded area, as I testified to before.

22         That covers that.

23    Q.   Was there another incident prior to February 15,

24         2013 that you contend was in retaliation for the

1       relationship between Patricelli and your sister

2       breaking up?

3    A.   The next incident I can remember was

4       approximately February 8th where I was called

5       over to Jack Mahar's office.  When I got there, I

6       let Marcelle know I was there.  And she said,

7       "Well, just, you know, have a seat in the hallway

8       and we'll be with you."

9            And then the door opened and Ruth Vibert

10       came out, Chief Vibert came out.  I could see the

11       Sheriff was in the office.  And I was brought

12       into the office and I was told to sit down.  In

13       front of me was a blank incident report and the

14       Sheriff started asking me questions about what I

15       knew about what Ruth told me.

16            And I said, "I'm not sure what it is you're

17       asking."

18            "Well, Ruth told you stuff about Patricelli.

19       What did she tell you?"

20            I said, "She didn't tell me anything."

21            "She didn't tell you anything about

22       Patricelli's activities?"

23            I said, "I don't know what kinds of

24       activities you're talking about."

*JOHN GORMAN - June 15, 2016          53*

```
 1              He goes, he says to me, "I need you to write

 2         a statement about what Ruth told you about

 3         Patricelli."  And he kept leafing through this

 4         three-page document.  It looked like three and a

 5         half or two and a half pages.

 6    Q.   Was it typed or handwritten?

 7    A.   It was typed.

 8    Q.   Hold on a second.

 9              MR. SORSBY:  Let's go off the record.

10              (Discussion off the record.)

11              MR. MARTIN:  I have asked for another copy of

12         whatever it was they gave me.  Everything kind of

13         got put together so that I can't figure out what

14         is responsive to that paragraph 6.  It was

15         paragraph 6.

16              MR. SORSBY:  They did not give you -- as far

17         as you understand, they did not give you an

18         original, they gave you the copy of it?

19              MR. MARTIN:  Correct.

20              MR. SORSBY:  Good.  Because I don't want them

21         to be upset with you.

22              MR. MARTIN:  I may have lost -- I thought

23         that was it.  I asked for another one.  I'm

24         supposed to go up there and get it.
```

*JOHN GORMAN - June 15, 2016          54*

```
 1            MR. SORSBY:  That would be helpful before
 2        next week.
 3            MR. MARTIN:  Yeah, absolutely.
 4   BY MR. MARTIN:
 5    Q.   Okay.  Before we went off the record, we were
 6         talking about the Sheriff repeatedly asking you
 7         questions about what Ruth had told you about
 8         Patricelli.  Is that correct?
 9    A.   Yes.  And I asked him if he could give me some
10         kind of idea or if I could read the document he
11         had in front of him.  He said, "Well, I'm not
12         letting you read this."
13            And he said, "I want you to write a
14         statement."  And as I said, there was a blank
15         incident report turned over to the lined side.
16         The one that was in front of me had lines on the
17         back of it.  And he kept saying that he wanted me
18         to write a statement about what she told me about
19         his activities.
20            And I was in there for about 40 minutes and
21         he asked me pretty much the same question over
22         and over and over and over again.
23    Q.   Did you ever write anything for him?
24    A.   I told him I couldn't write anything for him
```

```
 1          because she didn't tell me anything.  The
 2          conversation that I had with Ruth Vibert at any
 3          time about Patricelli was involving my nephew and
 4          his struggles after Patricelli was arrested, that
 5          was it, and that she was sorry and that she hoped
 6          my family was doing okay.
 7               And I said respectfully, I appreciate her
 8          apology but that I would like to see personal
 9          stay personal and work business stay work
10          business and I thanked her.  But I didn't write
11          him a statement because she didn't tell me
12          anything.
13     Q.   And the conversation with Chief Vibert, that
14          occurred in the parking lot; is that correct?
15     A.   It occurred outside of the facility, not actually
16          in the parking lot.
17     Q.   Whereabouts?
18     A.   Probably in the courtyard.  There's an entrance
19          there and then there's an entrance in the side
20          and there's windows.  One of the windows used to
21          be Patricelli's office.  It was out in that
22          courtyard.  What I did tell the Sheriff is that
23          Ruth never discussed anything about any affairs
24          involving Patricelli and nor would I write any
```

*JOHN GORMAN - June 15, 2016*          56

```
 1            false statements that she did such.  I was

 2            dismissed and Ruth went back into the office and

 3            I went back to work.

 4       Q.   What happened next?

 5       A.   Approximately February 11th, I was called over to

 6            the Sheriff's Department, at which time I was

 7            told that I wasn't reachable on the correctional

 8            facility list, that I wouldn't be a provisional

 9            sergeant anymore.

10                 I told him that I hadn't seen the list yet

11            and he informed me that as soon as I was

12            reachable that I would be promoted, and I said

13            okay and that was it.

14       Q.   Do you know what your score was on the civil

15            service test at that time?

16       A.   Off the top of my head, I don't recall.

17       Q.   Would it refresh your recollection that you got

18            an 80?

19                 MR. SORSBY:  Perhaps, we should have him

20            refer to evidence, Mr. Martin.

21       A.   Yeah, I don't recall the exact grade.

22       Q.   Okay.  Sergeant Walraed, W-A-L-R-A-E-D, was

23            appointed in January?

24       A.   He was a provisional sergeant and he did not have
```

*JOHN GORMAN - June 15, 2016*          57

```
 1            the top score and he was promoted over the people

 2            that had the top scores.

 3     Q.     Is it within the Sheriff's prerogative to do

 4            that, do you know?

 5                 MR. SORSBY:  Objection as to form.

 6     A.     I'm not versed enough in Civil Service Law to

 7            answer that other than he's within his

 8            prerogative to reach anybody who's been a

 9            provisional sergeant at the time the exam came

10            out.

11     Q.     Do you know if he has to pick from among the top

12            three scores?

13     A.     Top three score brackets.  So you have -- if you

14            have a hundred, a 90 and an 85 or you have a 95,

15            85 and 80, you can pick one person from each

16            bracket.  It's not top grades.  That's my

17            understanding.

18     Q.     Okay.  And Eric Moran and David Galusky and

19            Justin Gecewicz received permanent sergeant

20            appointments in February.  Do you recall that?

21     A.     I recall that the first gentleman you mentioned

22            had the highest score.  The other two had 85s.

23            At that time, I was reachable.  You didn't

24            mention Jason Lucey's name.  His name was on
```

```
 1                list.  He was not an eligible employee but his
 2                name was on the list til June of that year.
 3       Q.   Why was he not eligible?
 4       A.   Because he gave notice of resignation on February
 5                1st, 2013.  I was told I was not reachable
 6                because of that individual.  And if you look at
 7                the evidence you guys submitted, the civil
 8                service list includes his name and not my name.
 9                    There's plenty of practices of civil service
10                lists called raking the list.  There's all kinds
11                of practices.  I'm not an expert, but I do know
12                the Sheriff has the ability to recommend anybody
13                for the job and the Civil Service Commission is
14                the ultimate person that hires the individual.
15       Q.   All right.  Were you removed from your position
16                as a provisional sergeant in February, 2013?
17       A.   On February 15th, 2013.
18       Q.   What was the reason for that, to your
19                understanding?
20       A.   Per the conversation we just had from the Sheriff
21                that I wasn't reachable on the civil service
22                list, I assume, in his opinion.
23       Q.   Was there any sort of expiration on how long
24                people can be provisional sergeants?
```

1    A.   I believe it's one year or until the next exam

2         comes out.  The next exam has to be within one

3         year of that appointment.

4    Q.   How long had you been a provisional sergeant?

5    A.   About 10 months without incident.  Good job.

6         Great evaluations as you've read.  I would like

7         to point out that one of the individuals we

8         mentioned is the undersheriff's stepson who got

9         promoted.

10   Q.   Which one?

11   A.   Galusky.  You're looking at the initial list

12        would have all those names.  If you look at the

13        other list where they promoted Gecewicz from, it

14        does not include any of the other grades.  It

15        only includes three individuals and one of those

16        individuals was not eligible to be on that list.

17        It should have included the other grades, the

18        other 80s.

19   Q.   Is it your contention in this suit that you were

20        eligible to be selected for the February 15

21        sergeant appointments of which there were three?

22   A.   I don't know what three there were and I'm not

23        looking at the list.

24             MR. MARTIN:  We can mark that as an exhibit,

*JOHN GORMAN - June 15, 2016        60*

```
 1              if you like.
 2                   (Defendant's Exhibit A was marked for
 3              identification.)
 4    BY MR. MARTIN:
 5      Q.   I'm showing you what we've marked as Defendant's
 6           Exhibit A, and I believe that's the civil service
 7           list for the February 15 appointment to sergeant,
 8           and I believe we turned this over in discovery.
 9                And my question was:  Is it your contention
10           that you were eligible to be appointed off of
11           this list?
12      A.   And my answer is that to start, to begin with,
13           Jason Lucey, a 90, this list was put out on
14           February 5th, 2013.  As of February 1st, 2013, he
15           was no longer an eligible individual.  You have
16           Justin Walraed scored an 85.  It's not the
17           highest grade there.  He was appointed January
18           17th because he was already a provisional
19           sergeant.
20                It is my contention because I was already a
21           provisional sergeant that it was well within the
22           Sheriff's right and I was reachable, because you
23           have a 95, an 85 and I got an 80 according to
24           you, which I can look at my grade on here, I got
```

JOHN GORMAN - June 15, 2016          61

```
 1              an 80, that I was reachable on that list.

 2                   And supporting that, the reason showing that

 3              the Sheriff chose somebody first off the list who

 4              has an 85, not the highest grade, was a

 5              provisional sergeant and was the first promoted

 6              speaks to me also having that ability if he chose

 7              to.

 8                   So I believe yes, I was reachable.

 9      Q.      Okay.  And is it your contention in this lawsuit

10              that Sheriff Mahar selected the three individuals

11              that are indicated on Exhibit A, which would be

12              Mr. Moran, Mr. Galusky and Mr. Walraed ahead of

13              you for some improper reason?

14      A.      Your question was the February 15th appointment.

15              Walraed was already promoted at that time a month

16              prior.  So you asked -- there's two individuals.

17      Q.      Okay.

18      A.      So you're asking me if I feel that --

19      Q.      If any of those three were selected over you for

20              an improper reason.

21      A.      Yes, I do.

22      Q.      What is the reason?

23      A.      First of all, David Galusky is a relative of the

24              undersheriff.  And secondly, I believe it is a
```

```
 1            retaliation for my actions against Patricelli up
 2            to that date.
 3     Q.     What actions had you taken against Patricelli up
 4            to that date?
 5     A.     I verbally reported every single incident that he
 6            did to my supervisors and since the, you know,
 7            administration had weekly meetings about what was
 8            going on in the facility; that, and that
 9            Patricelli had written a formal complaint just
10            days prior against Ruth involving me and I
11            wouldn't write the formal -- the official
12            statement that Ruth had done something wrong,
13            that it was in retaliation that I was demoted.
14     Q.     Were you aware that Justin, I'm going to spell
15            it, G-E-C-E-W-I-C-Z, was appointed sergeant on
16            March 1, 2013?
17     A.     Yes, I was.
18     Q.     And is it your contention in this lawsuit that
19            that was an improper appointment by the Sheriff?
20     A.     Again, what was his score?  He got an 85.  Now,
21            you don't have a 95, you don't have a 90.  Now,
22            you have an 85.  He chose -- if you can show me
23            the list from that appointment, he chose from
24            what people?
```

 1              He also told me during the meeting that as

 2         soon as I was reachable, I would be promoted.

 3         Now, you have a month later.

 4              MR. MARTIN:  All right.  We can mark another

 5         exhibit, I guess.

 6              (Defendant's Exhibit B was marked for

 7         identification.)

 8    BY MR. MARTIN:

 9    Q.   I show you Exhibit B and I'll suggest to you that

10         that was the civil service list for the March 1

11         appointment.

12    A.   So my first question is why isn't -- why is Jason

13         Lucey a month after he resigned still on the list

14         and why does my name not appear there?  I think

15         that my name was intentionally left off.

16              The process that I understand by going to

17         civil service meetings and filing letters with

18         them, as you know, that the Sheriff requests the

19         individuals he wants.  If he wants the 90s and

20         the 85s, then that's what they give him.  There's

21         no 80s on here.  Why isn't my name on this list?

22              So my contention is yes, that this promotion

23         was intentionally -- I forget the word you

24         used -- improper and that I was left off the

```
 1           civil service list.  Somebody's ineligible to be

 2           on the list because they resigned from your own

 3           document that you turned over to us and my name

 4           doesn't even appear.  So you're choosing somebody

 5           from one grade, two people from the 85 bracket.

 6           You're not even choosing from the top three.

 7     Q.    How do you respond to the fact that all of the

 8           individuals selected had higher scores than you?

 9     A.    Being appointed to a civil service job is not

10           about highest grade.  If that was the case, you

11           wouldn't do grade brackets, right?  Top three

12           grades, top three individuals, top -- an 80, I

13           would be -- it would be Justin Gecewicz, Edward

14           Geran and could be John Gorman or any one of the

15           80s, but you don't have that here.

16                 You have someone here named Jason Lucey

17           who's no longer an employee of the Sheriff's

18           Department.  He works for Troy Fire.

19                 So if you're going to call civil service a

20           fair system, just put Justin Gecewicz's name on

21           the list, say that's who you wanted and who cares

22           who else, what their scores are.

23     Q.    You have not brought a claim against the civil

24           service of Rensselaer County for having erred on
```

JOHN GORMAN - June 15, 2016          65

```
 1            their list?
 2      A.    I certainly wrote letters and presented the
 3            evidence that I had at the time.  But at the
 4            time, I did not have the evidence that has come
 5            out in this lawsuit.  So Mr. Goldberger was
 6            allowed to spin whatever reasons for the
 7            promotions that he did.
 8      Q.    All right.  We're up to February 15th and you
 9            allege in the complaint that on that day,
10            Defendant Patricelli called the Sheriff's office
11            to obtain your home phone number?
12      A.    Yes.
13      Q.    How do you know that?
14      A.    There is an incident report and I'm not sure if
15            it's been put into evidence or not.  It was
16            provided by you, your clients, written by Ed --
17            well, it was written by Lieutenant Beaudry, sent
18            to Ruth Vibert, the chief at the time, and
19            written by one of the sergeants who answered the
20            phone.
21                 And according to the written statement from
22            this individual, I can't recall his name but it
23            came from Lieutenant Beaudry that Patricelli
24            called the jail and asked for my home phone
```

1              number and it was given out.

2    Q.   And did Patricelli call you on that day?

3    A.   Yes, he did.

4    Q.   All right.  And where were you when you received

5         that call?

6    A.   Actually, my wife answered the phone.  I was in

7         the kitchen making dinner and she told me he was

8         on the phone.

9    Q.   So this was in the evening?

10   A.   It was -- again, I wrote it all out.  So if you

11        want me to review the document, I will.  But it

12        was around 6:00 o'clock.

13   Q.   Okay.  Do you know what phone Patricelli used to

14        call you?

15   A.   I have caller ID so I wrote down the phone

16        number.  I was able to retrieve it when I got

17        done with the phone call and I believe I talked

18        to my sister later the next day and she told me

19        it was his Sheriff's Department-issued cellphone.

20   Q.   And you filled out a number of documents

21        regarding what was said which, from memory, what

22        did Patricelli say to you and what did you say to

23        him?

24   A.   I filled out one document and that was dated

1              February 25th, 2013 of the incident report from

2              February 15th of 2013 and it involved lots of

3              details, typewritten report.

4                   When I got off the phone, I wrote down

5              everything that he told me.  He was also yelling

6              and upset my wife who was standing next to me and

7              could hear everything he said as well.

8        Q.   Did you retain your notes?

9        A.   I believe I have my notes on a yellow legal pad

10             from that.

11       Q.   Could you turn those over to your attorney,

12             please?

13                  MR. SORSBY:  Well, hold on, Mr. Martin.  Are

14             you going to just furnish a demand so that we can

15             give those documents to you?

16                  MR. MARTIN:  Yes.

17       A.   We mentioned this in the 50-H hearing and you

18             know...

19       Q.   That's true.  All right.

20                  MR. SORSBY:  So just --

21       A.   I can do a lot from memory to answer your

22             questions, but if you want me to do every

23             specific thing that's in that typewritten thing,

24             I would need to see the document.

1    Q.   No, I don't need that.

2    A.   I know he started off with saying, "I heard you

3         been talking shit about me.  Do you know where

4         your sister is?"

5              And again, this is not in order that it's

6         typed in.  "Do you know where your sister is?"

7              I said, "I really don't know."

8              He said, "I took your stripes.  Now, I'm

9         going to take your job.  Everything you have down

10        there is because of me and, now, I'm going to

11        take it away."

12             I'm giving you the basic things I can

13        remember from my memory.  He was very angry.  He

14        started talking about Peter Colantonio and how he

15        had felonies and that my sister was in Florida.

16             I said, you know, "I don't understand why

17        you're calling me.  Call my sister.  Why are you

18        calling me to threaten me?"

19             "I'm not threatening you."

20             I said, "You are threatening me."

21             He said, "Well, it's my job to make sure

22        that people do their job in the correctional

23        facility."

24             I said, "What are you talking about?"

1           He goes "People like Hal Smith, they don't

2           do their job.  It's my job to make sure that he

3           does his job as Captain Smith."  He said, "You

4           betrayed me.  I'm angry.  You need to pay.  I'm

5           going -- you and your brother, everything you

6           have down there is because of me and I'm going to

7           take it."

8     Q.   Was there something that set him off to all of a

9           sudden call you like this, do you know?

10    A.   I know that my sister went to Florida to visit

11          Peter Colantonio.  My sister is older than me.

12          My sister can go where she wants.  She certainly

13          doesn't need my permission.  But Patricelli

14          couldn't call her, because she wasn't answering

15          her phone.

16    Q.   Okay.

17    A.   And he called me because he could get to me to

18          get to her, because he knows that -- he knew that

19          I'd be upset enough, concerned enough to reach

20          out to her.  So he was using me to get to her

21          along with all the threats.

22    Q.   Did you do that?

23    A.   Did I eventually talk to my sister?

24    Q.   Yes.

1    A.   Yes.

2    Q.   What did you tell her?

3    A.   All the stuff we just talked about.

4    Q.   And what was her response?

5    A.   That -- I'm trying to remember.  That it was his

6         problem.  That he created this problem.  That he

7         shouldn't be bothering me, he shouldn't be

8         threatening me.  That he's got to live with what

9         he did and he needs to leave me alone.  That was

10        always her thing.  He needs to leave me alone.

11        He needs to stop bothering me because he can't

12        have her.

13   Q.   Where was the son at this time?

14   A.   As I said before, he was with Patricelli, because

15        he threatened my sister because she had

16        postpartum depression and she had spent time -- a

17        short period of time at Samaritan Hospital Psych

18        to get treatment for postpartum depression.

19             When she got pregnant -- she didn't want to

20        get pregnant, he wanted a kid.  And then once she

21        gave birth, he didn't want the kid.  He didn't

22        want to help.  So she was trying to raise a child

23        by herself.  And that's one of the few times when

24        she would call for help, I would go, because you

```
 1            need help raising a child.  You can't do it by
 2            yourself.
 3     Q.     To your knowledge, was there a family court
 4            action started over custody?
 5     A.     No.
 6     Q.     Okay.
 7     A.     Not to my knowledge.
 8     Q.     And as a result of the phone call, did you file a
 9            criminal complaint against Patricelli with the
10            State Police?
11     A.     Well, first, I called my supervisor who was
12            Sergeant Scott Dunham.
13     Q.     Did you do it that night?
14     A.     That very night, as soon as I was done talking
15            and I was writing stuff down while I was dialing
16            his number.  I let him know what happened and he
17            said he felt it was serious enough for me to call
18            the Chief.  And he said I'll -- I said, "I don't
19            have the number."
20                He said, "I'll get the number from
21            Lieutenant Beaudry and call you back."
22     Q.     And you're talking about Ruth, right, the Chief?
23     A.     Yes, Chief Vibert.  So he called me back a few
24            minutes later with Chief Ruth Vibert's number and
```

*JOHN GORMAN - June 15, 2016          72*

```
 1                 I called her and let her know what had happened.
 2                       And she said, "Well, hold on.  Let me call
 3                 the Sheriff and get back to you."
 4      Q.    Did she do that?
 5      A.    Yes, she did.
 6      Q.    And what did she say?
 7      A.    She said that the Sheriff doesn't want to hear
 8                 about it, he feels it's not work related, "I
 9                 can't advise you what to do.  You have to do
10                 what's best for your family."
11                       I should say in the first phone call that I
12                 had talked to her, she asked me if I was okay.  I
13                 said no.  She asked me if my family was okay.  I
14                 said, well, he had threatened if he had a big
15                 enough fucking problem with me to come over there
16                 and break my jaw.
17                       I think I forgot to mention that.  There
18                 were physical threats involved in that phone call
19                 which is what led her to call the Sheriff,
20                 because she felt it was workplace violence.  He
21                 wanted nothing to do with it.
22      Q.    Who didn't want anything to do with it?
23      A.    The Sheriff per Ruth Vibert.  He wanted nothing
24                 to do with it; it was not work related and she
```

1                was not to help me.

2    Q.   Ruth told you the Sheriff said not to help you?

3    A.   I'm sorry?

4    Q.   Ruth Vibert told you specifically that the

5              Sheriff --

6    A.   Not to get involved, that it had nothing to do

7              with them and not to get involved.  She said to

8              me, "John, I can't help you.  I'm being told by

9              the Sheriff that I can't get involved."

10   Q.   And what did you do next?

11   A.   I called my brother to find out what I should do.

12             You know, I figure he has a lot of experience in

13             law enforcement and I was pretty upset, I was

14             pretty shaken.

15             He felt I should go to either call the

16             police or go to the barracks, trooper barracks,

17             because where I live, it's the Sheriff's

18             Department or it's the state troopers.  And the

19             last thing I want to do is call my own department

20             to handle the situation.

21             So I also didn't want to call the police and

22             have the troopers come to my house where my young

23             children are and upset them.  I want them to see

24             the police as someone they can go get help from,

JOHN GORMAN - June 15, 2016          74

 1          not workplace violence issues.

 2                So I waited until I could go to the state

 3          trooper barracks personally and then I did.  I

 4          went there and I talked to the trooper about what

 5          had happened.

 6     Q.   We've seen those documents as well in prior

 7          depositions.  There was a summons issued;

 8          correct?

 9     A.   Initially, I went there and made a complaint.  I

10          was still concerned at this point about being

11          promoted.  I was told by Jack Mahar, the Sheriff

12          of Rensselaer County, and when -- at least in my

13          life, when I give somebody my word that as soon

14          as you're reachable, you'll be promoted, it means

15          something.  I don't tell people they'll be

16          promoted and then never do it.

17                So I was still concerned that even though

18          this happened, I still wanted to have a career at

19          the Sheriff's Department.  But at the same time,

20          I had to weigh the options for my family.  So I

21          initially filed a complaint and then changed it

22          to a criminal complaint after I had really

23          thought about what I was going to do.

24     Q.   So how much time passed between filing the

```
 1            complaint and changing it to the criminal

 2            complaint?

 3     A.     Less than 24 hours.  I also thought when I went

 4            to work the next day that somebody would be there

 5            to talk about it because --

 6     Q.     Did that happen?

 7     A.     No.  Because what I knew about the workplace

 8            violence policy, because we're trained on a

 9            yearly basis for workplace violence, sexual

10            harassment and all of that as correctional

11            officers and as Rensselaer County employees, that

12            this fell under workplace violence.

13                 So I felt that somebody administration-wise

14            would be there and nobody was there.  Nobody was

15            there to talk to me.  Nobody was there to help.

16            There was no one to go to.

17                 I was working in a correctional facility

18            where everybody knew what happened, because the

19            trooper had called the watch commander and let

20            that person know what happened and they told

21            everybody in the facility.  So it was really kind

22            of a hostile situation.  And I didn't know if

23            Patricelli would show up at work either.

24     Q.     Did he?
```

*JOHN GORMAN - June 15, 2016        76*

```
1    A.   Not that day, no.

2    Q.   We're talking about Trooper Hock; correct?

3    A.   I'm sorry?

4    Q.   We're talking about Trooper Hock?

5    A.   The trooper that I talked to?

6    Q.   Yes.

7    A.   Yes, Trooper Hock.

8    Q.   She's the one that called the facility?

9    A.   Yes.

10   Q.   What happened next?

11   A.   What happened next?  I wrote the workplace

12        violence complaint.

13   Q.   I forgot the date of that.

14   A.   February 25th.

15   Q.   The 25th, right.

16   A.   I believe I met with Ruth Vibert and I don't know

17        all the details.  The Monday -- that happened on

18        a Friday.  I worked Saturday and Sunday.  No

19        administration, no nothing, nobody came to work.

20        I mean, you just saw on the news workplace

21        violence, went to work and shot people.  Who's to

22        say that broken jaw couldn't have happened?

23             We have an individual I testified to already

24        who had physical violent actions, you know, went
```

 1          to a bar with a gun.  That Monday was a holiday,

 2          so there was no administration there either.

 3              So when Ruth Vibert came in on that Tuesday,

 4          and I don't know what the date is, I know that I

 5          met with her and we talked about it and we looked

 6          at the workplace violence documentation and that

 7          she reached out to the Sheriff again to discuss

 8          the issue.

 9              And from what I can remember, she told me

10          that she was not to get involved.  So feeling

11          like I had no other option but to follow

12          Rensselaer County policy, I did the workplace

13          violence complaint.  And that's the reason for

14          the February 25th date.

15    Q.    And you helped to support the complaint form with

16          incident reports; correct?

17    A.    Hold on a second.

18              THE WITNESS:  Oh, that's the meeting I'm

19          talking about. (Directing to Mr. Sorsby)

20              MR. MARTIN:  Which paragraph are you looking

21          at?

22              MR. SORSBY:  We're looking at paragraph 81 of

23          the complaint regarding the facts and

24          circumstances regarding the meeting with Chief

*JOHN GORMAN - June 15, 2016        78*

1          Vibert.

2               You want to take a quick second to take a

3          look at that?

4     A.   Sure.  The date was February 19th.  I sat down --

5          I submitted a detailed report to the Chief.  Oh,

6          I remember now.  Initially, this typed report

7          that you see that's dated February 15 was just an

8          incident report of what happened.  It did not

9          become a workplace violence complaint.  It was an

10         informative thing for the administration to let

11         them know what had happened, what took place in

12         the phone call.

13              When nothing was done, when nobody would

14         help, that's when I did the workplace violence

15         complaint aspect of that.  I was trying to act

16         not unlike the chain of command where I did

17         things verbally.  I did things in writing.  I did

18         things that they could handle situations or

19         de-escalate the situations without having to get

20         formally involved.

21              So when I made it a workplace violence

22         complaint, now, that was a formal complaint.

23         Does that make sense?

24    Q.   Yes.

1    A.    So that was my course of action, my thinking of

2          why I did what I did.

3    Q.    Okay.

4    A.    I was trying to be a good employee and a team

5          player but also protect my family and myself.

6    Q.    I forgot if you sought a restraining order at any

7          time from the local court, the Schaghticoke

8          Court, when you went to file a criminal

9          complaint.

10   A.    I did ask for what would justify getting an Order

11         of Protection.  And I actually got phone calls

12         after that from District Attorney McNally at that

13         time and I was actually requested to go see him

14         at his office.  I believe that was March 7th.

15         And I did go see him and I met with him.

16              But at that time, an Order of Protection

17         still had not been issued and Patricelli still

18         had not been arraigned at that time.  And the

19         Order of Protection was issued after that

20         conversation and it was on his advice that he

21         felt it was warranted and that the case would be

22         pursued aggressively.

23   Q.    Okay.  The complaint indicates that you filed a

24         workplace complaint with Captain Hal Smith and

```
 1           Chief Ruth Vibert?

 2    A.   I gave the report to --

 3    Q.   Was it just copies to those two and then the main

 4         one went to Tom Hendry?

 5    A.   I gave a copy in a manila envelope.  I was

 6         looking to the Chief.  She wasn't in yet.  So I

 7         sought out Captain Hal Smith and I gave it to him

 8         and I said, "Can you please see that this got to

 9         Chief Vibert?"

10           He opened it up.  He asked what it was.  I

11         said it was a workplace violence complaint.  He

12         said, "I'll see that she gets it."

13           He came back 30 minutes later and said, "I

14         need an original and I want to know who else has

15         copies and what other copies exist."

16    Q.   What did you tell him?

17    A.   I told him I have a copy here that I'm going to

18         deliver after work to Tom Hendry and I have a

19         copy at home and I have the original on my

20         computer.  So they're all copies when you type

21         them on your computer so...

22    Q.   All right.  What did Hendry say in response to

23         that?

24    A.   He said "okay".
```

```
1    Q.   About a week after you met with Ruth on that

2         Tuesday, which I believe would be the 20th of

3         February, don't quote me here --

4    A.   I met with Ruth on the 19th.

5    Q.   The 19th, okay.  So your complaint indicates that

6         Ruth was terminated from her employment on the

7         27th, eight days later.  And do you believe her

8         termination was related to your situation?

9    A.   I was told by Ruth -- I was working in

10        visitation.  She came in and said to me, she

11        goes, "No matter what they tell you, this is not

12        your fault."  And she told me that she was being

13        terminated because she would not let the

14        workplace violence complaint go, that she was

15        fighting to get the Sheriff to read it, to look

16        at it, to do something about it; that she had met

17        with the undersheriff and he said he was going to

18        do something about it and that her termination

19        was because of that.

20             I can't testify to what I believe.  I can

21        testify to what she told me.

22             (Pause in proceedings.)

23   A.   It was very upsetting to --

24   Q.   She had a meeting with the Sheriff when she was
```

1              terminated; correct?

2       A.    She received a letter from what I was told.

3       Q.    Okay.  There was an incident that she testified

4              to regarding a request by the Sheriff to destroy

5              documents.  Did she tell you about that?

6       A.    She told me about it.  I also read about it and

7              I've also heard recordings of Marcelle saying she

8              heard the Sheriff say it.

9       Q.    All right.  And what did she tell you?

10      A.    She told me that she went over there with a

11             manila envelope that I gave Hal Smith with my

12             name on it clearly saying workplace violence and

13             that he yelled and screamed at her; that she

14             tried to see him multiple times; that she -- that

15             he told her to shred it, burn it, throw it out,

16             tear it up, "I don't care what you do with it, I

17             don't want to see it, I want nothing to do with

18             it, it doesn't belong in this place."  And that's

19             very upsetting and very stressful.

20                 Here, you're trying to do the right thing.

21             You're letting your supervisors know of all these

22             actions.  You're doing things what you think is

23             right according to policy.  You file a workplace

24             violence complaint and nobody would even read it.

1          You know, we haven't gotten there yet, but

2     even Tom Hendry, he didn't call me up for an

3     interview.  I had to call him three times to ask

4     to be interviewed.

5          If you receive a workplace violence

6     complaint, according to policy, it's supposed to

7     be immediately and swiftly and fairly dealt with.

8     I don't believe the administration, the County,

9     Jack Mahar, anybody actually did what they,

10    according to their own policy, was supposed to

11    do.

12         At the very least, you shouldn't destroy it.

13    I don't know about you, but I always open my mail

14    before I tear it up and throw it out.  So why

15    wouldn't Jack Mahar take a manila envelope that

16    the Chief of Corrections is trying to show him

17    and at least look at it before he tries to shred

18    it and rip it up?

19  Q.   You said you heard a recording of Marcelle saying

20       that she had overheard these statements?

21  A.   Yes.

22  Q.   What recording is that?

23  A.   I received a recording from Jimmy Karam of a

24       conversation he had with Marcelle Swanberry where

1    she clearly states lots of negative stuff about

2    Patricelli and the kind of person that he is and

3    that -- from my memory, I'm saying this -- and

4    that it clearly states that she heard Jack Mahar

5    tell Ruth Vibert to shred those documents.  I

6    haven't listened to the recording in a couple of

7    months.

8         MR. SORSBY:  Mr. Martin, we're going to seek

9    to have that tape transcribed and we'll have Mr.

10   Karam attest to it so we can have it in the record

11   hopefully by next week.

12   Q.  In your complaint, you indicate that at this

13   point with Ruth losing her position, you had

14   additional stress.

15        Did you begin treating at all at this time

16   in -- I guess we're around February and March,

17   2013.

18   A.  Treating for what?

19   Q.  Mental health issues, stress.

20   A.  I never had a mental health issue.  So how would

21   I know what a mental health issue is?  I'm not a

22   trained mental health professional.  All I know

23   is that starting in October, life became very

24   different working than what it was.

```
 1              Slowly, my hands started shaking.  I thought
 2         maybe because I skipped meals, I was working
 3         16-hour days, I wasn't eating proper.  I would
 4         always go work out.  I'm not eating enough
 5         compared to the calories I'm burning.  I started
 6         getting a heavy chest feeling.  I went to medical
 7         to have my blood pressure taken and they said it
 8         was high.
 9              On my day off, I went to my general
10         practitioner, had my blood pressure checked.  He
11         said it's a little high but, you know, it's okay.
12         There's stress and then there's stress over 10
13         months that turns into something.  And it was
14         very stressful to know that my actions --
15              MR. SORSBY:  I think, perhaps, maybe at
16         12:30, we'll take -- we should take lunch.
17    A.    (Continuing) -- my actions caused Ruth to lose
18         her job.  Because Ruth was a good boss.  She was
19         fair.  She listened to everybody in that
20         correctional facility.  She made improvements at
21         the correctional facility.  She listened to the
22         inmates in an appropriate manner which made the
23         officers job easier.
24              Overall, Ruth did a good job.  I'm not
```

1        saying that because Ruth and I became friends and

2        all, because we didn't.  We always kept a

3        professional relationship.  She did a good job.

4        Because we went years without a Chief of

5        Corrections or colonel or whatever you want to

6        call them.

7   Q.   Okay.  We've already chatted about the Order of

8        Protection that you sought through the Criminal

9        Justice System, but you also wrote a letter to

10       Tom Hendry also asking for protection from

11       Patricelli.  Do you recall that, a certified

12       letter?

13  A.   I don't recall off the top of my head.

14  Q.   Take a look at paragraph 88.

15  A.   Yes.  This was a letter that included again the

16       workplace violence complaint and asking for an

17       Order of Protection -- oh, an application for an

18       Order of Protection, yes.  I did that because

19       still at this point, I had not been given an

20       interview or been told a workplace violence

21       investigation was being done.  And I sent -- I

22       hand-delivered this to his office to Tom Hendry

23       personally, the workplace violence complaint.

24  Q.   All right.  We're talking about Exhibit 54.

*JOHN GORMAN - June 15, 2016*        87

1    A.   I hand-delivered that and March 4th, I still
2         haven't been interviewed.  Now, I'm sending
3         another letter.  This was February 25th.  I
4         delivered that the same day to Tom Hendry and I
5         still -- I mean, that's not a quick response.  I
6         mean, why didn't he call me?  Why didn't he
7         investigate it?
8    Q.   Okay.  The documents speak for themselves.  I
9         don't usually go over those again.  What happened
10        in response to the March 4 letter to Hendry?
11        What did he do?
12   A.   Nothing.
13   Q.   You didn't hear from him?
14   A.   No.
15   Q.   Did anybody else call, his agent or on his
16        behalf?
17   A.   Not that I remember.  I mean, I received calls
18        from people like Chris Meyer, but I don't know
19        when that -- I think that was later in March.
20        But at this point, I'm at my what Tom Hendry
21        would call a letter-writing frenzy.  I just see
22        that I'm letting people know that I filed a
23        workplace violence complaint and nobody's doing
24        anything about it.

JOHN GORMAN - June 15, 2016          88

1     Q.    Okay.  And in your complaint which we're looking

2           at, paragraphs 88 through 90, those all refer to

3           the same letter; correct?

4     A.    That's correct.

5     Q.    Okay.  There weren't separate letters, different

6           letters to these three --

7     A.    To each individual, no.

8     Q.    Okay.  What did Patricelli do in response to all

9           these incidents and the criminal charges at work?

10    A.    The following of the cameras and calls to Rankin

11          and all that escalated.  That's when the more

12          cafeteria visits, more unit visits.  I mean, I've

13          never seen him on a housing unit.  Now that I'm

14          an officer on a housing unit, now he was showing

15          up.

16               And initially, I was given what's called a

17          program detail so I could still do keys and

18          things like that.  So I made my way around the

19          jail a lot doing breaks and he would show up on a

20          housing unit and he never did that, he never went

21          to a housing unit.  When he wanted to interview

22          an inmate, he would call up the officer that he

23          trusted usually Sergeant Maselli and that

24          sergeant would bring the inmate to the watch

1        commander's office or out to his office.  He

2        never went in the facility.

3              Now, every day, he was in the facility that

4        I was working.  Now, was he in the facility when

5        I wasn't working?  I can't speak to that.  But he

6        was there every day where I was, smiling, shaking

7        his head or just his mere presence where he

8        wasn't before.

9              In the correctional facility, you don't go

10       on a housing unit unless you need to when you're

11       a sergeant, because you disrupt the flow, you

12       undermine the authority of the person running

13       that housing unit.

14             He also gave -- I just thought of something.

15       Sorry.  He also gave inmates phone calls for

16       giving him information.  So when he would come on

17       a housing unit, he would disrupt everything

18       because he'd have 10 people go up to him wanting

19       to give information to get phone calls.  Now,

20       your flow and your quiet --

21   Q.  Was that related to you or was that part of his

22       gang, the phone calls thing?

23   A.  The phone calls thing was related to his --

24       whatever his judgment.  But showing up on my

```
 1              housing unit and making it noisy and disrupting

 2              the -- when you're trying to serve meals to 65

 3              people, you're now creating a security issue.

 4              And why did he do that on my shift?  Why was he

 5              there on my housing unit?  There's 12 others.

 6     Q.   The information they were giving wasn't

 7          information about you?

 8     A.   No, no.  It's unrelated.  Maybe not even real.

 9          Just to get a phone call.

10     Q.   All right.  Maybe we can just -- on March 14th,

11          you filed a criminal complaint with Troy.  What

12          happened with that?

13     A.   Nothing.  Because unbeknownst to me, Patricelli

14          worked a lot of overtime with the task force

15          which he eventually was kicked off of because he

16          put in for overtime he was not entitled to.  And

17          this is in documentation and a phone recording

18          from Marcelle that shows that he put in in one

19          week, one pay period, enough overtime for the

20          whole program.

21              So he was putting in for overtime.  And I

22          think you released documents from a personnel

23          file that said that he put in for overtime he

24          didn't actually work.
```

```
 1              So the guy that took my report was one of

 2         the people from the task force.  So I was told

 3         that it didn't rise to the level of the law and

 4         the thing that I was seeking was some kind of

 5         charges involving the other threats and actions

 6         within the correctional facility.  Captain

 7         Strang-er (phonetic) was his name.

 8              And what I didn't realize, because I'm not

 9         up on everything, is that Jack Mahar and Pat

10         Russo worked for Troy and they were partners.  I

11         didn't know all that.

12    Q.   You finally received a letter dated March 27th

13         from Tom Hendry indicating that the claims were

14         too difficult to substantiate and between the

15         time you filed the complaint, workplace violence

16         complaint, and March 27th, had you spoken to Tom

17         Hendry at all?

18    A.   Not only during the interview where we previously

19         heard testimony that he took no notes, I called

20         him multiple times and I do have voicemail that

21         we can introduce evidence, if Patrick wants to,

22         asking him, you know, did you interview this

23         person?

24              I told him everything the first day I went
```

1           about everything that happened, all the

2           individuals that had been involved and everything

3           that had taken place.  And according to as you

4           just read, there were too difficult to

5           substantiate.  Needless to say, I wasn't happy

6           with those findings.

7     Q.    And you appealed, correct?

8     A.    There is no appeal process.

9     Q.    You went and complained to the Labor Department.

10          Was that the next action with respect to

11          Hendry's --

12    A.    I did, because the workplace violence policy and

13          law, if you want to call it that, is dictated by

14          the Labor Department.  I did some research and

15          some homework and figured it out.  So I filed a

16          complaint with the Labor Department.

17    Q.    Okay.  Which was founded, if I remember

18          correctly?

19    A.    Founded that Tom Hendry did an improper

20          investigation by not interviewing all the parties

21          and, to this date, all the parties aren't

22          interviewed.

23    Q.    Okay.  Who hasn't been interviewed that should

24          be?

1    A.   To this date?

2    Q.   To this date.

3    A.   They've never interviewed Ruth Vibert.  They say

4         they didn't interview Ruth Vibert because she

5         filed a lawsuit.  The lawsuit was filed way after

6         my workplace violence complaint was filed.

7              So if they had interviewed her immediately

8         prior to March 25th when -- or March 27th when he

9         made his findings, she wasn't suing the jail at

10        that time.  So why wasn't she -- she was directly

11        involved in the situation.  Why wasn't she

12        interviewed?

13   Q.   Anybody else they didn't interview?

14   A.   The Labor Department found her and Jeff Rankin

15        not to be interviewed.

16   Q.   Okay.  Anyone else from your perspective?

17   A.   From my knowledge, no.

18   Q.   You reported to Bill Webster that Patricelli had

19        used the e-Justice system to do the background

20        check --

21   A.   Yes, I did.

22   Q.   -- of Mr. Colantonio?

23   A.   Yes.

24   Q.   How did you find out he had done that?

*JOHN GORMAN - June 15, 2016          94*

```
 1    A.   If you recall, we went over the workplace

 2         violence claim, the February 15th, 2013 phone

 3         call, he tells me he did it.

 4              He says, "Do you know where your sister is?

 5         She's with Peter Colantonio.  Do you know what he

 6         did?"

 7              I'm like "no".

 8              "Well, he has a warrant."

 9              "Well, how do you know he has a warrant?"

10              "Well, I checked up on him."

11              So I went to Wendy Vega who is a

12         classification officer.  I said, you know, "You

13         don't have to do this and if it's breaking any

14         rule, please tell me."  I wasn't a sergeant at

15         the time, I was just an officer.  I said, "I'd

16         like to know did Patricelli ask you, if you can

17         tell me, did he ask you to run Peter Colantonio's

18         name?"  And she said yes.

19    Q.   She actually had misgivings about it when he

20         asked her, didn't she, Wendy?

21    A.   I don't know.

22    Q.   She never expressed that to you?

23    A.   We didn't talk about that.

24    Q.   Okay.  And what did you do with the information
```

*JOHN GORMAN - June 15, 2016        95*

```
 1              that you had received from Wendy?
 2     A.    As you said, I talked to Billy Webster and I
 3              believe my brother went with me because I knew
 4              Billy Webster, but I didn't know who was in
 5              charge of e-Justice, my brother did, so he did an
 6              investigation.
 7     Q.    Okay.
 8     A.    Do you want me to go on with that, what I know
 9              about that investigation, or no?
10     Q.    I've forgotten if -- was Patricelli suspended
11              from work as a result of the e-Justice issue?
12     A.    Not until mid-June of 2013, if I have the year
13              correct.  I believe it's 2013.
14     Q.    All right.  You don't happen to recall the date
15              he was charged with using the e-Justice system?
16     A.    I do not.
17     Q.    I'm trying to remember how long the investigation
18              was that Webster did.
19     A.    Well, I know that Billy Webster did an
20              investigation.  He called my brother one day and
21              said, "Meet me over in the Sheriff's Department
22              side --" they had a deputy side "-- and if your
23              brother's there, bring him."
24              And he told us that if you guys want
```

*JOHN GORMAN - June 15, 2016        96*

1         anything done with this, you need to call DCJS

2         yourself because the Sheriff took the file and

3         said nothing's going to happen.

4              So the only reason Patricelli was charged

5         with anything was -- and again, there's a letter

6         that you submitted and I believe it's in

7         evidence -- that we called DCJS, my brother and

8         I, and let them know that there was improper use

9         of the e-Justice system and that the Sheriff's

10        Department refused to do anything to the

11        individuals involved.

12             Because that's a serious issue if you're

13        running people that -- they ran Peter Colantonio

14        as a new inmate of the jail.  That's how they got

15        his information.  So I don't think that Kevin

16        Martin would like to be run as a new inmate at

17        Rensselaer County Jail to find out what his

18        information is.  I don't think you'd like that.

19             And since I took an oath in office and so

20        did my brother, and I meant everything I said

21        when I raised my right hand, we informed the

22        proper authorities because our boss wouldn't do

23        anything.

24             So I'm not sure when he was charged, because

 1          they came in and did an audit and they sent the
 2          information to the DA's office.
 3     Q.   DCJS?
 4     A.   DCJS sent the information, right, and they sent
 5          the information to the DA's office and that's
 6          where the charges came from.  I'm not sure
 7          exactly when those charges happened.
 8     Q.   In your complaint, you indicate that Sergeant
 9          Maselli, Sergeant Walraed and Sergeant Gecewicz
10          began to join in the harassment, if that's a fair
11          statement?
12     A.   Yes.  As I said in the beginning, when I first
13          was demoted, I was given program officer spots.
14          So program officer spots do breaks and then they
15          have a lot of downtime.
16              So during that downtime, I was making keys
17          and fixing computers and doing those other
18          details that I did as a sergeant.  Because,
19          normally, sergeants do their rounds and then sit
20          in an office with their feet up on a desk until a
21          code goes off, there's a lot of downtime in
22          correctional facilities.  I prefer to make the
23          eight hours or sixteen, depending on what you
24          had, go by fast.  So I volunteered and asked for

1          details so I was given those details.

2               Sergeant Maselli is Patricelli's best

3          friend.  They did a lot of stuff outside of work.

4          They went to races.  They are very tight.

5          Sergeant Walraed, he's the former Sheriff's son,

6          very good friends with Mahar.  And Sergeant

7          Gecewicz was a good military brother friend of

8          Mahar.  They would order me off my lunch -- you

9          can't be ordered off your lunch.  The only

10         time -- well, you're not supposed to be ordered

11         off your lunch; how about that? -- to take

12         deliveries of milk trucks or bread deliveries.

13              If I was in the middle of doing a key thing,

14         they would call me on the radio and say, "Report

15         to the watch commander's office", and they would

16         give me, "Well, this inmate needs to go be

17         strip-searched."

18              Well, there's five other people sitting in

19         the office talking to the watch commander and the

20         sergeants and they're ordering me who's doing

21         keys.

22              As a sergeant and as a correctional officer

23         up until that time, that stuff had never happened

24         to me before, ever.  So I saw that and I don't

 1          know how otherwise I could see it as being

 2          harassed by these individuals by being given

 3          excessive work details.

 4               They had a kitchen officer.  They also had

 5          an officer who was assigned to the hallway near

 6          the kitchen.  Those are the officers who do the

 7          deliveries.  So I would go do a delivery that was

 8          ordered, because it was a justified order, you

 9          know, and the officer who was in that area would

10          say, "What are you doing?"

11               "Well, I'm doing this delivery."

12               "Well, I got the delivery."

13               "Well, I was just ordered to do it."

14               So there was no reason this officer was busy

15          with something else for me to be doing that other

16          than it was retaliatory, it was harassment, it

17          was excessive.

18               Because if you have people to do their

19          assigned job that they were assigned to do that,

20          why are you asking me to do it?

21               MR. MARTIN:  Should we take a break at this

22          junction?

23               (Whereupon, at 12:41 p.m., a lunch break was

24          taken.)

```
 1                    Afternoon Session

 2              (Whereupon, at 1:15 p.m., the following

 3         proceedings were had:)

 4    BY MR. MARTIN:

 5     Q.   I believe when we left off before lunch, you were

 6         describing the details that you were being

 7         assigned which you felt were retaliatory.  And

 8         you described the milk truck, doing strip

 9         searches.

10              Were there other things of that kind that

11         you were assigned that you felt were in

12         retaliation for your complaints about Patricelli?

13     A.   Yes.  When these individuals, especially Maselli

14         as watch commander, you did assignments, my

15         assignments were changed.  When you work eight

16         hours and, say, you work on a housing unit and

17         then you get ordered for eight hours, the policy

18         is you're not supposed to work on another housing

19         unit.  You're supposed to be given a program

20         spot.

21              My assignments were initially given as

22         program spots and then changed to work units.

23         I'm just giving you some examples.  The

24         deliveries, the strip searches and then that,
```

*JOHN GORMAN - June 15, 2016        101*

```
 1              those are the three major examples.
 2     Q.   How often did you get these kinds of assignments?
 3     A.   How often did it happen?  Depending on when they
 4          worked and I worked, there was other -- I think
 5          later on, there's another individual who's named
 6          Connell, Jr., the second person, I can't think of
 7          his first name at the moment, he did the same
 8          thing, I don't know, once or twice a week.  I
 9          can't think of the first name.  If you do it too
10          often, don't you make it too obvious?
11     Q.   You indicated in your complaint that you were
12          requested to provide false testimony against Ruth
13          Vibert.  When was that?
14     A.   We talked about that.  That was during the
15          meeting with the Sheriff approximately February
16          8th involving Patricelli's complaint.
17     Q.   You indicate in your complaint that some time in
18          April, you had a telephone conversation with Tom
19          Hendry in which he was responding on behalf of
20          Kathy Jimino.  Do you recall that?
21     A.   Yes.
22     Q.   What did he say to you and what did you say to
23          him?
24     A.   He just said, "I'm returning a call on behalf of
```

*JOHN GORMAN - June 15, 2016      102*

```
 1            Kathy Jimino and I understand you called her.

 2            What do you have to tell me?"

 3                 And I said, "Tom, the same thing I've been

 4            telling you for weeks now."  I received the same

 5            call from Chris Meyer.  Tom Hendry refused to

 6            investigate my workplace violence complaint fully

 7            or at all.

 8      Q.    In your view, why did Tom fail to investigate

 9            your complaint fully?

10      A.    I think in my opinion or, I mean, we already

11            interviewed Tom Hendry and he told you he wasn't

12            trained, he didn't know, he wasn't working with

13            the Sheriff's Department.  I just think he was

14            directed by the Sheriff that this was not a

15            workplace environment -- workplace violence issue

16            and to make it go away.  What else can you

17            believe?

18                 I don't have any proof for that but the

19            actions speak for itself.  The man didn't

20            investigate.  He interviewed me and took no

21            notes.  You've been here doing depositions, you

22            take notes every single time you sit here.  So he

23            interviewed me for three hours and he took not

24            one note that's been provided by you guys or that
```

```
 1        he said he took, because we interviewed him and

 2        he said, "I don't have any", he doesn't know why.

 3             So he didn't remember any facts because he

 4        didn't want to.  So how do you do an

 5        investigation without taking notes?

 6             So my belief is that it was their intention

 7        to make me go away and they thought that if they

 8        did nothing with the workplace violence complaint

 9        that I would shut my mouth and I would go away.

10   Q.   You didn't know Tom socially or anything, did

11        you?

12   A.   I never met Tom Hendry before in my life until

13        the day I handed him the workplace violence

14        complaint.

15   Q.   Did you ever -- actually, strike that.

16             As I recall from Mr. Hendry's testimony on

17        deposition, he did go back and do some additional

18        investigation but he never interviewed you a

19        second time.  Is that correct?

20             MR. SORSBY:  Objection as to the form of the

21        question.  Do you understand the question?

22             THE WITNESS:  I understand.

23             MR. SORSBY:  Okay, go ahead.

24   A.   No.  He only interviewed after I wrote all those
```

1           letters on March 4th to all those individuals

2           that we talked about, Kathy Jimino and all those

3           on March 7th.  That was the only interview I've

4           ever gotten when I filed my second workplace

5           violence complaint.  I was never interviewed, I

6           was never consulted, nothing.

7                And to my knowledge, the other individuals

8           listed in that were never interviewed either.

9           Tom Hendry testified at Workman's Comp, and we

10          can submit the deposition if you want, that he

11          was working on it, and this was back in 2014, he

12          was working on it and that in the very beginning

13          of early 2014 that his decision for the July

14          incident was with the attorneys.

15               So he, by that point, had no intention of

16          actually investigating it.  They just sent it to

17          the attorneys.  So that says to me that you

18          really don't care about verifying facts with

19          individuals or finding out my side of the story.

20          You're just going to try to make me go away by

21          siccing attorneys on it, Goldberg and Pechenick.

22     Q.   Did he testify during that deposition that he was

23          being advised by counsel not to do anything about

24          your second workplace violence complaint?

*JOHN GORMAN - June 15, 2016        105*

```
 1            MR. SORSBY:  Objection to the form of the
 2            question.  Do you recall the --
 3       Q.   If you know.
 4       A.   He said that he was working with the Sheriff's
 5            Department and that the determination had been
 6            made by the authorities and that it was being
 7            reviewed by counsel within Rensselaer County but
 8            he hadn't interviewed me, hadn't called me,
 9            hadn't discussed any of it.
10            And part of my complaint of the July
11            workplace violence was Tom Hendry.  So why would
12            you have the person who's part of the complaint
13            do the investigation?  It's just bad police work,
14            bad investigation work.
15            MR. SORSBY:  Off the record for a second.
16            (Discussion off the record.)
17  BY MR. MARTIN:
18       Q.   Do you have any evidence that Kathleen Jimino has
19            a personal relationship with Sheriff Mahar?
20       A.   Do I have any personal evidence?  I know what I
21            was told, but do I have personal evidence?  No.
22       Q.   What were you told?
23       A.   I was told by her nephew -- excuse me, her
24            son-in-law, Aaron Simard, that they have a very
```

```
 1              close relationship and that they often did

 2              functions.  I went to a few fundraisers for Jack

 3              Mahar when I helped with his campaign and they

 4              ate together, they talked, they were very --

 5              seemed very close from what I could see.

 6      Q.      All right.  And do you have any evidence that

 7              Kathleen Jimino and Sheriff Mahar ever discussed

 8              your workplace violence complaints or your

 9              difficulties with Patricelli?

10      A.      Can you define evidence?  Do I have written

11              documentation?  No.

12      Q.      Testimony, too.  Like, if you heard from somebody

13              from the County.  Even if it's hearsay, it's okay

14              for now.

15      A.      I don't know.  I have -- I don't know.

16      Q.      You don't have any or you don't know if you do?

17      A.      I don't recall that I've read anything and I

18              can't think at this second if I have any.

19      Q.      Okay, good enough.  In your complaint, you

20              indicate that the Order of Protection was not

21              enforced by the facility.  And I guess my

22              question is:  What was your expectation with

23              respect to the Order of Protection within the

24              facility?
```

JOHN GORMAN - June 15, 2016          107

 1    A.   Same thing an Order of Protection should mean for

 2         anybody; that he doesn't appear in the cafeteria

 3         at the same time I have my lunch; that he does

 4         not appear on my housing unit; that he does

 5         not -- he's not in the same room that I'm in.

 6              And in evidence, Tom Hendry says in his very

 7         letter that I, John Gorman, should stay away from

 8         Anthony Patricelli.  The Order of Protection is

 9         not against me.  It's against him to stay away

10         from me.

11              So Tom Hendry is telling me to stay away

12         from Patricelli, but I have to go to work every

13         day.  I don't have free roaming of the facility

14         because I'm no longer a sergeant.  He is a master

15         sergeant and is answerable to only the Sheriff.

16         He can go anywhere he wants any time he wants.

17              Did I answer your question?

18    Q.   Yes.

19    A.   Okay.

20    Q.   Do we have that Order of Protection, actually?

21         Let's just take a quick look.

22    A.   I think there are two and I think we did mark

23         them.  This would be relative to the time frame

24         you're talking about now, so this is good enough.

```
 1              (Indicating)

 2       Q.   Getting right around the time, right.  Looking at

 3            Exhibit 41 that we had marked in a prior

 4            deposition, there is a handwritten notation about

 5            three quarters of the way down that says

 6            "incidental contact consistent with employment".

 7                 Do you know who wrote that there?

 8       A.   All this is filled out by the Judge.

 9       Q.   Did the Judge ever explain to you what the term

10            "incidental contact consistent with employment"

11            meant?

12       A.   That Order of Protection was sent to me via mail.

13            Nobody met with me or explained anything to me.

14       Q.   Did you ever go back and complain to the Judge

15            that it wasn't working?

16       A.   I called the ADA on the case and did that.  But

17            did I go to the Judge?  No.  Because --

18       Q.   Do you know if the ADA went back and talked to

19            the Judge?

20       A.   They say they're going to.  They did issue a

21            second one when this expired but I have no

22            knowledge of that.  The best I can do is call the

23            ADA.  I don't have direct contact with the Judge.

24       Q.   Did you ever have discussion with Sheriff Mahar
```

1        about what the phrase "incidental contact

2        consistent with employment" meant?

3   A.   Nobody from the administration met with me in

4        reference to the Order of Protection.  I handed

5        it in and that was as much -- but what I think it

6        means is probably a contact during employment is

7        okay but, remember, that I had no functionality

8        in employment with Patricelli except for he was a

9        key player in the chain of command.

10            So he was a supervisor and, in my mind, it's

11       their responsibility to make sure he didn't have

12       incidental contact with me, because he didn't --

13       he wasn't in charge of the west side of the jail.

14       He was in charge of the bigger picture.

15            So you're going to tell me that I need to

16       know what this means, because that means he could

17       have contact with me while I'm working.  But what

18       I'm telling you is that he had no day-to-day

19       function except for he was a supervisor.

20            So as a supervisor, he should have been

21       told, hey, you can't supervise somebody that has

22       an Order of Protection against you.

23            Is that -- does that make -- am I saying

24       that correct?

```
1              MR. SORSBY:  Since we're reading from the
2         exhibit, can we just have him read that full line
3         there, the full quote, the actual full where it
4         says --
5              THE WITNESS:  Surrender --
6              MR. SORSBY:  No.  It says something before
7         "incidental".  Read the whole line.
8              THE WITNESS:  "The specific other conditions
9         defendant must observe".
10             MR. SORSBY:  Okay.
11             THE WITNESS:  Is that what you mean?
12   A.   "Incidental contact consistent with employment."
13        Only the Judge really knows what that means,
14        right?  You can interpret it, I can interpret it.
15   Q.   My question is -- I know you handed it in.  I
16        forgot now who you told me --
17   A.   I gave it to Hal Smith because he's the highest
18        ranking person other than the Chief who was no
19        longer there at the time at the jail.
20   Q.   Did you ever talk to Hal about what he thought it
21        meant?
22   A.   He said he would meet with the Sheriff and get
23        back to me.  Because he directly reported to the
24        undersheriff and the Sheriff and then nobody ever
```

```
 1          got back.  And the whole time during this entire

 2          thing when the harassment and all these things

 3          took place, I verbally reported it to Hal Smith,

 4          Sergeant Rankin, Sergeant Dunham, all of the

 5          individuals I've talked about previously, and

 6          also put the July incident in writing.  I think

 7          this might be the later one.  I think there might

 8          have been one before this.

 9     Q.   The Order of Protection?

10     A.   Yeah, there were two.

11     Q.   Yeah.

12          MR. SORSBY:  Off the record.

13          (Discussion off the record.)

14 BY MR. MARTIN:

15     Q.   We've already talked about Chris Meyer giving you

16          a call, and I can't remember sitting here if we

17          got into any detail about what was said by you

18          and what was said by him.

19     A.   I should say he left a voice message saying he

20          was following up on behalf of Kathy Jimino about

21          my further problems with Tom Hendry and my

22          workplace violence complaint.

23          I returned the phone call within hours of

24          receiving it and received no phone call back.  So
```

1          I didn't actually have any conversation with

2          Chris Meyer.  I still obtained that voicemail if

3          you'd like it.

4               MR. SORSBY:  Voicemail from who, John?

5               THE WITNESS:  From Chris Meyer.

6               MR. SORSBY:  Okay.  All right.

7     Q.   In your complaint, you indicate that on April

8          15th, 2013, you had a conversation with Sergeant

9          Rankin where he told you that he wished someone

10         would give Patricelli something to do other than

11         following you all day, and you have a good

12         specific date there.

13              How are you able to remember the date?

14    A.   Because I was in the office I believe, getting

15         permission for what I was doing for the day

16         because that was the order and Patricelli called

17         Rankin on the radio, Sergeant Rankin called

18         Master Sergeant Patricelli and he called him and

19         when he got off the phone with Patricelli, that

20         was exactly what he said.

21    Q.   You indicate in your complaint that on May 7th,

22         the Department of Labor came in and did an

23         on-site investigation.  Were you present for all

24         of the interviews that the DOL conducted that

JOHN GORMAN - June 15, 2016        113

1           day?

2    A.    I wasn't present for any of them.

3    Q.    Okay.  How did you know that Undersheriff Russo

4          was present for those meetings?

5    A.    When they sent out their findings, if you read

6          the first page, it lists all of the individuals

7          who were there.

8    Q.    And they interviewed you separately?

9    A.    I went down to their office in Albany and was

10         interviewed for hours along with Ruth Vibert and

11         Jim Karam separately.  We weren't interviewed

12         together.

13   Q.    You indicate in your complaint that Sergeant

14         Connell was harassing you by giving you, if I can

15         call them, details?  No.  Giving you the

16         assignments that were not usual, such as the milk

17         truck --

18   A.    Details would have been fine.

19   Q.    Details.  Is that the terminology?

20   A.    Yes.

21   Q.    And you indicate that it was in conspiracy with

22         Sheriff Mahar and with Patricelli.  I was

23         wondering what evidence you had of any conspiracy

24         among Mahar, Patricelli and Sergeant Connell,

```
 1            either documentary or even hearsay, that you

 2            heard from others.

 3     A.     We can provide documents, if you like.  Going

 4            back to the workplace, the Labor Department

 5            investigation, Connell, Sr., his father, Connell

 6            Jr.'s father, works at the jail, he was the union

 7            president at the time.  He refused to go to those

 8            meetings and represent me as a union member, a

 9            paying union member.

10            And when I questioned him in an office where

11            his son was, he said he had better things to do

12            on his days off or while he's working than to

13            represent some idiot who can't keep his mouth

14            shut.

15            And I said, "You know what?  You're the

16            union president.  You should represent everybody

17            fairly whether you agree or disagree with their

18            issue.  That is your job.  That's what you signed

19            up for.  That's what you were elected to do."

20            After that point -- after I called his

21            father out in the office, after that point,

22            Connell, Jr., who I never had to deal with, never

23            had any problems with, never had even spoke to, I

24            now was getting ordered off lunch, all those
```

```
 1            things.

 2     Q.     Connell, Jr., was present for this conversation

 3            between you and Connell, Sr.?

 4     A.     Yes, he was in the office with us.  Connell,

 5            Jr., and Connell, Sr., are Jack Mahar's biggest

 6            campaign contributors for his running for

 7            Sheriff, and I can prove that in documentation,

 8            if you like.  That's my connection with Connell,

 9            Jr.

10                 Connell, Jr., worked for years and only

11            ever -- even still only ever worked one housing

12            unit.  Nobody in the jail works one housing unit

13            without being rotated.

14     Q.     Is he retired now?

15     A.     I have no idea.

16     Q.     In your complaint, it seems like -- I'm looking

17            at paragraph 128, if you want to go there.  It

18            seems like after the incident with Connell, Jr.,

19            and Connell, Sr., I guess, you discussed that

20            with Sergeant Rankin; is that correct?

21                 Look at the last sentence there.  You might

22            be referring to something else in there.  I'm not

23            trying to put words in your mouth.  I just want

24            you to clarify for me.
```

1    A.   I think that paragraph includes not only Connell,

2         Jr. -- it says Sergeant Connell.  I'm assuming

3         it's Junior.  It includes the whole situation.

4    Q.   I'm just sort of trying to get a time frame on

5         when you may have spoken with Jeff Rankin.

6    A.   I spoke with Jeff Rankin very often because he

7         was my training officer as a sergeant.  I thought

8         that he and I had a pretty good working

9         relationship and whenever there was issues, he

10        was the watch commander, he's in charge of the

11        whole B line shift, you would go to him and talk

12        to him and he'd be a good ear, a good sounding

13        board.

14             And that's where the comment "You need to be

15        patient".  I'm not sure what I was being patient

16        for, but that's what he kept saying.

17   Q.   This is looking at paragraph 127 of the

18        complaint.  We're up to some time in May or some

19        time after May 8th.  So I was just trying to get

20        an idea of when you may have heard from Jeff that

21        you need to be patient, in quotes.

22   A.   Oh, you want a date?

23   Q.   A time frame.  I wouldn't expect a date, to be

24        honest.

```
 1    A.    I don't -- somewhere between May there and June

 2          and, you know, when Patricelli gets suspended,

 3          you know.

 4    Q.    All right.  Now, we're up to the point where, in

 5          June, you had a phone conversation with Tom

 6          Hendry.  And we might have spoken about this once

 7          already, but I wonder if you can tell me what you

 8          said to Tom and what Tom said to you on this

 9          occasion, June 4th, 2013.  Jump up to 129.  Look

10          at 130, too, if you want.

11    A.    Yeah, I think this is related to the October 8th

12          phone call and Tom Hendry's go-to is "I can't get

13          any help from the Sheriff's Department."  That

14          was all he said.  "I can't get down there to do

15          interviews."

16          He even told the Labor Department, as you

17          read, "I couldn't interview these people because

18          I couldn't go there.  I didn't go there, I

19          couldn't get them on the phone."

20          My great attorney said, "Can't you drive the

21          less than a mile down to the jail to interview

22          the individuals?"

23          That relates to that.  So I said, okay, you

24          can't get a phone call, you can't get a recording
```

1          and you're saying the undersheriff is not

2          returning your calls, I believe that says, right?

3              He sends e-mails and made phone calls,

4          messages for Undersheriff Russo and had received

5          no response.

6              So I went over to see Marcelle with Jeff

7          Rankin's permission, because I'm on the clock,

8          and asked if I could have a meeting with Pat

9          Russo, the undersheriff at the time, to find out

10         what was going on with the phone call.

11    Q.   And what did Marcelle say?

12    A.   She said, "What's in it?"  In regards to -- I

13         explained what I just explained to you.  And she

14         said, "Go back to work, I'll let you know."

15    Q.   What happened after that?

16    A.   And a few minutes later, I was called by Jeff

17         Rankin to come down to the office to go over to

18         see Undersheriff Russo.

19    Q.   All right.  What day was this again?

20    A.   June 4th.

21    Q.   All right.  Was this the first time that you had

22         interaction with Pat Russo regarding your issue

23         with Patricelli and Mahar and Patricelli's

24         friends?

```
 1    A.   That didn't involve something in writing?  In

 2         person in person?

 3    Q.   Yeah.

 4    A.   Yeah, this would be the first in-person meeting I

 5         had with him.  As far as writing of documents,

 6         there were plenty of those.

 7    Q.   He had received copies of a number of items?

 8    A.   Right.  First time I met with him in person.

 9    Q.   Was anyone else present for the meeting?

10    A.   The door was open and Marcelle Swanberry was

11         sitting in her office right outside.

12    Q.   All right.  And what did you say to Pat and what

13         did Pat say to you?

14    A.   From my memory, he said that he wasn't preventing

15         Tom Hendry from getting any phone call, that he'd

16         been busy and that he'd get to it when he got to

17         it.  And I went on to explain the situation that

18         was going on with Patricelli and the thing and --

19    Q.   How much detail were you able to get into with

20         Pat?

21    A.   Not a lot of detail because he said, "Well, I

22         already know about all of that."  While I was

23         sitting at his desk, he's got two chairs, on the

24         left-hand side of his desk in a manila envelope
```

1         in big writing was "John Gorman Workplace

2         Violence".  So I could see that he already had

3         all the documentation.

4              So he said, "I know about your situation.

5         I'll get the phone call to Tom Hendry."  And he

6         basically said, "I don't have time to discuss

7         everything right now."

8              And I was very upset, because he really

9         didn't want to be bothered with it.  And I went

10        back to the office and I sat down with Jeff

11        Rankin.  He said, "Take a minute".  And I was

12        physically shaking and emotionally upset.

13             And Jeff asked me if I needed to go home.

14        Again, I don't know, not being very smart, I

15        said, "No, I'm okay, I don't need to go home,"

16        and I went back to work.

17             But it took me about a half hour, 40 minutes

18        to get myself together because, here, you have an

19        undersheriff who knows all the stuff that's going

20        on.  He told me he did.  I didn't need to get

21        into detail.  He knows it all and he's not doing

22        anything about it.

23             And up to this point, I followed all the

24        rules.  I didn't use e-Justice.  I didn't

JOHN GORMAN - June 15, 2016        121

```
 1              threaten people.  I didn't get peoples' home
 2              numbers.  I didn't do any of that stuff.  I
 3              filled out forms.  I informed my supervisors.  I
 4              did everything I was supposed to do and I'm more
 5              of a criminal than a victim.
 6      Q.      And did you socialize with Russo outside of work?
 7      A.      Before I got the job at the jail, I never saw him
 8              before in my life.
 9      Q.      And when you worked there, you did not become
10              friendly or anything or unfriendly?
11      A.      The first time I talked to Pat Russo, he called
12              me over and he said, "So I hear you want to
13              accept the promotion to be provisional sergeant."
14                  I said, "It would be a great honor to be a
15              supervisor and authority."
16                  He said, "Really, you want to do this?"
17                  I said "yes", and he said okay, and that was
18              the end of the conversation.
19      Q.      So you didn't have much interaction with him?
20      A.      No.
21      Q.      All right.  Do you have any evidence, documentary
22              or hearsay or anything, that Sheriff (sic) Russo
23              conspired with Sheriff Mahar and Patricelli and
24              his friends to retaliate against you?
```

JOHN GORMAN - June 15, 2016        122

```
 1              MR. SORSBY:  Other than what's already been
 2         introduced?  Are you asking if he has evidence on
 3         him?
 4              MR. MARTIN:  On Russo, yeah, about Russo.
 5              MR. SORSBY:  Other than what's already been
 6         introduced to the extent that it answers your
 7         question?
 8              MR. MARTIN:  Sure.
 9              MR. SORSBY:  Are you aware of any other
10         evidence that you haven't already introduced or
11         that hasn't been admitted?
12              THE WITNESS:  No.
13    Q.   What would motivate Russo to want to --
14              MR. SORSBY:  Objection to the form of the
15         question.
16    Q.   -- harm you at work?  Feel free to speculate.  At
17         this point, all this wild stuff is admissible.
18    A.   What I do know is that Mahar was married to
19         Russo's sister.  I do know that Mahar was
20         cheating on Pat Russo's sister.  I do know that
21         the way Mahar got caught was another co-worker
22         told Mahar's wife.
23    Q.   The situation sounds similar.
24    A.   I do know if I spent 30 years as somebody's
```

518-982-1341
WWW.AMFREPORTING.COM

JOHN GORMAN - June 15, 2016          123

1          partner and they wanted me to do X, I'd probably

2          keep my mouth shut and do it.  Me personally, I

3          wouldn't.  But it's not a far stretch.

4               So Pat Russo had all knowledge of everything

5          that was going on.  He had an opportunity to stop

6          it or to intervene and he did nothing.  So to me,

7          that is -- and I'm not a lawyer.  But to me, that

8          is evidence to show that he not only should have

9          known but he did know and he had an obligation as

10         the oath he took of office and the policies that

11         he knew of Rensselaer County that he should have

12         done something if his boss was not doing it.

13              But motivated by that relationship, he may

14         have kept his mouth shut and acted along with

15         Mahar.

16     Q.   Okay.  Did Undersheriff -- at the time

17         Undersheriff Russo ever tell you that Sheriff

18         Mahar had actually assigned him to look into your

19         complaints about Patricelli because of the

20         perception that Mahar and Patricelli were close

21         friends?

22     A.   No, not that I --

23     Q.   Did you hear that from anybody else throughout

24         this?

JOHN GORMAN - June 15, 2016          124

```
 1    A.    No.

 2    Q.    Okay.

 3    A.    As far as I know, the Sheriff's Department never

 4          did any kind of investigation into this workplace

 5          violence or anything.

 6    Q.    All right.  Your complaint indicates that on June

 7          17th, you had another conversation with Tom

 8          Hendry.  And other than what's in paragraph 138

 9          that you've already written, is there anything

10          else you can remember about that conversation?

11                MR. SORSBY:  You can read 138.

12                MR. MARTIN:  I think that's the only

13          paragraph about that.

14    A.    Can you ask your question again, please, since I

15          read that?

16    Q.    I just wonder if there's anything else that you

17          can remember about that conversation other than

18          what's already written there in paragraph 138.

19    A.    All I remember is talking to Tom Hendry about,

20          you know, that he was busy and that he didn't

21          hear anything threatening.  I said, well, you

22          could listen to a statement and not think it's

23          threatening but I can listen to a statement and

24          think it's threatening because it's related to
```

JOHN GORMAN - June 15, 2016        125

1        me, it's not related to you.  For somebody to say

2        I'm going to shoot you in the head?  No.  But do

3        you know what "thank your wife, thank your

4        brother, thank you, you'll pay" means?  Does that

5        mean anything to you?  But if it involved your

6        family and you, it might mean something to you.

7            That was the kind of conversation we had.

8            By the way, he said he's going to get

9        something out.  That statement never came til, I

10       don't know, was it 2015?  It was a long time

11       before they put any findings out for the

12       workplace violence complaint.

13           He never -- this is before the workplace

14       violence -- second workplace violence complaint.

15       He never put out a second finding for the first

16       workplace violence complaint.

17           The Labor Department said "you didn't do a

18       good investigation, you didn't interview these

19       people, you didn't look at these facts."

20           You have all these pages and we have

21       evidence that shows phone calls and evidence.  He

22       never wrote another finding to add to that March

23       finding to the first workplace violence claim.

24  Q.   Did Mr. Hendry have any response to your

JOHN GORMAN - June 15, 2016         126

```
 1              discussion with him about what I'm going to call
 2              the more implied threats than maybe were
 3              expressed but were implied, statements like
 4              "thank your brother"?
 5      A.      Other than he didn't find -- he didn't hear
 6              anything threatening, other than that, no.
 7      Q.      You indicate in your complaint that you were
 8              intentionally hit with a heavy metal door --
 9                  MR. SORSBY:  Excuse me for a minute.  Off the
10              record.
11                  (Discussion off the record.)
12  BY MR. MARTIN:
13      Q.      You indicate in your complaint that you were
14              intentionally hit with a heavy metal door by
15              Sergeant Maselli.  And have you had an
16              opportunity to review the videotape of that
17              incident?
18      A.      I never received a video from that incident.
19      Q.      It's on there.
20      A.      Never reviewed it.
21                  MR. MARTIN:  Off the record.
22                  (Discussion off the record.)
23  BY MR. MARTIN:
24      Q.      Maybe just based upon our off-the-record
```

1      discussion, I could follow up with a question

2      about how the doors, from my knowledge, are

3      controlled.  And I took it from our

4      off-the-record discussion that it wasn't

5      necessarily just that somebody slammed the door

6      but there was some other method of control of the

7      doors opening and closing that may have come into

8      play?

9   A.  Well, we don't know why that door -- why that

10     individual allowed the door to close but that

11     door is not controlled electronically like any

12     other door.  It had a special thing installed by

13     maintenance, a chain that held it open.

14         Maselli was standing in front of the door

15     and four other people were in the office when I

16     entered the office.  I was standing in the

17     doorway and Maselli walked away from the door,

18     didn't look back, didn't anything, and went

19     behind the desk and the door hit me from behind.

20         Maselli as a supervisor's job is to make

21     sure that no harm comes to anybody, any officer,

22     any inmate.  He allowed that door knowing that it

23     had been like that for years, that that door

24     doesn't stay shut or, excuse me, open unless that

JOHN GORMAN - June 15, 2016        128

1        chain is affixed.  So as I'm a supervisor, or

2        when I was, I would conscientiously make sure

3        that door was secure, otherwise, that door is

4        going to hit somebody.

5            So it's in my mind his job and obligation as

6        a supervisor to make sure that that's safe for

7        employees.  My workplace violence complaint was

8        found to be unfounded because the door never hit

9        me.  But witnesses' statements, three out of the

10       five, say the door hit me.

11           My work -- my 207(c) decision was denied

12       solely based upon McIntyre's and Hal Smith's

13       investigation that said the door never hit me.

14       Whether or not, you know -- sorry.  You didn't

15       ask that question.  Sorry.

16           MR. SORSBY:  Can I just ask a real quick -- I

17       know we're out of order.

18           MR. MARTIN:  Sure, no, that's fine.

19           MR. SORSBY:  Was the door open when you came

20       in?

21           THE WITNESS:  Maselli was standing on the

22       door.  It was like the door was open, he was

23       leaning against it.

24           MR. SORSBY:  Okay.

JOHN GORMAN - June 15, 2016       129

```
1              THE WITNESS:  He was acting as the doorstop.
2              MR. SORSBY:  Then he walked away?
3              THE WITNESS:  And then he just walked away
4         from the door.
5              MR. SORSBY:  Okay.
6    BY MR. MARTIN:
7    Q.   What was the purpose of the meeting, if you
8         remember?
9    A.   The computer system went down on the north end of
10        the jail and I was called off of my unit by
11        Connell, by Sergeant Connell, Jr., to fix the
12        computer, because Sergeant Dunham requested me
13        to.
14             And I said to Sergeant Connell that I can't
15        do it unless I hear -- unless Sergeant Dunham
16        tells me because it involves Black Creek
17        Security, it involves rebooting, it's a security
18        issue unless Sergeant Dunham tells me to do so.
19        That's why I was in there.
20   Q.   Okay.
21   A.   If I can add, that was not part of my job duties,
22        by the way.
23   Q.   Why were there so many people involved if that
24        was -- if all they wanted to do was to have you
```

JOHN GORMAN - June 15, 2016        130

1            come in and try to help them with the computer?

2      A.   What do you mean?

3      Q.   Weren't there five people in the room?

4      A.   Why were so many people in the office or --

5      Q.   Yeah.

6      A.   It's the watch commander's office, which that

7            office is normally a hangout.  Three of the

8            people were sergeants.

9      Q.   They were just already there when you got there?

10     A.   They hang out there and talk and two of them were

11           program officers.

12     Q.   So they weren't necessarily there for the

13           problem; they just were there?

14     A.   Correct.

15     Q.   I gotcha.  Somehow, I had in my mind that it was

16           like a meeting that the five of you were having

17           together?

18     A.   No.  There's only two people in the whole place

19           that can reboot the computer that can do what

20           they needed done.

21     Q.   And that door has an automatic door closer on it;

22           correct?

23     A.   You mean it has an arm on it that slams it shut?

24     Q.   Yes.

```
 1    A.   Or hydraulic, yes.

 2    Q.   Forgive me, we talked about this, but July 10th,

 3         2013, you indicate you had a phone call from Tom

 4         Hendry regarding a Notice of Violation from DOL.

 5         So this is paragraph 143 of the complaint.  Do

 6         you want to take a look?

 7    A.   That must have been involving -- I don't know

 8         what the violation was, but that was involving

 9         the second workplace violence complaint.

10    Q.   Do you remember anything else about that

11         conversation with Tom, what he said to you --

12    A.   Other than he was investigating my second

13         workplace violence complaint, I may have talked

14         about how I didn't understand why he would be

15         investigating it since he was part of the

16         issue -- he was part of the complaint.

17    Q.   What did he say in response to that?

18    A.   I don't recall.

19    Q.   Okay.  Anything else?

20    A.   I don't recall.

21    Q.   All right.  July 13th, you indicate Sergeant

22         Connell criticized you for something.  The

23         document speaks for itself, but I wonder if there

24         was anything else that happened around this
```

```
 1              incident that you describe in paragraph 144 of

 2              your second amended complaint.

 3        A.    I'm not sure what you're looking for.  Again,

 4              it's pretty clear what happened and how I felt --

 5        Q.    I just wondered if there was anything else you

 6              wanted to add.

 7        A.    -- and the players.

 8        Q.    Yeah, I think it's clear.

 9        A.    Yeah, I don't know what you're looking for other

10              than what it says.

11        Q.    Okay.  Was there any write-up or any other form

12              of discipline, even a verbal, other than this

13              verbal questioning out of this incident with

14              Sergeant Galusky?

15        A.    No, I didn't receive any write-up.  But I don't

16              know if they attempted to go to Rankin.  I don't

17              know what happened, you know, at that point, but

18              nothing that I'm aware of.

19        Q.    On July 15th, you were admitted to St. Peter's

20              Hospital.  And was that your primary care

21              physician?  Did he refer -- he or she refer you

22              to St. Peter's?  How did you come to --

23        A.    I'd like to note that I called in for the first

24              time in my career on July 14, 2013 when I was
```

1          hired July 8th of 2008.  So I think that's

2          important to show that I went all those years

3          without calling in sick.

4               I called my primary care physician, Dr.

5          Fogel, and I explained how I felt and he said, "I

6          want you to go to the ER."

7               And I said, "Well, I don't know what this

8          is.  I don't know if it's --" I don't want to go

9          to the ER and look like an idiot for going to the

10         ER.

11              He told me, "If you come here and I don't

12         like what I see, you're going by ambulance to St.

13         Peter's."  So that's what happened.

14    Q.   And how long were you hospitalized at St.

15         Peter's?

16    A.   I think it was three or four days.

17    Q.   Did they start you on a medication regimen at St.

18         Peter's?

19    A.   Lots of medications, nitroglycerin, lots of

20         tests.

21    Q.   Looking at cardiac issues?

22    A.   Yes, it was all cardiac issues.

23    Q.   And you requested a psychiatric evaluation at St.

24         Peter's?

*JOHN GORMAN - June 15, 2016          134*

```
 1    A.    I don't know that I requested it.  I kept

 2          describing the symptoms and when none of the

 3          tests worked, they thought maybe it was anxiety

 4          or something to look at that, you know, to talk

 5          about that.  So stress related after describing

 6          what I'd been going through.

 7    Q.    And you have not returned to work since July

 8          14th, 2013; correct?

 9    A.    You're asking me that?

10    Q.    Yes.

11    A.    Yes.

12    Q.    And you filed a 207(c) application.  And the

13          process of filing that, your complaint suggests,

14          was unusual or improper.  Can you tell me about

15          that?

16    A.    I was told that I had to go down to the jail in

17          person and pick up an application.  Well, if I'm

18          in the hospital --

19    Q.    Who told you?

20    A.    Hal Smith, when I called to let him know.  If I'm

21          in the hospital at the time when I got -- or just

22          got out of the hospital, I think I was released

23          on the 18th, how can I go to the correctional

24          facility if I'm not feeling well?
```

JOHN GORMAN - June 15, 2016       135

1              I thought it was a great burden and kind of

2         ridiculous to ask somebody who's sick to go down

3         there and get it.  So when I called one of the

4         union representatives that I trust --

5    Q.   Is that Lenny Smith?

6    A.   Lenny Smith.  And Hal Smith refused to give him

7         the documentation, the application 207(c).  And

8         to my knowledge, he ultimately got it from the

9         union.

10             And then as it says, Hal Smith questioned

11        the notary on the paperwork and wanted me to get

12        it done while the notary is done by an attorney.

13        So I'm not sure how -- I didn't go to a bank.  An

14        actual notarized attorney.  It just seemed like

15        they were giving me a hard time for no reason.

16   Q.   And Dr. Fogel is your primary care physician;

17        correct?

18   A.   Yes.

19             (Discussion off the record.)

20   BY MR. MARTIN:

21   Q.   Other than what we've already talked about with

22        respect to Pat Russo, did you have any other

23        discussions with him about your issues with

24        Patricelli and Mahar and others?

*JOHN GORMAN - June 15, 2016       136*

1    A.   As part of the 207(c) process, I was interviewed

2         by Pat Russo.

3    Q.   All right.  And so the issues, did they all come

4         up in the context of the 207(c)?

5    A.   I talked about the workplace violence forms which

6         he said he had.  I talked about all the issues

7         and all the incidences that had happened within

8         the jail.

9              He told me I needed to relax, don't get so

10        worked up.  And he goes "When I'm stressed out, I

11        just get this doll out and I -- you know, this

12        helps me with my stress.  I wring its neck."  He

13        goes to the closet, he gets out a doll that's

14        about this big -- you're shaking your head.

15   Q.   I've seen it, I think.

16   A.   I thought it didn't exist.

17   Q.   I think I've seen it.

18   A.   He takes it by the neck and he goes "When I'm

19        stressed out", he shakes it, goes like this, it

20        giggles, and he thought that was hysterical.

21             Somebody who has PTSD, well, at that point,

22        chronic anxiety, acute stress disorder and

23        depression, those actions to me were not only

24        disrespectful, it was further disregard for

1          anything that I said, felt or experienced over

2          the last however 10 months, whatever it was.

3              So you've seen the doll.  I don't think that

4          it was appropriate at a 207(c) interview when you

5          look at what the outcome of the 207(c) was.  And

6          he was the Undersheriff of the County Sheriff's

7          Department.

8     Q.   Any other discussions with Undersheriff Russo

9          other than what you've already described?

10    A.   No.

11    Q.   How about Sheriff Mahar?  Any other discussions

12         with Sheriff Mahar other than what you've already

13         described?

14    A.   Never interviewed or saw Sheriff Mahar that has

15         anything to do with workplace violence.  He

16         refused to answer or see me at all other than the

17         February 8th, sorry, meeting.

18    Q.   Right, which we've already talked about.  After

19         July of 2013, I believe that all of your contact

20         with Tom Hendry was also in writing; correct?

21    A.   That is correct.  He never offered an interview

22         for the second workplace violence complaint or

23         anything like that.

24    Q.   Some letters went back and forth between you two

```
 1              after July; correct?
 2     A.    I think I sent them all.  I don't think he
 3           actually sent responses.  At this point, I'm
 4           sending the letters to everybody, Kathy Jimino,
 5           Mahar, Russo, Tom Hendry, and nobody's sending
 6           any responses.
 7     Q.    Your doctor, James Thalmann, did he ever receive
 8           any replies of any kind to the faxes, letters
 9           that he sent on your behalf to the Sheriff's
10           Department?
11     A.    Other than confirmations that his faxes were
12           delivered, no.  He never received request for
13           documents either from the Sheriff's Department or
14           Dr. McIntyre.
15     Q.    All right.  The complaint indicates in paragraph
16           157, if you want to refer to it, there was a
17           letter from Tom Hendry regarding interviews being
18           conducted.  Do you recall receiving that letter?
19     A.    In August?  If you can show me something, show me
20           the letter.
21     Q.    I didn't bring it.
22     A.    I'm sure I could find it.  I don't -- other than
23           what's written there, if it's written there, to
24           me, it's true.  But I don't -- I don't remember
```

1          the...

2                MR. SORSBY:  Do you remember receiving a

3          letter from Tom Hendry in regards to your claim

4          that the investigation interviews were being

5          conducted?

6     Q.   We don't even have to look at the letter.  I

7          mean, the documents speak for themselves.  I was

8          just going to use it for a springboard really to

9          other questions to kind of orient us to time.

10               And I wonder if you were aware of any

11         additional investigative interviews were

12         conducted following or around this August 21,

13         2013 time frame.

14    A.   Other than what's come out in the limited notes

15         from Tom Hendry in this case, no, I'm not aware

16         of anything.

17    Q.   Okay.  Jumping down to page, excuse me, paragraph

18         159 of the second amended complaint, that

19         paragraph recites that you received a letter

20         dated October 5, 2013 from Tom Hendry in which he

21         disputes saying that the case -- and I presume

22         he's talking about the workplace violence

23         complaint was closed and that the county had no

24         intention of taking further action.

*JOHN GORMAN - June 15, 2016        140*

```
 1              Did he ever say that to you?
 2   A.   I would like to state that wasn't a letter.  I'd
 3        like to say that I can provide the recording.
 4        That was a voicemail.
 5   Q.   All right.
 6   A.   And like I said, I could provide that voicemail.
 7        But that voicemail was -- it did happen, it was
 8        said.  I think that was just an error in writing
 9        the complaint.  No matter how many times you look
10        at it, you always miss something.
11   Q.   The complaint indicates that the union member,
12        Sergeant Lenny Smith, wanted to donate sick time
13        to you and was denied.  Do you know if there's a
14        sick bank under the collective bargaining
15        agreement or any kind of past practice that would
16        have allowed union members --
17   A.   There most certainly was a past practice.  Now,
18        whether or not that was a policy -- and that was
19        not only denied for me but it was denied for
20        other people, for example, like Jimmy Karam, but
21        yet approved for other people.  And that went
22        into specifics in documentation and all that, but
23        other people were given sick time.  And if we
24        need to produce that, we will.  Lenny Smith was
```

1          denied.

2    Q.    And the decision whether or not to allow the

3          donation of sick time rested with the Sheriff's

4          administration, not with the union

5          administration?

6    A.    It rested with Jack Mahar.

7    Q.    Your complaint talks about -- jump up to 174.

8          MR. SORSBY:  174?

9          MR. MARTIN:  Yeah.

10   Q.    Your bidding rights, leave accruals and I think

11         that's it under the collective bargaining

12         agreement.  And you allege in this case that you

13         were arbitrarily deprived of these rights.  I

14         wonder if you can explain to me what is the basis

15         for that.

16   A.    I wasn't allowed to bid.  The bid came and went

17         and I wasn't sent a bid letter.  There's no

18         policy written anywhere in a contract or in

19         Sheriff's Department policy that says because

20         you're out on sick leave or medical leave that

21         you're denied the right to bid your shift.

22              And it also doesn't cover accruals -- it

23         doesn't say you no longer accrue accruals if

24         you're out on sick leave using your accruals.

*JOHN GORMAN - June 15, 2016        142*

```
 1              I don't know if that answers your question,
 2         but that's where that claim is from.
 3    Q.    You did.  Did you file a grievance over being
 4         deprived your bidding rights?
 5    A.    I know I filed a grievance on the bidding rights.
 6         I don't recall if I did one on the accruals but I
 7         may have.
 8    Q.    What was the decision on the bidding rights
 9         grievance?
10    A.    The two grievances I did file were -- I don't
11         know what they call it.
12    Q.    Denied?
13    A.    If they weren't affirmed, they were denied.
14    Q.    They were not taken to arbitration?
15    A.    No.  But again, I was already told because I
16         wasn't working -- and I was told way before that
17         by -- and I can't recall her name at the union
18         that because I went after Patricelli that I had
19         no rights with the union and they were going to
20         refuse to represent me.
21    Q.    Okay.  And this is in the January, 2014 time
22         frame.  You were still technically employed at
23         that point; right?
24    A.    That is correct.
```

```
 1    Q.   When did your accruals run out, though?

 2    A.   December 3rd of 2013.

 3    Q.   And so that was the last time that you received

 4         any kind of pay or benefits from the county;

 5         correct?

 6    A.   That is correct.  I was getting medical but I had

 7         to pay my share out of my pocket, and I would go

 8         down to Tom Hendry's office or mail a check to

 9         them each month.

10    Q.   Okay.  As of January, 2014, had a doctor released

11         you to return to work?

12    A.   Can you repeat the question?

13    Q.   As of January, 2014, had your doctor released you

14         to return to work?

15    A.   No.

16    Q.   When did your doctor release you to return to

17         some kind of employment?

18    A.   He never released me to go back to the

19         correctional facility as a correction officer.

20         He cautiously released me for a job with no

21         demand, an entry level job with no demand, which

22         is where I still struggle to find reasonable

23         employment that will work with my PTSD.

24    Q.   I see.
```

JOHN GORMAN - June 15, 2016        144

```
 1    A.   If he had his choice, he would make me leave
 2         where I am now.
 3    Q.   So you've been released to work with limitations,
 4         if that's a fair --
 5    A.   Correct.
 6    Q.   When did the doctor first release you to work to
 7         something with no demand, as you put it?
 8    A.   It really wasn't his choice to release me.  He
 9         would prefer not but I have to pay the bills and
10         provide for my family.  And since the Sheriff's
11         Department denied me any benefits, I couldn't --
12         I mean, I made $62,000 the last year I worked.  I
13         had credit card bills, I had a mortgage, I had a
14         car payment.  I had to do something.  I wasn't
15         getting workman's comp even though, you know, the
16         case was pending at that time.  I had to do
17         something.
18    Q.   When did you first start applying for jobs that
19         you thought you could do?
20    A.   As I previously said, I started looking for jobs
21         and I applied to 127 jobs and I provided those
22         documents to Workman's Comp, so we can get those,
23         in July.
24    Q.   But when did you start doing that?
```

1    A.   Applying for jobs?

2    Q.   Yeah.

3    A.   In July.

4    Q.   Of 2013 when you went out or 2014?

5    A.   No; 2014.

6    Q.   Oh, okay.

7    A.   My intention was always to go back to the jail.

8         (Pause in the proceedings.)

9    A.   Remember, the 207(c) decision is still

10        outstanding in January.

11   Q.   Right.

12   A.   So I'm still waiting to go back or secure if I'm

13        going to get benefits when I applied in July of

14        2013.  It's January of 2014, and I still don't

15        know.

16   Q.   Right.  It was shortly after that you got the

17        decision; right?

18   A.   July 15th of 2014.

19   Q.   Okay.

20   A.   Which, by the way, 207(c) in some cases takes

21        weeks.  In my case, it took from July of 2013 to

22        January of 2014.  That's an excessive amount of

23        time.

24   Q.   Let's jump up to June of 2014 when you receive

```
 1              your notification regarding termination.
 2     A.    Can you reword that question or repeat that
 3           question?  Because it wasn't a notice of
 4           termination.
 5     Q.    That you would be terminated.  I'm looking at
 6           paragraph 182.
 7                MR. SORSBY:  The date's different than what
 8           your -- you said 24th.
 9     Q.    Did I?  June 23rd letter.  And it indicates that
10           you need to request a due process hearing and
11           that the one-year anniversary is coming up on
12           July 15th.  Do you recall that?
13     A.    I recall that.  I recall that was the same day I
14           was notified that I won my workman's comp case,
15           that my injury was caused by my employment,
16           specifically by the actions of Anthony
17           Patricelli.  So I received those letters on the
18           same day.
19     Q.    Did you have any contact with anybody at the
20           Sheriff's Department as a result of the June 23rd
21           letter from Sheriff Mahar?
22     A.    I remember the letter was sent certified.  So
23           actually, the letter was sent the 24th but I
24           didn't get it -- what is the deadline on the
```

```
1              letter?  I think it's July 1st.  I didn't get it
2              til the day before, because I had to go down to
3              the post office and get it.  So I -- the only
4              person I contacted was Matt Ryan with the union
5              because what was I going to say to the Sheriff's
6              Department?  You know...
7        Q.   And you requested representation from Matt?
8        A.   I did, reluctantly.
9        Q.   Did they do anything?
10       A.   He sent a letter saying that I'm requesting a due
11             process hearing.
12       Q.   Okay.  And it was scheduled for August 14th;
13             correct?
14       A.   That's correct.
15       Q.   And who attended the August 14th due process
16             hearing?
17       A.   Oh, I think Goldberg was the hearing officer and
18             myself and Matt Ryan, Pat Russo and Ed Bly
19             (phonetic), I think is his name.
20       Q.   All right.  And you indicate in your complaint
21             that you thought it was a due process hearing
22             which implies that it turned out to be something
23             else.  Can you -- am I right on that?
24       A.   Most of the meeting took place out in the hallway
```

*JOHN GORMAN - June 15, 2016*        148

1    between Goldberg and Matt Ryan and I was not

2    present.  I was not allowed to hear what they

3    said.  I asked you're my attorney, you represent

4    me, I'd like to hear what they discuss.  I was

5    told I don't have a right to do that.

6         I wanted to present evidence.  I was not

7    allowed to present evidence.  I presented the

8    Workman's Comp decision.  They said they didn't

9    care because they were appealing it.  And I was

10   asked one or two questions, could I come back to

11   work, and I said not with my current disability,

12   not with my current situation until I'm better,

13   and that was it.

14        It wasn't a due process.  Due process is you

15   hear -- I mean, my limited experience of what due

16   process is you listen to evidence, you take in

17   evidence, you ask the person questions.  It was

18   none of that at all.

19        And I don't understand why the county labor

20   attorney was the one running the hearing.  It

21   should be somebody that's a neutral party in my

22   mind, not the guy who wrote the termination

23   letter or the notice you may be terminated if you

24   don't do this.

```
1              I think I asked questions about why I was

2         being terminated for being out for 12 months on a

3         non-work related injury when the Workman's Comp

4         decision was my injury was work related.

5    Q.   Following the -- I'll call it a due process

6         hearing, you did not receive notification until

7         October of the determination?

8    A.   That's correct.

9    Q.   I've seen the letter, it speaks for itself.  Did

10        you have any discussions with anybody at the

11        county about the October, 2014 determination

12        letter from Pat Russo?

13   A.   I sent letters to the Civil Service Commission.

14        As a matter of fact, I requested a meeting in

15        October.  And I also had a meeting, I think, in

16        March where I brought my attorney with me, Mr.

17        Sorsby, to discuss what had happened with the

18        Civil Service Commission.

19   Q.   Okay.  And who was present from the county at

20        that meeting?

21   A.   From the Civil Service Commission?

22   Q.   It was in front of the -- it was the full

23        commission?

24   A.   It was Dan Moran and one other lady.  There's
```

*JOHN GORMAN - June 15, 2016      150*

```
 1              only three members and one of them -- I think the

 2              O'Malley lady had excused herself from it because

 3              she knew my mother.  But she didn't excuse

 4              herself from any conclusions of determinations

 5              that were made in the future.  She just excused

 6              herself from that meeting, and we met with them.

 7     Q.       Okay.  And what were you able to present in terms

 8              of information to the Civil Service Commission?

 9     A.       I mean, off the top of my head, I presented the

10              three letters I received from the Sheriff's

11              Department, the Workman's Comp letter.  I know

12              that there was some discussion about the law and

13              ADA and I don't remember all the details.  That

14              was a long time ago.

15     Q.       How long were you able to spend with the Civil

16              Service Commission at this meeting?

17     A.       I don't know the exact time.  More than an hour.

18     Q.       Okay.  And was this a part of the appeal process

19              in front of the Commission?

20     A.       There is no appeal process.

21     Q.       Okay.

22     A.       To my knowledge, there's nobody ever sent me a

23              letter that says you can appeal this by doing

24              this.  This was all action I took.
```

 1    Q.   If there is -- strike that.

 2              On July 3rd, 2015, the Commission issued a

 3         letter to you indicating that there was no change

 4         in the county's position, essentially.  And I

 5         guess my question is:  If there was no appeal

 6         process, were you surprised to receive the July

 7         3rd letter from the Civil Service Commission?

 8    A.   Do you mean no appeal process from the Sheriff's

 9         Department is what I was specifically talking

10         about.

11    Q.   Oh.  I had asked about the Civil Service

12         Commission and whether or not your meeting with

13         them was part of an appeal process of the Civil

14         Service Commission.

15    A.   The Civil Service Commission hadn't made any

16         determination at that point, so I was going to

17         them for help with the Sheriff's Department.

18    Q.   I see.

19    A.   The answer to me was there was no appeal process

20         to the Sheriff's Department terminating me.

21    Q.   I gotcha.

22    A.   But to my understanding, the Sheriff's Department

23         doesn't ultimately terminate you; the Civil

24         Service Commission does.  They, the Sheriff's

JOHN GORMAN - June 15, 2016      152

1          Department, makes a recommendation to the Civil

2          Service Commission.  So I was going, in my mind,

3          to the source of who approved that determination

4          and that's according to documentation that we've

5          already submitted.  So your question, I think,

6          was:  Was I surprised to get the July 3rd letter?

7     Q.   Yeah.

8     A.   Well, they're saying that there was no violation

9          of my due process rights, whatever those rights

10          are.  There's no written policy or contractual

11          policy for what the due process exists; what is

12          that?  Due process is different for everybody,

13          right?  I don't know.  There's no policy at the

14          Sheriff's Department or in our contract that says

15          what the due process -- what my right is.

16     Q.   Just for the record, what process is due under

17          due process?  That's a whole year of law school.

18     A.   The letter said I can request reinstatement

19          pursuant to Civil Service Law.  So that's exactly

20          what I did.  I'll just end right there.

21     Q.   I was going to ask about that.  You did request

22          reinstatement.  And what happened following your

23          request?

24     A.   I believe they required me to show that I no

JOHN GORMAN - June 15, 2016        153

```
 1           longer had a disability and could come back to
 2           work.
 3      Q.   Without restriction?
 4      A.   No; that I no longer had a disability.  Now, I
 5           don't have the exact letter in front of me and I
 6           don't know if we put it in evidence.  I'm sure we
 7           can --
 8                MR. SORSBY:  Let's just go off the record.
 9                MR. MARTIN:  Sure.
10                (Discussion off the record.)
11   BY MR. MARTIN:
12      Q.   We've had an off-the-record discussion.  Did you
13           want to clarify your answer or add to your
14           answer, not that it was unclear before?
15      A.   I just want to figure out how to get into it.
16           Sorry.
17      Q.   I think the original question was:  What happened
18           when you requested reinstatement?
19      A.   Okay.  The letter -- at the time I asked to be
20           reinstated, according to Civil Service Law
21           Section 73, I asked for an accommodation that I
22           could come back to work, I'd like to be
23           reinstated but I would like to have an
24           accommodation.  And they sent a response back
```

1        saying that I needed to show that I had no

2        disability in order to come back to work.

3             MR. SORSBY:  And if I may, Mr. Martin --

4    Q.  And that was a written --

5    A.  I can further clarify.

6    Q.  Why don't you go on with --

7    A.  We can further clarify if we look at the actual

8        documents that -- and I don't want to mislead

9        anything or it's like you said, the documents

10       speak for themselves.

11   Q.  Yeah, I don't like to go over them and just have

12       people read them and say here's what it says.

13   A.  I was told -- after asking for an accommodation,

14       I was told that no accommodation will be given,

15       that I have to show that I have nothing wrong

16       with me in order to come back to work.

17            MR. SORSBY:  Mr. Martin, can I ask a quick

18       follow-up question on this?

19            MR. MARTIN:  Certainly.

20            MR. SORSBY:  Mr. Gorman, did you ever receive

21       an inquiry from the Commission indicating that

22       they would provide an independent medical

23       evaluation?

24            THE WITNESS:  No.

```
 1                 MR. SORSBY:  Okay.

 2                 MR. MARTIN:  I want to take just a couple

 3           minute break.  I think we're close to the end.

 4                 (A short break was taken.)

 5    BY MR. MARTIN:

 6      Q.   Other than what we've already talked about, have

 7           you had any other interactions or conversations

 8           with Anthony Patricelli?

 9      A.   No.

10      Q.   Certainly not after he was put out of work on in

11           June of 2014 -- 2013, I should say, you haven't

12           talked to him since then?

13      A.   No.

14      Q.   Have you had any discussions with your sister Kim

15           about Anthony Patricelli since June of 2013?

16      A.   My relationship with my sister is not -- has

17           suffered a great deal because of the events that

18           took place in that time frame and we're not as

19           close and we don't speak as often.  We certainly

20           don't -- when we do speak, we don't speak about

21           him.  As a matter of fact, I haven't seen my

22           nephew in years.

23      Q.   Is he still living with Mr. Patricelli or down

24           with your sister or --
```

 1     A.   I believe he's still living with his father.

 2     Q.   Okay.  If I understood your testimony, you never

 3          actually had a chance to talk with Kathleen

 4          Jimino at all about this situation; correct?

 5     A.   She never returned any calls, she never saw me

 6          the multiple times I went to her office, no,

 7          that's correct.  She never answered any letters.

 8              MR. MARTIN:  All right.  I don't have any

 9          other questions.

10              EXAMINATION BY COUNSEL FOR PLAINTIFF

11     BY MR. SORSBY:

12     Q.   John, I just have some quick follow-up questions.

13          John, you testified earlier that after no longer

14          working at the jail, you had obtained employment

15          at, among other places, the post office and

16          Cargill and that with your PTSD, you were not

17          able to continue at those jobs.

18              Can you tell us what about Express Scripts

19          has allowed you to remain at that job compared to

20          these other jobs?

21     A.   You mean Beacon Health?

22     Q.   Yes, Beacon Health.  I'm sorry.

23     A.   The only reason I'm still there against my

24          doctor's wishes, because it's no different than

JOHN GORMAN - June 15, 2016          157

```
 1              Express Scripts, is that I have to have an

 2              income, I have to work with Workman's Comp,

 3              because it will directly affect that case; and

 4              not to mention it will affect my family.

 5                   So as I testified to before, I take all of

 6              my Xanax, four pills, during that eight-hour

 7              period in order to survive, in order to make it

 8              through those eight hours.

 9    Q.   And speaking of those medications, are there --

10         other than the medications, are there other

11         things that the doctors have prescribed for you

12         to do to help you with the PTSD?

13    A.   There's mindful meditating.  There's getting back

14         into group activities and going back into

15         activities.  But those things are easily said and

16         done when you're fighting the symptoms and

17         fatigue and taking Xanax all day.  I don't know

18         if you've experienced Xanax.

19    Q.   No.

20    A.   But it's short acting.  It lasts three and a

21         half, four hours, if you're lucky.  And all the

22         symptoms come back like a brick fell on you, and

23         you have to take that next pill.  So when you go

24         home and you no longer have that next pill
```

JOHN GORMAN - June 15, 2016          158

 1            because you used the four that you're allowed to

 2            take, it's a struggle to just, you know, help

 3            make dinner and have a positive interaction with

 4            your children and help them with their homework

 5            and then, you know, do general life stuff.

 6                 Does that answer your question?

 7       Q.   Yes.  I'd like to just talk about that briefly as

 8            well.  Can you tell us the symptoms you

 9            experienced from the October period of 2012 up

10            until the time you were first diagnosed with

11            PTSD, symptoms related to the events that

12            unfolded at the jail?

13       A.   Sure.  It's built up like a brick wall.  Hands

14            shaking was the first thing.  Severe headaches.

15            Chest heaviness, almost like you're having a

16            heart attack or somebody's sitting on your chest.

17            Fatigue.  Insomnia.  Not being able to perform

18            sexually because, one, you have no interest and,

19            two, you're just not physically able to do it.

20                 All of those things built to the point where

21            I couldn't -- one day, while I was doing rec on

22            July 13th maybe, I couldn't stop myself from

23            crying, I was emotional and that certainly -- and

24            physically shaking.  It's not a state you want to

JOHN GORMAN – June 15, 2016        159

1        be in when you're in charge of inmates.  It makes

2        you look very vulnerable.

3    Q.  And when was this, the rec you said?  When did

4        this incident occur?

5    A.  You said starting in October and I kind of named

6        each one as it built.  And the last thing that

7        led me to being suicidal and having all that

8        emotional stuff was July 13th.  I called in on

9        July 14th, because I couldn't function.  July

10       15th, I went to my primary and went to St.

11       Peter's.  That's kind of the progression of

12       symptoms that I experienced.

13   Q.  And before you went to St. Peter's, were you on

14       any medications?

15   A.  No, nothing at all.  Well, I shouldn't say that.

16       You know, Mucinex or Zyrtec or something like

17       that.

18   Q.  Any medications --

19   A.  Over the counter stuff.  Nothing prescribed by a

20       physician.

21   Q.  All right.

22            MR. MARTIN:  He did say he took

23       migraine medication --

24            THE WITNESS:  Not really.  Not prior to the

JOHN GORMAN - June 15, 2016          160

```
 1          October date.
 2                MR. MARTIN:  Oh, okay.
 3     A.   You said prior to the October date, correct?  Is
 4          that what you meant?
 5     Q.   Right.  Well, prior -- I'm saying what, if any,
 6          medications were you on from the time that you
 7          went into St. Peter's to the October 8th
 8          incident?
 9     A.   Prior to, nothing.  Occasional headache but
10          nothing on a daily basis that I take, no.
11     Q.   I'm talking about the same period again.  Did one
12          of your symptoms include an effect on your
13          sleeping patterns?
14     A.   Yeah.  I would stay up all night, even when I was
15          working, you know, go to work and then sleep for
16          four hours and I had nights where I stayed up all
17          night.  That hasn't changed.  Even taking a sleep
18          aid, sometimes it only works for four hours and
19          then you're up for two nights.
20     Q.   And just to clarify, is that a side effect of the
21          medication or is that a symptom of PTSD?
22     A.   That's a symptom of PTSD, because you can't turn
23          your brain off.  Mr. Martin asked me all these
24          questions about all these events.  Some of those
```

JOHN GORMAN - June 15, 2016          161

1        events play over and over and over in my head and
2        never stop and I can't turn them off.
3    Q.  Okay.  Can you tell us what you understood Master
4        Sergeant Patricelli's powers at the jail to
5        include?
6    A.  I understood and saw that he reported to the
7        Sheriff only, that he oversaw anything that
8        happened in the correctional facility.  He had
9        power over the captain, he had power over Chief
10       Vibert when she was there.  If he didn't like the
11       way something was run or some decision was made
12       in the facility, he would immediately go over to
13       see the Sheriff if the Sheriff was there and
14       either a phone call would be made, that policy or
15       that practice would be stopped or somebody was
16       called over to the Sheriff's Department and it
17       was addressed.
18   Q.  Did you know of any limitations to his authority
19       and power at the jail?
20   A.  I don't know of any limitations, but I know he
21       could go over there and walk into the Sheriff's
22       office and see him any time he wanted.
23   Q.  Okay.  What was the basis for this broad power,
24       if you know, if you understand?  Do you know

*JOHN GORMAN - June 15, 2016       162*

```
 1              where he derived this power from?

 2        A.    Yeah.  I mean, I went to the Bronx Zoo once with

 3              Patricelli and I don't remember the year.  It was

 4              prior to October of 2012, I'd say, way prior to

 5              that, and he liked to talk, and it's always good

 6              to listen.  He would say that the Sheriff trusted

 7              him; that when things weren't going right, he

 8              wanted to know it was his job and because he

 9              built that trust up over the years that he could

10              do anything he wanted and the Sheriff would

11              believe him and so he had unlimited access to

12              him.

13        Q.    And where was he in your chain of command, at

14              least as you understood it?

15        A.    When I got hired, I would say he wasn't in my

16              chain of command but through my experiences, in a

17              chain of command in a correctional facility, he

18              was above the chief and the captain and any

19              sergeant in there, any lieutenant.

20        Q.    Just so I understand, that is what it turned out

21              to be.  But based on his rank, where should he

22              have fallen in the chain of command vis-a-vis

23              you?

24        A.    Right above a sergeant, below the first sergeant,
```

JOHN GORMAN - June 15, 2016        163

 1              below the lieutenant, below the captains.  So you
 2              have a sergeant and master sergeant.
 3     Q.   So under normal circumstances, you didn't report
 4              directly to him?
 5     A.   I never reported to him directly, but he had a
 6              direct influence and effect on me.
 7     Q.   And you had mentioned you were concerned about
 8              Patricelli based on things in the past.  And I
 9              don't know if you went into what specific thing
10              in the past involving Patricelli were you aware
11              of that made you concerned?
12     A.   The whole incident when there was a party after
13              work and they all went to the bar down the street
14              from the jail and he had a disagreement with an
15              officer.  And the documents are in evidence, I
16              believe.  He had a disagreement with him and he
17              went home, got his gun and came back and put that
18              gun up to that co-worker's head.
19     Q.   How did you become aware of that?
20     A.   Initially, through rumors, then through Jimmy
21              Karam who was the internal affairs investigator
22              and then, ultimately, through the actual
23              documentation.
24     Q.   And when did you receive the documentation?

```
 1    A.    I would say the documentation was recent but the
 2          other information --
 3    Q.    You had known?
 4    A.    For a while.  I had known prior to the October
 5          incident.  Not to mention, you know, what I saw,
 6          his, you know, unlimited power in the jail over
 7          other people.  He had the ability to get people
 8          in details.  He had the ability to take people
 9          out of details.
10    Q.    And you had mentioned threats to your sister.  Do
11          you recall what specific threats were made by him
12          against your sister?
13    A.    My sister will refuse to testify out of fear for
14          her son and their relationship, but she was
15          physically, mentally threatened by Patricelli and
16          threatened with, to my knowledge, a firearm.
17    Q.    By Patricelli?
18    A.    By Patricelli.  But again, she won't testify.
19          She'll tell us, you know, family members, but she
20          won't do that, you know, in court because she's
21          afraid like normal domestic violence victims.  I
22          think she was a domestic violence victim.
23    Q.    I just want to stay on the subject for a little
24          bit longer.  Tell us, if you can, and you may
```

JOHN GORMAN - June 15, 2016        165

1              have gone over this, the relationship that you

2              had with your sister before October 8th, 2012.

3         A.   What kind of relationship did I have?

4         Q.   Yes.

5         A.   Good relationship.  We went to the Bronx Zoo a

6              lot.  We went shopping.  We would do lots of

7              things on the weekend.  My sister would always do

8              stuff.  She'd always have her (sic) nephew and

9              just her.  It would never be with Patricelli,

10             because he always had to work or go to the lodge

11             with friends, with the Sheriff, never doing stuff

12             with her.  So we did a lot of stuff together.

13             Went to New York City.  We had a good

14             relationship.

15        Q.   Can you tell us how your relationship changed

16             after October 8, 2012?

17        A.   What it is now?

18        Q.   Well, tell us what -- after October 8th, 2012,

19             tell us how, if at all, the relationship changed.

20        A.   I think that what I know for her, a lot of

21             threats happened when she was leaving, lots of

22             stress happened for her when I was filing, you

23             know, criminal charges or complaints against him,

24             because he would go after her and tell her you

*JOHN GORMAN - June 15, 2016       166*

```
 1              gotta control your brother and things like that.
 2                   When he couldn't get to me, he'd go to her.
 3              When he couldn't get to her, he'd go to me and it
 4              was back and forth like that.
 5       Q.     So qualitatively, how is the relationship now
 6              with your sister compared before October 8th,
 7              2012?
 8       A.     I think it's been about three months since I even
 9              talked to my sister and we always talked every
10              weekend or did something and we haven't done
11              anything.  We haven't gone to the City.  We
12              haven't gone to the zoo.  We haven't done that in
13              years.
14       Q.     So based on that, is it your belief that the
15              events that unfolded at the jail after October 8,
16              2012 going forward affected the relationship with
17              your sister?
18       A.     Directly and extremely, yes.
19       Q.     And specifically, do you believe the conduct of
20              Anthony Patricelli affected the relationship you
21              had with your sister after October 8th, 2012?
22       A.     I do, yes.
23       Q.     Also, you had mentioned before that Patricelli
24              was on an ESU team.  Do you know what ESU stands
```

JOHN GORMAN - June 15, 2016        167

1          for?

2     A.   I know it's on what's called the cert team, which

3          is a team that goes into the jail and squashes

4          any inmate uprisings.  What that stands for,

5          E-S-U, again, I don't know.  I apologize.

6     Q.   You answered.  If you don't know, we'll find

7          out --

8     A.   I don't know.

9     Q.   -- on Monday, potentially.

10    A.   They're a group that goes outside and handles

11         emergency situations in the community.  My

12         brother was on that as well.  I'm sorry, I don't

13         know what it means.

14    Q.   That's all right.

15    A.   Emergency something.  I don't know.

16    Q.   Earlier, you had testified that your demotion

17         from provisional sergeant, you believe, was in

18         retaliation for the -- I believe you had stated

19         it was the events -- it was out of retaliation by

20         Patricelli.  But do you also believe it had

21         anything to do with your refusal on February 8th,

22         I believe, 2013, to offer evidence against Ruth

23         Vibert?

24    A.   I think it was a collective part of Patricelli

JOHN GORMAN - June 15, 2016        168

```
 1            and Mahar acting as a unit.  I believe, because I

 2            wouldn't support Patricelli and his claims, I was

 3            directly disobeying the Sheriff and disobeying

 4            and it was well-known that not doing what the

 5            Sheriff wanted would cost you.  And it cost me my

 6            stripes.

 7       Q.   Okay.

 8       A.   It is quite known that Mahar would yell and

 9            scream and go off on people when things were not

10            done exactly the way he wanted them.

11       Q.   Okay.  You also testified earlier in form or

12            substance that you believe your actions caused

13            the termination of Ruth Vibert.  Can you explain

14            why you believe Ruth Vibert was terminated?

15       A.   I believe up until the point where that February

16            15th incident happened, Ruth Vibert did a good

17            job.  I think that we've heard testimony and saw

18            documents that she did a good job.  There was no

19            negative, to my knowledge, any negative reports

20            out there that she wasn't doing a good job.

21                 And when she refused to shred the documents,

22            you know, that she tried to hand in on February

23            25th, she was terminated on February 27th.  That

24            is a pretty interesting coincidence to me or
```

```
 1              not -- it's not a coincidence; it's a direct

 2              result of her actions or lack of.

 3      Q.      Okay.  So just to be clear, you don't necessarily

 4              believe that she was terminated for anything that

 5              you did wrong?

 6      A.      Well, I didn't do anything wrong.  I just refused

 7              to let it go.

 8      Q.      Let what go?

 9      A.      The workplace violence.  Because I wrote the

10              statement, I handed it in, I had a discussion

11              with her on the 19th during that meeting and I

12              didn't let it go.  I didn't let it just get swept

13              under the rug.  I further pushed it with the

14              workplace violence report.

15      Q.      Did there come a time when you became aware that

16              Vibert was told by Sheriff Mahar that she should

17              shred your workplace violence complaint, that

18              Gorman's -- something to the extent that

19              "Gorman's F'ing through"?

20      A.      Yes.  Ruth Vibert told me a couple days after she

21              was terminated that this is what the Sheriff

22              directed her to do, that she was to shred the

23              documents, "Gorman's F'ing done, you see to it."

24                   And she said to me, "I can't go after an
```

 1              innocent person.  It's nothing I can do.  You did

 2              nothing wrong.  I cannot go after an innocent

 3              person."  She just kept repeating that.

 4       Q.    Now, earlier, we had -- Kathy Jimino had come up

 5              in the discussion as to whether or not you were

 6              aware if she had any conversations with Mahar.

 7              Have you -- are you aware of any evidence -- have

 8              you had a chance to see any evidence, whether

 9              submitted by the defendants or in your own

10              possession, indicating that Ms. Kathleen Jimino

11              was aware of your workplace violence complaints?

12       A.    Well, we received quite a few letters that are

13              stamped by her office and in her handwriting.

14              She's written not to me directly, to Tom Hendry.

15              And we've seen that kind of evidence.  Is that

16              what you mean?

17       Q.    Yes.  Have you reviewed evidence like that

18              recently?

19       A.    Yes.

20       Q.    Okay.  We might come back to that.  Do you recall

21              was that evidence that you had in your possession

22              or was provided to you from the defendants?

23       A.    That was defendants provided evidence.

24       Q.    Just to be clear as well, Sheriff Mahar was not

```
 1              at the due process hearing?

 2      A.    That is correct.

 3      Q.    Okay.

 4      A.    He was the one that made the sole decision --

 5      Q.    Is it also --

 6      A.    -- supporting the policy.

 7      Q.    And is it also your understanding that he

 8              reviewed the transcript from the hearing as it

 9              were with Undersheriff Russo before that

10              determination was made?

11      A.    That was what the letter stated that I received

12              from -- either from Pat Russo, I believe.

13      Q.    Okay.  That would be -- you're referencing

14              Exhibit 8?

15      A.    No, that's not it.

16      Q.    Okay.  That's okay.  We don't have to look for

17              it, that's fine.

18      A.    Pat Russo was directed to send a letter on behalf

19              of Jack Mahar and, in that, it stated that the

20              due process transcript was reviewed by Jack Mahar

21              in making his determination.

22              MR. SORSBY:  Off the record.

23              (Discussion off the record.)

24   BY MR. SORSBY:
```

```
 1    Q.    Mr. Gorman, I'm going to hand you what's in a

 2          binder here.  I'll let you take a look at it and

 3          tell me if you recognize what's in this binder.

 4    A.    It's the 207(c) determination from the Sheriff's

 5          Department.

 6    Q.    Just for identification purposes, can you

 7          indicate the date on it?

 8    A.    The date of the first page is January 15, 2014.

 9    Q.    And who is it to?

10    A.    It's to Matt Ryan, Council 82, from Pat Russo,

11          Undersheriff.

12    Q.    And it's regarding whose name?

13    A.    My name, John Gorman.

14    Q.    All right.  And let's go ahead and turn to the

15          second page.  And just tell us what the title is

16          under "regarding".

17    A.    "Determination/GML 207(c) application".

18    Q.    All right.  And is there a title at the top of

19          the document?

20    A.    "Memorandum".

21          MR. SORSBY:  I'm going to go ahead and have

22          this marked as an exhibit which would be --

23          MR. MARTIN:  C.  These are A and B.  Just

24          attach it to the transcript when we get them.
```

 1              MR. SORSBY:  Okay, let's do that.

 2              (Defendant's Exhibit C was marked for

 3         identification.)

 4              MR. SORSBY:  We can go on the record that

 5         what's been marked as Exhibit C is in attorney for

 6         plaintiff's possession and I'll take sole

 7         responsibility for it.  Do you want to do that?

 8              MR. MARTIN:  Sure.

 9              MR. SORSBY:  I will not lose it.  I'll scan

10         it to you.

11    BY MR. SORSBY:

12     Q.   So now that we've had this marked for

13         identification as Exhibit C, can you -- so do you

14         understand that this was the -- what do you

15         understand this to be?

16     A.   I understand this to be the investigation and

17         determination of Jack Russo's -- Sheriff Jack

18         Mahar's, excuse me, decision in my 207(c) case.

19     Q.   Okay.  And do you know -- and have you read

20         through this before, this document?

21     A.   Many times, yes.

22     Q.   All right.  And do you know if it includes the

23         Worker's Compensation determination?

24     A.   It does not.

 1      Q.   All right.  And do you know who conducted -- who

 2           was responsible for conducting this

 3           investigation?

 4      A.   According to policy, it's supposed to be the

 5           sheriff.

 6      Q.   Okay.  And then who actually conducted the

 7           investigation?

 8      A.   It says Undersheriff Pat Russo is designated by

 9           the Sheriff to make the determination in this

10           matter.

11      Q.   Okay.  And you said that you don't believe

12           this -- well, having reviewed this exhibit, you

13           did not see anywhere where the Worker's

14           Compensation was included in the actual

15           determination?

16      A.   The Workman's Compensation was not included.  Not

17           only that, my application for 207(c) was, because

18           of workplace violence --

19      Q.   Okay.

20      A.   -- not, one, sustained as to work-related stress,

21           work-related stress, workplace violence, threats,

22           retaliation, work assignments.  It doesn't

23           contain any workplace violence document -- not

24           one workplace violence complaint or document is

*JOHN GORMAN - June 15, 2016        175*

```
 1              included in this folder.
 2     Q.    Specifically -- and again, there's been a number
 3           of workplace violence complaints filed as
 4           exhibits in the depositions in this case.  None
 5           of those were included in this decision?
 6     A.    There are two, February 25th of 2013 and July
 7           15th of 2013.
 8     Q.    Okay.
 9     A.    Those two are the only two workplace violence
10           complaints and neither of those are in here or
11           any of the incident reports.  And the nature of
12           the injury that I state in my application is
13           directly related to stress related to retaliation
14           due to workplace violence.
15     Q.    Okay.  And do you know if you independently
16           offered these documents to Undersheriff Russo?
17     A.    I certified mailed them to Tom Hendry, Kathy
18           Jimino, Jack Mahar, Pat Russo.  I further on the
19           date in June in 2013 when I was interviewed by
20           Pat Russo witnessed those workplace violence
21           documents from February on his desk.
22     Q.    Okay.
23     A.    So I know that he had them in his possession.
24     Q.    And did you submit the Worker's Compensation
```

*JOHN GORMAN - June 15, 2016*        176

 1          decision to Mr. Russo?

 2    A.    I submitted the Workman's Compensation findings

 3          at the due process hearing.

 4    Q.    Okay, at the due process hearing.

 5    A.    And it's mentioned in the transcript.  I don't

 6          know if it was included as evidence if they

 7          accepted it or not, but I certainly attempted to

 8          and was mentioned in there.

 9    Q.    Okay.

10    A.    Pat, can I add something?

11    Q.    You have something else to say?

12    A.    Well, I just wanted to talk about the limited --

13          this report was done in January 15th of 2014.

14    Q.    Which report, John?

15    A.    The 207(c) findings.

16    Q.    Okay, yes.

17    A.    No medical documentation was requested from Dr.

18          Thalmann even though part of my application was

19          signing a release for information.  But the only

20          information from Dr. Thalmann or from a doctor

21          included in this was one letter from August of

22          2013.

23    Q.    Okay.

24    A.    So there were a lot of documents which we've

1          submitted into evidence from Dr. Thalmann talking
2          about my condition, but none of them were
3          included in his investigation or his findings.
4     Q.   And do you know whether or not they were
5          provided?  Did you or Dr. Thalmann send those
6          documents?
7     A.   To my knowledge, Dr. Thalmann sent them to
8          Workman's Comp and to Rensselaer County upon my
9          request --
10    Q.   Okay.
11    A.   -- when I filled out the application for the
12         workplace violence or the 207(c).  So I guess the
13         question is if my turning in this application on
14         July 18 of 2013 and their findings aren't done
15         until January, what's their obligation?  They
16         only reviewed August 1st of 2013.  You have
17         September, October, November, December, half of
18         January.  You have four and a half months of
19         medical documentation that could have been
20         reviewed to make their decision, which they did
21         not review or request or approve or anything.
22    Q.   Okay.  And were any inquiries sent to you for
23         further medical documentation during that
24         process?

JOHN GORMAN - June 15, 2016          178

```
 1      A.   Other than meeting with Pat Russo the one time,
 2           no contact or inquiries were made to me or my
 3           doctor's office, to my knowledge.
 4      Q.   Do you know if a medical authorization was
 5           requested by Dr. McIntyre regarding this?
 6      A.   Yes.
 7      Q.   Okay.  Who was the authorization of these
 8           documents from?
 9      A.   Can you be --
10      Q.   Sure.  A medical authorization was provided by
11           Dr. McIntyre to you?
12      A.   To me to release information to him and
13           Rensselaer County from Dr. Camperlengo and Dr.
14           Thalmann.  And I saw him in October 29th of 2013
15           and December something.  I don't know the exact
16           date, December of 2013.  So...
17      Q.   Okay.  And did you have subsequent conversations
18           with your doctors to ensure that those documents
19           were sent or do you have any information that
20           would tell you that they were sent?
21      A.   I think that included in the evidence are some
22           faxes that show that the information was sent to
23           Rensselaer County.
24      Q.   All right.
```

1    A.   I'd have to review Dr. McIntyre's records again

2         to show that he received them.

3    Q.   Right, no problem.  Other than that other medical

4         documentation that we've been discussing, are you

5         aware of any other information that wasn't

6         provided to Dr. McIntyre by the Sheriff in order

7         for him to make a determination of 207(c)?

8    A.   In the back is Dr. McIntyre's findings and Dr.

9         McIntyre lists the records that he reviewed.  He

10        reviewed clinical records from Dr. James

11        Thalmann.  He doesn't include dates.  He included

12        clinical records from Camperlengo.  He included

13        Rensselaer County performance appraisals, report

14        from 3/14 supporting documents from Officer

15        Gorman, workplace violence complaint

16        investigation findings.

17             I'm not sure what that means, because the

18        only thing in here that has to do with workplace

19        violence is Hal Smith's finding that he reviewed

20        my complaint and that my -- and video

21        surveillance of the facility and that my

22        complaint -- "I find your complaint unfounded".

23        That's the only reference to workplace violence.

24        So I'm not sure if --

JOHN GORMAN - June 15, 2016        180

```
1    Q.   When you're saying it's the only reference, are

2         you saying it's the only reference in that

3         decision?

4    A.   It's the only reference from that decision, yes.

5    Q.   To workplace violence?

6    A.   Correct.  And then preemployment psychological

7         evaluation.  There are, as we know from this

8         case, probably 50 documents that could have been

9         reviewed by Dr. McIntyre that were not included

10        in this finding.

11   Q.   Okay.

12   A.   The date he saw me or I saw him was December 12th

13        of 2013.

14   Q.   Do you know what the requirements are for 207(c)

15        in terms of what type of investigation the

16        Sheriff's supposed to engage in before denying

17        benefits?

18   A.   A general response to you without reviewing the

19        policy that's in evidence is that he's supposed

20        to review any evidence that is available or has

21        been submitted or can be obtained by him.  But he

22        has sole discretion to decide what's included in

23        the investigation.

24   Q.   Okay.
```

JOHN GORMAN - June 15, 2016        181

```
 1    A.   There's quite a -- you know, I think it's a
 2         two-page long policy contract.
 3    Q.   And when you got the medical authorization from
 4         Dr. McIntyre -- when did you receive that?  Was
 5         that when you went for the evaluation?
 6    A.   I signed it on October 29th of 2013 and it had to
 7         be an unlimited authorization, meaning he wanted
 8         access to every single thing.  As a matter of
 9         fact, the reason why there's such a big
10         difference between October and December and the
11         dates, according to him, was my doctor refused to
12         turn over handwritten notes, because the general
13         response to any inquiries, legal response to any
14         inquiries of medical information is typewritten
15         letters and status updates, not doctors'
16         handwritten notes.
17              So Dr. Thalmann was not willing to release
18         them, but he ultimately did release my entire
19         medical file prior to December 12th to Dr.
20         McIntyre.
21    Q.   And you know this because?
22    A.   I had a discussion with Dr. McIntyre in length
23         about it or, excuse me, Dr. McIntyre and Dr.
24         Thalmann in length about it.
```

JOHN GORMAN - June 15, 2016          182

```
 1    Q.   These documents listed in the 207(c), the records

 2         that apparently Dr. McIntyre reviewed, did you

 3         receive a request for documents other than

 4         medical documentation from Dr. McIntyre?

 5    A.   Did I receive any request from Dr. McIntyre?  No.

 6    Q.   Okay.

 7    A.   He didn't request any from me.

 8    Q.   Where did you understand these documents to have

 9         been received from?

10    A.   The first two that say clinical records from

11         James Thalmann, and Camperlengo, directly from --

12    Q.   Specifically, the Troy Police report, the

13         workplace violence complaint.

14    A.   The rest of those came from the Sheriff's

15         Department.  They are the only people that had my

16         performance ratings.  I didn't bring them with

17         me.  By the way, the two interviews that Dr.

18         McIntyre conducted were recorded by me and can be

19         turned over.

20    Q.   Okay.  Just as a follow up, when -- can you tell

21         us what role -- so there was -- let me back up.

22              When the Sheriff denied your 207(c)

23         benefits, did there -- was there an appeal

24         process to that of any kind?
```

*JOHN GORMAN - June 15, 2016        183*

 1    A.   There is no appeal process.

 2    Q.   For 207(c)?

 3    A.   For 207(c).

 4    Q.   All right.  Does an arbitrator get involved in

 5         any way?

 6    A.   Well, I guess -- yeah, I guess there is.  I

 7         apologize.  There is some action through the

 8         union and they did call an arbitrator, but the

 9         arbitrator solely looks at did the Sheriff follow

10         the policy, the contract that's written, not the

11         findings.

12    Q.   Okay.

13    A.   How the findings were come by, for lack of a

14         better phrase.

15    Q.   And just -- okay.  So as far as you know, they do

16         not substantively analyze whether or not the

17         determination was correct?

18    A.   That is correct.  The arbitrator -- Dr. Thalmann

19         came and testified for five or six hours and Ruth

20         Vibert came and testified -- and he ruled that

21         according to our contract, none of that was

22         admissible, because the Sheriff has sole

23         discretion on what is put in here, not what facts

24         are available or information available, what he

*JOHN GORMAN - June 15, 2016        184*

```
 1              decides he wants to put in here.

 2      Q.      The final point on this:  What was the

 3              determination of the Sheriff in regards to

 4              207(c)?

 5      A.      That I wasn't entitled is the general...

 6      Q.      Do you know why he's saying you were not entitled

 7              to 207(c)?

 8      A.      "Based upon Dr. McIntyre's assessment, based upon

 9              comprehensive review and issues raised by Officer

10              Gorman's application and documents submitted to

11              support thereof...concluded that the officer may

12              have a psychological issue, they are not related

13              to the performance of his duties.  Based upon the

14              foregoing, Claimant's application for 207(c)

15              benefits is denied."

16      Q.      John, we had discussed earlier a situation in

17              which you were challenged by Captain Smith

18              regarding the complaint and you were arguing the

19              policy supported your actions.  And Captain Smith

20              said he couldn't help you because it was being

21              pushed by Patricelli.

22                   Do you recall that?

23      A.      Are you talking about the write-up that had to do

24              with the signing of a firearm log by Sergeant
```

1           Maselli?

2    Q.    Yes.

3    A.    There may be now but, at the time, there was no

4          policy to dictate that log.  That log was just

5          something they made up to double check and that

6          when I went to him and said, "There's no policy

7          on training", you know, "I don't feel that I

8          should be written up," he said, "There's nothing

9          I can do; that Patricelli is pushing this and I

10         have no control over it, nothing -- I can't help

11         you."

12   Q.    Okay.  Earlier, we discussed log entries and that

13         Sergeant Maselli was helping Patricelli by

14         checking your logs.

15               What are your -- can you just tell us

16         quickly what the log entries are?

17   A.    When a sergeant enters a housing unit, he either

18         writes in a log which needs to be handwritten or

19         now it's computerized when I was there.  You

20         would type in how you found the officer's

21         performance, their appearance, the appearance of

22         the housing unit, the overall setting, you know,

23         and that you were there, the time you were there.

24         You make rounds of the unit, then you would

JOHN GORMAN - June 15, 2016          186

```
 1              leave.
 2      Q.      Okay.  And so that's what the log would entail?
 3      A.      Right.  And if I failed -- they were checking to
 4              see if I failed to write anything at all or I
 5              failed to go three times a shift.  You had a
 6              certain amount of time you had to do your rounds.
 7              You don't want to go too many because you're
 8              harassing the officer and it's affecting how
 9              they're doing their job, but you want to go
10              enough to know they're supported and you're
11              checking up on them.
12      Q.      How did you come to understand they were checking
13              your logs?
14      A.      Besides witnessing it, Maselli going behind me
15              and on the housing unit when he wasn't assigned.
16              Each sergeant was assigned to a certain side of
17              the jail.  If I was on the north side and he's on
18              the west side, why is he on the north side?  You
19              know, going to my housing unit and looking at the
20              logs, not making an entry.
21                  As I said before, Officer Barry McDonald
22              pulled me aside and said, "You're a sergeant,
23              I've been where you've been before.  Just be
24              aware that Maselli is going around checking your
```

JOHN GORMAN - June 15, 2016        187

```
1              logs and he stated that he's acting on
2              Patricelli's behalf, that he's working with
3              Patricelli to write you up".  And Officer
4              McDonald is a 20-year veteran of the Sheriff's
5              Department.
6        Q.    Given the way the deposition was today, we kind
7              of broke up the time increments and the way
8              things happened, so I just would like to ask you
9              in regards to the following around the camera
10             system, did that -- was that -- did that just
11             happen once or twice or was that throughout the
12             period of time that Patricelli was still working
13             at the jail?
14       A.    That was a daily occurrence.  Any time I worked,
15             Rankin got those phone calls after the thing in
16             October, got worse.  There came a time when
17             Patricelli was accused of following not only me
18             but Pat Russo and Lieutenant Karam, that he blew
19             up in Ruth's office and Ruth removed the cameras
20             from Patricelli's office.
21       Q.    Okay.
22       A.    And then -- and that was -- you want a time
23             frame?  That was maybe January.
24       Q.    Okay.
```

JOHN GORMAN - June 15, 2016        188

```
 1   A.   When Ruth was fired, the cameras were placed back
 2        into his office, and I know because I put the
 3        cameras on the cart, it was part of my job, as
 4        opposed to installation.  I didn't go into the
 5        office to take them out but I put those things on
 6        the shelf for Sergeant Dunham.  Then, I got a
 7        request from Sergeant Dunham to put those
 8        computers, that system, because there was only
 9        five or six systems that did that, back on the
10        cart and Dunham told me he was reinstalling that
11        into Patricelli's office.
12   Q.   How did you become aware that Patricelli was
13        following Russo and others with the cameras?
14   A.   Through Ruth Vibert and Sergeant Dunham.
15   Q.   Okay.  And how did you become aware that you were
16        routinely being followed on camera by Patricelli?
17   A.   Through those two same parties, Ruth and Sergeant
18        Dunham and Jeff Rankin.
19   Q.   And in regards to showing up at your work site
20        and for unexplained reasons, can you tell us how
21        frequently that happened?
22   A.   At least one to three times per shift that I
23        worked.
24   Q.   Okay.  And what was the time period that this was
```

```
 1              happening?  After -- obviously after October 8th?
 2      A.   I don't think it happened quite as often in
 3           October.  It got worse in November, December,
 4           January.
 5      Q.   In regards to whenever he would meet you smiling
 6           at you in an awkward way, is that something he
 7           would engage in frequently?
 8      A.   Every time I walked by him at roll call in the
 9           cafeteria in the hallway, that was a daily
10           occurrence or multi-daily occurrence, that smile
11           and head shake and it's hard to describe.  People
12           say, well, that's just a boy thing but have you
13           ever been eyeballed?  They call it hairy eyeball.
14           Have you ever been eyeballed by an inmate or
15           somebody on the street?  Have you ever had that
16           experience?  It's hard to describe.
17                It's a look of intimidation, it's a look of
18           threat.  Somebody might say, well, aren't you
19           interpreting that?  I think what they teach you
20           to be a correction officer, you learn from years
21           of reading hundreds of people that come in and
22           out of the jail, you know, what certain faces
23           mean and what certain actions mean.  And you
24           know, he had 20 years -- he has over 20 years
```

1        experience.  He knew what he was doing and it was

2        intentional and it was harassing.

3   Q.   Okay.  All right.

4   A.   It was intimidating.

5   Q.   I want to stay on the record on this.  We had

6        discussed some cases off the record to be when

7        Sheriff Russo (sic) approached you and was

8        talking to you about Ruth Vibert and the

9        possibility that she was discussing Patricelli's

10       personal issues.  You've discussed a complaint

11       that you saw.

12            Do you recall that?

13  A.   I think what you mean to say is Sheriff Mahar;

14       right?

15  Q.   Correct.

16  A.   Okay.  You said Russo.

17  Q.   I'm sorry.

18  A.   Sheriff Jack Mahar had me go into his conference

19       room where he referenced a two and a half or

20       three and a half page typed stapled complaint

21       that he said was written by Patricelli involving

22       allegations of Ruth sharing confidential personal

23       information with me.

24  Q.   And you understand that that document is

JOHN GORMAN - June 15, 2016        191

```
 1              different than what's already in evidence as what

 2              appears to be a workplace violence complaint or

 3              workplace complaint by Patricelli against -- let

 4              me back up.  Let me strike that.  You've answered

 5              the question already.

 6                   Now, John, there came a time in February

 7              that you filed a state police report with Trooper

 8              Hock with regards to Mr. Patricelli?

 9    A.   Yes.

10    Q.   Okay.  And did you come to understand that

11         Patricelli admitted to Trooper Hock that he used

12         his work issue cellphone to contact you?

13    A.   Did I learn that from Trooper Hock?

14    Q.   Yeah, that he admitted to her that he had used

15         his cellphone, workplace cellphone, to call you?

16    A.   I'm not sure of that.

17    Q.   Okay.

18    A.   I'd have to look at her report.  I know he did

19         for a fact because I confirmed it with my sister.

20    Q.   Okay.

21              MR. SORSBY:  Off the record.

22              (Discussion off the record.)

23    BY MR. SORSBY:

24    Q.   Now, John, we discussed earlier the termination
```

*JOHN GORMAN - June 15, 2016         192*

 1          of Chief Vibert.  Did you understand that she was

 2          terminated because she refused to shred your

 3          workplace violence complaint and refused to

 4          terminate you?

 5     A.   That's what she told me, yes --

 6     Q.   Okay.

 7     A.   -- while I was working at the correctional

 8          facility.

 9     Q.   Okay.  Did there come a time in March of 2013

10          when you were contacted by Patricelli in regards

11          to dropping the charges against them?  When I say

12          charges, I mean the criminal charges.

13     A.   There are phone calls that I don't remember if --

14          I used to remember them.  You're asking me in

15          March, did he contact me?  At some point, he did

16          approach me and I don't know, if it was via

17          phone, it did take place.  It was an issue that

18          he wanted me to drop them.

19              He also did that on a regular basis through

20          my sister.  He would have my sister call me and

21          ask me to drop the charges.

22     Q.   Okay.

23     A.   Again, this was after the February 15th incident,

24          okay, 2013.

*JOHN GORMAN - June 15, 2016*        193

 1    Q.    Okay.  Just briefly, there came a time when you

 2          actually went to Kathleen Jimino's office to

 3          discuss your workplace violence case?

 4    A.    I went three times.

 5    Q.    Did you meet with Kathy?

 6    A.    No.  I was always told she was in a meeting or

 7          out and I left my name and my phone number with

 8          her secretary and I was assured all three times

 9          that she or somebody would get back to me to

10          discuss either an appointment or discuss the

11          issue.

12    Q.    Okay.  And there's some discussion about a

13          Sergeant Walraed, and I can't say his name,

14          Gecewicz, about assigning you to some duties at

15          the jail.  Were these duties bad because they

16          were to be assigned to new staff?

17    A.    The worst duty you do is a strip search.  After

18          every visit, attorney or any visit, a strip

19          search would be conducted.  Generally, strip

20          searches were done by either the officer who was

21          assigned to visitation -- any time I was assigned

22          to visitation, I was that officer and I did the

23          strip searches; or they were assigned to new

24          recruits as a training experience.  They were

```
 1             never assigned to somebody who had been a
 2             sergeant prior, especially.
 3     Q.    And you were assigned these duties?
 4     A.    On a regular basis by those individuals.
 5     Q.    And were you in charge of visitation when you
 6             were assigned those?
 7     A.    No.
 8     Q.    Okay.  And you were certainly not a new employee?
 9     A.    No.  As a matter of fact, the only time I did
10             strip searches is when they assigned them to me.
11             If they weren't working, I didn't do strip
12             searches.
13     Q.    This may be self-evident, but you indicated this
14             was the worst duty and it involves, as the term
15             would describe, a complete strip search?
16     A.    Yes.
17     Q.    Okay.  Of male inmates only, to clarify that.
18             Did there come a time that you sent a letter
19             in April to Ms. Jimino advising her about the
20             incomplete investigation of Tom Hendry?
21     A.    Yes.  I sent her multiple letters.
22     Q.    Okay.
23     A.    All certified mail.
24     Q.    And again, you never received a response from her
```

1           specifically?

2     A.    I never received a response, period.

3     Q.    When you say period, from her office?

4     A.    From anybody at Rensselaer County, yeah.

5     Q.    Okay.  Did you have a conversation with Chris

6           Meyer?

7     A.    I didn't have -- I've never had a conversation

8           with him.  I was just left a voicemail and I

9           returned the voicemail.

10    Q.    Okay.  Did you understand that there came a time

11          when Chief Vibert had given copies of your

12          complaint to Undersheriff Russo?

13    A.    Ruth told me she did on multiple occasions.  I

14          also heard her testimony.

15          MR. MARTIN:  You're referring to the first

16          workplace violence complaint?

17    A.    Yes, the first one.

18          MR. SORSBY:  Yes.

19    Q.    Did you understand there came a time that your

20          doctor sent a letter to Undersheriff Russo

21          seeking to remove you from working for ongoing

22          emotional distress?

23    A.    Are we talking about Dr. Fogel?

24    Q.    Thalmann.

JOHN GORMAN - June 15, 2016      196

```
 1     A.    Thalmann, yes.  Dr. Fogel initially took me out

 2           of work and then the treatment was taken over by

 3           Dr. Thalmann.

 4     Q.    Okay.  And he told you that he sent this letter

 5           to Undersheriff Russo?

 6     A.    I believe he sent multiple letters, yes.

 7     Q.    Okay.  When you interacted with Dr. McIntyre, did

 8           there come a time when he threatened you with

 9           insubordination if you did not -- insubordination

10           resulting in your termination if you didn't

11           provide all the medical documents to him?

12     A.    Yes.  He told me if I didn't sign the release and

13           I didn't make my doctors turn over every scrap of

14           paper, as he put it, in my medical file that I

15           would be determined to be insubordinate and would

16           be immediately terminated.

17     Q.    Do you know what prompted that type of statement?

18     A.    Because as I said before, Dr. Thalmann and

19           Camperlengo as a practice, according to them,

20           that it was the law when one doctor requests

21           medical records or anybody that they turn over,

22           you know, typed letters and progress reports and

23           things like that.  But they are under no

24           obligation to turn over handwritten notes.
```

JOHN GORMAN - June 15, 2016        197

```
1     Q.   Okay.  And do you know what, if any, relationship
2          Dr. McIntyre's office has with the Sheriff's
3          office?
4     A.   Dr. McIntyre has a contract to do all the new
5          hires for any of the correctional officers or
6          deputies that are hired by the county and, who
7          knows, maybe other people, who knows, maybe other
8          people within the county, but who need to have
9          psychological exams done in order to be hired for
10         their jobs.
11    Q.   In the complaint, it's stated -- it says in his
12         report -- referring to Dr. McIntyre's report, it
13         says definitively that he knew the plaintiff's
14         backstory, that he knew things that Defendant
15         Patricelli had done in his past.
16              Did you inform him of the quote-unquote
17         backstory?
18    A.   I think what he told me was he didn't need to
19         hear all the details of my situation because he
20         knew the backstory, he got the backstory.  And my
21         comment to him was you haven't heard my version
22         of the events that took place.  Aren't you here
23         to interview me and hear what happened to me?
24         Not get that information from the Sheriff's
```

1          Department.

2     Q.   And I just want to clear up the record and the

3          complaint, for that matter.  The statement that

4          "I already know the backstory, I know the

5          problems with Patricelli in the past", that

6          statement was made to you when you were being

7          interviewed by Dr. McIntyre?

8     A.   On October 29th, when I went to see Dr. McIntyre

9          and I took the psychological exams and there was

10         an interview part, that's what he said to me when

11         I wanted to tell him my side of the story, the

12         events that took place that led me to having the

13         illness that I went there for.

14    Q.   When he told you he already was aware of the

15         backstory, what, if anything, did you tell him?

16    A.   Well, I asked him where he got the backstory

17         from.  He said, "Well, I got it from the

18         Sheriff's Department."

19              And I said, well, I thought that was

20         interesting since the Sheriff's Department hadn't

21         done any investigation into workplace violence so

22         how did he get the backstory when they didn't

23         even investigate it?

24    Q.   And what did he say to that, if you can recall?

JOHN GORMAN - June 15, 2016        199

```
1    A.   Nothing.  He just didn't say anything that I can
2         recall.
3    Q.   Now, there came a time that you -- after the --
4         well, let's back up.
5              There came a time when you applied for
6         Worker's Compensation benefits?
7    A.   Yes.
8    Q.   Do you recall about what time that was, when that
9         was?
10   A.   I don't remember the exact date but...
11   Q.   Do you recall being January and May of 2014?
12        Does that seem to --
13   A.   Yeah, it wouldn't be May of '14 because -- well,
14        when did they make the decision?  June of '14.
15   Q.   Correct.
16   A.   I would say January would be more like it,
17        because it took them quite a bit of time to come
18        to a determination.
19   Q.   Okay.  And --
20   A.   Not only that, I'm sorry, I applied -- I also
21        attempted to apply for shared disability.  At the
22        Sheriff's Department, you don't get New York
23        State long term and short term disability, you
24        can't buy into that.
```

1              You have two ways of getting disability

2          while you're on the job, 207(c) and what they

3          call shared disability which we pay into every

4          week out of our pay period.  I was told by

5          Marcelle I was not eligible for that and denied

6          an application.

7     Q.   Who's Mark?  Can you just say --

8     A.   Marcelle.

9     Q.   Swanberry?

10    A.   Swanberry, yes.  I ultimately was sent an

11         application after I applied for Workman's Comp

12         because they told me, well, you can't have an

13         application because you're no longer eligible

14         because you applied for Workman's Comp benefits.

15    Q.   Let's back up.  What, if anything, did Marcelle

16         say as to the reason why you're not eligible for

17         the Sheriff's disability?

18    A.   She just said I didn't qualify.  I had no

19         documentation to explain the program and I wasn't

20         given any when I was hired.  I just knew that we

21         paid for that out of our check weekly and that

22         was another benefit option.

23              So I called her, and I don't recall the

24         date, but I asked her for an application and she

```
 1              told me I was -- I didn't need the application
 2              because I didn't qualify.
 3                   And I also called Lieutenant Beaudry and
 4              talked to him, because he does the time and
 5              benefits at the jail.
 6     Q.    And so this would have been after the June 24th,
 7           2014 Worker's Comp decision?
 8     A.    No.  This was prior to that.  It was after I
 9           applied for Workman's Comp but not before I got
10           it.
11     Q.    Okay.  And so you were -- you had also just
12           testified at another point you were told that you
13           should apply for the Sheriff's disability but
14           somebody told you it doesn't matter because you
15           wouldn't be eligible?
16     A.    That's what Marcelle told me.
17     Q.    When did she tell you that?
18     A.    Again, I don't recall.
19     Q.    Okay.
20     A.    I know I consulted an attorney about the whole
21           thing after-the-fact, but I don't know the exact
22           date of when I talked to her.  It was prior to me
23           going to see Johnson to apply for workman's comp.
24     Q.    Who's Lemire Johnson?
```

*JOHN GORMAN - June 15, 2016      202*

```
 1    A.   Lemire Johnson is the attorneys representing me
 2         in the workman's comp case.
 3    Q.   Did she ever indicate why you weren't eligible
 4         for the Sheriff's benefits?
 5    A.   Again, he gets to decide who's eligible.
 6    Q.   Who's he?
 7    A.   The Sheriff, Jack Mahar, gets to decide who's
 8         eligible for that.
 9    Q.   Okay.  And did the Worker's Compensation Board
10         ultimately come render a decision in your case?
11    A.   Yes.  And on June 23rd of 2014, I believe the
12         date is, they ruled that my condition was caused
13         by my employment, specifically by the actions of
14         Anthony Patricelli.
15    Q.   Okay.  Do you know if this is already in the
16         record, the decision?
17    A.   I want to say yes, Pat, but I'm not sure.
18         Patrick.  I'm not sure.
19              MR. MARTIN:  I don't remember.
20              MR. SORSBY:  Would you be willing to just go
21         on the record and say we'll add it?
22              MR. MARTIN:  Sure, Exhibit D.
23    A.   This isn't the ultimate decision.  It's just one
24         of the awards.  This is 2015.
```

JOHN GORMAN - June 15, 2016          203

1    Q.   So it's not talking -- yeah, it's not talking

2         substantively about the law.

3    A.   This is the answer to the appeal.  They lost --

4              MR. SORSBY:  It may actually be in here.

5    A.   They lost the initial workman's comp case and

6         then they appealed it and it took another year

7         for the findings to come back.

8              MR. SORSBY:  Off the record.

9              (Discussion off the record.)

10             MR. SORSBY:  The parties agree at the next

11        scheduled deposition that we will -- that there

12        won't -- we'll enter for admission the decision

13        from the Worker's Compensation Board granting

14        eligibility for Mr. Gorman's workman's

15        compensation benefits.

16             MR. MARTIN:  That's the June, 2014 decision,

17        right?

18             MR. SORSBY:  As far as -- yes, I think it is,

19        actually, yes.

20             THE WITNESS:  You're not looking for the one

21        that they send to the full board where it upholds

22        the decision?  Because there was an appeal.

23        You're okay with --

24             MR. MARTIN:  That was last month?

 1              THE WITNESS:  That was May -- no, that was

 2          2015 was the first appeal.  Then, they appealed

 3          not the condition, they appealed the monetary

 4          award and that was the one that just happened.  So

 5          there have been two appeals and two affirms.

 6          MR. SORSBY:  My sense is that for different

 7          reasons, both parties are going to want that in

 8          the record for varying reasons, but I think we

 9          should get all of it in.

10              THE WITNESS:  I thought it was in.

11          MR. SORSBY:  It's here.  There's a lot of

12          documents, but we will find it.

13   BY MR. SORSBY:

14      Q.  I'd like to talk about the due process hearing

15          and Civil Service Law Section 73.  From your

16          understanding of that, does the Sheriff have to

17          terminate you if you've been out of work for more

18          than a year?

19      A.  My extensive reading of the law and going over it

20          with Mr. Martin or, excuse me, Mr. Ryan was that

21          that is a law that may be enforced, but there's

22          nothing in the wording that says that it has to

23          be.

24              As a matter of fact, we have evidence

1          submitted by Mr. Martin that shows that there are

2          countless employees who have been out since 2010,

3          you know, 2012, you know, one of them has been

4          out since the '80s, that have maintained their

5          employment and not been terminated.

6      Q.  Okay.

7      A.  An example would be Laura Seabury, Laurie Abbot

8          was also her name, married name.  She's been out

9          since 2010 and she has not been terminated.

10     Q.  Do you know if -- I don't know the answer to

11         this, but do you know if Anthony Patricelli was

12         out for more than a year?

13     A.  I want to -- I don't know the exact date.  It

14         certainly was close to a year.  He recently was

15         out with a knee injury and received workman's

16         comp without any kind of appeals or fighting.

17         Had knee surgery and went back to work in May.

18         And I believe that he was out for more than a

19         year and he was not terminated.

20     Q.  Okay.

21     A.  I can give you an example of somebody who was

22         terminated right around the same time I was for

23         one year, after 18 months, requested their job

24         back, was given their job back without taking a

```
 1            civil service exam and kept their seniority back
 2            to 1997.  That person's name is Chris LaFountain.
 3            Again, we have evidence to show that.  This
 4            recently came from Mr. Martin.
 5       Q.   Okay.  So not only do you believe that the
 6            Section 73 was permissive but you're aware of
 7            situations where the Sheriff could have but did
 8            not terminate people that are out for more than a
 9            year?
10       A.   I'm not aware of any incidents besides my own
11            where the person was terminated after 12 months.
12       Q.   All right.
13       A.   At the Sheriff's Department, I should say.
14       Q.   Right, to be clear.  Just tell us again when you
15            were first diagnosed with PTSD.
16       A.   The initial diagnosis was acute stress disorder
17            and depression and anxiety.  That is something
18            from my reading and discussing with my doctor
19            that happens to somebody who can be in a car
20            accident out here on Central Avenue, somebody
21            that's exposed to, short term, one incident, and
22            it lasts approximately three months or so.  Once
23            my condition lasted an extended amount of time,
24            now, we're talking three years, it was changed to
```

JOHN GORMAN - June 15, 2016          207

```
 1          chronic PTSD.
 2    Q.    Do you know when that change came?
 3    A.    Probably two years ago.
 4    Q.    Okay.  And when do you believe that the county
 5          became first aware of the fact that you had a
 6          disability?
 7    A.    Officially aware of by a doctor, by a trained
 8          professional?
 9    Q.    We can get to that.  Is there another way that
10          they might be made aware of the fact that you may
11          have had a disability?
12    A.    My application for 207(c) in my mind would say,
13          hey, I have something wrong, I'm having symptoms,
14          this is what's going on, these symptoms related
15          to workplace stress; that, to me, you know,
16          reporting it.
17    Q.    That would be the first time in your mind that
18          they would become potentially aware of a
19          disability?
20    A.    First time I had anything seriously wrong with
21          me.
22    Q.    And before that, just on the timeline, when did
23          you go to St. Peter's Hospital?  Was that
24          before --
```

1    A.    July 15 of 2013.

2    Q.    Okay.

3    A.    So that was before the application.  July 18 was

4          the application for 207(c).

5    Q.    So shortly thereafter?

6    A.    Yes.  You have a short period of time, 48 hours,

7          I believe, to apply for 207(c) unless you are,

8          for some reason, physically unable to and then

9          you can request a short-term extension, which is

10         maybe seven days, I'm guessing.  I don't remember

11         the exact details, but it's a short period of

12         time, which is why being denied the application

13         was such a stressful point, because if I didn't

14         get it in, I wasn't even going to be eligible.

15   Q.    This has been previously marked as an exhibit in

16         deposition, Exhibit C.  So again, just to refresh

17         your recollection, this is the memorandum for

18         207(c) and I'm trying to -- one, two, three,

19         four, this is Exhibit A, going back to page two,

20         it says that the -- it says, "Officer John Gorman

21         filed a complaint for benefits to GML 207(c).

22         Attached is exhibit A."

23             So I'm going to go back to exhibit A and

24         just have you take a look at that and tell me

1            when you've had a chance to look at that real

2            quick.

3    A.     Okay.

4    Q.     Having looked at this, do you recognize your

5            207(c) application?

6    A.     Yes.

7    Q.     And just tell me again, you may have already

8            answered this, but who was this given to, this

9            application, initially?

10   A.     That was turned in by Len Smith and it was given

11           to Hal Smith, I believe on my behalf.

12   Q.     Just for the record, can you read your employee

13           statement for us?

14   A.     "Officer went to primary care physicians due to

15           stress, pain and elevated blood pressure due to

16           work-related stress related to retaliation from

17           workplace violence complaint and was sent to St.

18           Peter's by ambulance."

19   Q.     Okay.  Now, you had mentioned that you were at

20           one point diagnosed with chronic stress disorder.

21           Is that the right term?

22   A.     Acute stress as part of the three-prong

23           diagnosis, what's called pre-PTSD diagnosis.

24   Q.     It says your attending physician was Dr. Fogel at

JOHN GORMAN - June 15, 2016          210

```
 1            that time?

 2     A.     Yes.

 3     Q.     And we talked about it before, still on exhibit

 4            A, it appears -- it looks like page five on

 5            exhibit A, there's something that says "medical

 6            release".  Do you recognize this document?

 7     A.     Yeah.  It was part of the application that I was

 8            to sign a release for medical documents for the

 9            Sheriff's Department.  I believe it covers any

10            physician unlimited.  It doesn't say it's just

11            for Dr. Fogel or just Dr. Thalmann for this time

12            period.  It's open-ended.

13     Q.     Okay.  We're still in the same exhibit.  I'm on

14            exhibit -- when I say exhibit, I mean Plaintiff's

15            Exhibit C.  And this is the 207(c) memorandum by

16            Undersheriff Russo.  I'm looking at exhibit B of

17            that same document and I'm looking now at page 2.

18                 Do you recognize this letter?

19     A.     It's from Dr. Thalmann.

20     Q.     Okay.  And can you tell us who it's addressed to?

21     A.     Undersheriff Russo.

22     Q.     Okay.  Can you just read the letter to us,

23            please?

24     A.     "Mr. Gorman continues in therapy.  Diagnostic
```

```
 1            formulation of acute stress disorder and panic
 2            disorder."  I forgot about that one.
 3    Q.    And tell us the date on that.
 4    A.    It's August 21st, 2013.
 5    Q.    Okay.  Is this the acute distress disorder you
 6            were discussing earlier?
 7    A.    Yes.
 8    Q.    Okay.  I'm just curious if you could help us.  Do
 9            you recognize -- there seems to be -- there
10            appears to be numbers at the top.  Do you
11            recognize -- I'm just asking, and you may not,
12            but do you recognize that as the fax number to
13            the county jail?
14    A.    I believe so.
15    Q.    Okay.
16    A.    I believe it's Marcelle's fax number.
17    Q.    Okay.  And do you recognize the fax number for
18            your Dr. Thalmann?
19    A.    Yes.
20    Q.    Just read that real quick.
21    A.    Read the number?
22    Q.    Yes, please.
23    A.    518-689-1385.
24    Q.    Okay.  Excellent.  Do you have any independent
```

```
 1              knowledge that this letter was sent to

 2              Undersheriff Russo other than looking at this

 3              letter?

 4     A.    Independent knowledge, no.

 5     Q.    Okay.  I'm just going to turn -- I'm still on

 6              that same section, exhibit B again, page 1, page

 7              2, 3, now we're on page 4.  Can you just read the

 8              letter, please?

 9     A.    "John Gorman, age 43, was seen for psychological

10              testing and psychotherapy.  He currently has

11              significant distress, depression, anxiety

12              symptoms such that he needs continued sick leave

13              from work."

14     Q.    All right.  What's the date on that letter?

15     A.    August 19 of 2013.

16     Q.    Okay.  And can you tell us who that letter is to?

17     A.    Undersheriff Russo.

18     Q.    You know that by reading the document?

19     A.    That is correct.

20     Q.    All right.  And at the top, there may be a

21              clearer fax number this time.  Do you see where

22              it says "to"?

23     A.    Yes.  It says 270-5447.

24     Q.    What do you understand that to be a fax number
```

 1              to?  Where do you understand that to be going?

 2      A.   I believe that's Marcelle's fax number.

 3      Q.   Okay.

 4      A.   These letters, I believe, were not requested by

 5           me.

 6      Q.   Who were they requested by?

 7      A.   They were obtained by the Sheriff's Department,

 8           I'm assuming Mr. Russo, assuming Undersheriff

 9           Russo, since that's the address because of the

10           medical disclosure form.  I didn't call up Dr.

11           Thalmann and say, hey, can you send in --

12      Q.   -- these documents?

13      A.   Right.

14      Q.   Okay.

15      A.   Can I say something?

16      Q.   Go ahead.

17      A.   My same point I made before is that if they're

18           requesting records in August and they didn't make

19           their decision until January of 2015 -- excuse

20           me, January 15th of 2013, why didn't they

21           continue to ask for medical records?  Why did

22           they only do it for, you know, the 21st, the 19th

23           and the 1st of August and then that's it?

24      Q.   So all of these requests for medical

JOHN GORMAN - June 15, 2016         214

```
 1            documentation you're saying came -- you're asking

 2            why did it come before or after?

 3    A.      No.  They're just from August, but they have

 4            September, October, November, December, and half

 5            of January before they made their decision.  But

 6            they stopped asking for any medical updates.

 7    Q.      Okay.

 8    A.      If you're going to make a fair assessment of

 9            somebody's condition and whether or not they're

10            qualified for 207(c), why didn't you seek medical

11            documentation for the rest of those four and a

12            half months when you did it for the first month?

13    Q.      Okay.

14    A.      So was the decision really made in August and all

15            they were waiting for was Dr. McIntyre's reports

16            or, according to this, it was made January 15th

17            of 2014.

18    Q.      Well, let's -- staying on that same line of

19            discussion, let's just go over one thing.  I'm on

20            page 6 now of exhibit B.  We've been talking

21            about exhibit B for a while here.  I'm going to

22            read from the actual document this time.

23            "It is understood that Mr. Gorman has worked

24            for Rensselaer County Sheriff's Department for
```

 1          the past six years as a correction officer.  He

 2          relates work stress issues resulting in

 3          significant anxiety and depression.  He's been

 4          out of work from July 15, 2013 at which time he

 5          notes he was briefly admitted to St. Peter's

 6          Hospital.  At this time, due to the level of

 7          ongoing stress, it is recommended that he

 8          continue to remain on sick leave beyond the

 9          anticipated work date of August 3rd, 2013.  It is

10          undetermined as to his return to work date."

11              What does that mean?  Was there a return to

12          work date of August 3rd that you were expected to

13          be back?

14     A.   When the treatment was -- and I believe it's in

15          here under Dr. Fogel's guidance.  He had said the

16          return date would be August 3rd.  When I sought

17          further when I was -- when it was determined it

18          was a psychological issue, then I started

19          treatment with Dr. Thalmann and this is his first

20          letter that he's written, August 1st, 2013.  He

21          determined that I couldn't return at that date

22          and wrote that it was undetermined.

23     Q.   Okay.  And so you're saying it's your

24          understanding that they never -- the county never

*JOHN GORMAN - June 15, 2016       216*

```
 1              inquired again as to whether or not -- whether or
 2              not that had changed that your work date was
 3              undetermined, the date that you could return?
 4         A.   If this evidence is all the evidence they
 5              examined to determine my 207(c), the last
 6              doctor's note that they obtained from Dr.
 7              Thalmann on their request was from August 21st.
 8              They didn't make the decision until January 15th
 9              of 2015.
10                   My question or my big thought is why didn't
11              they ask for monthly or biweekly updates from Dr.
12              Thalmann to figure out how I'm doing?
13         Q.   Before they made their final determination?
14         A.   Before they made their final determination.
15         Q.   Right.  To at least have up-to-date information,
16              right, okay.
17                   All right.  Now, a little earlier, we looked
18              at a letter, June, 2014 from, I believe it was,
19              the Sheriff indicating that you were going to be
20              terminated on August 15th if you didn't ask for a
21              probation period hearing?
22         A.   I believe it was July 15th.
23         Q.   July 15th, okay.  Now, accompanied with that
24              letter, did you receive any inquiry as to your
```

JOHN GORMAN - June 15, 2016          217

```
 1            medical status at that point?
 2     A.     No.
 3     Q.     Okay.  Did you receive any request for
 4            independent medical evaluation at that point?
 5     A.     No.
 6     Q.     Okay.  And at the due process hearing that you
 7            ultimately went to, was there an inquiry as to
 8            your medical condition at that point?
 9     A.     They asked me if I could return to work.  That's
10            what they asked me.
11     Q.     Okay.  And what did you tell them?
12     A.     No because of my current medical condition.
13     Q.     Okay.  And did they inquire about what your
14            medical condition was?
15     A.     No.
16     Q.     Okay.
17     A.     I think they may have asked me was I able to
18            perform my job duties.
19     Q.     Did there come a time that they mentioned --
20            excuse me.
21                 Did there come a time when they inquired as
22            to whether or not you could fulfill your job with
23            an accommodation?
24     A.     No.
```

JOHN GORMAN - June 15, 2016        218

```
 1    Q.   Were you aware at that time of positions
 2         available at the correctional facility that
 3         people could perform when they had a disability?
 4    A.   They call them light duty details.
 5    Q.   And you used the plural form of that word.  Was
 6         there more than one position?
 7    A.   Two clear ones that were regularly used were
 8         visitation control or control, which is basically
 9         sitting in a chair and pushing buttons to open
10         doors.  Those are the very two common ones that
11         were used.
12    Q.   What is visitation control?
13    A.   Visitation control is you're out in the lobby and
14         you control the attorneys coming in.  Anybody who
15         comes to the window, you ask a question or you
16         check in visitors, things like that.  You don't
17         leave the control room.
18    Q.   Okay.  You said visitation control and control
19         are two different things?
20    A.   Yes, two different things.
21    Q.   What's control?
22    A.   Control is two people sitting in a room smaller
23         than this with two huge computers, 40-inch
24         computer screens, sitting in front of them and
```

```
 1              all they do is push buttons to open the doors

 2              when officers or inmates who are supposed to be

 3              going somewhere need to go.

 4         Q.   And are these positions -- are they positions

 5              that correctional officers normally perform?

 6         A.   Yes.

 7         Q.   All right.  And now, how do you know that they

 8              are utilized for individuals that are somehow

 9              injured?

10         A.   A guy named Teddy, last name's not coming to me,

11              but he hurt his leg, received 207(c) for a short

12              period of time and then came back on light duty.

13         Q.   Okay.

14         A.   He was in visitation control for at least the

15              first two years I worked at the jail.

16         Q.   Okay.

17         A.   And then he requested regular full-time duty

18              because he wanted to get overtime and when you're

19              on light duty, you're not eligible for overtime.

20         Q.   How did you come to understand that he was on

21              light duty?

22         A.   It was common knowledge, because you couldn't

23              bump him off of his -- if you had more seniority

24              than he did, you couldn't bump him off his duty
```

*JOHN GORMAN - June 15, 2016*      220

```
1              detail because it was light duty assigned.
2    Q.   How did you know that?
3    A.   It was just announced at roll call.  It was
4         general practice; everybody knew.
5    Q.   Do you know of another person that was in that
6         light duty position?
7    A.   There have been many people.  I can't think of
8         all the names, I think of first names, I don't
9         know all their last names, where they did light
10        duty, where they fell, they were in a motorcycle
11        accident that was unrelated to work but they had
12        an injury to their knee and they worked in
13        control for a period of six months or three
14        months or six months until they were healed.
15   Q.   And why was control and visitation control a job
16        that could be utilized for an accommodation?
17        What was different about that compared to the
18        other jobs?
19   A.   Well, you have no exposure to inmates and you
20        don't respond to codes.
21   Q.   Okay.
22   A.   And you have very limited staff interaction
23        because control and visitation control are not
24        somewhere that staff can walk in and out; only
```

1          authorized personnel.  So it's a very controlled

2          environment.

3     Q.   Okay.  And do you know what qualifications for

4          those two positions are, positions in those

5          sections are?

6     A.   Regular basis or as a light duty position?

7     Q.   Okay.  Well, let me ask a different question.

8          Are there regular based positions in control and

9          visitation control in addition to the light duty

10         positions?

11    A.   If they're in the light duties, regular officers

12         are rotated in and out of there.  At the time

13         Ruth Vibert was terminated, I was assigned to

14         visitation control.  That was my detail for a

15         five-week rotation.

16    Q.   What I would like to know is if there is already

17         somebody in visitation rotation, then somebody

18         becomes disabled, are they not overstaffed in

19         those departments?

20    A.   What I know, the six years I worked at the jail,

21         it's never fully staffed.  Somebody always

22         resigns.  There's always an open position.  So

23         those people could easily be utilized in another

24         area, then there wouldn't be overtime.

1            Now, say the Teddy guy was assigned to C

2       line as a regular officer and he had to have

3       light duty on B line, that would make C line

4       short one person theoretically.  When you're a

5       new officer, you can't bid so they can move you

6       with no notice.

7            So they could take somebody from -- a new

8       officer within the first year of your employment

9       and move you from B line to C line to cover his

10      position without any hardship of overtime.

11           Does that make sense?

12   Q.   It does.  So if somebody had a disability, are

13      you saying that the staffing demands were

14      flexible enough that somebody with a disability

15      could be put into control even if there were

16      other staff occupying --

17   A.   In my opinion, yes, because it takes four

18      officers, two officers on B line, two officers on

19      C line for control and one for A line for control

20      and one for B line and one for C line.  So you

21      have a lot of flexibility because you can move

22      people around.

23   Q.   What does control do?

24   A.   Control is two people who control all the doors

```
 1              in the facility to let people in and out.
 2      Q.    For the B line, C line, A line?
 3      A.    And A line.  Visitation control is just that,
 4              visitors.  During the day, checking in attorneys
 5              and visitors and afternoon shift, C line --
 6      Q.    How many people are normally in visitation
 7              control?
 8      A.    That control, one.
 9      Q.    For visitation?
10      A.    For visitation, yes.
11      Q.    And do you feel that you were qualified for those
12              positions?
13      A.    I was certainly qualified.  I worked as a normal
14              officer, you know, prior to my disability in
15              those positions.
16      Q.    What do you understand that the qualifications
17              were for those positions?
18      A.    You're breathing and you can push the buttons.
19      Q.    And going back to when you went out on leave
20              after you went to St. Peter's Hospital and you
21              were out of work, do you know if there was
22              anybody on light duty in those positions?
23      A.    I don't know off the top of my head, but the
24              evidence that I talked about before that Mr.
```

1            Martin recently submitted, which is their monthly

2            log entries to New York State Corrections, state

3            there who's on 207(c), who's on, you know, sick

4            leave.  So there are a number of people that are

5            on 207(c) or could be on light duty at any given

6            time.

7       Q.   All right.  One final question on this point.

8            When you were terminated, now we're talking

9            October now, are you -- 2014, right?  October,

10           2014?  Are you aware --

11      A.   No.  I believe that's '15.

12      Q.   '15 ultimately, all right.

13      A.   They didn't make the decision until January of

14           '15.

15      Q.   I think it was that October, I think.

16      A.   Was it October, 2014?  Sorry.  It's hard to --

17      Q.   We'll just say the ultimate determination I

18           thought was '14.

19           MR. MARTIN:  '14.  I think it is '14.  Yeah,

20           I think it's '14.

21      Q.   When you were terminated in October of 2014, at

22           that time, were you aware of anybody -- were you

23           aware of any staff that were on light duty at the

24           jail?

1    A.    I hadn't been there since July, so I can't answer

2          that question.

3    Q.    All right.  Now, John, do you know if the

4          position that -- the position you were in, do you

5          know that if it could have been -- are you aware

6          that -- do you know if it could have been altered

7          in some way so that you can continue to work in

8          that position?

9    A.    I do know before I was promoted to provisional

10         sergeant, I served in a capacity of writing

11         policies and editing policies to get it ready for

12         accreditation.  The ultimate goal was the Sheriff

13         wanted to have the facility accredited.  You

14         didn't respond to codes, you have no access to

15         inmates.

16              It was just another one of those things that

17         could have been utilized for light duty.  Just

18         sat in the office.  And Sergeant Dunham was in

19         charge.  Aaron Simard also, Kathy Jimino's

20         son-in-law also worked in that capacity.  He was

21         made provisional sergeant the same time I was.

22         Certainly, the Sheriff controls budgetary and

23         what positions he utilizes, he could have made

24         that available again since I was in that position

JOHN GORMAN - June 15, 2016        226

```
 1              for over two years.
 2     Q.   Which position?
 3     A.   The transition team.  You know, once the
 4          construction was done, we were doing -- I was in
 5          keys, I was in computers and I was writing
 6          policies, things like that.  I didn't work as a
 7          normal correction officer.
 8     Q.   Okay.  And just also additionally, as of the time
 9          you were terminated, you had already been
10          diagnosed with PTSD; correct?
11     A.   Correct.
12     Q.   Okay.  And with that diagnosis, as I understand
13          it, Dr. Thalmann indicates you can still perform
14          some work, correct, under the right conditions?
15     A.   I believe he was willing to say that I could go
16          back to the correctional facility with a
17          particular accommodation if they were willing to
18          discuss an accommodation, but they were never
19          willing to discuss an accommodation.
20     Q.   Okay.
21     A.   So he ultimately -- when they said you can only
22          come back if you prove that you have nothing
23          wrong with you, he ultimately determined that he
24          felt that I was a hundred percent disabled from
```

*JOHN GORMAN - June 15, 2016        227*

```
 1              going back as a normal correction officer.
 2    Q.   So you had a conversation with Dr. Thalmann
 3         around about the time that you received the
 4         letter from the Civil Service Commission?
 5    A.   Yeah.  I always talked about Dr. Thalmann,
 6         because my ultimate goal was to go back to that
 7         career, because I enjoyed my job.  It's probably
 8         a weird thing to say I enjoyed a job at the
 9         correctional facility, but it was a rewarding job
10         and I ultimately wanted to go back.
11    Q.   Just to be clear, in talking to Dr. Thalmann,
12         after you received a letter from the Civil
13         Service Commission requesting a medical
14         evaluation before you came back, he indicated you
15         could go back with an appropriate accommodation.
16         Did he say what the accommodation was?
17    A.   He didn't say what it was, because we didn't know
18         what the parameters would be, so if he could
19         examine what it would be that I was doing or if
20         they were willing to try a particular
21         accommodation and we could evaluate as we went.
22         You know, I told Tom Hendry when I met with him,
23         I told the Commission, I've always said my goal
24         is not to sue anybody, my goal was to go back to
```

JOHN GORMAN - June 15, 2016        228

```
 1          work.

 2     Q.   Okay.

 3     A.   To get better and go back to work.

 4     Q.   Okay.  And just to clarify, in the time -- in all

 5          of this time, has there ever been a discussion or

 6          inquiry by a representative of the county in

 7          regards to how they might be able to provide an

 8          accommodation for you to come back to work?

 9     A.   The only communication I had was after the

10          determination by the Sheriff's Department, it was

11          with the Civil Service Commission.

12     Q.   And again, nobody from the county has ever

13          inquired of you as to what accommodation would be

14          necessary for you to come back to work?

15     A.   No.

16     Q.   Okay.  Let's take a two-minute break.  I think

17          we're done.

18               (A short break was taken.)

19   B MR. SORSBY:

20     Q.   All right.  John, we're looking at Plaintiff's

21          Exhibit 18.  I'm just going to read a portion of

22          it to you, the second page.  It says that

23          "Therefore, we --" this is the second paragraph.

24          "Therefore, we are unable to place you on the
```

1              preferred list until you submit correspondence

2              requesting reinstatement to your former

3              position."

4                   Did you send correspondence requesting -- I

5              think we discussed that earlier.

6         A.   Yeah, I sent multiple correspondence to the

7              Rensselaer County Civil Service Commission, the

8              first one being to have my one-year leave

9              extended per Civil Service Law.  They denied that

10             in the letter that you have in there.  And then

11             this one is asking to be reinstated.

12        Q.   And did you request reinstatement?

13        A.   Yes.

14        Q.   And the letter goes on to say, "Once your request

15             is received, we will then send you for a medical

16             examination."

17                  Were you sent for a medical examination?

18        A.   No.  I sent a letter requesting a medical

19             examination.  I also sent in that letter

20             requesting an accommodation and then I was sent

21             another letter.

22        Q.   "If deemed eligible by the medical examiner, you

23             may return to your former position or similar

24             position, if available.  If no position is

```
 1              available, your name will then be placed on a

 2              preferred list."

 3                   Were you ever placed on a preferred list?

 4     A.    No.

 5     Q.    Okay.  I just turned the page, Exhibit 17 --

 6              wait.  Let me back up.  Exhibit 18.  What's the

 7              date on the top of that?

 8     A.    July 13th of 2015.

 9     Q.    All right.  We're now looking at Exhibit 17.

10              What's the date on that?

11     A.    August 17th of 2015.

12     Q.    Okay.  It says, "Dear Mr. Gorman, after reviewing

13              your correspondence dated July 27, 2015, the

14              Rensselaer County Civil Service Commission

15              requests that you submit evidence that your

16              disability was terminated and the effective date

17              of this termination.  Upon satisfactory proof of

18              this evidence, a medical examination will be

19              scheduled for you at the time to be determined by

20              this office.  Also, please submit a medical

21              release to return to work without restriction for

22              your position."

23                   Did you give this letter to Dr. Thalmann?

24              Did you show this letter to Dr. Thalmann?
```

```
 1    A.   I made a copy and we talked about it.
 2    Q.   What did you do with this letter?  How did you
 3         respond, if at all?
 4    A.   I don't believe I responded.  I believe I gave it
 5         to Dr. Thalmann and I gave it to you for review.
 6    Q.   Okay.
 7    A.   I don't know how I could respond to that, because
 8         my disability is not terminated and I'm not sure
 9         how I can have it terminated other than getting
10         better.
11    Q.   Okay.
12    A.   And getting better is going to be a slow process,
13         which is why I asked for an accommodation which
14         was --
15    Q.   Which was the original letter?
16    A.   The original letter was if you want a medical
17         examination, send us a request and we'll give you
18         a medical examination.
19              Now, they're saying we're not going to send
20         you for a medical examination until you show us
21         your disability has been terminated.  Well,
22         you're not evaluating, so how do you know if my
23         disability's still there or not?  They offered
24         something and then they took it away.
```

 1    Q.   Okay.

 2    A.   It's not like I'm choosing to have a disability.

 3              MR. SORSBY:  Mr. Martin, we're going to try

 4         to locate John's letter to the Civil Service

 5         Commission.

 6              MR. MARTIN:  July 27 letter?

 7              MR. SORSBY:  Yeah.  We'll disclose that --

 8    A.   You already do have it.  I submitted all of that

 9         stuff.

10    Q.   Oh, it's in there?

11    A.   I will be happy to have it for the next time,

12         deposition, if you guys are okay with that.  I

13         can go out to the car and get it out of the

14         trunk.  We have everything in a folder but it

15         will be easy to obtain.

16              MR. MARTIN:  I would like to see it,

17         actually.

18              (A short break was taken.)

19              (Defendant's Exhibits D through J,

20         respectively, were pre-marked for identification.)

21              MR. SORSBY:  Back on the record.

22    BY MR. SORSBY:

23    Q.   I'm handing you what's been marked as Exhibit D.

24         Do you recognize this document?

JOHN GORMAN - June 15, 2016          233

```
 1    A.   Yes.  It's the June 24th, 2014 Workman's Comp

 2         determination.

 3    Q.   And I'm going to hand you what's been marked

 4         Exhibit E.  Do you recognize this document?

 5    A.   Yes.  This is the full board panel decision in

 6         the appeal of the 2014 decision and it's dated

 7         May 26th, 2015 for workman's comp.

 8    Q.   Okay.  I'm going to hand you what's been marked

 9         as Exhibit F.  Tell us the date -- well, first of

10         all, do you recognize this document?

11    A.   Yes.  It's the letter I wrote to the Rensselaer

12         County Civil Service Commission board on October

13         14th of 2014.

14    Q.   Tell us how many pages it is.

15    A.   It is three pages and a quarter.

16    Q.   Okay.  Exhibit G, do you recognize this document?

17    A.   Yes.  It's a letter to the Rensselaer County

18         Civil Service Commission dated December 12th of

19         2014 and it's one page.

20    Q.   Let's look at --

21    A.   And I'm requesting a second review of my

22         termination by the Sheriff's Department.  The

23         first one, exhibit --

24    Q.   We'll go into depth on some of them once we get
```

JOHN GORMAN - June 15, 2016          234

1          them all in.

2               I'm going to show you what's been marked as

3          Exhibit H.  Do you recognize this?

4     A.   This is a letter to Rensselaer County Civil

5          Service Commission board from me dated May 11,

6          2015.

7     Q.   Okay.  And do you recognize, finally, Exhibit I?

8     A.   Yes.  It's another letter to Rensselaer County

9          Civil Service Commission board dated July 27,

10         2015 from me.

11    Q.   And then, finally, Exhibit J.

12    A.   This is a letter to Rensselaer County Civil

13         Service board dated August 26th of 2015 from me.

14    Q.   Okay.  So we'll just ask you a few questions

15         about that and then we'll proceed from there.

16    A.   And all those letters were sent certified mail

17         through the United States Post Office.

18    Q.   When you say all those letters, are you

19         referencing what's been marked as Exhibits F, G,

20         H, I, J?

21    A.   Yes.

22    Q.   All right.  You sent all those registered mail?

23    A.   Yes.

24    Q.   Okay.  Looking at Exhibit F, without reading the

 1          whole thing, can you just tell in sum or

 2          substance what this letter's about?

 3     A.   Yes.  This letter is a formal request for review

 4          under rule, whatever that is, leave of absence

 5          Section 2 of my recent termination from

 6          Rensselaer County Sheriff's Department.

 7     Q.   Can you just take a quick look at Exhibit G?  Can

 8          you tell us what this letter in form or substance

 9          is about?

10     A.   Second formal request for an opportunity to

11          present to the Civil Service board in person the

12          facts that have led to my wrongful termination by

13          Jack Mahar.

14     Q.   Okay.  Can you tell us what this document is

15          about, Exhibit H?

16     A.   It states:  "To date, I have not received a

17          decision from the Commission about my unlawful

18          termination.  I once again request that

19          Rensselaer County Civil Service Commission uphold

20          their obligation and share the people who are

21          hired and/or terminated by the county --" so it's

22          a request for a response.

23     Q.   I'm going to hand you Exhibit I.  Tell us the

24          date on that.

```
 1    A.    This is dated July 27th of 2015.

 2    Q.    Okay.  And again, all these exhibits we've been

 3          talking about, they're addressed to the Civil

 4          Service Commission?

 5    A.    To the Civil Service Commission of Rensselaer

 6          County and they go on to name the board members.

 7    Q.    All right.  And Exhibit I that we're talking

 8          about now, in form or substance, what is this

 9          letter about?

10    A.    It says, "Dear Civil Service Commission, as

11          you're aware, and as I stated in my previous

12          letter, the New York State Worker's Compensation

13          Board has determined that my injury is work

14          related and that determination was given prior to

15          my notice of termination.

16              "The County was aware of this decision

17          before the so called due process hearing in July,

18          2014.  Therefore, the underlying premise of the

19          County's decision to terminate my employment

20          under Section 73 is factually and legally

21          incorrect.

22              "Fortunately, the Committee has oversight

23          and the County's decision wasn't final until the

24          rendering of your current decision."
```

*JOHN GORMAN - June 15, 2016       237*

```
1     Q.   Okay.

2     A.   And I request -- I'm exercising my right to

3          formally request a further review.

4     Q.   Okay.

5     A.   I also go on to ask -- because we were talking

6          about the letters earlier, I go on to ask for a

7          formal request of my reinstatement with an

8          accommodation of past or medical evaluation by an

9          independent examiner.  So this is the letter

10         where I ask for the reinstatement and an

11         accommodation, which is what we were talking

12         about before.

13    Q.   Can you read that part where it says that?

14    A.   It says, "As per your prior letter, I am

15         exercising my rights to formally request my

16         reinstatement with an accommodation after a

17         medical evaluation by an independent examiner."

18    Q.   Okay.  And when you say as per your prior letter,

19         what are you referencing?  The documents we were

20         talking just before the --

21    A.   We went over document number 18, number 17 where

22         they say that I can ask for reinstatement.

23    Q.   Okay.

24    A.   And I can also ask for -- once I ask for
```

JOHN GORMAN - June 15, 2016        238

1           reinstatement, I can be sent for a medical

2           evaluation.

3     Q.    And so you're saying that Exhibit I is a response

4           to that?

5     A.    Yes.

6     Q.    Okay.  Let's take a look at Exhibit J.  Can you

7           tell us the date on that?

8     A.    This is the date, August 26th, where I previously

9           testified that I hadn't responded to their letter

10          where they tell me I have to provide

11          documentation that my disability has been

12          terminated.

13    Q.    Okay.

14    A.    I don't remember if it was 8/17 or 18.

15    Q.    But it was a document we were reviewing earlier?

16    A.    Yeah.  You asked me if I made a response.  I

17          believe I said no but, apparently, after

18          reviewing the documents, I did respond.

19    Q.    Can you tell us -- why don't you go ahead and

20          read the letter to us real quick?

21    A.    It says, "Dear Commission members, I am in

22          receipt of your response to my request for an

23          accommodation dated August 17.  Rather than

24          provide accommodation...disability

JOHN GORMAN - June 15, 2016          239

```
 1          discrimination...you have requested that I prove
 2          my disability has ended.  I cannot offer this
 3          proof, because my letter clearly indicated my
 4          disability has not ended.  In my letter, I
 5          request the resubmission of my employment with an
 6          accommodation.  I understand no basis under which
 7          you can request that I prove that my disability
 8          has ended before you provide an accommodation.
 9          Please be advised as to -- please advise me as to
10          your legal basis for requiring that I prove my
11          disability has ended before you provide an
12          accommodation."
13     Q.   And did you receive a response to this letter?
14     A.   I'm going to say no, I never received a response
15          to that letter.
16     Q.   Okay.  And just so we're clear, this letter dated
17          August 26th, which is now Exhibit J, I'm going to
18          show you again what's been marked as Exhibit 17
19          in a prior deposition.  We were looking at this
20          earlier.  It's dated August 17th.  Do you see
21          this letter?
22     A.   Yes.
23     Q.   Do you see Exhibit 17?
24     A.   Yes.
```

1    Q.   Are you saying that Exhibit J is in response to

2         Exhibit 17?

3    A.   Yes.  And the first sentence says it is in

4         response to your request for an accommodation

5         dated August 17, 2015.  So it's in response to

6         the letter, it states that.

7    Q.   Just briefly going back again to I, the date on

8         Exhibit I, what's the date on that?

9    A.   July 27, 2015.

10   Q.   Okay.  And is Exhibit I a letter you wrote in

11        response to what's been marked as Plaintiff's

12        Exhibit 18?

13   A.   Yes.

14   Q.   Okay.

15   A.   Where it says if I want to be reinstated, I need

16        to make that request and I'll be sent for a

17        medical evaluation.

18   Q.   Okay.

19             (Defendant's Exhibit K was marked for

20        identification.)

21  BY MR. SORSBY:

22   Q.   Mr. Gorman, I'm going to hand you what's been

23        marked as Exhibit K.  Can you tell us what you

24        understand this document to be?

```
 1      A.    This document is basically Dr. McIntyre's

 2            evaluation.  And in this document, as I said

 3            previous, I recorded both sessions, the October

 4            29th and December 12th interviews with Dr.

 5            McIntyre.  I had those recordings transcribed.

 6      Q.    Okay.

 7      A.    Not by a licensed official --

 8      Q.    Transcriptionist?

 9      A.    -- stenographer but actually by somebody who

10            works in the medical -- they transcribe medical

11            stuff.  So they're experienced.

12      Q.    Okay.

13      A.    So I put in there, it says recording date, time

14            stamp, so the time of the recording and pieces of

15            evidence or things that I say that Mr. -- that

16            Dr. McIntyre left out and those are in red.  The

17            items that are in green are listed under records.

18            The black items, black print items, Dr. McIntyre

19            looked at.

20                 The items in green are all items that were

21            available and were in the possession of the

22            Sheriff's Department and have further been turned

23            over during this proceeding as evidence that they

24            did have them.  So they were available at the
```

1    time of the evaluation and weren't reviewed by

2    Dr. McIntyre.

3  Q.  All right.  I'm just going to ask you some

4    questions about these real quick.  And the one

5    thing that I'm interested in is I'm looking at

6    the second page of this, and there's quite a bit

7    of documents that are in green.  You're saying

8    that indicates that these documents were not

9    reviewed by Dr. McIntyre?

10  A.  Well, Dr. McIntyre in his first page of report

11    put in their records, so they're records that he

12    reviewed.

13  Q.  Are you saying the report we already marked --

14    entered into the record, marked for evidence,

15    indicates what records he based his decision on?

16  A.  In his psychological evaluation, at the end of

17    the 207(c) determination, it's his report.  And

18    on the first page, it has clinical review and

19    then records, and he lists the records that he

20    reviewed to make his determination.

21  Q.  And none of these documents in the green were

22    listed on there; correct?

23  A.  That is correct.

24  Q.  How is it you know that these documents -- I

1           won't have you read every one, but how do you

2           know that these documents were available to Dr.

3           McIntyre?

4     A.    Well, I'm assuming he's representing Rensselaer

5           County and if he had questions on what the

6           Rensselaer County Workplace Violence Prevention

7           Policy was, he would ask.  New York State Labor

8           Department's formal statement dated September

9           6th, that's their finding, he would have access

10          to that.

11              Human resources, Tom Hendry's letter dated

12          August 21st, 2013, if he's going to interview me,

13          hear all the facts and then evaluate whether or

14          not I'm truthful or not, which is what he did,

15          whether my testimony is credible, he might want

16          to ask for documentation.

17              And all of these are things that -- letters

18          to Kathy Jimino dated April 8, 2013, Mr. Martin

19          asked me earlier about that document, the letter

20          of complaint to New York State Labor Department,

21          March 31st 2013, they're all things that I told

22          him I provided and were provided to the county

23          and could have been provided prior to the

24          evaluation that could have been provided to Dr.

JOHN GORMAN - June 15, 2016          244

1          McIntyre to make a full and unbiased evaluation

2          of my events leading up to my illness.

3     Q.   All right.

4               MR. SORSBY:  Now, Mr. Martin, I want to

5          introduce the -- you recall the 50-H hearing in

6          this matter?

7               MR. MARTIN:  Yes.

8               MR. SORSBY:  I'd like to have it marked as an

9          exhibit so we would make it Exhibit L.

10              THE WITNESS:  This is not the 50-H.  This is

11         the arbitration, the testimony, the 207(c).

12              MR. SORSBY:  We've got this incorrectly

13         labeled.  I'm sorry.  Here's the transcript from

14         the worker's comp hearing.  At this point, we'll

15         get this marked.  I'd like to have this marked

16         as --

17              MR. MARTIN:  M.

18              MR. SORSBY:  L, wouldn't it?

19              MR. MARTIN:  I thought we were going to do

20         the 50-H.

21              MR. SORSBY:  I gotta figure that out.  I

22         gotta find the transcript.

23              THE WITNESS:  You mean 50-H.  You have the

24         207(c) transcript in your hand.

1          MR. MARTIN:  We can get it later.

2          MR. SORSBY:  You're not going to have a

3     problem with it?  So M would be -- what is that?

4     Worker's comp --

5          THE WITNESS:  Workman's comp transcript of

6     the witnesses.

7          MR. SORSBY:  So we've got L for the worker's

8     comp or the --

9          MR. MARTIN:  50-H.

10         MR. SORSBY:  50-H.  Then, M for worker's

11    comp.  And then we'll make N for the transcript

12    from the 207(c).

13         MR. SORSBY:  And that's it for me.

14         (WHEREUPON, at 5:32 p.m., the examination of

15    JOHN GORMAN in the above-entitled matter was

16    concluded.)

17                    *  *  *  *  *

18

19

20

21

22

23

24

1                    INDEX TO WITNESS

2    EXAMINATION BY MR. MARTIN.................PAGE 4

3    EXAMINATION BY MR. SORSBY.................PAGE 156

4

5                    INDEX TO EXHIBITS

6    DEFENDANT'S EXHIBITS                          PAGE

7    Exhibit A    Civil Service List for 2/15        60

8    Exhibit B    Civil Service List for 3/1         63

9    Exhibit C    207(c) determination             173

10   Exhibit D    6/24/14 Worker's Comp decision    232

11   Exhibit E    5/26/15 Worker's Comp decision    233

12   Exhibit F    10/14/14 letter                   233

13   Exhibit G    12/12/14 letter; 1 pg.            233

14   Exhibit H    5/11/15 letter                    234

15   Exhibit I    7/27/15 letter                    234

16   Exhibit J    8/26/15 letter                    234

17   Exhibit K    Dr. McIntyre's evaluation         241

18   Exhibit L    50-H transcript                   245
                  (To be marked.)
19
     Exhibit M    Worker's Comp transcript          245
20                (To be marked.)

21   Exhibit N    207(c) transcript                 245
                  (To be marked.)
22

23       (Exhibits Were Not Provided to the Court Reporter.)

24         (They were retained by counsel for the Plaintiff.)

1    STATE OF NEW YORK

2    COUNTY OF

3

4    I have read the foregoing record of my testimony taken at

5    the time and place noted in the heading hereof and I do

6    hereby acknowledge it to be a true and correct transcript

7    of the same.

8

9

10                                    _____

11                                    JOHN GORMAN

12

13   Sworn to before me this

14            day of                  , 2016.

15

16

17   _____

18   Notary Public

19

20

21

22

23

24

1               C E R T I F I C A T I O N

2          I, **THERESA L. KLOS,** a Shorthand Reporter and

3     Notary Public within and for the State of New York, do

4     hereby CERTIFY that prior to being examined, the witness

5     named in the foregoing deposition was duly sworn to

6     testify the truth, the whole truth and nothing but the

7     truth.

8          That said deposition was taken down by me in

9     shorthand at the time and place therein named and

10    thereafter reduced by me to typewritten form and that the

11    same is a true, correct and complete transcript of said

12    proceedings.

13         Before completion of the deposition, review of the

14    transcript was requested.  If requested, any changes made

15    by the deponent (and provided to the reporter) during the

16    period allowed are appended hereto.

17         I further certify that I am not interested in the

18    outcome of this matter.

19         Witness my hand this _____ day of _____,

20    2016.

21

22                        -------------------------

23                        THERESA L. KLOS, CSR, RMR

24

## $

**$1,500** [1] - 16:11
**$10** [1] - 40:18
**$12** [1] - 5:3
**$150** [2] - 40:16, 40:17
**$42,000** [1] - 18:5
**$62,000** [1] - 144:12
**$67,000** [1] - 18:4

## '

**'14** [6] - 199:13,
199:14, 224:18,
224:19, 224:20
**'15** [3] - 224:11,
224:12, 224:14
**'80s** [1] - 205:4

## 1

**1** [4] - 62:16, 63:10,
212:6, 246:13
**10** [5] - 2:11, 59:5,
85:12, 89:18, 137:2
**10/14/14** [1] - 246:12
**100** [1] - 40:22
**10:08** [1] - 1:16
**10th** [1] - 131:2
**11** [1] - 234:5
**11th** [1] - 56:5
**12** [3] - 90:5, 149:2,
206:11
**12/12/14** [1] - 246:13
**12205** [1] - 2:4
**127** [3] - 7:3, 116:17,
144:21
**128** [1] - 115:17
**129** [1] - 117:9
**12:30** [1] - 85:16
**12:41** [1] - 99:23
**12th** [4] - 180:12,
181:19, 233:18,
241:4
**130** [1] - 117:10
**13501** [1] - 2:11
**138** [3] - 124:8,
124:11, 124:18
**13th** [4] - 131:21,
158:22, 159:8, 230:8
**14** [2] - 43:2, 132:24
**143** [1] - 131:5
**144** [1] - 132:1
**14th** [6] - 90:10, 134:8,
147:12, 147:15,
159:9, 233:13
**15** [7] - 51:23, 59:20,

60:7, 78:7, 172:8,
208:1, 215:4
**150** [2] - 12:23, 14:3
**156** [1] - 246:3
**1568** [2] - 1:15, 2:4
**157** [1] - 138:16
**159** [1] - 139:18
**15th** [21] - 1:14, 58:17,
61:14, 65:8, 67:2,
94:2, 112:8, 132:19,
145:18, 146:12,
159:10, 168:16,
175:7, 176:13,
192:23, 213:20,
214:16, 216:8,
216:20, 216:22,
216:23
**16** [1] - 22:1
**16-hour** [1] - 85:3
**17** [8] - 230:5, 230:9,
237:21, 238:23,
239:18, 239:23,
240:2, 240:5
**173** [1] - 246:9
**174** [2] - 141:7, 141:8
**17th** [4] - 60:18, 124:7,
230:11, 239:20
**18** [9] - 9:12, 177:14,
205:23, 208:3,
228:21, 230:6,
237:21, 238:14,
240:12
**182** [1] - 146:6
**18th** [1] - 134:23
**19** [1] - 212:15
**1997** [1] - 206:2
**19th** [5] - 78:4, 81:4,
81:5, 169:11, 213:22
**1:14-cv-434** [1] - 1:6
**1:15** [1] - 100:2
**1st** [6] - 58:5, 60:14,
147:1, 177:16,
213:23, 215:20

## 2

**2** [3] - 210:17, 212:7,
235:5
**2/15** [1] - 246:7
**20** [3] - 30:17, 189:24
**20-year** [1] - 187:4
**2008** [1] - 133:1
**2010** [2] - 205:2, 205:9
**2012** [18] - 20:10,
20:11, 20:15, 22:2,
22:16, 22:21, 23:18,
24:17, 38:9, 158:9,
162:4, 165:2,
165:16, 165:18,

166:7, 166:16,
166:21, 205:3
**2013** [60] - 20:9,
30:10, 30:20, 30:21,
38:6, 38:10, 41:14,
43:2, 47:24, 50:5,
51:24, 58:5, 58:16,
58:17, 60:14, 62:16,
67:1, 67:2, 84:17,
94:2, 95:12, 95:13,
112:8, 117:9, 131:3,
132:24, 134:8,
137:19, 139:13,
139:20, 143:2,
145:4, 145:14,
145:21, 155:11,
155:15, 167:22,
175:6, 175:7,
175:19, 176:22,
177:14, 177:16,
178:14, 178:16,
180:13, 181:6,
192:9, 192:24,
208:1, 211:4,
212:15, 213:20,
215:4, 215:9,
215:20, 243:12,
243:18, 243:21
**2014** [34] - 5:15, 6:23,
7:18, 7:23, 104:11,
104:13, 142:21,
143:10, 143:13,
145:4, 145:5,
145:14, 145:18,
145:22, 145:24,
149:11, 155:11,
172:8, 176:13,
199:11, 201:7,
202:11, 203:16,
214:17, 216:18,
224:9, 224:10,
224:16, 224:21,
233:1, 233:6,
233:13, 233:19,
236:18
**2015** [17] - 11:17,
125:10, 151:2,
202:24, 204:2,
213:19, 216:9,
230:8, 230:11,
230:13, 233:7,
234:6, 234:10,
234:13, 236:1,
240:5, 240:9
**2016** [6] - 1:14, 11:1,
11:10, 11:12,
247:14, 248:20
**207(c** [36] - 128:11,
134:12, 136:1,
136:4, 137:4, 137:5,

145:9, 145:20,
172:4, 172:17,
173:18, 174:17,
176:15, 179:7,
180:14, 182:1,
182:22, 183:2,
184:4, 184:7,
184:14, 200:2,
207:12, 208:7,
208:18, 209:5,
210:15, 214:10,
216:5, 219:11,
224:3, 224:5,
242:17, 244:24,
246:9, 246:21
**207(c)** [7] - 135:7,
177:12, 183:3,
208:4, 208:21,
244:11, 245:12
**20th** [1] - 81:2
**21** [1] - 139:12
**21st** [4] - 211:4,
213:22, 216:7,
243:12
**232** [1] - 246:10
**233** [3] - 246:11,
246:12, 246:13
**234** [3] - 246:14,
246:15, 246:16
**23rd** [5] - 11:10,
11:12, 146:9,
146:20, 202:11
**24** [1] - 75:3
**241** [1] - 246:17
**245** [3] - 246:18,
246:19, 246:21
**24th** [4] - 146:8,
146:23, 201:6, 233:1
**25th** [9] - 30:10, 67:1,
76:14, 76:15, 77:14,
87:3, 93:8, 168:23,
175:6
**26th** [4] - 233:7,
234:13, 238:8,
239:17
**27** [5] - 21:17, 230:13,
232:6, 234:9, 240:9
**270-5447** [1] - 212:23
**27th** [6] - 81:7, 91:12,
91:16, 93:8, 168:23,
236:1
**29** [1] - 6:23
**29th** [5] - 5:15, 178:14,
181:6, 198:8, 241:4

## 3

**3** [1] - 212:7
**3/1** [1] - 246:8

**3/14** [1] - 179:14
**30** [2] - 80:13, 122:24
**31st** [1] - 243:21
**3:30** [1] - 25:1
**3rd** [7] - 143:2, 151:2,
151:7, 151:6, 215:9,
215:12, 215:16

## 4

**4** [3] - 87:10, 212:7,
246:2
**40** [7] - 4:23, 5:16,
9:17, 9:18, 9:19,
54:20, 120:17
**40-inch** [1] - 218:23
**401-K** [1] - 11:18
**41** [1] - 108:3
**421** [1] - 2:11
**43** [1] - 212:9
**48** [1] - 208:6
**4th** [4] - 87:1, 104:1,
117:9, 118:20

## 5

**5** [2] - 14:4, 139:20
**5/11/15** [1] - 246:14
**5/26/15** [1] - 246:11
**50** [1] - 180:8
**50-H** [9] - 4:11, 67:17,
244:5, 244:10,
244:20, 244:23,
245:9, 245:10,
246:18
**518-689-1385** [1] -
211:23
**518.456.4529** [1] - 2:5
**54** [1] - 86:24
**57** [1] - 30:4
**58** [1] - 37:4
**5:00** [1] - 14:13
**5:32** [1] - 245:14
**5th** [2] - 11:1, 60:14

## 6

**6** [3] - 53:14, 53:15,
214:20
**6/24/14** [1] - 246:10
**60** [4] - 12:17, 12:22,
14:3, 246:7
**600** [2] - 18:4, 18:10
**63** [1] - 246:8
**65** [1] - 90:2
**6:00** [1] - 66:12
**6th** [1] - 243:9

## 7

**7/27/15** [1] - 246:15
**73** [4] - 153:21, 204:15, 206:6, 236:20
**7:15** [2] - 24:24, 25:5
**7th** [3] - 79:14, 104:3, 112:21

## 8

**8** [5] - 29:20, 165:16, 166:15, 171:14, 243:18
**8/17** [1] - 238:14
**8/26/15** [1] - 246:16
**80** [5] - 56:18, 57:15, 60:23, 61:1, 64:12
**80s** [3] - 59:18, 63:21, 64:15
**81** [1] - 77:22
**82** [1] - 172:10
**85** [8] - 57:14, 57:15, 60:16, 60:23, 61:4, 62:20, 62:22, 64:5
**85s** [2] - 57:22, 63:20
**88** [2] - 86:14, 88:2
**8th** [17] - 31:17, 31:22, 32:8, 36:5, 52:4, 101:16, 116:19, 117:11, 133:1, 137:17, 160:7, 165:2, 165:18, 166:6, 166:21, 167:21, 189:1

## 9

**90** [4] - 57:14, 60:13, 62:21, 88:2
**90s** [1] - 63:19
**95** [3] - 57:14, 60:23, 62:21

## A

**a.m** [1] - 1:16
**Aaron** [2] - 105:24, 225:19
**Abbot** [1] - 205:7
**ability** [4] - 58:12, 61:6, 164:7, 164:8
**able** [12] - 7:6, 49:24, 66:16, 112:13, 119:19, 150:7, 150:15, 156:17,

158:17, 158:19, 217:17, 228:7
**above-entitled** [1] - 245:15
**absence** [1] - 235:4
**absolutely** [3] - 9:14, 27:24, 54:3
**accept** [1] - 121:13
**accepted** [1] - 176:7
**access** [8] - 40:13, 40:19, 41:23, 47:4, 162:11, 181:8, 225:14, 243:9
**accessing** [1] - 42:11
**accident** [2] - 206:20, 220:11
**accommodation** [25] - 9:17, 153:21, 153:24, 154:13, 154:14, 217:23, 220:16, 226:17, 226:18, 226:19, 227:15, 227:16, 227:21, 228:8, 228:13, 229:20, 231:13, 237:8, 237:11, 237:16, 238:23, 239:6, 239:8, 239:12, 240:4
**accommodation... disability** [1] - 238:24
**accompanied** [1] - 216:23
**accordance** [1] - 10:23
**according** [13] - 60:23, 65:21, 82:23, 83:6, 83:10, 92:3, 152:4, 153:20, 174:4, 181:11, 183:21, 196:19, 214:16
**accreditation** [1] - 225:12
**accredited** [1] - 225:13
**accruals** [6] - 141:10, 141:22, 141:23, 141:24, 142:6, 143:1
**accrue** [1] - 141:23
**accuracy** [1] - 10:2
**accused** [1] - 187:17
**acknowledge** [1] - 247:6
**act** [1] - 78:15
**acted** [1] - 123:14
**acting** [4] - 129:1, 157:20, 168:1, 187:1
**action** [8] - 30:14,

37:8, 71:4, 79:1, 92:10, 139:24, 150:24, 183:7
**actions** [16] - 44:9, 62:1, 62:3, 76:24, 82:22, 85:14, 85:17, 91:5, 102:19, 136:23, 146:16, 168:12, 169:2, 184:19, 189:23, 202:13
**active** [1] - 16:9
**activities** [7] - 15:13, 17:12, 52:22, 52:24, 54:19, 157:14, 157:15
**actual** [6] - 110:3, 135:14, 154:7, 163:22, 174:14, 214:22
**acute** [5] - 136:22, 206:16, 209:22, 211:1, 211:5
**ADA** [4] - 108:16, 108:18, 108:23, 150:13
**add** [7] - 51:1, 125:22, 129:21, 132:6, 153:13, 176:10, 202:21
**addictive** [2] - 13:15, 14:6
**addition** [1] - 221:9
**additional** [4] - 8:18, 84:14, 103:17, 139:11
**additionally** [1] - 226:8
**address** [1] - 213:9
**addressed** [3] - 161:17, 210:20, 236:3
**administration** [9] - 62:7, 75:13, 76:19, 77:2, 78:10, 83:8, 109:3, 141:4, 141:5
**administration-wise** [1] - 75:13
**admissible** [2] - 122:17, 183:22
**admission** [1] - 203:12
**admitted** [5] - 122:11, 132:19, 191:11, 191:14, 215:5
**adverse** [1] - 37:8
**advice** [1] - 79:20
**advise** [2] - 72:9, 239:9
**advised** [4] - 30:13,

30:22, 104:23, 239:9
**advising** [1] - 194:19
**affair** [3] - 22:20, 22:24, 23:14
**Affairs** [1] - 42:5
**affairs** [3] - 23:4, 55:23, 163:21
**affect** [2] - 157:3, 157:4
**affected** [2] - 166:16, 166:20
**affecting** [1] - 186:8
**affirmed** [1] - 142:13
**affirms** [1] - 204:5
**affixed** [1] - 128:1
**afraid** [1] - 164:21
**after-the-fact** [1] - 201:21
**afternoon** [2] - 100:1, 223:5
**afterwards** [1] - 25:18
**age** [1] - 212:9
**agent** [1] - 87:15
**aggressive** [3] - 51:5, 51:8, 51:11
**aggressively** [1] - 79:22
**ago** [2] - 150:14, 207:3
**agree** [3] - 21:1, 114:17, 203:10
**AGREED** [3] - 3:2, 3:5, 3:8
**agreement** [2] - 140:15, 141:12
**ahead** [6] - 61:12, 103:23, 172:14, 172:21, 213:16, 238:19
**aid** [4] - 13:9, 13:14, 13:16, 160:18
**Albany** [4] - 1:15, 2:4, 8:3, 113:9
**allegation** [1] - 41:23
**allegations** [3] - 25:21, 26:11, 190:22
**allege** [3] - 23:18, 65:9, 141:12
**alleged** [1] - 40:5
**allow** [3] - 14:7, 49:8, 141:2
**allowed** [10] - 65:6, 127:10, 127:22, 140:16, 141:16, 148:2, 148:7, 156:19, 158:1, 248:16
**allows** [1] - 9:12
**almost** [2] - 18:4, 158:15
**alone** [2] - 70:9, 70:10

**altered** [1] - 225:6
**ambulance** [2] - 133:12, 209:18
**amended** [3] - 4:8, 132:2, 139:18
**amount** [2] - 145:22, 186:6, 206:23
**analyze** [1] - 183:16
**AND** [3] - 3:2, 3:5, 3:8
**angry** [2] - 68:13, 69:4
**anniversary** [1] - 146:11
**announced** [1] - 220:3
**answer** [15] - 30:12, 33:8, 51:16, 57:7, 60:12, 67:21, 107:17, 137:16, 151:19, 153:13, 153:14, 158:6, 203:3, 205:10, 225:1
**answerable** [1] - 107:15
**answered** [7] - 30:11, 65:19, 66:6, 156:7, 167:6, 191:4, 209:8
**answering** [1] - 69:14
**answers** [2] - 122:6, 142:1
**ANTHONY** [1] - 1:7
**Anthony** [7] - 107:8, 146:16, 155:8, 155:15, 166:20, 202:14, 205:11
**anti** [1] - 13:2
**antianxiety** [1] - 13:1
**anticipated** [1] - 215:9
**antidepressant** [1] - 13:2
**anxiety** [7] - 13:2, 19:20, 134:3, 136:22, 206:17, 212:11, 215:3
**apartment** [4] - 48:6, 48:8, 49:24, 50:3
**apologize** [3] - 11:12, 167:5, 183:7
**apology** [1] - 55:8
**appeal** [17] - 11:4, 11:7, 11:14, 92:8, 150:18, 150:20, 150:23, 151:5, 151:8, 151:13, 151:19, 182:23, 183:1, 203:3, 203:22, 204:2, 233:6
**appealed** [4] - 92:7, 203:6, 204:2, 204:3
**appealing** [1] - 148:9
**appeals** [2] - 20:3, 204:5, 205:16

appear [4] - 63:14,
64:4, 107:2, 107:4
appearance [2] -
185:21
APPEARANCES [1] -
2:1
appended [1] - 248:16
application [23] -
86:17, 134:12,
134:17, 135:7,
174:17, 175:12,
176:18, 177:11,
177:13, 184:10,
184:14, 200:6,
200:11, 200:13,
200:24, 201:1,
207:12, 208:3,
208:4, 208:12,
209:5, 209:9, 210:7
application" [1] -
172:17
applied [9] - 6:15, 7:3,
144:21, 145:13,
199:5, 199:20,
200:11, 200:14,
201:9
apply [6] - 6:11, 6:14,
199:21, 201:13,
201:23, 208:7
applying [2] - 144:18,
145:1
appointed [5] - 56:23,
60:10, 60:17, 62:15,
64:9
appointment [7] -
59:3, 60:7, 61:14,
62:19, 62:23, 63:11,
193:10
appointments [2] -
57:20, 59:21
appraisals [1] -
179:13
appreciate [1] - 55:7
approach [1] - 192:16
approached [2] -
32:17, 190:7
appropriate [3] -
85:22, 137:4, 227:15
approve [1] - 177:21
approved [3] - 41:11,
140:21, 152:3
April [4] - 101:18,
112:7, 194:19,
243:18
arbitrarily [1] - 141:13
arbitration [2] -
142:14, 244:11
arbitrator [4] - 183:4,
183:8, 183:9, 183:18
area [4] - 40:10, 51:21,

99:9, 221:24
arguing [2] - 28:16,
184:18
arm [1] - 130:23
arraigned [1] - 79:18
arrested [1] - 55:4
aside [2] - 49:19,
186:22
aspect [1] - 78:15
assessment [2] -
184:8, 214:8
assigned [4] - 25:4,
39:8, 39:9, 39:14,
40:10, 99:5, 99:19,
100:7, 100:11,
123:18, 186:15,
186:16, 193:16,
193:21, 193:23,
194:1, 194:3, 194:6,
194:10, 220:1,
221:13, 222:1
assigning [1] - 193:14
assignments [6] -
100:14, 100:15,
100:21, 101:2,
113:16, 174:22
Assistant [1] - 41:11
assume [2] - 27:23,
58:22
assuming [5] - 10:23,
116:2, 213:8, 243:4
assured [1] - 193:8
ate [2] - 43:22, 106:4
atmosphere [1] - 45:2
attach [1] - 172:24
attached [1] - 208:22
attack [1] - 158:16
attacking [1] - 47:21
attempted [4] - 37:13,
132:16, 176:7,
199:21
attempts [2] - 49:6,
49:9
attended [2] - 16:13,
147:15
attending [1] - 209:24
attest [1] - 84:10
Attorney [1] - 79:12
attorney [10] - 67:11,
117:20, 135:12,
135:14, 148:3,
148:20, 149:16,
173:5, 193:18,
201:20
attorneys [7] - 3:3,
104:14, 104:17,
104:21, 202:1,
213:14, 223:4
audit [1] - 97:1
August [26] - 138:19,

139:12, 147:12,
147:15, 176:21,
177:16, 211:4,
212:15, 213:18,
213:23, 214:3,
214:14, 215:9,
215:12, 215:16,
215:20, 216:7,
216:20, 230:11,
234:13, 238:8,
238:23, 239:17,
239:20, 240:5,
243:12
authorities [2] - 96:22,
105:6
authority [3] - 89:12,
121:15, 161:18
authorization [5] -
178:4, 178:7,
178:10, 181:3, 181:7
authorize [2] - 41:8,
42:13
authorized [2] - 41:7,
221:1
automatic [1] - 130:21
available [10] -
180:20, 183:24,
218:2, 225:24,
229:24, 230:1,
241:21, 241:24,
243:2
Avenue [3] - 1:15, 2:4,
206:20
average [1] - 17:5
award [1] - 204:4
awards [1] - 202:24
aware [30] - 22:24,
62:14, 122:9,
132:18, 139:10,
139:15, 163:10,
163:19, 169:15,
170:6, 170:7,
170:11, 179:5,
186:24, 188:12,
188:15, 188:14,
206:6, 206:10,
207:5, 207:7,
207:10, 207:18,
218:1, 224:10,
224:22, 224:23,
225:5, 236:11,
236:16
awkward [1] - 189:6

# B

background [2] -
21:4, 93:19
backstory [8] -
197:14, 197:17,

197:20, 198:4,
198:15, 198:16,
198:22
backwards [1] - 16:1
bad [4] - 47:19,
105:13, 105:14,
193:15
bait [1] - 51:14
balance [1] - 42:15
bank [2] - 135:13,
140:14
bar [2] - 46:21, 77:1,
163:13
bargaining [2] -
140:14, 141:11
barracks [3] - 73:16,
74:3
Barry [2] - 37:3,
186:21
based [13] - 8:9,
11:14, 11:15,
126:24, 128:12,
162:21, 163:8,
166:14, 184:8,
184:13, 221:8,
242:15
basic [2] - 18:5, 68:12
basis [11] - 14:11,
39:13, 75:9, 141:14,
160:10, 161:23,
192:19, 194:4,
221:6, 239:6, 239:10
beacon [3] - 4:17,
9:14, 9:22
Beacon [9] - 5:14,
5:21, 7:13, 9:11,
9:13, 9:15, 11:19,
156:21, 156:22
Beaudry [4] - 65:17,
65:23, 71:21, 201:3
became [4] - 84:23,
86:1, 169:15, 207:5
become [6] - 78:9,
121:9, 163:19,
188:12, 188:15,
207:18
becomes [1] - 221:18
BEFORE [1] - 1:12
began [1] - 97:10
begged [1] - 28:1
begin [2] - 60:12,
84:15
beginning [2] - 97:12,
104:12
BEHALF [2] - 2:2, 2:9
behalf [8] - 87:16,
101:19, 101:24,
111:20, 138:9,
171:18, 187:2,
209:11

behavior [1] - 36:13
behind [3] - 127:19,
186:14
belief [2] - 103:6,
166:14
belong [1] - 82:18
below [3] - 162:24,
163:1
benefit [3] - 6:4,
11:19, 200:22
benefits [14] - 5:9,
10:15, 143:4,
144:11, 145:13,
180:17, 182:23,
184:15, 199:6,
200:14, 201:5,
202:4, 203:15,
208:21
best [10] - 8:3, 24:19,
29:7, 33:6, 34:13,
49:21, 51:11, 72:10,
98:2, 108:22
betrayed [1] - 69:4
better [6] - 114:11,
148:12, 183:14,
228:3, 231:10,
231:12
between [11] - 3:2,
9:10, 35:8, 52:1,
74:24, 91:14, 115:3,
123:17, 137:24,
148:1, 181:10
beyond [1] - 215:8
bid [5] - 141:16,
141:17, 141:21,
222:5
bidding [4] - 141:10,
142:4, 142:5, 142:8
big [6] - 18:9, 72:14,
120:1, 136:14,
181:9, 216:10
bigger [1] - 109:14
biggest [2] - 18:16,
115:5
Bill [1] - 93:18
bills [2] - 144:9,
144:13
Billy [3] - 95:2, 95:4,
95:19
binder [2] - 172:2,
172:3
birth [2] - 48:13, 70:21
bit [6] - 16:2, 18:2,
42:9, 164:24,
199:17, 242:6
biweekly [1] - 216:11
black [2] - 241:18
Black [1] - 129:16
blank [2] - 52:13,
54:14

blanks [1] - 42:7
blew [1] - 187:18
blood [3] - 85:7, 85:10, 209:15
Bly [1] - 147:18
Board [3] - 202:9, 203:13, 236:13
board [9] - 116:13, 203:21, 233:5, 233:12, 234:5, 234:9, 234:13, 235:11, 236:6
bonus [1] - 5:7
books [1] - 35:13
boss [3] - 85:18, 96:22, 123:12
bothered [1] - 120:9
bothering [2] - 70:7, 70:11
bottle [1] - 22:13
bouts [1] - 13:12
boy [1] - 189:12
bracket [2] - 57:16, 64:5
brackets [2] - 57:13, 64:11
brain [1] - 160:23
brass [1] - 40:16
bread [1] - 98:12
break [10] - 32:23, 44:7, 72:16, 99:21, 99:23, 155:3, 155:4, 228:16, 228:18, 232:18
breaking [2] - 52:2, 94:13
breaks [2] - 88:19, 97:14
breakup [1] - 44:10
breathing [1] - 223:18
brick [2] - 157:22, 158:13
briefly [4] - 158:7, 193:1, 215:5, 240:7
bring [5] - 26:3, 88:24, 95:23, 138:21, 182:16
Broad [2] - 2:11
broad [1] - 161:23
broke [2] - 40:9, 187:7
broken [1] - 76:22
Bronx [2] - 162:2, 165:5
brother [27] - 21:9, 21:11, 24:5, 28:8, 48:6, 48:7, 48:18, 48:23, 49:1, 49:3, 49:4, 49:12, 49:14, 49:23, 69:5, 73:11, 95:3, 95:5, 95:20,

96:7, 96:20, 98:7, 125:4, 126:4, 166:1, 167:12
brother's [1] - 95:23
brought [3] - 52:11, 64:23, 149:16
budgetary [1] - 225:22
built [4] - 158:13, 158:20, 159:6, 162:9
bump [2] - 219:23, 219:24
burden [1] - 135:1
burn [1] - 82:15
burning [1] - 85:5
business [4] - 26:5, 33:4, 55:9, 55:10
busy [3] - 99:14, 119:16, 124:20
but.. [1] - 199:10
buttons [3] - 218:9, 219:1, 223:18
buy [1] - 199:24
BY [27] - 4:5, 4:6, 29:10, 44:8, 50:21, 54:4, 60:4, 63:8, 100:4, 105:17, 111:14, 126:12, 126:23, 129:6, 135:20, 153:11, 155:5, 156:10, 156:11, 171:24, 173:11, 191:23, 204:13, 232:22, 240:21, 246:2, 246:3

**C**

cafeteria [6] - 43:18, 44:12, 44:20, 88:12, 107:2, 189:9
caller [2] - 24:13, 66:15
calm [1] - 13:24
calories [1] - 85:5
camera [2] - 187:9, 188:16
cameras [7] - 45:4, 45:5, 88:10, 187:19, 188:1, 188:3, 188:13
campaign [3] - 25:17, 106:3, 115:6
Camperlengo [7] - 12:2, 12:6, 14:10, 178:13, 179:12, 182:11, 196:19
cannot [2] - 170:2, 239:2
capacity [2] - 225:10, 225:20

Captain [12] - 29:14, 30:24, 31:10, 31:21, 32:3, 35:3, 69:3, 79:24, 80:7, 184:17, 184:19
captain [4] - 49:13, 91:6, 161:9, 162:18
captains [1] - 163:1
car [4] - 40:24, 144:14, 206:19, 232:13
card [2] - 25:9, 144:13
cardiac [2] - 133:21, 133:22
care [9] - 26:6, 28:9, 82:16, 104:18, 132:20, 133:4, 135:16, 148:9, 209:14
cared [1] - 28:2
career [6] - 47:10, 47:21, 49:7, 74:18, 132:24, 227:7
cares [1] - 64:21
Cargill [6] - 7:4, 7:14, 7:15, 8:1, 8:8, 156:16
carried [2] - 40:21, 47:6
cart [2] - 188:3, 188:10
case [26] - 10:9, 11:3, 11:6, 14:24, 15:4, 15:7, 15:21, 19:24, 46:19, 64:10, 79:21, 108:16, 139:15, 139:21, 141:12, 144:16, 145:21, 146:14, 157:3, 173:18, 175:4, 180:8, 193:3, 202:2, 202:10, 203:5
Case [1] - 1:6
cases [2] - 145:20, 190:6
caught [1] - 122:21
caused [4] - 85:17, 146:15, 168:12, 202:12
causing [1] - 19:20
cautiously [1] - 143:20
cease [1] - 8:22
cellphone [12] - 24:14, 24:16, 27:21, 27:22, 28:14, 32:13, 36:7, 38:22, 66:19, 191:12, 191:15
Central [3] - 1:15, 2:4, 206:20
cert [1] - 167:2

certain [5] - 14:20, 186:6, 186:16, 189:22, 189:23
certainly [13] - 43:16, 65:2, 69:12, 140:17, 154:19, 155:10, 155:19, 158:23, 176:7, 194:8, 205:14, 223:13, 225:22
certifications [1] - 3:4
certified [5] - 86:11, 146:22, 175:17, 194:23, 234:16
Certified [1] - 1:17
CERTIFY [1] - 248:4
certify [1] - 248:17
chain [8] - 78:16, 109:9, 127:13, 128:1, 162:13, 162:16, 162:17, 162:22
chair [1] - 218:9
chairs [1] - 119:23
challenged [1] - 184:17
chance [4] - 17:1, 156:3, 170:8, 209:1
change [4] - 22:12, 36:13, 151:3, 207:2
changed [10] - 15:13, 42:8, 74:21, 100:15, 100:22, 160:17, 165:15, 165:19, 206:24, 216:2
changes [1] - 248:14
changing [1] - 75:1
characterization [1] - 21:2
charge [9] - 40:6, 47:15, 95:5, 109:13, 109:14, 116:10, 159:1, 194:5, 225:19
charged [3] - 95:15, 96:4, 96:24
charges [9] - 88:9, 91:5, 97:6, 97:7, 165:23, 192:11, 192:12, 192:21
chatted [1] - 86:7
cheating [1] - 122:20
check [10] - 16:11, 36:8, 36:10, 39:2, 42:14, 93:20, 143:8, 185:5, 200:21, 218:16
checked [4] - 36:23, 45:20, 85:10, 94:10
checking [7] - 36:24, 185:14, 186:3,

186:11, 186:12, 186:24, 223:4
chest [5] - 9:5, 14:19, 85:6, 158:15, 158:16
chief [2] - 65:18, 162:18
Chief [20] - 30:23, 31:8, 37:12, 52:10, 55:13, 71:18, 71:22, 71:23, 71:24, 77:24, 78:5, 80:1, 80:6, 80:9, 83:16, 86:4, 110:18, 161:9, 192:1, 195:11
child [3] - 48:17, 70:22, 71:1
children [4] - 17:12, 21:20, 73:23, 158:4
choice [2] - 144:1, 144:8
choosing [3] - 64:4, 64:6, 232:2
chores [1] - 17:24
chose [4] - 61:3, 61:6, 62:22, 62:23
Chris [9] - 39:20, 51:19, 87:18, 102:5, 111:15, 112:2, 112:5, 195:5, 206:2
chronic [4] - 16:20, 136:22, 207:1, 209:20
church [4] - 16:9, 16:17, 16:21, 17:10
circumstances [2] - 77:24, 163:3
City [2] - 165:13, 166:11
Civil [36] - 1:6, 57:6, 58:13, 149:13, 149:18, 149:21, 150:8, 150:15, 151:7, 151:11, 151:13, 151:15, 151:23, 152:1, 152:19, 153:20, 204:15, 227:4, 227:12, 228:11, 229:7, 229:9, 230:14, 232:4, 233:12, 233:18, 234:4, 234:9, 234:12, 235:11, 235:19, 236:3, 236:5, 236:10, 246:7, 246:8
civil [12] - 56:14, 58:7, 58:9, 58:21, 60:6, 63:10, 63:17, 64:1, 64:9, 64:19, 64:23,

206:1
**claim** [11] - 6:19, 10:9, 10:13, 10:14, 10:24, 17:7, 64:23, 94:2, 125:23, 139:3, 142:2
**Claimant's** [1] - 184:14
**claimed** [1] - 40:20
**claims** [4] - 4:19, 10:3, 16:3, 20:23, 91:13, 168:2
**clarify** [7] - 115:24, 153:13, 154:5, 154:7, 160:20, 194:17, 228:4
**classical** [1] - 16:15
**classification** [1] - 94:12
**clear** [9] - 132:4, 132:8, 169:3, 170:24, 198:2, 206:14, 218:7, 227:11, 239:16
**clearer** [1] - 212:21
**clearly** [4] - 82:12, 84:1, 84:4, 239:3
**clients** [1] - 65:16
**clinical** [4] - 179:10, 179:12, 182:10, 242:18
**clock** [2] - 25:8, 118:7
**close** [7] - 106:1, 106:5, 123:20, 127:10, 155:3, 155:19, 205:14
**closed** [1] - 139:23
**closer** [1] - 130:21
**closet** [1] - 136:13
**closing** [1] - 127:7
**co** [4] - 23:6, 46:20, 122:21, 163:18
**co-worker** [2] - 46:20, 122:21
**co-worker's** [1] - 163:18
**co-workers** [1] - 23:6
**code** [1] - 97:21
**codes** [2] - 220:20, 225:14
**coincidence** [2] - 168:24, 169:1
**Colantonio** [5] - 68:14, 69:11, 93:22, 94:5, 96:13
**Colantonio's** [1] - 94:17
**colic** [1] - 22:11
**collective** [3] - 140:14, 141:11, 167:24
**college** - 16:16

**colonel** [1] - 86:5
**combination** [2] - 42:2, 42:12
**coming** [5] - 7:3, 36:18, 146:11, 218:14, 219:10
**command** [6] - 78:16, 109:9, 162:13, 162:16, 162:17, 162:22
**commander** [4] - 75:19, 98:19, 100:14, 116:10
**commander's** [4] - 38:1, 89:1, 98:15, 130:6
**commencing** [1] - 1:16
**comment** [2] - 116:14, 197:21
**comments** [1] - 36:19
**Commission** [32] - 58:13, 149:13, 149:18, 149:21, 150:8, 150:16, 150:19, 151:2, 151:7, 151:12, 151:14, 151:15, 151:24, 152:2, 154:21, 227:4, 227:13, 227:23, 228:11, 229:7, 230:14, 232:5, 233:12, 233:18, 234:5, 234:9, 235:17, 235:19, 236:4, 236:5, 236:10, 238:21
**commission** [2] - 5:4, 149:23
**Committee** [1] - 236:22
**common** [3] - 13:19, 218:10, 219:22
**communicate** [1] - 33:7
**communication** [1] - 228:9
**community** [1] - 167:11
**comp** [12] - 144:15, 146:14, 201:23, 202:2, 203:5, 205:16, 233:7, 244:14, 245:4, 245:5, 245:8, 245:11
**Comp** [16] - 7:5, 104:9, 144:22, 148:8, 149:3, 150:11, 157:2,

177:8, 200:11, 200:14, 201:7, 201:9, 233:1, 246:10, 246:11, 246:19
**compared** [5] - 9:11, 85:5, 156:19, 166:6, 220:17
**compensation** [1] - 203:15
**Compensation** [14] - 6:1, 6:3, 10:5, 11:3, 19:24, 173:23, 174:14, 174:16, 175:24, 176:2, 199:6, 202:9, 203:13, 236:12
**complain** [1] - 108:14
**complained** [1] - 92:9
**complaint** [98] - 4:8, 15:14, 23:19, 41:18, 62:9, 65:9, 71:9, 74:9, 74:21, 74:22, 75:1, 75:2, 76:12, 77:13, 77:15, 77:23, 78:9, 78:15, 78:22, 79:9, 79:23, 79:24, 80:11, 81:5, 81:14, 82:24, 83:6, 84:12, 86:16, 86:23, 87:23, 88:1, 90:11, 91:15, 91:16, 92:16, 93:6, 97:8, 101:11, 101:16, 101:17, 102:6, 102:9, 103:8, 103:14, 104:5, 104:24, 105:10, 105:12, 106:19, 111:22, 112:7, 112:21, 113:13, 115:16, 116:18, 124:6, 125:12, 125:14, 125:16, 126:7, 126:13, 128:7, 131:5, 131:9, 131:13, 131:16, 132:2, 134:13, 137:22, 138:15, 139:18, 139:23, 140:9, 140:11, 141:7, 147:20, 169:17, 174:24, 179:15, 179:20, 179:22, 182:13, 184:18, 190:10, 190:20, 191:2, 191:3, 192:3, 195:12, 195:16, 197:11, 198:3, 208:21, 209:17,

243:20
**complaints** [7] - 100:12, 106:8, 123:19, 165:23, 170:11, 175:3, 175:10
**complete** [2] - 194:15, 248:11
**completion** [1] - 248:13
**comprehensive** [1] - 184:9
**computer** [7] - 80:20, 80:21, 129:9, 129:12, 130:1, 130:19, 218:24
**computerized** [1] - 185:19
**computers** [7] - 36:17, 36:18, 47:15, 97:17, 188:8, 218:23, 226:5
**concerned** [5] - 69:19, 74:10, 74:17, 163:7, 163:11
**concerts** [1] - 16:16
**concluded** [1] - 245:16
**conclusions** [1] - 150:4
**condition** [10] - 11:16, 11:22, 177:2, 202:12, 204:3, 206:23, 214:9, 217:8, 217:12, 217:14
**conditions** [2] - 110:8, 226:14
**conduct** [1] - 166:19
**conducted** [9] - 1:13, 112:24, 138:18, 139:5, 139:12, 174:1, 174:6, 182:18, 193:19
**conducting** [1] - 174:2
**conference** [1] - 190:18
**confidential** [1] - 190:22
**confirmations** [1] - 138:11
**confirmed** [1] - 191:19
**confused** [1] - 43:6
**connection** [1] - 115:8
**Connell** [20] - 101:6, 113:14, 113:24, 114:5, 114:22, 115:2, 115:3, 115:4, 115:5, 115:8, 115:10, 115:18, 115:19, 116:1,

116:2, 129:11, 129:14, 131:22
**conscientiously** [1] - 128:2
**consistent** [4] - 108:6, 108:10, 109:2, 110:12
**conspiracy** [2] - 113:21, 113:23
**conspired** [1] - 121:23
**construction** [1] - 226:4
**consulted** [3] - 35:14, 104:6, 201:20
**contact** [16] - 43:14, 43:17, 44:1, 108:6, 108:10, 108:23, 109:1, 109:6, 109:12, 109:17, 110:12, 137:19, 146:19, 178:2, 191:12, 192:15
**contacted** [2] - 147:4, 192:10
**contain** [1] - 174:23
**contend** [1] - 51:24
**contention** [9] - 17:19, 35:16, 35:18, 59:19, 60:9, 60:20, 61:9, 62:18, 63:22
**context** [1] - 136:4
**continue** [8] - 9:12, 17:11, 18:24, 42:22, 156:17, 213:21, 215:8, 225:7
**continued** [3] - 28:7, 51:8, 212:12
**continues** [1] - 210:24
**continuing** [1] - 85:17
**contract** [6] - 141:18, 152:14, 181:2, 183:10, 183:21, 197:4
**contractual** [1] - 152:10
**contributors** [1] - 115:6
**control** [32] - 24:2, 127:6, 166:1, 185:10, 218:8, 218:12, 218:13, 218:14, 218:17, 218:18, 218:21, 218:22, 219:14, 220:13, 220:15, 220:23, 221:8, 221:9, 221:14, 222:15, 222:19, 222:23, 222:24, 223:3, 223:7, 223:8

**controlled** [3] - 127:3, 127:11, 221:1
**controls** [1] - 225:22
**conversation** [30] - 25:11, 25:14, 25:15, 27:11, 27:17, 27:19, 35:8, 36:6, 42:16, 43:13, 55:2, 55:13, 58:20, 79:20, 83:24, 101:18, 112:1, 112:8, 115:2, 117:5, 121:18, 124:7, 124:10, 124:17, 125:7, 131:11, 195:5, 195:7, 227:2
**conversations** [4] - 22:15, 155:7, 170:6, 178:17
**copies** [6] - 80:3, 80:15, 80:20, 119:7, 195:11
**copy** [6] - 53:11, 53:18, 80:5, 80:17, 80:19, 231:1
**correct** [57] - 17:22, 20:3, 21:14, 23:21, 24:12, 28:23, 30:1, 30:2, 31:3, 35:10, 36:12, 36:15, 53:19, 54:8, 55:14, 74:8, 76:2, 77:16, 82:1, 88:3, 88:4, 92:7, 95:13, 103:19, 109:24, 115:20, 130:14, 130:22, 134:8, 135:17, 137:20, 137:21, 138:1, 142:24, 143:5, 143:6, 144:5, 147:13, 147:14, 149:8, 156:4, 156:7, 160:3, 171:2, 180:6, 183:17, 183:18, 190:15, 199:15, 212:19, 226:10, 226:11, 226:14, 242:22, 242:23, 247:6, 248:11
**correction** [6] - 49:16, 143:19, 189:20, 215:1, 226:7, 227:1
**correctional** [24] - 33:17, 40:15, 45:2, 51:10, 56:7, 68:22, 75:10, 75:17, 85:20, 85:21, 89:9, 91:6, 97:22, 98:22, 134:23, 143:19, 161:8, 162:17, 192:7, 197:5, 218:2,
219:5, 226:16, 227:9
**Corrections** [4] - 30:24, 83:16, 86:5, 224:2
**correctly** [1] - 92:18
**correspondence** [4] - 229:1, 229:4, 229:6, 230:13
**cost** [2] - 168:5
**cottonmouth** [1] - 19:22
**Council** [1] - 172:10
**COUNSEL** [2] - 4:5, 156:10
**counsel** [3] - 104:23, 105:7, 246:24
**counter** [2] - 13:3, 159:19
**counter-dict** [1] - 13:3
**countless** [1] - 205:2
**COUNTY** [4] - 1:7, 1:8, 1:8, 247:2
**County** [39] - 6:6, 6:9, 6:12, 6:17, 6:23, 7:6, 7:21, 10:16, 11:7, 16:10, 64:24, 74:12, 75:11, 77:12, 83:8, 96:17, 105:7, 106:13, 123:11, 137:6, 177:8, 178:13, 178:23, 179:13, 195:4, 214:24, 229:7, 230:14, 233:12, 233:17, 234:4, 234:8, 234:12, 235:6, 235:19, 236:6, 236:16, 243:5, 243:6
**county** [14] - 139:23, 143:4, 148:19, 149:11, 149:19, 197:6, 197:8, 207:4, 211:13, 215:24, 228:6, 228:12, 235:21, 243:22
**County's** [2] - 236:19, 236:23
**county's** [1] - 151:4
**couple** [4] - 14:1, 84:6, 155:2, 169:20
**course** [2] - 30:14, 79:1
**court** [5] - 48:16, 48:19, 71:3, 79:7, 164:20
**Court** [3] - 3:11, 79:8, 246:23
**COURT** [1] - 1:1
**courtyard** [2] - 55:18,
55:22
**cover** [3] - 10:24, 141:22, 222:9
**covered** [1] - 10:4
**covers** [2] - 51:22, 210:9
**crazy** [1] - 48:16
**created** [1] - 70:6
**creating** [1] - 90:3
**credible** [1] - 243:15
**credit** [1] - 144:13
**Creek** [1] - 129:16
**Criminal** [1] - 86:8
**criminal** [9] - 71:9, 74:22, 75:1, 79:8, 88:9, 90:11, 121:5, 165:23, 192:12
**criticized** [1] - 131:22
**crying** [1] - 158:23
**CSR** [1] - 248:23
**curious** [1] - 211:8
**current** [4] - 148:11, 148:12, 217:12, 236:24
**custody** [2] - 48:17, 71:4
**Cymbalta** [3] - 12:14, 12:20, 13:4

**D**

**DA's** [2] - 97:2, 97:5
**daily** [10] - 12:18, 12:19, 13:14, 15:12, 33:20, 33:23, 160:10, 187:14, 189:9, 189:10
**damages** [2] - 4:13, 16:2
**Dan** [1] - 149:24
**date** [52] - 5:17, 6:4, 7:16, 7:20, 7:22, 62:2, 62:4, 76:13, 77:4, 77:14, 78:4, 92:21, 93:1, 93:2, 95:14, 112:12, 112:13, 116:22, 116:23, 160:1, 160:3, 172:7, 172:8, 175:19, 178:16, 180:12, 199:10, 200:24, 201:22, 202:12, 205:13, 211:3, 212:14, 215:9, 215:10, 215:12, 215:16, 215:21, 216:2, 216:3, 216:15, 230:7, 230:10,
230:16, 233:9, 235:16, 235:24, 238:7, 238:8, 240:7, 240:8, 241:13
**date's** [1] - 146:7
**dated** [21] - 31:4, 31:5, 66:24, 78:7, 91:12, 139:20, 230:13, 233:6, 233:18, 234:5, 234:9, 234:13, 236:1, 238:23, 239:16, 239:20, 240:5, 243:8, 243:11, 243:18
**dates** [5] - 32:10, 37:23, 38:5, 179:11, 181:11
**David** [2] - 57:18, 61:23
**Dawn** [2] - 23:8, 23:11
**day-to-day** [1] - 109:18
**days** [11] - 24:20, 24:21, 44:2, 48:14, 62:10, 81:7, 85:3, 114:12, 133:16, 169:20, 208:10
**DCJS** [4] - 96:1, 96:7, 97:3, 97:4
**de** [2] - 51:12, 78:19
**de-escalate** [2] - 51:12, 78:19
**deadline** [1] - 146:24
**deal** [2] - 114:22, 155:17
**dealt** [1] - 83:7
**Dear** [3] - 230:12, 236:10, 238:21
**December** [11] - 143:2, 177:17, 178:15, 178:16, 180:12, 181:10, 181:19, 189:3, 214:4, 233:18, 241:4
**decide** [4] - 48:19, 180:22, 202:5, 202:7
**decides** [1] - 184:1
**deciding** [1] - 8:21
**decision** [40] - 11:9, 104:13, 128:11, 141:2, 142:8, 145:9, 145:17, 148:8, 149:4, 161:11, 171:4, 173:18, 175:5, 176:1, 177:20, 180:3, 180:4, 199:14, 201:7, 202:10, 202:16, 202:23,
203:12, 203:16, 203:22, 213:19, 214:5, 214:14, 216:8, 224:13, 233:5, 233:6, 235:17, 236:16, 236:19, 236:23, 236:24, 242:15, 246:10, 246:11
**deemed** [1] - 229:22
**defendant** [1] - 110:9
**Defendant** [2] - 65:10, 197:14
**DEFENDANT'S** [1] - 246:6
**defendant's** [5] - 60:2, 63:6, 173:2, 232:19, 240:19
**Defendant's** [1] - 60:5
**DEFENDANTS** [2] - 2:9, 4:5
**defendants** [4] - 1:9, 170:9, 170:22, 170:23
**define** [1] - 106:10
**definitively** [1] - 197:13
**deliver** [1] - 80:18
**delivered** [4] - 86:22, 87:1, 87:4, 138:12
**deliveries** [4] - 98:12, 99:7, 100:24
**delivering** [1] - 8:24
**delivery** [3] - 99:7, 99:11, 99:12
**demand** [6] - 9:2, 67:14, 143:21, 144:7
**demands** [2] - 8:23, 222:13
**demoted** [2] - 62:13, 97:13
**demotion** [1] - 167:16
**denied** [14] - 128:11, 140:13, 140:19, 141:1, 141:21, 142:12, 142:13, 144:11, 182:22, 184:15, 200:5, 208:12, 229:9
**denying** [1] - 180:16
**department** [2] - 49:5, 73:19
**Department** [60] - 6:7, 6:10, 6:18, 7:1, 7:21, 18:9, 24:15, 26:13, 49:2, 49:18, 56:6, 64:18, 66:19, 73:18, 74:19, 92:9, 92:14, 92:16, 93:14, 95:21, 96:10, 102:13,

105:5, 112:22, 114:4, 117:13, 117:16, 124:3, 125:17, 137:7, 138:10, 138:13, 141:19, 144:11, 146:20, 147:6, 150:11, 151:9, 151:17, 151:20, 151:22, 152:1, 152:14, 161:16, 172:5, 182:15, 187:5, 198:1, 198:18, 198:20, 199:22, 206:13, 210:9, 213:7, 214:24, 228:10, 233:22, 235:6, 241:22, 243:20

**Department's** [1] - 243:8

**Department-issued** [2] - 24:15, 66:19

**departments** [1] - 221:19

**deponent** [1] - 248:15

**deposition** [13] - 5:18, 103:17, 104:10, 104:22, 108:4, 187:6, 203:11, 208:16, 232:12, 239:19, 248:5, 248:8, 248:13

**Deposition** [1] - 3:9

**depositions** [4] - 30:4, 74:7, 102:21, 175:4

**depression** [7] - 48:13, 70:16, 70:18, 136:23, 206:17, 212:11, 215:3

**deprived** [2] - 141:13, 142:4

**depth** [1] - 233:24

**deputies** [1] - 197:6

**deputy** [2] - 49:2, 95:22

**derived** [1] - 162:1

**describe** [9] - 15:2, 15:12, 20:13, 38:12, 49:9, 132:1, 189:11, 189:16, 194:15

**described** [6] - 18:7, 39:1, 44:17, 100:8, 137:9, 137:13

**describing** [3] - 100:6, 134:2, 134:5

**designated** [1] - 174:8

**desk** [5] - 97:20, 119:23, 119:24, 127:19, 175:21

**destroy** [2] - 82:4, 83:12

**detail** [20] - 33:19, 36:16, 36:17, 39:10, 39:24, 40:4, 41:17, 41:19, 42:20, 42:23, 47:7, 47:12, 88:17, 111:17, 119:19, 119:21, 120:21, 220:1, 221:14

**detailed** [1] - 78:5

**details** [22] - 27:23, 36:15, 37:15, 45:9, 49:11, 51:3, 67:3, 76:17, 97:18, 98:1, 99:3, 100:6, 113:15, 113:18, 113:19, 150:13, 164:8, 164:9, 197:19, 208:11, 218:4

**determination** [25] - 105:5, 149:7, 149:11, 151:16, 152:3, 171:10, 171:21, 172:4, 173:17, 173:23, 174:9, 174:15, 179:7, 183:17, 184:3, 199:18, 216:13, 216:14, 224:17, 228:10, 233:2, 236:14, 242:17, 242:20, 246:9

**determination/GML** [1] - 172:17

**determinations** [1] - 150:4

**determine** [1] - 216:5

**determined** [7] - 9:3, 196:15, 215:17, 215:21, 226:23, 230:19, 236:13

**detour** [1] - 11:2

**diagnosed** [4] - 158:10, 206:15, 209:20, 226:10

**diagnosis** [7] - 16:19, 17:21, 19:18, 206:16, 209:23, 226:12

**diagnostic** [1] - 210:24

**dialing** [1] - 71:15

**diapers** [1] - 22:12

**dict** [1] - 13:3

**dictate** [1] - 185:4

**dictated** [1] - 92:13

**dictates** [1] - 31:13

**difference** [2] - 9:10,

181:10

**differences** [1] - 15:22

**different** [15] - 12:13, 18:18, 19:3, 23:4, 84:24, 88:5, 146:7, 152:12, 156:24, 191:1, 204:6, 218:19, 218:20, 220:17, 221:7

**difficult** [2] - 91:14, 92:4

**difficulties** [1] - 106:9

**dinner** [2] - 66:7, 158:3

**dioramas** [2] - 17:16, 17:24

**direct** [4] - 34:16, 108:23, 163:6, 169:1

**directed** [3] - 102:14, 169:22, 171:18

**directing** [1] - 77:19

**directly** [11] - 34:11, 93:10, 110:23, 157:3, 163:4, 163:5, 166:18, 168:3, 170:14, 175:13, 182:11

**disability** [28] - 5:24, 7:10, 148:11, 153:1, 153:4, 154:2, 199:21, 199:23, 200:1, 200:3, 200:17, 201:13, 207:6, 207:11, 207:19, 218:3, 222:12, 222:14, 223:14, 230:16, 231:8, 231:21, 232:2, 238:11, 239:2, 239:4, 239:7, 239:11

**disability's** [1] - 231:23

**disabled** [2] - 221:18, 226:24

**disagree** [1] - 114:17

**disagreement** [4] - 46:17, 46:20, 163:14, 163:16

**discipline** [6] - 35:22, 35:24, 37:8, 37:10, 42:18, 132:12

**disciplined** [1] - 36:21

**disclose** [1] - 232:7

**disclosure** [1] - 213:10

**discovery** [1] - 60:8

**discretion** [2] - 180:22, 183:23

**discrimination...you**

[1] - 239:1

**discuss** [12] - 22:9, 29:14, 37:15, 77:7, 120:6, 148:4, 149:17, 193:3, 193:10, 226:18, 226:19

**discussed** [10] - 55:23, 105:9, 106:7, 115:19, 184:16, 185:12, 190:6, 190:10, 191:24, 229:5

**discussing** [4] - 179:4, 190:9, 206:18, 211:6

**discussion** [25] - 29:9, 36:3, 50:20, 53:10, 105:16, 108:24, 111:13, 126:1, 126:11, 126:22, 127:1, 127:4, 135:19, 150:12, 153:10, 153:12, 169:10, 170:5, 171:23, 181:22, 191:22, 193:12, 203:9, 214:19, 228:5

**discussions** [7] - 22:3, 22:18, 135:23, 137:8, 137:11, 149:10, 155:14

**dismissed** [1] - 56:2

**disobeying** [2] - 168:3

**disorder** [6] - 136:22, 206:16, 209:20, 211:1, 211:2, 211:5

**disputes** [1] - 139:21

**disregard** [1] - 136:24

**disrespectful** [1] - 136:24

**disrupt** [2] - 89:11, 89:17

**disrupting** [1] - 90:1

**distress** [3] - 195:22, 211:5, 212:11

**District** [1] - 79:12

**DISTRICT** [2] - 1:1, 1:2

**doctor** [12] - 12:1, 138:7, 143:10, 143:13, 143:16, 144:6, 176:20, 181:11, 195:20, 196:20, 206:18, 207:7

**doctor's** [3] - 156:24, 178:3, 216:6

**doctors** [5] - 14:7, 18:20, 157:11,

178:18, 196:13

**doctors'** [1] - 181:15

**document** [30] - 35:11, 46:9, 46:10, 53:4, 54:10, 64:3, 66:11, 66:24, 67:24, 131:23, 172:19, 173:20, 174:23, 174:24, 190:24, 210:6, 210:17, 212:18, 214:22, 232:24, 233:4, 233:10, 233:16, 235:14, 237:21, 238:15, 240:24, 241:1, 241:2, 243:19

**documentary** [2] - 114:1, 121:21

**documentation** [21] - 77:6, 90:17, 106:11, 115:7, 120:3, 135:7, 140:22, 152:4, 163:23, 163:24, 164:1, 176:17, 177:19, 177:23, 179:4, 182:4, 200:19, 214:1, 214:11, 238:11, 243:16

**documents** [43] - 20:23, 50:12, 66:20, 67:15, 74:6, 82:5, 84:5, 87:8, 90:22, 114:3, 119:5, 138:13, 139:7, 144:22, 154:8, 154:9, 163:15, 168:18, 168:21, 169:23, 175:16, 175:21, 176:24, 177:6, 178:8, 178:18, 179:14, 180:8, 182:1, 182:3, 182:8, 184:10, 196:11, 204:12, 210:8, 213:12, 237:19, 238:18, 242:7, 242:8, 242:21, 242:24, 243:2

**DOL** [2] - 112:24, 131:4

**doll** [3] - 136:11, 136:13, 137:3

**domestic** [2] - 164:21, 164:22

**donate** [1] - 140:12

**donation** [1] - 141:3

**done** [32] - 17:2, 17:4, 17:17, 31:3, 42:14,

44:14, 46:2, 47:2,
62:12, 66:17, 71:14,
78:13, 86:21, 93:24,
96:1, 123:12,
130:20, 135:12,
157:16, 166:10,
166:12, 168:10,
169:23, 176:13,
177:14, 193:20,
197:9, 197:15,
198:21, 226:4,
228:17

**door** [25] - 52:9,
119:10, 126:8,
126:14, 127:5,
127:9, 127:10,
127:11, 127:12,
127:14, 127:17,
127:19, 127:22,
127:23, 128:3,
128:8, 128:10,
128:13, 128:19,
128:22, 129:4,
130:21

**doors** [5] - 127:2,
127:7, 218:10,
219:1, 222:24

**doorstop** [1] - 129:1

**doorway** [1] - 127:17

**dosage** [2] - 12:9,
12:16

**dose** [2] - 14:2, 19:14

**double** [1] - 185:5

**down** [24] - 11:9,
24:12, 52:12, 66:15,
67:4, 68:9, 69:6,
71:15, 78:4, 108:5,
113:9, 117:14,
117:21, 118:17,
120:10, 129:9,
134:16, 135:2,
139:17, 143:8,
147:2, 155:23,
163:13, 248:8

**downtime** [3] - 97:15,
97:16, 97:21

**Dr** [73] - 12:2, 12:3,
12:6, 14:10, 133:4,
135:16, 138:14,
176:17, 176:20,
177:1, 177:5, 177:7,
178:5, 178:11,
178:13, 179:1,
179:6, 179:8,
179:10, 180:9,
181:4, 181:17,
181:19, 181:22,
181:23, 182:2,
182:4, 182:5,
182:17, 183:18,

184:8, 195:23,
196:1, 196:3, 196:7,
196:18, 197:2,
197:4, 197:12,
198:7, 198:8,
209:24, 210:11,
210:19, 211:18,
213:10, 214:15,
215:15, 215:19,
216:6, 216:11,
226:13, 227:2,
227:5, 227:11,
230:23, 230:24,
231:5, 241:1, 241:4,
241:16, 241:18,
242:2, 242:9,
242:10, 243:2,
243:24, 246:17

**drive** [1] - 117:20

**driven** [1] - 9:22

**driving** [1] - 8:23

**drop** [2] - 192:18,
192:21

**dropping** [1] - 192:11

**Drose** [2] - 23:8, 23:11

**due** [28] - 7:4, 7:10,
20:5, 146:10,
147:10, 147:15,
147:21, 148:14,
148:15, 149:5,
152:9, 152:11,
152:12, 152:15,
152:16, 152:17,
171:1, 171:20,
175:14, 176:3,
176:4, 204:14,
209:14, 209:15,
215:6, 217:6, 236:17

**dues** [1] - 20:7

**duly** [2] - 4:3, 248:5

**Dunham** [22] - 29:5,
29:18, 34:2, 40:11,
41:5, 41:6, 41:12,
41:21, 42:11, 46:13,
46:16, 71:12, 111:4,
129:12, 129:15,
129:18, 188:6,
188:7, 188:10,
188:14, 188:18,
225:18

**Dunham's** [1] - 45:16

**during** [19] - 32:23,
34:12, 35:19, 36:1,
38:13, 46:24, 63:1,
91:18, 97:16,
101:14, 104:22,
109:6, 111:1, 157:6,
169:11, 177:23,
223:4, 241:23,
248:15

**duties** [7] - 129:21,
184:13, 193:14,
193:15, 194:3,
217:18, 221:11

**duty** [18] - 193:17,
194:14, 218:4,
219:12, 219:17,
219:19, 219:21,
219:24, 220:1,
220:6, 220:10,
221:6, 221:9, 222:3,
223:22, 224:5,
224:23, 225:17

# E

**e-Justice** [6] - 93:19,
95:5, 95:11, 95:15,
96:9, 120:24

**e-mail** [1] - 42:10

**e-mails** [1] - 118:3

**ear** [1] - 116:12

**early** [3] - 38:6, 38:9,
104:13

**earn** [2] - 5:13, 17:5

**easier** [1] - 16:6, 85:23

**easiest** [1] - 6:21

**easily** [2] - 157:15,
221:23

**easy** [1] - 232:15

**eat** [1] - 43:19

**eating** [2] - 85:3, 85:4

**Ed** [2] - 65:16, 147:18

**editing** [1] - 225:11

**Edward** [1] - 64:13

**effect** [4] - 3:10,
160:12, 160:20,
163:6

**effective** [1] - 230:16

**effects** [9] - 13:3,
13:6, 13:7, 13:8,
14:17, 14:18, 14:20,
19:5, 19:11

**eight** [6] - 81:7, 97:23,
100:15, 100:17,
157:6, 157:8

**eight-hour** [1] - 157:6

**either** [12] - 41:10,
73:15, 75:23, 77:2,
104:8, 114:1,
138:13, 161:14,
171:12, 185:17,
193:10, 193:20

**elected** [2] - 25:17,
114:19

**election** [1] - 27:2

**electronically** [1] -
127:11

**elevated** [1] - 209:15

**eligibility** [1] - 203:14

**eligible** [18] - 6:15,
7:23, 58:1, 58:3,
59:16, 59:20, 60:10,
60:15, 200:5,
200:13, 200:16,
201:15, 202:3,
202:5, 202:8,
208:14, 219:19,
229:22

**emergency** [2] -
167:11, 167:15

**emotional** [3] -
158:23, 159:8,
195:22

**emotionally** [1] -
120:12

**employed** [2] - 6:24,
142:22

**employee** [5] - 58:1,
64:17, 79:4, 194:8,
209:12

**employees** [4] -
26:14, 75:11, 128:7,
205:2

**employment** [19] -
6:6, 8:22, 37:8, 49:5,
81:6, 108:10, 109:2,
109:6, 109:8,
110:12, 143:17,
143:23, 146:15,
156:14, 202:13,
205:5, 222:8,
236:19, 239:5

**employment"** [1] -
108:6

**encourage** [1] - 48:18

**encouraged** [1] - 29:3

**end** [7] - 32:21, 32:22,
121:18, 129:9,
152:20, 155:3,
242:16

**ended** [6] - 7:13,
210:12, 239:2,
239:4, 239:8, 239:11

**ends** [1] - 39:6

**enforced** [2] - 106:21,
204:21

**enforcement** [2] -
26:19, 73:13

**engage** [2] - 180:16,
189:7

**enjoyed** [3] - 47:10,
227:7, 227:8

**ensure** [1] - 178:18

**entail** [1] - 186:2

**enter** [1] - 203:12

**entered** [2] - 127:16,
242:14

**entering** [1] - 9:1

**enters** [1] - 185:17

**entire** [6] - 12:7, 40:1,
41:17, 43:19, 111:1,
181:18

**entitled** [4] - 90:16,
184:5, 184:6, 245:15

**entrance** [2] - 55:18,
55:19

**entries** [3] - 185:12,
185:16, 224:2

**entry** [2] - 143:21,
186:20

**envelope** [4] - 80:5,
82:11, 83:15, 119:24

**environment** [2] -
102:15, 221:2

**er** [1] - 91:7

**ER** [3] - 133:6, 133:9,
133:10

**Eric** [1] - 57:18

**erred** [1] - 64:24

**error** [1] - 140:8

**escalate** [4] - 51:12,
51:14, 78:19

**escalated** [1] - 88:11

**escapes** [1] - 11:24

**especially** [2] -
100:13, 194:2

**ESQ** [2] - 2:6, 2:12

**essentially** [1] - 151:4

**ESU** [4] - 47:4, 166:24,
167:5

**ethic** [1] - 47:18

**evaluate** [2] - 227:21,
243:13

**evaluating** [1] -
231:22

**evaluation** [16] -
133:23, 154:23,
180:7, 181:5, 217:4,
227:14, 237:8,
237:17, 238:2,
240:17, 241:2,
242:1, 242:16,
243:24, 244:1,
246:17

**evaluations** [1] - 59:6

**evening** [1] - 66:9

**event** [1] - 26:16

**events** [11] - 20:18,
48:21, 155:17,
158:11, 160:24,
161:1, 166:15,
167:19, 197:22,
198:12, 244:2

**eventually** [5] - 29:24,
34:3, 43:9, 69:23,
90:15

**evidence** [51] - 35:13,
46:18, 56:20, 58:7,

65:3, 65:4, 65:15, 91:21, 96:7, 105:18, 105:20, 105:21, 106:6, 106:10, 107:6, 113:23, 121:21, 122:2, 122:10, 123:8, 125:21, 148:6, 148:7, 148:16, 148:17, 153:6, 163:15, 167:22, 170:7, 170:8, 170:15, 170:17, 170:21, 170:23, 176:6, 177:1, 178:21, 180:19, 180:20, 191:1, 204:24, 206:3, 216:4, 223:24, 230:15, 230:18, 241:15, 241:23, 242:14

**evident** [1] - 194:13

**exact** [13] - 7:16, 7:22, 32:10, 37:23, 38:5, 56:21, 150:17, 153:5, 178:15, 199:10, 201:21, 205:13, 208:11

**exactly** [4] - 97:7, 112:20, 152:19, 168:10

**exam** [8] - 27:20, 28:13, 46:6, 46:8, 57:9, 59:1, 59:2, 206:1

**examination** [8] - 229:16, 229:17, 229:19, 230:18, 231:17, 231:18, 231:20, 245:14

**EXAMINATION** [5] - 1:12, 4:5, 156:10, 246:2, 246:3

**examine** [1] - 227:19

**examined** [3] - 4:4, 216:5, 248:4

**examiner** [3] - 229:22, 237:9, 237:17

**example** [3] - 140:20, 205:7, 205:21

**examples** [2] - 100:23, 101:1

**exams** [2] - 197:9, 198:9

**Excedrin** [1] - 19:14

**excellent** [1] - 211:24

**except** [3] - 3:6, 109:8, 109:19

**excessive** [4] - 38:12,

99:3, 99:17, 145:22

**excessively** [2] - 36:9, 36:14

**exciting** [1] - 40:18

**excuse** [13] - 20:11, 29:2, 38:16, 105:23, 126:9, 127:24, 139:17, 150:3, 173:18, 181:23, 204:20, 213:19, 217:20

**excused** [2] - 150:2, 150:5

**Executive** [1] - 41:11

**EXECUTIVE** [1] - 1:8

**exercising** [2] - 237:2, 237:15

**exhibit** [21] - 59:24, 63:5, 110:2, 172:22, 174:12, 208:15, 208:22, 208:23, 210:3, 210:5, 210:13, 210:14, 210:16, 212:6, 214:20, 214:21, 230:6, 233:16, 233:23, 244:9

**Exhibit** [58] - 30:4, 37:4, 60:2, 60:6, 61:11, 63:6, 63:9, 86:24, 108:3, 171:14, 173:2, 173:5, 173:13, 202:22, 208:16, 208:19, 210:15, 228:21, 230:5, 230:9, 232:23, 233:4, 233:9, 234:3, 234:7, 234:11, 234:24, 235:7, 235:15, 235:23, 236:7, 238:3, 238:6, 239:17, 239:18, 239:23, 240:1, 240:2, 240:8, 240:10, 240:12, 240:19, 240:23, 244:9, 246:7, 246:8, 246:9, 246:10, 246:11, 246:12, 246:13, 246:14, 246:15, 246:16, 246:17, 246:18, 246:19, 246:21

**EXHIBITS** [2] - 246:5, 246:6

**exhibits** [2] - 175:4, 236:2

**Exhibits** [3] - 232:19, 234:19, 246:23

**exist** [2] - 80:15, 136:16

**exists** [1] - 152:11

**expect** [2] - 10:19, 116:23

**expectation** [1] - 106:22

**expected** [1] - 215:12

**expecting** [1] - 10:18

**expenses** [2] - 10:4, 10:7

**experience** [5] - 73:12, 148:15, 189:16, 190:1, 193:24

**experienced** [6] - 16:19, 137:1, 157:18, 158:9, 159:12, 241:11

**experiences** [1] - 162:16

**experiencing** [3] - 13:8, 14:18, 19:17

**experiment** [1] - 12:20

**experimenting** [1] - 12:13

**expert** [1] - 58:11

**expiration** [1] - 58:23

**expired** [1] - 108:21

**explain** [6] - 8:20, 108:9, 119:17, 141:14, 168:13, 200:19

**explained** [4] - 108:13, 118:13, 133:5

**exposed** [1] - 206:21

**exposure** [3] - 15:10, 49:3, 220:19

**Express** [4] - 7:11, 8:13, 156:18, 157:1

**expressed** [2] - 94:22, 126:3

**extended** [2] - 206:23, 229:9

**extension** [1] - 208:9

**extensive** [1] - 204:19

**extent** [2] - 122:6, 169:18

**extremely** [1] - 166:18

**eyeball** [1] - 189:13

**eyeballed** [1] - 189:13, 189:14

## F

**F'ing** [2] - 169:19, 169:23

**face** [2] - 42:16

**face-to-face** [1] - 42:16

**faces** [1] - 189:22

**facilities** [2] - 8:5, 97:22

**facility** [38] - 8:1, 24:10, 33:17, 33:22, 34:6, 37:18, 45:3, 49:16, 51:10, 55:15, 56:8, 62:8, 68:23, 75:17, 75:21, 76:8, 85:20, 85:21, 89:2, 89:3, 89:4, 89:9, 91:6, 106:21, 106:24, 107:13, 134:24, 143:19, 161:8, 161:12, 162:17, 179:21, 192:8, 218:2, 223:1, 225:13, 226:16, 227:9

**fact** [12] - 46:11, 46:13, 64:7, 149:14, 155:21, 181:9, 191:19, 194:9, 201:21, 204:24, 207:5, 207:10

**factors** [2] - 8:17, 8:20

**facts** [7] - 77:23, 103:3, 104:18, 125:19, 183:23, 235:12, 243:13

**factually** [1] - 236:20

**fail** [2] - 46:8, 102:8

**failed** [4] - 46:6, 186:3, 186:4, 186:5

**failure** [1] - 7:9

**fair** [9] - 9:24, 13:22, 19:1, 19:2, 64:20, 85:19, 97:10, 144:4, 214:8

**fairly** [2] - 83:7, 114:17

**fall** [1] - 27:3

**fallen** [1] - 162:22

**false** [2] - 56:1, 101:12

**familiar** [1] - 12:24

**family** [12] - 20:18, 48:19, 55:6, 71:3, 72:10, 72:13, 74:20, 79:5, 125:6, 144:10, 157:4, 164:19

**far** [8] - 10:6, 10:10, 53:16, 119:5, 123:3, 124:3, 183:15, 203:18

**fast** [2] - 8:24, 97:24

**father** [4] - 114:5, 114:6, 114:21, 156:1

**fatigue** [4] - 14:22,

19:7, 157:17, 158:17

**fault** [2] - 28:17, 81:12

**fax** [6] - 211:12, 211:16, 211:17, 212:21, 212:24, 213:2

**faxes** [3] - 138:8, 138:11, 178:22

**fear** [2] - 47:3, 164:13

**February** [41] - 30:10, 30:20, 30:21, 38:7, 43:9, 43:10, 47:24, 50:5, 51:23, 52:4, 56:5, 57:20, 58:4, 58:16, 58:17, 59:20, 60:7, 60:14, 61:14, 65:8, 67:1, 67:2, 76:14, 77:14, 78:4, 78:7, 81:3, 84:16, 87:3, 94:2, 101:15, 137:17, 167:21, 168:15, 168:22, 168:23, 175:6, 175:21, 191:6, 192:23

**feelings** [1] - 32:18

**feet** [1] - 97:20

**fell** [3] - 75:12, 157:22, 220:10

**felonies** [1] - 68:15

**felt** [12] - 48:19, 71:17, 72:20, 73:15, 75:13, 79:21, 100:7, 100:11, 132:4, 133:5, 137:1, 226:24

**few** [12] - 7:4, 7:14, 8:8, 22:10, 39:4, 48:14, 70:23, 71:23, 106:2, 118:16, 170:12, 234:14

**fighting** [4] - 28:16, 81:15, 157:16, 205:16

**figure** [7] - 28:6, 45:22, 53:13, 73:12, 153:15, 216:12, 244:21

**figured** [1] - 92:15

**file** [10] - 30:9, 71:8, 79:8, 82:23, 90:23, 96:2, 142:3, 142:10, 181:19, 196:14

**filed** [16] - 29:24, 74:21, 79:23, 87:22, 90:11, 91:15, 92:15, 93:5, 93:6, 104:4, 134:12, 142:5, 175:3, 191:7, 208:21

**filing** [5] - 3:4, 63:17, 74:24, 134:13,

165:22
**fill** [1] - 25:9
**filled** [5] - 66:20,
66:24, 108:8, 121:3,
177:11
**final** [5] - 184:2,
216:13, 216:14,
224:7, 236:23
**finally** [5] - 7:13,
51:18, 91:12, 234:7,
234:11
**findings** [13] - 92:6,
93:9, 113:5, 125:11,
176:2, 176:15,
177:3, 177:14,
179:8, 179:16,
183:11, 183:13,
203:7
**fine** [3] - 113:18,
128:18, 171:17
**Fire** [1] - 64:18
**firearm** [5] - 34:12,
34:21, 37:6, 164:16,
184:24
**fired** [1] - 188:1
**First** [1] - 2:4
**first** [51] - 7:15, 15:15,
22:10, 28:22, 31:14,
36:4, 46:6, 57:21,
61:3, 61:5, 61:23,
63:12, 71:11, 72:11,
91:24, 97:12, 101:7,
101:9, 113:6,
118:21, 119:4,
119:8, 121:11,
125:15, 125:23,
132:23, 144:6,
144:18, 158:10,
158:14, 162:24,
172:8, 182:10,
195:15, 195:17,
204:2, 206:15,
207:5, 207:17,
207:20, 214:12,
215:19, 219:15,
220:8, 222:8, 229:8,
233:9, 233:23,
240:3, 242:10,
242:18
**first-time** [1] - 36:4
**five** [11] - 6:8, 6:16,
18:12, 98:18,
128:10, 130:3,
130:16, 183:19,
188:9, 210:4, 221:15
**five-week** [2] - 6:8,
221:15
**fix** [3] - 36:18, 49:24,
129:11
**fixing** [2] - 36:17,

97:17
**flexibility** [1] - 222:21
**flexible** [1] - 222:14
**Floor** [1] - 2:4
**Florida** [2] - 68:15,
69:10
**flow** [2] - 89:11, 89:20
**Fogel** [6] - 133:5,
135:16, 195:23,
196:1, 209:24,
210:11
**Fogel's** [1] - 215:15
**folder** [2] - 175:1,
232:14
**follow** [9] - 29:15,
29:16, 45:4, 77:11,
127:1, 154:18,
156:12, 182:20,
183:9
**follow-up** [2] - 154:18,
156:12
**followed** [3] - 36:2,
120:23, 188:16
**following** [10] - 88:10,
100:2, 111:20,
112:11, 139:12,
149:5, 152:22,
187:9, 187:17,
188:13
**follows** [1] - 4:4
**FOR** [2] - 4:5, 156:10
**force** [3] - 3:10, 90:14,
91:2
**foregoing** [3] -
184:14, 247:4, 248:5
**forget** [1] - 63:23
**forgive** [1] - 131:2
**forgot** [5] - 72:17,
76:13, 79:6, 110:16,
211:2
**forgotten** [1] - 95:10
**forklift** [1] - 8:24
**form** [13] - 3:6, 57:5,
77:15, 103:20,
105:1, 122:14,
132:11, 168:11,
213:10, 218:5,
235:8, 236:8, 248:10
**formal** [8] - 35:24,
62:9, 62:11, 78:22,
235:3, 235:10,
237:7, 243:8
**formally** [1] - 78:20,
237:3, 237:15
**former** [3] - 98:5,
229:2, 229:23
**forms** [2] - 121:3,
136:5
**formulation** [1] -
211:1

forth [3] - 11:5,
137:24, 166:4
**fortunately** [2] - 49:7,
236:22
**forward** [2] - 18:20,
166:16
**founded** [2] - 92:17,
92:19
**four** [15] - 14:4, 14:11,
14:14, 127:15,
133:16, 157:6,
157:21, 158:1,
160:16, 160:18,
177:18, 208:19,
214:11, 222:17
**frame** [12] - 36:11,
38:6, 38:10, 38:14,
50:5, 107:23, 116:4,
116:23, 139:13,
142:22, 155:18,
187:23
**free** [2] - 107:13,
122:16
**frenzy** [1] - 87:21
**frequently** [2] -
188:21, 189:7
**Friday** [2] - 43:24,
76:18
**friend** [4] - 34:14,
46:14, 98:3, 98:7
**friendly** [1] - 121:10
**friends** [6] - 86:1,
98:6, 118:24,
121:24, 123:21,
165:11
**front** [8] - 52:13,
54:11, 54:16,
127:14, 149:22,
150:19, 153:5,
218:24
**fucking** [1] - 72:15
**fulfill** [1] - 217:22
**full** [9] - 42:10, 110:2,
110:3, 149:22,
203:21, 219:17,
233:5, 244:1
**full-time** [2] - 4:20,
219:17
**fully** [1] - 102:6, 102:9,
221:21
**function** [5] - 8:19,
9:3, 9:21, 109:19,
159:9
**functionality** [1] -
109:7
**functions** [1] - 106:2
**fundraisers** [1] -
106:2
**furnish** [1] - 67:14
**FURTHER** [2] - 3:5,

3:8
**future** [2] - 47:21,
150:5

# G

**gain** [2] - 14:22, 19:7
**Galusky** [5] - 57:18,
59:11, 61:12, 61:23,
132:14
**gang** [2] - 39:9, 89:22
**gears** [1] - 11:21
**GECEWICZ** [1] - 62:15
**Gecewicz** [6] - 57:19,
59:13, 64:13, 97:9,
98:7, 193:14
**Gecewicz's** [1] - 64:20
**general** [6] - 15:9,
85:9, 158:5, 180:18,
181:12, 220:4
**general..** [1] - 184:5
**generally** [2] - 14:13,
193:19
**gentleman** [1] - 57:21
**Geran** [1] - 64:14
**germain** [1] - 49:17
**giggles** [1] - 136:20
**given** [26] - 9:17,
28:14, 32:12, 35:21,
38:23, 41:16, 47:12,
47:13, 66:1, 86:19,
88:16, 97:13, 98:1,
99:2, 100:19,
100:21, 140:23,
154:14, 187:6,
195:11, 200:20,
205:24, 209:8,
209:10, 224:5,
236:14
**Glenville** [1] - 8:6
**GML** [1] - 208:21
**go-to** [1] - 117:12
**goal** [4] - 225:12,
227:6, 227:23,
227:24
**Goldberg** [3] - 104:21,
147:17, 148:1
**Goldberger** [1] - 65:5
**GORMAN** [5] - 1:4,
1:13, 4:2, 245:15,
247:11
**Gorman** [16] - 4:7,
20:18, 50:22, 64:14,
107:7, 120:1,
154:20, 172:1,
172:13, 179:15,
208:20, 210:24,
212:9, 214:23,
230:12, 240:22

**Gorman's** [5] -
169:18, 169:19,
169:23, 184:10,
203:14
**gotcha** [2] - 130:15,
151:21
**gotta** [3] - 166:1,
244:21, 244:22
**grade** [7] - 56:21,
60:17, 60:24, 61:4,
64:5, 64:10, 64:11
**grades** [4] - 57:16,
59:14, 59:17, 64:12
**granting** [1] - 203:13
**great** [6] - 8:23, 59:6,
117:20, 121:14,
135:1, 155:17
**green** [4] - 241:17,
241:20, 242:7,
242:21
**grievance** [3] - 142:3,
142:5, 142:9
**grievances** [2] - 20:2,
142:10
**group** [2] - 157:14,
167:10
**guess** [13] - 15:17,
16:4, 22:22, 27:2,
43:22, 63:5, 84:16,
106:21, 115:19,
151:5, 177:12, 183:6
**guessing** [2] - 27:4,
208:10
**guidance** [1] - 215:15
**gun** [6] - 46:21, 46:23,
47:6, 77:1, 163:17,
163:18
**guns** [1] - 47:4
**guy** [5] - 45:19, 91:1,
148:22, 219:10,
222:1
**guys** [5] - 25:8, 58:7,
95:24, 102:24,
232:12

# H

**hairy** [1] - 189:13
**Hal** [15] - 30:24, 31:10,
69:1, 79:24, 80:7,
82:11, 110:17,
110:20, 111:3,
128:12, 134:20,
135:6, 135:10,
179:19, 209:11
**half** [10] - 53:5,
120:17, 157:21,
177:17, 177:18,
190:19, 190:20,

214:4, 214:12
**Hall** [1] - 39:6
**hall** [5] - 39:6, 39:14,
44:17, 50:16, 50:23
**hallway** [6] - 39:16,
51:20, 52:7, 99:5,
147:24, 189:9
**hand** [13] - 19:20,
86:22, 87:1, 96:21,
119:24, 168:22,
172:1, 233:3, 233:8,
235:23, 240:22,
244:24, 248:19
**hand-delivered** [2] -
86:22, 87:1
**handed** [4] - 103:13,
109:4, 110:15,
169:10
**handing** [2] - 50:15,
232:23
**handle** [3] - 9:18,
73:20, 78:18
**handles** [1] - 167:10
**hands** [5] - 9:5, 14:19,
19:6, 85:1, 158:13
**handwriting** [1] -
170:13
**handwritten** [6] - 53:6,
108:4, 181:12,
181:16, 185:18,
196:24
**hang** [1] - 130:10
**hangout** [1] - 130:7
**happy** [3] - 33:8, 92:5,
232:11
**harassed** [1] - 99:2
**harassing** [3] -
113:14, 186:8, 190:2
**harassment** [4] -
75:10, 97:10, 99:16,
111:2
**hard** [5] - 32:18,
135:15, 189:11,
189:16, 224:16
**hardship** [1] - 222:10
**harm** [2] - 122:16,
127:21
**head** [14] - 23:12,
44:19, 44:21, 46:22,
56:16, 86:13, 89:7,
125:2, 136:14,
150:9, 161:1,
163:18, 189:11,
223:23
**headache** [1] - 160:9
**headaches** [4] - 19:8,
19:10, 19:11, 158:14
**heading** [1] - 247:5
**healed** [1] - 220:14
**health** [11] - 11:23,

14:23, 15:2, 15:3,
15:5, 15:6, 15:8,
84:19, 84:20, 84:21,
84:22
**Health** [4] - 4:17, 7:13,
156:21, 156:22
**hear** [14] - 67:7, 72:7,
87:13, 121:12,
123:23, 124:21,
126:5, 129:15,
148:2, 148:4,
148:15, 197:19,
197:23, 243:13
**heard** [16] - 23:2, 23:3,
23:13, 36:19, 68:2,
82:7, 82:8, 83:19,
84:4, 91:19, 106:12,
114:2, 116:20,
168:17, 195:14,
197:21
**hearing** [20] - 20:6,
26:9, 67:17, 146:10,
147:11, 147:16,
147:17, 147:21,
148:20, 149:6,
171:1, 171:8, 176:3,
176:4, 204:14,
216:21, 217:6,
236:17, 244:5,
244:14
**hearsay** [3] - 106:13,
114:1, 121:22
**heart** [1] - 158:16
**heaviness** [1] - 158:15
**heavy** [3] - 85:6,
126:8, 126:14
**held** [2] - 25:7, 127:13
**hello** [1] - 51:5
**help** [31] - 20:4, 21:7,
21:9, 22:11, 22:13,
25:17, 28:1, 28:4,
28:8, 32:18, 33:3,
48:10, 48:14, 70:22,
70:24, 71:1, 73:1,
73:2, 73:8, 73:24,
75:15, 78:14,
117:13, 130:1,
151:17, 157:12,
158:2, 158:4,
184:20, 185:10,
211:8
**helped** [7] - 20:24,
38:10, 48:3, 48:4,
48:6, 77:15, 106:3
**helpful** [1] - 54:1
**helping** [1] - 185:13
**helps** [1] - 136:12
**Hendry** [38] - 80:4,
80:18, 80:22, 83:2,
86:10, 86:22, 87:4,

87:10, 87:20, 91:13,
91:17, 92:19,
101:19, 102:5,
102:11, 103:12,
104:9, 105:11,
107:6, 107:11,
111:21, 117:6,
119:15, 120:5,
124:8, 124:19,
125:24, 131:4,
137:20, 138:5,
138:17, 139:3,
139:15, 139:20,
170:14, 175:17,
194:20, 227:22
**HENDRY** [1] - 1:8
**Hendry's** [5] - 92:11,
103:16, 117:12,
143:8, 243:11
**HEREBY** [1] - 3:2
**hereby** [3] - 3:4,
247:6, 248:4
**hereof** [1] - 247:5
**hereto** [2] - 3:3,
248:16
**herself** [4] - 70:23,
150:2, 150:4, 150:6
**high** [2] - 85:8, 85:11
**higher** [2] - 14:5, 64:8
**highest** [5] - 57:22,
60:17, 61:4, 64:10,
110:17
**hired** [8] - 7:8, 46:5,
133:1, 162:15,
197:6, 197:9,
200:20, 235:21
**hires** [2] - 58:14,
197:5
**hit** [7] - 126:8, 126:14,
127:19, 128:4,
128:8, 128:10,
128:13
**hobbies** [2] - 17:15,
17:23
**Hock** [6] - 76:2, 76:4,
76:7, 191:8, 191:11,
191:13
**hold** [4] - 53:8, 67:13,
72:2, 77:17
**holiday** [1] - 77:1
**home** [11] - 32:24,
41:6, 46:21, 65:11,
65:24, 80:19,
120:13, 120:15,
121:1, 157:24,
163:17
**homework** [2] - 92:15,
158:4
**honest** [1] - 116:24
**honor** [1] - 121:14

**hoped** [1] - 55:5
**hopefully** [1] - 84:11
**horrific** [1] - 9:14
**Hospital** [6] - 48:14,
70:17, 132:20,
207:23, 215:6,
223:20
**hospital** [3] - 134:18,
134:21, 134:22
**hospitalized** [1] -
133:14
**hostile** [1] - 75:22
**hour** [9] - 4:24, 5:1,
10:3, 20:22, 45:17,
120:17, 150:17,
157:6
**hourly** [1] - 4:22
**hours** [27] - 4:23, 5:16,
9:18, 9:19, 14:1,
14:11, 14:14, 18:4,
18:7, 24:23, 25:6,
25:7, 75:3, 97:23,
100:16, 100:17,
102:23, 111:23,
113:10, 157:8,
157:21, 160:16,
160:18, 183:19,
208:6
**house** [5] - 16:21,
20:20, 40:24, 48:5,
73:22
**household** [1] - 17:24
**housing** [19] - 37:2,
88:13, 88:14, 88:20,
88:21, 89:10, 89:13,
89:17, 90:1, 90:5,
100:16, 100:18,
107:4, 115:11,
115:12, 185:17,
185:22, 186:15,
186:19
**huge** [1] - 218:23
**HUMAN** [1] - 1:8
**human** [1] - 243:11
**hundred** [3] - 10:2,
57:14, 226:24
**hundreds** [2] - 26:13,
189:21
**hung** [1] - 24:7
**hurt** [1] - 219:11
**hydraulic** [1] - 131:1
**hysterical** [1] - 136:20


**I**


**ID** [2] - 24:13, 66:15
**idea** [9] - 23:18, 26:17,
26:20, 31:19, 32:6,
37:23, 54:10,

115:15, 116:20
**identification** [7] -
60:3, 63:7, 172:6,
173:3, 173:13,
232:20, 240:20
**idiot** [2] - 114:13,
133:9
**illness** [2] - 198:13,
244:2
**immediately** [5] - 7:8,
83:7, 93:7, 161:12,
196:16
**imminent** [1] - 47:9
**impacted** [1] - 16:4
**implied** [2] - 126:2,
126:3
**implies** [1] - 147:22
**important** [1] - 133:2
**improper** [7] - 61:13,
61:20, 62:19, 63:24,
92:19, 96:8, 134:14
**improvement** [1] -
18:23
**improvements** [1] -
85:20
**in-person** [1] - 119:4
**incidences** [1] - 136:7
**incident** [55] - 8:7,
29:12, 29:20, 29:24,
30:5, 30:10, 30:21,
31:2, 31:10, 31:18,
32:9, 32:16, 35:12,
37:4, 38:8, 39:19,
39:20, 39:22, 40:2,
44:17, 44:18, 47:24,
50:6, 50:7, 50:9,
50:10, 50:23, 51:2,
51:23, 52:3, 52:13,
54:15, 59:5, 62:5,
65:14, 67:1, 77:16,
78:8, 82:3, 104:14,
111:6, 115:18,
126:17, 126:18,
132:1, 132:13,
159:4, 160:8,
163:12, 164:5,
168:16, 175:11,
192:23, 206:21
**incidental** [5] - 108:6,
108:10, 109:1,
109:12, 110:12
**incidental"** [1] - 110:7
**incidents** [12] - 10:8,
14:24, 15:3, 15:7,
15:14, 15:21, 30:23,
38:18, 44:2, 48:4,
88:9, 206:10
**include** [5] - 59:14,
160:12, 161:5,
179:11

**included** [14] - 59:17, 86:15, 174:14, 174:16, 175:1, 175:5, 176:6, 176:21, 177:3, 178:21, 179:11, 179:12, 180:9, 180:22

**includes** [5] - 58:8, 59:15, 116:1, 116:3, 173:22

**income** [4] - 5:20, 5:24, 10:11, 157:2

**incomplete** [1] - 194:20

**incorrect** [1] - 236:21

**incorrectly** [1] - 244:12

**increments** [1] - 187:7

**incurred** [1] - 10:8

**independent** [6] - 154:22, 211:24, 212:4, 217:4, 237:9, 237:17

**independently** [1] - 175:15

**INDEX** [2] - 246:1, 246:5

**indicate** [15] - 84:12, 97:8, 101:17, 106:20, 112:7, 112:21, 113:13, 113:21, 126:7, 126:13, 131:3, 131:21, 147:20, 172:7, 202:3

**indicated** [8] - 36:5, 46:1, 50:22, 61:11, 101:11, 194:13, 227:14, 239:3

**indicates** [9] - 79:23, 81:5, 124:6, 138:15, 140:11, 146:9, 226:13, 242:8, 242:15

**indicating** [6] - 91:13, 108:1, 151:3, 154:21, 170:10, 216:19

**individual** [16] - 35:20, 35:21, 43:11, 43:15, 44:23, 47:1, 47:3, 47:20, 58:6, 58:14, 60:15, 65:22, 76:23, 88:7, 101:5, 127:10

**individuals** [22] - 31:11, 34:17, 59:7, 59:15, 59:16, 61:10, 61:16, 63:19, 64:8, 64:12, 92:2, 96:11,

145:7

**intentional** [1] - 190:2

**intentionally** [4] - 63:15, 63:23, 126:8, 126:14

**interacted** [1] - 196:7

**interaction** [5] - 43:14, 118:22, 121:19, 158:3, 220:22

**interactions** [1] - 155:7

**interest** [1] - 158:18

**interested** [2] - 242:5, 248:17

**interesting** [2] - 168:24, 198:20

**internal** [1] - 163:21

**Internal** [1] - 42:5

**interpret** [2] - 110:14

**interpreting** [1] - 189:19

**interrupt** [1] - 33:2

**interrupted** [2] - 14:16, 17:11

**intervene** [2] - 49:6, 123:6

**interview** [17] - 39:12, 83:3, 86:20, 88:21, 91:18, 91:22, 93:4, 93:13, 104:3, 117:17, 117:21, 125:18, 137:4, 137:21, 197:23, 198:10, 243:12

**interviewed** [25] - 21:4, 83:4, 87:2, 92:22, 92:23, 93:3, 93:7, 93:12, 93:15, 102:11, 102:20, 102:23, 103:1, 103:18, 103:24, 104:5, 104:8, 105:8, 113:8, 113:10, 113:11, 136:1, 137:14, 175:19, 198:7

**interviewing** [1] - 92:20

**interviews** [7] - 112:24, 117:15, 138:17, 139:4, 139:11, 182:17, 241:4

**intimidating** [2] - 45:18, 190:4

**intimidation** [1] - 189:17

**introduce** [2] - 91:21, 244:5

**introduced** [3] -

**ineligible** [1] - 64:1

**influence** [1] - 163:6

**inform** [1] - 197:16

**information** [23] - 89:16, 89:19, 90:6, 90:7, 94:24, 96:15, 96:18, 97:2, 97:4, 97:5, 150:8, 164:2, 176:19, 176:20, 178:12, 178:19, 178:22, 179:5, 181:14, 183:24, 190:23, 197:24, 216:15

**informative** [1] - 78:10

**informed** [3] - 56:11, 96:21, 121:3

**initial** [4] - 16:19, 59:11, 203:5, 206:16

**injured** [1] - 219:9

**injury** [2] - 146:15, 149:3, 149:4, 175:12, 205:15, 220:12, 236:13

**inmate** [8] - 88:22, 88:24, 96:14, 96:16, 98:16, 127:22, 167:4, 189:14

**inmates** [9] - 39:11, 39:12, 85:22, 89:15, 159:1, 194:17, 219:2, 220:19, 225:15

**innocent** [3] - 44:22, 170:1, 170:2

**inquire** [1] - 217:13

**inquired** [3] - 216:1, 217:21, 228:13

**inquiries** [4] - 177:22, 178:2, 181:13, 181:14

**inquiry** [4] - 154:21, 216:24, 217:7, 228:6

**insomnia** [4] - 13:10, 13:12, 14:17, 158:17

**installation** [1] - 188:4

**installed** [1] - 127:12

**insubordinate** [1] - 196:15

**insubordination** [2] - 196:9

**insurance** [4] - 5:24, 6:5, 6:17, 6:19

**intent** [1] - 41:19

**intention** [4] - 103:6, 104:15, 139:24,

99:2, 100:13, 104:1, 104:7, 104:19, 111:5, 113:6, 117:22, 194:4, 219:8

122:2, 122:6, 122:10

**investigate** [5] - 87:7, 102:6, 102:8, 102:20, 198:23

**investigating** [3] - 104:16, 131:12, 131:15

**investigation** [26] - 46:24, 86:21, 92:20, 95:6, 95:9, 95:17, 95:20, 103:5, 103:18, 105:13, 105:14, 112:23, 114:5, 124:4, 125:18, 128:13, 139:4, 173:16, 174:3, 174:7, 177:3, 179:16, 180:15, 180:23, 194:20, 198:21

**investigative** [1] - 139:11

**investigator** [1] - 163:21

**involve** [1] - 119:1

**involved** [16] - 26:4, 33:5, 34:18, 67:2, 72:18, 73:6, 73:7, 73:9, 77:10, 78:20, 92:2, 93:11, 96:11, 125:5, 129:23, 183:4

**involvement** [1] - 50:2

**involves** [3] - 129:16, 129:17, 194:14

**involving** [9] - 55:3, 55:24, 62:10, 91:5, 101:16, 131:7, 131:8, 163:10, 190:21

**IS** [3] - 3:2, 3:5, 3:8

**issue** [23] - 7:5, 11:16, 37:3, 37:7, 40:4, 42:17, 77:8, 84:20, 84:21, 90:3, 95:11, 96:12, 102:15, 108:20, 114:18, 118:22, 129:18, 131:16, 184:12, 191:12, 192:17, 193:11, 215:18

**issued** [7] - 24:15, 34:19, 66:19, 74:7, 79:17, 79:19, 151:2

**issues** [16] - 4:13, 7:12, 15:5, 15:11, 34:8, 74:1, 84:19, 116:9, 133:21, 133:22, 135:23, 136:3, 136:6, 184:9, 190:10, 215:2

**IT** [3] - 3:2, 3:5, 3:8

**items** [6] - 119:7, 241:17, 241:18, 241:20

**itself** [4] - 19:12, 102:19, 131:23, 149:9

**ivy** [1] - 15:10

---
**J**
---

**Jack** [18] - 41:11, 52:5, 74:11, 83:9, 83:15, 84:4, 91:9, 106:2, 115:5, 141:6, 171:19, 171:20, 173:17, 175:18, 190:18, 202:7, 235:13

**JACK** [1] - 1:7

**jail** [45] - 18:3, 23:6, 25:20, 37:9, 39:8, 39:9, 39:11, 39:13, 39:15, 40:10, 46:5, 46:7, 46:9, 48:22, 65:24, 88:19, 93:9, 96:14, 109:13, 110:19, 114:6, 115:12, 117:21, 121:7, 129:10, 134:16, 136:8, 145:7, 156:14, 158:12, 161:4, 161:19, 163:14, 164:6, 166:15, 167:3, 186:17, 187:13, 189:22, 193:15, 201:5, 211:13, 219:15, 221:20, 224:24

**Jail** [2] - 16:10, 96:17

**James** [3] - 138:7, 179:10, 182:11

**January** [27] - 39:21, 41:14, 50:6, 50:11, 50:16, 56:23, 60:17, 142:21, 143:10, 143:13, 145:10, 145:14, 145:22, 172:8, 176:13, 177:15, 177:18, 187:23, 189:4, 199:11, 199:16, 213:19, 213:20, 214:5, 214:16, 216:8, 224:13

**Jason** [4] - 57:24, 60:13, 63:12, 64:16

**jaw** [2] - 72:16, 76:22

**Jeff** [11] - 34:1, 37:24,

93:14, 116:5, 116:6,
116:20, 118:6,
118:16, 120:10,
120:13, 188:18
**Jim** [1] - 113:11
**Jimino** [13] - 101:20,
102:1, 104:2,
105:18, 106:7,
111:20, 138:4,
156:4, 170:4,
170:10, 175:18,
194:19, 243:18
**JIMINO** [1] - 1:8
**Jimino's** [2] - 193:2,
225:19
**Jimmy** [3] - 83:23,
140:20, 163:20
**job** [51] - 4:20, 5:22,
5:23, 7:7, 7:9, 9:2,
9:22, 21:1, 21:7,
21:10, 40:1, 40:12,
47:11, 47:20, 58:13,
59:5, 64:9, 68:9,
68:21, 68:22, 69:2,
69:3, 85:18, 85:23,
85:24, 86:3, 99:19,
114:18, 121:7,
127:20, 128:5,
129:21, 143:20,
143:21, 156:19,
162:8, 168:17,
168:18, 168:20,
186:9, 188:3, 200:2,
205:23, 205:24,
217:18, 217:22,
220:15, 227:7,
227:8, 227:9
**jobs** [11] - 7:3, 8:23,
9:11, 144:18,
144:20, 144:21,
145:1, 156:17,
156:20, 197:10,
220:18
**JOHN** [5] - 1:4, 1:13,
4:2, 245:15, 247:11
**John** [17] - 50:12,
64:14, 73:8, 107:7,
112:4, 120:1,
156:12, 156:13,
172:13, 176:14,
184:16, 191:6,
191:24, 208:20,
212:9, 225:3, 228:20
**John's** [1] - 232:4
**Johnson** [3] - 201:23,
201:24, 202:1
**join** [1] - 97:10
**Jr** [9] - 101:6, 114:22,
115:2, 115:5, 115:9,
115:10, 115:18,

116:2, 129:11
**Jr.'s** [1] - 114:6
**Judge** [8] - 10:19,
108:8, 108:9,
108:14, 108:17,
108:19, 108:23,
110:13
**judgment** [1] - 89:24
**July** [42] - 7:17, 43:2,
104:13, 105:10,
111:6, 131:2,
131:21, 132:19,
132:24, 133:1,
134:7, 137:19,
138:1, 144:23,
145:3, 145:13,
145:18, 145:21,
146:12, 147:1,
151:2, 151:6, 152:6,
158:22, 159:8,
159:9, 175:6,
177:14, 208:1,
208:3, 215:4,
216:22, 216:23,
225:1, 230:8,
230:13, 232:6,
234:9, 236:1,
236:17, 240:9
**jump** [3] - 117:9,
141:7, 145:24
**jumping** [1] - 139:17
**junction** [1] - 99:22
**June** [21] - 1:14,
11:10, 58:2, 95:12,
117:1, 117:5, 117:9,
118:20, 124:6,
145:24, 146:9,
146:20, 155:11,
155:15, 175:19,
199:14, 201:6,
202:11, 203:16,
216:18, 233:1
**Junior** [1] - 116:3
**Justice** [7] - 86:9,
93:19, 95:5, 95:11,
95:15, 96:9, 120:24
**justified** [3] - 35:17,
35:19, 99:8
**justify** [1] - 79:10
**Justin** [5] - 57:19,
60:16, 62:14, 64:13,
64:20

**K**

**Karam** [6] - 83:23,
84:10, 113:11,
140:20, 163:21,
187:18
**Kathleen** [5] - 105:18,

106:7, 156:3,
170:10, 193:2
**KATHLEEN** [1] - 1:8
**Kathy** [10] - 101:20,
102:1, 104:2,
111:20, 138:4,
170:4, 175:17,
193:5, 225:19,
243:18
**keep** [5] - 7:6, 29:22,
42:22, 114:13, 123:2
**kept** [10] - 40:8, 51:15,
53:3, 54:17, 86:2,
116:16, 123:14,
134:1, 170:3, 206:1
**KEVIN** [1] - 2:12
**Kevin** [1] - 96:15
**key** [26] - 36:17, 39:24,
40:1, 40:4, 40:5,
40:7, 40:9, 40:16,
40:17, 40:18, 41:1,
41:4, 41:9, 41:24,
42:2, 42:3, 42:11,
42:12, 42:17, 42:22,
45:9, 50:7, 98:13,
109:9
**keys** [17] - 40:6, 40:8,
40:13, 40:14, 40:15,
40:19, 40:20, 40:23,
41:1, 47:13, 49:15,
49:16, 88:17, 97:16,
98:21, 226:5
**kicked** [1] - 90:15
**kid** [2] - 70:20, 70:21
**Kim** [11] - 20:19,
21:14, 22:3, 22:19,
28:21, 32:12, 36:7,
38:23, 43:5, 44:11,
155:14
**kind** [27] - 5:4, 5:9,
6:3, 11:18, 16:2,
20:19, 53:12, 54:10,
75:21, 84:2, 91:4,
100:10, 124:4,
125:7, 135:1, 138:8,
139:9, 140:15,
143:4, 143:17,
159:5, 159:11,
165:3, 170:15,
182:24, 187:6,
205:16
**kinds** [7] - 16:17,
19:22, 22:14, 23:8,
52:23, 58:10, 101:2
**kitchen** [3] - 66:7,
99:4, 99:6
**KLOS** [3] - 1:16,
248:2, 248:23
**kmartin@**
**martinrayhill.com**

[1] - 2:13
**knee** [3] - 205:15,
205:17, 220:12
**knights** [1] - 17:16
**know..** [2] - 67:18,
147:6
**knowing** [4] - 44:22,
44:23, 44:24, 127:22
**knowledge** [21] -
24:19, 29:18, 33:11,
34:22, 34:24, 71:3,
71:7, 93:17, 104:7,
108:22, 123:4,
127:2, 135:8,
150:22, 164:16,
168:19, 177:7,
178:3, 212:1, 212:4,
219:22
**known** [5] - 123:9,
164:3, 164:4, 168:4,
168:8
**knows** [6] - 69:18,
110:13, 120:19,
120:21, 197:7

**L**

**labeled** [1] - 244:13
**labor** [1] - 148:19
**Labor** [10] - 92:9,
92:14, 92:16, 93:14,
112:22, 114:4,
117:16, 125:17,
243:7, 243:20
**lack** [2] - 169:2,
183:13
**lady** [2] - 149:24,
150:2
**LaFountain** [2] -
39:20, 206:2
**last** [15] - 4:10, 11:22,
18:3, 18:8, 44:11,
73:19, 115:21,
137:2, 143:3,
144:12, 159:6,
203:24, 216:5,
219:10, 220:9
**lasted** [1] - 206:23
**lasts** [2] - 157:20,
206:22
**late** [1] - 38:9
**Laura** [1] - 205:7
**Laurie** [1] - 205:7
**Law** [5] - 57:6, 152:19,
153:20, 204:15,
229:9
**LAW** [1] - 2:3
**law** [13] - 1:14, 26:19,
73:13, 91:3, 92:13,

105:24, 150:12,
152:17, 196:20,
203:2, 204:19,
204:21, 225:20
**lawsuit** [5] - 61:9,
62:18, 65:5, 93:5
**lawyer** [1] - 123:7
**leading** [2] - 16:20,
244:2
**leafing** [1] - 53:3
**leaning** [1] - 128:23
**learn** [3] - 35:21,
189:20, 191:13
**learning** [1] - 35:20
**least** [7] - 74:12,
83:12, 83:17,
162:14, 188:22,
216:15, 219:14
**leave** [16] - 16:21,
70:9, 70:10, 141:10,
141:20, 141:24,
144:1, 186:1,
212:12, 215:8,
218:17, 223:19,
224:4, 229:8, 235:4
**leaving** [1] - 165:21
**led** [5] - 8:7, 72:19,
159:7, 198:12,
235:12
**leeway** [1] - 35:21
**left** [16] - 6:6, 6:11,
6:17, 6:22, 42:8,
42:24, 46:19, 48:8,
63:15, 63:24, 100:5,
111:19, 119:24,
193:7, 195:8, 241:16
**left-hand** [1] - 119:24
**leg** [1] - 219:11
**legal** [3] - 67:9,
181:13, 239:10
**legally** [1] - 236:20
**Lemire** [2] - 201:24,
202:1
**Len** [1] - 209:10
**length** [2] - 181:22,
181:24
**Lenny** [4] - 135:5,
135:6, 140:12,
140:24
**less** [3] - 20:22, 75:3,
117:21
**letter** [95] - 82:2, 86:9,
86:12, 86:15, 87:3,
87:10, 87:21, 88:3,
91:12, 96:5, 107:7,
138:17, 138:18,
138:20, 139:3,
139:6, 139:19,
140:2, 141:17,
146:9, 146:21,

146:22, 146:23,
147:1, 147:10,
148:23, 149:9,
149:12, 150:11,
150:23, 151:3,
151:7, 152:6,
152:18, 153:5,
153:19, 171:11,
171:18, 176:21,
194:18, 195:20,
196:4, 210:18,
210:22, 212:1,
212:3, 212:8,
212:14, 212:16,
215:20, 216:18,
216:24, 227:4,
227:12, 229:10,
229:14, 229:18,
229:19, 229:21,
230:23, 230:24,
231:2, 231:15,
231:16, 232:4,
232:6, 233:11,
233:17, 234:4,
234:8, 234:12,
235:3, 235:8, 236:9,
236:12, 237:9,
237:14, 237:18,
238:9, 238:20,
239:3, 239:4,
239:13, 239:15,
239:16, 239:21,
240:6, 240:10,
243:11, 243:19,
246:12, 246:13,
246:14, 246:15,
246:16

**letter's** [1] - 235:2
**letter-writing** [1] -
87:21
**letters** [22] - 63:17,
65:2, 88:5, 88:6,
104:1, 137:24,
138:4, 138:8,
146:17, 149:13,
150:10, 156:7,
170:12, 181:15,
194:21, 196:6,
196:22, 213:4,
234:16, 234:18,
237:6, 243:17
**letting** [5] - 26:5,
28:13, 54:12, 82:21,
87:22
**level** [3] - 91:3,
143:21, 215:6
**licensed** [1] - 241:7
**lieutenant** [3] - 42:5,
162:19, 163:1
**Lieutenant** [5] - 65:17,

65:23, 71:21,
187:18, 201:3
**life** [7] - 15:20, 16:4,
74:13, 84:23,
103:12, 121:8, 158:5
**light** [15] - 218:4,
219:12, 219:19,
219:21, 220:1,
220:6, 220:9, 221:6,
221:9, 221:11,
222:3, 223:22,
224:5, 224:23,
225:17
**limitations** [3] - 144:3,
161:18, 161:20
**limited** [4] - 139:14,
148:15, 176:12,
220:22
**line** [22] - 24:23,
24:24, 25:2, 110:2,
110:7, 116:11,
214:18, 222:2,
222:3, 222:9,
222:18, 222:19,
222:20, 223:2,
223:3, 223:5
**lined** [1] - 54:15
**lines** [1] - 54:16
**List** [2] - 246:7, 246:8
**list** [27] - 56:8, 56:10,
58:1, 58:2, 58:8,
58:10, 58:22, 59:11,
59:13, 59:16, 59:23,
60:7, 60:11, 60:13,
61:1, 61:3, 62:23,
63:10, 63:13, 63:21,
64:1, 64:2, 64:21,
65:1, 229:1, 230:2,
230:3
**listed** [4] - 104:8,
182:1, 241:17,
242:22
**listen** [6] - 23:16,
30:17, 124:22,
124:23, 148:16,
162:6
**listened** [3] - 84:6,
85:19, 85:21
**lists** [4] - 58:10, 113:6,
179:9, 242:19
**live** [3] - 21:16, 70:8,
73:17
**lived** [1] - 21:18
**living** [4] - 21:14,
33:11, 155:23, 156:1
**lobby** [1] - 218:13
**local** [1] - 79:7
**locate** [1] - 232:4
**location** [1] - 8:1
**lock** [2] - 40:15, 42:4

**locked** [1] - 40:23
**lodge** [1] - 165:10
**log** [10] - 34:12, 35:1,
184:24, 185:4,
185:12, 185:16,
185:18, 186:2, 224:2
**logs** [8] - 36:22, 36:24,
39:2, 185:14,
186:13, 186:20,
187:1
**look** [36] - 29:14, 32:4,
32:5, 39:22, 50:13,
58:6, 59:12, 60:24,
78:3, 81:15, 83:17,
86:14, 107:21,
115:21, 117:9,
123:18, 125:19,
127:18, 131:6,
133:9, 134:4, 137:5,
139:6, 140:9, 154:7,
159:2, 171:16,
172:2, 189:17,
191:18, 208:24,
209:1, 233:20,
235:7, 238:6
**looked** [5] - 53:4,
77:5, 209:4, 216:17,
241:19
**looking** [28] - 16:2,
18:22, 45:20, 45:21,
59:11, 59:23, 77:20,
77:22, 80:6, 88:1,
108:2, 115:16,
116:17, 132:3,
132:9, 133:21,
144:20, 146:5,
186:19, 203:20,
210:16, 210:17,
212:2, 228:20,
230:9, 234:24,
239:19, 242:5
**looks** [2] - 183:9,
210:4
**lose** [2] - 85:17, 173:9
**losing** [1] - 84:13
**lost** [5] - 11:7, 15:23,
53:22, 203:3, 203:5
**Lucey** [3] - 60:13,
63:13, 64:16
**Lucey's** [1] - 57:24
**lucky** [1] - 157:21
**lunch** [8] - 85:16,
98:8, 98:9, 98:11,
99:23, 100:5, 107:3,
114:24

## M

**Mahar** [41] - 61:10,
74:11, 83:9, 83:15,

84:4, 91:9, 98:6,
98:8, 105:19, 106:3,
106:7, 108:24,
113:22, 113:24,
118:23, 121:23,
122:18, 122:19,
122:21, 123:15,
123:18, 123:20,
135:24, 137:11,
137:12, 137:14,
138:5, 141:6,
146:21, 168:1,
168:8, 169:16,
170:6, 170:24,
171:19, 171:20,
175:18, 190:13,
190:18, 202:7,
235:13
**MAHAR** [1] - 1:7
**Mahar's** [5] - 41:11,
52:5, 115:5, 122:22,
173:18
**mail** [8] - 9:1, 42:10,
83:13, 108:12,
143:8, 194:23,
234:16, 234:22
**mailed** [1] - 175:17
**mails** [1] - 118:3
**main** [1] - 80:3
**maintained** [1] - 205:4
**maintenance** [1] -
127:13
**major** [1] - 101:1
**male** [1] - 194:17
**man** [1] - 102:19
**MANAGER** [1] - 1:8
**manila** [4] - 80:5,
82:11, 83:15, 119:24
**manner** [1] - 85:22
**Marcelle** [12] - 41:10,
52:6, 82:7, 83:19,
83:24, 90:18, 118:6,
118:11, 119:10,
200:5, 200:15,
201:16
**marcelle** [1] - 200:8
**Marcelle's** [2] -
211:16, 213:2
**March** [19] - 62:16,
63:10, 79:14, 84:16,
87:1, 87:10, 87:19,
90:10, 91:12, 91:16,
93:8, 104:1, 104:3,
125:22, 149:16,
192:9, 192:15,
243:21
**Mark** [3] - 49:17,
49:21, 200:7
**mark** [3] - 59:24, 63:4,
107:22

**marked** [28] - 30:3,
60:2, 60:5, 63:6,
108:3, 172:22,
173:2, 173:5,
173:12, 208:15,
232:20, 232:23,
233:3, 233:8, 234:2,
234:19, 239:18,
240:11, 240:19,
240:23, 242:13,
242:14, 244:8,
244:15, 246:18,
246:20, 246:21
**married** [2] - 122:18,
205:8
**MARTIN** [56] - 2:10,
2:12, 4:6, 29:10,
44:8, 50:13, 50:19,
50:21, 53:11, 53:19,
53:22, 54:3, 54:4,
59:24, 60:4, 63:4,
63:8, 67:16, 77:20,
99:21, 100:4,
105:17, 111:14,
122:4, 122:8,
124:12, 126:12,
126:21, 126:23,
128:18, 129:6,
135:20, 141:9,
153:9, 153:11,
154:19, 155:2,
155:5, 156:8,
159:22, 160:2,
172:23, 173:8,
195:15, 202:19,
202:22, 203:16,
203:24, 224:19,
232:6, 232:16,
244:7, 244:17,
244:19, 245:1, 245:9
**Martin** [14] - 56:20,
67:13, 84:8, 96:16,
154:3, 154:17,
160:23, 204:20,
205:1, 206:4, 224:1,
232:3, 243:18, 244:4
**MARTIN.................**
**PAGE** [1] - 246:2
**Maselli** [19] - 34:14,
34:24, 35:1, 35:4,
35:8, 35:14, 88:23,
97:9, 98:2, 100:13,
126:15, 127:14,
127:17, 127:20,
128:21, 185:1,
185:13, 186:14,
186:24
**Masonic** [1] - 16:13
**masons** [2] - 16:22,
17:10

**master** [2] - 107:14, 163:2
**Master** [2] - 112:18, 161:3
**Matt** [5] - 147:4, 147:7, 147:18, 148:1, 172:10
**matter** [16] - 19:12, 37:14, 51:4, 81:11, 140:9, 149:14, 155:21, 174:10, 181:8, 194:9, 198:3, 201:14, 204:24, 244:6, 245:15, 248:18
**maximum** [2] - 18:22, 19:14
**McDonald** [4] - 37:3, 186:21, 187:4
**McIntyre** [26] - 138:14, 178:5, 178:11, 179:6, 179:9, 180:9, 181:4, 181:20, 181:22, 181:23, 182:2, 182:4, 182:5, 182:18, 196:7, 197:4, 198:7, 198:8, 241:5, 241:16, 241:18, 242:2, 242:9, 242:10, 243:3, 244:1
**McIntyre's** [8] - 128:12, 179:1, 179:8, 184:8, 197:2, 197:12, 214:15, 241:1
**mcIntyre's** [1] - 246:17
**McNally** [1] - 79:12
**meals** [2] - 85:2, 90:2
**mean** [42] - 17:7, 17:13, 18:11, 19:20, 24:9, 25:21, 30:15, 31:6, 33:2, 36:21, 39:4, 43:8, 44:16, 46:3, 48:2, 76:20, 87:5, 87:6, 87:17, 88:12, 102:10, 107:1, 110:11, 125:5, 125:6, 130:2, 130:23, 139:7, 144:12, 148:15, 150:9, 151:8, 156:21, 162:2, 170:16, 189:23, 190:13, 192:12, 210:14, 215:11, 244:23
**meaning** [1] - 181:7
**means** [8] - 74:14,

109:6, 109:16, 110:13, 125:4, 167:13, 179:17
**meant** [7] - 13:2, 47:17, 96:20, 108:11, 109:2, 110:21, 160:4
**medical** [52] - 10:4, 10:10, 10:12, 11:16, 11:21, 18:22, 85:6, 141:20, 143:6, 154:22, 176:17, 177:19, 177:23, 178:4, 178:10, 179:3, 181:3, 181:14, 181:19, 182:4, 196:11, 196:14, 196:21, 210:5, 210:8, 213:10, 213:21, 213:24, 214:6, 214:10, 217:1, 217:4, 217:8, 217:12, 217:14, 227:13, 229:15, 229:17, 229:18, 229:22, 230:18, 230:20, 231:16, 231:18, 231:20, 237:8, 237:17, 238:1, 240:17, 241:10
**medically** [1] - 18:24
**medication** [6] - 9:20, 14:6, 19:16, 133:17, 159:23, 160:21
**medications** [12] - 9:4, 9:16, 12:8, 12:14, 19:3, 19:23, 133:19, 157:9, 157:10, 159:14, 159:18, 160:6
**meditating** [1] - 157:13
**Meditech** [1] - 10:20
**meet** [5] - 37:19, 41:1, 110:22, 189:5, 193:5
**Meet** [1] - 95:21
**meeting** [23] - 26:21, 27:6, 63:1, 77:18, 77:24, 81:24, 101:15, 118:8, 119:4, 119:9, 129:7, 130:16, 137:17, 147:24, 149:14, 149:15, 149:20, 150:6, 150:16, 151:12, 169:11, 178:1, 193:6
**meetings** [7] - 16:14,

37:20, 37:22, 62:7, 63:17, 113:4, 114:8
**member** [7] - 16:9, 16:12, 17:9, 17:10, 114:8, 114:9, 140:11
**members** [5] - 140:16, 150:1, 164:19, 236:6, 238:21
**memorandum** [2] - 208:17, 210:15
**memorandum"** [1] - 172:20
**memory** [5] - 66:21, 67:21, 68:13, 84:3, 119:14
**mental** [8] - 11:23, 14:23, 15:3, 15:5, 84:19, 84:20, 84:21, 84:22
**mentally** [1] - 164:15
**mention** [5] - 47:9, 57:24, 72:17, 157:4, 164:5
**mentioned** [10] - 57:21, 59:8, 67:17, 163:7, 164:10, 166:23, 176:5, 176:8, 209:19, 217:19
**mere** [1] - 89:7
**Merit** [1] - 1:17
**message** [1] - 111:19
**messages** [1] - 118:4
**met** [17] - 37:21, 37:24, 38:3, 41:13, 41:21, 76:16, 77:5, 79:15, 81:1, 81:4, 81:16, 103:12, 108:13, 109:3, 119:8, 150:6, 227:22
**metal** [2] - 126:8, 126:14
**method** [1] - 127:6
**Meyer** [6] - 87:18, 102:5, 111:15, 112:2, 112:5, 195:6
**mid** [2] - 27:21, 95:12
**mid-June** [1] - 95:12
**mid-October** [1] - 27:21
**middle** [1] - 98:13
**midnights** [2] - 49:1, 49:23
**might** [12] - 25:14, 39:23, 111:7, 115:21, 117:6, 125:6, 170:20, 189:18, 207:10, 228:7, 243:15
**migraine** [1] - 159:23

**Migraine** [1] - 19:14
**mile** [1] - 117:21
**mileage** [3] - 10:13, 10:14, 10:24
**military** [1] - 98:7
**milk** [3] - 98:12, 100:8, 113:16
**milligrams** [4] - 12:17, 12:22, 14:3, 14:4
**mind** [9] - 15:20, 27:4, 109:10, 128:5, 130:15, 148:22, 152:2, 207:12, 207:17
**mindful** [1] - 157:13
**mine** [2] - 46:14, 50:3
**miniature** [1] - 17:15
**minute** [3] - 126:9, 155:3, 228:16
**minute"** [1] - 120:11
**MINUTES** [1] - 1:12
**minutes** [5] - 54:20, 71:24, 80:13, 118:16, 120:17
**misgivings** [1] - 94:19
**mislead** [1] - 154:8
**miss** [1] - 140:10
**missed** [2] - 16:11, 25:14
**moment** [5] - 11:24, 13:20, 49:13, 50:18, 101:7
**Monday** [6] - 43:24, 44:4, 76:17, 77:1, 167:9
**monetary** [1] - 204:3
**money** [4] - 6:2, 7:3, 11:15, 17:5
**monitor** [1] - 39:2
**monitoring** [2] - 36:14, 38:12
**month** [10] - 5:13, 7:17, 12:4, 12:5, 61:15, 63:3, 63:13, 143:9, 203:24, 214:12
**monthly** [2] - 216:11, 224:1
**months** [16] - 9:12, 26:24, 59:5, 84:7, 85:13, 137:2, 149:2, 166:8, 177:18, 205:23, 206:11, 206:22, 214:12, 220:13, 220:14
**Moran** [3] - 57:18, 61:12, 149:24
**morning** [3] - 14:12, 28:12, 51:7
**mortgage** [1] - 144:13

**most** [2] - 140:17, 147:24
**mother** [1] - 150:3
**motivate** [1] - 122:13
**motivated** [1] - 123:13
**motorcycle** [1] - 220:10
**mouth** [5] - 103:9, 114:13, 115:23, 123:2, 123:14
**move** [5] - 48:3, 48:5, 222:5, 222:9, 222:21
**MR** [132] - 4:6, 29:10, 44:8, 50:12, 50:13, 50:17, 50:19, 50:21, 53:9, 53:11, 53:16, 53:19, 53:20, 53:22, 54:1, 54:3, 54:4, 56:19, 57:5, 59:24, 60:4, 63:4, 63:8, 67:13, 67:16, 67:20, 77:20, 77:22, 84:8, 85:15, 99:21, 100:4, 103:20, 103:23, 105:1, 105:15, 105:17, 110:1, 110:6, 110:10, 111:12, 111:14, 112:4, 112:6, 122:1, 122:4, 122:5, 122:8, 122:9, 122:14, 124:11, 124:12, 126:9, 126:12, 126:21, 126:23, 128:16, 128:18, 128:19, 128:24, 129:2, 129:5, 129:6, 135:20, 139:2, 141:8, 141:9, 146:7, 153:8, 153:9, 153:11, 154:3, 154:17, 154:19, 154:20, 155:1, 155:2, 155:5, 156:8, 156:11, 159:22, 160:2, 171:22, 171:24, 172:21, 172:23, 173:1, 173:4, 173:8, 173:9, 173:11, 191:21, 191:23, 195:15, 195:18, 202:19, 202:20, 202:22, 203:4, 203:8, 203:10, 203:16, 203:18, 203:24, 204:6, 204:11, 204:13, 224:19, 228:19, 232:3, 232:6, 232:7,

232:16, 232:21,
232:22, 240:21,
244:4, 244:7, 244:8,
244:12, 244:17,
244:18, 244:19,
244:21, 245:1,
245:2, 245:7, 245:9,
245:10, 245:13,
246:2, 246:3
**Mucinex** [1] - 159:16
**multi** [1] - 189:10
**multi-daily** [1] -
189:10
**multiple** [12] - 8:17,
9:4, 37:24, 38:4,
82:14, 91:20, 156:6,
194:21, 195:13,
196:6, 229:6
**music** [1] - 16:15
**must** [2] - 110:9,
131:7

## N

**name** [32] - 11:24,
13:20, 21:22, 49:13,
49:14, 57:24, 58:2,
58:8, 63:14, 63:15,
63:21, 64:3, 64:20,
65:22, 82:12, 91:7,
94:18, 101:7, 101:9,
142:17, 147:19,
172:12, 172:13,
193:7, 193:13,
205:8, 206:2, 230:1,
236:6
**name's** [1] - 219:10
**named** [7] - 37:2,
64:16, 101:5, 159:5,
219:10, 248:5, 248:9
**names** [9] - 12:10,
12:11, 23:5, 23:7,
23:9, 59:12, 220:8,
220:9
**nature** [1] - 175:11
**near** [1] - 99:5
**necessarily** [3] -
127:5, 130:12, 169:3
**necessary** [1] -
228:14
**neck** [2] - 136:12,
136:18
**need** [26] - 12:9,
13:22, 26:3, 28:5,
28:8, 53:1, 67:24,
68:1, 69:4, 69:13,
71:1, 80:14, 89:10,
96:1, 109:15,
116:14, 116:21,
120:15, 120:20,

140:24, 146:10,
197:8, 197:18,
201:1, 219:3, 240:15
**needed** [11] - 13:21,
14:8, 29:13, 32:18,
34:5, 40:9, 48:10,
120:13, 130:20,
136:9, 154:1
**needless** [1] - 92:5
**needs** [6] - 70:9,
70:10, 70:11, 98:16,
185:18, 212:12
**negative** [3] - 84:1,
168:19
**nephew** [5] - 28:9,
55:3, 105:23,
155:22, 165:8
**neutral** [1] - 148:21
**never** [63] - 16:10,
20:20, 27:22, 36:15,
37:10, 39:12, 40:19,
41:9, 41:15, 41:24,
43:11, 43:21, 44:14,
45:20, 55:23, 74:16,
84:20, 88:13, 88:20,
89:2, 93:3, 94:22,
98:23, 103:12,
103:18, 104:5,
104:6, 104:8,
114:22, 114:23,
121:7, 124:3, 125:9,
125:13, 125:15,
125:22, 126:18,
126:20, 128:8,
128:13, 137:14,
137:21, 138:12,
143:18, 156:2,
156:5, 156:7, 161:2,
163:5, 165:9,
165:11, 194:1,
194:24, 195:2,
195:7, 215:24,
221:21, 226:18,
239:14
**NEW** [2] - 1:2, 247:1
**new** [9] - 40:9, 96:14,
96:16, 193:16,
193:23, 194:8,
197:4, 222:5, 222:7
**New** [11] - 1:15, 1:18,
2:4, 2:11, 165:13,
199:22, 224:2,
236:12, 243:7,
243:20, 248:3
**news** [1] - 76:20
**next** [24] - 25:11,
27:16, 27:19, 28:12,
32:7, 33:14, 43:18,
52:3, 54:2, 56:4,
59:1, 59:2, 66:18,

67:6, 73:10, 75:4,
76:10, 76:11, 84:11,
92:10, 157:23,
157:24, 203:10,
232:11
**night** [5] - 27:20,
71:13, 71:14,
160:14, 160:17
**nights** [2] - 160:16,
160:19
**nitroglycerin** [1] -
133:19
**no"** [1] - 94:7
**nobody** [12] - 75:14,
75:15, 76:19, 78:13,
82:24, 108:13,
109:3, 110:24,
115:12, 150:22,
228:12
**nobody's** [2] - 87:23,
138:5
**noisy** [1] - 90:1
**non** [1] - 149:3
**non-work** [1] - 149:3
**none** [7] - 33:4, 134:2,
148:18, 175:4,
177:2, 183:21,
242:21
**normal** [6] - 47:1,
163:3, 164:21,
223:13, 226:7, 227:1
**normally** [4] - 97:19,
130:7, 219:5, 223:6
**north** [3] - 129:9,
186:17, 186:18
**NORTHERN** [1] - 1:2
**notarized** [1] - 135:14
**Notary** [5] - 1:18, 3:9,
4:3, 247:18, 248:3
**notary** [2] - 135:11,
135:12
**notation** [1] - 108:4
**note** [3] - 102:24,
132:23, 216:6
**noted** [1] - 247:5
**notes** [11] - 67:8, 67:9,
91:19, 102:21,
102:22, 103:5,
139:14, 181:12,
181:16, 196:24,
215:5
**nothing** [32] - 20:1,
20:5, 28:4, 42:18,
47:22, 48:9, 72:21,
72:23, 73:6, 76:19,
78:13, 82:17, 87:12,
90:13, 103:8, 104:6,
123:6, 132:18,
154:15, 159:15,
159:19, 160:9,

160:10, 170:1,
170:2, 185:8,
185:10, 199:1,
204:22, 226:22,
248:6
**nothing's** [1] - 96:3
**Notice** [2] - 1:14,
131:4
**notice** [5] - 58:4,
146:3, 148:23,
222:6, 236:15
**notification** [2] -
146:1, 149:6
**notified** [1] - 146:14
**November** [5] - 27:2,
39:5, 177:17, 189:3,
214:4
**number** [27] - 24:12,
27:22, 28:14, 32:12,
36:8, 38:23, 65:11,
66:1, 66:16, 66:20,
71:16, 71:19, 71:20,
71:24, 119:7, 175:2,
193:7, 211:12,
211:16, 211:17,
211:21, 212:21,
212:24, 213:2,
224:4, 237:21
**numbers** [3] - 42:3,
121:2, 211:10

## O

**o'clock** [2] - 14:13,
66:12
**O'Connell** [1] - 51:19
**O'Malley** [1] - 150:2
**oath** [2] - 96:19,
123:10
**objection** [4] - 57:5,
103:20, 105:1,
122:14
**objections** [1] - 3:6
**obligation** [5] - 123:9,
128:5, 177:15,
196:24, 235:20
**observe"** [1] - 110:9
**obtain** [2] - 65:11,
232:15
**obtained** [5] - 112:2,
156:14, 180:21,
213:7, 216:6
**obvious** [1] - 101:10
**obviously** [1] - 189:1
**occasion** [1] - 117:9
**occasional** [1] - 160:9
**occasionally** [2] - 6:2,
20:17
**occasions** [1] -

195:13
**occupying** [1] -
222:16
**occur** [2] - 37:22,
159:4
**occurred** [2] - 55:14,
55:15
**occurrence** [3] -
187:14, 189:10
**October** [53] - 5:15,
6:23, 7:23, 20:9,
20:15, 22:2, 22:16,
22:21, 23:18, 24:17,
26:22, 27:21, 29:20,
31:17, 31:22, 32:8,
36:5, 36:11, 84:23,
117:11, 139:20,
149:7, 149:11,
149:15, 158:9,
159:5, 160:1, 160:3,
160:7, 162:4, 164:4,
165:2, 165:16,
165:18, 166:6,
166:15, 166:21,
177:17, 178:14,
181:6, 181:10,
187:16, 189:1,
189:3, 198:8, 214:4,
224:9, 224:15,
224:16, 224:21,
233:12, 241:3
**OF** [7] - 1:2, 1:12, 2:2,
2:3, 2:9, 247:1,
247:2
**off-the-record** [3] -
126:24, 127:4,
153:12
**offer** [2] - 167:22,
239:2
**offered** [3] - 137:21,
175:16, 231:23
**office** [69] - 1:14, 7:9,
23:21, 25:13, 25:16,
25:22, 27:7, 27:12,
27:17, 28:21, 38:1,
40:5, 40:21, 40:24,
41:1, 41:4, 41:5,
41:24, 45:8, 45:13,
45:16, 52:5, 52:11,
52:12, 55:21, 56:2,
65:10, 79:14, 86:22,
89:1, 96:19, 97:2,
97:5, 97:20, 98:15,
98:19, 112:14,
113:9, 114:10,
114:21, 115:4,
118:17, 119:11,
120:10, 123:10,
127:15, 127:16,
130:4, 130:6, 130:7,

143:8, 147:3, 156:6, 156:15, 161:22, 170:13, 178:3, 187:19, 187:20, 188:2, 188:5, 188:11, 193:2, 195:3, 197:2, 197:3, 225:18, 230:20
**Office** [4] - 6:20, 8:4, 8:11, 234:17
**OFFICE** [1] - 2:3
**Officer** [5] - 179:14, 184:9, 186:21, 187:3, 208:20
**officer** [35] - 18:18, 24:2, 37:2, 40:11, 41:16, 47:14, 88:14, 88:22, 94:12, 94:15, 97:13, 97:14, 98:22, 99:4, 99:5, 99:9, 99:14, 116:7, 127:21, 143:19, 147:17, 163:15, 184:11, 186:8, 189:20, 193:20, 193:22, 209:14, 215:1, 222:2, 222:5, 222:8, 223:14, 226:7, 227:1
**officer's** [1] - 185:20
**officers** [11] - 75:11, 85:23, 99:6, 130:11, 197:5, 219:2, 219:5, 221:11, 222:18
**official** [2] - 62:11, 241:7
**officially** [1] - 207:7
**often** [9] - 13:12, 16:16, 101:2, 101:3, 101:10, 106:1, 116:6, 155:19, 189:2
**okay"** [1] - 80:24
**old** [1] - 21:24
**older** [1] - 69:11
**ON** [2] - 2:2, 2:9
**on-site** [1] - 112:23
**Once** [1] - 229:14
**once** [18] - 7:1, 7:2, 12:4, 12:5, 12:22, 15:9, 36:19, 46:8, 70:20, 101:8, 117:6, 162:2, 187:11, 206:22, 226:3, 233:24, 235:18, 237:24
**one** [87] - 5:13, 8:4, 8:15, 13:1, 13:4, 13:19, 16:24, 21:21, 26:10, 30:3, 35:13, 40:20, 42:19, 45:14,

49:15, 49:19, 53:23, 54:16, 55:20, 57:15, 59:1, 59:2, 59:7, 59:10, 59:15, 64:5, 64:14, 65:19, 66:24, 70:23, 75:16, 76:8, 80:4, 90:18, 90:19, 91:1, 95:20, 102:24, 108:21, 111:7, 111:8, 115:11, 115:12, 135:3, 142:6, 146:11, 148:10, 148:20, 149:24, 150:1, 158:18, 158:21, 159:6, 160:11, 171:4, 174:20, 174:24, 176:21, 178:1, 188:22, 195:17, 196:20, 202:23, 203:20, 204:4, 205:3, 205:23, 206:21, 208:18, 209:20, 211:2, 214:19, 218:6, 222:4, 222:19, 222:20, 223:8, 224:7, 225:16, 229:8, 229:11, 233:19, 233:23, 242:4, 243:1
**one-year** [2] - 146:11, 229:8
**ones** [3] - 14:3, 218:7, 218:10
**ongoing** [2] - 195:21, 215:7
**open** [10] - 83:13, 119:10, 127:13, 127:24, 128:19, 128:22, 210:12, 218:9, 219:1, 221:22
**open-ended** [1] - 210:12
**opened** [2] - 52:9, 80:10
**opening** [1] - 127:7
**opera** [1] - 16:15
**opinion** [3] - 58:22, 102:10, 222:17
**opportunity** [3] - 123:5, 126:16, 235:10
**opposed** [1] - 188:4
**opted** [1] - 14:4
**option** [2] - 77:11, 200:22
**Options** [1] - 4:17
**options** [1] - 74:20
**order** [13] - 10:24,

68:5, 79:6, 98:8, 99:8, 112:16, 128:17, 154:2, 154:16, 157:7, 179:6, 197:9
**Order** [15] - 79:10, 79:16, 79:19, 86:7, 86:17, 86:18, 106:20, 106:23, 107:1, 107:8, 107:20, 108:12, 109:4, 109:22, 111:9
**ordered** [9] - 10:15, 10:20, 11:8, 98:9, 98:10, 99:8, 99:13, 100:17, 114:24
**ordering** [1] - 98:20
**organization** [1] - 16:13
**orient** [1] - 139:9
**original** [6] - 53:18, 80:14, 80:19, 153:17, 231:15, 231:16
**otherwise** [2] - 99:1, 128:3
**out-of-pocket** [1] - 10:7
**outcome** [2] - 137:5, 248:18
**outside** [14] - 24:3, 24:8, 24:11, 32:16, 39:9, 41:2, 43:8, 43:11, 43:15, 55:15, 98:3, 119:11, 121:6, 167:10
**outstanding** [2] - 10:15, 145:10
**overall** [2] - 85:24, 185:22
**overheard** [1] - 83:20
**oversaw** [1] - 161:7
**oversight** [1] - 236:22
**overstaffed** [1] - 221:18
**overtime** [13] - 18:4, 18:10, 18:13, 49:20, 90:14, 90:16, 90:19, 90:21, 90:23, 219:18, 219:19, 221:24, 222:10
**overwhelming** [1] - 9:21
**own** [7] - 23:23, 48:10, 64:2, 73:19, 83:10, 170:9, 206:10

## P

**P.C** [1] - 2:10
**p.m** [3] - 99:23, 100:2, 245:14
**pad** [1] - 67:9
**page** [20] - 53:4, 113:6, 139:17, 172:8, 172:15, 181:2, 190:20, 208:19, 210:4, 210:17, 212:6, 212:7, 214:20, 228:22, 230:5, 233:19, 242:6, 242:10, 242:18
**PAGE** [1] - 246:6
**pages** [4] - 53:5, 125:20, 233:14, 233:15
**paid** [9] - 4:24, 10:15, 10:17, 10:18, 10:20, 10:21, 40:16, 48:7, 200:21
**pain** [3] - 9:5, 14:19, 209:15
**paint** [2] - 17:15, 49:24
**panel** [1] - 233:5
**panic** [1] - 211:1
**Panichi's** [1] - 26:17
**paper** [2] - 30:23, 196:14
**paperwork** [2] - 41:10, 135:11
**paragraph** [18] - 53:14, 53:15, 77:20, 77:22, 86:14, 115:17, 116:1, 116:17, 124:8, 124:13, 124:18, 131:5, 132:1, 138:15, 139:17, 139:19, 146:6, 228:23
**paragraphs** [1] - 88:2
**parameters** [1] - 227:18
**parents** [1] - 48:7
**parking** [3] - 32:17, 55:14, 55:16
**part** [16] - 89:21, 105:10, 105:12, 129:21, 131:15, 131:16, 136:1, 150:18, 151:13, 167:24, 176:18, 188:3, 198:10, 209:22, 210:7,

237:13
**particular** [4] - 30:14, 40:10, 226:17, 227:20
**parties** [6] - 3:3, 92:20, 92:21, 188:17, 203:10, 204:7
**partner** [1] - 123:1
**partners** [1] - 91:10
**party** [7] - 25:18, 26:12, 46:11, 46:15, 46:19, 148:21, 163:12
**passed** [2] - 36:7, 74:24
**past** [10] - 44:24, 46:2, 140:15, 140:17, 163:8, 163:10, 197:15, 198:5, 215:1, 237:8
**pat** [2] - 171:18, 176:10
**Pat** [21] - 91:9, 118:8, 118:22, 119:12, 119:13, 119:20, 121:11, 122:20, 123:4, 135:22, 136:2, 147:18, 149:12, 171:12, 172:10, 174:8, 175:18, 175:20, 178:1, 187:18, 202:17
**patient** [4] - 29:13, 29:23, 116:15, 116:21
**patient"** [1] - 116:15
**Patricelli** [125] - 20:12, 20:14, 20:24, 21:13, 22:4, 22:8, 22:19, 22:24, 23:14, 24:4, 24:9, 25:2, 25:12, 27:11, 31:17, 32:8, 33:15, 34:2, 34:7, 34:9, 34:20, 35:2, 35:5, 35:9, 35:14, 36:8, 37:7, 38:2, 38:11, 38:14, 38:22, 39:8, 41:18, 42:17, 43:4, 44:10, 45:11, 46:2, 48:12, 49:4, 49:6, 49:10, 51:3, 52:1, 52:18, 53:3, 54:8, 55:3, 55:4, 55:24, 62:1, 62:3, 62:9, 65:10, 65:23, 66:2, 66:13, 66:22, 69:13, 70:14, 71:9, 75:23, 79:17, 84:2,

86:11, 88:8, 90:13,
93:18, 94:16, 95:10,
96:4, 100:12, 106:9,
107:8, 107:12,
109:8, 112:10,
112:16, 112:18,
112:19, 113:22,
113:24, 117:2,
118:23, 119:18,
121:23, 123:19,
123:20, 135:24,
142:18, 146:17,
155:8, 155:15,
155:23, 162:3,
163:8, 163:10,
164:15, 164:17,
164:18, 165:9,
166:20, 166:23,
167:20, 167:24,
168:2, 184:21,
185:9, 185:13,
187:3, 187:12,
187:17, 188:12,
188:16, 190:21,
191:3, 191:8,
191:11, 192:10,
197:15, 198:5,
202:14, 205:11
**PATRICELLI** [1] - 1:7
**Patricelli's** [11] - 27:7,
52:22, 55:21, 98:2,
101:16, 118:23,
161:4, 187:2,
187:20, 188:11,
190:9
**PATRICK** [3] - 1:7,
2:3, 2:6
**Patrick** [3] - 1:15,
91:21, 202:18
**patterns** [1] - 160:13
**pause** [2] - 81:22,
145:8
**pay** [14] - 10:20,
10:23, 11:8, 17:1,
17:2, 17:3, 69:4,
90:19, 125:4, 143:4,
143:7, 144:9, 200:3,
200:4
**pay"** [1] - 24:6
**paying** [2] - 20:7,
114:9
**payment** [2] - 5:24,
144:14
**Pechenick** [1] -
104:21
**pending** [2] - 20:1,
144:16
**pension** [1] - 11:18
**People** [1] - 69:1
**people** [54] - 23:4,

40:13, 45:23, 46:12,
48:10, 49:17, 57:1,
58:24, 62:24, 64:5,
68:22, 74:15, 76:21,
87:18, 87:22, 89:18,
90:3, 91:2, 96:13,
98:18, 99:18,
117:17, 121:1,
125:19, 127:15,
129:23, 130:3,
130:4, 130:8,
130:18, 140:20,
140:21, 140:23,
154:12, 164:7,
164:8, 168:9,
182:15, 189:11,
189:21, 197:7,
197:8, 206:8, 218:3,
218:22, 220:7,
221:23, 222:22,
222:24, 223:1,
223:6, 224:4, 235:20
**peoples'** [1] - 121:1
**per** [10] - 10:3, 12:5,
12:23, 35:18, 58:20,
72:23, 188:22,
229:9, 237:14,
237:18
**percent** [3] - 10:2,
40:22, 226:24
**perception** [1] -
123:20
**perform** [7] - 9:23,
14:21, 158:17,
217:18, 218:3,
219:5, 226:13
**performance** [4] -
179:13, 182:16,
184:13, 185:21
**perhaps** [2] - 56:19,
85:15
**period** [19] - 6:8, 7:12,
70:17, 90:19, 157:7,
158:9, 160:11,
187:12, 188:24,
195:2, 195:3, 200:4,
208:6, 208:11,
210:12, 216:21,
219:12, 220:13,
248:16
**permanent** [1] - 57:19
**permission** [5] - 34:5,
37:17, 69:13,
112:15, 118:7
**permissive** [1] - 206:6
**person** [23] - 34:15,
57:15, 58:14, 75:20,
84:2, 89:12, 91:23,
101:6, 105:12,
110:18, 119:2,

119:4, 119:8,
134:17, 147:4,
148:17, 170:1,
170:3, 206:11,
220:5, 222:4, 235:11
**person's** [2] - 46:22,
206:2
**personal** [7] - 55:8,
55:9, 105:19,
105:20, 105:21,
190:10, 190:22
**personally** [3] - 74:3,
86:23, 123:2
**personnel** [2] - 90:22,
221:1
**perspective** [1] -
93:16
**Peter** [5] - 68:14,
69:11, 94:5, 94:17,
96:13
**Peter's** [13] - 132:19,
132:22, 133:13,
133:15, 133:18,
133:24, 159:11,
159:13, 160:7,
207:23, 209:18,
215:5, 223:20
**pg** [1] - 246:13
**phone** [54] - 23:20,
24:3, 24:4, 24:7,
24:9, 25:12, 25:15,
26:22, 27:16, 31:17,
31:22, 32:11, 32:15,
32:23, 65:11, 65:20,
65:24, 66:6, 66:8,
66:13, 66:15, 66:17,
67:4, 69:15, 71:8,
72:11, 72:18, 78:12,
79:11, 89:15, 89:19,
89:22, 89:23, 90:9,
90:17, 94:2, 111:23,
111:24, 112:19,
117:5, 117:12,
117:19, 117:24,
118:3, 118:10,
119:15, 120:5,
125:21, 131:3,
161:14, 187:15,
192:13, 192:17,
193:7
**phonetic** [4] - 13:3,
23:8, 91:7, 147:19
**phrase** [2] - 109:1,
183:14
**physical** [5] - 15:6,
15:8, 15:9, 72:18,
76:24
**physically** [5] -
120:12, 158:19,
158:24, 164:15,

208:8
**physician** [7] - 8:10,
132:21, 133:4,
135:16, 159:20,
209:24, 210:10
**physicians** [1] -
209:14
**pick** [3] - 57:11, 57:15,
134:17
**picked** [1] - 24:3
**picture** [2] - 15:20,
109:14
**piece** [1] - 30:23
**pieces** [2] - 9:1,
241:14
**pill** [3] - 13:18, 157:23,
157:24
**pills** [1] - 157:6
**place** [21] - 25:16,
26:21, 27:6, 32:16,
39:19, 42:15, 45:24,
46:7, 78:11, 82:18,
92:3, 111:3, 130:18,
147:24, 155:18,
192:17, 197:22,
198:12, 228:24,
247:5, 248:9
**placed** [3] - 188:1,
230:1, 230:3
**places** [2] - 8:15,
156:15
**PLAINTIFF** [2] - 2:2,
156:10
**Plaintiff** [3] - 1:5, 1:13,
246:24
**Plaintiff's** [3] - 210:14,
228:20, 240:11
**plaintiff's** [2] - 173:6,
197:13
**plan** [1] - 18:24
**play** [4] - 34:20, 37:7,
127:8, 161:1
**played** [1] - 34:11
**player** [2] - 79:5,
109:9
**players** [1] - 132:7
**playing** [1] - 17:12
**plenty** [2] - 58:9,
119:6
**PLLC** [2] - 1:15, 2:3
**plural** [1] - 218:5
**plus** [2] - 18:2, 18:7
**pocket** [2] - 10:7,
143:7
**point** [37] - 9:21, 10:6,
26:12, 29:2, 33:12,
33:16, 36:21, 39:22,
59:7, 74:10, 84:13,
86:19, 87:20,
104:15, 114:20,

114:21, 117:4,
120:23, 122:17,
132:17, 136:21,
138:3, 142:23,
151:16, 158:20,
168:15, 184:2,
192:15, 201:12,
208:13, 209:20,
213:17, 217:1,
217:4, 217:8, 224:7,
244:14
**poison** [1] - 15:10
**Police** [2] - 71:10,
182:12
**police** [5] - 73:16,
73:21, 73:24,
105:13, 191:7
**policies** [5] - 35:22,
123:10, 225:11,
226:6
**policy** [26] - 31:13,
35:18, 36:2, 46:8,
75:8, 77:12, 82:23,
83:6, 83:10, 92:12,
100:17, 140:18,
141:18, 141:19,
152:10, 152:11,
152:13, 161:14,
171:6, 174:4,
180:19, 181:2,
183:10, 184:19,
185:4, 185:6
**Policy** [1] - 243:7
**port** [1] - 8:3
**portion** [1] - 228:21
**position** [19] - 25:7,
58:15, 84:13, 151:4,
218:6, 220:6, 221:6,
221:22, 222:10,
225:4, 225:8,
225:24, 226:2,
229:3, 229:23,
229:24, 230:22
**positions** [12] - 218:1,
219:4, 221:4, 221:8,
221:10, 223:12,
223:15, 223:17,
223:22, 225:23
**positive** [1] - 158:3
**possession** [5] -
170:10, 170:21,
173:6, 175:23,
241:21
**possibility** [2] - 47:8,
190:9
**Post** [4] - 6:20, 8:4,
8:11, 234:17
**post** [3] - 7:8, 147:3,
156:15
**postpartum** [3] -

48:13, 70:16, 70:18
**potentially** [2] - 167:9, 207:18
**power** [7] - 45:3, 161:9, 161:19, 161:23, 162:1, 164:6
**powers** [1] - 161:4
**practice** [5] - 140:15, 140:17, 161:15, 196:19, 220:4
**practices** [2] - 58:9, 58:11
**practitioner** [2] - 15:9, 85:10
**pre** [2] - 209:23, 232:20
**pre-marked** [1] - 232:20
**pre-PTSD** [1] - 209:23
**preemployment** [1] - 180:6
**prefer** [2] - 97:22, 144:9
**preferred** [3] - 229:1, 230:2, 230:3
**pregnant** [2] - 70:19, 70:20
**premise** [1] - 236:18
**preparing** [1] - 49:15
**prerogative** [2] - 57:3, 57:8
**prescribed** [3] - 9:16, 157:11, 159:19
**presence** [1] - 89:7
**present** [11] - 112:23, 113:2, 113:4, 115:2, 119:9, 148:2, 148:6, 148:7, 149:19, 150:7, 235:11
**presented** [3] - 65:2, 148:7, 150:9
**president** [2] - 114:7, 114:16
**pressure** [4] - 9:23, 85:7, 85:10, 209:15
**presume** [1] - 139:21
**pretty** [10] - 9:9, 12:7, 28:10, 32:2, 54:21, 73:13, 73:14, 116:8, 132:4, 168:24
**preventing** [1] - 119:14
**Prevention** [1] - 243:6
**previous** [3] - 30:4, 236:11, 241:3
**previously** [6] - 45:6, 91:18, 111:5, 144:20, 208:15, 238:8
**primary** [5] - 132:20,

133:4, 135:16, 159:10, 209:14
**print** [1] - 241:18
**probation** [1] - 216:21
**problem** [7] - 51:9, 70:6, 72:15, 130:13, 179:3, 245:3
**problems** [4] - 15:8, 111:21, 114:23, 198:5
**proceed** [1] - 234:15
**proceeding** [1] - 241:23
**proceedings** [4] - 81:22, 100:3, 145:8, 248:12
**process** [39] - 10:3, 20:6, 40:19, 42:8, 63:16, 92:8, 134:13, 136:1, 146:10, 147:11, 147:15, 147:21, 148:14, 148:16, 149:5, 150:18, 150:20, 151:6, 151:8, 151:13, 151:19, 152:9, 152:11, 152:12, 152:15, 152:16, 152:17, 171:1, 171:20, 176:3, 176:4, 177:24, 182:24, 183:1, 204:14, 217:6, 231:12, 236:17
**processes** [1] - 35:22
**processor** [1] - 4:19
**produce** [1] - 140:24
**professional** [5] - 11:23, 14:23, 84:22, 86:3, 207:8
**prognosis** [1] - 18:19
**program** [8] - 88:17, 90:20, 97:13, 97:14, 100:19, 100:22, 130:11, 200:19
**programming** [1] - 40:7
**progress** [1] - 196:22
**progression** [1] - 159:11
**promoted** [11] - 56:12, 57:1, 59:9, 59:13, 61:5, 61:15, 63:2, 74:11, 74:14, 74:16, 225:9
**promotion** [2] - 63:22, 121:13
**promotions** [1] - 65:7
**prompted** [1] - 196:17

**prong** [1] - 209:22
**proof** [3] - 102:18, 230:17, 239:3
**proper** [2] - 85:3, 96:22
**protect** [2] - 49:21, 79:5
**protected** [1] - 34:7
**Protection** [15] - 79:11, 79:16, 79:19, 86:8, 86:17, 86:18, 106:20, 106:23, 107:1, 107:8, 107:20, 108:12, 109:4, 109:22, 111:9
**protection** [1] - 86:10
**prove** [5] - 115:7, 226:22, 239:1, 239:7, 239:10
**provide** [12] - 101:12, 114:3, 140:3, 140:6, 144:10, 154:22, 196:11, 228:7, 238:10, 238:24, 239:8, 239:11
**provided** [13] - 65:16, 102:24, 144:21, 170:22, 170:23, 177:5, 178:10, 179:6, 243:22, 243:23, 243:24, 248:15
**Provided** [1] - 246:23
**provisional** [15] - 29:21, 29:22, 56:8, 56:24, 57:9, 58:16, 58:24, 59:4, 60:18, 60:21, 61:5, 121:13, 167:17, 225:9, 225:21
**Prozac** [4] - 12:12, 12:14, 12:16, 13:4
**psych** [2] - 46:6, 46:8
**Psych** [1] - 70:17
**psychiatric** [1] - 133:23
**psychiatrist** [1] - 12:3
**psychological** [8] - 21:5, 180:6, 184:12, 197:9, 198:9, 212:9, 215:18, 242:16
**psychologically** [1] - 10:6
**psychologist** [1] - 12:4
**psychotherapy** [1] - 212:10
**PTSD** [18] - 7:4, 8:18, 9:6, 16:20, 19:12, 19:16, 19:18,

136:21, 143:23, 156:16, 157:12, 158:11, 160:21, 160:22, 206:15, 207:1, 209:23, 226:10
**Public** [5] - 1:18, 3:9, 4:3, 247:18, 248:3
**pulled** [2] - 49:19, 186:22
**punch** [1] - 25:8
**purple** [1] - 13:18
**purpose** [2] - 42:13, 129:7
**purposes** [1] - 172:6
**pursuant** [2] - 1:13, 152:19
**pursued** [1] - 79:22
**push** [2] - 219:1, 223:18
**pushed** [2] - 169:13, 184:21
**pushing** [2] - 185:9, 218:9
**put** [29] - 30:22, 39:4, 46:7, 46:22, 47:11, 53:13, 60:13, 64:20, 65:15, 90:16, 90:18, 90:23, 111:6, 115:23, 125:11, 125:15, 144:7, 153:6, 155:10, 163:17, 183:23, 184:1, 188:2, 188:5, 188:7, 196:14, 222:15, 241:13, 242:11
**putting** [1] - 90:21
**Pyle** [1] - 49:13

## Q

**qualifications** [2] - 221:3, 223:16
**qualified** [3] - 214:10, 223:11, 223:13
**qualify** [2] - 200:18, 201:2
**qualitatively** [1] - 166:5
**quality** [1] - 10:1
**quantity** [1] - 10:1
**quarter** [1] - 233:15
**quarters** [1] - 108:5
**questioned** [2] - 114:10, 135:10
**questioning** [2] - 39:16, 132:13
**questions** [14] - 4:8,

52:14, 54:7, 67:22, 139:9, 148:10, 148:17, 149:1, 156:9, 156:12, 160:24, 234:14, 242:4, 243:5
**quick** [12] - 11:2, 78:2, 87:5, 107:21, 128:16, 154:17, 156:12, 209:2, 211:20, 235:7, 238:20, 242:4
**quickly** [1] - 185:16
**quiet** [2] - 29:23, 89:20
**quite** [8] - 13:22, 18:2, 168:8, 170:12, 181:1, 189:2, 199:17, 242:6
**quota** [2] - 9:2, 9:22
**quote** [4] - 48:16, 81:3, 110:3, 197:16
**quote-unquote** [1] - 197:16
**quotes** [1] - 116:21

## R

**races** [1] - 98:4
**radio** [2] - 98:14, 112:17
**raise** [1] - 70:22
**raised** [2] - 96:21, 184:9
**raising** [1] - 71:1
**raking** [1] - 58:10
**ran** [1] - 96:13
**rank** [1] - 162:21
**Rankin** [32] - 29:1, 29:2, 29:11, 29:16, 31:20, 33:20, 33:24, 34:1, 34:5, 34:16, 34:19, 37:11, 37:12, 37:19, 37:24, 45:7, 45:10, 45:15, 88:10, 93:14, 111:4, 112:9, 112:17, 115:20, 116:5, 116:6, 118:17, 120:11, 132:16, 187:15, 188:18
**Rankin's** [1] - 118:7
**ranking** [1] - 110:18
**rant** [1] - 51:17
**rare** [1] - 43:15
**rarely** [2] - 20:20
**rate** [1] - 5:2
**rather** [1] - 238:23
**ratings** [1] - 182:16

RAYHILL [1] - 2:10
reach [2] - 57:8, 69:19
reachable [10] - 56:7,
56:12, 57:23, 58:5,
58:21, 60:22, 61:1,
61:8, 63:2, 74:14
reached [1] - 77:7
read [27] - 54:10,
54:12, 59:6, 81:15,
82:6, 82:24, 92:4,
106:17, 110:2,
110:7, 113:5,
117:17, 124:11,
124:15, 154:12,
173:19, 209:12,
210:22, 211:20,
211:21, 212:7,
214:22, 228:21,
237:13, 238:20,
243:1, 247:4
reading [6] - 110:1,
189:21, 204:19,
206:18, 212:18,
234:24
ready [1] - 225:11
real [6] - 90:8, 128:16,
209:1, 211:20,
238:20, 242:4
realize [1] - 91:8
really [14] - 10:19,
18:21, 20:16, 23:16,
68:7, 74:22, 75:21,
104:18, 110:13,
120:8, 139:8, 144:8,
159:24, 214:14
Really [1] - 121:16
reason [16] - 17:19,
42:21, 46:10, 58:18,
61:2, 61:13, 61:20,
61:22, 77:13, 96:4,
99:14, 135:15,
156:23, 181:9,
200:16, 208:8
reasonable [1] -
143:22
reasons [6] - 45:21,
65:6, 188:20, 204:7,
204:8
reboot [1] - 130:19
rebooting [1] - 129:17
rec [2] - 158:21, 159:3
recalled [1] - 48:4
receipt [1] - 238:22
receive [17] - 5:4, 5:9,
6:5, 83:5, 132:15,
138:7, 145:24,
149:6, 151:6,
154:20, 163:24,
181:4, 182:3, 182:5,
216:24, 217:3,

239:13
received [37] - 6:3,
6:16, 22:17, 23:19,
24:2, 28:20, 37:10,
57:19, 66:4, 82:2,
83:23, 87:17, 91:12,
95:1, 102:4, 111:24,
118:4, 119:7,
126:18, 138:12,
139:19, 143:3,
146:17, 150:10,
170:12, 171:11,
179:2, 182:9,
194:24, 195:2,
205:15, 219:11,
227:3, 227:12,
229:15, 235:16,
239:14
receiving [3] - 111:24,
138:18, 139:2
recent [2] - 164:1,
235:5
recently [4] - 170:18,
205:14, 206:4, 224:1
recites [1] - 139:19
recognize [14] - 172:3,
209:4, 210:6,
210:18, 211:9,
211:11, 211:12,
211:17, 232:24,
233:4, 233:10,
233:16, 234:3, 234:7
recollection [3] -
50:15, 56:17, 208:17
recommend [1] -
58:12
recommendation [2] -
8:10, 152:1
recommended [2] -
14:10, 215:7
record [39] - 29:9,
50:17, 50:20, 53:9,
53:10, 54:5, 84:10,
105:15, 105:16,
111:12, 111:13,
126:10, 126:11,
126:21, 126:22,
126:24, 127:4,
135:19, 152:16,
153:8, 153:10,
153:12, 171:22,
171:23, 173:4,
190:5, 190:6,
191:21, 191:22,
198:2, 202:16,
202:21, 203:8,
203:9, 204:8,
209:12, 232:21,
242:14, 247:4
recorded [3] - 51:21,

182:18, 241:3
recording [9] - 83:19,
83:22, 83:23, 84:6,
90:17, 117:24,
140:3, 241:13,
241:14
recordings [2] - 82:7,
241:5
records [15] - 179:1,
179:9, 179:10,
179:12, 182:1,
182:10, 196:21,
213:18, 213:21,
241:17, 242:11,
242:15, 242:19
recruits [1] - 193:24
red [1] - 241:16
reduced [1] - 248:10
refer [5] - 56:20, 88:2,
132:21, 138:16
reference [6] - 21:8,
109:4, 179:23,
180:1, 180:2, 180:4
referenced [1] -
190:19
referencing [3] -
171:13, 234:19,
237:19
referring [3] - 115:22,
195:15, 197:12
refresh [1] - 50:14,
56:17, 208:16
refusal [1] - 167:21
refuse [2] - 142:20,
164:13
refused [12] - 21:8,
22:14, 96:10, 102:5,
114:7, 135:6,
137:16, 168:21,
169:6, 181:11,
192:2, 192:3
regarding [15] - 27:12,
29:12, 34:21, 37:6,
66:21, 77:23, 77:24,
82:4, 118:22, 131:4,
138:17, 146:1,
172:12, 178:5,
184:18
regarding" [1] -
172:16
regards [9] - 118:12,
139:3, 184:3, 187:9,
188:19, 189:5,
191:8, 192:10, 228:7
regimen [1] - 133:17
Registered [1] - 1:17
registered [1] - 234:22
regular [12] - 6:4,
14:11, 16:13, 39:13,
47:14, 192:19,

194:4, 219:17,
221:6, 221:8,
221:11, 222:2
regularly [2] - 19:13,
218:7
reinstalling [1] -
188:10
reinstated [4] -
153:20, 153:23,
229:11, 240:15
reinstatement [10] -
152:18, 152:22,
153:18, 229:2,
229:12, 237:7,
237:10, 237:16,
237:22, 238:1
related [28] - 6:19, 9:6,
10:12, 11:18, 20:3,
38:15, 72:8, 72:24,
81:8, 89:21, 89:23,
117:11, 124:24,
125:1, 134:5, 149:3,
149:4, 158:11,
174:20, 174:21,
175:13, 184:12,
207:14, 209:16,
236:14
relates [2] - 117:23,
215:2
relations [1] - 38:19
relationship [28] -
20:12, 20:14, 20:16,
22:7, 22:9, 28:5,
33:5, 38:15, 43:4,
44:11, 52:1, 86:3,
105:19, 106:1,
116:9, 123:13,
155:16, 164:14,
165:1, 165:3, 165:5,
165:14, 165:15,
165:19, 166:5,
166:16, 166:20,
197:1
relative [2] - 61:23,
107:23
relax [1] - 136:9
release [10] - 143:16,
144:6, 144:8,
176:19, 178:12,
181:17, 181:18,
196:12, 210:8,
230:21
release" [1] - 210:6
released [8] - 46:18,
90:22, 134:22,
143:10, 143:13,
143:18, 143:20,
144:3
relieve [1] - 19:4
reluctantly [1] - 147:8

remain [2] - 156:19,
215:8
remember [35] - 7:15,
23:10, 26:21, 28:10,
34:3, 51:3, 52:3,
68:13, 70:5, 77:9,
78:6, 87:17, 92:17,
95:17, 103:3, 109:7,
111:16, 112:13,
124:10, 124:17,
124:19, 129:8,
131:10, 138:24,
139:2, 145:9,
146:22, 150:13,
162:3, 192:13,
192:14, 199:10,
202:19, 208:10,
238:14
remove [1] - 195:21
removed [3] - 39:24,
58:15, 187:19
render [1] - 202:10
rendering [1] - 236:24
Rensselaer [35] - 6:6,
6:9, 6:12, 6:17, 6:23,
7:6, 7:21, 10:16,
11:7, 16:10, 64:24,
74:12, 75:11, 77:12,
96:17, 105:7,
123:11, 177:8,
178:13, 178:23,
179:13, 195:4,
214:24, 229:7,
230:14, 233:11,
233:17, 234:4,
234:8, 234:12,
235:6, 235:19,
236:5, 243:4, 243:6
RENSSELAER [1] -
1:7
repaired [1] - 47:14
repeat [2] - 143:12,
146:2
repeatedly [1] - 54:6
repeating [1] - 170:3
replies [1] - 138:8
Report [1] - 98:14
report [43] - 28:22,
28:23, 28:24, 29:4,
29:7, 29:12, 29:19,
29:24, 30:5, 30:9,
30:19, 31:8, 31:14,
35:12, 39:5, 39:23,
44:18, 50:9, 50:10,
51:2, 52:13, 54:15,
65:14, 67:1, 67:3,
78:5, 78:6, 78:8,
80:2, 91:1, 163:3,
169:14, 176:13,
176:14, 179:13,

182:12, 191:7,
191:18, 197:12,
242:10, 242:13,
242:17
**reported** [9] - 29:6,
30:13, 31:11, 62:5,
93:18, 110:23,
111:3, 161:6, 163:5
**Reporter** [4] - 1:17,
246:23, 248:2
**reporter** [1] - 248:15
**reporting** [1] - 207:16
**reports** [6] - 31:2,
77:16, 168:19,
175:11, 196:22,
214:15
**represent** [5] - 114:8,
114:13, 114:16,
142:20, 148:3
**representation** [1] -
147:7
**representative** [1] -
228:6
**representatives** [1] -
135:4
**representing** [2] -
202:1, 243:4
**reputation** [1] - 47:17
**request** [34] - 40:11,
41:7, 48:5, 82:4,
138:12, 146:10,
152:18, 152:21,
152:23, 177:9,
177:21, 182:3,
182:5, 182:7, 188:7,
208:9, 216:7, 217:3,
229:12, 229:14,
231:17, 235:3,
235:10, 235:18,
235:22, 237:2,
237:3, 237:7,
237:15, 238:22,
239:5, 239:7, 240:4,
240:16
**requested** [19] - 29:1,
79:13, 101:12,
129:12, 133:23,
134:1, 147:7,
149:14, 153:18,
176:17, 178:5,
205:23, 213:4,
213:6, 219:17,
239:1, 248:14
**requesting** [8] -
147:10, 213:18,
227:13, 229:2,
229:4, 229:18,
229:20, 233:21
**requests** [4] - 63:18,
196:20, 213:24,

230:15
**required** [1] - 152:24
**requirements** [1] -
180:14
**requiring** [1] - 239:10
**research** [1] - 92:14
**reserved** [1] - 3:7
**resignation** [1] - 58:4
**resigned** [3] - 8:9,
63:13, 64:2
**resigns** [1] - 221:22
**resolved** [1] - 11:16
**RESOURCES** [1] - 1:8
**resources** [1] - 243:11
**respect** [4] - 25:22,
92:10, 106:23,
135:22
**respectfully** [1] - 55:7
**respective** [1] - 3:3
**respectively** [1] -
232:20
**respond** [7] - 33:1,
64:7, 220:20,
225:14, 231:3,
231:7, 238:18
**responded** [2] - 231:4,
238:9
**responding** [1] -
101:19
**response** [24] - 70:4,
80:22, 87:5, 87:10,
88:8, 118:5, 125:24,
131:17, 153:24,
180:18, 181:13,
194:24, 195:2,
235:22, 238:3,
238:16, 238:22,
239:13, 239:14,
240:1, 240:4, 240:5,
240:11
**responses** [2] - 138:3,
138:6
**responsibility** [3] -
41:16, 109:11, 173:7
**responsible** [2] -
28:18, 174:2
**responsive** [1] - 53:14
**rest** [2] - 182:14,
214:11
**Restaurant** [1] - 26:18
**rested** [2] - 141:3,
141:6
**restraining** [1] - 79:6
**restriction** [2] - 153:3,
230:21
**resubmission** [1] -
239:5
**result** [10] - 8:21, 10:8,
15:13, 15:23, 43:4,
44:10, 71:8, 95:11,

146:20, 169:2
**resulting** [2] - 196:10,
215:2
**retain** [1] - 67:8
**retained** [1] - 246:24
**retaliate** [1] - 121:24
**retaliation** [9] - 51:24,
62:1, 62:13, 100:12,
167:18, 167:19,
174:22, 175:13,
209:16
**retaliatory** [2] - 99:16,
100:7
**retired** [1] - 115:14
**retiring** [1] - 24:22
**retrieve** [1] - 66:16
**return** [11] - 143:11,
143:14, 143:16,
215:10, 215:11,
215:16, 215:21,
216:3, 217:16,
229:23, 230:21
**returned** [4] - 111:23,
134:7, 156:5, 195:9
**returning** [2] - 101:24,
118:2
**review** [12] - 66:11,
126:16, 177:21,
179:1, 180:20,
184:9, 231:5,
233:21, 235:3,
237:3, 242:18,
248:13
**reviewed** [18] - 51:2,
105:7, 126:20,
170:17, 171:8,
171:20, 174:12,
177:16, 177:20,
179:9, 179:10,
179:19, 180:9,
182:2, 242:1, 242:9,
242:12, 242:20
**reviewing** [4] -
180:18, 230:12,
238:15, 238:18
**rewarding** [1] - 227:9
**reword** [1] - 146:2
**ridiculous** [1] - 135:2
**rights** [9] - 141:10,
141:13, 142:4,
142:5, 142:8,
142:19, 152:9,
237:15
**rip** [1] - 83:18
**rise** [1] - 91:3
**RMR** [1] - 248:23
**roaming** [1] - 107:13
**role** [4] - 34:11, 34:20,
37:7, 182:21
**roll** [3] - 24:24, 189:8,

220:3
**room** [5] - 107:5,
130:3, 190:19,
218:17, 218:22
**rotated** [2] - 115:13,
221:12
**rotation** [2] - 221:15,
221:17
**roughly** [1] - 38:9
**rounds** [5] - 45:8,
45:13, 97:19,
185:24, 186:6
**routinely** [1] - 188:16
**rug** [1] - 169:13
**rule** [3] - 37:16, 94:14,
235:4
**ruled** [2] - 183:20,
202:12
**rules** [2] - 4:10,
120:24
**rumors** [10] - 23:2,
23:3, 23:14, 23:16,
25:20, 25:21, 26:9,
26:11, 27:12, 163:20
**run** [4] - 94:17, 96:16,
143:1, 161:11
**running** [5] - 37:2,
89:12, 96:13, 115:6,
148:20
**Russo** [43] - 91:10,
113:3, 118:4, 118:9,
118:18, 118:22,
121:6, 121:11,
121:22, 122:4,
122:13, 123:4,
123:17, 135:22,
136:2, 137:8, 138:5,
147:18, 149:12,
171:9, 171:12,
171:18, 172:10,
174:8, 175:16,
175:18, 175:20,
176:1, 178:1,
187:18, 188:13,
190:7, 190:16,
195:12, 195:20,
196:5, 210:16,
210:21, 212:2,
212:17, 213:8, 213:9
**RUSSO** [1] - 1:8
**Russo's** [3] - 122:19,
122:20, 173:17
**Ruth** [53] - 30:24,
37:11, 37:19, 38:3,
38:4, 41:13, 52:9,
52:15, 52:18, 53:2,
54:7, 55:2, 55:23,
56:2, 62:10, 62:12,
65:18, 71:22, 71:24,
72:23, 73:4, 76:16,

77:3, 80:1, 81:1,
81:4, 81:6, 81:9,
84:5, 84:13, 85:17,
85:18, 85:24, 86:1,
93:3, 93:4, 101:12,
113:10, 167:22,
168:13, 168:14,
168:16, 169:20,
183:19, 187:19,
188:1, 188:14,
188:17, 190:8,
190:22, 195:13,
221:13
**ruth** [1] - 73:2
**Ruth's** [1] - 187:19
**Ryan** [8] - 23:20,
24:20, 29:3, 147:4,
147:18, 148:1,
172:10, 204:20
**Ryan's** [3] - 25:13,
27:17, 28:20

## S

**safe** [3] - 42:4, 42:7,
128:6
**salary** [2] - 4:22, 18:5
**sales** [1] - 5:4
**Samaritan** [2] - 48:14,
70:17
**sang** [1] - 16:16
**sat** [3] - 78:4, 120:10,
225:18
**satisfactory** [1] -
230:17
**Saturday** [2] - 44:4,
76:18
**saw** [18] - 15:8, 33:17,
34:24, 36:15, 37:1,
43:11, 76:20, 98:24,
121:7, 137:14,
156:5, 161:6, 164:5,
168:17, 178:14,
180:12, 190:11
**scan** [1] - 173:9
**Schaghticoke** [1] -
79:7
**schedule** [3] - 12:6,
24:17, 43:23
**scheduled** [3] -
147:12, 203:11,
230:19
**school** [1] - 152:17
**score** [5] - 56:14,
57:1, 57:13, 57:22,
62:20
**scored** [1] - 60:16
**scores** [4] - 57:2,
57:12, 64:8, 64:22

**Scott** [1] - 71:12
**scrap** [1] - 196:13
**scream** [1] - 168:9
**screamed** [1] - 82:13
**screaming** [1] - 26:1
**screens** [1] - 218:24
**Scripts** [4] - 7:11,
8:13, 156:18, 157:1
**scripts** [1] - 9:1
**Seabury** [1] - 205:7
**sealing** [1] - 3:4
**search** [3] - 193:17,
193:19, 194:15
**searched** [1] - 98:17
**searches** [6] - 100:9,
100:24, 193:20,
193:23, 194:10,
194:12
**seat** [1] - 52:7
**second** [25] - 4:8,
17:1, 53:8, 77:17,
78:2, 101:6, 103:19,
104:4, 104:24,
105:15, 106:18,
108:21, 125:14,
125:15, 131:9,
131:12, 132:2,
137:22, 139:18,
172:15, 228:22,
228:23, 233:21,
235:10, 242:6
**secondly** [1] - 61:24
**secretary** [1] - 193:8
**section** [1] - 212:6
**Section** [5] - 153:21,
204:15, 206:6,
235:5, 236:20
**sections** [1] - 221:5
**secure** [2] - 128:3,
145:12
**security** [2] - 90:3,
129:17
**Security** [1] - 129:17
**see** [42] - 10:22, 12:4,
19:3, 20:16, 29:7,
35:5, 35:6, 39:13,
50:14, 52:10, 55:8,
67:24, 73:23, 78:7,
79:13, 79:15, 80:8,
80:12, 82:14, 82:17,
87:21, 99:1, 106:5,
118:6, 118:18,
120:2, 133:12,
137:16, 143:24,
151:18, 161:13,
161:22, 169:23,
170:8, 174:13,
186:4, 198:8,
201:23, 212:21,
232:16, 239:20,

239:23
**seek** [2] - 84:8, 214:10
**seeking** [2] - 91:4,
195:21
**seem** [1] - 199:12
**selected** [4] - 59:20,
61:10, 61:19, 64:8
**self** [1] - 194:13
**self-evident** [1] -
194:13
**semiautomatic** [1] -
47:5
**send** [9] - 42:10,
171:18, 177:5,
203:21, 213:11,
229:4, 229:15,
231:17, 231:19
**sending** [3] - 87:2,
138:4, 138:5
**sends** [1] - 118:3
**seniority** [2] - 206:1,
219:23
**sense** [3] - 78:23,
204:6, 222:11
**sent** [40] - 65:17,
86:21, 97:1, 97:4,
104:16, 108:12,
113:5, 138:2, 138:3,
138:9, 141:17,
146:22, 146:23,
147:10, 149:13,
150:22, 153:24,
177:7, 177:22,
178:19, 178:20,
178:22, 194:18,
194:21, 195:20,
196:4, 196:6,
200:10, 209:17,
212:1, 229:6,
229:17, 229:18,
229:19, 229:20,
234:16, 234:22,
238:1, 240:16
**sentence** [2] - 115:21,
240:3
**separate** [2] - 37:20,
88:5
**separately** [3] - 37:21,
113:8, 113:11
**September** [3] -
177:17, 214:4, 243:8
**Sergeant** [77] - 20:14,
21:13, 22:3, 22:7,
22:19, 23:20, 24:20,
25:2, 25:12, 25:13,
28:20, 29:3, 29:5,
29:11, 29:16, 29:18,
31:16, 31:20, 32:8,
33:14, 33:20, 33:24,
34:1, 34:5, 34:9,

34:14, 34:16, 34:18,
34:24, 36:8, 37:7,
37:11, 37:12, 37:19,
40:11, 41:5, 41:6,
41:12, 41:21, 42:11,
43:3, 45:15, 46:13,
49:17, 71:12, 88:23,
97:8, 97:9, 98:6,
111:4, 112:8,
112:17, 112:18,
113:13, 113:24,
115:20, 116:2,
126:15, 129:11,
129:12, 129:14,
129:15, 129:18,
131:21, 132:14,
140:12, 161:4,
184:24, 185:13,
188:6, 188:7,
188:14, 188:17,
193:13, 225:18
**sergeant** [50] - 18:17,
24:22, 28:12, 29:1,
29:2, 29:21, 29:22,
30:15, 34:13, 35:1,
36:1, 39:15, 45:8,
46:16, 56:9, 56:22,
56:24, 57:9, 57:19,
58:16, 59:4, 59:21,
60:7, 60:19, 60:21,
61:5, 62:15, 88:24,
89:11, 94:14, 97:18,
98:2, 98:5, 98:22,
107:14, 107:15,
116:7, 121:13,
162:19, 162:24,
163:2, 167:17,
185:17, 186:16,
186:22, 194:2,
225:10, 225:21
**sergeant's** [1] - 27:20
**sergeants** [5] - 58:24,
65:19, 97:19, 98:20,
130:8
**series** [1] - 42:3
**serious** [2] - 71:17,
96:12
**seriously** [1] - 207:20
**serve** [1] - 90:2
**served** [2] - 36:1,
225:10
**service** [12] - 56:15,
58:8, 58:9, 58:21,
60:6, 63:10, 63:17,
64:1, 64:9, 64:19,
64:24, 206:1
**Service** [35] - 57:6,
58:13, 149:13,
149:18, 149:21,
150:8, 150:16,

151:7, 151:11,
151:14, 151:15,
151:24, 152:2,
152:19, 153:20,
204:15, 227:4,
227:13, 228:11,
229:7, 229:9,
230:14, 232:4,
233:12, 233:18,
234:5, 234:9,
234:13, 235:11,
235:19, 236:4,
236:5, 236:10,
246:7, 246:8
**serving** [1] - 18:17
**Session** [1] - 100:1
**sessions** [1] - 241:3
**set** [1] - 69:8
**setting** [2] - 50:2,
185:22
**seven** [1] - 208:10
**several** [2] - 31:2,
37:13
**severe** [1] - 158:14
**sexual** [2] - 14:20,
75:9
**sexually** [1] - 158:18
**shake** [3] - 14:19,
44:21, 189:11
**shaken** [1] - 73:14
**shakes** [1] - 136:19
**shaking** [10] - 9:5,
19:6, 19:21, 44:19,
85:1, 89:6, 120:12,
136:14, 158:14,
158:24
**shall** [1] - 3:6
**share** [2] - 143:7,
235:20
**shared** [2] - 199:21,
200:3
**sharing** [1] - 190:22
**shelf** [1] - 188:6
**sheriff** [3] - 25:16,
174:5, 190:18
**Sheriff** [68] - 35:6,
52:11, 52:14, 54:6,
55:22, 58:12, 58:20,
61:3, 61:10, 62:19,
63:18, 72:3, 72:7,
72:19, 72:23, 73:2,
73:5, 73:9, 74:11,
77:7, 81:15, 81:24,
82:4, 82:8, 96:2,
101:15, 102:14,
105:19, 106:7,
107:15, 108:24,
110:22, 110:24,
113:22, 115:7,
121:22, 121:23,

123:17, 137:11,
137:12, 137:14,
146:21, 161:7,
161:13, 162:6,
162:10, 165:11,
168:3, 168:5,
169:16, 169:21,
170:24, 173:17,
174:9, 179:6,
182:22, 183:9,
183:22, 184:3,
190:7, 190:13,
202:7, 204:16,
206:7, 216:19,
225:12, 225:22
**SHERIFF** [1] - 1:7
**Sheriff's** [64] - 6:7,
6:9, 6:12, 6:18, 7:1,
7:21, 18:9, 24:15,
25:17, 26:13, 49:1,
49:18, 56:6, 57:3,
60:22, 64:17, 65:10,
66:19, 73:17, 74:19,
95:21, 96:9, 98:5,
102:13, 105:4,
117:13, 124:3,
137:6, 138:9,
138:13, 141:3,
141:19, 144:10,
146:20, 147:5,
150:10, 151:8,
151:17, 151:20,
151:22, 151:24,
152:14, 161:16,
161:21, 172:4,
180:16, 182:14,
187:4, 197:2,
197:24, 198:18,
198:20, 199:22,
200:17, 201:13,
202:4, 206:13,
210:9, 213:7,
214:24, 228:10,
233:22, 235:6,
241:22
**shift** [11] - 11:21,
24:18, 25:4, 32:21,
32:22, 90:4, 116:11,
141:21, 186:5,
188:22, 223:5
**shit** [1] - 68:3
**shoot** [1] - 125:2
**shopping** [1] - 165:6
**short** [15] - 7:12,
10:13, 44:7, 70:17,
155:4, 157:20,
199:23, 206:21,
208:6, 208:9,
208:11, 219:11,
222:4, 228:18,

232:18
**short-term** [1] - 208:9
**shorthand** [1] - 248:9
**Shorthand** [2] - 1:17, 248:2
**shortly** [2] - 145:16, 208:5
**shot** [1] - 76:21
**show** [21] - 39:2, 43:17, 62:22, 63:9, 75:23, 83:16, 88:19, 123:8, 133:2, 138:19, 152:24, 154:1, 154:15, 178:22, 179:2, 206:3, 230:24, 231:20, 234:2, 239:18
**showed** [1] - 24:13
**showing** [5] - 60:5, 61:2, 88:14, 89:24, 188:19
**shows** [4] - 47:19, 90:18, 125:21, 205:1
**shred** [7] - 82:15, 83:17, 84:5, 168:21, 169:17, 169:22, 192:2
**shut** [6] - 103:9, 114:14, 123:2, 123:14, 127:24, 130:23
**sic** [3] - 121:22, 165:8, 190:7
**siccing** [1] - 104:21
**sick** [12] - 17:18, 133:3, 135:2, 140:12, 140:14, 140:23, 141:3, 141:20, 141:24, 212:12, 215:8, 224:3
**side** [24] - 13:6, 13:7, 13:8, 14:16, 14:17, 14:20, 19:5, 19:11, 20:2, 39:14, 49:18, 54:15, 55:19, 95:22, 104:19, 109:13, 119:24, 160:20, 186:16, 186:17, 186:18, 198:11
**sign** [4] - 36:22, 46:9, 196:12, 210:8
**signature** [1] - 30:7
**signed** [5] - 3:9, 35:1, 41:10, 114:18, 181:6
**significant** [2] - 212:11, 215:3
**signing** [2] - 176:19, 184:24
**Simard** [1] - 105:24,

225:19
**similar** [2] - 122:23, 229:23
**similarly** [1] - 31:5
**simple** [1] - 40:15
**sing** [2] - 16:15, 16:22
**singing** [4] - 16:24, 17:6, 17:10, 17:24
**single** [4] - 19:15, 62:5, 102:22, 181:8
**sister** [44] - 21:14, 22:3, 22:19, 23:13, 28:1, 28:13, 32:19, 36:7, 38:15, 38:16, 38:19, 45:1, 46:3, 48:3, 48:20, 52:1, 66:18, 68:4, 68:6, 68:15, 68:17, 69:10, 69:11, 69:12, 69:23, 70:15, 94:4, 122:19, 122:20, 155:14, 155:16, 155:24, 164:10, 164:12, 164:13, 165:2, 165:7, 166:6, 166:9, 166:17, 166:21, 191:19, 192:20
**sister's** [1] - 49:24
**sit** [5] - 43:18, 43:20, 44:21, 52:12, 97:19, 102:22
**site** [2] - 112:23, 188:19
**sitting** [8] - 98:18, 111:16, 119:11, 119:23, 158:16, 218:9, 218:22, 218:24
**situation** [13] - 18:18, 73:20, 75:22, 81:8, 93:11, 116:3, 119:17, 120:4, 122:23, 148:12, 156:4, 184:16, 197:19
**situations** [4] - 78:18, 78:19, 167:11, 206:7
**six** [7] - 16:10, 183:19, 188:9, 215:1, 220:13, 220:14, 221:20
**sixteen** [1] - 97:23
**skipped** [1] - 85:2
**slammed** [1] - 127:5
**slams** [1] - 130:23
**sleep** [8] - 13:9, 13:14, 13:16, 14:1, 14:13, 160:15, 160:17
**sleeping** [1] - 160:13
**slow** [1] - 231:12

**slowly** [1] - 85:1
**smaller** [1] - 218:22
**smart** [1] - 120:14
**smile** [2] - 44:21, 189:10
**smiling** [3] - 44:19, 89:6, 189:5
**Smith** [24] - 29:15, 30:24, 31:21, 32:3, 35:3, 69:1, 69:3, 79:24, 80:7, 82:11, 110:17, 111:3, 134:20, 135:5, 135:6, 135:10, 140:12, 140:24, 184:17, 184:19, 209:10, 209:11
**Smith's** [3] - 31:10, 128:12, 179:19
**so..** [2] - 80:21, 178:16
**social** [1] - 43:14
**socialize** [1] - 121:6
**socially** [1] - 103:10
**sole** [4] - 171:4, 173:6, 180:22, 183:22
**solely** [3] - 11:14, 128:12, 183:9
**someone** [6] - 22:20, 23:1, 23:15, 64:16, 73:24, 112:9
**sometimes** [2] - 13:9, 160:18
**somewhere** [3] - 117:1, 219:3, 220:24
**son** [10] - 21:21, 21:22, 22:10, 48:11, 70:13, 98:5, 105:24, 114:11, 164:14, 225:20
**son-in-law** [2] - 105:24, 225:20
**soon** [5] - 32:1, 56:11, 63:2, 71:14, 74:13
**sorry** [18] - 11:10, 13:19, 27:23, 33:3, 55:5, 73:3, 76:3, 89:15, 128:14, 128:15, 137:17, 153:16, 156:22, 167:12, 190:17, 199:20, 224:16, 244:13
**Sorsby** [3] - 1:15, 77:19, 149:17
**SORSBY** [78] - 2:3, 2:6, 50:12, 50:17, 53:9, 53:16, 53:20, 54:1, 56:19, 57:5, 67:13, 67:20, 77:22, 84:8, 85:15, 103:20,

103:23, 105:1, 105:15, 110:1, 110:6, 110:10, 111:12, 112:4, 112:6, 122:1, 122:5, 122:9, 122:14, 124:11, 126:9, 128:16, 128:19, 128:24, 129:2, 129:5, 139:2, 141:8, 146:7, 153:8, 154:3, 154:17, 154:20, 155:1, 156:11, 171:22, 171:24, 172:21, 173:1, 173:4, 173:9, 173:11, 191:21, 191:23, 195:18, 202:20, 203:4, 203:8, 203:10, 203:18, 204:6, 204:11, 204:13, 228:19, 232:3, 232:7, 232:21, 232:22, 240:21, 244:4, 244:8, 244:12, 244:18, 244:21, 245:2, 245:7, 245:10, 245:13
**SORSBY**..................
**PAGE** [1] - 246:3
sorsbylaw@gmail. com [1] - 2:6
**sort** [11] - 4:12, 13:21, 13:24, 14:8, 15:19, 16:1, 16:2, 18:24, 20:8, 58:23, 116:4
**sought** [6] - 48:14, 49:4, 79:6, 80:7, 86:8, 215:16
**sounding** [1] - 116:12
**sounds** [1] - 122:23
**source** [3] - 5:20, 5:23, 152:3
**speaking** [1] - 157:9
**speaks** [3] - 61:6, 131:23, 149:9
**special** [3] - 47:7, 47:12, 127:12
**specific** [7] - 15:18, 22:5, 67:23, 110:8, 112:12, 163:9, 164:11
**specifically** [8] - 73:4, 146:16, 151:9, 166:19, 175:2, 182:12, 195:1, 202:13
**specifics** [2] - 39:21,

140:22
**speculate** [1] - 122:16
**spell** [1] - 62:14
**spend** [1] - 150:15
**spending** [2] - 33:21, 45:12
**spent** [3] - 18:5, 70:16, 122:24
**spin** [1] - 65:6
**spoken** [3] - 91:16, 116:5, 117:6
**spot** [1] - 100:20
**spots** [3] - 97:13, 97:14, 100:22
**springboard** [1] - 139:8
**squashes** [1] - 167:3
**Sr** [4] - 114:5, 115:3, 115:5, 115:19
**St** [14] - 49:17, 132:19, 132:22, 133:12, 133:14, 133:17, 133:23, 159:10, 159:13, 160:7, 207:23, 209:17, 215:5, 223:20
**staff** [5] - 193:16, 220:22, 220:24, 222:16, 224:23
**staffed** [1] - 221:21
**staffing** [1] - 222:13
**stamp** [1] - 241:14
**stamped** [1] - 170:13
**standing** [4] - 67:6, 127:14, 127:16, 128:21
**stands** [2] - 166:24, 167:4
**stapled** [1] - 190:20
**stare** [3] - 43:19, 43:20, 44:13
**start** [8] - 4:12, 15:2, 16:6, 20:8, 60:12, 133:17, 144:18, 144:24
**started** [12] - 7:15, 15:15, 26:1, 39:1, 52:14, 68:2, 68:14, 71:4, 85:1, 85:5, 144:20, 215:18
**starting** [3] - 14:12, 84:23, 159:5
**state** [7] - 73:18, 74:2, 140:2, 158:24, 175:12, 191:7, 224:2
**State** [8] - 1:18, 71:10, 199:23, 224:2, 236:12, 243:7, 243:20, 248:3
**STATE** [1] - 247:1

**statement** [19] - 9:24, 19:1, 49:14, 53:2, 54:14, 54:18, 55:11, 62:12, 65:21, 97:11, 124:22, 124:23, 125:9, 169:10, 196:17, 198:3, 198:6, 209:13, 243:8
**statements** [4] - 56:1, 83:20, 126:3, 128:9
**States** [2] - 6:20, 234:17
**STATES** [1] - 1:1
**states** [6] - 35:12, 35:14, 84:1, 84:4, 235:16, 240:6
**status** [4] - 11:5, 29:23, 181:15, 217:1
**stay** [10] - 33:10, 55:9, 107:7, 107:9, 107:11, 127:24, 160:14, 164:23, 190:5
**stayed** [2] - 18:21, 160:16
**staying** [1] - 214:18
**steadily** [1] - 5:16
**stenographer** [1] - 241:9
**STENOGRAPHIC** [1] - 1:12
**stepson** [1] - 59:8
**still** [30] - 14:19, 32:18, 33:11, 48:23, 63:13, 74:10, 74:17, 74:18, 79:17, 86:19, 87:1, 87:5, 88:17, 112:2, 115:11, 142:22, 143:22, 145:9, 145:12, 145:14, 155:23, 156:1, 156:23, 187:12, 210:3, 210:13, 212:5, 226:13, 231:23
**STIPULATED** [3] - 3:2, 3:5, 3:8
**stop** [6] - 16:24, 40:3, 70:11, 123:5, 158:22, 161:2
**stopped** [3] - 17:17, 161:15, 214:6
**story** [2] - 104:19, 198:11
**Strang** [1] - 91:7
**Strang-er** [1] - 91:7
**street** [2] - 163:13, 189:15
**Street** [1] - 2:11
**stress** [20] - 84:14,

84:19, 85:12, 134:5, 136:12, 136:22, 165:22, 174:20, 174:21, 175:13, 206:16, 207:15, 209:15, 209:16, 209:20, 209:22, 211:1, 215:2, 215:7
**stressed** [2] - 136:10, 136:19
**stressful** [3] - 82:19, 85:14, 208:13
**stretch** [1] - 123:3
**strike** [5] - 22:17, 31:20, 103:15, 151:1, 191:4
**strip** [10] - 98:17, 100:8, 100:24, 193:17, 193:18, 193:19, 193:23, 194:10, 194:11, 194:15
**strip-searched** [1] - 98:17
**stripes** [2] - 68:8, 168:6
**struggle** [2] - 143:22, 158:2
**struggles** [1] - 55:4
**stuff** [18] - 17:16, 52:18, 70:3, 71:15, 84:1, 98:3, 98:23, 120:19, 121:2, 122:17, 158:5, 159:8, 159:19, 165:8, 165:11, 165:12, 232:9, 241:11
**subject** [2] - 37:14, 164:23
**submit** [5] - 104:10, 175:24, 229:1, 230:15, 230:20
**submitted** [12] - 58:7, 78:5, 96:6, 152:5, 170:9, 176:2, 177:1, 180:21, 184:10, 205:1, 224:1, 232:8
**subscribed** [1] - 3:10
**subsequent** [1] - 178:17
**substance** [4] - 168:12, 235:2, 235:8, 236:8
**substantiate** [2] - 91:14, 92:5
**substantively** [2] - 183:16, 203:2
**sudden** [2] - 42:19, 69:9

**sue** [2] - 46:9, 227:24
**sued** [1] - 46:6
**suffered** [1] - 155:17
**suggest** [1] - 63:9
**suggestion** [3] - 30:16, 30:18, 31:8
**suggests** [1] - 134:13
**suicidal** [1] - 159:7
**suing** [1] - 93:9
**suit** [1] - 59:19
**Suite** [1] - 2:11
**sum** [1] - 235:1
**summons** [1] - 74:7
**Sunday** [2] - 44:4, 76:18
**supervise** [1] - 109:21
**supervisor** [8] - 34:16, 71:11, 109:10, 109:19, 109:20, 121:15, 128:1, 128:6
**supervisor's** [2] - 49:13, 127:20
**supervisors** [6] - 28:22, 45:19, 49:8, 62:6, 82:21, 121:3
**support** [4] - 46:19, 77:15, 168:2, 184:11
**supported** [4] - 48:20, 48:21, 184:19, 186:10
**supporting** [3] - 61:2, 171:6, 179:14
**supposed** [1] - 53:24, 83:6, 83:10, 98:10, 100:18, 100:19, 121:4, 174:4, 180:16, 180:19, 219:2
**surgery** [1] - 205:17
**surprised** [2] - 151:6, 152:6
**surrender** [1] - 110:5
**surveillance** [1] - 179:21
**survive** [3] - 9:14, 14:15, 157:7
**suspended** [3] - 46:24, 95:10, 117:2
**sustained** [1] - 174:20
**Swanberry** [2] - 83:24, 119:10
**swanberry** [2] - 200:9, 200:10
**swept** [1] - 169:12
**swiftly** [1] - 83:7
**Sworn** [1] - 247:13
**sworn** [3] - 3:11, 4:3, 248:5
**symptom** [3] - 19:15, 160:21, 160:22

**symptoms** [17] - 7:5, 8:18, 9:6, 9:20, 19:4, 19:17, 19:22, 134:2, 157:16, 157:22, 158:8, 158:11, 159:12, 160:12, 207:13, 207:14, 212:12
**system** [7] - 64:20, 93:19, 95:15, 96:9, 129:9, 187:10, 188:8
**System** [1] - 86:9
**systems** [1] - 188:9

**T**

**table** [1] - 43:18
**talks** [3] - 44:18, 51:4, 141:7
**tape** [1] - 84:9
**task** [2] - 90:14, 91:2
**taught** [2] - 40:14, 51:13
**taxes** [1] - 17:8
**teach** [1] - 189:19
**team** [6] - 47:4, 79:4, 166:24, 167:2, 167:3, 226:3
**tear** [2] - 82:16, 83:14
**technically** [2] - 35:24, 142:22
**Teddy** [2] - 219:10, 222:1
**telephone** [3] - 29:20, 36:6, 101:18
**term** [7] - 108:9, 194:14, 199:23, 206:21, 208:9, 209:21
**terminate** [5] - 151:23, 192:4, 204:17, 206:8, 236:19
**terminated** [30] - 7:1, 7:2, 81:6, 81:13, 82:1, 146:5, 148:23, 149:2, 168:14, 168:23, 169:4, 169:21, 192:2, 196:16, 205:5, 205:9, 205:19, 205:22, 206:11, 216:20, 221:13, 224:8, 224:21, 226:9, 230:16, 231:8, 231:9, 231:21, 235:21, 238:12
**terminating** [1] - 151:20

**termination** [17] - 7:20, 8:8, 8:9, 81:8, 81:18, 146:1, 146:4, 148:22, 168:13, 191:24, 196:10, 230:17, 233:22, 235:5, 235:12, 235:18, 236:15
**terminology** [1] - 113:19
**terms** [4] - 18:13, 18:19, 150:7, 180:15
**test** [2] - 21:3, 56:15
**testified** [13] - 4:4, 51:21, 76:23, 82:3, 104:9, 156:13, 157:5, 167:16, 168:11, 183:19, 183:20, 201:12, 238:9
**testify** [6] - 81:20, 81:21, 104:22, 164:13, 164:18, 248:6
**testimony** [11] - 36:9, 91:19, 101:12, 103:16, 106:12, 156:2, 168:17, 195:14, 243:15, 244:11, 247:4
**testing** [1] - 212:10
**tests** [2] - 133:20, 134:3
**Thalmann** [32] - 12:3, 12:6, 138:7, 176:18, 176:20, 177:1, 177:5, 177:7, 178:14, 179:11, 181:17, 181:24, 182:11, 183:18, 195:24, 196:1, 196:3, 196:18, 210:11, 210:19, 211:18, 213:11, 215:19, 216:7, 216:12, 226:13, 227:2, 227:5, 227:11, 230:23, 230:24, 231:5
**thanked** [1] - 55:10
**THE** [18] - 77:18, 103:22, 110:5, 110:8, 110:11, 112:5, 122:12, 128:21, 129:1, 129:3, 154:24, 159:24, 203:20, 204:1, 204:10, 244:10, 244:23, 245:5

the.. [1] - 139:1
themselves [3] - 87:8, 139:7, 154:10
theoretically [1] - 222:4
therapy [1] - 210:24
thereafter [2] - 208:5, 248:10
Therefore [1] - 228:23
therefore [2] - 228:24, 236:18
therein [1] - 248:9
thereof...concluded [1] - 184:11
THERESA [3] - 1:16, 248:2, 248:23
thereupon [1] - 4:1
they've [2] - 30:16, 93:3
they.. [1] - 10:22
thinking [1] - 79:1
thousands [1] - 8:24
threat [3] - 45:24, 47:9, 189:18
threaten [2] - 68:18, 121:1
threatened [7] - 46:22, 48:12, 70:15, 72:14, 164:15, 164:16, 196:8
threatening [7] - 68:19, 68:20, 70:8, 124:21, 124:23, 124:24, 126:6
threats [10] - 28:16, 44:24, 69:21, 72:18, 91:5, 126:2, 164:10, 164:11, 165:21, 174:21
three [38] - 12:7, 14:14, 44:2, 53:4, 57:12, 57:13, 59:15, 59:21, 59:22, 61:10, 61:19, 64:6, 64:11, 64:12, 83:3, 88:6, 101:1, 102:23, 108:5, 128:9, 130:7, 133:16, 150:1, 150:10, 157:20, 166:8, 186:5, 188:22, 190:20, 193:4, 193:8, 206:22, 206:24, 208:18, 209:22, 220:13, 233:15
three-page [1] - 53:4
three-prong [1] - 209:22
throughout [3] - 33:22, 123:23,

187:11
throw [2] - 82:15, 83:14
thrown [1] - 23:5
Thursday/Friday [1] - 43:23
tight [1] - 98:4
til [4] - 30:10, 58:2, 125:9, 147:2
timeline [1] - 207:22
timing [2] - 27:4, 27:5
tirade [1] - 51:18
title [2] - 172:15, 172:18
TO [2] - 246:1, 246:5
today [1] - 187:6
together [13] - 21:16, 21:17, 21:18, 21:20, 33:12, 37:20, 37:21, 53:13, 106:4, 113:12, 120:18, 130:17, 165:12
TOM [1] - 1:8
Tom [44] - 80:4, 80:18, 83:2, 86:10, 86:22, 87:4, 87:20, 91:13, 91:16, 92:19, 101:18, 102:3, 102:5, 102:8, 102:11, 103:10, 103:12, 104:9, 105:11, 107:6, 107:11, 111:21, 117:5, 117:8, 117:12, 119:15, 120:5, 124:7, 124:19, 131:3, 131:11, 137:20, 138:5, 138:17, 139:3, 139:15, 139:20, 143:8, 170:14, 175:17, 194:20, 227:22, 243:11
took [35] - 21:3, 25:15, 26:21, 27:6, 27:20, 32:16, 39:19, 41:9, 44:10, 48:9, 68:8, 78:11, 91:1, 91:19, 96:2, 96:19, 102:20, 102:23, 103:1, 111:3, 120:17, 123:10, 127:3, 145:21, 147:24, 150:24, 155:18, 159:22, 196:1, 197:22, 198:9, 198:12, 199:17, 203:6, 231:24
top [18] - 23:12, 56:16,

57:1, 57:2, 57:11, 57:13, 57:16, 64:6, 64:11, 64:12, 86:13, 150:9, 172:18, 211:10, 212:20, 223:23, 230:7
touched [1] - 50:23
towards [1] - 11:21
trained [4] - 75:8, 84:22, 102:12, 207:7
training [8] - 24:1, 24:20, 34:12, 34:15, 35:19, 116:7, 185:7, 193:24
transcribe [1] - 241:10
transcribed [2] - 84:9, 241:5
transcript [5] - 171:8, 171:20, 172:24, 176:5, 244:13, 244:22, 244:24, 245:5, 245:11, 246:18, 246:19, 246:21, 247:6, 248:11, 248:14
transcriptionist [1] - 241:8
transition [2] - 36:17, 226:3
transport [4] - 24:1, 24:21, 34:13, 36:16
treat [1] - 12:2
treated [1] - 14:23
treating [3] - 11:23, 84:15, 84:18
treatment [4] - 70:18, 196:2, 215:14, 215:19
trial [1] - 3:7
TRIAL [1] - 1:13
tried [5] - 8:15, 39:24, 48:18, 82:14, 168:22
tries [1] - 83:17
triggered [1] - 8:17
trooper [5] - 73:16, 74:3, 74:4, 75:19, 76:5
Trooper [6] - 76:2, 76:4, 76:7, 191:7, 191:11, 191:13
troopers [2] - 73:18, 73:22
Troy [4] - 64:18, 90:11, 91:10, 182:12
truck [3] - 9:1, 100:8, 113:17
trucks [1] - 98:12
true [5] - 41:24, 67:19, 138:24, 247:6, 248:11

trunk [1] - 232:14
trust [3] - 47:12, 135:4, 162:9
trusted [2] - 88:23, 162:6
truth [4] - 33:6, 248:6, 248:7
truthful [1] - 243:14
try [6] - 13:15, 13:23, 104:20, 130:1, 227:20, 232:3
trying [15] - 19:3, 51:13, 51:14, 70:5, 70:22, 78:15, 79:4, 82:20, 83:16, 90:2, 95:17, 115:23, 116:4, 116:19, 208:18
Tuesday [3] - 44:4, 77:3, 81:2
turn [9] - 67:11, 160:22, 161:2, 172:14, 181:12, 196:13, 196:21, 196:24, 212:5
turned [9] - 54:15, 60:8, 64:3, 147:22, 162:20, 182:19, 209:10, 230:5, 241:22
turning [1] - 177:13
turns [1] - 85:13
TV [1] - 13:18
twice [2] - 101:8, 187:11
two [47] - 12:2, 14:7, 21:16, 40:13, 47:11, 53:5, 57:22, 61:16, 64:5, 80:3, 107:22, 111:10, 119:23, 130:10, 130:18, 137:24, 142:10, 148:10, 158:19, 160:19, 175:6, 175:9, 181:2, 182:10, 182:17, 188:17, 190:19, 200:1, 204:5, 207:3, 208:18, 208:19, 218:7, 218:10, 218:19, 218:20, 218:22, 218:23, 219:15, 221:4, 222:18, 222:24, 226:1, 228:16
two-minute [1] - 228:16
two-page [1] - 181:2
type [4] - 80:20, 180:15, 185:20,

196:17
typed [6] - 53:6, 53:7, 68:6, 78:6, 190:20, 196:22
typewritten [4] - 67:3, 67:23, 181:14, 248:10
typically [1] - 34:14

**U**

U.S [1] - 8:4
ultimate [5] - 58:14, 202:23, 224:17, 225:12, 227:6
ultimately [13] - 29:5, 49:4, 135:8, 151:23, 163:22, 181:18, 200:10, 202:10, 217:7, 224:12, 226:21, 226:23, 227:10
unable [4] - 8:18, 14:20, 208:8, 228:24
unbeknownst [1] - 90:13
unbiased [1] - 244:1
unchanged [1] - 18:21
unchecked [1] - 45:4
unclear [1] - 153:14
under [14] - 75:12, 140:14, 141:11, 152:16, 163:3, 169:13, 172:16, 196:23, 215:15, 226:14, 235:4, 236:20, 239:6, 241:17
underlying [1] - 236:18
undermine [1] - 89:12
UNDERSHERIFF [1] - 1:7
Undersheriff [17] - 113:3, 118:4, 118:18, 123:16, 123:17, 137:6, 137:8, 171:9, 172:11, 174:8, 175:16, 195:12, 195:20, 196:5, 210:16, 212:2, 213:8
undersheriff [8] - 61:24, 81:17, 110:24, 118:1, 118:9, 120:19, 210:21, 212:17
undersheriff's [1] - 59:8

**understood** [5] - 156:2, 161:3, 161:6, 162:14, 214:23
**undetermined** [3] - 215:10, 215:22, 216:3
**uneligible** [1] - 6:13
**unemployment** [5] - 6:5, 6:11, 6:16, 6:18, 7:24
**unexplained** [1] - 188:20
**unfolded** [2] - 158:12, 166:15
**unfounded** [1] - 128:8
**unfounded"** [1] - 179:22
**unfriendly** [1] - 121:10
**uniform** [1] - 36:18
**union** [16] - 20:2, 20:3, 20:4, 114:6, 114:8, 114:9, 114:16, 135:4, 135:9, 140:11, 140:16, 141:4, 142:17, 142:19, 147:4, 183:8
**unit** [24] - 33:19, 37:2, 88:12, 88:13, 88:14, 88:20, 88:21, 89:10, 89:13, 89:17, 90:1, 90:5, 100:16, 100:19, 107:4, 115:12, 129:10, 168:1, 185:17, 185:22, 185:24, 186:15, 186:19
**United** [2] - 6:20, 234:17
**UNITED** [1] - 1:1
**units** [1] - 100:22
**unlawful** [1] - 235:17
**unless** [7] - 5:18, 89:10, 127:24, 129:15, 129:18, 208:7
**unlike** [1] - 78:16
**unlimited** [4] - 162:11, 164:6, 181:7, 210:10
**unquote** [1] - 197:16
**unrelated** [3] - 6:9, 90:8, 220:11
**untrue** [1] - 40:22
**unusual** [1] - 134:14
**unwatched** [1] - 41:23
**up** [107] - 6:23, 7:13, 10:6, 14:12, 16:20, 22:15, 24:3, 24:7, 24:13, 29:15, 29:16, 34:8, 34:9, 34:12, 34:15, 34:17, 34:18, 34:19, 34:20, 35:4, 35:7, 35:16, 35:18, 36:3, 37:3, 37:6, 37:13, 37:16, 38:2, 38:9, 39:2, 39:6, 40:16, 43:9, 43:17, 45:20, 45:21, 45:23, 46:22, 47:19, 47:23, 50:2, 50:4, 52:2, 53:24, 62:1, 62:3, 65:8, 75:23, 80:10, 82:16, 83:2, 83:14, 83:18, 88:15, 88:19, 88:22, 89:18, 89:24, 91:9, 94:10, 97:20, 98:23, 111:20, 114:19, 116:18, 117:4, 117:9, 120:23, 127:1, 132:11, 132:15, 134:17, 136:4, 136:10, 141:7, 145:24, 146:11, 154:18, 156:12, 158:9, 158:13, 160:14, 160:16, 160:19, 162:9, 163:18, 168:15, 170:4, 182:20, 182:21, 184:23, 185:5, 185:8, 186:11, 187:7, 187:19, 188:19, 191:4, 198:2, 199:4, 200:15, 213:10, 216:15, 230:6, 244:2
**up"** [1] - 187:3
**up-to-date** [1] - 216:15
**updates** [3] - 181:15, 214:6, 216:11
**uphold** [1] - 235:19
**upholds** [1] - 203:21
**uprisings** [1] - 167:4
**upset** [8] - 27:14, 53:21, 67:6, 69:19, 73:13, 73:23, 120:8, 122:10
**upsetting** [2] - 81:23, 82:19
**usual** [1] - 113:16
**Utica** [1] - 2:11
**utilized** [4] - 219:8, 220:16, 221:23, 225:17
**utilizes** [1] - 225:23

---

## V

**vacation** [2] - 5:11, 5:13
**various** [1] - 20:23
**varying** [1] - 204:8
**Vega** [3] - 23:8, 23:10, 94:11
**verbal** [9] - 28:23, 28:24, 29:2, 29:7, 29:11, 29:19, 35:23, 132:12, 132:13
**verbally** [6] - 30:13, 31:11, 31:14, 62:5, 78:17, 111:3
**verifying** [1] - 104:18
**versed** [1] - 57:6
**version** [1] - 197:21
**veteran** [1] - 187:4
**via** [3] - 9:1, 108:12, 192:16
**Vibert** [34] - 30:24, 37:11, 38:4, 52:9, 52:10, 55:2, 55:13, 65:18, 71:23, 72:23, 73:4, 76:16, 77:3, 78:1, 80:1, 80:9, 84:5, 93:3, 93:4, 101:13, 113:10, 161:10, 167:23, 168:13, 168:14, 168:16, 169:16, 169:20, 183:20, 188:14, 190:8, 192:1, 195:11, 221:13
**Vibert's** [2] - 31:8, 71:24
**victim** [2] - 121:5, 164:22
**victims** [1] - 164:21
**video** [3] - 51:21, 126:18, 179:20
**videotape** [1] - 126:16
**view** [1] - 102:8
**violation** [3] - 36:4, 131:8, 152:8
**Violation** [1] - 131:4
**violence** [77] - 30:22, 31:8, 38:8, 47:23, 72:20, 74:1, 75:8, 75:9, 75:12, 76:12, 76:21, 77:6, 77:13, 78:9, 78:14, 78:21, 80:11, 81:14, 82:12, 82:24, 83:5, 86:16, 86:20, 86:23, 87:23, 91:15, 92:12, 93:6, 94:2, 102:6, 102:15, 103:8, 103:13, 104:5, 104:24, 105:11, 106:8, 111:22, 124:5, 125:12, 125:14, 125:16, 125:23, 128:7, 131:9, 131:13, 136:5, 137:15, 137:22, 139:22, 164:21, 164:22, 169:9, 169:14, 169:17, 170:11, 174:18, 174:21, 174:23, 174:24, 175:3, 175:9, 175:14, 175:20, 177:12, 179:15, 179:19, 179:23, 180:5, 182:13, 191:2, 192:3, 193:3, 195:16, 198:21, 209:17
**Violence** [1] - 243:6
**Violence"** [1] - 120:2
**violent** [1] - 76:24
**vis** [2] - 162:22
**vis-a-vis** [1] - 162:22
**visit** [3] - 69:10, 193:18
**visitation** [18] - 81:10, 193:21, 193:22, 194:5, 218:8, 218:12, 218:13, 218:18, 219:14, 220:15, 220:23, 221:9, 221:14, 221:17, 223:3, 223:6, 223:9, 223:10
**visitors** [3] - 218:16, 223:4, 223:5
**visits** [2] - 88:12
**voice** [1] - 111:19
**voicemail** [8] - 91:20, 112:2, 112:4, 140:4, 140:6, 140:7, 195:8, 195:9
**volunteered** [1] - 97:24
**vulnerable** [1] - 159:2

---

## W

**wait** [3] - 10:22, 30:9, 230:6
**waited** [1] - 74:2
**waiting** [3] - 30:12, 145:12, 214:15
**waived** [1] - 3:4
**walk** [2] - 161:21, 220:24
**walked** [5] - 51:19, 127:17, 129:2, 129:3, 189:8
**wall** [1] - 158:13
**walraed** [1] - 61:15
**Walraed** [6] - 56:22, 60:16, 61:12, 97:9, 98:5, 193:13
**WALRAED** [1] - 56:22
**wants** [7] - 63:19, 69:12, 91:21, 107:16, 184:1
**warning** [1] - 35:23
**warrant** [2] - 94:8, 94:9
**warranted** [1] - 79:21
**watch** [8] - 38:1, 75:19, 88:24, 98:15, 98:19, 100:14, 116:10, 130:6
**watching** [2] - 34:2, 36:20
**watchman** [1] - 40:7
**ways** [1] - 200:1
**weapons** [1] - 47:5
**Webster** [5] - 93:18, 95:2, 95:4, 95:18, 95:19
**weddings** [1] - 16:17
**Wednesday** [2] - 43:24, 44:5
**week** [11] - 4:23, 6:8, 37:5, 44:3, 54:2, 81:1, 84:11, 90:19, 101:8, 200:4, 221:15
**weekend** [2] - 165:7, 166:10
**weekly** [2] - 62:7, 200:21
**weeks** [7] - 6:16, 7:4, 7:14, 8:8, 27:1, 102:4, 145:21
**weigh** [1] - 74:20
**weight** [2] - 14:22, 19:6
**weird** [1] - 227:8
**well-known** [1] - 168:4
**Wellbutrin** [3] - 12:12, 12:22, 12:24
**Wendy** [5] - 23:8, 23:10, 94:11, 94:20, 95:1
**West** [1] - 39:6
**west** [8] - 39:6, 39:14, 44:16, 50:16, 50:23, 109:13, 186:18
**whatsoever** [1] - 15:5
**whereabouts** [1] - 55:17
**WHEREUPON** [1] - 245:14

whole [15] - 13:7, 51:6, 51:17, 51:18, 90:20, 110:7, 111:1, 116:3, 116:11, 130:18, 152:17, 163:12, 201:20, 235:1, 248:6
wife [5] - 24:5, 66:6, 67:6, 122:22, 125:3
wild [1] - 122:17
willing [6] - 181:17, 202:20, 226:15, 226:17, 226:19, 227:20
window [1] - 218:15
windows [2] - 55:20
wise [1] - 75:13
wished [1] - 112:9
wishes [1] - 156:24
witness [4] - 35:9, 50:15, 248:4, 248:19
WITNESS [19] - 77:18, 103:22, 110:5, 110:8, 110:11, 112:5, 122:12, 128:21, 129:1, 129:3, 154:24, 159:24, 203:20, 204:1, 204:10, 244:10, 244:23, 245:5, 246:1
witnessed [1] - 175:20
witnesses [1] - 245:6
witnesses' [1] - 128:9
witnessing [1] - 186:14
woman [3] - 25:19, 26:15, 48:17
won [1] - 146:14
wonder [5] - 117:7, 124:16, 131:23, 139:10, 141:14
wondered [1] - 132:5
wondering [1] - 113:23
word [3] - 63:23, 74:13, 218:5
wording [1] - 204:22
words [2] - 23:23, 115:23
work-related [3] - 174:20, 174:21, 209:16
worker [2] - 46:20, 122:21
Worker's [15] - 6:1, 10:5, 11:2, 19:24, 173:23, 174:13, 175:24, 199:6, 201:7, 202:9,

203:13, 236:12, 246:10, 246:11, 246:19
worker's [5] - 163:18, 244:14, 245:4, 245:7, 245:10
workers [1] - 23:6
Workman's [15] - 6:2, 7:5, 104:9, 144:22, 148:8, 149:3, 150:11, 157:2, 174:16, 176:2, 177:8, 200:11, 200:14, 201:9, 233:1
workman's [9] - 144:15, 146:14, 201:23, 202:2, 203:5, 203:14, 205:15, 233:7, 245:5
workplace [81] - 30:22, 31:7, 38:7, 47:23, 72:20, 74:1, 75:7, 75:9, 75:12, 76:11, 76:20, 77:6, 77:12, 78:9, 78:14, 78:21, 79:24, 80:11, 81:14, 82:12, 82:23, 83:5, 86:16, 86:20, 86:23, 87:23, 91:15, 92:12, 93:6, 94:1, 102:6, 102:15, 103:8, 103:13, 104:4, 104:24, 105:11, 106:8, 111:22, 114:4, 124:4, 125:12, 125:13, 125:14, 125:16, 125:23, 128:7, 131:9, 131:13, 136:5, 137:15, 137:22, 139:22, 169:9, 169:14, 169:17, 170:11, 174:18, 174:21, 174:23, 174:24, 175:3, 175:9, 175:14, 175:20, 177:12, 179:15, 179:18, 179:23, 180:5, 182:13, 191:2, 191:3, 191:15, 192:3, 193:3, 195:16, 198:21, 207:15, 209:17
Workplace [2] - 120:1, 243:6
works [5] - 64:18, 114:6, 115:12, 160:18, 241:10

worry [2] - 38:3, 49:20
worse [3] - 14:22, 187:16, 189:3
worst [2] - 193:17, 194:14
wring [1] - 136:12
write [27] - 31:14, 34:9, 34:17, 34:18, 34:19, 34:20, 35:16, 35:18, 36:2, 37:3, 37:6, 37:13, 38:2, 45:21, 53:1, 54:13, 54:18, 54:23, 54:24, 55:10, 55:24, 62:11, 132:11, 132:15, 184:23, 186:4, 187:3
write-up [10] - 34:18, 34:19, 34:20, 35:16, 35:18, 37:3, 37:6, 132:11, 132:15, 184:23
writes [1] - 185:18
writing [13] - 31:15, 39:4, 71:15, 78:17, 87:21, 111:6, 119:1, 119:5, 120:1, 137:20, 140:8, 225:10, 226:5
written [30] - 29:3, 29:24, 30:9, 30:15, 30:19, 34:8, 34:12, 34:15, 35:4, 35:7, 45:23, 47:18, 62:9, 65:16, 65:17, 65:19, 65:21, 106:10, 124:9, 124:18, 138:23, 141:18, 152:10, 154:4, 170:14, 183:10, 185:8, 190:21, 215:20
wrongful [1] - 235:12
wrote [16] - 24:12, 37:4, 65:2, 66:10, 66:15, 67:4, 76:11, 86:9, 103:24, 108:7, 125:22, 148:22, 169:9, 215:22, 233:11, 240:10

## X

Xanax [11] - 9:4, 9:15, 9:19, 12:9, 13:23, 13:24, 14:2, 14:9, 157:6, 157:17, 157:18
XL [2] - 12:12, 12:22

## Y

yard [3] - 15:11, 17:13
year [25] - 10:11, 15:9, 16:12, 17:5, 18:3, 18:8, 18:9, 18:16, 58:2, 59:1, 59:3, 95:12, 144:12, 146:11, 152:17, 162:3, 203:6, 204:18, 205:12, 205:14, 205:19, 205:23, 206:9, 222:8, 229:8
yearly [1] - 75:9
years [29] - 12:7, 16:10, 16:23, 17:17, 18:12, 21:17, 21:18, 30:17, 36:16, 40:2, 43:21, 47:11, 86:4, 115:10, 122:24, 127:23, 133:2, 155:22, 162:9, 166:13, 189:20, 189:24, 206:24, 207:3, 215:1, 219:15, 221:20, 226:1
yell [2] - 28:7, 168:8
yelled [2] - 28:7, 82:13
yelling [2] - 26:1, 67:5
yellow [1] - 67:9
YORK [2] - 1:2, 247:1
York [11] - 1:16, 1:18, 2:4, 2:11, 165:13, 199:22, 224:2, 236:12, 243:7, 243:20, 248:3
young [1] - 73:22
yourself [2] - 71:2, 96:2

## Z

Zachary [1] - 21:23
Zoo [2] - 162:2, 165:5
zoo [1] - 166:12
Zyrtec [1] - 159:16