1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

4    JOHN GORMAN,

5                              Plaintiff,

6              -vs-                 Civil Case No 1:14-cv-434

7    RENNSELAER COUNTY, SHERIFF JACK MAHAR,
     ANTHONY PATRICELLI, UNDERSHERIFF PATRICK
8    RUSSO, COUNTY HUMAN RESOURCES MANAGER
     TOM HENDRY, COUNTY EXECUTIVE KATHLEEN JIMINO,
9
                             Defendants.
10
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11

12              EXAMINATION BEFORE TRIAL of

13         INVESTIGATOR ERIKA L. HOCK, held at Law Office of

14         Patrick Sorsby, PLLC, 1568 Central Avenue, Albany,

15         New York on October 28, 2015, commencing at

16         9:09 a.m., before NORA B. LAMICA, Court Reporter

17         and Notary Public in and for the State of New York

18

19

20

21

22

23

24

```
 1    APPEARANCES:

 2    Attorney for Plaintiff:

 3            LAW OFFICE OF PATRICK SORSBY, PLLC
              Attorney at Law
 4            1568 Central Avenue, First Floor
              Albany, New York 12205
 5            (518) 456-4529

 6            BY:  PATRICK SORSBY, ESQ.
                   sorsbylaw@gmail.com
 7

 8    Attorneys for Defendants:

 9            MARTIN & RAYHILL, P.C.
              Attorneys at Law
10            421 Broad Street, Suite 10
              Utica, New York 13501
11            (315) 507-3765

12            BY:  KEVIN G. MARTIN, ESQ.
                   kmartin@martinrayhill.com
13

14    Also Present:

15    John Gorman

16    Undersheriff Patrick Russo

17

18

19

20

21

22

23

24
```

1                          **I N D E X**

2

3                   E X A M I N A T I O N S

                                                          Page

4        INVESTIGATOR ERIKA HOCK

5               Examination by MR. SORSBY              5

6               Examination by MR. MARTIN             37

7

8                      E X H I B I T S

9

No.      Description                            Page

10

11      37    Incident Report                        9

        38    State Police Incident Report           9

12

        39    Town of Schaghticoke criminal          9

13            complaint

14      40    Thomas Hendry notes regarding         23
              conversation with Trooper Hock

