1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    * * * * * * * * * * * * * * * * * *

4    JOHN GORMAN,

5                          Plaintiff,

6         -vs-                Civil Case No 1:14-cv-434

7    RENNSELAER COUNTY, SHERIFF JACK MAHAR,
     ANTHONY PATRICELLI, UNDERSHERIFF PATRICK
8    RUSSO, COUNTY HUMAN RESOURCES MANAGER
     TOM HENDRY, COUNTY EXECUTIVE KATHLEEN JIMINO,
9
                          Defendants.
10
     * * * * * * * * * * * * * * * * * *
11

12              EXAMINATION BEFORE TRIAL of THOMAS HENDRY,

13         held at Law Office of Patrick Sorsby, PLLC,

14         1568 Central Avenue, Albany, New York on

15         November 13, 2015, commencing at 9:43 a.m., before

16         NORA B. LAMICA, Court Reporter and Notary Public

17         in and for the State of New York

18

19

20

21

22

23

24

```
 1    APPEARANCES:

 2    Attorney for Plaintiff:

 3            LAW OFFICE OF PATRICK SORSBY, PLLC
              Attorney at Law
 4            1568 Central Avenue, First Floor
              Albany, New York 12205
 5            (518) 456-4529

 6            BY:  PATRICK SORSBY, ESQ.
                   sorsbylaw@gmail.com

 7

 8    Attorneys for Defendants:

 9            MARTIN & RAYHILL, P.C.
              Attorneys at Law
10            421 Broad Street, Suite 10
              Utica, New York 13501
11            (315) 507-3765

12            BY:  KEVIN G. MARTIN, ESQ.
                   kmartin@martinrayhill.com

13

14    Also Present:

15    John Gorman

16

17

18

19

20

21

22

23

24
```

1

2                        <u>I N D E X</u>

3                   E X A M I N A T I O N S

4                                              Page

5       THOMAS HENDRY

6            Examination by MR. SORSBY          6

7

8                      E X H I B I T S

9       <u>No.</u>   <u>Description</u>                    <u>Page</u>

10      70    Trooper Hock's notes             109

11      71    Letter from Thomas Hendry to     111
              Sheriff Mahar

12      72    Series of handwritten notes      114
              by Thomas Hendry

13      73    E-mail from Thomas Hendry        124
              to Richard McNally 6/26/13

14      74    E-mail from Rita Romani 7/3      124

15      75    FOIL request from Mr. Gorman     137

16      76    Appeal letter from Mr. Gorman    137

17      77    Hendry response to Gorman        138

18      78    Workplace violence complaint 2013  152

19      79    Letter from T. Hendry to J. Gorman  158
              dated 2/13/14

20      80    Rejection of a FOIL request by   160
              Mr. Kehoe

21      81    Letter to Mr. Hendry from        160
              Sergeant Ryan dated 3/27/14

22

23

24

1    82      Certificate of eligibles                    172

2    83      Certificate of eligible list 79-155         181

3    84      Request for a hearing for                   190
             non-compliance by the county
4            Workers' Compensation program

5

6
                   R E Q U E S T S

7

8    Description                                         Page

9    Copy of the investigative notes or                  53
     the termination of that investigation,
10   specifically cases involving verbal
     threats
11

12

13

14

15

16

17

18

19

20

21

22

23

24

S T I P U L A T I O N S

           IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective parties hereto
that filing, sealing and certifications are hereby
waived;

           IT IS FURTHER STIPULATED AND AGREED that all
objections, except as to the form of the question, shall
be reserved to the time of the trial;

           IT IS FURTHER STIPULATED AND AGREED that the
within Deposition may be signed before any Notary Public
with the same force and effect as though subscribed and
sworn to before this Court.

```
 1    T H O M A S   H E N D R Y, having been called as a
 2          witness, being duly sworn, testified as follows:
 3    EXAMINATION
 4    BY MR. SORSBY:
 5      Q.   Please state your name for the record?
 6      A.   Thomas C. Hendry.
 7      Q.   Have you been to an examination before trial
 8          before?
 9      A.   Yes.
10      Q.   I'm going to ask you a number of questions today,
11          and I usually give instructions to every
12          deponent, part of which includes, I require -- I
13          request you verbalize all your answers to my
14          questions.  The stenographer can't record you
15          shaking your head, okay?
16      A.   Yes.
17      Q.   If you do not understand a question, make sure
18          you understand it before you give an answer.  So
19          you can have me repeat the question if you don't
20          understand it.
21      A.   Yes, sir.
22      Q.   To the extent that you need a break, please
23          indicate so.  If I'm in the middle of a question,
24          I just ask that you let me finish the question
```

```
1              and you answer it before you take a break.  Good
2              enough?
3    A.   Yes.
4    Q.   There may be an occasion that your attorney may
5              object to the form of the question.  He's
6              permitted to do so, and there may be a rare
7              circumstance in which he instructs you not to
8              answer the question.  Obviously you would listen
9              to your attorney, and myself and him may have
10             subsequent discussions on that.  But generally
11             speaking, there may be objections, and I'll
12             instruct you to answer the question.  Unless your
13             attorney advises you otherwise, you'll have to
14             answer the question.
15   A.   Yes, sir.
16   Q.   Do you understand these instructions?
17   A.   I do, sir.
18   Q.   Let's get underway.  Mr. Hendry, can you tell us
19             a little about your educational background,
20             starting with where or if you went to college?
21   A.   I attended Southern Vermont College.
22   Q.   When did you attend that college?
23   A.   I left in 1980.
24   Q.   And what degree were you seeking?
```

```
 1    A.   This is a long story, but I believe I have a
 2         degree.  I just don't have it in hand.  I
 3         graduated in 1980 with a degree in business
 4         management.  I finished my studies over the
 5         summer and never received the degree.
 6    Q.   Did you resume your college educational studies
 7         after that?
 8    A.   No.
 9    Q.   That's the only degree you have?
10    A.   Correct.
11    Q.   How long did you attend -- how many years did you
12         attend in that program?
13    A.   Four years.
14    Q.   And you didn't get --  I'm confused.  You didn't
15         get a degree?
16    A.   No.
17    Q.   Business management, can you tell us what that
18         included?  Do you recall the courses?
19    A.   Accounting, marketing, general psychology,
20         sociology courses.
21    Q.   Did it include human resources courses?
22    A.   I think it might have, yes.
23    Q.   Do you know for sure that it did?
24    A.   I don't, no.
```

```
 1    Q.   Let's talk --  and so let's talk about your work

 2         history.  Where is the first place you worked,

 3         outside of jobs during the summer?

 4    A.   You mean after college so to speak?

 5    Q.   Correct.

 6    A.   I took some odd jobs before working for the

 7         county.  I've been with the county since 1981.  I

 8         sold shoes and worked at a big box store,

 9         Caldor (phonetic).  It used to be down the street

10         here.

11              I started working for the county in 1981 in

12         the department of social services.  I was a

13         social welfare examiner.  I worked there for

14         approximately three or four months.  I then went

15         to work for the civil service commission in 1981.

16    Q.   What did you do there?

17    A.   I was a personnel technician.

18    Q.   What does that position do?

19    A.   It's generally dealing with municipalities in

20         determining their cooperation with civil service

21         law, payroll processing, payroll certifications.

22         Basically whatever the commission assigned me to

23         do.

24    Q.   Is this the county civil service or New York
```

```
 1            State?

 2    A.    County.

 3    Q.    In Rensselaer County?

 4    A.    Yes.

 5    Q.    Did you say --  were you going to say something?

 6    A.    No.

 7    Q.    If you need to clarify your testimony at any

 8          point, you may.

 9    A.    Okay.

10    Q.    Did you say you advised the civil service

11          commission or you worked with them?

12    A.    I worked with them.  I was not an advisor.

13    Q.    What are some of the things you did?

14    A.    Certification of payrolls, processing personnel

15          change forms.

16    Q.    Did you work on certifications of lists?

17    A.    Yes.  Yes.

18    Q.    Did you, yourself, ever certify a list?

19    A.    No.

20    Q.    And what did you -- you said you did -- you

21          assisted in certification.  What did you do in

22          that capacity?

23    A.    I would put material together in order for the

24          commission to establish an eligible list,
```

```
 1              reviewing applications.
 2     Q.   And at that point, did you become familiar with
 3          the rule of three?
 4     A.   Yes.
 5     Q.   What did you understand the rule of three to mean
 6          at that point?
 7     A.   That an appointing authority should choose from
 8          among the top three acceptors on an certificate
 9          of eligible lists -- list.
10     Q.   Do you understand that to include the top persons
11          or top three tiers of --
12     A.   Persons.
13     Q.   Okay.  And so when we talk about the list, is
14          that -- can you tell us what differentiates one
15          person -- I'm going to ask you questions that may
16          seem obvious at times.  Let me just say that
17          first.  Nonetheless, I need your answer.  Can you
18          tell us what differentiates a person on a list?
19     A.   Their score.
20     Q.   And their score is based upon a test that they
21          take?
22     A.   Correct, yes.
23     Q.   And so the scores are generally -- can you give
24          us the range, what they would be from?
```

```
 1    A.    100, 95, 90.  They're generally in blocks of
 2          five.
 3    Q.    When you say blocks of five, can you explain
 4          that?
 5    A.    Scores are given to the local commission by the
 6          state, who scores examinations.  When they come
 7          back, they're generally in tiers of five.  A
 8          group will have 100, a group will have 95, a
 9          group will have 90.
10    Q.    Test applicants?
11    A.    Yes.
12    Q.    And can you explain to us, based on your
13          knowledge of the civil service law -- and we can
14          talk more about this, because you probably have
15          more experience after that, but can you tell us
16          what happens when you have a person that scores
17          95, and another person scores 90, and then you
18          have thirty people that score 85?
19    A.    That would be the top three.  The 90, the 85 and
20          the thirty.
21    Q.    In that case, a hiring official could pick
22          somebody from the list of 85?
23    A.    Yes.
24    Q.    So when you say people, in a sense it's not one,
```

```
 1              two, and the third person, it could be a whole

 2              series of people in that one score set; is that

 3              true?

 4      A.     Yes, it is.

 5      Q.     All right.  So let's go back to where we were.

 6              How long were you a personnel technician?  Is

 7              that the correct term?

 8      A.     Yes.

 9      Q.     How long were you a personnel technician?

10      A.     Sixteen years.

11      Q.     And are there gradations in that position, tiers?

12      A.     Yes.

13      Q.     And what level did you start at?

14      A.     Personnel technician trainee, personnel

15              technician, senior personnel technician.

16      Q.     And what are the job requirements of just a

17              personnel technician?

18      A.     Just as I described before.  They don't change

19              much.  It's a very small office.

20      Q.     Now, is that a position that you have to take a

21              test for?

22      A.     Yes.

23      Q.     Do you recall what your score was?

24      A.     No.
```

1   Q.   And do you remember what the minimum requirements

2        for the position were?

3   A.   No, I don't.

4   Q.   Are there minimum requirements for the position?

5   A.   I'm assuming, yes.

6   Q.   I don't want you to assume.  Do you know?

7   A.   I do know, but I do not know what they are.

8   Q.   Okay.  And then for the senior personnel

9        technician, did you have to take a test for that?

10  A.   Yes.

11  Q.   And do you recall what the score was for that?

12  A.   No, I do not.

13  Q.   Can you tell us the difference between the

14       technician and senior technician by way of their

15       responsibilities and duties?

16  A.   I would think the responsibilities -- well, in

17       this particular case, I can tell you what

18       happened.  When I was a personnel technician, and

19       this was in the early '80s, the commission had an

20       executive secretary.  The executive secretary

21       passed away.  I was promoted to senior to

22       supervise the office more.

23  Q.   So you took on a supervisory capacity?

24  A.   Yes.  More so, yes.

```
 1    Q.   Now, did you have -- you said you had to take a

 2         test, though, to become a senior?

 3    A.   Yes.

 4    Q.   And there became -- there was a need for a

 5         supervisor in that office?

 6    A.   Yes.

 7    Q.   How quickly did you take the test after the need

 8         became prevalent?

 9    A.   I don't recall.  I don't recall.  I was probably

10         a provisional appointee for a period.

11    Q.   And the -- other than the supervisory component,

12         the requirements for the senior technician

13         position versus the technician position, are they

14         different?

15    A.   I recall the responsibilities on the job as being

16         pretty much the same.

17    Q.   So how long were you a senior technician in that

18         capacity?

19    A.   I'm thinking probably ten years.

20    Q.   Now, as a technician, you had indicated that you

21         didn't do the certification of lists.  Did

22         that -- as the senior technician, did you certify

23         lists?

24    A.   No.  I don't believe I've ever certified a list.
```

```
 1    Q.   Who do you understand certifies the lists?

 2    A.   The commission.

 3    Q.   How many people were you responsible for as the

 4         senior technician?

 5    A.   In the office?

 6    Q.   Correct.

 7    A.   I would guess three or four people.

 8    Q.   All right.  And I may have asked this.  How long

 9         were you a senior technician?

10    A.   I'm thinking ten years.  I'm an old timer.  My

11         memory is not what it used to be.

12    Q.   Which position were you in longer, the senior

13         technician or the technician?

14    A.   The senior.

15    Q.   At one point you left that position.  Do you know

16         what year that was?

17    A.   I'm throwing this out there.  Probably the

18         mid-'90s.

19    Q.   And you left that position.  Why did you leave

20         that position?

21    A.   I was given the position of associate personnel

22         technician.

23    Q.   Associate personnel technician?

24    A.   Yes.
```

```
 1    Q.    Is that a demotion from the senior technician?

 2    A.    No.

 3    Q.    Did you have to take a test for that?  You said

 4          appointment.

 5    A.    I think I took a test.  I'm not going to say

 6          definitively yes or no.  I don't remember.

 7    Q.    Let me backup.  As a senior technician, who did

 8          you report to?  Who was your supervisor?

 9    A.    The civil service commission.

10    Q.    And as associate personnel technician?

11    A.    The same.

12    Q.    I'm trying to figure out the steps here.  What's

13          the next step after associate personnel

14          technician?

15    A.    I don't know.  For me -- for me personally, the

16          county executive hired a --  in 1997 -- I'm

17          trying to be historical here to the best of my

18          ability.  In 1997, the county went from a civil

19          service commission to a personnel officer form of

20          civil service administration.

21    Q.    Now, personnel officer, is that an HR director?

22    A.    It's more of a civil service officer.

23    Q.    Okay.  All right.

24    A.    So the county executive at the time hired someone
```

1          from outside as the personnel officer, and I was

2          made deputy personnel officer.  And I'm thinking

3          that was 1997.

4     Q.   So you went from associate to deputy?

5     A.   Correct.  Yes.

6     Q.   But were you ever the personnel officer?

7     A.   No.  No, I was not.  Now, the personnel officer,

8          if you're familiar with civil service law, and I

9          expect you probably are, has the same authority

10         and responsibility as the commission.

11    Q.   Just we're going to fast-forward.  Who is the

12         commission or civil service officer now?

13    A.   It's the civil service commission.

14    Q.   It's one in the same?

15    A.   They went back to the commission form.  I think

16         that happened in 2002.

17    Q.   Gotcha.  All right.

18    A.   From '97 to 2002, they had a personnel officer.

19         In 2002, the commission came back.

20    Q.   Now, during that time as the -- when you had the

21         supervisory -- well, let me ask you this.  The

22         associate personnel technician position, was that

23         a supervisory capacity?

24    A.   Yes.

```
 1     Q.    And then the deputy personnel technician,

 2           supervisory capacity?

 3     A.    Not so much.

 4     Q.    Now, did you continue to have input into the list

 5           certification?

 6     A.    As deputy?

 7     Q.    Well, let's start with the associate personnel

 8           technician?

 9     A.    I was involved in the process.  I mean, from when

10           I started to -- right through the change in

11           titles, my responsibilities did not change much.

12           As I say, the office is small and it just didn't

13           change much.

14     Q.    All right.  And then let's just -- real quick,

15           when did you leave your position as the deputy

16           personnel technician?

17     A.    2002.  Deputy personnel officer?

18     Q.    Yes.

19     A.    2002.

20     Q.    Where did you go then?

21     A.    I became the human resources director.

22     Q.    I just want to stay -- I went to delve into your

23           knowledge and experience of civil service law.

24           It looks like you had at least twenty years
```

```
 1            experience in civil service?
 2     A.     I'd say so.
 3     Q.     Can you tell us what you understood -- I want to
 4            talk about what happens when a person that has
 5            taken a test, and has gotten a score and is part
 6            of a list, has taken another position with the
 7            county and is no longer eligible for the list.
 8            What's the process to be implemented?
 9     A.     Somebody takes another position?
10     Q.     Correct.
11     A.     And they're no longer eligible on the list?
12     Q.     Correct.
13     A.     Have they been appointed from that list?
14     Q.     I'm just asking if they haven't been appointed?
15     A.     If they haven't been appointed, then they would
16            stay on the list.
17     Q.     Even if they've taken another position?
18     A.     Yes.  Now, that would be in the case -- there are
19            two types of lists, open-competitive and
20            promotional.  If it's an open-competitive list,
21            you're going to stay on the list.  If you're on a
22            promotional eligible list, you're no longer
23            eligible because you're no longer in a position
24            from which you may promote.
```

```
 1              For example, if you're in -- you're in --
 2         we'll use the sheriff's department.  If you're in
 3         the sheriff's department and you're a clerk, and
 4         you go to another department as a typist, and
 5         you're on the senior clerk in the sheriff's
 6         department promotional list, you can't promote
 7         because you're no longer there, if that explains
 8         that.
 9    Q.   It explains some of it, yes.  We may come back on
10         that.
11              Let's talk -- you said in 2002 you started
12         -- you began working with the human resources
13         department?
14    A.   Yes.
15    Q.   And in what capacity?
16    A.   The human resources director.
17    Q.   That's where you first started?
18    A.   Yes.
19    Q.   And did you have to take a test for that
20         position?
21    A.   No.
22    Q.   How did you come -- how did you attain that
23         position?
24    A.   Quite honestly, my predecessor was being let go
```

```
 1            and the county executive called me up and said
 2            this is what's happening.  I want you to be the
 3            next HR director.  And I was a little taken back
 4            by that, because I didn't know what was
 5            happening.  So I said, okay.  And she appointed
 6            me, and I was confirmed by the Legislature as the
 7            HR director.
 8      Q.    Did you receive a job description before you
 9            accepted the job?
10      A.    No.
11      Q.    Were you told what was expected of you as the
12            director of human resources?
13      A.    I don't think that I was.  I guess I just thought
14            that I was going to do what my boss was doing.  I
15            had a boss at that time, the personnel officer,
16            Mrs. Mahoney.  She was let go.  She was the
17            person --
18      Q.    I'm sorry.  The confusion is, you said you would
19            do what your boss would do.  Was she the director
20            of HR?
21      A.    She was the director -- she was the personnel
22            officer.  And at that time, the personnel officer
23            was responsible for HR and civil service.  When
24            she left, it became HR and civil service
```

```
 1              separately.  At that point, I did HR.  Civil

 2              service went back to the commission.  And I

 3              really wasn't working with them at that point.

 4       Q.    So just to backup.  When you were the deputy

 5              personnel director, you also dealt with human

 6              resources issues, as well; isn't that true?

 7       A.    Yes.

 8       Q.    Because you said the two were merged?

 9       A.    Yes.

10       Q.    What kind of human resources issues did you deal

11              with?

12       A.    Health insurance, Workers' Compensation, things

13              like that, employee benefits.

14       Q.    Did you ever deal with discriminatory practices?

15       A.    I don't recall that I did.

16       Q.    Did you ever deal with decisions to hire and

17              fire?

18       A.    No, not personally.

19       Q.    Well, otherwise?

20       A.    I saw the stuff happening, yeah.  Sure.

21       Q.    When the office of personnel director and human

22              resources was effectively split, was it at that

23              time that the civil service commission was

24              formed?
```

```
 1     A.    It was re-put together, yes.  That would have
 2           been, I think, 2002.
 3     Q.    Having functioned in the civil service component,
 4           did you help with the assistance of putting that
 5           commission together?
 6     A.    No.
 7     Q.    So you started as the director of human resources
 8           in about 2002, and you've functioned in that
 9           capacity up until today?
10     A.    Yes.
11     Q.    Okay.  And you weren't told what your
12           expectations were at that point.  At some point
13           did, you get a job description?
14     A.    No.
15     Q.    And at some point -- well, let's talk about chain
16           of command and structure.  Who do you report to?
17     A.    The county executive.
18     Q.    And have you always reported to the county
19           executive?
20     A.    From 2002?
21     Q.    Yes.
22     A.    Yes.  Sorry.
23     Q.    And have you ever been told what your
24           responsibilities are at all?
```

```
 1     A.   Not generally, no.

 2     Q.   And have you received any documents indicating

 3          that?

 4     A.   No.

 5     Q.   Well, what do you understand your job to be as

 6          director of human resources, since we don't have

 7          any --

 8     A.   Just the administrator of the functions of the

 9          department.

10     Q.   Does that also include the benefits

11          administrator, as well?

12     A.   Yes.

13     Q.   Personnel administrator?

14     A.   Yes.

15     Q.   And having such extensive experience in civil

16          service, do you -- what role, if any, do you play

17          with the civil service commission?

18     A.   I advise them on matters.

19     Q.   Okay.  What type of matters?

20     A.   Well, all types of matters related to civil

21          service law and rules.  I can say that since this

22          case has hit the fan, the commission is not --

23          I'm not working with them now.

24     Q.   Since this case?
```

```
 1    A.   Correct.

 2    Q.   Why is that?

 3    A.   I recused myself, because I know we've had some

 4         correspondence in front of them and I don't want

 5         to go near it.

 6    Q.   At what point did you recuse yourself?

 7    A.   Probably a year ago, maybe more.

 8    Q.   Did you do that by letter?

 9    A.   No.

10    Q.   Did you verbalize that?

11    A.   Yes.

12    Q.   To who?

13    A.   Mr. Moran.

14    Q.   Who?

15    A.   Mr. Moran, the chairman.

16    Q.   What did he say?

17    A.   He understood.

18    Q.   Was this before or after you completed your

19         workplace violence investigation?

20    A.   I would say it was probably after.

21    Q.   Now, you became aware, at some point, that there

22         was a federal suit filed against the county; is

23         that true?

24    A.   Yes.
```

```
 1     Q.   Did you recuse yourself from advising the civil
 2          service commission before or after you became
 3          aware of that?
 4     A.   After.
 5     Q.   Now, you said you advised the civil service
 6          commission on civil service laws and rules.  Do
 7          they come to you with questions?  Now, we're
 8          talking -- you said you recused yourself.  We're
 9          talking before you recused yourself.
10     A.   Yes.  I would attend meetings, and if they had
11          questions, I would attempt to answer them or at
12          least attempt to find an answer.
13     Q.   When are the meetings?
14     A.   When are they?
15     Q.   Yes.
16     A.   Generally every other Thursday.
17     Q.   And you would attend all the meetings?
18     A.   Pretty much, yes.
19     Q.   Now, are these meetings convened with the members
20          of the commission?  These are not public
21          meetings?
22     A.   No, they're public meetings.  The public doesn't
23          always attend, but on occasion they do.
24     Q.   Do you know who Mr. Pechenik is?
```

```
 1     A.   No.

 2     Q.   How about Mr. Goldberger?

 3     A.   No.  I've never known either of them to attend a

 4          meeting.

 5     Q.   And when you get a question about a civil service

 6          -- a civil service question, whether it be the

 7          laws or rules, how do you -- do you research the

 8          question or do you just advise them from your

 9          experience?

10     A.   I'll look it up in the law.  If I'm vague on what

11          the answer is, I'll ask the state for assistance.

12     Q.   Now, you're not --  you're not an attorney,

13          right?

14     A.   I am not.

15     Q.   What do you believe -- what in your education and

16          experience -- what within your education and

17          experience do you believe allows you to advise

18          the commission on civil service law?

19     A.   Just twenty, twenty-five years doing it.  I don't

20          have any particular training in the area.

21     Q.   So what role do you play in the hiring and firing

22          of county employees?

23     A.   Just processing them, giving them orientations,

24          providing them with documents that are pertinent
```

```
 1              to county employees.
 2      Q.    Providing who?  You said "them".
 3      A.    New employees.  I'm sorry.
 4      Q.    Are you involved in the hiring process of
 5              employees?
 6      A.    No.
 7      Q.    Are you involved in the certification of lists?
 8      A.    Not particularly.  I mean, I may see a list
 9              before it's established by the commission.
10      Q.    Why would you be shown a list before it's
11              established?
12      A.    Just to know who has taken tests and who has
13              passed them, just for personal knowledge.
14      Q.    Why would you have a personal desire to see those
15              documents?
16      A.    Just to see whose taken tests, see who employees
17              are, potential employees.
18      Q.    You would ask the commission to see the list
19              before it's certified?
20      A.    No.
21      Q.    Well, how would you attain these lists?
22      A.    They're sent --  mailed to the office by the
23              State Department of Civil Service.
24      Q.    Mailed to which office?
```

```
 1     A.    The civil service office.

 2     Q.    And you would ask to see the list?

 3     A.    I would look over them and see what's what.

 4     Q.    Where's your office in relation to the civil

 5           service commission?

 6     A.    Next door.

 7     Q.    Do you share any secretarial staff?

 8     A.    Yes, we do.

 9     Q.    And so when you would go and seek these lists

10           out, who would you get them from?

11     A.    Probably Ashley Bombard.

12     Q.    Isn't it true that you would see the lists before

13           they are certified?

14     A.    Yes.

15     Q.    Having seen these lists, would you then render an

16           opinion as to whether or not they're in

17           compliance with civil service law at any point?

18                 MR. MARTIN:  Object to the form.

19                 MR. SORSBY:  You can still answer the

20           question.

21     A.    You're talking about the eligible list we would

22           get from the state?

23     Q.    Correct.

24     A.    Yes.  On occasion there are errors in the list.
```

```
 1              We may know ten people took the test and we only

 2              got scores for nine.  So things like that you

 3              check.

 4       Q.    So once a decision to terminate a county employee

 5              is made, what role do you play in that process?

 6       A.    Just as with an employee coming in on the front

 7              end, we would process the paperwork, process any

 8              type of correspondence that would be sent out to

 9              the employee, for example, continuation of health

10              insurance coverage.

11       Q.    Okay.  Do you assist the sheriff's department

12              with providing -- or the -- excuse me -- the

13              civil service commission in providing eligible

14              lists for competitive positions at the sheriff's

15              department?

16       A.    Do I assist?  I would say in general, yes.  I

17              would assist if a question was asked of me.

18       Q.    And does that happen?

19       A.    Yes.

20       Q.    What are some of the questions that are asked of

21              you?

22       A.    Oh, how many -- how many veterans credits does

23              this person have?

24       Q.    How many veterans credits?
```

```
 1    A.   If somebody is applying for veterans credits as a
 2         result of an exam.  You're entitled to credits as
 3         a veteran or a disabled veteran.
 4    Q.   So you would give them your opinion on that?
 5    A.   Yes.
 6    Q.   I'm trying to understand why you were at the
 7         civil service commission meetings and not an
 8         attorney.  Why didn't they have an attorney
 9         there, do you have an idea?
10    A.   I couldn't tell you.
11    Q.   Are you involved in removing personnel from
12         payroll once they're terminated?
13    A.   I would say no.  I'm not sure what you mean.
14    Q.   When a decision is made to terminate an employee,
15         are you involved in the removal of their names
16         from the payroll?
17    A.   We would send a form to the finance department
18         and that would occur, yes.  Most of those things
19         are processed via a four-part form.
20    Q.   Now, you would also -- if the sheriff was looking
21         for advice in regards to personnel management,
22         you would also offer advice to the sheriff, too;
23         is that correct?
24    A.   I would offer if asked, yes.
```

```
 1    Q.   And you have provided advice in terms of
 2         personnel issues; is that correct?
 3    A.   Probably, yes.
 4    Q.   All right.  We may come back to the civil service
 5         component later, but I want to talk about one of
 6         your roles as HR director as far as personnel
 7         issues.  When -- tell me how broad the authority
 8         or the responsibility of the human resources
 9         director, your position is, for all county
10         departments?  Are you responsible for all county
11         departments?
12    A.   Yes.
13    Q.   And what does that responsibility include, can
14         you tell us?
15    A.   My department in terms of all county employees?
16    Q.   Well, all right.  I'm going to -- don't bother
17         answering, because you answered that generally
18         earlier.  You said benefits administrator,
19         personnel?
20    A.   Yes.
21    Q.   I want to talk a little more about what role you
22         play in personnel decisions at different
23         departments in the county.
24    A.   Okay.
```

```
 1     Q.   If a supervisor/manager has a question about

 2          whether or not they can terminate an employee, do

 3          they come to you with those questions?

 4     A.   Do they?  They have, yes.  It has occurred.

 5     Q.   Does that happen often?

 6     A.   I would say over the course of time, probably

 7          yes.

 8     Q.   What do those questions typically include?

 9     A.   What are my responsibilities to this employee?

10          May I terminate the employee?

11     Q.   What do you understand -- as the human resources

12          director, what do you understand the chain of

13          command as it were for county department

14          supervisors in terms of who they go to to get the

15          final determination?

16               MR. MARTIN:  You mean generally in the

17          county?

18               MR. SORSBY:  Yes.

19     A.   Typically, the department head has the final

20          call.

21     Q.   And do terminations at the county have to be

22          approved by the human resources department?

23     A.   We sign off on the paperwork.

24     Q.   What paperwork do you sign off on?
```