15

        41    Order of Protection                   32

16

17

18

19

20

21

22

23

24

```
 1                    S T I P U L A T I O N S

 2

 3              IT IS HEREBY STIPULATED AND AGREED by and

 4     between the attorneys for the respective parties hereto

 5     that filing, sealing and certifications are hereby

 6     waived;

 7              IT IS FURTHER STIPULATED AND AGREED that all

 8     objections, except as to the form of the question, shall

 9     be reserved to the time of the trial;

10              IT IS FURTHER STIPULATED AND AGREED that the

11     within Deposition may be signed before any Notary Public

12     with the same force and effect as though subscribed and

13     sworn to before this Court.

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    I N V E S T I G A T O R   E R I K A   H O C K, having

 2            been called as a witness, being duly sworn,

 3            testified as follows:

 4    EXAMINATION

 5    BY MR. SORSBY:

 6      Q.   Good morning.

 7      A.   Good morning.

 8      Q.   Can you please state your name for the record?

 9      A.   Yes.  My name is Erika Hock.

10      Q.   And Ms. Hock, did your office receive a subpoena

11           in this matter?

12      A.   Yes, we did.

13      Q.   And it was a subpoena to appear?

14      A.   Yes.

15      Q.   And it was a subpoena to produce documents, as

16           well?

17      A.   Correct.

18      Q.   And do you have a copy of the subpoena with you

19           today?

20      A.   Yes, I do.

21      Q.   Before we proceed, just let me give you a few

22           instructions, rules for the road.  Have you been

23           to a deposition before?

24      A.   Not in this format, no.
```

```
 1    Q.    I'm going to ask you a series of questions.  If
 2          the questions aren't clear, ask me to clarify the
 3          question before you answer so that we're clear
 4          and that you're answering the question that I'm
 5          posing to you.  The stenographer cannot record
 6          the nodding of your head, so you'll have to
 7          verbalize your answers.
 8    A.    Okay.
 9    Q.    If at any time you need a break, let me know.  I
10          don't think that's going to be an issue.  This
11          should be relatively short.
12    A.    Okay.
13    Q.    So we were just discussing your receipt of a
14          subpoena to produce documents, and you indicated
15          you have that with you today?
16    A.    The subpoena?
17    Q.    Correct.
18    A.    Yes, I do.
19    Q.    All right.  And we'll talk about that in a little
20          bit, about the documents that were produced in a
21          little bit, but just give us quick -- real
22          briefly -- you're currently employed with who?
23          Can you tell us who?
24    A.    I'm employed by the New York State Police.
```

```
1    Q.   And in what capacity?

2    A.   I'm currently an investigator assigned to the

3         New York State Intelligence Center.

4    Q.   And how long have you served in that capacity?

5    A.   I've been there since November 2014.

6    Q.   And in what capacity did you serve before?

7    A.   I was a road trooper since I started, September

8         2005.

9    Q.   And that's when you first started working for the

10        State Troopers?

11   A.   Correct.

12   Q.   And what did you do before that?

13   A.   I was a physical education teacher.

14   Q.   All right.  Can you tell us the first time -- can

15        you tell us about the first time you became aware

16        of John Gorman?

17   A.   I became aware of John Gorman on February 16,

18        2013, where he entered into the State Police

19        station in Brunswick to report an aggravated

20        harassment complaint to me.

21             MR. MARTIN:  So you're referring to your

22        documents you have open?

23             THE WITNESS:  Yes, I am.

24             MR. SORSBY:  Mr. Martin, is that an
```

```
 1          objection, or are you just asking her to clarify?
 2                    MR. MARTIN:  Normally in a civil case, you
 3          don't -- you're not suppose to refer to your
 4          documents.  I know you do this in a criminal --
 5                    MR. SORSBY:  Mr. Martin, we'll introduce
 6          that as an exhibit and she can refer to it at that
 7          point.
 8                    MR. MARTIN:  You really should have no
 9          documents before you and testify from memory.
10    Q.    So you were just indicating that the first time
11          you met Mr. Martin [sic] was --
12                    MR. SORSBY:  Can you read back -- can you
13          read back the transcript, her answer to the first
14          time she met Mr. Martin [sic], please?
15                    (Whereupon, the requested portion of the
16          transcript was read by Reporter.)
17    Q.    Do you have an independent memory of that event?
18    A.    Sort of, yeah.  I mean, I handle a lot of
19          criminal cases, so it's --
20    Q.    Is there a document that would help you -- would
21          refresh your recollection as to that?
22    A.    It would be my incident report that I completed
23          that evening.
24    Q.    Let's go ahead and get that introduced.  Bear
```

```
 1              with me while I remove the staples.
 2    A.    Sure.
 3                  MR. SORSBY:  I'll have this marked as --
 4              Exhibit 36 was the last one, so this will be
 5              Exhibit 37.  Let's go off the record.
 6                  (Exhibits 37 through 39, inclusive, marked
 7              for identification.)
 8                  MR. SORSBY:  Back on the record.
 9    Q.    Investigator Hock, I'm going to hand you what's
10              been marked as Exhibit 37.
11    A.    Mm-hmm.
12    Q.    Do you recognize what's been marked as
13              Exhibit 37?
14    A.    Yes, I do.
15    Q.    Okay.  Now, ma'am, do you see that there -- in
16              looking at Exhibit 37, there appears to an
17              incident report?
18    A.    Mm-hmm.
19    Q.    And then an arrest report that follows that; is
20              that true?
21    A.    Correct.
22    Q.    And can you tell us -- you indicate you recognize
23              these.  How do you recognize these documents?
24    A.    Because I prepared them, and they're documents
```

```
 1            that I completed.

 2       Q.   Can you do me a favor and just read the incident

 3            report to yourself so we can talk about that?

 4       A.   Mm-hmm.  (Witness complied.)  Okay.

 5       Q.   All right.  Having reviewed the incident report

 6            in this matter, that you indicated you produced,

 7            do you have -- do you now have a recollection of

 8            the time that Mr. Gorman went in and filed the

 9            incident report -- filed the complaint at your

10            office?

11       A.   Yes, I do.

12       Q.   So you indicated earlier, the first time you --

13            can you tell us again the first time you met

14            Mr. Gorman?

15       A.   It was February 16, 2013.

16       Q.   And what happened --  what happened at that time?

17       A.   I brought Mr. Gorman in, and we had a

18            conversation about what had occurred to him, and

19            a conversation that had taken place between him

20            and Anthony Patricelli over the phone.  I took a

21            deposition from him, which he signed, stating the

22            facts of what occurred.

23                 And at that point he didn't want to pursue

24            any criminal charges, and I told him what I could
```

 1          do for him at that time is I could contact

 2          Mr. Patricelli and have him cease any more

 3          contact with him.  And that's what he wanted to

 4          do at that point.

 5     Q.   Now -- and do you believe that that's reflected

 6          in the -- in your -- in what's been marked as

 7          Exhibit 37, that incident report?

 8               MR. MARTIN:  Object to the form.

 9     A.   Yes, it is.

10     Q.   I just want to tell you, as we go, there may be

11          objections to the form of the question.  You can

12          still answer the question, okay?