1    A.    It's a report of personnel change.  It just kind

2          of puts the action into motion.  That's the thing

3          that connects with payroll and clues us to

4          generate whatever correspondence to the

5          terminating employee.  Those are generated at the

6          department level.

7    Q.    Okay.  Is there -- do you --  does the HR

8          department, which you're the head of, have any

9          approval -- let me say this differently -- any

10         veto power over termination?

11   A.    I'm going to say no.  I don't consider that I

12         have authority to tell a department head how to

13         do something.  I mean, I can advise how I think

14         they should do something, but I can't --

15   Q.    And that's really what I'm trying to get to.  In

16         other -- with other employers, the HR department

17         plays the role of advising management before

18         termination and in consultation.  They don't have

19         veto power, they advise?

20   A.    Yes.

21   Q.    And I'm trying to determine if you have that

22         role, as well?

23   A.    I would say yes.  Yes.

24   Q.    Now, also using that same analogy with other

```
 1              employers, all termination decisions go through

 2              the HR department automatically for some

 3              consultation.  Is that the same case here at the

 4              county?

 5      A.      Could you repeat that?

 6      Q.      So whenever there's a recommendation for

 7              termination by a supervisor, that -- before it

 8              becomes final, does that recommendation come to

 9              your office for consultation?

10      A.      Not always.  Not always.  I mean, I don't know

11              about it until the document lands on my office

12              desk.

13      Q.      So there's no policy requiring that it comes to

14              your office before?

15      A.      No.

16      Q.      All right.  Does -- I'm talking about the period

17              -- the period in question here for Mr. Gorman's

18              employment is the period of 2012 to 2013-ish,

19              that time period.  So that's the period I'm

20              talking about.  Did Rensselaer County have a

21              policy against discrimination?

22      A.      I'm sure we did, yes.

23      Q.      In your capacity as director of human resources,

24              was it your responsibility for enforcing that?
```

 1   A.   Yes.  I would say so, yes.

 2   Q.   What do you understand the policy against

 3        discrimination to be?

 4   A.   I'm not familiar to say right now.  I don't know.

 5   Q.   Now, you indicated earlier there were no specific

 6        job requirements given to you before you took the

 7        position as HR director, but did you take any

 8        special courses or any certification in your time

 9        as HR director?

10   A.   No.

11   Q.   Now, you indicated you're responsible --  you are

12        responsible for enforcing the county's policy

13        against discrimination.  Can you tell us what you

14        understand -- how you understand that to include

15        in combination of the Americans with Disabilities

16        Act?

17   A.   I just have -- no, I can't.  I have policies on

18        my bulletin board.  If something comes up, I'll

19        consult.

20   Q.   What do you -- do you understand -- when I say

21        "in combination", do you understand what I'm

22        talking about?

23   A.   Yes.

24   Q.   What do you understand that to be?

```
 1    A.   To make an employee comfortable in their
 2         workplace, providing them with whatever they need
 3         to have to get their job done within reason, I
 4         guess is the --
 5    Q.   Do you understand what the Americans with
 6         Disabilities Act is?
 7    A.   I wouldn't qualify myself as an expert on it, no.
 8    Q.   In your capacity as human resources director and
 9         all your experience in human resources, do you
10         understand what the Americans with Disabilities
11         Act is?
12    A.   I know what it is, yes.
13    Q.   Is there a -- do you know -- and we're sticking
14         to the same timeframe, when Mr. Gorman was
15         employed by the county.  Was there a policy of
16         providing accommodations to disabled workers?
17    A.   I suspect so, yes.
18    Q.   I'm asking, do you know?
19    A.   I don't.
20    Q.   But you would be responsible for implementing
21         that policy?
22    A.   I'm thinking so, yes.
23    Q.   But you don't know what the policy is?
24    A.   No.
```

```
 1    Q.   Are you familiar with any employees at the county

 2         that were provided an accommodation after

 3         presenting with a disability?

 4    A.   Specifically, I couldn't quote you names, but I

 5         know we have provided people with ergonomic

 6         chairs and headsets in order so they may work at

 7         their desk.

 8    Q.   Are there any special forms that have to be

 9         filled out in order to provide an accommodation?

10    A.   Not that I'm aware of.  I think it's done at an

11         employee's request.

12    Q.   You indicate there is one against discrimination?

13    A.   I expect it is.

14    Q.   But do you know?

15    A.   I know it's posted in my office.

16    Q.   Whose responsibility is it -- who is responsible

17         for posting those?  Is it someone in your office

18         that's responsible for that?

19    A.   We'll provide them to the departments and expect

20         that they'll post them.

21    Q.   To the extent a person is out on leave for any

22         particular reason, do they have to fill out any

23         paperwork and give it to your office?

24    A.   It would be provided to us by the department.
```

```
 1    Q.   It would be?

 2    A.   It should be, yes.

 3    Q.   To the extent somebody was out on a disability,

 4         would that -- would there be paperwork to be

 5         filled out by the employee?

 6    A.   I would think so, yes.

 7    Q.   Would your office receive that paperwork?

 8    A.   Not always, no.  When you say work-related

 9         disability --

10    Q.   Right now I'm talking about disability under the

11         Americans with Disabilities Act, so a disability.

12         Somebody claims that they have a disability,

13         can't work, and they -- and so an accommodation

14         would or would not be provided.  That's what I'm

15         talking about.  And I want to know --

16    A.   I can honestly say, sir, I don't think I've ever

17         seen one of those forms.

18    Q.   All right.  Have you ever received a request for

19         an accommodation, your department?

20    A.   No.

21    Q.   All right.  And I just want to be clear.  Are you

22         aware of any policy regarding providing

23         accommodations within the county?

24    A.   I'm practically sure we have a policy posted in
```

```
 1          our office.

 2     Q.   In terms of providing accommodations?

 3     A.   Yes.

 4     Q.   I would hope so.  But your familiarity --

 5     A.   Correct.  Yes.

 6     Q.   All right.  What is your familiarity with civil

 7          service law Section 73 of New York State, and

 8          Section 75?

 9     A.   I have familiarity.

10     Q.   Okay.  What's 73?

11     A.   73 is about a reinstatement of employee after

12          disability or injury.

13     Q.   And 75?

14     A.   That's disciplinary procedures.

15     Q.   All right.  And is it not true that 73 says the

16          -- a department may terminate a person if they're

17          out for more than a year?

18     A.   Yes.  I don't know if that's under 73.  That

19          might be 71 or 72.

20     Q.   Okay.  Maybe it's 71.  We'll get the actual

21          statute out, but what I'm asking is what your

22          knowledge of it is.

23     A.   Mm-hmm.

24     Q.   You understand it to be "may" -- that the
```

```
 1              language to be "may"?

 2    A.   I don't understand that, no.

 3    Q.   We'll get it out later.  We'll show you the

 4         actual statute.

 5    A.   Okay.

 6    Q.   Do you -- what is your understanding in terms of

 7         article -- Section 73 of the New York State civil

 8         service law in regards to an employee who has

 9         been out of work on leave for a year or more?

10         What is the process?  Do you understand what the

11         process is after they've been out for a year or

12         more?

13    A.   And the employee is looking to return to work?

14    Q.   Well, what if -- no, they're not looking to

15         return to work.  They're out on medical leave and

16         they're not able to return to work within a year.

17         What is the process at that point?

18    A.   I believe that the department can terminate the

19         employee's employment and replace him or her with

20         another employee is my vague understanding of it.

21    Q.   Okay.  Do you understand that they have --  that

22         the obligation is that they must fire somebody

23         after a year?

24    A.   I do not have that understanding.
```

```
 1    Q.   Did you ever advise the civil service commission

 2         with regards to Sections 73 and 71?

 3    A.   No.

 4    Q.   Did you ever advise the sheriff's office with

 5         regards to Sections 73 and 71 of the New York

 6         State Civil Service Law?

 7    A.   No.

 8    Q.   Have you advised any supervisors of the county in

 9         regards to those sections?

10    A.   Probably, yes.

11    Q.   I'll show you what's been marked as Exhibit 61.

12         This was from an earlier deposition.  Take a few

13         seconds to take a look at that.

14    A.   (Witness complied.)

15    Q.   Do you know who Lora Seabury is?

16    A.   Yes.

17    Q.   Did you have a chance to look at this exhibit?

18    A.   Yes.

19    Q.   Do you understand the incidents described in

20         here?  You read it.

21    A.   It would appear somebody is out of work, has been

22         for a period of time, not receiving any pay.

23    Q.   It indicates she's been out of work since 2010,

24         do you see that, from July 2010?
```

```
 1      A.    Yes.

 2      Q.    And she's still employed as of 2015?

 3      A.    Yes.

 4      Q.    Do you understand that is possible under civil

 5            service law?

 6      A.    Yes.

 7      Q.    Can you tell us how that's possible?

 8      A.    The employer has chosen not to terminate the

 9            employee and chosen not to refill her position.

10      Q.    Can they do that?

11      A.    Yes.

12      Q.    So after a year of being out on leave, the

13            employer doesn't have to terminate them; is that

14            true?

15      A.    Yes.  That's correct.

16      Q.    That's what you understand?

17      A.    That's what I understand, yes.

18      Q.    Again, because we're going to talk about civil

19            service law a number of times here, I think you

20            said -- I mean, you have close to twenty years of

21            experience on civil service law.  You advise the

22            commission on civil service law; isn't that true?

23      A.    Yes.

24      Q.    That's why I'm asking you these questions.  You
```

```
 1              have a dearth of knowledge on civil service law.
 2     A.    You're too kind.
 3     Q.    Wait until the end of the day.  We'll see.  Who
 4           do you understand has responsibility at the
 5           county to investigate claims of discrimination by
 6           county employees?
 7     A.    I don't know.  I'm not sure.
 8     Q.    Does your office investigate claims of
 9           discrimination?
10     A.    I have never done one, no.
11     Q.    All right.  What role does your office, the
12           department of human resources, play in
13           investigating complaints of workplace violence?
14     A.    Complaints come to my office, and I will attempt
15           to investigate them to the best of my ability.
16     Q.    You will attempt or you will?
17     A.    If I don't, I will ask someone else to do that.
18     Q.    Who do you ask?
19     A.    I would do that through the county attorney's
20           office.
21     Q.    Can you explain that?
22     A.    If I was unable to do an investigation for one
23           reason or another, I would ask the county
24           attorney to look into it.
```

```
1    Q.   And have you done that?

2    A.   Yes.

3    Q.   Are we talking about Pechenik?

4    A.   Yes.

5    Q.   Does that happen often, or do you more often

6         investigate the claims of workplace violence?

7    A.   I would say, more often than not, I would do

8         them.

9    Q.   All right.  And you would insure that the

10        investigation comports with New York laws

11        regarding workplace violence, as well as the

12        county, correct?

13   A.   To the best of my ability, yes.

14   Q.   And you understand -- well, let me strike that

15        question.

16            What informs your -- when you do an

17        investigation, what informs your investigation?

18        What guides your investigation, I should say?

19   A.   The complaint.

20   Q.   How does the complaint come to your office?  Is

21        it mailed, delivered?

22   A.   There's a couple of ways.  Yes, they come both

23        ways.

24   Q.   Sometimes does the employee come to your office?
```

```
 1    A.   Yes.
 2    Q.   What do you understand the policy to be in terms
 3         of getting the complaint to you?  Are they
 4         suppose to go through the supervisor first, or
 5         can they have direct access to you?
 6    A.   I'm fairly sure we would like them to be
 7         discussed internally first.
 8    Q.   Does the -- again, these may be obvious questions
 9         to you, but perhaps not.  Does the county have a
10         policy against workplace violence?
11    A.   Yes.
12    Q.   How long has that policy been in place, if you
13         know?
14    A.   I'm thinking two, three years.  Three years
15         maybe.
16    Q.   So we're in 2016, almost 2016 now.  Do you think
17         2012, 2013?
18    A.   I think 2012.
19    Q.   2012 is when the new policy was implemented?
20    A.   It was, but it was deemed not acceptable by the
21         labor department.
22    Q.   All right.  I just want to go over something else
23         before we leave this category.  What --  I just
24         want to make sure I covered this area.  Did you
```

1         have any other special training for human

2         resources?

3    A.   I don't think I did, no.

4    Q.   What about special training for investigations?

5    A.   No.

6    Q.   None?

7    A.   No.

8    Q.   Can you tell us, just to exclude perhaps

9         everything, what, if any, training you've had

10        while --  as director of the human resources

11        department?

12   A.   I don't recall any training, exterior training.

13   Q.   How about interior training?

14   A.   I don't recall any either, no.

15   Q.   All right.

16             THE WITNESS:  Could I take a break?

17             MR. SORSBY:  Sure.

18             (Whereupon, a brief recess was taken.

19             MR. SORSBY:  Back on the record.

20   Q.   Before we left off, I had asked you whether or

21        not the county had a policy against workplace

22        violence, and you had indicated that that was the

23        case, correct?

24   A.   Yes.

```
 1    Q.   I want to show you what's been marked at a
 2         previous deposition as Exhibit 6.  Take a look at
 3         that and make sure we're talking about the right
 4         policy.
 5    A.   (Witness complied.)
 6    Q.   As a point of reference, if you turn to Page 3, I
 7         think there's a date on the top of that.  Do you
 8         see that?
 9    A.   Yes.
10    Q.   Do you recognize what was previously marked as
11         Exhibit 6?
12    A.   Yes.
13    Q.   How do you recognize that document?
14    A.   It's the county's workplace violence policy.
15    Q.   Is this a document your department normally keeps
16         in the ordinary course of business?
17    A.   Yes.  I'm not exactly positive this is the most
18         recent copy of it, though.
19    Q.   Turn to Page 3.  I have a copy myself.  Do you
20         want to indicate the date on that?
21    A.   March 15, 2012.
22    Q.   As director of human resources, do you know when
23         Mr. Gorman was employed at the sheriff's
24         department?
```

```
 1    A.    Not specifically, but I understand he was
 2          employed then.
 3    Q.    Do you understand this policy was in place during
 4          Mr. Gorman's employment?
 5    A.    Yes.
 6    Q.    Do you understand this to be the policy at that
 7          time?
 8    A.    I would say yes.  Yes.
 9    Q.    Go to Page 7, if you would, please?
10    A.    (Witness complied.)  I have.
11    Q.    Excellent.  What is the title on the top of that
12          page?
13    A.    Rensselaer County workplace violence prevention
14          policy statement, parens, incident reporting.
15    Q.    Can you tell me where, if at all on this
16          document, do you see your name?
17    A.    Yes.  The lower half of the page.
18    Q.    And isn't it true it says you're designated as
19          the contact person for this?
20    A.    Yes.
21    Q.    Now, what do you understand --
22                MR. MARTIN:  Can we go off the record for
23          just one second?
24                MR. SORSBY:  Sure.
```

```
 1                 (Discussion off the record.)
 2                 MR. SORSBY:  Back on the record.
 3     Q.    Do you understand that the workplace violence
 4           policy that was in place during Mr. Gorman's
 5           employment was posted throughout the county?
 6     A.    Yes.
 7     Q.    All right.  And did you understand that that
 8           policy had a page in it or -- strike that.
 9                 Do you also recognize that there was a
10           different page or document placed around the
11           county indicating that you were the person to
12           report incidents of workplace violence to?
13     A.    Yes.
14     Q.    I'm going to show you, again, what's already been
15           marked Exhibit 6, Page 7.  Does this look like
16           the document that was provided to the county
17           indicating county employees should report
18           incidents to you?
19     A.    I would say yes, yes.
20     Q.    What do you understand the policy against
21           workplace violence at Rensselaer County to
22           include?  What is workplace violence?
23     A.    Threatening behavior, harassment, assault.
24     Q.    Do you understand it to include verbal threats?
```

```
 1    A.   Yes.
 2    Q.   Is there a requirement that the threats or the
 3         violence have to be at the workplace?
 4    A.   I don't believe they do.
 5    Q.   So you understand the workplace violence policy
 6         to include off-site threats, as well?
 7    A.   I believe it's stated in there.  I believe so.
 8    Q.   So you're referencing the policy statement, the
 9         first page of this Exhibit 6.  If you read the
10         second paragraph, last sentence?
11    A.   I see it, yes.  Yes.
12    Q.   All right.  So do you see the second to last
13         paragraph?  It says, "Employees found in
14         violation of this policy will be subject to
15         disciplinary action, up to and including
16         termination of employment."
17    A.   Yes.
18    Q.   Were you ever -- did any of your investigations
19         of workplace violence lead to termination of an
20         employee?
21    A.   Not that I can recall.
22    Q.   Did any of your investigations lead to
23         disciplinary action?
24    A.   Yes.
```

1    Q.   Many?  Have many led to disciplinary action?

2    A.   I would say probably more than half.

3    Q.   Have any of your investigations included

4         investigations into verbal threats?

5    A.   I couldn't say.  I'm thinking yes, but I couldn't

6         say.