13     A.   Okay.

14     Q.   I'm going to show you what's been marked

15          Exhibit 38.  Take a chance -- take a few seconds

16          to look at that.

17     A.   Okay.

18     Q.   Do you recognize what's been marked as

19          Exhibit 38?

20     A.   I do.

21     Q.   And how do you recognize it?

22     A.   It's a supporting deposition that I took from

23          John Gorman.

24     Q.   Okay.  And is that the supporting --  the

```
 1              deposition you were referring to earlier?

 2      A.    Yes, it was.

 3      Q.    Okay.  I'll take that back.

 4      A.    Mm-hmm.

 5      Q.    Now, is this the type of document that, in your

 6              capacity as a state trooper, you would normally

 7              keep in the course of ordinary business?

 8      A.    Yes.

 9      Q.    I'm going to also show you what's been marked as

10              Exhibit 39.

11      A.    Mm-hmm.

12      Q.    Do you recognize this document?

13      A.    I do.

14      Q.    And can you tell us how you recognize this

15              document?

16      A.    I prepared it with John Gorman.

17      Q.    And it mentions a supporting deposition.  Is that

18              what's -- the supporting deposition, is that

19              Exhibit 38 that you just looked at?

20      A.    Yes, it is.

21      Q.    I'll take that back from you.

22      A.    Mm-hmm.

23      Q.    And again, Exhibit 39, is this a document you

24              would normally keep in the ordinary course of
```

```
 1          business?

 2     A.   Yes, I would.

 3     Q.   And can you explain -- it indicates on,

 4          Exhibit 39, aggravated harassment in the -- it

 5          appears to be in the third degree.  Can you tell

 6          us why you believe what Mr. Gorman alleged would

 7          meet the requirements for that charge?

 8     A.   Just based on the conversation that Mr. Gorman

 9          and I had, I wasn't one hundred percent sure that

10          it would fit the section.  That's why I notified

11          the Court and submitted a criminal summons for

12          the charge.

13     Q.   Okay.  Can you tell us if a copy of that criminal

14          summons was provided in response to the subpoena

15          in this matter?

16     A.   No, I don't have a copy of that.

17     Q.   You don't have a copy of that?

18     A.   Not of the summons, no.

19     Q.   I'm going to hand you back Exhibit 37.

20     A.   Mm-hmm.

21     Q.   And if you will, if you could just open the first

22          page?

23     A.   Yes.

24     Q.   Now, see at the bottom there's a narrative?
```

```
 1    A.    Mm-hmm.
 2    Q.    Can you tell us, in these incident reports, what
 3          is the purpose of the narrative?
 4    A.    Just to document what occurred in chronological
 5          order.
 6    Q.    And are these incident reports something that you
 7          -- a document you have on you and you fill out
 8          contemporaneously when you have discussions with
 9          individuals?
10    A.    I don't know what "contemporaneously" means.
11    Q.    Do you fill it out while you're speaking with
12          them, or do you have notes that you take this
13          from?
14    A.    Typically I would fill out some of the
15          information, the pedigree information of the
16          person I'm speaking with as I'm speaking with
17          them, but a lot of the -- I would take notes,
18          either on the computer.  And I don't recall if --
19          in this instance if I was actually typing when I
20          was speaking with Mr. Gorman, the narrative, but
21          it would be shortly after our conversation.
22          After he would have left the station, I would
23          make my narrative.
24    Q.    And can you tell us why it might -- why it would
```

1           be important to record these notes as soon as you

2           have a conversation with the deponent?

3    A.     Just so I make sure I have everything in there

4           that we discussed.

5    Q.     Is it important to record those notes as soon as

6           possible after the investigation, or the

7           discussion, I should say?

8    A.     Yes.

9    Q.     And is that a policy with your division of the

10          State Troopers to record notes as soon as

11          possible after having a conversation with an

12          interviewee, as it were?

13   A.     I wouldn't say necessarily a policy.  I'd say

14          it's a good idea.

15   Q.     Now, is this a document that's on a -- again, is

16          it on a computer that you fill out?  Generally

17          speaking, do you have a laptop that you fill this

18          out with or is it like a paper document you can

19          carry?

20   A.     No.  It's a desktop computer.  It's a computer

21          program.