7    Q.   Have any of your investigations of verbal threats

8         led to disciplinary action?

9    A.   Yes.  Again, I'm thinking out loud.  I think so.

10   Q.   And would your office be able to provide a copy

11        of the investigative notes or the termination of

12        that investigation to our office?

13   A.   On other cases?

14   Q.   Correct, specifically cases for verbal threats?

15   A.   I mean, if I'm allowed to do that.

16   Q.   If your counsel says that's okay, will you

17        provide that to your attorney?

18   A.   Yes.

19   Q.   Have you done any investigations regarding verbal

20        threats that were made off-site?

21   A.   Not as I can recall, other than this one.

22   Q.   How about acts of violence off-site directed at

23        county employees?

24   A.   I can't recall any.

```
 1     Q.   And do you understand that threats also include

 2          threats made with the use of a telephone?

 3     A.   Sure.

 4     Q.   Now, when you prepare --  when you do an

 5          investigation into workplace threats, do you

 6          prepare some type of disciplinary --  do you

 7          prepare an investigative report, any type of

 8          report?

 9     A.   Yes.  A report of the findings?

10     Q.   Correct.

11     A.   Yes.

12     Q.   Who do you give the report to?

13     A.   The person filing the workplace violence

14          complaint, as well as the department head.

15     Q.   Do you give that report to the county executive?

16     A.   No.

17     Q.   Do you have any consultation with the county

18          executive regarding workplace violence

19          complaints?

20     A.   I do not.

21     Q.   Do you have consultations with the county

22          executive in terms of implementing the workplace

23          violence policy?

24     A.   I don't recall any, no, I don't.
```

```
 1    Q.   Did you help devise this workplace violence

 2         policy?

 3    A.   I was on a group that devised it, yes.

 4    Q.   What was that group?

 5    A.   The county attorney's office was represented, the

 6         various labor unions.

 7    Q.   What role did you play in that group?

 8    A.   Just a part of the group.

 9    Q.   Did you offer advice?

10    A.   Probably.

11    Q.   Do you know why you were brought into that group?

12    A.   I'm assuming because I would be the one

13         administering it.

14    Q.   I have to ask.  I can't assume.  You can only

15         speak for yourself, right?

16    A.   Yes.

17    Q.   How often are employees trained on workplace

18         violence?

19    A.   Yearly.

20    Q.   That's all employees?

21    A.   Yes.  They're suppose to be.

22    Q.   You said that with some trepidation?

23    A.   Some may not be.  I'm not going to say it's a

24         hundred percent.
```

1    Q.   Isn't your office in charge of the implementation

2         of the policy?

3    A.   Yes.

4    Q.   So you would be responsible for insuring that --

5    A.   Well, we ask the various departments to give the

6         employees refreshers.

7    Q.   What would the refresher consist of?

8    A.   A brief overview of the policy yearly.

9    Q.   How do you advise the director to do that?

10   A.   We would do that at a department head meeting.

11   Q.   They would just go over page by page of the

12        policy, or would it be more effective

13        communication?

14   A.   With their employees?

15   Q.   Yes.

16   A.   I really don't know.  I don't know.

17   Q.   Can you tell us your explicit directions to the

18        division chairs with regards to training?

19   A.   It would be something to the effect that it's

20        that time to refresh workplace violence with your

21        employees.

22   Q.   Would you ever go to these departments and

23        provide training?

24   A.   No.

```
 1    Q.   Did you ever provide training to the directors of

 2         these departments or the division chairs?

 3    A.   No.

 4    Q.   Can you tell us what -- if you know, what

 5         New York laws govern workplace violence?

 6    A.   No.

 7    Q.   Do you know if there are New York State laws that

 8         govern workplace violence at the county?

 9    A.   I'm thinking there are.  Do I know?  No.  I know

10         the labor department checks on us.

11    Q.   How do they check on you?

12    A.   The policy we have was pretty much driven by

13         labor department advisement.

14    Q.   Do you --  having said that, do you understand

15         that there are New York laws in regards to

16         workplace violence?

17    A.   Yes.

18    Q.   So you're indicating the Department of Labor has

19         some oversight of the implementation at the

20         county?

21    A.   Yes.

22    Q.   Can you tell us what procedures you have for

23         investigating workplace violence complaints?

24    A.   I don't have any written procedures, per se,
```

```
 1              outside of the policy.  If I get a complaint, I
 2              would first talk to the person filing the
 3              complaint and then branch out from there in other
 4              areas to aid in the investigation.
 5      Q.      So your investigation would include talking to
 6              the complainant, if you will, and other
 7              witnesses?
 8      A.      Yes.
 9      Q.      All right.  Look at the first sentence on
10              Exhibit 6.  It says, "Rensselaer County has a
11              zero tolerance for violence."  What does that
12              mean, can you tell us?
13      A.      We don't tolerate any violence in the workplace,
14              any.
15      Q.      So it's a serious matter?
16      A.      I would think so, yes.
17      Q.      What is --  now, it said -- we read earlier, it
18              says up to and including termination.  Do you
19              think somebody -- if you have credible evidence
20              that somebody has completed an act of violence
21              against another employee, do you think they
22              should be terminated?
23      A.      Depending on the level, yes.  Sure.
24      Q.      The level of what?  Can you explain that?
```

```
 1     A.   Violence.

 2     Q.   It says zero tolerance for violence.  Are there

 3          some gradations?  There's some violence that's

 4          acceptable, some are not?

 5     A.   I think what that means is it would be penalized

 6          in accordance with the level of the violation.

 7     Q.   So not all acts of violence warrant termination;

 8          is that what you're saying?

 9     A.   Yes, depending on your description of violence.

10          To me, violence is a strong word.

11     Q.   It is.

12     A.   So if someone is perpetrating violence on another

13          person, I kind-of look at that as causing them

14          physical harm.

15     Q.   But that's not what the policy defines workplace

16          violence as; isn't that true?  It's a little bit

17          more broad?

18     A.   I would say you're right, yes.

19     Q.   Okay.  In fact, it includes "exhibits threatening

20          behavior", right, or "engages in violent acts on

21          county property", right?

22     A.   Yes.

23     Q.   And I'm reading from the exhibit that's in front

24          of you.  "May be removed from county property.
```

1           Includes threats, threatening behaviors, other

2           acts of violence executed off the property,

3           off-site threats."

4                 And actually if we go to Page 1, it's

5           probably actually even more specific.  You can

6           see there, for example, it says, "A report of a

7           workplace violence incident is defined as one or

8           more attempt of a threat, whether verbal or

9           physical, to inflict injury upon a person."

10                Do you believe, because you're the person

11          responsible for implementing this.  Do you

12          believe a threat of physical violence is

13          sufficient for termination?

14   A.    Possibly.

15   Q.    All right.  I just want to quickly go down these,

16          because it's important.

17                Section B, it says, "Any intentional display

18          of force, which would give a person a reason to

19          fear or expect bodily harm."  Do you think that

20          is a terminable offense?

21   A.    Again, possibly.  I would have to view each one

22          specifically or particularly.

23   Q.    All right.  Okay.  What I'm trying to figure out,

24          in the description of workplace violence, is

```
 1              there -- are there workplace violence acts of

 2              violence that are not subject to termination?

 3                   So for example, if you look at E.  It says,

 4              "Stalking a person with the intent of causing

 5              fear when such stalking is within or in the

 6              course of employment."  Do you believe stalking

 7              is a terminable offense?

 8      A.   Difficult to say.  You know.  Again, potentially,

 9           yes.

10      Q.   All right.  Now, when you said one of the first

11           steps in your investigation includes

12           investigating the complainant, if the complainant

13           makes accusations, do you followup on all those

14           accusations?

15      A.   I try to.

16      Q.   You try to.  What do you mean by that?

17      A.   I don't think I would intentionally not

18           investigate something that's staring me in the

19           face.

20      Q.   So --  all right.  Now, if there was an

21           accusation that somebody verbally threatened

22           somebody, and you were told by the complainant

23           that there's a police report where the person

24           admits they verbally threatened them, would you
```

```
 1              followup and try to get that police report?
 2      A.   I would say so, yes.
 3      Q.   Would you deem that would be an important part of
 4           your investigation?
 5      A.   Yes.
 6      Q.   We may touch on this later.  Spoiler alert, just
 7           to let you know.
 8                Do you know what a FOIL officer is?
 9      A.   FOIL officer?
10      Q.   Correct.
11      A.   Yes.
12      Q.   Does Rennselaer County have a FOIL officer?
13      A.   Yes.
14      Q.   And you're the appeals officer, correct?
15      A.   I am.
16      Q.   So is that in addition to your directorship as
17           the HR director?
18      A.   Yes.
19      Q.   It's not part of the human resources division?
20      A.   No.
21      Q.   Other than being director of HR and the FOIL
22           appeals officer, what other positions do you have
23           at the county, or is that it?
24      A.   That's pretty much it.
```

```
 1    Q.   So --
 2    A.   Well, I'm going to take a step back for a second.
 3         I'm on various committees.  I'm on the deferred
 4         compensation committee.  I'm on the corporate
 5         compliance committee.  So a few committeeships.
 6    Q.   I'm not really concerned about the corporate, but
 7         the deferred comp committee, what does that do?
 8    A.   The deferred comp committee oversees the county's
 9         deferred compensation plan for its employees.
10    Q.   Is that retirement?
11    A.   Well, it's a retirement benefit.  It's exterior
12         to the New York State retirement system.
13    Q.   Does it have anything to do with 207-c benefits?
14    A.   No.
15    Q.   Any other positions?
16    A.   That's all I can think of.
17    Q.   That's it for now?
18    A.   Yes.
19    Q.   Now, does the FOIL officer, freedom of
20         information officer, does he report to you, or
21         are you his supervisor?
22    A.   No.  He's an employee of the county attorney's
23         office.
24    Q.   What is his name?
```

```
 1      A.   Peter Kehoe.

 2      Q.   And he was the officer at this time, 2012/2013?

 3      A.   I think so.  I think so.

 4      Q.   Now -- so he doesn't report to you.  What is your

 5           job --  can you tell us about what the appeals

 6           officer does?

 7      A.   If somebody files a freedom of information

 8           request, and it's for whatever reason denied, and

 9           the requestor is not happy with that decision, I

10           would consult with the freedom of information

11           officer and respond.

12      Q.   And so would a person seeking documents have to

13           appeal the denial to get it to you?

14      A.   Yes.

15      Q.   And now, what would be the basis of denying it?

16      A.   Most of the denials are based on legalities.

17      Q.   Now -- all right.  Mr. Kehoe, the FOIL officer,

18           is he an attorney?

19      A.   Yes.

20      Q.   So why would --  I'm just curious.  Why would an

21           attorney be coming to you for legal advice?

22      A.   I don't advise him.  We just discuss the matter.

23      Q.   You offer your opinion regarding the laws for

24           freedom of information act?
```

```
 1     A.   We would just discuss it and prepare a response,

 2          generally together.

 3     Q.   You would discuss it and prepare a response?

 4     A.   Yes.  He would explain to me his denial in law.

 5     Q.   And what role -- and then what would you --  how

 6          would you advise him?

 7     A.   I'm not advising him.

 8     Q.   All right.  As the appeals officer, you have the

 9          right to deny his --

10     A.   That's correct, yes.

11     Q.   And under what basis would you deny that?

12     A.   It never happened.

13     Q.   Any time there's a denial by his office, you

14          approve it?

15     A.   Generally, yes.  I can't think of a time an

16          appeal was upheld.

17     Q.   And as part of the review process with him, do

18          you --  does yourself and Mr. Kehoe review the

19          proposed documents that the person's looking for?

20     A.   Sure.

21     Q.   And where do you -- now, this is for the entire

22          county?

23     A.   Yes.

24     Q.   And so where would you get the documents from?
```

```
 1    A.   The documents that are being requested?

 2    Q.   Sought, yes.  Would you send a request to the

 3         appropriate division?

 4    A.   Yes.

 5    Q.   Is it true there's no limitation to where you can

 6         attain documents from in the county?

 7    A.   Correct.

 8    Q.   You have full access to the documents that FOIL

 9         requestors are looking for?

10    A.   I would say so, yes.

11    Q.   Not that you would release them, per se, but you

12         have access to them?

13    A.   Yes.

14    Q.   I'm just -- just to finalize this line of

15         questioning.  I'm trying to determine what

16         Mr. Kehoe would discuss with you regarding these

17         applications for FOIL requests?

18    A.   He would explain --  it would always be rationale

19         for denial.  He would tell me in his legal mind

20         why he does not believe the documents should be

21         released.

22    Q.   And you would do what at that point?

23    A.   I pretty much will say okay, I get your argument.

24    Q.   I don't want to put words in your mouth, but it
```

```
 1              sounds like you're a sounding board for his

 2              opinion; Is that appropriate?

 3      A.    I wouldn't say that.

 4      Q.    You don't give legal consultation to him?

 5      A.    No.

 6      Q.    Do you give any other consultation to him?

 7      A.    I would generally just ask questions.

 8      Q.    He's there to talk about basically the FOIL

 9              requests?

10      A.    Yes.

11      Q.    The FOIL appeals officer position, is that an

12              appointed position?

13      A.    I think it's just designated.

14      Q.    Well, how did you get the position?

15      A.    I was told I was the FOIL appeals officer.

16      Q.    Who told you that?

17      A.    I don't recall that.

18      Q.    What do you understand your role to be?

19      A.    To hear appeals of denied FOIL requests.

20      Q.    And how do you determine whether an appeal from

21              Mr. Kehoe, the determination, should be

22              overturned or affirmed?

23      A.    I discuss it with him.

24      Q.    You discuss it with him?
```

```
 1    A.   Yes.

 2    Q.   Do you discuss the FOIL law?

 3    A.   No.

 4    Q.   Do you have any familiarity with the freedom of

 5         information request law?

 6    A.   No.

 7    Q.   Have you taken any courses on that?

 8    A.   No.

 9              MR. SORSBY:  Let's stop for a minute and

10         see what time it is.

11              MR. MARTIN:  11:24.

12              MR. SORSBY:  Just keeping track of the

13         time.

14    Q.   Let's talk --  I'd like to talk about the process

15         of filing a workplace violence complaint.  Now,

16         we had -- you had indicated before that the

17         policy is posted throughout the county.  Do you

18         recall saying that, that the workplace violence

19         policy is posted?

20    A.   It's suppose to be.

21    Q.   It's suppose to be?

22    A.   Yes.

23    Q.   The page with your name as point of contact for

24         the reporting policy is also posted?
```

```
 1    A.   Yes.

 2    Q.   And what do you understand --  what is the first

 3         thing that a person who is reporting workplace

 4         violence do?  What are they suppose to do?  Are

 5         they suppose to fill out a form?

 6    A.   There is a form in that package.

 7    Q.   If we turn to Page 8, maybe that's what you're

 8         talking about?

 9    A.   Yes.

10    Q.   You understand Page 8 entitled Rensselaer County

11         workplace violence prevention incident report is

12         what a complainant would fill out?

13    A.   Yes.

14    Q.   And again, you testified earlier this could be

15         hand-delivered to your office or mailed to your

16         office?

17    A.   Certainly, yes.

18    Q.   Are complainants also suppose to delivery a copy

19         to their supervisor?

20    A.   Yes.

21    Q.   And how quickly after you receive one of these do

22         you start --  do you interview the complainant?

23    A.   As quickly as possible.

24    Q.   Is it important that you investigate these
```

```
 1        quickly?

 2   A.   Yes.

 3   Q.   Why is that?

 4   A.   Because there may be an imminent problem.

 5   Q.   By investigating it as soon as possible, you

 6        might stop violence, correct?

 7   A.   Yes.

 8   Q.   Is there a person in your office that processes

 9        these before they come to you?

10   A.   No, not particularly.  We all share

11        responsibilities.

12   Q.   Well, for what though?

13   A.   For taking mail in.

14   Q.   But when these come in to your office, do they go

15        directly to you?

16   A.   Yes.

17   Q.   And how many of these do you receive a week, do

18        you believe?

19   A.   Less than one.

20   Q.   So you don't receive that many over a year?

21   A.   No.  I would say in the last five years, we

22        probably had less than ten complaints.

23   Q.   So it's not as if you have a large investigation

24        load?
```

```
 1   A.   No.

 2   Q.   So when you receive a workplace violence

 3        complaint and you start your investigation, do --

 4        is there a tandem investigation launched at the

 5        department in question?

 6   A.   That's difficult to say.  In some cases, that

 7        does occur.

 8   Q.   Is that a policy that a separate investigation be

 9        launched in the department in question?

10   A.   No.

11   Q.   So in some scenarios, you will start your own

12        investigation and they'll start -- the department

13        will start its own independent investigation?

14   A.   Yeah.  I would expect -- and I'm just kind-of

15        talking now.  I would expect that a department is

16        probably going to investigate.  I mean, if that

17        was my department, I would do something

18        independently.

19   Q.   I'm asking if you know that's the case?

20   A.   I don't.  I don't know.

21   Q.   All right.  And do you -- now, alternatively, do

22        you -- when you do an investigation, do you

23        utilize staff in the division in question to help

24        you investigate?
```

```
 1    A.    Do you mean do I utilize staff to interview
 2          people and things of that nature?
 3    Q.    Sure.  Do you coordinate with staff in the
 4          department in question to help you with the
 5          investigation?
 6    A.    It's possible.  It's possible.  It doesn't happen
 7          in all cases, though.  If somebody has done an
 8          investigation at the department level, I would
 9          probably ask to see what they've done, just for
10          my own reference.
11    Q.    And just out of curiosity, in the county, where
12          do most of the workplace violence complaints come
13          from?
14    A.    The nursing home.
15    Q.    All right.  All right.  What about the sheriff's
16          department, a lot?
17    A.    I wouldn't say a lot, no.  I suspect there are
18          more than Mr. Gorman's out there though.
19    Q.    Do you file a copy of your --  the workplace
20          violence complaint made at the county or the
21          incident report, do you file copies with the New
22          York State Department of Labor?
23    A.    No.
24    Q.    Do you keep copies of those incident reports?
```

```
 1    A.   Yes.
 2    Q.   Is there a requirement to keep those for a
 3         certain period of time?
 4    A.   I don't know, but I haven't thrown any out.  I
 5         haven't disposed of any, I should say.
 6    Q.   We didn't ask this earlier.  When did you take on
 7         the role of implementing the workplace violence
 8         policy?
 9    A.   Shortly after it was implemented, so March of
10         2012 thereabouts.
11    Q.   There was a policy before, you stated earlier?
12    A.   Yes.
13    Q.   That was thrown out, revised?
14    A.   Revised.
15    Q.   Were you responsible for implementing the
16         workplace violence complaint before this?
17    A.   Not implementing, but it was part of our --
18    Q.   Enforcing?
19    A.   Yes.  Yes.
20    Q.   The department is responsible for enforcing it?
21    A.   Yes.
22    Q.   All right.  And so you're saying in all that time
23         in which you were the HR director, in which you
24         were responsible for enforcing the policy against
```

```
 1              workplace violence, you never destroyed any
 2              incident reports of workplace violence?
 3    A.   No.
 4    Q.   That you're aware of?
 5    A.   Right.
 6    Q.   You did not destroy any?
 7    A.   Right.
 8    Q.   Now, I'm looking at Page 4 back on this policy
 9              here.  It says that, "Post-incident response and
10              evaluation are an important part of effective
11              workplace violence policy."  It says, "Reporting
12              the incident to appropriate authorities is
13              required by applicable laws and regulations."
14                  In your investigation, if the complainant is
15              reporting what would be assault or a threat,
16              something that would be a crime, would you report
17              that to the authorities yourself?
18    A.   Sure, if I thought it was worthy, yes.
19    Q.   Would you consult with somebody before you did
20              that to determine if it rose to the level of a
21              crime?
22    A.   I may.  I may consult with the county attorney's
23              office.  It hasn't occurred.
24    Q.   And I'm still looking at the post-incident
```

```
 1              response, because it says that the -- again, this
 2              is -- the county's committed to this.
 3                   These items on this post-incident response,
 4              is that also part of what your department, the
 5              human resources department, does in terms of
 6              enforcing the policy?  It says, "Insure that all
 7              injured employees receive prompt and appropriate
 8              medical care."
 9    A.        I guess it falls under the policy, but I've never
10              done anything to insure that that happened.
11    Q.        Securing the premises to safeguard evidence and
12              reduce distractions during the post-incident?
13    A.        Never done that.
14    Q.        "Reporting the incident to the appropriate
15              authorities as required by laws and regulations."
16              Have you ever reported the incident to the
17              appropriate authorities as required by --
18    A.        Not that I can recall, no.
19    Q.        Prepare an incident report immediately after the
20              incident, utilizing the incident report form.  I
21              suppose that's the complaint, correct?
22    A.        That's my understanding, yes.
23    Q.        What about conducting post-incident debriefing
24              and counseling?  Do you do that as part of your
```

```
 1          investigation?
 2    A.    I have never.
 3    Q.    You've never done a debriefing or counseling?
 4    A.    No.
 5    Q.    After the occurrence of a workplace violence
 6          incident, conduct a review of the workplace
 7          violence prevention plans.  Do you do that after
 8          each one of these incidents?
 9    A.    Yes.  I don't want to definitively say after
10          every one, but we revisit the policy.
11    Q.    Where is the workplace violence prevention plan
12          located?
13    A.    In our office.
14    Q.    Are we -- that says program plan.  There's not a
15          separate document?
16    A.    No.
17    Q.    Okay.  Just to be clear, they used the wrong
18          word.  Okay.  I'd like you to just turn to
19          Page 6.
20    A.    Sure.
21    Q.    Do you see on the bottom there, "No retaliation"?
22    A.    Yes.
23    Q.    All right.  "County of Rensselaer, as the
24          employer, will not retaliate against any
```

1           employee's reporting of an alleged serious

2           violation to a supervisor or requested an

3           inspection by the New York State Department of

4           Labor officials or accompanied a New York State

5           Department of Labor official during an

6           inspection.  In addition, it is the

7           responsibility of the County of Rensselaer to

8           take appropriate disciplinary action against any

9           employee whose actions are retaliatory in

10          nature."

11              Now, do you understand Rensselaer County has

12          a policy against retaliation?

13      A.  Yes.

14      Q.  Now -- and that includes reporting an alleged

15          serious violation to a supervisor?

16      A.  Yes.

17      Q.  Now, do you understand that to mean that if a

18          person reports an alleged serious violation,

19          meaning that it doesn't have to be proven, so

20          long as they report what is alleged to be a

21          violation, they can't be retaliated for that?