22   Q.     Now, in this case, the discussion with

23          Mr. Gorman, did you take notes and then did you

24          take -- did you transfer them to this form, do

```
1              you know?
2    A.   I don't recall.
3    Q.   All right.  Do you have -- do you know if you
4         have any notes regarding this incident report?
5    A.   I didn't have any in my case folder.
6    Q.   All right.  Let's go and turn to the next page,
7         if you will?
8    A.   Mm-hmm.
9    Q.   Now, I just want to --  for clarification --
10        actually, let's turn back one page.  Do you see
11        where it says, "Walk-in at SP-Brunswick"?
12   A.   Yes.
13   Q.   All right.  And so that's -- that's a -- you're
14        recording a conversation.  Can you tell us who
15        that part -- who this conversation is with?
16   A.   Mr. Gorman.
17   Q.   And that --  the conversation proceeds to the end
18        of this page?
19   A.   Yes.
20   Q.   And if you turn the page over, can you go ahead
21        and read for us that paragraph?
22   A.   It says, "If I had a big enough problem with you,
23        I would come over there and break your jaw.
24        Gorman is fearful for the safety of himself and
```

```
1              his family, but at this time does not wish to

2              pursue criminal charges for aggravated

3              harassment.  Deposition obtained from Gorman."

4        Q.    All right.  Now, that's a conversation you had

5              with Mr. Gorman that you recorded?

6        A.    Correct.

7        Q.    Can you do me a favor and read the next

8              paragraph?

9        A.    Sure.  "I contacted Patricelli via his cellphone,

10             and he advised me he did have a conversation with

11             Gorman last night.  He told him that if he had a

12             big enough problem with him, he could come over

13             and break his fucking jaw.  I advised Patricelli

14             to cease any further contact with Gorman.  He

15             agreed with same."

16       Q.    Now, this conversation that you wrote down and

17             memorialized, who is that conversation with?

18       A.    The second paragraph?

19       Q.    Correct.

20       A.    With Anthony Patricelli.

21       Q.    And the second paragraph, it says, "He told him

22             that if he had a big enough problem with him, he

23             would come over and break his fucking jaw."  Are

24             you quoting -- are you quoting him?  When you
```

1      wrote this down, would this be a quote of what he

2      said?

3   A.   Yes.

4   Q.   All right.  At that time, did you believe that

5      you had enough to file a misdemeanor aggravation

6      charge?

7   A.   No.

8   Q.   Did you believe that you had enough to file any

9      charge?

10  A.   At that point, I wasn't exactly sure, no.

11  Q.   Okay.  Did you understand that what Patricelli

12      told you to be a threat against Mr. Gorman?

13  A.   Yes.

14  Q.   Okay.  And can you tell us why that threat -- why

15      you didn't believe at that time that that threat

16      didn't rise to that level of a charge?

17  A.   Over the course of a few years, the section of

18      aggravated harassment had been discussed within

19      whatever court system, and the section was being

20      changed.  There were certain factors within that

21      law that -- I'm not a lawyer.  I'm just a police

22      officer.

23  Q.   I'm just asking for your understanding.

24  A.   There were certain sections in there where we had

1      notification within the State Police to not

2      pursue an aggravated harassment charge unless

3      something specific occurred, and I can't recall

4      what that was, but at the time I didn't -- I

5      wasn't exactly positive if the court would

6      proceed with the charge.  That's why I submitted

7      a criminal summons.

8   Q.  Okay.  And you said you conferred with a

9       supervisor as to whether or not there was a basis

10      to proceed with a charge?

11  A.  I had --  I didn't contact Sergeant Bacso on the

12      basis of that.  I contacted her just to let her

13      know that both the parties involved were

14      corrections officers, and that is policy with the

15      State Police.

16  Q.  What is policy?

17  A.  To notify a supervisor if any parties were law

18      enforcement or corrections.

19  Q.  We may come back to this.  Can you turn to the

20      next page, please?  Can you tell us, do you

21      recognize this document?

22  A.  Yes, I do.

23  Q.  And how do you recognize this document?

24  A.  It's an arrest report of Anthony Patricelli that

1           I prepared.

2     Q.    All right.  Actually, can I have that back?  We

3           just got that and I didn't have a chance to make

4           copies, so I don't actually have a copy of it.

5     A.    Mm-hmm.

6     Q.    So there came a time when you arrested

7           Mr. Patricelli?

8     A.    Yes, I did.

9     Q.    And what was the nature of that arrest?

10    A.    It was a non-custodial issuance of a criminal

11          summons.

12    Q.    What were the charges?

13    A.    Aggravated harassment.

14    Q.    And this was the arrest relevant to Mr. Gorman's

15          case?

16    A.    Yes, it was.

17    Q.    And was Mr. Patricelli arrested?

18    A.    Yes, he was.

19    Q.    And where was he detained?

20    A.    He wasn't necessarily detained, but I arrested

21          him at his residence.

22    Q.    And then what did you do?

23    A.    Issued him the criminal summons, and got his

24          pedigree information and left.

1    Q.   All right.  Now, I'll give this back to you.

2         It's actually on the incident report.  You'll see

3         that it says "associated persons".  Do you see

4         that in the middle of the document?