22      A.  Yes.

23      Q.  Are you aware of any situations where a person

24          was retaliated against for reporting an incident

```
 1              of workplace violence?

 2    A.   I am not.

 3              MR. SORSBY:  Off the record.

 4              (Whereupon, a lunch recess was taken from

 5         11:36 a.m. through 12:24 p.m.)

 6              MR. SORSBY:  Back on the record.

 7    Q.   Mr. Hendry, do you know who John Gorman is?

 8    A.   Yes.

 9    Q.   How do you know John Gorman?

10    A.   I know him through his employment with Rensselaer

11         County.

12    Q.   Were you a part of the review process for the

13         hiring of Mr. Gorman in any way?

14    A.   No.

15    Q.   Do you recall if you were part of the

16         certification of the list to become a corrections

17         officer?

18    A.   I don't recall, but I would say no.

19    Q.   Now, when was the first time you ever met

20         Mr. Gorman?

21    A.   My guess is when he filed his complaint.

22    Q.   Well, let's be specific.  Are you referencing a

23         workplace violence complaint?

24    A.   Yes.  Sorry.
```

```
 1    Q.   And do you remember the first time he filed a

 2         workplace violence complaint?

 3    A.   Not specifically, no.  I don't remember the date.

 4    Q.   Let me show you what's been marked as Exhibit 54,

 5         Exhibit 55, 56, 57 and 58, but you can look at 54

 6         to start with.  These other exhibits were affixed

 7         to Exhibit 54.  We broke them out for

 8         identification purposes, but do you recognize

 9         what I've just shown you as Exhibit 54?

10    A.   Yes.

11    Q.   How do you recognize this?

12    A.   I recognize this as Mr. Gorman's workplace

13         violence complaint.

14    Q.   It says "incident report", same thing?

15    A.   Yes.

16    Q.   Is this the incident report form that you

17         discussed earlier that was affixed to the county

18         policy that is suppose to be placed around the

19         county?

20    A.   Can I see it?

21    Q.   Sure.

22    A.   It looks like it, yes.

23    Q.   This is Exhibit 6, and we showed you earlier the

24         incident report.  I'm showing you Page 8.
```

```
 1                   Looking at Exhibit 6, Page 8, and now
 2            looking at 54.  Is this -- is Exhibit 54, is this
 3            incident report page the same report page that
 4            was placed around the county as part of the
 5            workplace violence policy?
 6     A.     It looks similar, yes.  Yes.  It may not be
 7            identical.
 8     Q.     What's the date on this incident report?
 9     A.     7/31/12, or do you mean the date it was filed?
10     Q.     Well, where do you see -- where do you see 2012?
11     A.     7/31/12.  It was completed by Mr. Gorman,
12            apparently, on the 25th of February, 2013.
13     Q.     All right.  Now, had you had any contact with
14            Mr. Gorman before this date?
15     A.     I think he called and asked about it, yes.  Yes.
16     Q.     Asked about what?
17     A.     About how to file for this.  And I either --
18            somehow I think I provided him with the paperwork
19            or someone in the office did.
20     Q.     And the paperwork, you're talking --  are you
21            referencing the incident report sheet here?
22     A.     Yes.
23     Q.     Would that come as part of the packet, the
24            workplace policy?
```

```
1    A.   I think it probably came with the rest of the

2         policy documents.

3    Q.   Well, let me ask you specifically.  When a report

4         is made of workplace violence policies, is it

5         your policy to give an incident report --

6    A.   Yes.

7    Q.   -- for them to fill out?

8    A.   Yes.

9    Q.   Is it also your policy to give a copy of the

10        policy?

11   A.   Yes.

12   Q.   Why would you give a copy of the policy in

13        addition to --

14   A.   So the employee could be familiar with it.

15   Q.   So prior to that conversation with Mr. Gorman,

16        had you had any contact with Mr. Gorman?

17   A.   I don't recall that, no.  No.

18   Q.   All right.  Now, I want to show you what --  I

19        handed you a number of exhibits here.  Do you see

20        that, Exhibits 55, 57, 58?

21   A.   Yes.

22   Q.   It says on there -- they're incident reports.  Do

23        you recognize these incident reports?  We'll

24        start with 55.  Do you recognize this as being
```

```
 1              affixed to Mr. Gorman's criminal complaint?

 2      A.    I don't recall.  It very possibly may have been.

 3      Q.    Well, why don't you take a look at Exhibit 55 and

 4              advise me if you've seen this?

 5      A.    I have seen this before, yes.

 6      Q.    It's described as "west hall staff interaction".

 7              Do you see that at the top?

 8      A.    Yes.

 9      Q.    All right.  The date on that is January 22, 2013,

10              just to establish the date.

11      A.    Yes.

12      Q.    And then Exhibit 56, do you see that, as well?

13              Have you seen this before, what's been marked as

14              Exhibit 56?

15      A.    I have, yes.

16      Q.    All right.  And then 57?

17      A.    Yes.

18      Q.    And then lastly, 58?

19      A.    Yes.

20      Q.    Okay.  And do you see the dates on these are 2012

21              in some cases?

22      A.    Yes.

23      Q.    And when did you --  you established you've seen

24              this before.  When do you recall first seeing it?
```

```
 1            The date is October 2012.  When do you recall
 2            first seeing it?
 3      A.    February of the following year.
 4      Q.    What about the rest of these exhibits?
 5      A.    I think they all came at the same time.
 6      Q.    At the same time you reviewed his workplace
 7            violence complaint?
 8      A.    Yes.
 9      Q.    Then were these a part of his workplace violence
10            complaint?
11      A.    I don't recall specifically, but at some point
12            they were part of it, yes.
13      Q.    All right.  Now, prior to 2013, so the period of
14            October 2012 to January 2013, did you have any
15            discussions regarding John Gorman with
16            Sheriff Mahar?
17      A.    Not that I recall.
18      Q.    And did you have any conversations regarding
19            Mr. Gorman with Undersheriff Russo?
20      A.    Not to my recollection, no.
21      Q.    Did you have any conversations with
22            Anthony Patricelli?
23      A.    No.
24      Q.    Now, to be clear, the same time period.  I'm
```

```
 1              talking about October to --
 2     A.    I've spoken to Patricelli once in my life.
 3     Q.    During that period, did you speak to anybody in
 4           the county about John Gorman from October to
 5           February?
 6     A.    Not that I recall.  I say I spoke to Patricelli
 7           once in my life.  Once since we get into this
 8           stuff.  I may have had two conversations with
 9           him.
10     Q.    You beat me to the punch.  What is your
11           relationship with Patricelli, if any, outside of
12           work?
13     A.    Zero.
14     Q.    What relationship if any, do you have with
15           Sheriff Mahar outside of work?
16     A.    None.
17     Q.    What about Undersheriff Russo?
18     A.    None.
19     Q.    What was the nature of your contacts with
20           Anthony Patricelli before the matters involving
21           Mr. Gorman?
22     A.    Before the matters?
23     Q.    Yes.
24     A.    Never talked to him.
```

```
 1    Q.   What was the basis of your speaking to him before

 2         that?

 3    A.   Following up on Mr. Gorman's complaint.

 4    Q.   I thought you had indicated you'd spoken to

 5         Mr. Patricelli before that?

 6    A.   I don't recall ever doing so.

 7    Q.   Ever in your life?

 8    A.   I don't think I would know him if I saw him.

 9    Q.   What is --  all right.  Okay.  What is the basis

10         of your relationship with -- professionally, of

11         course, with Sheriff Mahar?

12    A.   Nothing other than professional.

13    Q.   All right.  Do you have -- do you have quarterly

14         meetings with him?

15    A.   No.

16    Q.   Do you have any annual meetings with regards to

17         training for any of the things you're responsible

18         for, workplace violence, sexual harassment,

19         discrimination, any of those things?

20    A.   No.  With the sheriff?

21    Q.   That's what I'm saying.

22    A.   I don't think I've spoke to Sheriff Mahar in

23         probably a year.

24    Q.   From now?
```

```
 1    A.   Going back.

 2    Q.   Does Sheriff Mahar contact you with legal -- with

 3         questions about civil service?

 4    A.   Yes.

 5    Q.   He has?

 6    A.   Yes.

 7    Q.   Has he contacted you specifically regarding civil

 8         service questions regarding John Gorman?

 9    A.   I don't recall that, no.

10    Q.   Have you spoke to Sheriff Mahar in regards to the

11         workplace violence complaint that Mr. Gorman

12         filed?

13    A.   Yes.

14    Q.   When was the first time you had a conversation

15         with him?

16    A.   When I was sending him a copy of the findings.

17    Q.   What was the substance of that conversation?

18    A.   It was just to explain to him what I came up with

19         as a result of talking to the people in the jail.

20    Q.   When was that conversation?

21    A.   I'm thinking either March or thereabouts of 2013.

22    Q.   Was it before or after you released the results

23         of your investigation with him?

24    A.   I would say -- after, I would say.  I didn't talk
```

```
 1              to him before that, no.

 2    Q.    Now, looking at these incident reports that you

 3          identified you've seen before, did you look into

 4          each one of these incidents as part of your

 5          investigation into the workplace violence

 6          complaint?

 7    A.    I would go ahead and say yes, I did.

 8    Q.    You investigated those claims?

 9    A.    I looked into them, yes.

10    Q.    What did your investigation involve?

11    A.    Speaking with the people associated with the

12          documents.

13    Q.    You looked into the west hall incident?

14    A.    Can you describe it to me?

15    Q.    Well, it says on or about January 2.  You just

16          looked at this.

17    A.    Sorry.  Yes.  I called Officer LaFountain.

18    Q.    Did you review a videotape as part of that, your

19          investigation into that?

20    A.    Of this?

21    Q.    Correct.

22    A.    I don't recall doing that, no.

23    Q.    Did you review any videotapes in regards to

24          Mr. Gorman's workplace violence complaints?
```

```
 1     A.   Yes.

 2     Q.   Which videotapes did you review?

 3     A.   I'm not sure how to describe it.  There was a

 4          door that came up and tapped Mr. Gorman on the

 5          back, hit Mr. Gorman on the back.

 6     Q.   Hit him on the back?

 7     A.   Yes.

 8     Q.   Do you still have a copy of that video?

 9     A.   No.

10     Q.   What happened to it?

11     A.   I have never had a copy of it.

12     Q.   Who had a copy of it?

13     A.   I saw a copy in Captain Smith's office,

14          Hal Smith.

15     Q.   Was it a long video, do you know?

16     A.   It didn't seem to be, no.  Actually, seconds I

17          would say.

18     Q.   Now, what conclusion did you draw after reviewing

19          that videotape?

20     A.   It didn't appear that Mr. Gorman was injured.  He

21          seemed to walk away from the incident without an

22          injury.

23     Q.   Is that a requirement, as part of workplace

24          violence, that somebody becomes injured?
```

```
 1    A.    No.

 2    Q.    It includes threats of violence and violence,

 3          correct?

 4    A.    Yes.  I didn't see that either.

 5    Q.    See what?

 6    A.    Any threats of violence.

 7    Q.    I didn't ask you that.

 8    A.    Sorry.

 9    Q.    You said that you saw the door hit him?

10    A.    Yes.

11    Q.    Did you come to the conclusion that that violated

12          the county's policy against workplace violence?

13    A.    It did not, in my opinion.

14    Q.    Why is that?

15    A.    It just seemed to be an innocent happening.

16    Q.    What led you to that opinion?

17    A.    The door just happened to -- it seemed like it

18          was a door that would shut on its own.  And it

19          just kind of came and hit him on the back.  It

20          didn't look like anybody had perpetrated anything

21          against him.

22    Q.    It's your testimony there was nobody around that

23          door?

24    A.    No.  There were people around.  There were
```

```
 1              several people in that office.

 2      Q.    And you didn't think that somebody may have

 3             released that door on him?

 4                    MR. MARTIN:  Object to the form.

 5                    MR. SORSBY:  You can still answer the

 6             question.

 7      A.    I don't recall that happening, no.

 8      Q.    Did you ask for a copy of that tape?

 9      A.    No.

10      Q.    Why did you not ask for a copy?

11      A.    It was provided to me.  It was shown to me.

12      Q.    Did you get a copy of the tape?

13      A.    No.

14      Q.    That's evidence as part of your investigation.

15             Why didn't you preserve the evidence?

16      A.    I preserved it in my mind.

17      Q.    You preserved it in your mind?

18      A.    Yes.

19      Q.    Is that part of the workplace violence policy, to

20             preserve evidence in your mind?

21      A.    I don't know.

22      Q.    Do you take notes for your investigations?

23      A.    Yes.

24      Q.    Do you keep those notes?
```

1    A.   Yes.

2    Q.   Do you ever destroy those notes?

3    A.   No.

4    Q.   You keep all of the incident reports -- you kept

5         all the incident reports for workplace violence,

6         you said -- you testified earlier?

7    A.   I believe so.

8    Q.   But you didn't keep this evidence, the evidence

9         of the video?

10   A.   I never had possession of it.

11   Q.   You never asked for it either, true?  Correct?

12   A.   I don't know that I did.  I may not have asked

13        for it, yes.

14   Q.   Let me show you what's been marked as Exhibit 57

15        -- all of these, Exhibit 57, 58, 56.  You

16        testified you've seen all of these before.  This

17        is dated October 8, 2012.

18             You also testified you investigated these

19        incident reports, so I want to talk to you about

20        your investigation into that incident report.  Do

21        you recall investigating that incident, sir?

22   A.   Yes.

23   Q.   All right.  What did you do to investigate the

24        incident?

```
 1    A.   Spoke to Sergeant Ryan and Mr. Patricelli as I
 2         recall.
 3    Q.   You just read the narrative on Exhibit 57.  What
 4         did you understand the allegation to be?
 5    A.   The allegation by Mr. Gorman?
 6    Q.   Correct.
 7    A.   That Patricelli was perpetrating a threat against
 8         him.
 9    Q.   Did you understand that Anthony Patricelli called
10         Mr. Gorman at work?
11    A.   Yes.
12    Q.   And did you understand that he said "thank your
13         wife and thank your brother"?
14    A.   That's my understanding, from what Mr. Gorman has
15         stated.
16    Q.   What did you understand that statement to mean?
17    A.   It was parlayed to me as a threatening overtone.
18         I don't know any other way to take it other than
19         what I was told.
20    Q.   You questioned Anthony Patricelli about this, did
21         you not?
22    A.   I think I did.
23    Q.   You think you did?
24    A.   I believe I did.
```

```
 1    Q.   What did he say about this?

 2    A.   Patricelli has done nothing but deny any

 3         wrongdoing to me.

 4    Q.   When did you conduct the investigation of this

 5         incident?

 6    A.   I'm guessing probably in March of 2013.

 7    Q.   Was it in more of July?

 8    A.   I don't think so.

 9    Q.   You think it was March?

10    A.   Yes.

11    Q.   Now, you said you had discussions with

12         Sergeant Ryan; is that correct?

13    A.   Yes.

14    Q.   And you interviewed him in regards to this

15         incident?

16    A.   I believe I did.

17    Q.   And what did he tell you?

18    A.   He told me Mr. Gorman took a phone call, and

19         after he had hung up the phone, Mr. Gorman

20         appeared --  looked as if someone had died.  I

21         believe those were his exact words to me.

22    Q.   What conclusion did you draw from that?

23    A.   That Mr. Gorman gave him the impression he was

24         upset about something.
```

```
 1    Q.   So at that point, having conducted your

 2         investigation -- and you had -- let me backup.

 3         You seemed to indicate you interviewed Mr. Gorman

 4         in regards to this incident; is that right?

 5    A.   I'm sure we talked about it.

 6    Q.   And did you believe that the testimony or what

 7         Sergeant Ryan told you indicated that Mr. Gorman

 8         perceived a threat?

 9    A.   I got that from Sergeant Ryan, yes.

10    Q.   And did you get from Mr. Gorman that he perceived

11         it as a threat?

12    A.   Yes.

13    Q.   And did you, at that point, determine that there

14         had been a violation of the workplace policy

15         against violence?

16    A.   No.

17    Q.   Do you recall what we were discussing earlier,

18         that workplace violence also includes threats?

19    A.   Yes.

20    Q.   Did you not believe that constituted a threat?

21    A.   I didn't see any corroboration.

22    Q.   Well, you just testified that you got from

23         Sergeant Ryan that Mr. Gorman perceived a threat?

24    A.   He gave that appearance.
```

```
 1    Q.   Did you not credit his testimony to you?

 2    A.   Ryan's?

 3    Q.   Correct.  You didn't believe that was

 4         corroborating testimony?

 5    A.   No.

 6              MR. MARTIN:  Object to the form.

 7              MR. SORSBY:  He's already answered.

 8    A.   Ryan did not hear the conversation.

 9    Q.   Now, just going forward in time a little bit.  Do

10         you recall having a conversation in June of 2013

11         with the plaintiff, Mr. John Gorman, in regards

12         to your investigation?

13    A.   I have no specific recollection.

14    Q.   Do you know who Chris Myers is?

15    A.   Yes.

16    Q.   Did you conduct any interviews with Chris Myers

17         with regards to Mr. Gorman?

18    A.   No.  I believe we discussed it.  I didn't

19         interview him.  I think what happened was

20         Mr. Gorman wrote a letter or made a phone call or

21         something like that to the county executive.

22              The county executive --  and this is just --

23         I don't know if I should be saying this, but this

24         is my assumption.  Is that okay?  I'm going to
```

```
 1                tell you what my assumption is.

 2                    My assumption is the county executive

 3                delegated to Chris Myers, who is the deputy and

 4                Chris probably called me to see what was

 5                happening.

 6       Q.      When did this call come in?

 7       A.      I have no recollection.  I don't know.

 8       Q.      You have absolutely no recollection?

 9       A.      No.

10       Q.      Do you recall having a conversation with

11                Mr. Gorman to the extent that he was checking on

12                the status of the investigation, and you had

13                indicated you had been very busy, and you

14                indicated you received a recording of the phone

15                call and you didn't hear anything threatening.

16                Do you recall that?

17       A.      It sounds familiar.  I have no specific

18                recollection.

19       Q.      So you had heard the recording of the phone call

20                from Patricelli to Mr. Gorman at the work

21                station?

22       A.      I think I did, yes.  I think I did.

23       Q.      All right.  And did you hear him say, "Thank your

24                sister, thank your brother", what we just read?
```

```
 1    A.    Yeah.  I think he said that.

 2    Q.    So there's no denying he said that.  You heard it

 3          on the recording?

 4    A.    My recollection is I did hear that, yes.

 5    Q.    Why is it you didn't perceive it as a threat?

 6    A.    It didn't sound threatening to me.

 7    Q.    What did you understand it to mean?  It seems

 8          kind-of a strange statement, wouldn't you agree?

 9    A.    No.

10    Q.    What does it mean, "Thank your brother, thank

11          your -- "

12                MR. MARTIN:  Object to the form.

13    Q.    What did you understand it to mean?  You're doing

14          the investigation.

15    A.    I understood it to mean "thank your brother,

16          thank your sister".

17    Q.    I was misquoting.  "Thank your wife, thank your

18          brother."  Do you remember that being stated on

19          the --

20    A.    I don't recall what was stated.

21    Q.    You remember hearing --

22    A.    I remember hearing the conversation, yes.

23    Q.    Did you ask Mr. Patricelli what that statement

24          meant?
```

```
 1    A.    I don't recall.  I don't recall.  I don't think

 2          after hearing the tape, I spoke to Patricelli

 3          again.

 4    Q.    You didn't followup with him?

 5    A.    No.

 6    Q.    Why didn't you followup with him?

 7    A.    I don't recall.

 8    Q.    Wouldn't you want to determine what he meant by

 9          that statement as the investigator?

10    A.    Perhaps.  At the time I didn't.

11    Q.    I mean, what do you understand that statement to

12          mean, if anything --

13                MR. MARTIN:  Object to the form.

14    Q.    -- "thank your wife and thank your brother"?

15    A.    No clue.  It didn't sound threatening to me,

16          though.

17    Q.    If you didn't understand what the statement

18          meant, why didn't you followup with the person

19          that made the statement?

20    A.    Because it didn't sound threatening to me.  It

21          didn't sound as if Mr. Gorman was being

22          threatened.  It could have been for a Christmas

23          present.  I don't know.

24    Q.    That's the point, isn't it?  You don't know what
```

```
 1              the statement meant, and you didn't followup to
 2              find out what the statement meant, so how could
 3              you determine whether it was a threat or not?
 4                   MR. MARTIN:  Object to the form.
 5         A.   I didn't perceive it as a threat.
 6         Q.   But you didn't know what the statement was,
 7              correct?
 8         A.   No.
 9         Q.   So my question is:  How do you know if it was a
10              threat or not if you didn't know what the
11              statement meant?
12                   MR. MARTIN:  Don't answer.  Don't answer.
13              You're not going to ask the same question twenty
14              times.
15                   MR. SORSBY:  Listen, you made your
16              objection.  You don't have to elaborate --
17                   MR. MARTIN:  I can do -- you can't --
18                   MR. SORSBY:  This is my deposition.
19                   MR. MARTIN:  You can't --
20                   MR. SORSBY:  Listen.  Fine.  Objection
21              noted.  We're done.  We're moving on.  You're
22              done.
23         Q.   Let's go forward.  We're looking back at
24              Exhibit 54 again.  I'm going to show you the
```

```
 1              second page, which is attached to it.
 2      A.    (Witness complied.)
 3      Q.    Do you recall seeing this document?
 4      A.    Yes.
 5      Q.    What do you understand that to be?
 6      A.    I think that was attached to John's, or
 7              Mr. Gorman's, workplace violence incident report
 8              describing what transpired.  I think that was
 9              regarding the phone call to his home.
10      Q.    You understand that to be the alleged workplace
11              violence incident in February?
12      A.    Yes.
13      Q.    Okay.  It says that -- it looks like the date --
14              the signature date on this is February -- the
15              date of the incident is February 15th, and the
16              date it was signed was February 25th; do you see
17              that?
18      A.    Yes.
19      Q.    Do you know when you received this?
20      A.    No.
21      Q.    Do you know when you started your investigation
22              into this?
23      A.    No.  As a matter of fact, and this is just a
24              sidebar.  My recollection is the day that
```

```
 1            Mr. Gorman brought this to my office, I went for
 2            heart surgery the next day and I know it was the
 3            end of February of 2013.  So that 25th looks
 4            somewhat right.
 5      Q.    And how do you know that?  How do you know that
 6            was brought the day before you went for heart
 7            surgery?
 8      A.    I think he brought it to the office, and I was
 9            either there or heard about the document coming
10            in.
11      Q.    You heard about the document coming in.  Who
12            would you have heard that from?
13      A.    Somebody in the office.
14      Q.    And when did you -- so you went out for heart
15            surgery.  When did you commence this
16            investigation?
17      A.    I'm thinking when I returned, which might have
18            been a week.
19      Q.    What was the first thing you did as part of your
20            investigation?
21      A.    I suspect, and I don't know for sure, talked to
22            Mr. Gorman.
23      Q.    Well, I want to know, do you know what was the
24            first thing you did?
```

```
1    A.   No.

2    Q.   Do you recall having a conversation with

3         Mr. Gorman?

4    A.   Yes.

5    Q.   And did you take notes of that conversation?

6    A.   I suspect I did, yes.

7    Q.   Now, what did you understand Mr. Gorman's

8         allegation to be on February 15th?

9    A.   Something occurred, and that Mr. Patricelli

10        called Mr. Gorman at home and made an allegedly

11        threatening comment.

12   Q.   What was the alleged threatening comment?

13   A.   Something about breaking your jaw or something

14        like that.

15   Q.   Well, we can --  if you turn it over, this is --

16        you indicated you've seen this document before?

17   A.   Yes, I've seen this.  Sure.

18   Q.   It looks like it's a little bit --  I'll show

19        you.

20   A.   "If I had a big enough problem with you, I'd come

21        over there and break your jaw."

22   Q.   Does that refresh your recollection as to what

23        the allegation was?

24   A.   Yes.
```

```
1    Q.   We won't go through that whole document, but that
2         was the general -- you understood that to be the
3         general allegation, at least to the February 15th
4         incident, that he called Mr. Gorman and
5         threatened to break his jaw?
6    A.   Yes.
7    Q.   In those words that you read?
8    A.   Yes.
9    Q.   You don't remember --  you don't remember when
10        you interviewed Mr. Gorman.  Do you remember
11        which -- strike that.
12             How many -- do you remember, did you
13        interview a number of witnesses or purported
14        witnesses?
15   A.   Yes.
16   Q.   And in the order of interviewing these people,
17        where did Mr. Gorman fall?  Was he the first
18        person you talked to?
19   A.   That's my recollection, yes.
20   Q.   And after discussing the matter with Mr. Gorman,
21        what did you do next?
22   A.   In terms of speaking to people, I think the next
23        person I spoke to was Patricelli.
24   Q.   Did you do that over the phone or --
```

```
1    A.   Yes.

2    Q.   -- in person?

3    A.   Yes.  Phone.  Sorry.

4    Q.   Okay.  And what did Mr. Patricelli say to you?

5    A.   He told me what --  I think he told me the

6         background of the situation and what had

7         happened.  And my recollection is further that he

8         denied making that threat.

9    Q.   Now, when you spoke to Mr. Gorman, do you recall

10        him telling you that he had filed a criminal

11        report or criminal complaint against Patricelli?

12   A.   At some point, yes, I remember that.

13   Q.   Do you remember him telling you that?

14   A.   Mr. Gorman?

15   Q.   Yes.

16   A.   Yes.

17   Q.   Where do you recall that that complaint was

18        filed?

19   A.   I'm thinking Schaghticoke, Schaghticoke Town

20        Court, I think.  Was it filed with the State

21        Police?

22   Q.   I'm asking you.  You can't ask me questions.

23   A.   I'm sorry.

24   Q.   I'll ask you.  Do you recall what law enforcement
```

```
 1              agency was involved with that complaint?

 2     A.    My recollection is the State Police.

 3     Q.    Can you tell us what people you interviewed as

 4           part of this investigation?

 5     A.    Patricelli, Ryan.  I spoke to LaFountain; she did

 6           not call me back.  Perhaps Sergeant Dunham.

 7           Quite a number of people.

 8     Q.    Okay.  Now, do you recall when you interviewed

 9           Sergeant Ryan?

10     A.    No.

11     Q.    Now, Sergeant Ryan testified at his deposition, I

12           believe in form or substance, that you had called

13           him, interviewed him, after you published or

14           after you concluded your investigation; is that

15           true?

16     A.    It's possible.  I don't know for a fact.

17     Q.    Why is it that you would interview a person

18           relevant to the investigation after you already

19           concluded your results?

20     A.    Again, I don't know this for a fact, but at a

21           point, the labor department got involved and said

22           we had not interviewed everybody, so I went back

23           and interviewed additional people.

24     Q.    This was after you had --
```

```
 1    A.   I don't recall that.  I'm not sure.

 2    Q.   Okay.  I'll show you what's been marked as

 3         Exhibit 5.  Do you recognize this document?

 4    A.   Yes, I do.

 5    Q.   How do you recognize this document?

 6    A.   It's a letter I prepared for Mr. Gorman as a

 7         result of the workplace violence filing.

 8    Q.   Is this the results of your investigation into

 9         the workplace violence complaint?

10    A.   Yes.

11    Q.   Now, is it true that you had indicated -- strike

12         that.

13              You indicated that the Department of Labor

14         had became involved at some point?

15    A.   Yes.

16    Q.   Did the Department of Labor become involved after

17         you released the results of your investigation?

18    A.   I would say, yes.

19    Q.   It was at that time you had interviewed

20         Sergeant Ryan, after the Department of Labor

21         became involved?

22    A.   I don't recall that.  I know there were a couple

23         people.

24    Q.   So you had to investigate more witnesses after
```