5    A.   Yes.

6    Q.   Okay.  Do you see that there's a Ruth Vibert

7         there?

8    A.   Yes, I do.

9    Q.   So what -- in the incident report, what does the

10        associated person's component mean?

11   A.   Basically it's any person that is associated with

12        the case that should be documented in the report.

13   Q.   Can you tell us why Ruth Vibert was an associated

14        person?

15   A.   Ruth was, at the time, the chief of corrections,

16        and it's also policy to notify corrections or,

17        you know, a supervisor of law enforcement of the

18        incident that occurred.

19   Q.   And did you have a conversation with Chief

20        Vibert?

21   A.   I did.

22   Q.   One, two?  How many conversations did you have

23        with her?

24   A.   I had one on the --  can I refer back to the

```
 1          date?
 2   Q.     Well, we've introduced it as an exhibit.  Yes.
 3   A.     I contacted her on the evening of February 16th.
 4   Q.     Okay.  And where did you reach her at?
 5   A.     On her cellphone.
 6   Q.     And how did you get that cellphone number?
 7   A.     I think we had it in our system from previous
 8          contacts with her.
 9   Q.     All right.  And can you tell us about the
10          conversation?
11   A.     I just advised her of the complaint that
12          Mr. Gorman had made against Anthony Patricelli.
13   Q.     And what did she say?
14   A.     That she was going to handle it on her end.
15   Q.     All right.  So that's one conversation.  Did you
16          have any other conversations with her?
17   A.     I used to see her every once in a while.
18   Q.     Did you have another conversation regarding this
19          matter?  Was there a followup?
20   A.     I don't recall.
21   Q.     Did you ever talk to the Rensselaer County
22          District Attorney regarding this matter, or
23          anybody in the Rensselaer County District
24          Attorney's office?
```

```
1    A.   No, I don't recall that I did.

2    Q.   Do you know what became of the charges against

3         Mr. Patricelli, that were filed against him, at

4         least with you?

5    A.   I do not.

6    Q.   Now, just for the uninformed.  When a State

7         Trooper files a criminal complaint, is it the

8         district attorney that prosecutes those?

9    A.   I'm assuming, or an ADA.

10   Q.   All right.  I just wanted to be clear on that.

11        Do you know who a Thomas Hendry is?

12   A.   No, not off the top of my head.

13             MR. SORSBY:  I'm going to have this marked

14        as an exhibit, which would be, at this point, 39.

15             MR. MARTIN:  40.

16             MR. SORSBY:  I was looking at 39, so this

17        would be 40.  Off the record a minute.

18             (Discussion off the record.)

19             (Exhibit 40 marked for identification.)

20             MR. SORSBY:  Back on the record.

21   Q.   I'm going to show you what's been marked as

22        Exhibit 40, okay?

23   A.   Mm-hmm.

24   Q.   Can you just read the top sentence for us?
```

1    A.    "Trooper Hock, 7/15, 12:30."

2    Q.    You can continue to read it.

3    A.    "No written statement made by" --  I don't know

4          what that says.

5    Q.    Do your best.

6    A.    Jeez.  "No written statement made by AP.  She is

7          reluctant to provide any notes because the case

8          is outstanding.  Didn't want to be involved in

9          this case."  Oh, okay.  I know who he is.  Is it

10         Patricelli's attorney, I'm assuming?

11   Q.    Well, let's -- having read Exhibit 40, do you

12         recall -- I'll tell you.  Thomas Hendry is the

13         human resources director for Rensselaer County.

14   A.    Okay.

15   Q.    You spoke to Ruth Vibert.  Do you have a

16         recollection of speaking to somebody else from

17         the county regarding this matter?

18   A.    I don't recall honestly, no.

19   Q.    Do you see on Exhibit 40, it says, "Troop G"?

20   A.    Mm-hmm.

21   Q.    Is that the number to Troop G?

22   A.    That's to the front desk over at Latham.

23   Q.    And you're an investigator now, but when you were

24         employed as a rural patrol person, were you at

```
 1           Troop G?
 2    A.     Oh, actually this is the number to -- 786-3211,
 3           that's NYSIC.  What?
 4    Q.     Do you recognize any of these phone numbers?
 5    A.     I do.
 6    Q.     And how do you recognize these phone numbers?
 7    A.     One is my cellphone, one is --  I believe that's
 8           communications, that 477-9333 over at Latham.
 9    Q.     And is -- your cellphone, how is that given out,
10           can you tell us?
11    A.     I don't know who gave my cellphone number out.
12    Q.     That's not something somebody could typically --
13    A.     No.  It's a private cellphone number.
14    Q.     All right.  Okay.  But having read that, and
15           telling you who Thomas Hendry is, at this moment
16           you don't have a recollection of having a
17           conversation with him?
18    A.     No, I don't.
19    Q.     And other than Ruth Vibert and Mr. Patricelli and
20           Mr. Gorman himself, do you have a recollection of
21           having a conversation about this matter with any
22           other person?
23    A.     There was another trooper that was -- that had
24           given me a phone call actually.
```

1    Q.   And what was that trooper's name?

2    A.   Janelle Waite (phonetic).

3    Q.   And who is Janelle Waite, do you recall?

4    A.   I believe at the time of this incident, she was

5         dating Anthony Patricelli or somehow involved.