1          the Department of Labor came?

2     A.   Yes.

3     Q.   Who were those witnesses?

4     A.   I don't know.  There were several people.

5     Q.   Okay.  Do you recall having to interview

6          Sergeant Rankin?

7     A.   Yes.

8     Q.   What were the results of that interview?

9     A.   Nobody provided me any information to corroborate

10         Mr. Gorman's allegations.

11              MR. SORSBY:  Off the record.

12              (Whereupon, a brief recess was taken.)

13              MR. SORSBY:  Back to the fun.

14    Q.   Mr. Hendry, what I'm trying to figure out is how

15         you came to your determination, your

16         investigation -- the -- we're looking at

17         Exhibit 5, which is your -- the --  your exhibit

18         --  excuse me -- is the conclusions of your

19         investigation.

20              How were you able to come to a determination

21         without interviewing all the witnesses?

22    A.   I don't have a specific recollection.  I thought

23         I had enough information to make a determination

24         based on those I spoke to.  There was no other

```
 1            way for me to make that determination --  make a
 2            different determination.
 3     Q.     Now, did you talk to any officials with the Town
 4            of Schaghticoke, the town court, in regards to
 5            the complaint filed against Mr. Patricelli?
 6     A.     No.  I spoke to the district attorney's office.
 7     Q.     Did you speak to anyone at the State Police
 8            barracks?
 9     A.     Yes.
10     Q.     Who did you talk to there?
11     A.     The Trooper involved in the case, Hock or Koch or
12            something like that, a female.
13     Q.     Now, this letter is dated March 25th and it
14            references the Town of Schaghticoke court.  Did
15            you contact the State Troopers barracks,
16            Trooper Hock, before you published the findings
17            -- your findings?
18     A.     I don't recall.  I don't know.
19     Q.     Did you talk with the DA's office before
20            March 25th, the day of this?
21     A.     I don't recall specifically.  I don't know.
22                  MR. SORSBY:  Off the record for a moment.
23                  (Discussion off the record.)
24                  MR. SORSBY:  Back on the record.
```

```
 1              (Exhibit 70 marked for identification.)

 2    Q.   I'm going to show you what's been marked as

 3         Exhibit 70.

 4              MR. SORSBY:  And you can label this as

 5         Trooper Hock's notes.

 6    Q.   Do you recognize this document?

 7    A.   Yes.

 8    Q.   How do you recognize this document?

 9    A.   Those would appear to be my notes from my

10         conversation with the Trooper.

11    Q.   Now, you will notice that there are two dark

12         spots at the top of this.  It appears this was

13         part of a clipboard type file.  Do you keep all

14         of your notes in a clipboard type file?

15    A.   No.

16    Q.   Were you asked to provide all your notes relative

17         to this investigation?

18    A.   Yes.

19    Q.   Was this one of the things you provided, one of

20         the documents you provided?

21    A.   I guess so.  This was just in the folder I gave

22         to Mr. Martin.

23    Q.   So now it says Trooper Hock.  Would you have

24         taken the notes while you talked to her?
```

```
 1      A.   I would suspect.

 2      Q.   Did you talk to her over the phone or in person?

 3      A.   Over the phone.

 4      Q.   Could you tell us the date of that?

 5      A.   7/15, July '15.

 6      Q.   So you recall this being in July 2015 that you

 7           had this conversation with her?

 8      A.   I don't recall specifically, but I'm not

 9           disputing it.

10      Q.   Do you remember what she said during the

11           conversation?

12      A.   I don't recall, again, specifically, but just

13           referring to my notes, it appears Patricelli

14           didn't make a written statement and she didn't

15           want to give up her notes because the case was

16           outstanding.

17      Q.   Is this one of the witnesses you interviewed

18           after PESH became involved?

19      A.   I'm not sure of that.  I'm speculating.

20      Q.   We prefer you not speculate.

21      A.   Pardon?

22      Q.   We prefer you not speculate.

23      A.   I think this is what happened.  This finding came

24           out March 25, 2013.  I mailed it to Mr. Gorman.
```

```
 1            Mr. Gorman -- I'm thinking out loud -- I think he

 2            called me.  We had further a conversation, and I

 3            went out and talked to additional people.  I

 4            didn't want to close the case, being the fact

 5            that there was still this criminal element to it

 6            that was unresolved.

 7     Q.   All right.  So you would -- would you agree,

 8            then, that you interviewed Trooper Hock after you

 9            had issued this report to Mr. Gorman?

10     A.   It would appear so, yes.

11     Q.   And you had other witnesses, as well, after this

12            -- the date of this, correct?

13     A.   That is true, yes.

14     Q.   Now, after interviewing --

15                MR. SORSBY:  Off the record a moment.

16                (Discussion off the record.)

17                MR. SORSBY:  Back on the record.

18     Q.   I'm going to show you --

19                MR. SORSBY:  This has not been marked as an

20            exhibit.  We'll have to get it marked.  So this

21            will be 71.  This was provided to us in response

22            to our document request Number 11 by the county.

23            We'll get that marked as Exhibit 71.

24                (Exhibit 71 marked for identification.)
```

1    Q.   Do you recognize Exhibit 71?

2    A.   I do.

3    Q.   Can you tell us how you recognize this document?

4    A.   This is a memo I sent to the sheriff advising him

5         of the results of the investigation regarding

6         Officer Gorman.

7    Q.   Do you see the date of that, March 26, 2013?

8    A.   Yes.

9    Q.   Did you have any conversations between

10        February 15, 2013 and March 26th with the sheriff

11        in regards to your ongoing investigation?

12   A.   I do not think so.  I don't think so.  I think at

13        a point --  at a point between those dates, the

14        sheriff provided me a copy of Mr. Gorman's

15        complaint.  After Mr. Gorman had given it to me,

16        I got a copy of it from the sheriff's department.

17   Q.   You said the sheriff.  Did the sheriff give it to

18        you?

19   A.   It was sent via mail or something.  Not

20        personally, no.

21   Q.   All right.  And did he call you and --

22   A.   He may have called and said, "Hey, I've got this

23        thing I've got to send you."

24   Q.   What other conversations did you have with him at

1          that time?

2     A.   None.  Zero.

3     Q.   Did you get into the merits of the investigation?

4     A.   Not at all.

5     Q.   So you received Mr. Gorman's February 15th

6          complaint via him and the sheriff ultimately?

7     A.   February 15th?

8     Q.   Yeah, February 15th.

9     A.   Yes.

10    Q.   So one of the things I'd like to know is you

11         indicated there was a subsequent conversation

12         following your March 25th letter to Mr. Gorman

13         indicating that you had -- I'm referencing

14         Exhibit 5 now again.

15    A.   Mm-hmm.

16    Q.   Is it at this point the investigation was closed

17         and it was later reopened?

18    A.   Yes.  I mean, this letter was sent out.  And I

19         think there may have been a provision in there --

20         and I'm not reading it -- but if there's further

21         information that can be brought up, let me know.

22    Q.   So it was closed at this point, but it was

23         reopened later on?

24    A.   I believe so, yes.

1    Q.   What led you to reopen the investigation?

2    A.   I don't recall.  It may have been the labor

3         department.  It may have been additional

4         information that Mr. Gorman provided me.  I don't

5         recall exactly.

6    Q.   All right.  You reopened the investigation and

7         you interviewed additional people?

8    A.   Yes.

9    Q.   And you've already gone over who you believe you

10        interviewed, but what I'd like to do at this

11        point is I'd like to introduce another exhibit.

12             MR. SORSBY:  These are what appear to be a

13        series of notes, handwritten notes taken by

14        Hendry.  These were provided as part of the

15        county's Rule 26 disclosures -- well, not 26.

16        They were provided per a document request.

17        Mr. Martin provided these.  We will get this

18        marked as Exhibit 72.

19             (Exhibit 72 marked for identification.)

20   Q.   I'll start with the first page.  We're going to

21        go page by page.  I didn't want to separate

22        exhibits here, so we'll start with the first

23        page.  Is that your writing, sir?

24   A.   It is, yes.

```
1    Q.   I'm referencing Exhibit 72.  I'll have you look

2         at the one that's marked and I'll take this.  So

3         do you see where it says "A.P." at the top?

4    A.   Yes.

5    Q.   Is that Anthony Patricelli?

6    A.   Yes.

7    Q.   And the date is March 12th?

8    A.   Yes, 3/12/13.

9    Q.   And you understand that this is the notes you

10        took while interviewing Mr. Patricelli --

11        Sergeant Patricelli?

12   A.   Yes.

13   Q.   Now, if you turn the page over, do you see in the

14        middle there it appears to say Captain Smith?

15   A.   Yes.

16   Q.   And there's a date there?

17   A.   Yes.

18   Q.   March 15, 2013?

19   A.   Yes.

20   Q.   So do you believe that's the note for

21        Captain Smith, your interview of Captain Smith?

22   A.   It appears to be, yes.

23   Q.   You recognize your writing, by the way, on this

24        page, correct?
```

```
 1    A.   Yes, as bad as it is.

 2    Q.   Do you see down towards the end of the page, it

 3         says Anthony Patricelli 3/18?

 4    A.   Yes.

 5    Q.   So you conducted two separate interviews of

 6         Mr. Patricelli?

 7    A.   Yes.

 8    Q.   And why did you conduct two?

 9    A.   There must have been other information that I

10         became aware of that I wanted to ask him.

11         Actually --  actually -- I'm sorry.  I think he

12         called me.

13    Q.   Which incident?

14    A.   I think he called me on the 18th.

15    Q.   Okay.  He called you?

16    A.   I believe so, yes.

17    Q.   Did he tell you why he called you?

18    A.   Just regarding this situation.

19    Q.   It says something to the extent -- and I'm

20         reading 3/18, "DA is trying to railroad him

21         because of that bitch Rogers."  What did you

22         understand that to mean?

23    A.   He was --  seemed to be trying to relate to me

24         that there was some type of political vendetta
```

```
 1              against him.  That's my interpretation.

 2       Q.   Of what that meant?

 3       A.   Yes.

 4       Q.   All right.  And what did you -- did you believe

 5            that there was a political vendetta?

 6       A.   No.  It didn't mean anything to me.

 7       Q.   Do you know why he called you to tell you that?

 8       A.   No.  I think it had to do with his case in the

 9            town court, and the DA was going to --

10       Q.   Nail him?

11       A.   Put it to him, yes.

12       Q.   What did you say to him, if anything?

13       A.   I don't recall.  I think I probably just let him

14            speak.

15       Q.   Okay.  All right.  Now, if you turn to the next

16            page, it starts with Dunham 3/21.  Do you see

17            that?

18       A.   Yes.

19       Q.   So you interviewed Sergeant Dunham?  It doesn't

20            look like there was much to say there, so I see

21            why; is that true?

22                 MR. MARTIN:  Object to the form.

23       Q.   How long was your conversation with him?

24       A.   Brief.  Very brief.  I think I was basically
```

```
 1              asking these individuals if they had any
 2              knowledge of harassment.
 3         Q.   And did Sergeant Dunham mention anything about
 4              Mr. Gorman calling him and mentioning anything
 5              about the workplace violence incident?
 6         A.   No.
 7         Q.   Let's turn the page, if you would, please.  Oh,
 8              you're already there.  Okay.  So it looks like
 9              you --  is this -- well, looking at this page, it
10              says "Sergeant Ryan" on the top.  Do you
11              understand this to be the notes you took while
12              interviewing Sergeant Ryan?
13         A.   Yes.
14         Q.   Okay.  It says looks like "J.G.", which is
15              John Gorman I presume, "on second phone."  I'm
16              looking at what you wrote.  Do you agree that's
17              what it says "on second phone"?
18         A.   Yes.
19         Q.   "Seemed like somebody -- "
20         A.   "Died."  I'm sorry.
21         Q.   We had a doctor here already.  Don't worry.  That
22              writing was worse.  Then it says, "A.P.
23              threatened to end his career, his life"?
24         A.   Yes.  It says "per J.G.", so apparently
```

1           Mr. Gorman told Sergeant Ryan that.

2    Q.    Just real quick.  I want to go down.  Do you see

3          where it says Chris LaFountain.  You interviewed

4          Chris LaFountain, as well?

5    A.    Yes.

6    Q.    It says, "Retaliation is going on throughout the

7          workplace"?

8    A.    Yes.

9    Q.    First of all, did you agree with that?

10   A.    I didn't know one way or the other.

11   Q.    Did you investigate that?

12   A.    I did not.  I asked her to call me back and she

13         never did.

14   Q.    Did she elaborate on that phone call what she

15         meant?

16   A.    No.  She told me she was uncomfortable on the

17         phone.

18   Q.    She never called you back, but did you followup

19         with her?

20   A.    No.

21   Q.    Why didn't you followup with her?

22   A.    I was waiting for her to call me.

23   Q.    I'm just trying to figure this out, because

24         you're in charge of the enforcement of the

```
 1              workplace violence policy in Rensselaer County

 2              and you're expecting her to call you back.  Why

 3              didn't you call her?

 4        A.    Well, I did at first.  I called her and we had a

 5              brief conversation.  And she said, "I would

 6              prefer to call you from my cellphone.  I will

 7              call you from my cellphone."  And she did not.

 8        Q.    But she still works at the county, does she not?

 9        A.    I'll be honest with you.  I don't know.

10        Q.    Did she continue to work at the county after you

11              talked to her?

12        A.    I don't know.

13        Q.    You could have got ahold of her if you wanted to;

14              isn't that true?

15        A.    I'm sure I could have called her at the worksite,

16              but she didn't want to talk to me there.

17        Q.    As part of -- we talked about retaliation

18              earlier, right?  And we talked about retaliation

19              being prohibited in the workplace violence policy

20              for Rensselaer County.

21                   If a person comes to you with an allegation

22              of retaliation, do you not believe it's part of

23              your duty to followup on a claim of retaliation?

24        A.    Yes.
```

1    Q.   So why didn't you do that in this case?

2    A.   I just was waiting for her to call me.

3    Q.   All right.  I'm just -- one of the things I'd

4         like to get more understanding of is the location

5         of your office relative to the sheriff's

6         department or correctional facility.  How close

7         is that?

8    A.   Several miles.

9    Q.   They're both within the City of Troy; is that

10        true?

11   A.   Yes.

12   Q.   So it doesn't take that long to get to the

13        correctional facility?

14   A.   No.  I'd say within ten minutes.

15   Q.   I understand that you didn't call

16        Chris LaFountain back, but did you ever look into

17        the fact that there was quote/unquote retaliation

18        within the jail?

19   A.   I couldn't specifically say I did, no.

20   Q.   If you turn the page over to the next page.

21        You're fast.  Do you see the date on the top of

22        that?

23   A.   8/16.

24   Q.   Now, all the dates before appear to have been in

```
 1            March and we're now in August.  Is this the
 2            second set of --  is this the interviewed that
 3            occurred after you opened --  reopened the
 4            investigation?
 5      A.    I'd say yes.  I would say this is after having
 6            met with the Department of Labor.
 7      Q.    Okay.  There also came another time when
 8            Mr. Gorman filed another workplace violence
 9            complaint, didn't he, or incident report?
10      A.    I believe so.
11      Q.    Do you remember when that was?
12      A.    I don't.  Probably in the summer.  I'm just
13            thinking out loud.
14      Q.    Was that before or after you opened up the
15            original investigation?
16      A.    I'd say after.
17      Q.    Now, I'm going --  before we go to August, I'm
18            going to stay in March when you released your
19            initial determination.  Hold on a second.
20               Of all the witnesses I'm seeing here, I
21            don't see any notes from a conversation with
22            Mr. Gorman.  Can you tell us why that is?
23      A.    No.
24      Q.    Did you take any notes?
```

```
 1    A.   I'm assuming.  I thought I did.

 2    Q.   Well, do you recall taking notes of your

 3         interview with Mr. Gorman?

 4    A.   I don't see any in the file.  I thought for sure

 5         that I had.

 6    Q.   You took notes for every one of these persons you

 7         interviewed.  Do you have a recollection of

 8         taking notes of your interview with Mr. Gorman?

 9    A.   I don't have a recollection.

10    Q.   Is that the totality of your file, or is it

11         possible there are other documents?

12    A.   I'm not aware of any other documents.

13    Q.   And you provided everything in your file?

14    A.   It's possible I went off of --  it's not

15         reasonable to me that I didn't make notes of our

16         conversations.

17    Q.   You had several conversations with Mr. Gorman;

18         isn't that true?

19    A.   Yes.

20    Q.   Maybe even more than ten; would you say that's

21         true?

22    A.   Probably, yes.

23    Q.   And you don't have notes from any of those

24         conversations?
```

```
1    A.   I don't see any in this group of documents, no.

2         I don't see any in there.

3    Q.   Now, you said you keep all of the --  you have

4         never destroyed an incident report from any

5         workplace violence complaint?

6    A.   I don't recall that, no.

7    Q.   Would you have destroyed notes?

8    A.   Absolutely not, no.

9    Q.   Where do you keep the notes?

10   A.   In my office on a table.

11   Q.   Because it would seem you'd have a lot of notes

12        if there were a lot of conversations with

13        Mr. Gorman.  I would say, if you get an

14        opportunity, just look again, in case they do

15        exist?

16   A.   Certainly.

17             MR. SORSBY:  All right.  Time to mark some

18        more exhibits.  Off the record.

19             (Exhibits 73 and 74 marked for

20        identification.)

21             MR. SORSBY:  Back on the record.

22   Q.   I'm going to show you what's been marked as

23        Exhibit 73.  Now, this was provided to us by your

24        attorney as part of our discovery request.  Do
```

```
 1              you recognize this document?

 2     A.   Yes.  It's an e-mail.

 3     Q.   And is that an e-mail from you --  we'll start

 4          with the --

 5     A.   The original?

 6     Q.   Yeah.  Let's start at the bottom.  Would you say

 7          that's where it starts?

 8     A.   Yes.

 9     Q.   And the date on the bottom is June 26, 2013?

10     A.   Yes.

11     Q.   And this is from you to Richard McNally?

12     A.   Yes.

13     Q.   Who is Richard McNally?

14     A.   He was at the time district attorney.  He's a

15          Judge now.

16     Q.   Essentially in your e-mail, you were asking for

17          testimony available -- that was available?

18     A.   I'm asking for whatever he could give me to

19          assist in the case.

20     Q.   And then he responded to you, correct?

21     A.   He responded, I have no problem.  I'm going to

22          tell ADA Kennedy to contact me.

23     Q.   Now, it says, "We have no objection to you using

24          this statement."  What does he mean by that?
```

```
 1    A.    The statement that Patricelli may have given.

 2    Q.    Okay.  Now, let's go to the followup.  There

 3          appears to be another e-mail that came in

 4          July 3rd?

 5    A.    Yes.

 6    Q.    That's from Rita Reynolds, Rita Romani (phonetic)

 7          There's two names there, but they seem to be from

 8          Rita Romani; do you see that?

 9    A.    Yes.

10    Q.    Who is Rita Romani?

11    A.    She's an assistant DA.

12    Q.    And it appears that she signed it as

13          Rita Reynolds?

14    A.    Yeah.  It appears she got married somewhere in

15          the interim.

16    Q.    That's what I thought.  Now, it appears she's

17          cc'ing the current DA at that time, an

18          Elizabeth Kennedy?

19    A.    Yes.  It appears that DA McNally was asking

20          Kennedy to get ahold of me, and not knowing that

21          Kennedy was not on the case but this other person

22          was, so that -- a week or so later, she contacted

23          me.

24    Q.    Do you know Rita Romani AKA Rita Reynolds outside
```

```
 1          of work?

 2     A.   No.

 3     Q.   Had you ever met her before?

 4     A.   No.

 5     Q.   Now, this is dated in June and July of 2013, so

 6          this was well after your initial conclusion,

 7          correct?

 8     A.   Yes.

 9     Q.   Now, when you --  I'm just backing up.  When you

10          spoke to Trooper Hock, it appears to be later in

11          these e-mails, July 15th.  Did you ask her for a

12          copy of her police report, her incident report?

13     A.   I don't recall specifically.

14     Q.   Okay.

15     A.   By virtue of the notes, it appears like I may

16          have.

17     Q.   And did you get a copy of the incident report?

18     A.   No.

19     Q.   Why didn't you get a copy?

20     A.   It wasn't provided to me.  She said she didn't

21          want to give it to me while the investigation was

22          open.

23     Q.   Who said that to you?

24     A.   The trooper.
```

```
1    Q.   Now, but she indicated there was a report to

2         give, an incident report to give; do you recall

3         that?

4    A.   No, I don't.  I don't think that --  I don't

5         know.  I'm not familiar with the forms.  I was

6         actually more interested in Patricelli's

7         statement to see if he had admitted some type of

8         guilt.

9    Q.   And wouldn't you have gotten that from the

10        arresting officer?

11   A.   She said there was none.

12   Q.   Who said there wasn't one, Trooper Hock?

13   A.   Yes.

14   Q.   She said there was no --

15   A.   No statement was given by Patricelli.

16   Q.   That's strange, because Trooper Hock was here

17        recently under oath, and she showed us the

18        incident report, the arrest report.  And she

19        quoted Mr. Patricelli making a direct threat to

20        Mr. Gorman.  Did you ever see that incident

21        report?

22   A.   No.

23   Q.   But she's telling -- you're saying she told you

24        there was --
```

```
 1    A.   There was no statement made by him.

 2              MR. MARTIN:  And that's not a statement by

 3         Patricelli.

 4              MR. SORSBY:  I understand that.  I know

 5         there's a -- there's a difference between an

 6         arrest report and a statement.  I understand that.

 7    Q.   Did you ask her for a copy of the arrest report?

 8    A.   I don't recall.  I don't recall.

 9    Q.   Did you ask her if he made any statements to her?

10    A.   Yes.  I asked her if I could get a copy of it.

11    Q.   And she said he made no statements?

12    A.   Correct.

13    Q.   In fact, if you could look back at 74 again,

14         right there, do you see where it says, "Hi Tom."

15         This is from Rita Reynolds, the second one down?

16    A.   Yes.

17    Q.   So that is -- it says that --

18    A.   It looks like there should be more to this,

19         though.

20    Q.   We've got --

21    A.   Oh, that's the July 3rd.

22    Q.   Yes.

23    A.   Okay.

24    Q.   I'm moving to the other one, August 13th.  It
```

1         says, "All I can tell you is there's no indicia

2         that Patricelli said anything other than basic

3         pedigree information on the New York State Police

4         paperwork."  Did you ask her for the paperwork?