6    Q.   What did she -- she called you?

7    A.   She did call me.

8    Q.   Okay.  And she called you on your cellphone?

9    A.   Yes.

10   Q.   Okay.  And what did she say to you?

11   A.   She was inquiring about the complaint that

12        Mr. Gorman had made against Patricelli, and how

13        we could -- it was the night that I tried to make

14        contact with Patricelli to serve the criminal

15        summons on him.  And it was -- she just wanted to

16        know information on what the complaint was, and I

17        just let her know I was trying to get ahold of

18        Patricelli to serve the criminal summons.

19   Q.   Now, at that time, did you know that

20        Trooper Waite was in a relationship with the

21        accused?

22   A.   I wasn't exactly sure, but I came to the

23        conclusion.

24   Q.   Based on what?

```
 1    A.   Based on Facebook pictures and posts, whatnot,
 2         stuff like that, talk amongst people.
 3    Q.   Okay.  So part of your recollection is based on
 4         Facebook posts before this conversation you're
 5         referring to?
 6    A.   Yeah.  Yeah.
 7    Q.   All right.  Now, there are certain policies that
 8         State Troopers have, correct, in terms of
 9         guidelines and in terms of communication
10         regarding ongoing cases; is that true?
11    A.   Is there a policy?
12    Q.   Yes.
13    A.   I'm assuming.  I mean, yes, there is.
14    Q.   Did you -- now, you stated that you had the
15         understanding that she was in a relationship with
16         the accused.  Did you think it was improper for
17         her to inquire about the case because she had a
18         relationship with the accused?
19    A.   Yes.  I was actually very upset about it.
20    Q.   And did you tell her that?
21    A.   I did not.
22    Q.   What did you do about that?
23    A.   I didn't do anything about it.  I was just -- I
24         was inside upset, the fact that she had the nerve
```

1    to contact me on my personal cellphone in regards

2    to an issue that -- if she wanted to know what

3    the situation was, she had access to the State

4    Police records.  She could have looked this

5    information up herself instead of contacting me

6    direct.

7  Q. And did you go to -- did you talk to any of your

8    superiors about this?

9  A. I don't believe so.

10  Q. Did you talk to anybody about that incident?

11  A. My spouse I did.

12  Q. Other than that?

13  A. No.

14  Q. Now, was that the only time Ms. Waite talked to

15    you about this matter?

16  A. Yes.

17  Q. So other than Ms. Waite and Mr. Patricelli and

18    Mr. Gorman, was there anybody else you spoke to

19    about this incident?

20  A. I think just other troopers at my station, but

21    that's common to discuss cases.

22  Q. All right.  And did you have any conversations

23    with Sheriff Mahar about this incident?