5   A.   Yes.  I must have, yes, because a period of time

6         had passed and I called her and said, "What's

7         going on?"

8   Q.   Called who?

9   A.   I e-mailed her and said, "What's happening?"

10   Q.   You e-mailed Rita; is that what you're saying?

11   A.   Yes.

12   Q.   Okay.

13   A.   And it appears now it had been sent to another

14         assistant district attorney.

15   Q.   Do you see where it says, "I have spoken with the

16         Trooper who issued Patricelli the appearance

17         ticket.  She told me she took no statement, as

18         Patricelli barely answered basic pedigree

19         information for her"?

20   A.   Yes.

21   Q.   And did not speak to her about the incident?

22   A.   Yes.

23   Q.   And "I have had confirmation with New York State

24         Police investigators that no one spoke to nor

```
 1              took any statement from Patricelli"?

 2      A.   Yes.

 3      Q.   Now, you had indicated that you probably did ask

 4           for a copy of the paperwork.  It says, "I reached

 5           out to the New York State Police Brunswick for

 6           all of their paperwork."  Did you ask again Rita

 7           for the paperwork from the state troopers?

 8      A.   After this time?

 9      Q.   Yes.

10      A.   No.

11      Q.   Did you have any followup conversations with

12           Trooper Hock other than this?

13      A.   I think I just spoke to her one time.

14      Q.   Now, it says here, "No written statement made."

15           Does it indicate she asked him about the event?

16      A.   I don't recall.  I don't know.

17      Q.   Can you tell me --  well, on March 25th, you

18           issued a report with your investigative findings,

19           finding that there was no workplace violence in

20           regards to Mr. Gorman's allegations.

21              Why is it not until July, which is a number

22           of months later, that you're asking for copies of

23           the police report and whether or not any

24           statements were made?  Why did you wait that
```

```
 1              long?
 2    A.   I'm suspecting it was a result of conversations I
 3         may have had with Mr. Gorman.
 4    Q.   What do you mean by that?
 5    A.   I think we probably spoke, and he brought some
 6         information to my attention, and I attempted to
 7         check into it.
 8    Q.   You're saying before March 25th, you had no
 9         notice that there was a police report filed in
10         this matter?
11    A.   I knew that there was something going on in the
12         town court.
13    Q.   In Schaghticoke Town Court?
14    A.   Yes.
15    Q.   How did you know that?
16    A.   Conversations between Mr. Gorman and
17         Officer Patricelli.
18    Q.   At that time, why did you not call the police
19         that filed the criminal complaint?
20    A.   I don't know.  I'm not sure.  I don't know.
21    Q.   You didn't reach out to Trooper Hock at that
22         point?
23    A.   I don't recall doing that, no.  I had one
24         conversation with her and it was apparently in
```

```
 1           July.

 2    Q.    And you didn't ask for any documents from the

 3           court?

 4    A.    No.  I guess I was relying on the DA to get me

 5           that stuff.

 6    Q.    But not before March 25th, correct?

 7    A.    No.

 8    Q.    Because there's no indication you reached out to

 9           the DA's office?

10    A.    You are correct.

11    Q.    In fact, the only people you interviewed, as part

12           of -- up until March 25th when you reached your

13           conclusion, was Anthony Patricelli, correct --

14           Dunham, Smith, Ryan and that's it, correct?

15    A.    It's possible, yes.

16    Q.    Did you interview at all Chief Vibert?

17    A.    No.

18    Q.    Was she still there at the time?

19    A.    It was right around the time when she left.

20    Q.    Why didn't you interview her?  She was the chief

21           in charge, was she not?

22    A.    She was.

23    Q.    Why didn't you interview her?

24    A.    I didn't know she had any pertinent information
```

```
1              to provide me.  It was my understanding that

2              Mr. Gorman went to her, at least in some way,

3              shape or form after the event.

4     Q.   How did you come to that understanding?

5     A.   I'm pretty sure Mr. Gorman told me.

6     Q.   Why didn't you followup with Chief Vibert to

7              discuss that with her?

8     A.   I wasn't sure she had any pertinent information.

9     Q.   But he brought the information to his supervisor,

10             correct?

11    A.   I think he did, yes.

12    Q.   Why would she not have pertinent information?

13    A.   She didn't see the events happening.  I was

14             looking for witnesses.

15    Q.   Well, this was a phone conversation, at least the

16             February 15th event was a threat over the phone,

17             correct?

18    A.   I believe there was.

19    Q.   So the people you interviewed weren't witnesses;

20             isn't that true?

21             Anthony Patricelli would have been -- he was

22             the one on the other side of the telephone, but

23             Dunham, Ryan and these other people were not

24             witnesses, true?
```

```
 1    A.   Yes.

 2    Q.   So your investigation wasn't limited to actual

 3         witnesses?

 4              MR. MARTIN:  To the phone call?

 5    Q.   To the phone call, right?

 6    A.   Right.

 7    Q.   As part of your investigation process into

 8         workplace violence complaints, is it routine to

 9         at least investigate the supervisor of the person

10         that reported the workplace violence?

11    A.   I would say so.

12    Q.   Now, is there somebody --  when you launched your

13         investigation initially, was there an

14         investigation in conjunction with your

15         investigation at the sheriff's department?

16    A.   I'm not aware of one.

17    Q.   Did you utilize any staff at the sheriff's

18         department to help you with your investigation?

19    A.   No.

20    Q.   So the only person involved in conducting the

21         investigation was you?

22    A.   Yes.

23    Q.   Did that change after you opened the initial

24         investigation?
```

```
 1    A.   At a point, and we're some months down the road,

 2         I consulted with the county attorney's office.

 3    Q.   What's the timeframe we're talking about?

 4    A.   Probably the end of the year.

 5    Q.   The end of 2013?

 6    A.   Yes.

 7    Q.   What did that conversation involve?

 8    A.   I guess there was correspondence from Mr. Gorman

 9         to the county executive and legislators and

10         things of that nature, and the county attorney,

11         he asked to consult.

12    Q.   I just want to clear something up.  Did you --

13         before you involved the county attorney, was

14         there anybody at the sheriff's department that

15         assisted you in your investigation into workplace

16         violence?

17    A.   I don't recall one.  I'm not saying it didn't

18         happen, just if it did, I don't recall.

19    Q.   Okay.

20              MR. SORSBY:  Off the record.

21              (Discussion off the record.)

22              MR. SORSBY:  Back on the record.

23    Q.   Now, you testified earlier, Mr. Hendry, you're

24         the appeals officer for FOIL requests?
```

```
 1    A.   Yes.
 2    Q.   Do you recall receiving a FOIL appeal from
 3         John Gorman and a request for documents?
 4    A.   No.
 5              MR. SORSBY:  I'll mark some exhibits.
 6              (Exhibits 75 and 76 marked for
 7         identification.)
 8    Q.   I'm going to show you what's been marked
 9         Exhibit 75.  Do you recognize this document?
10    A.   No.
11    Q.   You've never seen this document before, but what
12         do you understand --
13    A.   I'm not saying I didn't see it.  I don't
14         recognize it.
15    Q.   Have you seen this document before?
16    A.   It's possible.
17    Q.   What do you understand this document to be?
18    A.   Mr. Gorman's asking for some documents from the
19         district attorney's office, and Kelly Cramer, who
20         must be acting as the freedom of information
21         officer, is denying them.
22    Q.   Now, I'm going to show you what's been marked as
23         Exhibit 76.  Do you recognize that?
24    A.   Yes.
```

1    Q.   How do you recognize this document?

2    A.   It was addressed to me, so I'm saying I probably

3         read it.  I'm starting to get a little drunk in

4         documents now.

5    Q.   Do you recall receiving a request from Mr. Gorman

6         regarding a FOIL request to the DA's office?

7    A.   I don't recall it specifically.  Again, it

8         doesn't mean I didn't get it.

9              MR. SORSBY:  Let's get this marked.

10             (Exhibit 77 marked for identification.)

11   Q.   I'm going to show you what's been marked

12        Exhibit 77.  Do you recognize this document?

13   A.   I do remember that, yes.

14   Q.   How do you recognize this document?

15   A.   How do I recognize this?

16   Q.   Yes.

17   A.   It's my response to some correspondence to

18        Mr. Gorman.

19   Q.   What was his correspondence?

20   A.   He was asking about, I assume, the status of the

21        investigation.

22   Q.   This was October, 2013.  The investigation from

23        February was still ongoing at that point?

24   A.   Yes.  It was open.  Somewhere around this time is

```
 1              when I asked the county attorney's office for
 2              some help on this matter.  And I'm assuming this
 3              is around that time.
 4     Q.   One of the things I really don't understand.  You
 5              testified earlier it's very important to
 6              investigate a claim of workplace violence
 7              promptly for the protection of county employees.
 8              Why are we still investigating an allegation of
 9              workplace violence in October, 2013 when it was
10              alleged in February, 2013?
11     A.   I can't tell you.  I don't have an answer.
12     Q.   Do you consider that an effective investigation?
13     A.   No.
14     Q.   You also see on Exhibit 77, it appears you
15              received a FOIL request, as well?
16     A.   Yes.
17     Q.   Okay.  What did you do with that FOIL request?
18     A.   Again, I'm assuming I turned it over to the
19              freedom of information officer.
20     Q.   Would that be the normal protocol to turn it over
21              to the FOIL officer?
22     A.   Yes.
23     Q.   Did you issue a determination on Mr. Gorman's
24              appeal?
```

```
 1    A.   I don't recall.

 2    Q.   You don't recall?

 3    A.   No.

 4    Q.   Did you investigate his appeal?

 5    A.   I don't recall.  I don't remember.

 6    Q.   You were the appeals officer, correct?

 7    A.   Yes.

 8    Q.   Would you have investigated this appeal?

 9    A.   If I didn't, the county attorney's office would

10         have done so on my behalf.

11    Q.   You indicated you remember seeing this?

12    A.   I don't recall it.

13    Q.   All right.  I'm going to show you what was

14         previously marked as Exhibit 12.  Take a look at

15         that letter for me.

16    A.   (Witness complied.)

17    Q.   Do you see that this was a response by

18         Officer Kehoe to a FOIL request?

19    A.   It appears to be, yes.

20    Q.   Do you recognize --  specifically, is this --  do

21         you recognize this as a response to a FOIL

22         request?

23    A.   Yes.

24    Q.   Now, it appears as though Mr. Kehoe produced
```

```
1              documents as part of this response.  Where would
2              he have obtained these documents from?
3                   You indicated earlier that you have broad
4              reach as far as documents go in the county, so
5              I'm trying to determine where, in fact, you got
6              these from?
7    A.   These look like they're from the State Police.
8    Q.   Now, I'd like you to take a look at that.  If
9              you'd flip over the front page.  Do you see where
10             it says "incident report" at the top?
11   A.   Yes.
12   Q.   Do you recognize this document?
13   A.   No.
14   Q.   Now, I'm going to need these back, but I'm going
15             to show you another exhibit.  This is Exhibit 37.
16             It is a cleaner copy of that exhibit, and this
17             was produced at the deposition of Trooper Hock.
18             And I'm showing it to you for purposes of your
19             long-term vision, as it were.
20   A.   Am I looking at this?
21   Q.   This is just an indication it was a true copy.
22   A.   All right.
23   Q.   Having been provided with a clear copy, if at any
24             point you recognize this document, let me know.
```

1    A.   (Witness complied.)

2    Q.   Do you recognize any of the pages marked in 37?

3    A.   No.

4    Q.   You've never seen that before?

5    A.   I don't recall seeing that, no.

6    Q.   I'm just going to bring your attention back.  Let

7         the record reflect we're on Exhibit 37.  As

8         indicated earlier, it's a cleaner copy of the

9         incident report of Exhibit 12.

10             I'm going to show you the third page.  Well,

11        actually start at the beginning here.  Sorry.  I

12        had to gain my bearings here.  Do you see at the

13        bottom where it says "narrative"?

14   A.   Yes.

15   Q.   And do you see a name there -- officer name and

16        rank there?

17   A.   Yes.

18   Q.   What's the name there?

19   A.   Erika Hock, Trooper.

20   Q.   What's the date on that?

21   A.   2/16/13.

22   Q.   And so do you understand that to be the day after

23        Mr. Gorman alleges that he was verbally

24        threatened on the phone?

1   A.   Yes.

2   Q.   And that was the day before your conclusion?

3   A.   Yes.

4   Q.   I'll turn the page over here so you can see me do

5        it.  Do you see here where it says, "I contacted

6        Patricelli"?  Do you see that?

7   A.   Yes.

8   Q.   Let the record reflect I'm talking about the top

9        of the page, second paragraph.  It says, "I

10       contacted Patricelli via his cellphone and he

11       advised me he did have a conversation with Gorman

12       last night.  He told him that if he had a big

13       enough problem, he could come over and break his

14       fucking jaw.  I advised Patricelli to cease any

15       further contact with Gorman and he agreed with

16       the same."

17            Is that the first time that you heard that

18       Patricelli had confided or told the State Trooper

19       or gave that statement to the State Trooper, I

20       should say?

21  A.   I think so, yes.

22  Q.   Now, you would agree, reading that, that

23       Patricelli admitted that he had made a threat to

24       Gorman?

```
 1                    MR. MARTIN:  Object to the form.

 2     Q.   Would you agree, having read that?

 3                    MR. SORSBY:  You can answer the question.

 4                    MR. MARTIN:  Do you want him to interpret

 5          that right now?

 6                    MR. SORSBY:  I'm asking.  He's the one that

 7          investigated this, so I'm asking him, having read

 8          that.

 9                    MR. MARTIN:  He just saw it ten minutes

10          ago.  I mean --

11                    MR. SORSBY:  Listen, there's no speaking

12          objections.  If you want to object to the form of

13          the question, go ahead.

14                    MR. MARTIN:  You're asking him like -- he

15          just got this five minutes ago.

16                    MR. SORSBY:  It doesn't matter.

17                    MR. MARTIN:  It does matter.

18                    MR. SORSBY:  How?

19                    MR. MARTIN:  The investigation is over.

20                    MR. SORSBY:  You can go at any point.

21                    MR. MARTIN:  The investigation is over.

22          Who cares what he thinks now on something --

23                    MR. SORSBY:  Either we're going to continue

24          or not.  And we'll get the magistrate involved.
```

```
 1              If you have an objection, you can make your
 2         objection.
 3              MR. MARTIN:  I'm objecting to this line of
 4         questions.  Why are you doing this?
 5              MR. SORSBY:  Why -- no.  I'm not going to
 6         explain it to you.  If you have an objection as to
 7         the form of the question, you can make your
 8         objection.  You have no right to make speaking
 9         objections and you know that.
10              MR. MARTIN:  This is more than that.  This
11         is more than that.  You can't abuse people's time.
12              MR. SORSBY:  Make your objection in writing
13         or we'll have to --
14              MR. MARTIN:  I don't have to do it in
15         writing.
16              MR. SORSBY:  Do you want to leave now?
17              MR. MARTIN:  I'm not instructing him not to
18         answer.
19              MR. SORSBY:  It appears as though you are.
20              MR. MARTIN:  I didn't say that.  You can go
21         back and look at my objection.
22              MR. SORSBY:  We're on the record.
23              MR. MARTIN:  I'm objecting to the form, but
24         I'm just trying to tell you why, because there's
```

```
 1              -- he just got this five seconds ago, and now
 2              you're saying, "Please interpret this."
 3                   MR. SORSBY:  I'm asking him --
 4                   MR. MARTIN:  What does this really have to
 5              do with anything?  And my point is, we've been
 6              going on and on and on with these people --
 7                   MR. SORSBY:  It's not my fault you don't
 8              understand what case we're actually doing.  That's
 9              your problem, not mine.
10                   MR. MARTIN:  I'm just telling you what the
11              basis is, and then if we have to instruct him,
12              we'll get the magistrate on the phone.
13                   MR. SORSBY:  That's fine.
14      Q.      Sir, having read this exhibit, do you now believe
15              Patricelli threatened Mr. Gorman on the phone?
16      A.      I'm not sure if Gorman was going to go over and
17              break his jaw or vice-versa.
18      Q.      Do you want to take some time and read that to
19              yourself?
20      A.      He told him if he had a big enough problem with
21              him, he'd come over and break his jaw.  I guess
22              it doesn't sound normal to say, "Why don't you
23              come over and break my jaw?", but I can't --  I
24              mean, that's the way it's written.
```

```
 1    Q.   You were responsible for investigating threats.

 2    A.   It's threatening in one form or another.

 3    Q.   Okay.  And you testified today that you're in

 4         charge of investigating threats of the workplace

 5         violence policy.  And I'm asking you as the one

 6         investigating those claims, that having read

 7         that, do you believe that that was a threat

 8         against Mr. Gorman?

 9    A.   I guess I'd want to talk to him about that.

10    Q.   To who?

11    A.   Patricelli.

12    Q.   Why would you want to talk to him about that?

13    A.   I'd want to know what he's saying there, whose

14         jaw are we talking about?

15    Q.   Do you see that it says he did have a

16         conversation with Gorman last night?

17    A.   Yes.  Yes.

18    Q.   Isn't it clear that he's referencing Mr. Gorman?

19    A.   Yes.

20    Q.   Okay.  So when you say you don't know which jaw

21         -- which person he's talking about, isn't it

22         true --

23    A.   I don't know if he's asking Mr. Gorman to come

24         over and break his jaw, which doesn't make any
```

```
 1              sense, or vice-versa.

 2      Q.   If it doesn't make any sense, why would you

 3           believe it?

 4      A.   I only want to talk about what I know.

 5      Q.   Okay.

 6      A.   I really don't know what that says.  I mean, I

 7           get the assumption, and it makes sense.

 8      Q.   What makes sense?

 9      A.   That the threat was against Mr. Gorman.

10      Q.   Okay.

11      A.   But I don't necessarily get that from reading

12           that.

13      Q.   Okay.  And that's what I wanted to know.  You

14           don't perceive, having read this, that that was a

15           threat against Mr. Gorman?

16      A.   I believe it could be if it was interpreted a

17           particular way.

18      Q.   And important -- most important, you're saying

19           that through your investigation, this is the

20           first time you've seen this was today?

21      A.   That's the first I recall seeing it, yes.

22      Q.   If you had seen this during your investigation,

23           which you're saying you didn't, do you believe it

24           would have changed the results of your
```

```
 1          investigation?

 2     A.   I certainly would have called Patricelli back and

 3          asked him what's that all about.  I guess it

 4          would have been nice if the trooper told me what

 5          was going on.

 6     Q.   I mean -- and it looks like, looking at the

 7          e-mails from the DA, they look like there was

 8          something to give to you.  I don't know -- I

 9          don't know.

10               Now, we're also looking at Exhibit 12.  And

11          you recall it has a cover letter on it, and it's

12          from Mr. Kehoe with regards to a FOIL request

13          from Mr. Gorman, and includes the police report

14          you looked at.  Would you not also have access to

15          the same documents the FOIL officer had?

16     A.   Not necessarily.

17     Q.   Why is that?

18     A.   He doesn't routinely share that stuff with me.

19     Q.   But you testified earlier there was no limit to

20          your access to documents in the county, in your

21          position as FOIL officer in the county?

22     A.   I would think not.

23     Q.   What I'm trying to understand is how Mr. Kehoe

24          was able to get a copy of this State Trooper's
```

```
1              report and you were not able to get the same?
2    A.   I must not have been asking the right people.
3    Q.   Okay.  Does Mr. Kehoe have any ability to get
4              these documents from the State Trooper's
5              department?
6    A.   I guess he did.
7    Q.   Do you understand that the district attorney's
8              office had these documents?
9    A.   I did not understand that.
10   Q.   Did Trooper Hock give you any indication she had
11             these documents?
12   A.   No.
13   Q.   Did the DA's office indicate they had this
14             document?
15   A.   Not to me, no.
16   Q.   All right.  I just want to show you what was
17             previously marked as Exhibit 38.  We'll start
18             with 38.  Do you recognize this document?
19   A.   I can't identify it, per se.  I may have seen it,
20             though.
21   Q.   Exhibit 39.  I just want to let you know these
22             documents were provided from our response to
23             request for documents.
24   A.   From the court?
```

```
 1    Q.   No, from your attorney.

 2    A.   Oh.

 3    Q.   Do you recognize it?

 4    A.   I don't.  I really don't.

 5    Q.   Okay.

 6              MR. SORSBY:  I'm going to take a quick

 7         five-minute break.  It's 2:30 so we're still good

 8         on time.  Thank you.

 9              (Whereupon, a brief recess was taken.)

10              MR. SORSBY:  Back on the record.

11    Q.   I want to quickly go over some exhibits.  This is

12         Exhibit 8, previously marked.  Do you recognize

13         this?

14    A.   I don't believe I've seen that.

15    Q.   All right.  Were you involved in a PESH

16         investigation?  I think you may have indicated

17         that earlier.

18    A.   Yes.

19    Q.   Were there two PESH investigations?

20    A.   I don't remember.

21    Q.   What was the conclusion of that investigation, do

22         you recall?

23    A.   I think they had asked me to do some more talking

24         to people.
```

```
 1    Q.   Okay.  And did you -- and is that when you did

 2         your further investigations?

 3    A.   Yes.

 4    Q.   Okay.  Now, there came a time when Mr. Gorman

 5         filed a second workplace violence incident,

 6         correct?  This would be in July, 2013?

 7    A.   I don't remember, but I'll take a look.

 8              (Exhibit 78 marked for identification.)

 9    Q.   Do you recognize this document?

10    A.   Yes.

11    Q.   How do you recognize it?

12    A.   I think I reviewed it, looked at it.

13    Q.   Do you understand that this is an incident report

14         of workplace violence?

15    A.   Yes.

16    Q.   Did you investigate this incident, this report

17         filed by Mr. Gorman?

18    A.   I investigated this portion of it.  The --  what

19         happened in the --  I don't know what they call

20         it.  It was where the door hit him in the back.

21    Q.   I actually want to show you the letter that's

22         attached to the incident report dated July 22nd.

23    A.   Yes.

24    Q.   Do you recognize that letter?
```

```
 1    A.    Yes, I do.

 2    Q.    All right.  Do you recognize that letter as part

 3          of the incident report?

 4    A.    I think I considered this letter part of the

 5          incident report, yes.

 6    Q.    Did you investigate the claims of workplace

 7          violence in there?

 8    A.    Yes.

 9    Q.    Isn't it true that there was an allegation of

10          misconduct on your part in there, as well, that

11          you were investigating?

12    A.    Yes.

13    Q.    Now, you testified earlier that you had recused

14          yourself once you found out that there was a

15          lawsuit involved in this case in terms of

16          advising the civil service commission?

17    A.    Yes.

18    Q.    Did you recuse yourself from this investigation

19          of this claim of workplace violence since you

20          were involved in the allegations?

21    A.    I think at a point shortly after this, I turned

22          all of this information over to the county

23          attorney's office, because once my name was

24          mentioned in there, I didn't want to be involved.
```

```
 1          However, the things with the door I did look at.
 2     Q.   So who concluded the investigation?
 3     A.   I have no idea.
 4     Q.   Did you issue a determination?
 5     A.   I don't think I did.  Again, I gave the
 6          information to the county attorney, and I think
 7          at a point I was told to let them handle it.
 8     Q.   You were told to let the county attorney handle
 9          it?
10     A.   Yes.
11     Q.   Who told you that?
12     A.   The county attorney.
13     Q.   I want to show you now --  this is Exhibit 9
14          previously marked.  We've already went over this,
15          I believe, but we may not have.  Do you see the
16          date on that, August 6, 2014?
17     A.   Yes.
18     Q.   That's a letter from you, is it not?
19     A.   Yes, it is.
20     Q.   Do you see where it says in the opening, "It has
21          been determined that no credible evidence exists
22          supporting your allegations of workplace
23          violence."?
24     A.   Yes.
```

```
 1     Q.    Now, you sent that letter after you received the

 2           complaint, but you indicated you recused yourself

 3           at some point and you let the county attorney

 4           take over --

 5     A.    This letter was prepared with the assistance of

 6           the county attorney.

 7     Q.    The investigation was concluded.  You testified

 8           it was taken over by the county attorney, but

 9           this letter indicates that the investigation was

10           concluded, does it not?

11     A.    I haven't read it.  I don't know.

12     Q.    You wrote it.  You can read it right now.  You

13           can take some time.

14     A.    I will.

15     Q.    So the county attorney didn't conclude the

16           investigation in this matter, you concluded the

17           investigation of workplace violence?

18                 MR. MARTIN:  Object to the form of the

19           question.  You can answer.

20     A.    I don't want to call it a conclusion.  It's the

21           findings of what occurred or what happened

22           occurred.

23     Q.    Do you understand that the workplace --

24           Mr. Gorman's workplace violence complaint -- was
```

```
 1           there another investigation that preceded after

 2           this?

 3     A.    I don't recall.  After this, I'm out of it, I do

 4           believe.

 5     Q.    Now, in looking at Exhibit 9 again, there's no

 6           indication as to a conclusion about your improper

 7           investigation.  Was that -- did that part of the

 8           investigation, was that passed on to the county

 9           attorney?

10     A.    I couldn't say.  I don't know.

11     Q.    Okay.  Did you make a determination whether or

12           not your investigation was adequate?

13     A.    No.

14     Q.    Do you know if Mr. Gorman's workplace violence

15           complaint is still open?

16     A.    I don't.

17     Q.    Now --

18     A.    It's not open in my office, I can say that.

19     Q.    But you're in charge of enforcing the workplace

20           violence policy, right?

21     A.    If something were to occur, I would refer it to

22           the county attorney.

23     Q.    So your office is no longer investigating

24           incidents of workplace violence?
```