24  A. I don't believe so.

```
 1    Q.   Just to be clear, I'm talking about then or any
 2         time subsequent to that?
 3    A.   I don't recall.
 4    Q.   And did you have any conversations with
 5         Undersheriff Russo --
 6    A.   No.
 7    Q.   Let me finish the question.  Any conversations
 8         with Undersheriff Russo regarding this incident,
 9         then or subsequent to that?
10    A.   No.
11    Q.   Do you --  now, can you just --  Trooper Waite,
12         she is -- she was stationed at your barracks?
13    A.   At the time, I don't believe she was.
14    Q.   Okay.  All right.  Do you have a recollection of
15         where she might have been?
16    A.   I believe she was at the academy.  She was
17         temporarily at the academy as an academy training
18         officer, but I think her permanent station was in
19         Columbia County.
20    Q.   And do you have --  do you know if Ms. Waite
21         tried to get the charges dropped -- the complaint
22         dropped against Mr. Patricelli?
23    A.   I have no idea.
24    Q.   Now, if you take a look at this exhibit here?
```

```
1              Again, this is Exhibit 37.

2    A.    Mm-hmm.

3    Q.    You've had a chance to look through the whole

4          thing, correct?

5    A.    Yes.

6    Q.    This is what was produced by your counsel's

7          office in regards to the federal subpoena.  And

8          having read -- you had a chance to read the

9          subpoena yourself?  Did they give you the

10         subpoena?

11   A.    Yes.

12   Q.    Okay.  And the subpoena says, "All documents,

13         stored media including e-mails, voice recordings,

14         notes or conversation logs relating or pertaining

15         to any conversation with Mr. Patricelli or any

16         individual regarding John Gorman."  You read

17         that, and this is all the documents that you

18         have?

19   A.    In this exhibit?

20   Q.    Correct.

21   A.    No.  I faxed over the supporting deposition, as

22         well as the criminal complaint, as well as the

23         Order of Protection that was issued by the

24         Schaghticoke court.  I faxed all that information
```

```
1              over to my counsel yesterday.
2      Q.      That was the supporting deposition, which we've
3              already looked at, the criminal complaint, and
4              the Order of Protection, correct?
5      A.      Correct.  Actually, I scanned it and e-mailed it.
6              I didn't fax.
7      Q.      I'll have to call Mr. Maley and see what the
8              situation is with that.
9                      Since you brought it up, I'll just -- we
10             will go ahead and introduce that, the Order of
11             Protection.
12                     So while we're pulling that up, other than
13             what we just described and the documents you
14             described in addition to what's in Exhibit 37,
15             were there any other documents?
16     A.      No.  Two fax cover sheets.  Those are the other
17             documents, but I don't know if those pertain.
18     Q.      That goes into details.  Fax cover sheets to who?
19     A.      I submitted the paperwork to the Rensselaer
20             County DA's office.  One was the cover sheet I
21             filled out, and the other was the response that
22             the transmission went through.
23     Q.      So two sheets.  Okay.
24     A.      Correct.
```

```
 1    Q.   I'll reach back out, because we may indeed want

 2         those.

 3    A.   Mm-hmm.

 4              MR. SORSBY:  We will have this marked as

 5         Exhibit 41, Order of Protection.

 6              (Exhibit 41 marked for identification.)

 7    Q.   I'm going to hand you what's been marked

 8         Exhibit 41.

 9    A.   Mm-hmm.

10    Q.   Do you recognize this document?

11    A.   Yes, I do.

12    Q.   And how do you recognize this document?

13    A.   I received this -- a copy of this from

14         Judge Arnold of the Schaghticoke court.

15    Q.   And what was this in response to?  Why did you

16         receive this document?

17    A.   It's typical for the courts to give the arresting

18         officer, the investigating officer, a copy of the

19         Order of Protection in a case in which they

20         filed.

21    Q.   Okay.  Who is "they"?

22    A.   The courts.  The Judge.

23    Q.   When you say "they filed", filed what, the Order

24         of Protection?
```

1    A.    What do you mean "they"?

2    Q.    You said that they filed?

3    A.    That the court completed -- that the Judge

4          completed the document.

5    Q.    All right.  So just so I understand the procedure

6          here -- and again, I'm not really a criminal law

7          attorney.  You --  there was an arrest report,

8          but Mr. Patricelli wasn't arrested, he was issued

9          an appearance ticket to appear at a later date?

10   A.    It's considered an arrest, a non-custodial

11         arrest, but he was issued a criminal summons, an

12         appearance ticket.

13   Q.    For a future date?

14   A.    For the charge, correct.

15   Q.    And you're saying that -- well, is it the policy

16         of the court to then issue what would be a

17         temporary Order of Protection?

18   A.    Depending on the case, if the Judge feels that

19         there's enough of a threat that an Order of

20         Protection needs to be issued, then they will

21         issue.  If they don't believe it, then they don't

22         issue.

23   Q.    And you understand that that's what Judge Arnold

24         issued in this case?

```
1    A.   Yes, I do.

2    Q.   All right.  Let me just see that back real quick.

3         I want to make sure I'm looking at the right

4         document.

5              MR. SORSBY:  I'm going to just go off the

6         record for one second.

7              (Discussion off the record.)

8              MR. SORSBY:  We're back on.

9    Q.   And did you mail a copy of this Order of

10        Protection to Mr. Gorman?

11   A.   Yes.

12   Q.   So the steps were, you received this from the

13        court and then you just mail it?

14   A.   Or issue it, hand it to them in person.

15   Q.   All right.

16             MR. SORSBY:  I'm going to take a

17        thirty-second break and I think we're going to

18        wrap this up.

19             (Whereupon, a brief recess was taken.)

20             MR. SORSBY:  Back on the record.

21   Q.   Investigator Hock, the last time we were on the

22        record, we were talking about the Order of

23        Protection.  Having sent the Order of Protection

24        to Mr. Gorman, did you contact the county with
```

1          the Order of Protection?

2     A.   I don't recall.

3     Q.   Do you recall sending this to the county, as

4          well?