1    A.   That's correct.

2    Q.   I'm just looking at Exhibit 9 again, and I'm

3         focused on Number 3.  Do you see that?

4    A.   Yes.

5    Q.   "On several occasions, this office attempted to

6         obtain notes or statements with regards to the

7         arrest of Sergeant Patricelli.  We have been

8         advised by the Rensselaer County DA's office that

9         either no statement was given or no notes are

10        available.  All pending criminal matters against

11        Sergeant Patricelli have been concluded, and upon

12        information and belief, you have had no contact

13        with him in the workplace."

14             And do you see the date of the letter?  This

15        letter is dated August 6, 2014, okay?  And it

16        says that there was either -- no statement was

17        given or no notes are available.  Do you see

18        that?  I'm still on Paragraph 3.

19   A.   Yes.

20   Q.   I'm going back to Exhibit 12.  Do you see --

21        this is the letter from FOIL Officer Kehoe?

22   A.   Yes.

23   Q.   Do you see the date on that?

24   A.   Yes.

```
 1    Q.   March 13, 2014?

 2    A.   Yes.

 3    Q.   And do you see Officer Kehoe provided the

 4         incident report from Trooper Hock that we

 5         discussed earlier and the arrest report?

 6    A.   Yes.

 7    Q.   So as of August 6, 2014, when you wrote the

 8         letter saying there were no notes available in

 9         regards to the criminal complaint, the notes

10         weren't available to you, but you can see the

11         notes were available to the county; isn't that

12         true?

13    A.   Yes.

14              MR. SORSBY:  Mark this please.

15              (Exhibit 79 marked for identification.)

16              MR. SORSBY:  Thank you.

17    Q.   I show you what's been marked as Exhibit 79.  Do

18         you recognize this document?  Again, this was a

19         document provided in response to a discovery

20         request by your attorney.

21    A.   Okay.

22    Q.   All right.  Now, as of the date of this letter,

23         February 13th, Exhibit 79, had you received or

24         reviewed a FOIL request of Mr. Gorman?
```

```
 1    A.    Yes, I'm assuming I did.

 2    Q.    That's in February.  A month later, Mr. Kehoe is

 3          providing a copy of this incident and police

 4          report pursuant to Mr. Gorman's FOIL request.

 5    A.    Okay.

 6    Q.    Did you discuss with or review, in your function

 7          as the appeals officer, Mr. Gorman's request for

 8          the documents relating to the request?

 9    A.    Say that again?

10    Q.    Did you review the FOIL request from Mr. Gorman

11          requesting copies of documents relating to

12          Mr. Patricelli's arrest?

13    A.    I don't recall, no.

14    Q.    Did Mr. Kehoe have you review this request?  You

15          indicated earlier that you review requests, FOIL

16          requests with Mr. Kehoe?

17    A.    Yes.

18    Q.    Did you review this request?

19    A.    I don't recall.  This is not a denial.  Those are

20          different requests.

21    Q.    Where is Peter Kehoe's office in relation to

22          yours?

23    A.    Two floors up.

24                MR. SORSBY:  Mark this, please.
```

```
 1                  (Exhibit 80 marked for identification.)

 2      Q.    I'm going to show you what's been marked as

 3            Exhibit 80.  Mr. Hendry, it would appear the

 4            first page is in response to the second page.

 5      A.    Okay.

 6      Q.    It would appear, and you can correct me, this is

 7            a rejection of a FOIL request by Mr. Kehoe?

 8      A.    It appears to be.

 9      Q.    Did you receive this appeal on this FOIL request?

10      A.    I don't know.  I don't know.  Again, I think

11            these are two different FOIL requests.

12                  MR. SORSBY:  Off the record.

13                  (Exhibit 81 marked for identification.)

14                  MR. SORSBY:  Back on the record.

15      Q.    I show you what's been marked as Exhibit 81.

16            This letter is addressed to you.  It says, "Dear

17            Mr. Hendry."  Take some time to read it.

18      A.    (Witness complied.)

19      Q.    Do you recall receiving this letter?

20      A.    Yes.

21      Q.    The date on this letter is March 27, 2014, and

22            it's indicating Mr. Gorman has yet to get the

23            results of the workplace violence investigation.

24            Did you respond to this letter?
```

```
 1   A.   No.

 2   Q.   Why didn't you respond to this letter?

 3   A.   Because the county attorney was responding at

 4        that point.

 5   Q.   What did you do with the letter?

 6   A.   I'm sure I gave it to the county attorney's

 7        office.

 8   Q.   Just as a point of clarification, you said you

 9        didn't do anything with this letter and you gave

10        it to the county attorney?

11   A.   Yes.

12   Q.   Your letter comes out in August, 2014 with your

13        investigative findings, right?

14   A.   Right.

15   Q.   Why did you not respond?

16   A.   I was asking for some help with the letter from

17        the county attorney's office.

18   Q.   To respond to that letter?

19   A.   Yes.

20   Q.   But you hadn't completed your investigation at

21        that point; isn't that true?

22   A.   It would appear not.

23   Q.   Quickly, I want to show you what's been earlier

24        marked Exhibit 25.  Do you recognize that?
```

```
 1    A.    No.

 2    Q.    Are you aware of any light duty assignments

 3          available to persons with a disability as an

 4          accommodation?

 5    A.    I've heard of them.  They work in the control

 6          room or something.

 7    Q.    You have no knowledge of that?

 8    A.    No.

 9    Q.    Now, there came a time when Mr. Gorman went out

10          on medical leave.  You're aware of that, right?

11    A.    Yes.

12    Q.    Do you know when that happened, about?

13    A.    I don't.

14    Q.    And did you receive any paperwork relative to his

15          going out on medical leave?

16    A.    I have to assume so.  I have to assume so.  I

17          don't recall specifically seeing it.

18    Q.    Okay.  All right.  And how were you aware that he

19          was out on medical leave?

20    A.    Report of personnel change, the form that

21          generates personnel transactions.

22    Q.    And as the director of HR, is your department

23          responsible for insuring that persons who are out

24          have not exhausted their sick or leave time?
```

1    A.    No.

2    Q.    Who is responsible for that?

3    A.    That would be the department.

4    Q.    Now, you're aware that after Mr. Gorman was out

5          on leave for a year, he was given a letter from

6          the sheriff indicating that he might be

7          terminated?

8    A.    I understand that.

9    Q.    And how did you come to that understanding?

10   A.    I'm assuming I got a copy of the letter.

11   Q.    Now, your --  did you have any conversations with

12         the sheriff in regards to Mr. Gorman's

13         termination?

14   A.    No.

15   Q.    Undersheriff Russo?

16   A.    No.

17   Q.    Did you have any conversations with the civil

18         service commission in regards to Mr. Gorman's

19         pending termination?

20   A.    No.

21   Q.    Were you involved at all in any of the

22         applications or denial of Mr. Gorman's 207-c

23         benefits?

24   A.    No.

```
1    Q.   Were you involved in his Workers' Compensation

2         benefits?

3    A.   Involved from the perspective that my office is

4         responsible for paying the bills -- or processing

5         the bills, not paying them.  So I have seen him

6         on registers.

7    Q.   That's the extent of it?

8    A.   Yes.

9    Q.   Now, did anybody from the sheriff's office

10        consult with you before terminating Mr. Gorman?

11   A.   No.

12   Q.   Now, did you become aware that Mr. Gorman had

13        asked for a due process hearing?

14   A.   I heard that.

15   Q.   Do you know what that is?

16   A.   No.

17   Q.   I mean, you've got experience with civil service

18        law?

19   A.   What is it regarding?

20   Q.   If you don't know -- it doesn't appear you know.

21   A.   I'm not familiar with it.

22   Q.   Now, are you aware that when Mr. Gorman filed his

23        workplace violence complaint, he also went to

24        seek medical help, as well?
```

```
 1    A.    No.  I may have heard that at a point.

 2    Q.    At any point, did you seek to offer Mr. Gorman an

 3          accommodation of any kind?

 4    A.    For returning to work?

 5    Q.    Correct.

 6    A.    I don't believe I did.

 7    Q.    Now -- and just for clarification, earlier we had

 8          testimony that you're responsible for enforcing

 9          the county's discrimination policy.  What role

10          would you have in insuring that an employee is

11          offered an accommodation before termination?

12    A.    I would attempt to talk to the department to see

13          what we could do.

14    Q.    And how would that come about?

15    A.    I'd have to have a request for that.

16    Q.    You testified earlier that like most HR

17          departments, before someone's terminated you're

18          brought into the process -- although you don't

19          have veto power, you're brought into the process?

20    A.    Not always.

21    Q.    Were you brought into the process with

22          Mr. Gorman's termination?

23    A.    No.

24    Q.    I'm going to show you what's been marked as
```

```
 1              Exhibit 14.  Just look it over briefly.  If you
 2              don't recognize it, you don't have to take the
 3              time.  If you recognize it, let me know?
 4    A.    I think I've seen it.
 5    Q.    Did you see it in preparation for the deposition,
 6              or did you see it prior to today?
 7    A.    I would guess I saw it when it was attached to a
 8              document, personnel document, change form.  The
 9              nuts and bolts of that action was not discussed
10              with me.
11    Q.    Now, you said a change of status?
12    A.    Change of his employment status.
13    Q.    And that would have come to your office?
14    A.    Yes.
15    Q.    Change of status of what?
16    A.    Employee to not employee.
17    Q.    That was the same type of status you would have
18              received from active working to out on medical
19              leave?
20    A.    Yes.
21    Q.    And did you investigate or did you --  as part of
22              your -- because the investigation was ongoing
23              until August.  I showed you the letter.  Your
24              results came out in August, 2014.  Mr. Gorman's
```

```
 1              being terminated in June.

 2                   So as part of your investigation, did you

 3              include the possibility that Mr. Gorman was being

 4              retaliated for filing a workplace violence

 5              complaint?

 6     A.    No.

 7     Q.    Why not?

 8     A.    I didn't see any indication of that.  I thought

 9              Mr. Gorman had a medical issue and was unable to

10              return to work.

11     Q.    You had no idea he was being terminated as of

12              August when you wrote your findings?

13     A.    I don't think so.

14     Q.    I'm going to show you some exhibits.  You may or

15              may not have seen them.  Once you've identified

16              that you have or haven't, let me know.

17     A.    I have.

18     Q.    You've seen this document?

19     A.    Yes.

20     Q.    And when did you see this, if you recall?

21     A.    I'm guessing probably on or about that day.

22     Q.    So -- all right.  I want to show you the same

23              line on the documents, Exhibit 63.  Have you seen

24              this before?
```

1    A.   No.

2    Q.   Now, I'm just trying to figure out why is it you

3         would receive the document of termination in

4         October, which is Exhibit 64, and you wouldn't

5         receive the initial document in June, which is

6         Exhibit 14 indicating that Mr. Gorman would be

7         terminated.  Do you know why you only received

8         this one?

9    A.   No, I don't know.  I may have gotten this one.

10        I'm not saying I didn't get it.  I may have.  And

11        I have no explanation why I'm not notified until

12        basically after the fact.

13   Q.   Who gave this to you then?

14   A.   It came from the sheriff's department.

15   Q.   So --  all right.  You're not sure if you

16        received this or you don't --

17   A.   By looking at it, it looks like something I've

18        read.

19             MR. MARTIN:  That's Exhibit Number 14?

20             MR. SORSBY:  Correct.

21   Q.   You believe you've read this before?

22   A.   I think I have, yes.  There's wording in there

23        I'm familiar with.

24   Q.   Do you believe you received Exhibit 14 from the

```
 1          sheriff?
 2     A.   Yes.
 3     Q.   Do you believe you received it before you issued
 4          your report?
 5     A.   I don't know.  I don't know.  I'm not sure I
 6          didn't receive it when I got this also.  It could
 7          have all come at the same time.
 8     Q.   I'll show you Exhibit 63.  Have you seen that
 9          before?
10     A.   No.
11     Q.   Now, do you advise department heads in terms of
12          due process hearings?
13     A.   No.
14     Q.   Do you advise them --  you said earlier you have
15          a great deal of experience on civil service law?
16     A.   Sure.
17     Q.   Are you familiar --  I think you said you were
18          familiar with Section 73 of the civil service
19          law?
20     A.   Yes.
21     Q.   Did the sheriff consult with you on the
22          application of civil service law with Mr. Gorman?
23     A.   No.
24               MR. SORSBY:  Now, just one second here.
```

1    Q.   What do you understand Section 73 to mean?

2    A.   Reinstating after an illness or disability.

3    Q.   Doesn't it mean related to Workers' Compensation?

4    A.   It can mean that, yes.

5    Q.   What's 71?

6    A.   71 or 72, one is for job-related illness.  The

7         other is for non-job-related.

8    Q.   Do you understand that both of those sections,

9         that the county may terminate after a year?

10   A.   Yes.

11   Q.   Do you, as the director of human resources and

12        your experience in civil service law, can you

13        tell us what is the process for determining

14        whether a person may or may not be terminated

15        after a year?

16   A.   What's the process to determine?

17   Q.   Yes.

18   A.   It probably has something to do with whether or

19        not the position needs to be filled.  When you

20        have positions that are being left open over long

21        periods, overtime creeps up.  And I would assume

22        the department head would want to permanently

23        fill the spot.

24   Q.   You think that's one way to decide that?

```
 1                    MR. MARTIN:  Object to the form.
 2       Q.   Just so I understand.  You believe that the
 3            availability of positions and keeping positions
 4            open is one reason why a person may be
 5            terminated?
 6       A.   Yes.  I think it's a factor.
 7       Q.   All right.  Now, earlier we showed you a document
 8            from Sergeant Seabury, Lora Seabury?
 9       A.   I remember seeing it.
10       Q.   It showed she had been out of work for like five
11            years?
12       A.   Yes.
13       Q.   You're the director of HR.  Is that normal to be
14            out of work for five years?
15       A.   No.
16       Q.   Do you have any information on the specific case,
17            why she would be allowed to be out?
18       A.   I'm trying to think.  Did she have a lawsuit
19            against the county?  I think that may be why they
20            were keeping that open.  I can't even begin to
21            think for other people.
22       Q.   I want to determine why in one case, somebody
23            like Seabury would be kept after a year when it
24            says "may", it doesn't say "have to", and
```

```
 1              Mr. Gorman is not kept after a year?  And

 2              apparently they both filed lawsuits, so --

 3     A.   I understand.

 4     Q.   Maybe one was a different lawsuit?

 5     A.   I just don't -- I don't get it.

 6     Q.   I just wanted to know if you had personal

 7              knowledge?

 8     A.   No.

 9              MR. SORSBY:  Give me one second.

10              (Discussion off the record.)

11              MR. SORSBY:  Back on the record.

12     Q.   Now, Mr. Hendry, are you familiar --  are you

13              aware that Mr. Gorman had applied for a position

14              and was on an eligible list, but me may have not

15              got the position because somebody ineligible was

16              on the list.  Are you familiar with that?

17              MR. MARTIN:  Object to the form.

18     A.   No.

19              MR. SORSBY:  Can you mark this?

20              (Exhibit 82 marked for identification.)

21     A.   Are you saying someone ineligible got the

22              position?

23     Q.   So I'm going to show you what's been marked as

24              Exhibit 82.
```

```
 1     A.   All right.

 2     Q.   It's a certificate of eligibles.  You've seen

 3          these forms before?

 4     A.   Yes.

 5     Q.   You testified earlier you started out in the

 6          civil service division as a technician and worked

 7          your way up, so you've got a lot of experience in

 8          this field?

 9     A.   Yes.

10     Q.   Have you seen this certificate of eligibles list

11          before?

12     A.   I think I probably have, yes.

13     Q.   Now, you can keep it for a second.  Do you see

14          the date of certification at the top?

15     A.   Yes.

16     Q.   What's the date on that?

17     A.   1/17/2013.

18     Q.   Do you see that there's a name on there, Lucie,

19          Jason?

20     A.   Jason Lucie, yes.

21     Q.   Sorry.  I'm reading it upsidedown.  Do you

22          recognize that name?

23     A.   No.  Do I recognize the name?  I've heard the

24          name.
```

```
 1      Q.   Okay.  Do you know who that is?

 2      A.   No, but I think I've seen it spelled different,

 3           too.  I think I've seen it L-U-C-E-Y.

 4      Q.   Are you aware that Mr. Lucie, Jason, accepted a

 5           job at fire department and gave his two weeks

 6           notice prior to being on this list?  Do you have

 7           any familiarity with that?

 8      A.   No.

 9      Q.   Do you have any familiarity that it was later

10           deemed he shouldn't have been on the list?

11      A.   I heard that, yes.

12      Q.   Who did you hear that from?

13      A.   Ashley Bombard.

14      Q.   Do you know why she told you that?

15      A.   No.

16      Q.   You testified earlier sometimes the civil service

17           commission seeks guidance from you.  Did they

18           seek guidance from you in producing this list?

19      A.   No.  Eligible lists are produced in a routine

20           manner of office work.

21      Q.   Whose office work?

22      A.   Ashley's.  A request for a list will come from a

23           department and she'll prepare the list based on

24           what they're asking for.
```

1    Q.   I'm going to try to refresh your recollection.

2         We talked about this exhibit earlier, Number 5?

3    A.   Yes.

4    Q.   Do you see the second to last paragraph there?

5    A.   Yes.

6    Q.   Now, it says, "You are on the current civil

7         service eligible list, 79-155."  Is that this

8         eligible list?