5     A.   I don't.  I don't recall it.

6     Q.   All right.  Did you subsequently speak to

7          Mr. Patricelli regarding the Order of Protection?

8     A.   No.

9     Q.   Did you send a copy to Mr. Patricelli?

10    A.   No.

11    Q.   Other than Mr. Gorman, who did you send the Order

12         of Protection to?

13    A.   I don't believe anybody.

14    Q.   Okay.  Let me take this back from you real quick.

15    A.   Mm-hmm.

16    Q.   Now, Trooper Hock, the incident report you filed

17         in this matter, which is the first page --

18         second page of Exhibit 37, you submitted -- I

19         think you indicated you submitted this to the

20         court, is that correct, the incident report?

21    A.   I don't believe I submitted that to the court,

22         no.

23    Q.   All right.  What, if any, information did you

24         submit to the court?

```
 1    A.   The supporting deposition, as well as the signed
 2         criminal complaint and maybe a sticky note that
 3         says "requesting criminal summons" on it.
 4    Q.   And so it was based on those documents that the
 5         arrest, the warrant for arrest, was issued?
 6    A.   The criminal summons, yes.
 7    Q.   And again, that was what we marked as Exhibit 39?
 8    A.   Correct.
 9    Q.   All right.  And you submitted both of these
10         documents, 39 and 38, which is the supporting
11         deposition?
12    A.   Yes, I did.
13    Q.   And in order for the Judge to order an arrest
14         warrant, he made a determination that there was
15         probable cause?
16    A.   Yes.
17    Q.   Probable cause that the underlying charge was
18         committed?
19    A.   Correct.
20    Q.   And again, just for clarification, what was the
21         underlying charge again?
22    A.   Aggravated harassment.
23    Q.   All right.  So although you were not sure that
24         there was sufficient facts to go forward, the
```

```
 1            court in this matter felt that there was probable

 2            cause?

 3      A.    Yes.

 4                  MR. SORSBY:  You're all done today.

 5                  MR. MARTIN:  I have a couple questions.

 6   EXAMINATION

 7   BY MR. MARTIN:

 8      Q.    In one of the exhibits, it indicates that you

 9            called Mr. Patricelli on his cellphone.  Do you

10            recall that?

11      A.    Yes.

12      Q.    And you were trying to serve the ticket on him,

13            correct?

14      A.    Yes.

15      Q.    How did you get his cellphone?

16      A.    I don't initially recall how I got his cellphone.

17      Q.    Did you know Mr. Patricelli prior to February 16,

18            2013?

19      A.    No, I did not.

20      Q.    You had never been out on any -- I forget what

21            the term is, but I think there was a task force

22            that sometimes the sheriffs and troopers worked

23            together on.  You had never been out on any

24            calls --
```

```
1    A.   No.  I may have met him inside the jail, dropping
2         off a prisoner, but not that I would remember.
3    Q.   Okay.  And it was two-and-a-half years ago when
4         this incident occurred.  As you sit here today,
5         is there anything, other than what's written in
6         your reports, that you can recall about your
7         conversations that you haven't already talked
8         about to Mr. Sorsby today?
9    A.   No.
10   Q.   You don't have any other independent
11        recollections other than what you've talked about
12        today?
13   A.   Correct.
14             MR. MARTIN:  Thank you.
15             MR. SORSBY:  Thank you.  We really
16        appreciate you coming today.
17             (Whereupon, the Examination concluded at
18        10:05 a.m.)
19
20
21
22
23
24
```

```
1   STATE OF NEW YORK

2   COUNTY OF_____

3

4        I have read the foregoing record of my testimony

5   taken at the time and place noted in the heading hereof

6   and I do hereby acknowledge it to be a true and correct

7   transcript of the same.

8

9

10                              _____

11                              INVESTIGATOR ERIKA HOCK

12

13

14  Sworn to before me this

15  _____ day of _____, 2015.

16

17

18  _____

19  Notary Public

20

21

22

23

24
```

```
 1                  C E R T I F I C A T I O N

 2

 3          I, NORA B. LAMICA, a Shorthand Reporter and

 4     Notary Public within and for the State of New York, do

 5     hereby CERTIFY that prior to being examined, the witness

 6     named in the foregoing deposition was duly sworn to

 7     testify the truth, the whole truth, and nothing but the

 8     truth.

 9          That said deposition was taken down by me in

10     shorthand at the time and place therein named and

11     thereafter reduced by me to typewritten form and that the

12     same is true, correct, and complete of said proceedings.

13          Before completion of the deposition, review of the

14     transcript was requested.  If requested, any changes made

15     by the deponent (and provided to the reporter) during the

16     period allowed are appended hereto.

17          I further certify that I am not interested in the

18     outcome of this matter.

19          Witness my hand this 18th day of November, 2015.

20

21                    ---------------------------

22                    NORA B. LAMICA

23

24
```