9    A.   Yes, it is.

10   Q.   For correctional sergeant?

11   A.   Yes.

12   Q.   After serving in that capacity on a provisional

13        basis through April -- through February.  At that

14        time, your status was changed to a correctional

15        officer as a result of not being reached --

16        reachable on the eligible list.  You are

17        currently ranked as Number 3 on the list.

18             What did you mean by that, "not being

19        reachable"?

20   A.   That goes back to the rule of three.

21   Q.   Now, I'm trying to lean on your knowledge of

22        civil service law in this case.  In looking at

23        that list, if Mr. Lucie was removed from the

24        list, what would be the three tiers of

```
1              eligibility, if you can determine?

2    A.   Are we assuming Lucie is off the list and the

3         list has not otherwise been used?

4    Q.   That's correct.

5    A.   Or do I take into consideration the appointment?

6    Q.   You take into consideration the appointment.

7    A.   I don't know where Mr. Gorman is.  Okay.  He's an

8         80.  Assuming there have been appointments from

9         the list, he is third.

10   Q.   All right.  Now, isn't it true that a provisional

11        sergeant takes precedence over other

12        non-provisional charges in terms of the civil

13        service examination as a policy?

14             In other words, if you have applicants on

15        this list, one is provisional, meaning they have

16        experience, and one has no experience, do they

17        take --  are they rated higher on the list?

18   A.   No.  From a civil service perspective, we're

19        providing a certificate of eligibles.

20   Q.   What I'm trying to understand is -- maybe you

21        can explain this.  Do you see where it says

22        Justin Walreed (phonetic)?

23   A.   Yes.

24   Q.   And right here, it says the date of acceptance of
```

```
 1              the appointment is January?

 2    A.    Yes.

 3    Q.    It appears he was appointed before this

 4          Eric Morey (phonetic)?

 5    A.    Yes.

 6    Q.    And I have information to believe that Walreed

 7          was a provisional sergeant.

 8    A.    Okay.

 9    Q.    So I'm asking, for an untrained person, it would

10          appear this person should have been appointed

11          first, Mr. Morey?

12    A.    That would be completely the sheriff's choice.

13    Q.    Okay.  In terms of --  okay.  It's not --  the

14          highest ranked person --

15    A.    By virtue of having been a sergeant does not give

16          you preference.

17    Q.    As clarification, what I want to understand is

18          you said it's up to the sheriff, but the sheriff

19          can pick one of the three highest?

20    A.    Yes.

21    Q.    And then as he makes those appointments, that

22          person goes off the list and you keep going down

23          like that?

24    A.    Yes.  After those appointments were made, Lucie
```

```
 1              is taken off the list because he's no longer

 2              eligible.  The assumption is he's taken off.

 3              Mr. Gorman would be reachable.

 4         Q.   Are you saying that he was taken off the list

 5              ultimately?

 6         A.   Lucie?

 7         Q.   Do you have knowledge of that?

 8         A.   Didn't another list come out?

 9         Q.   I'm asking if you know?

10         A.   I don't.  I don't.

11         Q.   You were saying if he was taken off?

12         A.   Yes.  Yes.  Yes.

13         Q.   All right.  So -- all right.  And just a final

14              point of clarification on this, because there was

15              some confusion in the past.  When we talk about

16              people in terms of high scores, it's not

17              necessarily an individual, but it may be multiple

18              individuals that have the same score.  So you can

19              have a high score, next high score and a number

20              of people after that?

21         A.   Yes.

22         Q.   It's not people as much as it is level of scores?

23         A.   Yes.

24         Q.   All right.  And again, I don't know if I heard
```

```
1           you.  Your analysis, if Lucie was off, Mr. Gorman

2           would at least be reachable?

3    A.     After all these appointments are made, yes.

4                MR. SORSBY:  Hold on one second.

5                (Discussion off the record.)

6                MR. SORSBY:  Back on the record.

7    Q.     Just a real quick question on the final close-up

8           of this document.  Even if these persons weren't

9           appointed first, but if Lucie was off, is it true

10          that Mr. Gorman would still be reachable because

11          that would leave no 90?  It would just leave the

12          95 and the 85, right?

13   A.     This is just giving me the assumption that no

14          appointments had happened.  The top three at that

15          point would be Morey and then the 85s.

16   Q.     You wouldn't get to the 80s?

17   A.     You have three people.  You have 95, 85, 85, 85,

18          85.  You have five.

19   Q.     And I'm just trying to get -- isn't -- all people

20          on one level are considered one, correct?

21   A.     Yes.

22   Q.     You have 95, ten people on 85, and ten people on

23          80 --

24   A.     You don't get to the 80s.
```

```
 1    Q.   Why is that?

 2    A.   Because it's not -- it's beyond the top three.

 3         It's beyond the top three.  The top three would

 4         be 95, Number 1, and these 85s are all 2 and 3.

 5    Q.   Okay.  You don't get down to the 80s?

 6    A.   No.

 7    Q.   So what you're saying, just so I understand, it

 8         would be the 95 and then 85, 85 and then --

 9    A.   Four 85s, that's the top three.  Now, if you got

10         three of those 85s off, then you'd have 95, 85,

11         and then twenty 80s or whatever those are, and

12         that's your top three.

13    Q.   Why in this scenario then, would you not -- once

14         these appointments were made --  what I'm trying

15         to figure out is once the -- I just want -- as a

16         point of clarification, you're basing that on

17         your knowledge of the civil service law on the

18         rule of three?

19    A.   Yes.

20    Q.   I just want to be sure.

21    A.   Yes.

22    Q.   So I guess what I don't understand is if -- even

23         if there wasn't a 95 and a 90, would you have to

24         go, to get to the 80, there's one, two, three,
```

```
1              four 85s, and you wouldn't get to the 80,

2              correct?

3     A.    Correct.  Right.

4     Q.    You had satisfied the three with the first top

5              out of the 85s?

6     A.    Yes.

7     Q.    You don't get out of that unless appointments are

8              made?

9     A.    You make two appointments out of the 85s and then

10             you get into the 80s.

11    Q.    Now, all right.  Thank you for that.  That was --

12    A.    Sure.

13                 MR. SORSBY:  This will be probably the last

14             exhibit of the day.

15                 (Exhibit 83 marked for identification.)

16    Q.    I show you Exhibit 83.  Have you seen this

17             particular document before?

18    A.    I'd say yes.  I'd say yes.

19    Q.    What's the date of the certification of this?

20    A.    March 1, 2013.

21    Q.    And so that's dated before your March 25th

22             letter?

23    A.    Yes.

24    Q.    And when you said in your March 25th letter that
```

```
 1              Mr. Gorman's on the current civil service
 2              eligible list 79-155, were you referencing this
 3              list?
 4      A.    Yes.
 5      Q.    Can you explain why he's not on the list?
 6      A.    No.
 7      Q.    Should he be on the list?
 8      A.    Well, I know -- I'm not sure when Lucie left.
 9              Assuming he left, and I don't know when he left.
10              Should he be on the list?
11      Q.    I'm just asking, because your letter says --
12      A.    You're Number 3 on the list, right?
13      Q.    Right.  Yes.  And it says -- and you reference
14              this particular list, certificate list?
15      A.    Yes.  I must be looking at the existing list, and
16              I'm seeing Jason Lucie on there.  I'm not knowing
17              that he shouldn't be there.  And then you have --
18              do you know which one of these guys got
19              appointed?
20                   MR. GORMAN:  The second one down was.
21      A.    Gusevitch (phonetic).  So Lucie would be one,
22              Garrin (phonetic) two, and all of the 80s three.
23      Q.    And you understood Mr. Gorman had a score of 80,
24              correct?
```

1    A.    Yes.  So again, not knowing when Lucie left, I

2          don't know if he's gone at this point or not.  He

3          may be.  An obvious clerical error was made.  He

4          should not be on this list, and I played into

5          that myself.

6    Q.    What do you mean?

7    A.    I assumed he was on the list.

8    Q.    Mr. Gorman?

9    A.    Lucie.

10   Q.    You assumed Mr. Lucie was on the list?

11   A.    Yes.

12   Q.    You assumed he was validly on the list?

13   A.    Yes.  These certificate of eligibles are drawn

14         from a much larger eligible list.  There's a

15         whole lot more names on it than that.  You go

16         down into 75s and 70s and they often result in

17         hundreds of names.  And I just went in and looked

18         and saw Lucie and Garrin and then the 80s and I

19         said he's third.

20   Q.    Were these given to you by the civil service

21         commission for your review and opinion?

22   A.    No.

23   Q.    You just looked through them?

24   A.    I'm sure I looked at them after the fact.  I

```
 1              think, as a matter of fact, these were brought to

 2              my attention when the Department of Labor was in

 3              town.

 4                   I apologize.  I think I'm losing my voice.

 5              My wife would be happy about that.

 6         Q.   I understand.  People that are here can attest

 7              that I lost my voice.  We're almost done.

 8                   You have a great amount of experience in

 9              civil service law based on your education -- not

10              your education, your experience.  And maybe you

11              don't know the answer, but why would Mr. Gorman

12              not be on the list anymore?

13         A.   I don't know.  I do not know the answer.

14              Certainly he could have been on the list.

15         Q.   All right.  All right.  Just so I understand the

16              different dates on this.  Where it says

17              certification date, what does that mean?  It's

18              certified that day, but what does it mean?

19         A.   It's the date the eligibles on the list may be

20              appointed after.  This list is, shall we say,

21              live.

22         Q.   It's for exam 79-155?

23         A.   Yes.

24         Q.   This was the one I showed you earlier.  It's an
```

```
 1              earlier date.  It's February.  It's the same exam
 2              number, but the list is much smaller.  Maybe it's
 3              updated for the appointments.  Would you think
 4              that's why it's smaller?
 5    A.   Again, just being --  just thinking out loud, on
 6              this first certificate, they were looking for
 7              more officers, okay?
 8    Q.   Yes.
 9    A.   So they appoint their three and then the sheriff
10              -- Marcelle will ask Ashley for the list, and
11              Ashley will say, hypothetically, how many are you
12              looking for, one?  They may have been looking for
13              that guy.  I don't know.
14    Q.   But this list reflects all the persons that have
15              taken tests for this position, correct?
16    A.   Yes.
17    Q.   All right.  So everybody that's taken the test
18              that's still eligible should still be on this
19              list; is that true?
20    A.   Not necessarily.
21    Q.   Just real quick, can you explain how a person
22              could not be on the list?
23    A.   I don't have an explanation.  I can only think
24              that the sheriff's office said we're looking for
```

1           this guy, we're looking for him, don't go any
2           further than the 85s.

3   Q.   All right.

4   A.   And again, I don't know that to be true.

5   Q.   Right.

6   A.   For whatever reason, they didn't go to the 80s
7           and I don't know the answer.

8   Q.   You were at one point in your past involved in --
9           were you ever involved in the certification of
10          lists?

11  A.   I've never prepared a list or anything like that.

12  Q.   You provided input to the commission at some
13          point?

14  A.   Sure.

15  Q.   Can you --  is it appropriate to end the list
16          with three people?  Is it appropriate to leave
17          people with lower scores off?

18  A.   Well, appropriate?  It's not unusual.  It's not
19          extraordinary.

20  Q.   Just as a final point of clarification, looking
21          at this list, this is my thinking.  Understanding
22          civil service law, and you've got more
23          experience, would it have been that this is the
24          first tier, the two people at 85 make one tier,

```
 1          and the people at 80 would make another tier?
 2    A.   In this case, that's the top three.
 3    Q.   Okay.
 4    A.   That's the top three.
 5    Q.   You don't get to the 80s?
 6    A.   You don't get to the 80s, no.
 7    Q.   And again, you've already testified that he
 8          shouldn't have been on this list -- you don't
 9          believe he should have been on this list?
10    A.   At a point, I'm understanding that he has left
11          employment.  Once you leave employment --
12    Q.   If you're working at the fire department, you
13          shouldn't be on the list for --
14    A.   You can be on an open competitive list.  You
15          can't be on a promotional list.
16    Q.   You've already said that.
17    A.   So If he termed before March 1st, he shouldn't be
18          on that list.
19    Q.   In which case, you would agree, that would have
20          opened up the 80s based on this list?
21    A.   Yes.
22    Q.   Okay.
23              MR. SORSBY:  Off the record.
24              (Discussion off the record.)
```

```
 1                    MR. SORSBY:  Back on the record.

 2      Q.    Now, Mr. Hendry, did there come a time you had a

 3            discussion with county executive Kathleen Jimino

 4            regarding Mr. Gorman's workplace violence

 5            complaint?

 6      A.    Yes.

 7      Q.    When was that?

 8      A.    I can't tell you.  It was in response to a letter

 9            Mr. Gorman sent to her.  She probably said

10            something to the effect of, What's going on with

11            this or something.  It was very brief.

12      Q.    Did she send a copy of that letter to you, the

13            letter you're referencing?

14      A.    Probably.

15      Q.    All right.  And did you respond to her inquiry?

16      A.    I don't recall.

17      Q.    Mr. Hendry, I'm handing what's been marked

18            already as Exhibit 11A.  Have you seen this

19            document before?

20      A.    Yes.

21      Q.    How do you recognize this document?

22      A.    How do I recognize it?

23      Q.    You said you recognized it.

24      A.    I think it was provided to me.
```

1    Q.   Is this the letter that you were indicating?

2    A.   I would assume so.  I would think yes.

3    Q.   Do you see where it says "Tom" at the top?

4    A.   Yes.

5    Q.   "What's the status of this?  Kathy"

6    A.   Yes.

7    Q.   Do you recognize the county executive's

8         signature?

9    A.   Yes.

10   Q.   Do you now recall you received this document?

11   A.   Yes.

12   Q.   Did you followup on this document with

13        Kathleen Jimino or Mr. Gorman?

14   A.   I don't recall either way.

15   Q.   And did you understand that this letter from

16        Mr. Gorman was indicating that you were not doing

17        a proper investigation?

18   A.   Yes.

19   Q.   And did you tell --  did you inform Kathleen

20        Jimino the status of your investigation?

21   A.   I may have or I may not.  I don't recall.

22   Q.   I want to show you what's been marked previously

23        as Exhibit 10.  Do you recognize this exhibit?

24   A.   Yes.

```
1    Q.   How do you remember getting this exhibit, this

2         document?

3    A.   I don't recall how I received it.

4    Q.   What do you understand it to be?

5    A.   An appeal by Mr. Gorman to have somebody else do

6         the investigation.

7    Q.   It says independent investigation.  Was there

8         ever an independent investigation done?

9    A.   Not that I'm aware of.

10   Q.   Why was he requesting an independent

11        investigation?

12   A.   He wasn't happy with --  I believe he was not

13        happy with the job I had done.

14   Q.   Did you have any other communications or receive

15        any other documents with the county executive

16        about what was going on at that point?

17   A.   Not that I recall.

18             MR. SORSBY:  While we're going through our

19        stuff, I want to get this marked.  This will be

20        the last exhibit.

21             (Exhibit 84 marked for identification.)

22   Q.   I want to show you what's been marked as

23        Exhibit 84.  This is addressed to your attention.

24             You indicated earlier that you handle the
```

```
 1              Workers' Compensation -- I think you had some
 2              role in that in terms of -- I think you said you
 3              had some role in that?
 4      A.      My department administers our Workers'
 5              Compensation plan.
 6      Q.      Now, I'll give you a few --  you can take a look
 7              and read this real quick.  You never seen this
 8              before, I know, so I'm going to ask you to read
 9              it just a second.
10      A.      Thank you.  Okay.
11      Q.      It says Mr. Burke had a conversation with you?
12      A.      Had a conversation with me?
13      Q.      Actually, I thought this was addressed to you.  I
14              do apologize.  Have you seen this document
15              before?
16      A.      No.  It looks like it was just mailed yesterday,
17              so it's probably sitting on my desk.
18                      MR. SORSBY:  Folks, I've got the wrong
19              letter, that's why.  We'll take that --
20                      MR. GORMAN:  It's a request.
21                      MR. SORSBY:  84 is request for a hearing
22              for non-compliance by the county Workers'
23              Compensation program.  I can give you a request
24              electronically, Mr. Martin.
```

```
 1                    (Exhibit 85 marked for identification.)

 2      Q.    Here's Exhibit 85.

 3      A.    And this is different from this?

 4      Q.    Correct.

 5                    MR. GORMAN:  That was addressed to the

 6            attorney.

 7      Q.    That was addressed to the attorney.  It's

 8            relevant, but it's not to you?

 9      A.    They both look like they're to me, actually.

10                    MR. SORSBY:  Hold on one second.  All

11            right.  Bear with me one second.  We'll get this

12            resolved.  I was reading from the wrong one.

13            That's the problem.  I'll withdraw Exhibit 85.

14                    (Whereupon, previously marked Exhibit 85

15            was withdrawn.)

16      Q.    Let's try this again.  We're looking at 84.

17      A.    Yes.

18      Q.    Now, I wanted to ask you about this, because

19            Workers' Compensation decisions -- you said

20            Workers' Compensation paperwork comes to your

21            office?

22      A.    Yes.

23      Q.    When we turned the third page, it says Notice of

24            Decision?
```

1    A.   Yes.

2    Q.   Have you seen this document before?

3    A.   I may have.

4    Q.   Now, your office would be responsible for paying

5         out Workers' Compensation claims?

6    A.   Well, processing them.

7    Q.   Processing them?

8    A.   Yes.

9    Q.   Did you process Mr. Gorman's original Workers'

10        Compensation claim?

11   A.   No.

12   Q.   Your office?

13   A.   No.  Just to give you background on how that

14        works, our third-party, Bene-Tech, who I guess

15        you know who they are.  Bene-Tech also gets this.

16        Bene-Tech will send us a voucher, which we will

17        prepare and ask the finance department to pay.

18        We then send that to Bene-Tech.  So Bene-Tech

19        makes all the payments.

20   Q.   All Workers' Comp awards?

21   A.   Yes.

22   Q.   What's the voucher for?

23   A.   So we can get money out of the county coffers.

24        If Bene-Tech is paying Mr. Gorman whatever this

```
 1              award is, Bene-Tech fronts the money and we have
 2              to reimburse them.
 3         Q.   Are you familiar with the process whereby if an
 4              individual is out on Workers' Compensation and
 5              they're --  they have to exhaust their leave,
 6              their sick leave and vacation leave, when there's
 7              an ultimate award of Workers' Compensation, there
 8              is a furnishing of the employee's accruals?
 9         A.   Yes.
10         Q.   Can you explain what your knowledge of that is?
11         A.   We'll get a --  again, this goes through
12              Bene-Tech, but we'll get a statement, not
13              unsimilar to this, and it will say Mr. Gorman has
14              been awarded $13,000 for back wages.  His wages
15              -- his accruals are then reinstated to his
16              accrual pile based on --  by taking that dollar
17              amount and dividing it by his hourly rate.
18         Q.   So just so I understand, a county worker is
19              entitled to their accrual leave plus their
20              salary, right, generally speaking?
21         A.   Yes.
22         Q.   So if you leave --
23         A.   There's a percentage.  I think it might be
24              two-thirds or something like that you're
```

```
 1              reinstated.
 2      Q.      So if you left service, would you be entitled to
 3              all that accrued time in the form of a check?
 4      A.      I think you'd be minimally entitled to your
 5              vacation time.
 6      Q.      More specifically involving Workers' Comp, if a
 7              person is out on Workers' Comp and they exhaust
 8              their -- well, strike that.
 9                  If a person's out on leave and has applied
10              for Workers' Comp and has not received the
11              benefits yet, they have to exhaust their sick
12              leave; is that true?
13      A.      Yes.
14      Q.      And if there's an ultimate award of Workers'
15              Comp, is the county entitled to reimbursement for
16              the leave that they paid the employee?
17      A.      I would think so.
18      Q.      All right.  Do you understand in this case that
19              the county was given a reimbursement for
20              Mr. Gorman's time?
21      A.      No.
22                  MR. GORMAN:  Accruals.
23      Q.      Accruals.  Excuse me.
24      A.      No, I'm not.
```

```
 1    Q.   I'm looking back at the exhibit again.  Do you
 2         understand that the county was given $15,000 for
 3         Mr. Gorman's accruals?
 4    A.   I can see that.  I don't know where that went.
 5    Q.   Would your office be involved in determining
 6         where that went?
 7    A.   No.
 8    Q.   What office would be?
 9    A.   Bene-Tech.  They're our consultant.  They do all
10         this stuff.
11    Q.   The county got this money?
12    A.   Bene-Tech would send us a check and, say, put
13         this back in the general fund or Workers'
14         Compensation fund or whatever.
15    Q.   The idea is the county paid Mr. Gorman for the
16         time he was off?
17    A.   The county paid him for his sick time, yes.
18    Q.   The county is getting reimbursed for something?
19    A.   Yes, but I have no idea what that is.
20    Q.   All right.  Now, this was sent to you, so it
21         might be worth your time to go over, because
22         you're going to have to read it at some point.
23    A.   I don't know.  It's out of my realm.  I could
24         talk to Bene-Tech Monday and call you.  If I go
```

1        back and that's sitting on my desk, I'm calling

2        Bene-Tech.

3   Q.   It says, The employee is to be reimbursed by

4        Rensselaer County for wages paid to the claimant

5        during his lost time for the injury, etcetera,

6        etcetera.  The amount of the reimbursement is to

7        be deducted from the award to the claimant.

8            Mr. Gorman, he hasn't received -- the county

9        has been reimbursed, but Mr. Gorman hasn't

10       received his accruals for sick time and vacation.

11       So, I mean, I'm glad that you're here today.  If

12       you can do something to make -- to bring that

13       about.

14  A.   Do you have a card?  I'll be happy to call you on

15       Monday.

16  Q.   Sure.  I'll definitely give you my card.  It's a

17       matter of -- yes, we have a federal lawsuit, but

18       this really shouldn't be a part of it.

19           MR. MARTIN:  It probably should go through

20       me or the lawyer for Bene-Tech.

21           MR. SORSBY:  We'll go off the record for a

22       moment.

23           (Discussion off the record.)

24           MR. SORSBY:  Well folks.  End of a Friday

1          afternoon.   Off the record.

2                   (Whereupon, the Examination concluded at

3          4:23 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1    STATE OF NEW YORK

2    COUNTY OF_____

3

4         I have read the foregoing record of my testimony

5    taken at the time and place noted in the heading hereof

6    and I do hereby acknowledge it to be a true and correct

7    transcript of the same.

8

9

10                              _____

11                              THOMAS HENDRY

12

13

14   Sworn to before me this

15   _____ day of _____, 2015.

16

17

18   _____

19   Notary Public

20

21

22

23

24
```

C E R T I F I C A T I O N

1

2

3         I, NORA B. LAMICA, a Shorthand Reporter and

4    Notary Public within and for the State of New York, do

5    hereby CERTIFY that prior to being examined, the witness

6    named in the foregoing deposition was duly sworn to

7    testify the truth, the whole truth, and nothing but the

8    truth.

9         That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter reduced by me to typewritten form and that the

12   same is true, correct, and complete of said proceedings.

13        Before completion of the deposition, review of the

14   transcript was requested.  If requested, any changes made

15   by the deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17        I further certify that I am not interested in the

18   outcome of this matter.

19        Witness my hand this 20th day of November, 2015.

20

21              ---------------------------

22              NORA B. LAMICA

23

24