1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK.

3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

4    JOHN GORMAN,

5                              Plaintiff,

6              -vs-               Civil Case No 1:14-cv-434

7    RENNSELAER COUNTY, SHERIFF JACK MAHAR,
     ANTHONY PATRICELLI, UNDERSHERIFF PATRICK
8    RUSSO, COUNTY HUMAN RESOURCES MANAGER
     TOM HENDRY, COUNTY EXECUTIVE KATHLEEN JIMINO,
9
                             Defendants.
10
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11

12                EXAMINATION BEFORE TRIAL of

13         UNDERSHERIFF PATRICK RUSSO, held at Law Office of

14         Patrick Sorsby, PLLC, 1568 Central Avenue, Albany,

15         New York on October 28, 2015, commencing at

16         10:16 a.m., before NORA B. LAMICA, Court Reporter

17         and Notary Public in and for the State of New York

18

19

20

21

22

23

24

1      **APPEARANCES:**

2      Attorney for Plaintiff:

3              LAW OFFICE OF PATRICK SORSBY, PLLC
               Attorney at Law
4              1568 Central Avenue, First Floor
               Albany, New York 12205
5              (518) 456-4529

6              BY:  PATRICK SORSBY, ESQ.
                    sorsbylaw@gmail.com
7

8      Attorneys for Defendants:

9              MARTIN & RAYHILL, P.C.
               Attorneys at Law
10             421 Broad Street, Suite 10
               Utica, New York 13501
11             (315) 507-3765

12             BY:  KEVIN G. MARTIN, ESQ.
                    kmartin@martinrayhill.com
13

14     Also Present:

15     John Gorman

16

17

18

19

20

21

22

23

24

1                        **I N D E X**

2

3                E X A M I N A T I O N S

                                                    Page
4    UNDERSHERIFF PATRICK RUSSO

5        Examination by MR. SORSBY            6

6

7                   E X H I B I T S

8
     No.   Description                        Page

9    42    Corrections bureau general order    29

10   43    Letter from Chief Bly to            47
11         Undersheriff Russo

12   44    Copy of Rensselaer County Sheriff   51
           Administrative Manual for Corrections

13   45    Memo from P. Russo to A. Patricelli 59

14   46    DCJS letter of inquiry              65

15   47    DCJS followup                       65

16   48    Webster notes                       68

17   49    E-justice Internal Investigative    69
18         Report

19   50    Overtime violation                  82

20   51    E-mail, M. Connor to Inv. Ungerman  88

21   52    Judge McGrath removal of pistols    90

22   53    Suspension without pay, Civil       90
           Service Commission
23
     54    Rennselaer County Violence          96
24         Prevention Incident Report

55      Incident report 1/22/13              103

56      Incident Report 10/9/2012            103

57      Incident report 10/8/2012            104

58      Incident Report 11/11/12             109

59      207-c decision                       140

60      Collective bargaining agreement      147

61      Lora Seabury Abbott statement        166

62      Letter dated 6/23/14 from            169
        Sheriff Mahar to John Gorman

63      Letter dated 8/7/14 from             170
        Undersheriff Russo to John Gorman

64      Letter dated 10/1/14 from            172
        Undersheriff Russo to John Gorman

65      Section 73 due process               172
        hearing transcript

66      Page 27 and 28 of transcript         194
        of P. Russo in Vibert
        versus Rensselaer County

67      Page 39 and 40 of transcript         195
        of P. Russo in Vibert
        versus Rensselaer County

68      Pages 131 and 132 of transcript      198
        of P. Russo in Vibert
        versus Rensselaer County

69      Entire transcript, 143 pages         204
        total

```
1                    S T I P U L A T I O N S

2


3                    IT IS HEREBY STIPULATED AND AGREED by and

4   between the attorneys for the respective parties hereto

5   that filing, sealing and certifications are hereby

6   waived;

7                    IT IS FURTHER STIPULATED AND AGREED that all

8   objections, except as to the form of the question, shall

9   be reserved to the time of the trial;

10                   IT IS FURTHER STIPULATED AND AGREED that the

11  within Deposition may be signed before any Notary Public

12  with the same force and effect as though subscribed and

13  sworn to before this Court.

14

15

16

17

18

19

20

21

22

23

24
```

```
 1   U N D E R S H E R I F F   P A T R I C K   R U S S O,

 2           having been called as a witness, being duly sworn,

 3           testified as follows:

 4   EXAMINATION

 5   BY MR. SORSBY:

 6     Q.   Good morning.

 7     A.   Good morning.

 8     Q.   Please state your full name for the record.

 9     A.   Patrick Russo, R-U-S-S-O.

10     Q.   Now, Mr. Russo, you probably heard the

11           instructions I gave earlier to Trooper --

12           Investigator Hock?

13     A.   I did.

14     Q.   Have you been through a deposition before?

15     A.   Yes, I have.

16     Q.   So I'm going to give you some rules of the road.

17           I'm going to ask you a number of questions.  If

18           you don't understand the question, please let me

19           know and I can repeat the question, rephrase the

20           question.  The stenographer cannot record nodding

21           of your head, so you have to verbalize all your

22           answers.

23               If you need a break, let me know.  I only

24           ask that if I'm in the middle of a question, we
```

```
 1          wait until you answer the question before we take
 2          a break.
 3               From time to time, there may be objections.
 4          Actually, there will likely be objections from
 5          your attorney, and he can object to the form of
 6          the question, but he can't make speaking
 7          objections.  So we're not going to get into
 8          discussions about relevance.  And what that means
 9          is that I will say, "You can answer the
10          question."  So don't let the objections deter
11          you.  You still have to answer the question.
12               MR. MARTIN:  Unless I tell you not to.
13     Q.   Unless he tells you not to, and we'll proceed
14          from there.
15               And at this time, do you have any questions
16          about the instructions I've given you?
17     A.   No, I do not.
18     Q.   Mr. Russo, can you tell us who you're currently
19          employed by?
20     A.   Rensselaer County Sheriff.
21     Q.   And in what capacity?
22     A.   I am the undersheriff.
23     Q.   And how long have you been employed as the
24          undersheriff?
```

```
 1    A.   I'm in my twelfth year.

 2    Q.   And so that would put us at about 2003,

 3         thereabouts?

 4    A.   Actually, my start date is January 12, 2004.

 5    Q.   Is that the first time you became employed with

 6         the sheriff's department?

 7    A.   That's correct.

 8    Q.   And that was in the capacity of undersheriff?

 9    A.   That's correct.

10    Q.   What did you do before that?

11    A.   I was a City of Troy police officer for

12         twenty-eight years.

13    Q.   And in what capacity were you employed at the

14         Troy police?

15    A.   I actually was a patrolman for ten years, I was a

16         uniformed sergeant for ten years, and I was a

17         detective sergeant for almost eight years -- or

18         eight years, whatever the balance adds up to

19         there.  I believe it's eight years.

20    Q.   You started as a patrolman?

21    A.   That's correct.

22    Q.   And you moved to what position?

23    A.   Uniformed sergeant.  I was a sergeant, but I

24         stayed in uniform.
```

```
 1    Q.   What were you promoted to?

 2    A.   Detective sergeant, and I was assigned to the

 3         narcotics unit.

 4    Q.   So as the detective sergeant, you were in the

 5         narcotics division the whole time?

 6    A.   Yes.  I went up -- I believe I was.  My last

 7         years, I believe I was with the narcotics unit.

 8    Q.   And can you tell us what type of special training

 9         you have as an investigator?

10    A.   I don't remember all the schools, but I've taken

11         basic criminal investigation, investigative

12         schools, numerous narcotic related investigative

13         schools, command and control schools, supervising

14         multi-jurisdictional task force.  So there was a

15         lot of training.  I can't remember it all, but I

16         had basic in all, if not advanced.

17    Q.   For investigations?

18    A.   Some of them were connected to investigations.

19         When you say investigations, not necessarily like

20         a criminal investigation, but I was a clandestine

21         lab investigator.  So part of -- I mean, most of

22         that school dealt with investigations, but more

23         so towards the clandestine lab.

24    Q.   Just briefly, what's a clandestine lab?
```

```
 1     A.    It's a meth amphetamine lab, a lab that's set-up

 2           in a remote location, how to determine where they

 3           are, what leads you took to locate them, and how

 4           to investigate them safely without injuring

 5           yourself or anybody else.

 6     Q.    So before you started working for the City of

 7           Troy, where else did you work?

 8     A.    Before I worked for Troy, I worked for Niagara

 9           Mohawk, which is now National Grid.  I worked for

10           General Electric for a short time.  I worked for

11           Trojan Contracting.  I think those are the big

12           ones.  I mean, I worked for Bumstead Chevrolet

13           when I was in high school.

14     Q.    You've given us enough in that regard.  Can you

15           tell us what your education is?

16     A.    I have a high school education and some college

17           courses.

18     Q.    Where did you go to high school?

19     A.    LaSalle.

20     Q.    What are some of the college -- do you have a

21           degree, a college degree?

22     A.    No, I don't.

23     Q.    What are some of the college courses you took?

24     A.    I think I might have gone to Hudson Valley for a
```

```
 1              period of maybe six months, and whatever your

 2              entry courses are, I don't know, but school isn't

 3              my thing.

 4        Q.    Did you take any criminal courses?

 5        A.    I may have gone back under LEAP when the

 6              government had LEAP funds available for cops to

 7              go back to school, but I didn't go back for very

 8              long.  So I would say that I don't have anything

 9              on record as far as courses taken in college for

10              criminal activity.

11        Q.    Okay.  All right.  Let's talk about your

12              employment with the Rensselaer County sheriff's

13              department.  So you left the Troy city police

14              department and went right to the Rensselaer

15              County sheriff's department?

16        A.    That's correct.

17        Q.    And you went right into the undersheriff role?

18        A.    That's correct.

19        Q.    Tell us, is that a civil service position or an

20              appointment?

21        A.    It's an appointment.  You serve at the pleasure

22              of the sheriff.

23        Q.    And who was the sheriff when you became

24              undersheriff?
```

1      A.   Jack Mahar.

2      Q.   At that time, how long had he been the sheriff?

3      A.   He actually started a few days before I did.  He

4           started on January 1st of that year, and I

5           started on the 12th.

6      Q.   Now, explain to me, as an outsider, your role as

7           an undersheriff.  The term is undersheriff, so

8           you're under the sheriff, but what are some of

9           your duties as an undersheriff?

10     A.   Pretty much your duties are whatever the sheriff

11          needs you to do.  Some undersheriffs in

12          facilities that do not have a chief of

13          corrections or correctional superintendent, some

14          of those facilities the undersheriff actually

15          runs the jail.  Other facilities, the

16          undersheriff oversees highway, jail, civil.  All

17          of them come under his umbrella.

18              I think my --  most of my time there, I

19          would say, was focused on highway patrol, because

20          in our facility we did have a superintendent of

21          the facility who was a colonel at the time I

22          first started, Bob Loveridge (phonetic).  And it

23          was a rank structure there, so there were

24          lieutenants.

```
1                 So primarily for the majority of my time

2            there, I was focused more on highway patrol.

3     Q.     Now, there would be times when the sheriff was

4            not there, he would have been on vacation or out?

5     A.     That's correct.

6     Q.     And did your role, at that point, change?

7     A.     Well, I mean, in the sheriff's absence, if

8            something was to happen to the sheriff, the

9            undersheriff could take over, and there could be

10           a gubernatorial appointment.

11                So that's what the position is there for, if

12           something happens to the sheriff.  If the

13           sheriff's on vacation, yeah, I could make

14           decisions.  Most of them could wait until he came

15           back from his vacation.  So it would change, but

16           not dramatically, let me put it that way.

17    Q.     Let me ask you a more specific question.  When

18           the sheriff is not in Rensselaer County, when

19           he's out of the county and otherwise cannot

20           function in his capacity as a sheriff, who serves

21           in that role?

22    A.     I would say he still serves as sheriff.  He could

23           delegate some decisions to me, but in today's

24           world with cellphones, and you could pick up a
```

1          cellphone and call somebody over in Europe -- I

2          mean, it's not like years ago if the sheriff was

3          out you couldn't get ahold of him.

4               So today I would say the role changes -- to

5          answer your question, the role changes a little

6          bit, but the sheriff is still ultimately the

7          boss.

8     Q.   As the undersheriff, what role do you play in --

9          where are you -- can you explain the chain of

10         command at the sheriff's department?  Where are

11         you in the chain of command?

12    A.   I would be below the sheriff, right underneath

13         the sheriff.

14    Q.   And who falls right below you?

15    A.   Well, on the correctional side it would be, right

16         now, the chief of corrections.  At one time it

17         was, as I said, Bob Loveridge, who was

18         superintendent.  Titles have changed.

19              On the highway patrol side, it would be the

20         captain of the highway patrol.  They would be the

21         next step down from me.

22    Q.   During the time Mr. Gorman was employed at the

23         sheriff's department, who was the director of

24         corrections?  Who was in charge of the

1           corrections department?
2      A.   I don't know if -- I know Ruth Vibert was the
3           chief.  I don't know if Mr. Gorman had come in
4           under Bob Loveridge or if he was there under
5           Ruth Vibert?
6      Q.   Do you know who Hal Smith is?
7      A.   Yes.
8      Q.   What role did he play?
9      A.   Hal Smith was a lieutenant at one time and then a
10          captain.  When Vibert was there, Hal was a
11          captain.
12     Q.   What were his duties?
13     A.   He would be a step down below the chief or
14          superintendent, whatever you want to call it.
15          And his duties would vary.  Whatever the chief
16          needed him to do, he would probably be assigned.
17          He would oversee the lieutenant and so on down
18          the line.
19     Q.   And in the chain of command underneath you, you
20          indicated there's a division between highway duty
21          and corrections?
22     A.   That's correct.
23     Q.   As far as corrections went, who was next in the
24          chain of command underneath you?

1    A.   For corrections, it would have been either the

2         superintendent or chief, whatever title you call

3         him.  The next one down would be a captain.

4    Q.   And who were those two individuals at that time?

5    A.   Well, in my tenure there were a few different

6         ones, but at the time with Mr. Gorman, what we're

7         talking about here, I believe it would be

8         Ruth Vibert as the chief and Captain Smith,

9         Hal Smith.  And maybe -- I think he might have

10        been there a little bit for Dave Hetman, too, but

11        I'm not sure.

12   Q.   Now, staying on the chain of command, to the

13        extent that there is a personnel problem at the

14        correctional facility, is the proper chain of

15        command for the issue to go through the

16        superintendent to you to the sheriff?  How does

17        that work?

18   A.   Well, I think depending on the type it is.  I

19        mean, some disagreements could be handled on a

20        sergeant's level.  If not, it would probably move

21        up to lieutenant, to a captain, and to the chief,

22        and then it would come over to myself or the

23        sheriff.

24   Q.   You said it would come over to yourself or the

```
 1              sheriff.  So it would depend?  When would it come
 2              to you, and when would it come to the sheriff?
 3       A.     For the most part, like I said, since I have been
 4              there, a lot of times I was only highway patrol.
 5              The majority would go to the sheriff.  I'm
 6              talking about where disciplinary action would be
 7              taken, things to that effect.
 8       Q.     Since there's a chain of command, must the
 9              disciplinary matters fall through you before they
10              go to Sheriff Mahar?
11       A.     In a perfect world, yes.  That's not always
12              necessarily the case.
13       Q.     Was there a procedure that required that?
14       A.     That I'm not sure.
15       Q.     So it sounds to -- well, strike that.  Did there
16              -- are there times when you deal with personnel
17              issues?
18       A.     Yes.
19       Q.     Okay.  And how is the decision made whether or
20              not personnel issues should be brought to you or
21              Sheriff Mahar first?
22       A.     I think --  I would say that that has changed a
23              lot over the years.  I know when Bob Loveridge
24              was there, and even Vibert in the beginning, she
```

1         would deal directly with the sheriff for most

2         issues.  Some of them wouldn't come to me.

3         They'd go to him and it would be resolved.  If it

4         came to me, I would look at it, make my

5         recommendation to the sheriff, and move on.

6    Q.   Your office, is that located in the jail, the

7         correctional facility?

8    A.   No, it's not.

9    Q.   Where was your office?  At the time Mr. Gorman

10        was employed, where was your office?

11   A.   It's all one big building, the public safety

12        building.  The correctional facility is like on

13        the west side, which would be along the river,

14        and administrative offices for sheriff,

15        undersheriff, confidential secretary and the

16        highway patrol officers are on the other side of

17        the building, divided by -- naturally, the

18        correctional facility is a secure area, where

19        ours isn't as secure.

20   Q.   Within walking distance?  It's the same property,

21        correct?

22   A.   Yes.

23   Q.   Now, can you tell us about how often you would go

24        to the jail, the correctional facility?

```
 1   A.   Myself, I didn't go there often.  My function was
 2        primarily highway patrol.
 3   Q.   How did -- who established that you would be
 4        primarily responsible for the highway patrol?
 5   A.   I think the sheriff initially wanted me to focus
 6        on the highway patrol.  I know the sheriff would
 7        go to the jail frequently, walk through the jail
 8        himself.  And I occasionally would, or if I was
 9        attending a meeting over on that side or
10        something.
11   Q.   Can you tell us a little more what role you would
12        play in the operation of the jail?
13   A.   It has changed from time to time.
14   Q.   I'm talking about the time when Mr. Gorman was
15        employed.
16   A.   Well, in a certain period during that, I don't
17        know if it was from its inception, but at some
18        time during that period, the sheriff did not want
19        to handle anything that was associated with that,
20        so then it started coming to my office.  I don't
21        recall the time, but sometime within that --
22        Mr. Gorman's situation.
23   Q.   There came a time when he didn't want to deal
24        with -- he wanted you to handle the matters
```

```
 1              coming out of the correctional facility?
 2     A.    Yes.
 3     Q.    All right.  Okay.  You don't recall right now
 4           when that time period happened?
 5     A.    No.
 6     Q.    Do you recall if it happened after Mr. Gorman
 7           filed his incident reports regarding
 8           Anthony Patricelli?  Did it come after or before
 9           these events happened?
10     A.    I would have to say it came during that time
11           period.  Before or after, I don't know.
12     Q.    Mr. Gorman was employed for a period of time
13           before the events happened?
14     A.    That's correct.
15     Q.    So you're saying that you became --
16           Sheriff Mahar had you handle the issues at the
17           correctional facility after the events Mr. Gorman
18           has alleged?  Is that your understanding, it was
19           during that period of time?
20     A.    I don't know if I handled that event from the
21           beginning, but at some point that found its way
22           to my desk.
23     Q.    We can talk about that more, and maybe your
24           memory will jog once we go over documents and
```

```
 1            things.

 2    A.    All right.

 3    Q.    Do you remember the first time you met

 4          Mr. Gorman?

 5    A.    I would say probably at his interview.

 6    Q.    You interviewed Mr. Gorman?

 7    A.    I don't know if I interviewed him.  I might have

 8          sat in on it.

 9    Q.    Who conducted the interview, do you recall?

10    A.    That I do not.

11    Q.    Did you look over Mr. Gorman's application for

12          employment?

13    A.    I probably did.  I can't be sure.

14    Q.    Now, you sat in on the interview.  Is that

15          another role that you had as the undersheriff, to

16          sit in on interviews of perspective employees?

17    A.    For the most part, I will sit in on an interview.

18          At the present time, we have the chief and the

19          captain and two lieutenants conduct the

20          interviews.  That had varied from time to time,

21          but for the most part, if I'm around, I would sit

22          in on the interview and not necessarily conduct

23          it myself.  I may ask questions, but --

24    Q.    Can you tell us, more specifically, what role you
```

```
 1              play in the decision to employ corrections

 2              officers at the sheriff's department?

 3      A.      Well, ultimately the decision would be the

 4              sheriff, but I could recommend or not recommend

 5              somebody.

 6      Q.      For Mr. Gorman's interview, do you remember

 7              taking notes during the interview?

 8      A.      I don't know.  There may have been a

 9              questionnaire that was checked off when he

10              answered questions, but I can't be positive.

11              Sometimes they use those and sometimes they

12              don't.

13      Q.      What was your --  do you remember what your

14              impression of the interview was?

15      A.      I don't recall.  It must have been favorable.

16      Q.      All right.  Now, you said you recall taking a

17              question --  filling out a questionnaire.  Where

18              do you keep those questionnaires?

19      A.      They would be filed with jail paperwork

20              somewhere.

21      Q.      And is it the jail's practice to keep those

22              documents?

23      A.      That I'm not sure.  And I don't know if they were

24              used on every series of interviews, because
```

```
1            everybody -- I mean, this chief that is there

2            now, he has his way of doing things.

3      Q.   You just remember it being used --

4      A.   Sometimes they were done, sometimes they weren't.

5      Q.   But in Mr. Gorman's case, you remember them being

6            used?

7      A.   I can't be certain, but I want to say probably

8            around that time we were.

9      Q.   Okay.  So that's the first time you met

10           Mr. Gorman.  On the questionnaire, do you believe

11           that would have been kept in Mr. Gorman's

12           personnel file?

13     A.   I'm not sure.

14     Q.   All right.  After you were part of the interview

15           for Mr. Gorman, when is the next time you

16           remember meeting him?

17     A.   I've seen him from time to time during the course

18           of business or --

19     Q.   Okay.  Okay.  All right.  So when you -- and when

20           would you see him?  Would you see him at the

21           correctional facility?

22     A.   Sometimes.

23     Q.   Have you seen him outside of the correctional

24           facility?
```

```
 1    A.    I may have, but I don't recall.
 2    Q.    All right.  Can you tell us --  now, let me
 3          backup.  You're going to be --  you've been
 4          elected to be the next sheriff?
 5    A.    Election Day is next week, but I don't have an
 6          opponent.
 7    Q.    Now, have you picked an undersheriff yet?
 8    A.    I have not.
 9    Q.    Is there a criteria for an undersheriff to be
10          selected?
11    A.    Criteria set by me?
12    Q.    That's the question.  Is it set by you?
13    A.    The undersheriff would be my choice, and I have
14          some ideas what I'm looking for.
15    Q.    Now, did there come --  in your role as
16          undersheriff, did there come times when you acted
17          on behalf of the sheriff for personnel issues?
18    A.    Yes.
19    Q.    And did that include the writing of letters on
20          behalf of the sheriff regarding personnel issues?
21    A.    That's correct.
22    Q.    And did that happen often?
23    A.    I don't believe often.  I think it happened more
24          when I started to get more involved with the
```

|  |  |  |
|---|---|---|
| 1 |  | correctional side, but I don't believe prior to |
| 2 |  | that it happened often.  It may have happened |
| 3 |  | from time to time. |
| 4 | Q. | Other than the letters you've written on behalf |
| 5 |  | of the sheriff regarding Mr. Gorman, did you |
| 6 |  | write any letters on behalf of the sheriff for |
| 7 |  | any other personnel? |
| 8 | A. | I'm sure I did, but I don't recall. |
| 9 | Q. | Now, do you know who Anthony Patricelli is? |
| 10 | A. | Yes, I do. |
| 11 | Q. | And now --  and how do you know Mr. Patricelli? |
| 12 | A. | Well, I've known him a long time, because I grew |
| 13 |  | up in the south end and he grew up in the south |
| 14 |  | end.  I know when I ran my drug unit, I used him |
| 15 |  | from time to time when we conducted street sweeps |
| 16 |  | or undercover buys on the street because of his |
| 17 |  | knowledge of the bad guys from seeing them in the |
| 18 |  | correctional facility.  So a lot of times he was |
| 19 |  | able to identify somebody on the street and put a |
| 20 |  | name to that person's face that we may have been |
| 21 |  | looking for. |
| 22 |  | So I used him from time to time when I was |
| 23 |  | employed by the City of Troy in the narcotics |
| 24 |  | unit, with the approval of then Sheriff Dan |

```
1              Keating.

2     Q.   So you're indicating that you had contact with

3          Mr. Patricelli when you were a Troy detective?

4     A.   That's correct.

5     Q.   And he was working with the sheriff as a

6          corrections officer at that time?

7     A.   I believe he may have been a master sergeant.  He

8          was a sergeant.  Master sergeant was kind of an

9          honorary title.

10    Q.   He was a sergeant?

11    A.   Yes.

12    Q.   And you're also indicating you know Patricelli

13         outside of work?

14    A.   I knew him as a kid.  I worked the street in

15         Troy, so I knew him, seen him out.  He was a

16         young kid.  It was good practice to learn who the

17         kids in the neighborhood were.

18    Q.   So since we're on that and that was your

19         neighborhood, so to speak.  Did you ever have to

20         arrest Mr. Patricelli?

21    A.   No.

22    Q.   All right.  Did you ever have to charge him with

23         anything?

24    A.   No.
```

```
 1    Q.   Are you aware of any charges that were filed
 2         against him?
 3    A.   I'm aware of the charges --
 4    Q.   Other than these charges?
 5    A.   I don't believe so, no.
 6    Q.   And I'm talking about the period you were a beat
 7         cop there.
 8    A.   I don't remember him being arrested that I can
 9         recall.
10    Q.   All right.  We may talk about your relationship
11         with him further down the road, but tell me about
12         when you first met Sheriff Mahar?
13    A.   Again, he grew up on the south end and I grew up
14         on the south end, so I knew him since, I would
15         say, high school days, if not before.  You know,
16         probably eighth grade on up through.  He was
17         married to my sister at one time.  So I've known
18         him, let's say, freshman year on through.
19    Q.   And again, during the time in question that we're
20         talking about when Mr. Gorman was employed, you
21         had a relationship outside of work with
22         Mr. Mahar, true?  You would go to events?
23    A.   We would go to events because of family ties.  I
24         don't know.  They have got divorced.  I don't
```

```
1              recall when that was, and if it was during the
2              period of this.  I'm pretty sure it was before
3              this period here, but we would still see each
4              other at family gatherings.  We wouldn't actually
5              hang together.
6       Q.     So your relationship was familial, not sociable?
7       A.     It would be sociable in terms of family
8              gatherings, retirement parties, whatever, but --
9       Q.     Would you go to events like Nascar or anything
10             like that?
11      A.     No.
12      Q.     Now, you indicated you began shortly after
13             Sheriff Mahar?
14      A.     That's correct.
15      Q.     Now, have you ever witnessed Sheriff Mahar become
16             angry in the work setting?
17      A.     Yes.
18      Q.     And does that happen -- does that happen often?
19      A.     Well, I don't think it happens as much as it used
20             to.  I think he used to get frustrated more at
21             some things and he would get angry.
22      Q.     And how would you know he became angry?  Did he
23             yell, scream?
24      A.     People yell and their demeanor changes.
```

```
1    Q.   Did he ever yell and scream at you?

2    A.   Not that much, no.  We didn't always agree on

3         things, but he really didn't yell at me, I don't

4         think.

5              MR. SORSBY:  Can you mark this, please, as

6         Exhibit 42?

7              (Exhibit 42 marked for identification.)

8    Q.   I'm going to show you what's been marked

9         Exhibit 42.  Take a second to take a look at

10        that.

11   A.   (Witness complied.)  Okay.

12   Q.   Can you read the top label on that exhibit?

13   A.   It says corrections bureau general order.

14   Q.   Do you know what the corrections bureau is?

15   A.   Yes, I do.

16   Q.   What is corrections bureau?

17   A.   Corrections bureau is the jail side of the

18        sheriff's office.

19   Q.   Now, this was a --

20             MR. SORSBY:  Off the record one second.

21             (Discussion off the record.)

22             MR. SORSBY:  Back on the record.

23   Q.   This is one of the documents that was provided by

24        the county pursuant to federal rules procedure 26
```

```
 1              submission.

 2                      Now, this was provided to us, so is this

 3              document -- and you said this is a document that

 4              the sheriff's department may have; is that true?

 5      A.      This is a general order, which I know they've

 6              been revised different times from time to time.

 7              I know this is date of issue 21 March, 96.

 8                      I don't see a signature on this, like

 9              facility superintendent or something.  Normally

10              when we put orders into place now -- we revise

11              them also.  Our policies and procedures are

12              usually signed by the sheriff.  Like I said, I

13              don't see a signature here, so I know what this

14              exhibit is.  I just don't know if it was ever

15              implemented.  I'm sure there's something

16              implemented over there that deals with this.

17                      I don't know if this is current, is what I'm

18              telling you.

19      Q.      All right.  Now, from the time that you were

20              employed by the sheriff, do you remember that

21              there was always an order in place like this?

22      A.      There was policies and procedures, and I'm sure

23              they dealt with workplace violence.

24      Q.      In looking at this, what do you understand this
```

```
 1              order to be?

 2      A.      It tries to insure there's an atmosphere in the

 3              workplace where violence does not occur.

 4      Q.      I'll take that back from you.

 5                    MR. SORSBY:  Can we go off the record?

 6                    (Whereupon, a brief recess was taken.)

 7                    MR. SORSBY:  On the record.

 8      Q.      I'm going to show you what's been marked already

 9              as Exhibit 6, previously in a previous

10              depositions.  Take a look at that.  Do you

11              recognize what's been handed to you as Exhibit 6?

12      A.      I see it says Rennselaer County Workplace

13              Violence.

14      Q.      Do you recognize this document?

15      A.      I don't know if I've ever seen it before.

16      Q.      Turn the first page over to the second page.  Do

17              you see the date at the top?

18      A.      Yes.

19      Q.      What's the date on that?

20      A.      3/15/2012.

21      Q.      Are you aware that Rennselaer County had a

22              workplace violence program?

23      A.      Yes.

24      Q.      Have you ever read the workplace violence
```

```
 1           prevention policy statements before?
 2     A.    I don't know if I ever read this policy before.
 3           I know we were made aware of the workplace
 4           violence policy through Tom Hendry.  I know what
 5           the intent of it is.  I know what the body of it
 6           is.  But this actual packet, I don't know if I've
 7           seen it.
 8     Q.    Now, did Thomas Hendry -- did there come a time
 9           that Thomas Hendry gave you a workplace violence
10           policy program statement?
11     A.    I don't think he provided me, personally, with
12           one.
13     Q.    How do you know there's a workplace violence
14           policy for the county?
15     A.    Because Tom Hendry says there is and our people
16           know there are.
17     Q.    How do they know that there is one?
18     A.    They may have gotten one.  The superintendent of
19           the jail may have gotten a policy, or the sheriff
20           may have directed that prior to me assuming
21           duties at the jail.
22     Q.    You're currently undersheriff?
23     A.    That's correct.
24     Q.    And you're going to be sheriff?
```

```
 1    A.   Yes.

 2    Q.   Do you have a copy of the Rensselaer County

 3         workplace violence policy?

 4    A.   Now?

 5    Q.   Yes.

 6    A.   I don't believe I do.

 7    Q.   Now --

 8    A.   I would say that probably the confidential

 9         secretary has this on file, and if I needed to

10         refer to it, I would.

11    Q.   Who is the confidential secretary?

12    A.   Marcelle Swanberry.

13    Q.   You don't currently have a workplace violence

14         prevention statement at your office.  Have you

15         ever had a workplace violence prevention

16         statement at your office?

17              MR. MARTIN:  Object to the form.

18              MR. SORSBY:  You can still answer.

19    A.   I don't believe I have one in my office.  It's

20         probably with the confidential secretary, who is

21         outside my office.

22    Q.   Have you ever reviewed any policy regarding

23         workplace violence prevention?

24    A.   I probably have at some time, but I'm not sure.
```

```
1    Q.   Did you read the policy when the incidents that

2         Mr. Gorman has alleged in this case arose?

3    A.   I don't think I read the policy.  I was in

4         contact with Tom Hendry.

5    Q.   Okay.  Did -- when --  now, did Mr. Hendry give

6         any presentations or meeting on the workplace

7         violence policy?

8    A.   He did not to me, but he may have provided the

9         jail -- the jail I'm sure --  well, I would say

10        that the jail probably did some type of training

11        when this came out, training on this.

12   Q.   Can you explain to me how you came to understand,

13        during the time in question when Mr. Gorman was

14        employed, what the Rensselaer County workplace

15        violence prevention policy was, if you knew what

16        it was?

17   A.   I believe at the time that Mr. Gorman's incident

18        happened -- and again, I have to state that I

19        don't know if I came in on the very beginning of

20        his, but Ruth Vibert was the chief of

21        corrections.  And Ruth Vibert would have realized

22        that this -- in her opinion, this had to be

23        reported because it was a violation of this.

24   Q.   Yeah, I know.  We're going to get to the actual
```

```
 1              specifics.  I'm just trying to understand your

 2              knowledge of what the policy was.  So we'll get

 3              to that.

 4                    And so I'm asking, specifically as

 5              undersheriff, when and how you became aware of

 6              Rensselaer County's policy regarding workplace

 7              violence?

 8    A.        It probably was through my conversations with

 9              Tom Hendry, where there was a workplace violence

10              violation or alleged violation.  And he handles

11              the investigation into that.

12    Q.        Can you tell us if at the time he gave you a copy

13              the policy?

14    A.        I don't believe I got a policy from Tom Hendry,

15              no.

16    Q.        Do you recall there being a time that you have

17              actually read the policy, or is this the first

18              time you had seen the policy?

19    A.        I don't recall.

20    Q.        Now, while we're on the workplace violence, do

21              you know who a Cliff McLean and a Scott Bouret

22              are?  Do you know who those two individuals are?

23    A.        Cliff McLean, and Bouret maybe, they are

24              maintenance.  Cliff McLean is actually a
```

```
 1              maintenance supervisor, and Scott is one of the
 2              maintenance workers.
 3        Q.    Now, are those individuals still employed?
 4        A.    They are.
 5        Q.    Did there come a time that Scott filed a
 6              complaint of threatening behavior against
 7              Mr. McLean?
 8        A.    I'm not sure.
 9        Q.    Do you remember receiving, from the internal
10              affairs division, e-mails to you that you needed
11              to take action before the events between the two
12              became escalated?
13        A.    I don't recall.
14        Q.    Scott is a janitor, but where in the building is
15              he located at?
16        A.    Their office is actually over by corrections, so
17              anywhere you need them, they work.  So they work
18              if we need them over on our side, or if
19              corrections needed them, they work over on that
20              side.
21        Q.    All right.  Now, are you aware of a threat made
22              by Mr. --  excuse me.
23              Are you aware of a situation that arose
24              between Mr. Bouret and Mr. McLean?
```

```
 1    A.   I'm really not.  I'm trying hard to remember.  I
 2         don't recall an incident.
 3    Q.   Well, you know what, we can get back to that when
 4         we get a document that may refresh your memory on
 5         that.
 6              All right.  I want to stick on Exhibit 6, if
 7         you will.  Now, we're just going to have to have
 8         you read from it.  If you turn to the first page
 9         -- the first page --
10    A.   Page 1.
11    Q.   All right.  Let's have you turn to the first
12         page, not the page marked as Page 1.
13    A.   Page 2?
14    Q.   The first page after the cover sheet.  Go ahead
15         and read the first sentence for me.
16    A.   "Rensselaer County has a zero tolerance violence
17         policy, and considers the safety and security of
18         its employees to be a priority."
19    Q.   Did you understand that to be the policy
20         regarding workplace violence at the sheriff's
21         office, as well?
22    A.   Yes.
23    Q.   Do you understand that -- can you tell us if the
24         Rensselaer County workplace violence policy was
```

```
1              the same policy -- was that policy adopted at the

2              sheriff's department?

3        A.    I think this was a county-wide policy that was

4              adopted.

5        Q.    So you understood this was effective at the

6              sheriff's department, as well?

7        A.    That's correct.

8        Q.    And did you understand that the sheriff's

9              department also had a zero tolerance for -- zero

10             tolerance violence policy, and considers the

11             safety and security of its employees as a

12             priority?

13                  MR. MARTIN:  Object to the form.

14       A.    Absolutely.

15       Q.    Go ahead and read the second sentence for me, if

16             you will?

17       A.    "Therefore, threats, threatening behavior, acts

18             of violence, and any related conduct, including

19             but not limited to physical violence, verbal or

20             written threats or intimidation, intimidating

21             gestures or acts, and violence against property

22             will not be tolerated."

23       Q.    So did you also understand that this --  did you

24             understand that this policy meant that threats of
```

```
1              violence were not tolerated?
2       A.     That's correct.
3       Q.     All right.  I'm going to go down to the second
4              paragraph.  Can you start with the second
5              sentence and read that to us, please?
6       A.     Looks like we're starting with, "Threats,
7              threatening behaviors, or other acts of violence
8              executed off county property, that are directed
9              at employees, are also in violation of this
10             policy.  Off-site threats include, but are not
11             limited to, threats made via telephone, fax,
12             electronic or conventional mail, or any other
13             communication."
14      Q.     Having read that, did you understand the county's
15             policy to include threats of violence that were
16             made off property?
17      A.     Yes, I understand that.
18      Q.     I'll ask you that.  Did you understand the policy
19             regarding workplace violence at the sheriff's
20             department to include threats that were made off
21             site, off location, against sheriff employees?
22      A.     Yes.
23      Q.     Did you understand that to include threats made
24             by telephone, as well?
```

```
1    A.    Correct.

2    Q.    And can you read the third paragraph there for

3          us?

4    A.    "Employees found in violation of this policy will

5          be subject to disciplinary action, up to and

6          including termination of employment."

7    Q.    So did you understand, during the period in

8          question when Mr. Gorman was employed, that the

9          policy for workplace violence required that an

10         employee may be subject to disciplinary action,

11         including termination if they violate the policy?

12               MR. MARTIN:  Object to the form.

13               MR. SORSBY:  You can still answer the

14         question.

15   A.    I understand this to mean that, yes.

16   Q.    What did you understand the policy at that time

17         to mean?  If somebody violated the workplace

18         violence policy at the sheriff's department, what

19         were the ramifications?

20               MR. MARTIN:  Object to the form.

21               MR. SORSBY:  You can still answer.

22   A.    Okay.  I'm not sure if I was aware of it at the

23         time, but I am aware of it after reading this.

24   Q.    What do you understand the ramifications to be
```

```
1              for violating the workplace violence policy for

2              Rensselaer County at the time in question?

3     A.       I don't know what I understood at the time in

4              question.

5     Q.       Do you know, during the time in question when

6              Mr. Gorman was employed, was there -- in addition

7              to the Rensselaer County workplace violence

8              prevention program, was there a workplace

9              violence prevention policy for the sheriff's

10             department separate from the county?

11    A.       I don't know that to be true.  I know we have

12             policies and procedures.  Like I said before,

13             several times they were changed.  I don't know if

14             there was something in place at the time.  I'm

15             not sure.

16    Q.       During the time in question, you understand that

17             there was a policy in place, a workplace violence

18             policy?

19    A.       Yes.

20    Q.       And during the time in question, what would be

21             the consequence --  based on your understanding

22             of the policy, what would be the consequence,

23             based on a violation of the policy?

24                  MR. MARTIN:  Object to the form of the
```

```
 1            question.
 2      A.    You can be subject to disciplinary action, up to
 3            and including termination.
 4      Q.    Other than Mr. Patricelli, were you aware of
 5            anybody that's violated the workplace violence
 6            program?
 7                  MR. MARTIN:  Object to the form.
 8      Q.    Are you aware of anybody that's violated the
 9            workplace violence prevention program?
10                  MR. MARTIN:  Object to the form.
11      A.    I'm sure --  again, we go back to what I
12            testified before.  I did not oversee a lot of
13            activity at the jail prior to -- I think it was
14            during the time Mr. Gorman here had his problems.
15            And so I'm sure there were cases along the way
16            that may have included some of this, and I don't
17            know what the status was, but I can't tell you we
18            did not have any, because I'm not sure.
19      Q.    You were in charge of the highway patrol program?
20      A.    That's correct.
21      Q.    In your capacity and responsibility for that, can
22            you tell us what, if any, violations of the
23            workplace violence prevention program you
24            handled?
```

```
1    A.   I don't believe I handled any workplace violence
2         complaints regarding the highway patrol.  I don't
3         believe I did.
4    Q.   Now, you said that you spoke to Mr. Hendry about
5         the workplace violence program.  Did he conduct
6         any training of you in regards to that program,
7         that policy?
8    A.   I don't believe there was any actual training.
9         There may have been.  Sometimes they would send
10        an e-mail and you would read the e-mail, but I'm
11        sure in the jail they had some type of structured
12        training.  I don't believe I ever went to any
13        structured training on workplace violence.
14   Q.   All right.  Can you do me a favor and turn to
15        Page 5?
16   A.   (Witness complied.)
17   Q.   Now, can you tell us -- now, we're looking at the
18        section marked "supervisor".  Do you see that?
19   A.   Right.
20   Q.   Can you read that first bullet point?
21   A.   "Be familiar with Rensselaer County workplace
22        violence policy and program."
23   Q.   So I just want to be sure on this.  Can you tell
24        us what further efforts Mr. Hendry made to bring
```

```
1          you up to speed on the workplace violence policy
2          program?
3    A.    You would have to ask Mr. Hendry.  I'm not sure.
4          Some of this here -- like if you don't mind --
5          some of this here -- I mean, this deals with, "Do
6          not carry any weapons to work."  We carry weapons
7          all the time to work.  That's our job.  In the
8          corrections side, they don't carry weapons.  On
9          the highway patrol side, everybody carries
10         weapons all the time.
11   Q.    In the sheriff's department, in your capacity as
12         undersheriff, about how many people are you
13         responsible for?
14   A.    As the undersheriff, you're responsible for
15         basically the same thing the sheriff would be
16         responsible for.  You're responsible for the
17         corrections, highway patrol, and the civil.
18             Am I supervising directly those people
19         everyday?  Absolutely not.
20             Do I meet with my commander, especially on
21         the highway patrol side?  Pretty much on a daily
22         basis I do.
23             Do I try to meet with the -- and now in the
24         position that I'm in, do I try to meet with the
```

```
 1            chief of corrections?  Maybe two times a week, at
 2            least, I do.
 3      Q.    So would you say that you're a supervisor?
 4      A.    I would say I'm an administrator more than a
 5            supervisor.
 6      Q.    If we turn back to Page 5.  I'm not quite done
 7            with that.
 8                 Now, you read the first bullet point under
 9            "supervisor"?
10      A.    Right.
11                 MR. MARTIN:  Just to be clear, is this
12            Page 5 as written on the exhibit or --
13                 MR. SORSBY:  It would be technically
14            Page 6, because of the cover letter, but it
15            indicates on the exhibit Page 5.
16                 MR. MARTIN:  Okay.
17      Q.    And just -- you see where it says, "Be familiar
18            with Rensselaer County violence policy and
19            program"?
20      A.    Right.
21      Q.    You understood that that was directed at you, as
22            well?
23      A.    Yes.
24      Q.    All right.  And you've never read the policy
```

```
 1            regarding the workplace violence policy program?
 2            Is it fair to say that you weren't familiar
 3            with the Rensselaer County workplace violence
 4            program?
 5     A.     Well, I don't know.  Maybe --  I mean, I don't
 6            know if I testified -- I said I don't recall
 7            reading it.  I never said I didn't read it.  I
 8            may have read it at some time.  I'm not sure.
 9     Q.     Do you have a recollection of reading a workplace
10            violence prevention program for Rensselaer
11            County?
12     A.     I'm sure I did, but I can't state positively that
13            I did.
14     Q.     Okay.  We may come back to that.  We're done with
15            that for now.  You can put it there in case we do
16            come back to it.
17                 Now, you indicated that you had known
18            Anthony Patricelli for some time.  Were you a
19            part of his interview process?
20     A.     To be hired as a correctional officer, no.
21     Q.     You testified -- all right.  Okay.  Now, has
22            there ever come a time where you were involved in
23            a disciplinary matter, other than Mr. Gorman,
24            involving Anthony Patricelli?
```

```
 1    A.   Not that I can recall.  I may have, if it was

 2         minor discipline, but I don't recall.

 3              MR. SORSBY:  Let's get this marked.

 4              (Exhibit 43 marked for identification.)

 5    Q.   I'm going to show you what's been marked as

 6         Exhibit 43.

 7    A.   Okay.  Read it?

 8    Q.   Do you need more time to read it?

 9    A.   Yes.  Let me read it through.  Okay.

10    Q.   Do you recognize what's been marked as

11         Exhibit 43?

12    A.   I'm sorry.  Do I recognize --

13    Q.   This document.

14    A.   It's a letter written by Chief Bly to myself.

15    Q.   What's the date on the letter?

16    A.   January 6, 2015.

17    Q.   Did you receive this letter from Chief Bly?

18    A.   Yes.

19    Q.   Having read that document, do you remember the

20         substance of what was going on in the letter?

21    A.   Basically, Lieutenant Rankin had told Patricelli

22         to assume the duties of watch commander, and

23         Patricelli had a problem with that for various

24         reasons that he stated.  And the chief of
```

```
 1              corrections had a meeting and set him straight, I
 2              guess.
 3       Q.    Now, in the chain of command, Sergeant Rankin,
 4              where is he placed vis-a-vis Anthony Patricelli?
 5       A.    In the chain of command, there would be the chief
 6              of corrections, Captain Hetman below him, and
 7              Lieutenant Rankin would be one of the lieutenants
 8              below the captain and above the sergeants.  I
 9              don't know if he would be his direct supervisor,
10              but he would be the supervisor above the
11              sergeant.
12       Q.    Was it within his power and authority to ask
13              Anthony Patricelli to take the watch command?
14       A.    Yes.
15       Q.    Now, there's a policy, Rensselaer County
16              sheriff's department policy, correct?
17       A.    There's a lot of policies.
18       Q.    An administrative manual, is that true?
19       A.    An administrative manual, yes.
20       Q.    Now, sergeant -- based on this letter you read,
21              Sergeant Rankin gave a direct order to
22              Anthony Patricelli?
23       A.    Lieutenant, just because he's over sergeant.
24       Q.    Lieutenant Rankin gave a direct order to
```

```
 1           Sergeant Patricelli?

 2      A.   That's correct.

 3      Q.   Was he still a master sergeant at that time?

 4      A.   No.  He did not have a master sergeant, which was

 5           only an honorary title.

 6      Q.   Now -- so what --  would it be misconduct for a

 7           subordinate to disobey a direct order from a

 8           superior?

 9      A.   It wouldn't be appropriate for that to happen.

10      Q.   I want to know, would it be misconduct?

11      A.   Well, I mean, if you're getting at -- to where

12           can somebody be terminated for violating a direct

13           order?  I mean, if it was an emergency situation

14           where something had happened, that's a

15           possibility.

16               A lot of times there are disagreements, and

17           that's why we have procedures for counseling and

18           meetings to straighten these things out.  There

19           could be a miscommunication in the order, so

20           that's why we have these meetings.

21               I mean, technically, at the far end of the

22           spectrum, could you terminate someone for

23           violating -- for not following a direct order?

24           Yeah.  Good luck in doing that, but I think
```

1          that's why we have procedures in place to meet

2          with people, talk them over.  There's options for

3          counseling, options for time off.  Depending on

4          the severity and the interest of both parties

5          that are involved in there, most situations can

6          be resolved.

7     Q.   Now, violating or disobeying a direct order, is

8          that a violation of the administrative rules at

9          the sheriff's department?

10    A.   I would say yes.

11    Q.   Is it a serious event?

12    A.   Again, you would have to weigh all the

13         circumstances.

14    Q.   Okay.  The date on this is January 16, 2015, so

15         is Sergeant Patricelli still employed at the

16         sheriff's department?

17    A.   He's still employed.  I think he's out with a

18         knee injury.

19    Q.   Can you tell us if he was disciplined for this

20         violation of the administrative rules?

21    A.   I believe he was given a counseling letter.

22         That's apparently what the chief of corrections

23         decided to do with that situation was give him

24         that letter, and apparently it was fine with

1           Rankin.

2      Q.   Do you believe that some other action should have

3           been taken for violating this order, or do you

4           think this is appropriate?

5      A.   Well, I have to put my confidence in my chief of

6           corrections and my lieutenant, who were both

7           directly involved in that.  And I hope -- I would

8           hope they would make the best decision based on

9           their knowledge and experience.  So I would say

10          those two people are highly capable people and

11          they probably came to the right conclusion.

12               MR. SORSBY:  I'd like to have another

13          exhibit marked.

14               (Exhibit 44 marked for identification.)

15     Q.   All right.  I'm going to hand you what's been

16          marked Exhibit 44.  Let me know, did you have a

17          chance to look at that?

18     A.   I mean, I basically know what it is.

19     Q.   Do you recognize what's been marked as

20          Exhibit 44?

21     A.   Yes.  It's a copy of Rensselaer County Sheriff's

22          Administrative Manual for Corrections.

23     Q.   So you recognize this document?

24     A.   Yes, I do.

```
 1    Q.   You understand this --  what do you understand
 2         this document to be?
 3    A.   This was an administrative manual that was put
 4         together shortly after we came in.  This says
 5         2006, so within a year or two after we came in.
 6         We updated the administrative manual that was
 7         there prior to us.
 8    Q.   Did you have a role in updating this?
 9    A.   I might have looked at some policies.  We had
10         meetings from time to time.  We may have looked
11         at some policies.  I didn't draft this, but we
12         may have had some input into some policies that
13         were in there.
14    Q.   So you're familiar with this document and the
15         things in it, correct -- the rules in it,
16         correct?
17    A.   Yes.
18    Q.   Have you had a chance to review this document, in
19         addition to having had some input into the
20         updates?
21    A.   When this document came out, I'm sure I went
22         right through the document.  And I have it on
23         file, if I have to refer to it.  Since then, I
24         believe we made additional changes.  And when a
```

```
 1              new chief came in, I know they were working on
 2              upgrading policies and procedures.
 3       Q.     Do me a favor.  Could you turn to Page 11?  I'm
 4              referring to Page 11 on the bottom of the
 5              document.
 6       A.     Okay.  County work rules?
 7       Q.     Correct.  Now, do you see Number 3 at the bottom?
 8       A.     Penalties?
 9       Q.     Yes.  All right.  Can you just read for me 3.1?
10       A.     "In conjunction with the county work rules
11              concerning disciplinary action as set out in the
12              policy and procedures manual, the sheriff's
13              office may take any of the following disciplinary
14              actions against a member or employee who violates
15              any of the sheriff's office rules and
16              regulations; (A) verbal reprimand, (B) written
17              reprimand, (C) impose a sanction, (D) suspension,
18              (E) demotion, and (F) dismissal."
19       Q.     Now, can you turn over to Page 12, the next page?
20       A.     Page 12.  Okay.
21       Q.     Okay.  Now, what -- do you see it appears to
22              indicate various violations there?
23       A.     These are the county work rules, yes.
24       Q.     Those are county work rules.  And it says to the
```

```
 1              right, first offense, second offense.  Explain
 2              what you understand this to mean?
 3    A.    I understand it to mean that's what you would
 4              give somebody on their first offense, give them
 5              an oral warning.
 6    Q.    Okay.  All right.  Okay.  Can you turn to the
 7              next page?  It would be 13 at the bottom.  I
 8              think it's actually --
 9    A.    This one here?
10    Q.    Yes.  Do you see Number 26?
11    A.    Yes.  Okay.
12    Q.    Can you read that to us?
13    A.    "Refusal to follow job instructions,
14              insubordination."
15    Q.    Is that an administrative rule?
16    A.    Yes.
17    Q.    And what does it say for the first offense?
18    A.    "Suspension, review for discharge."
19    Q.    Now, can you tell us why this particular
20              incidence that we're talking about where
21              Sergeant Patricelli refused a direct order from
22              Lieutenant Rankin, he was not suspended or
23              reviewed for discharge?
24    A.    Because I think that's some decision that was
```

1        made between Rankin, Chief Bly, and Patricelli.

2        I think they came up with that solution, rather

3        than Rankin suspending him on the spot.

4            If I may expand on that a little bit, if I

5        gave you a direct order, Stop that guy before he

6        puts that noose around his neck, and you don't do

7        it, that's a pretty serious violation.  I

8        probably would suspend you right on the spot for

9        that.  But if I said to you, Hey, get back to

10       work.  I don't want you drinking that coffee, and

11       you wound up taking two more sips before you

12       threw the coffee away, it probably isn't grounds

13       for suspension.

14           So that's why in situations like this, we

15       put our heads together for solutions that both

16       satisfy the problem, satisfy the union

17       obligations that we have to work with the union,

18       and in the best of the sheriff's department in

19       general.

20   Q.  So you're saying that when somebody refuses an

21       instruction or is insubordinate, it depends on

22       the situation?  You have discretion as to what --

23   A.  I think the person giving the order is the one

24       with discretion.  I think if Rankin thought --

```
 1              Rankin is familiar with the -- he's familiar with
 2              the administrative manual.  He's familiar with
 3              the county work rules.  If he gave somebody an
 4              order and they did not follow the order, and he
 5              felt it warranted suspension, he probably would
 6              have done that.  But he didn't, so I'm sure he
 7              thought that didn't rise to that occasion.
 8    Q.   Keep on Page 13.  And what I'm trying to
 9         understand is why, on 26, it says, "First
10         offense, review"; do you see it?
11    A.   Right.
12    Q.   All right.  Now, you read that, and it says,
13         "Suspension, review for discharge."  Why doesn't
14         it say "depending on the situation"?
15    A.   Because I think all of these can be worked out
16         through negotiations before you get to this step.
17    Q.   All right.  So you don't -- all of these.  I
18         mean, do you see that Number --
19    A.   Theft of county property, okay?  Number 28,
20         Suspension and review for discharge.  If you
21         stole three pencils from the office, am I going
22         to suspend or discharge you?
23    Q.   I don't know.
24    A.   If you -- if you wound up taking a notepad home
```

```
 1              from my office, am I going to suspend you and

 2              discharge you?

 3      Q.      I'm asking, would you in that scenario?

 4      A.      You would probably get what they gave Patricelli,

 5              a counseling notice.  I don't want to be

 6              argumentative --

 7      Q.      It says --

 8      A.      -- but people have to use their heads in

 9              situations.

10      Q.      What about falsification on county forms and

11              records; would it depend on the situation?

12      A.      Again, it would depend on the situation.  I think

13              if you were falsifying a record where you were

14              embezzling, this and that, it would be a lot more

15              --  I can't even think of a situation.  But I'm

16              saying, again, you would have to look into the

17              situation.  That's why we do investigations.

18      Q.      And just to clarify, what about overtime

19              violations?

20      A.      What do you mean?

21      Q.      Misreporting overtime, would that depend?  Is

22              that a terminable offense in this scenario?

23      A.      Here's the thing with overtime.  If you

24              investigate that and there's a situation where
```

1          that happens, and you prove that, that's almost

2          like a criminal charge, a larceny charge.  So

3          you're going down a different avenue there.

4     Q.   And just for clarification, because I want to be

5          clear.  If somebody were to take pencils home or

6          a notepad home, that's something to discuss, not

7          necessarily a terminable offense?

8     A.   Right.

9     Q.   Now, I just want to be clear on this.  I'm

10         looking at the county rules.  They're saying

11         first offense, discharge, suspension, review for

12         discharge.  These are not hard, fast rules at the

13         sheriff's department.  These rules are --

14    A.   Well, our argument has always been that a lot of

15         those county work rules don't -- not that they --

16         they are county work rules, legitimate county

17         work rules, but they don't necessarily fit into

18         the parameters of the sheriff's office, because

19         we operate different than a lot of other agencies

20         within the county.  We work a 24/7 operation.

21         You have to depend on certain things.

22              So our argument is always we'd like to

23         negotiate a separate set of county work rules for

24         the sheriff's office, because some of them just

```
 1            don't apply to certain things, but that's what
 2            we've got to work with.
 3      Q.    Well, just to be clear --
 4      A.    I mean, let me -- let me explain.  Are you asking
 5            me, could you, if somebody stole two pencils or a
 6            notebook from the office, could you suspend them
 7            and discharge them?
 8      Q.    I'm just asking --
 9      A.    Yes, you could.  How far do you think you would
10            get with it?  Not too far.
11      Q.    Well, that's what I'm -- there's what's written
12            and there's what's practiced in application.  Is
13            this what's actually applied in the sheriff's
14            department?  You already testified that not in
15            all cases, so you don't have to go on.  I think
16            you've established that.  All right.
17                  MR. SORSBY:  Let's mark another exhibit.
18                  (Exhibit 45 marked for identification.)
19      Q.    Going back in time, if you will.  I'm going to
20            show you what's been marked as Exhibit 45.  Let
21            me know when you've had a chance to review it?
22      A.    I have.
23      Q.    Do you recognize this document?
24      A.    Yes.
```

```
 1    Q.    How do you recognize this document?

 2    A.    I recognize it.  It was a document that I sent to

 3          Patricelli, advising him that the office is

 4          conducting an internal affairs investigation, and

 5          it was regarding improper use of the E-justice

 6          system.  I did not conduct the investigation.  I

 7          did, however, sign this and issue this to him.

 8          And I think this is probably based on the

 9          recommendation of the sheriff or county.

10    Q.    What was the recommendation?

11    A.    To send him the notice.

12    Q.    But you sent him the notice, correct?

13    A.    I did.  I signed the notice.

14    Q.    What did you understand the allegation regarding

15          the E-justice system to be?

16    A.    This, I believe, was a situation where he was

17          alleged to have accessed the E-justice system to

18          check the record of a person that he shouldn't

19          have been checking.

20    Q.    Why shouldn't he have been checking it?

21    A.    To run a criminal history check, you have to have

22          an open case on it.  And people who come in to

23          the jail, they run a criminal history check.

24              To the best of my recollection, this person
```

```
 1              was not in the jail, he was not an inmate, and

 2              there wasn't an open criminal case on it.

 3       Q.     Do you know who the individual was?

 4       A.     I don't positively, but I believe and I was told

 5              it was some person that Mr. Gorman's sister maybe

 6              was dating.

 7       Q.     All right.  And how did you first become aware of

 8              this incident?

 9       A.     I can't remember if it came from the sheriff that

10              he was telling me or --  I'm not sure.  I knew of

11              the incident.  I did not investigate the

12              incident, but I knew of it.

13       Q.     Were you part of the investigation?

14       A.     I might have been apprised at different stages of

15              it.

16       Q.     And that would have been by who?

17       A.     The sheriff probably told me, and I believe --

18              I'm not sure, but it might have been one of our

19              highway patrol investigators was investigating

20              it, Bill Webster.

21       Q.     Now, what is the E-justice system?

22       A.     It's a portal you can use to check somebody's

23              background.

24       Q.     Criminal background?
```

```
 1    A.   Criminal background.
 2    Q.   So for a person --  an unauthorized person or a
 3         person using it in an unauthorized way, do you
 4         understand that to be a crime?
 5    A.   It is definitely a violation of our policy, and
 6         it could be a crime.
 7    Q.   I mean, do you understand that --  you said it
 8         could be a crime.  Do you understand that it --
 9         what type of crime it might be?
10    A.   I'm not positive.
11    Q.   Do you understand it could have been a violation
12         of the rules and regulations regarding the
13         Department of Corrections and Justice --
14         Department of Corrections and Criminal Justice,
15         DCJS.
16    A.   Yeah.  It's definitely a violation of their rules
17         and regulations of when you can -- and I believe
18         that -- now that we're talking about it, I
19         believe that's how it was originally determined,
20         because we have to do audits on them, or they
21         come in and do audits on it.  Our numbers have to
22         match with our cases, and I think we may have
23         gotten a heads-up when they came in to do the
24         audits.
```

```
1    Q.   You don't recall one of the other corrections

2         officers making a report regarding an alleged

3         misuse of the system?

4    A.   I think the other person is a correctional

5         officer named Wendy Vega.  And if I can remember

6         the case, she stated that Patricelli went to her

7         to ask her to run this person.  She ran the

8         person.

9              Now, her being in charge of that system, she

10        should know the rules and regulations of what to

11        operate.  If Patricelli went to her and said,

12        "I'm doing an investigation" -- At that time, the

13        sheriff had Patricelli working with Troy P.D. on

14        different cases out on the street.  Vega said,

15        "From time to time, he will come to me with a

16        name to run."  Legitimate, as long as they have a

17        case number.

18             I don't know.  Apparently it wasn't the case

19        in this situation, but those are the two people

20        that would have access to that.

21   Q.   Did you also mention a Mr. Webster, as well,

22        involved in this?

23   A.   Webster is one of our investigators from the

24        highway patrol.  And I believe he investigated
```

```
 1              the case.  Bill Webster is our contact person

 2              with DCJS as far as warrant checks and overseeing

 3              those portals or stations.

 4    Q.   Did you also understand that Mr. Gorman himself

 5              went to Mr. Webster and made a report regarding

 6              the misuse of the E-justice system?

 7    A.   That I don't recall.  Which Gorman?  There were

 8              two.

 9    Q.   Mr. John Gorman.

10    A.   His brother is a deputy sheriff.

11    Q.   Do you recall that?

12    A.   No, but I mean, when you said Mr. Gorman, I

13              believe at the time his brother was a deputy

14              sheriff.

15    Q.   And -- all right.  So you don't recall --  did

16              Mr. Webster tell you how he began the

17              investigation, how it came to his attention?

18    A.   I don't remember, but I think it was some audit

19              that may have discovered it.

20    Q.   That's what you understand?

21    A.   Yeah.  I'm not positive, though.

22    Q.   Now, Mr. Webster was part of the highway patrol?

23    A.   That's correct.

24    Q.   All right.  And so he had a lot of contact with
```

```
 1              you.  You testified earlier you were in charge of

 2              the highway patrol?

 3     A.       That's right.

 4     Q.       How many times did he talk to you about this

 5              investigation?

 6     A.       He was doing this investigation and reporting to

 7              the sheriff.

 8                    MR. SORSBY:  Bear with me one second here.

 9              Can you mark these two exhibits?

10                    (Exhibits 46 and 47 marked for

11              identification.)

12     Q.       Have you had a chance to review that?

13     A.       No.

14     Q.       Go ahead.

15     A.       Okay.

16     Q.       Now, do you recognize that document, having had a

17              chance to read it?

18     A.       Yes.

19     Q.       What do you recognize that document to be?

20     A.       I recognize it came from New York State

21              Department of Criminal Justice Services, and it

22              was a notification to Sheriff Mahar that they

23              think there might have been an impropriety in the

24              records check.  And they're asking for
```

```
 1              William Webster to assist us.

 2       Q.   Have you seen this document before?

 3       A.   The sheriff may have showed it to me, but I don't

 4            recall.

 5       Q.   Is it addressed to you?

 6       A.   No.

 7       Q.   Is there a cc on the bottom that you can see?

 8       A.   I don't think so.

 9       Q.   I show you what's been marked Exhibit 46.

10       A.   Thank you.

11       Q.   Do you recognize this document?

12       A.   Again, it's a letter from the New York State

13            Department of Criminal Justice Services to

14            Sheriff Jack Mahar, and it looks like it's a

15            conclusion of their investigation.

16       Q.   And what did they conclude?  Do you see it?

17       A.   It says, "Given the above, we conclude that the

18            inquiry into the CHRI of Peter Colantonio was a

19            violation of the terms of use of the

20            dissemination agreement between the sheriff's

21            office and DCJS."  It says, "An inquiry is not

22            only a violation of the U&D, but also violates

23            FBI and NCIC guidelines covering access to use of

24            CHRI."
```

```
 1    Q.   And had you -- before today, have you seen this
 2         document?
 3    A.   I can't say one way or another.  I mean, he may
 4         have shown me, but I'm not sure.  I wasn't cc'd
 5         on it.
 6    Q.   Were you made aware of the ultimate results of
 7         their investigation, even if you hadn't seen this
 8         before?
 9    A.   I was made aware that there was a violation of
10         the use of that term.
11    Q.   Who made you aware of that?
12    A.   The sheriff.
13    Q.   Now, it says here -- I'm looking at Exhibit 46.
14         It says, "It would be helpful if you could
15         arrange for an E-justice New York terminal agency
16         coordinator William Webster."  What is an
17         E-justice terminal agency coordinator?
18    A.   He is our liaison between DCJS and the sheriff's
19         office.  He actually checks the logs and makes
20         sure the case numbers are logged in for the
21         different reports.  So that's one of his duties.
22         He is the coordinator of that.
23    Q.   Anthony Patricelli was a corrections --  worked
24         in the corrections department; is that right?
```

1    A.   That is correct.

2    Q.   Why would he use the E-justice system?

3    A.   They have it in corrections.  So when people come

4         in, they're allowed to use that facility.

5    Q.   I'm wondering why Mr. Webster would be made the

6         coordinator if it's over on the corrections side?

7    A.   I think he's just the coordinator of the project

8         in general.

9              MR. SORSBY:  All right.  Bear with me one

10        second.  I'll have this marked as an exhibit.

11             (Exhibit 48 marked for identification.)

12   Q.   Now, before DCJS got involved, there was an

13        investigation launched by Mr. Webster himself,

14        correct?

15   A.   I don't know if that was before DCJS got involved

16        or simultaneously.  I know that according to one

17        of those I just read, it looks like DCJS was

18        informed by somebody that there was a violation,

19        and they were asking for Webster to contact them.

20        So I don't know if it was before, simultaneously,

21        or after.

22   Q.   Okay.  All right.  I'm just going to show you

23        more documents to refresh your recollection.

24             MR. SORSBY:  Off the record.

```
 1                (Whereupon, a lunch recess was taken from
 2          12:08 p.m. through 12:51 p.m.)
 3                MR. SORSBY:  Back on the record.
 4     Q.   And last we were discussing -- Undersheriff
 5          Russo, we were discussing the E-justice system.
 6          Do you recall that?
 7     A.   Yes.
 8     Q.   And Mr. --  Sergeant Patricelli -- Master
 9          Sergeant Patricelli's, at the time, use of that
10          system?
11     A.   Mm-hmm.
12                MR. SORSBY:  Now, I just want to clarify
13          something.  We started with the documents from
14          DCJS and their investigation, but we probably
15          should have started with the documents we have
16          regarding the internal investigation at the
17          sheriff's department.  So I'm going to introduce
18          that now, and have that marked.
19                (Exhibit 49 marked for identification.)
20     Q.   Let me show you what's been marked as Exhibit 49.
21          Now, there's a lot of documents.  Do you
22          generally recognize the documents you're looking
23          at?
24     A.   I do.  One is an incident report, SIR-3205, and
```

```
 1            the rest look like followup.
 2    Q.    You're talking about the first page?
 3    A.    First page.
 4    Q.    That's an incident report filed within the
 5            sheriff's department?
 6    A.    That's correct.
 7    Q.    Does it indicate who filed it?
 8    A.    It looks like William Webster was the reporting
 9            officer, and it was filed on the request of
10            Sheriff Mahar.
11    Q.    And is there a date on that?
12    A.    It looks like the report date is 3/22/13.
13    Q.    Based on your reading of that, do you understand
14            that the DCJS investigation came after the
15            launching of the internal investigation?
16    A.    If the dates are --
17    Q.    Exhibit 46 I just handed you, and 47.
18    A.    Yes.  So the internal came first and they came
19            after.
20    Q.    So you're saying the internal investigation came
21            before the DCJS?
22    A.    The internal investigation is dated before the
23            DCJS report.
24    Q.    And I apologize.  I didn't get to make a copy of
```

```
1            that beforehand.  I just wanted to show you.
2            This is the one --  this would be one, two,
3            three, four, the fifth page of this exhibit.
4                 Do you see something to the effect that
5            there was a sworn statement taken by
6            Mr. Patricelli?
7      A.    I just --  "A reporting investigator interviewed
8            Master Sergeant Anthony Patricelli in reference
9            to this investigation.  A sworn voluntary
10           statement was obtained."  And it just says, "See
11           attached.  Investigation to continue."
12     Q.    Sir, do you know where that sworn statement is?
13     A.    I do not.
14     Q.    Is it the custom and practice of the sheriff's
15           department to keep those statements?
16     A.    Yes.
17     Q.    I mean, it's a sworn statement?
18     A.    Yes.
19     Q.    So that statement should have been kept, correct?
20     A.    It should be somewhere with the file, yes.
21     Q.    I'll take that back.  All right.  I'm going to
22           show you what is the last page of this exhibit.
23           Sorry.  Start with the date at the top there for
24           us?
```

```
 1    A.   The date?

 2    Q.   Yes.  Correct.

 3    A.   3/22/13.

 4    Q.   Let me take that back and make sure we're reading

 5         the right date.

 6    A.   Right here.

 7    Q.   That's the incident date/time.  I'm talking about

 8         in the narrative, do you see there's a date

 9         there?

10    A.   Okay.

11    Q.   What's that date?

12    A.   6/13/13.

13    Q.   Now, who is that from, can you tell?

14    A.   It looks like the reporting officer is

15         William Webster.

16    Q.   What is this type of document?  We've looked at a

17         couple of them.

18    A.   Document, supplemental.

19    Q.   It's part of the report?

20    A.   Part of the investigation.

21    Q.   Are they normally affixed to the incident report?

22    A.   They're normally with the incident report.  I

23         don't know if they're affixed to it.

24    Q.   So -- all right.  Can you read what it says in
```

```
 1              the narrative, please?

 2     A.    "No other investigative leads for this

 3            investigation.  Copies of all case paperwork

 4            provided to the sheriff's assistant for further

 5            action in regards to subpoena.  No further

 6            actions.  Closed by investigation."

 7     Q.    Can you tell us what subpoena he's referencing?

 8     A.    That I do not know, because I had no part in this

 9            investigation.

10     Q.    So having just read that, what was the result of

11            the investigation, the internal investigation?

12     A.    It says closed by the investigation.  I don't

13            know what the result of that investigation were.

14     Q.    All right.  Was any further action taken after

15            this date, do you know?

16     A.    I wasn't part of the investigation, so I don't

17            know.

18     Q.    Well --

19     A.    I don't know.  I mean, according to this, it says

20            "closed by investigation".  Now, I don't know if

21            something else was generated that I don't have in

22            front of me.

23     Q.    Do you understand what the results of the

24            sheriff's investigation was?
```

```
1     A.   I do not have it.

2     Q.   And so now the DCJS did its own investigation,

3          correct?

4     A.   That's correct.

5     Q.   And they found Anthony Patricelli violated the

6          rules and regulations regarding the E-justice

7          system?

8     A.   Correct.

9     Q.   I'll take that back from you.  I want to show you

10         what's been marked Exhibit 48.  Can you read the

11         top of that for us?

12    A.   "Webster notes."

13    Q.   And can you read what it says right below that?

14    A.   "DCJS recommendations, termination."  It says

15         "normally" -- I think "normally".

16    Q.   Now, DCJS found that he violated the rules and

17         regulations regarding the E-justice system, and

18         you read earlier from Exhibit 47 that that's a

19         violation of a number of regulations, but

20         specifically FBI regulations and Department of

21         Corrections or DCJS regulations.  As a result of

22         that, was Mr. Patricelli terminated?

23    A.   No.

24    Q.   Do you have -- now, we've looked at -- again, we
```

```
 1            marked exhibits here, letters from DCJS.  Do you
 2            know where the letter from DCJS is with their
 3            recommendation?
 4      A.    Let me see one of those.
 5      Q.    These are the two.
 6      A.    Okay.  This is saying it can result in the
 7            termination of the sheriff's office access to it,
 8            not to terminate Mr. Patricelli.
 9      Q.    I'll take that.
10      A.    To answer your original question, I don't know.
11      Q.    And was -- now, did --  hold on a second.  Can
12            you tell us -- it says in Webster's notes,
13            Exhibit 48, "DCJS recommendation, termination
14            normally."  Do you know if there was a
15            recommendation by DCJS for termination of
16            Anthony Patricelli?
17      A.    That I do not know.
18      Q.    Can you tell us if Webster -- Sergeant Webster,
19            is that correct?
20      A.    No, Investigator.
21      Q.    Investigator Webster, if he made a recommendation
22            for Anthony Patricelli's termination?
23      A.    That I don't know.
24      Q.    Did you talk to Investigator Webster about the
```

```
1              investigation?

2    A.   Briefly, but like I said, I wasn't involved.  He

3         was reporting to the sheriff at the time.

4    Q.   Do you know if the results of

5         Investigator Webster's investigation were

6         provided to DCJS?

7    A.   I do not know.

8    Q.   All right.  Now, are you involved in the

9         termination process of employees?  You said

10        you're responsible for everybody the sheriff is

11        responsible for, and you also testified that

12        sometimes you're involved in the disciplinary

13        process, correct?

14   A.   Correct.

15   Q.   Have you ever recommended termination for an

16        employee?

17   A.   I don't believe I've recommended termination.

18        I've signed letters of termination based on the

19        sheriff and counsel's advice.

20   Q.   Are you aware of the fact that

21        Mr. Anthony Patricelli was prosecuted criminally

22        for this violation?

23   A.   Yeah.  I'm not sure I remember what the outcome

24        was.  I think he pled to something, some charge.
```

```
 1     Q.    You have a belief or understanding that he pled

 2           to a charge in the matter?

 3     A.    I believe the case was adjudicated.

 4     Q.    Can you tell us why, today, Anthony Patricelli

 5           wouldn't have been terminated for this offense,

 6           for the abuse of the E-justice system?

 7     A.    I don't think that's the way the county wanted to

 8           pursue.

 9     Q.    Is the misuse of the E-justice system a violation

10           of one of the county rules?

11     A.    I would say yes.  I'd have to look to see which

12           one it fits, but I'm sure.

13     Q.    Is it a violation of one that prohibits

14           committing crimes?

15     A.    It could be.

16     Q.    Do you understand the abuse of the E-justice

17           system to be a crime?

18     A.    Yes.

19     Q.    And so do you believe that Anthony Patricelli

20           misused the E-justice system?

21     A.    I believe that the investigation found that to be

22           true.

23     Q.    And then based on that belief, do you think he

24           should have been terminated for committing a
```

```
 1            crime?

 2     A.    That was not my decision to make.

 3     Q.    Whose decision was it to make?

 4     A.    It was up to the sheriff and the county.  In a

 5            lot of these cases, union rights come into play.

 6            So you're fighting another battle on that front,

 7            too.

 8     Q.    Was it the recommendation of the sheriff that

 9            Anthony Patricelli be terminated?

10     A.    That I don't know.

11     Q.    We already marked this as an exhibit.  I'm going

12            to have you read it so we can have clarification.

13               It's the county rules.  Go to Page 15 real

14            quick, Number 30.  Do you see that?  I don't know

15            if we had you read this earlier, but go ahead and

16            read the first part?

17     A.    Number 30?

18     Q.    Number 30, yes.

19     A.    "Conviction of a crime or engaging in unlawful or

20            improper conduct which -- "  Do you want me to

21            continue?

22     Q.    Yes.

23     A.    " -- which affects the employee's ability to

24            perform the job or report to work, resulting in
```

```
 1              reluctance or refusal of other employees to work
 2              with him or her, harms the county's reputation or
 3              public trust."
 4         Q.   Now, the E-justice system contains personal
 5              criminal records of members of the public?
 6         A.   That's correct.
 7         Q.   Would the violation of the E-justice system harm
 8              the public trust?
 9                   MR. MARTIN:  Object to the form.
10                   MR. SORSBY:  You can still answer.
11         A.   It could.
12         Q.   Now, you said you weren't involved --  it would
13              be the county and the sheriff that would
14              recommend termination.  You're going to be
15              sheriff soon, presumably.  Would you have
16              recommended termination?
17                   MR. MARTIN:  Object to the form.
18         A.   I'll make that decision when I'm sheriff.  I
19              don't deal in hypotheticals.
20         Q.   Again -- but I'm asking you -- I'll ask you in
21              your role as an undersheriff, because you're
22              responsible for all the employees, in addition to
23              the sheriff.  So do you believe termination
24              should have been recommended in this matter?
```

1              MR. MARTIN:  Object to the form.

2              MR. SORSBY:  You can answer.

3    A.    I believe that could be an option.  I believe the

4          county, like any other agency, would look at all

5          our options and - you know - choose the best one

6          that fits the case.

7              I'd like to revert back, if I could, to Item

8          Number 30, conviction of a crime or engaging in

9          unlawful or improper conduct that affects the

10         employee's ability to perform the job or report

11         to work.  Now, if I had an employee who happened

12         to go out drinking and drank in excess, and it

13         was improper conduct in my opinion, and you

14         should be aware that you're out in public and you

15         shouldn't get intoxicated.  But let's say that he

16         did, and he had to call in sick that day, and

17         that affected his ability to come to work.  Would

18         I suspend or discharge him?  Probably not.

19             So these are very, very broad, broad

20         examples of how they should be applied, but it's

21         not concrete that they should be applied in every

22         case or we wouldn't have anybody working

23         probably.

24   Q.    Let me ask you.  That says the commission of a

```
 1              crime or conviction of crime, does it not?
 2    A.   It does, but what I'm saying right above that,
 3         where it says conviction of a crime or engaging
 4         in unlawful or improper.  So that -- reading that
 5         is if you engage in improper conduct.
 6    Q.   But we're not talking about that.  We're talking
 7         about the conviction of a crime.
 8    A.   Okay.
 9    Q.   I'm asking you, a conviction that violated the
10         E-justice system?
11    A.   I would say it would be an option I would
12         consider.  I'd have to deal with the facts of the
13         case.
14    Q.   And do you believe in every case when a person is
15         convicted of a crime, an employee the sheriff's
16         department, they should be terminated?
17    A.   No.  I think -- you're talking crimes being
18         misdemeanors and --
19    Q.   Correct.
20    A.   Again, I'd take it on a case-by-case basis.  I
21         think there's some crimes that absolutely don't
22         belong there, and other ones you may be given a
23         second chance.
24    Q.   So --
```

```
1    A.    I mean, you can hire somebody that's been

2          convicted of a misdemeanor, actually hire them.

3    Q.    Okay.  I understand.  Do you understand that the

4          public officer's law prohibits the continued

5          employment of somebody who commits a crime?

6    A.    Certain crimes, I believe.  I'm not that familiar

7          with it.  I think certain crimes allow continued

8          employment.  Maybe I'm wrong.

9    Q.    And do you believe that the public officer's law

10         prohibits the continued employment of somebody

11         that commits a crime in the line of duty?

12   A.    Again, I'd have to research that again and take

13         each case on an individual basis.

14   Q.    All right.

15              MR. SORSBY:  Can you mark this?

16              (Exhibit 50 marked for identification.)

17   Q.    I'm going to show you what's been marked as

18         Exhibit 50.

19   A.    Okay.

20   Q.    Now, let me know when you've had a chance to go

21         over it.

22   A.    Yes.  Okay.

23   Q.    Now, are you aware that Sergeant Patricelli was

24         on an impact team?
```

```
 1    A.    That was one of his --  one of his duties that he
 2          worked with the impact team.
 3    Q.    Did there come a time where there was an abuse of
 4          overtime with Anthony Patricelli?
 5    A.    That I do not know looking at the sheet.  I think
 6          there were allegations that he may have put in
 7          for overtime that he did not work, but I did not
 8          have anything to do with that investigation.  I'm
 9          looking at this sheet that I believe I'm looking
10          at for the first time from Troy P.D..
11    Q.    Let's see.  Maybe there was something improperly
12          affixed.  Do you recognize what the second
13          document is?
14    A.    The second document looks like a form from Troy
15          P.D., impact results, and they're showing a
16          couple dates where there was impact activity.
17          And it looks like some totals for arrests and
18          drugs seized, but I don't -- I don't know if
19          there's totals for the three days.  Let me see.
20          This is a Troy P.D. report of when the impact
21          details went out.
22    Q.    So if he's claiming overtime at that time, isn't
23          that part of the issue?
24    A.    Yeah, it would be, unless there was some other
```

```
 1              explanation, which I don't know.  On its face, it

 2              looks like -- it looks like on its face, there's

 3              additional dates here that Troy does not have on

 4              their impact results.  I don't know if it was.

 5         Q.   Have you ever seen these documents before today?

 6         A.   I've never seen this before today.  This is a

 7              standard form that we use for our overtime, so

 8              I've signed them, but I don't know if I've seen

 9              this one, but I've seen these forms before.

10         Q.   You said you were aware of an allegation of

11              misuse of overtime; is that correct?

12         A.   This is probably what they were talking about.

13         Q.   How did you become aware of that?

14         A.   I think Sheriff Mahar made a complaint that he

15              was misusing overtime.  I don't know if it was

16              ever investigated.

17         Q.   Do you know if Anthony Patricelli was removed

18              from the impact panel, impact team?

19         A.   I'm not sure.  I know the sheriff allowed him to

20              work with other agencies, so I don't know what he

21              was working on and what he wasn't.

22         Q.   Can you tell us where, in the chain of command,

23              Patricelli fit -- Anthony Patricelli fit during

24              the time in question?
```

```
 1    A.   Well, Anthony Patricelli would have fit in

 2         between the lieutenants and the corrections

 3         officers.  He was a sergeant.

 4    Q.   He was a master sergeant; isn't that true?

 5    A.   Master sergeant was in title only.  He held the

 6         permanent rank of sergeant and got the sergeant's

 7         pay, so I would say he's a sergeant.

 8    Q.   And did that special title give him special

 9         privileges?

10    A.   I don't know if the title gave him special

11         privileges.  I know he had the opportunity to go

12         work with other agencies, but I think it was more

13         the job he was in allowed that.  I guess the job

14         he was in probably was associated with the master

15         sergeant rank, the job he worked.

16    Q.   Okay.  So again, just for clarification, who did

17         he report directly to in the chain of command?

18    A.   He would have reported to a lieutenant, who was

19         the next rank above him.

20    Q.   Do you recall who that was?

21    A.   No, I don't.

22    Q.   Do you recall that he reported to Sheriff Mahar

23         for most things?

24    A.   Well, he definitely had a connection with the
```

```
 1              sheriff, but his reporting responsibility was to

 2              the lieutenant, which would have been the next

 3              higher rank above him.  If you're asking me, did

 4              he go to the sheriff and see him on different

 5              things?  Yes.

 6      Q.    How did you know that?

 7      A.    Because they were pretty close at that time.

 8      Q.    When you say "pretty close", can you tell us more

 9              about that?  What do you mean by that?

10      A.    They were friends, like I was when I worked in

11              Troy.  The sheriff was a friend of his.  At the

12              time we all had motorcycles, so occasionally we

13              would ride together.  He would talk to the

14              sheriff, just like I have people come over and

15              talk to me in my office.  So I would see him

16              there.

17      Q.    You said at that time they were close.  Did there

18              come a time they weren't close anymore?

19      A.    Probably down the road they distanced themselves,

20              and I don't know if it was from one of these

21              investigations or not.

22      Q.    Did it happen during this period when Mr. Gorman

23              was employed?

24      A.    I don't recall when the actual --  I know the
```

```
 1              relationship now isn't what it used to be.
 2     Q.   Did that breakdown occur before or after the
 3              instances that Mr. Gorman has alleged?
 4     A.   I think the breakdown was -- when Ruth Vibert was
 5              the chief, there may have been some friction
 6              there between him and her, and that spilled over
 7              to his relationship with the sheriff.
 8     Q.   Do you recall an incident where Judge McGrath had
 9              Anthony Patricelli's guns taken away, and he was
10              suspended from work for thirty days as a result
11              of that?
12     A.   As a result of this arrest here?
13     Q.   No.  Do you recall an incident where his --
14              Sergeant Patricelli's guns were taken away from
15              him by a judicial order?
16     A.   Yes, I do remember his guns being taken.  I think
17              it was the criminal case where they went and
18              seized his guns.
19     Q.   Which criminal case?
20     A.   The E-justice case.
21     Q.   You think it was a response to that?
22     A.   I think it was.
23     Q.   You don't recall if there was an incident where
24              he fired a weapon at a moving car, and that's why
```

```
 1          his guns were removed by judicial order?
 2     A.   I don't believe that.  I do recall the incident,
 3          but he didn't fire into a moving vehicle.  Like
 4          he fired into the tire of a vehicle that was
 5          attempting to move.  And at that time, he was a
 6          member of the SWAT team, who are capable of
 7          making those shots.
 8               And in that situation, that shot probably,
 9          although it did not disable the car, it prevented
10          the car from leading the police on a 100 mile an
11          hour high-speed chase as opposed to that car
12          could only do 40 miles an hour with a flat tire.
13               So in my opinion, that shot never placed
14          anybody in danger.  It did partially neutralize
15          the situation.  And I don't -- as an
16          administrator and seeing that situation unfold
17          there, I did not have a problem with a trained
18          member of the SWAT Team taking that shot.  My
19          personal opinion.  And I don't think his guns
20          would have been away for that reason.
21               MR. SORSBY:  I'll have that marked.
22               (Exhibit 51 marked for identification.)
23     Q.   I show you what's been marked Exhibit 51.
24     A.   Okay.
```

```
1    Q.   Do you recognize who -- Investigator Ungerman, do

2         you know who that is?

3    A.   No, I do not.

4    Q.   Can you tell us what the date is?

5    A.   October 26, 2004.

6    Q.   Let me actually see that.  It's a different date,

7         I believe.

8    A.   October 26, 2004.  Okay.  He's saying --  you

9         want it back first?

10   Q.   Yes, just to make sure we're talking about the

11        same date.  I'll give it right back to you.

12        Correct.  That's the correct date.  You can take

13        a look at that e-mail.

14   A.   This is -- this is referring to an incident that

15        happened in 1994.  It says Patricelli was

16        suspended without pay from March 18 to April 4,

17        1994, was placed on probation until September 22,

18        1994, and his pistol permit was suspended on

19        March 14, 1994 and reinstated on December 14,

20        1994, but I didn't go down to sheriff's office

21        until 2004.  So this happened like --

22   Q.   The letter is dated 2004, correct?

23   A.   2004, yes.  It's the first time I saw the letter,

24        and it's -- it's from Marcelle Connor to
```

```
 1              Investigator Charles Ungerman.

 2      Q.   Do you recognize who Connor is?

 3      A.   Well, she's Marcelle Swanberry now.

 4      Q.   This letter was written after you became

 5           undersheriff?

 6      A.   That's correct.

 7      Q.   You're telling me this is the first time you've

 8           seen this letter?

 9      A.   Yes.  I don't know why she's writing to let him

10           know he has a valid pistol's permit.  All I know

11           is what I have here in front of me.

12               MR. SORSBY:  I'll have these marked as

13           well, sequentially.

14               (Exhibit 52 and 53 marked for

15           identification.)

16      Q.   So now I'm trying to figure out the purpose of

17           this letter, as well.  It's dated October 26,

18           2004.

19               Are you aware, when you first became

20           employed as undersheriff, was there an ongoing

21           investigation of Patricelli, as well?

22      A.   The last name Ungerman sounds familiar, but I

23           don't know who that is.

24      Q.   You may --  I'm going to hand you these
```

```
 1              documents, and you can tell me if you've seen it
 2              before.  And it's related to the document I just
 3              showed you.  I think it's dated 1994.
 4      A.      Yeah.
 5      Q.      Have you ever seen that?
 6      A.      No.
 7      Q.      I'm just asking if you've seen it before.  It's
 8              an old document, right?
 9      A.      Yes.
10      Q.      You do see he was suspended without pay at that
11              time?
12      A.      Yes.
13      Q.      And you do see that -- I just handed you
14              Exhibit 53.  You do see that Judge McGrath
15              ordered his guns be taken away at the time?
16      A.      This one just says he was suspended without pay
17              from 3/18/94 to 3/29/94.
18      Q.      And you see the letter from Judge McGrath?
19      A.      Yes.
20      Q.      He had his guns taken away?
21      A.      Right.
22      Q.      Now, that was '94.  That was before your time?
23      A.      Yes.
24      Q.      Okay.  Now, you were discussing some other
```

```
1              incident where you said he shot somebody's tire.
2              That wasn't in '94.  That was a different
3              incident?
4        A.    No.  No.  No.  That was when we were down there
5              on the -- somebody -- I believe you said he shot
6              at a moving vehicle, and I wanted to clarify
7              that, that it wasn't a moving vehicle.  It was a
8              SWAT operation and at no time -- the shot was
9              made by a trained SWAT guy into the tire of a
10             stationary vehicle, and at no time was the public
11             in danger by that shot.
12                  I don't want you to think he's going down
13             the street and shooting at the cars.  And that --
14             when you said that, you kind of gave me the
15             impression that's what you thought.
16       Q.    That incident is different than what we were
17             talking about?
18       A.    Yeah.
19       Q.    That was when you were --
20       A.    That's right.  That's right.
21       Q.    Was there -- did you investigate that?
22       A.    We did, and I believe --  I don't have reports on
23             it, but I myself, personally, I thought we should
24             have got right in front of that.  And I mean, the
```

```
 1              more that the rumor was out there that the car
 2              was being shot at, and the public was in danger,
 3              and a high speed chase.  We didn't need that.
 4    Q.   Was it government property, the vehicle?
 5    A.   No.
 6    Q.   Who did it belong to?
 7    A.   It belonged to the bad guy that was trying to get
 8              away.
 9    Q.   Was that person ultimately convicted as far as
10              you know?
11    A.   It was a joint operation with the feds.  I
12              believe he was, yes, but I don't know the exact
13              outcome.
14    Q.   All right.  Do you know, in that investigation --
15              who conducted that investigation, by the way, do
16              you know, the car incident?
17    A.   I think it might have been done by maybe the
18              captain of the SWAT Team.
19    Q.   Captain Hal Smith?
20    A.   Pyle maybe.  Hal Smith wouldn't have been there.
21    Q.   When did this happen, do you know that?
22    A.   No.
23    Q.   Was it your first year in office?
24    A.   No, but I don't know the exact date or year, but
```

```
 1              it definitely wasn't the first.
 2      Q.    Was there a video of the incident?
 3      A.    I believe there might have been video.  I believe
 4              --  I'm not positive.  I believe the feds may
 5              have had a video.
 6      Q.    Let me just get these exhibits out of the
 7              way. Are you aware of any threats that
 8              Sergeant Patricelli made against other
 9              sheriff employees, other than Mr. Gorman?
10      A.    I can't offhand.  That there was actually
11              complaints filed?  Guys are arguing down there
12              from time to time.  It's an environment where
13              people tend to --
14      Q.    Okay.  Are you aware of any threats made, again
15              by Anthony Patricelli, to other staff members?
16      A.    I'm not aware of anything that was brought to my
17              attention, like a complaint or anything.
18      Q.    I just want to also clarify something else.
19              There are cameras in the correctional facility?
20      A.    Yes.  In certain areas, yes.
21      Q.    Is there a monitoring station for those cameras?
22      A.    There is.  I believe it had been moved from time
23              to time, but there was a monitoring station when
24              we first put it in.
```

```
 1    Q.   Did Anthony Patricelli have access to those
 2         cameras in his office?
 3    A.   He may have had access.  I don't know if he had
 4         access to all cameras, but he had access to some
 5         cameras.
 6    Q.   And that access would have been unmonitored?
 7    A.   I believe they would have, yes.
 8    Q.   Why would he have a bank of cameras in his
 9         office?
10    A.   I think his position was considered facility
11         security, so --
12    Q.   Facility security?
13    A.   Yeah.
14    Q.   And again, just for clarification, would he still
15         be answerable to the --
16    A.   Lieutenant.
17    Q.   Would that have been Hal Smith?
18    A.   There was several lieutenants.  Hal Smith was a
19         lieutenant and became captain, but there would
20         have been a lieutenant.
21    Q.   That he would have been answerable to?
22    A.   Yes.
23    Q.   Tell us about -- can you tell us -- you had a
24         chance to observe Patricelli at times.  Can you
```

```
 1              tell us about his demeanor?  Was he one to go off
 2              the handle, so to speak?
 3         A.   He is -- I'd say he can be intense at times.  I
 4              don't know if he would go off the handle for no
 5              reason.
 6                   When I ran the drug unit, he worked out of
 7              my office.  He was very good at what he did.  He
 8              was a hard charger, kind of intense guy.  I seen
 9              him get angry from time to time.  I don't know if
10              it would be for no reason.
11         Q.   All right.
12                   MR. SORSBY:  I'm trying to limit our
13              exhibit numbers.  Bear with me one second.  Can I
14              get this marked as one whole exhibit?
15                   (Exhibit 54 marked for identification.)
16         Q.   Now, just to give us relevance to these
17              documents.  The time in question when Mr. Gorman
18              was employed -- so this would have been in the
19              final -- the last quarter of 2013, the October
20              period.  The person in charge of the correctional
21              facility, again, for the day-to-day operations,
22              would that have been Hal Smith or would that have
23              been some other person?
24         A.   Part of when Mr. Gorman was there, Ruth Vibert
```

```
 1              was there.  And I don't know at what point in
 2              time she left, but I think she was there during
 3              this time.
 4        Q.   Now, to the extent that a correctional officer
 5              files an incident report, who are they to file
 6              the incident reports with?
 7        A.   If it's a correctional officer, they file the
 8              report and it would work its way up the chain of
 9              command from sergeant, lieutenant, captain,
10              chief.
11        Q.   Would it work it's way up to you?
12        A.   In some situations.  I may not see it in a couple
13              cases we discussed earlier today.
14        Q.   I just want to clarify that, too.  My thinking of
15              chain of command is everything has to go through
16              you before it goes to the sheriff, but you're
17              saying that's not necessarily --
18        A.   It didn't happen all the time like that, no.
19        Q.   So the person that's bringing it up the chain of
20              command could decide whether it would go to you
21              or the sheriff; is that true?
22        A.   I guess it could be true that they could decide,
23              or if the sheriff tasked them with something,
24              they could go back to him.
```

```
 1      Q.   So they had options to go to you or the sheriff

 2           with a problem?

 3      A.   Yeah.  I agree with that.  They had an option

 4           that they had to go to.

 5      Q.   Okay.  Now, to make life easier, I'm going to

 6           hand you Exhibit 54, but I'm going to start at

 7           the back and work our way forward.

 8      A.   Okay.

 9      Q.   I'm just going to show you.  We'll start with the

10           last page --  second to last page.  That's the

11           narrative.

12      A.   The second to last?

13      Q.   Yes.  Do you recognize what that is?

14      A.   It's an incident report from the correctional

15           facility.

16      Q.   Are these the type of incident reports that would

17           have been filed during the time of Mr. Gorman's

18           employment?

19      A.   Yes.

20      Q.   So these are documents the sheriff's office uses?

21      A.   Yes.

22      Q.   All right.  And when do personnel file those?

23      A.   When there's an incident and they want to file a

24           report on something.
```

```
1     Q.   Report an incident of what?  What's the criteria?

2     A.   I don't actually know what the criteria is.  If

3          you want to report something to a supervisor, I

4          would suggest that they use this form.

5     Q.   Is there something that's usually attached with

6          that?  Are there documents attached to that?

7     A.   Let me see the back of this.  If there's no --

8          if there's no --

9     Q.   If you look at the last page, what is that

10         document titled?

11    A.   That's a narrative.

12    Q.   Are narratives usually --

13    A.   They should be, yeah.  They should be to explain

14         what you're reporting.

15    Q.   I'm asking you in the normal practice, in every

16         incident report is there a narrative that's

17         attached to it?

18    A.   I can't answer that because I don't see every

19         incident report, because it goes to corrections.

20         Rarely would one of these come over to me unless

21         it's a case we're investigating.

22    Q.   Now, are you aware that Mr. Gorman has alleged

23         that Anthony Patricelli called Mr. Gorman in

24         October of 2013 and threatened him?
```

```
 1                    MR. MARTIN:  2012.

 2                    MR. SORSBY:  2012, yes.

 3        A.   That was the case we were talking about this

 4             morning with the Trooper?

 5        Q.   No, this was earlier.

 6        A.   I don't know if I was.

 7        Q.   What's the date on that incident report?

 8        A.   This is --

 9        Q.   That's the narrative, but you can look back at

10             that.  What's the date on the incident report?

11        A.   It's 25 February, 2013.

12        Q.   Okay.

13        A.   Date of incident 22 January, 2013.  So this

14             report is a month after the incident.

15        Q.   I'll give it back to you.  The dates are a little

16             out of order here.  Hold on.

17                  Do you recall receiving incident reports

18             from Mr. Gorman in the period of October 2012?

19        A.   I don't recall.  Do you have them in front of

20             you?  I'll just take a look.

21        Q.   Yes.  There's one there for October.

22        A.   The incident report is filed on the 25th of

23             February, when the incident took place on the

24             22nd of January.  Unless you have the wrong
```

```
1              paperwork, but on this one, the incident took
2              place on 9th of October of 2012 and the report is
3              filed on the 25th of January, 2013.  Why is there
4              such a delay?
5         Q.   Let me see the document so I know what you're
6              referencing.
7         A.   Wait a second.  I'll give it back to you.  This
8              one is 8 October, 2012, and the date it's filed
9              is 25 February, 2013.  That's the date of the
10             incident.  That's the date the report is filed.
11             I'm just wondering why there's such a lag between
12             the date of the incident and the filing of the
13             report.
14        Q.   Have you seen these documents before today?
15        A.   I probably have seen some.  I want to look at
16             them again.  I know there was one where
17             Mr. Gorman claimed to be hit by the door.
18        Q.   That was the west hall incident?
19        A.   I believe so, yes.
20        Q.   Not the west hall incident -- go ahead.
21        A.   Can I un-clip this?  I'll keep them in order.
22        Q.   Okay.  That's fine.  Do you recognize any of
23             these yet?
24        A.   I recognize some.  I just want to see if one --
```

```
1              I think one is missing here.  That's what I want
2              to make sure.
3    Q.   You believe there's an incident report missing?
4    A.   Well, this goes with this.  This does not have a
5              narrative attached to it.  I want to make sure.
6              Maybe somebody put them out of order.  It appears
7              that the one date, November 5, 2012 and filed
8              November 11, 2012 says transports.  That doesn't
9              have a narrative.  But I have seen some of these.
10             I don't know if I've seen all of them.
11   Q.   Which ones have you seen, can you tell us?
12   A.   I believe I saw the one about not saying hello,
13             and this one here that follows where Christine
14             LaFountain was a witness.
15   Q.   What was the date of that one?
16   A.   The date it happened was 22 January, 2013 and it
17             was filed 25 February, 2013.
18   Q.   Hold that for one second.
19             MR. SORSBY:  Off the record.
20             (Discussion off the record.)
21             MR. SORSBY:  Back on the record.
22   Q.   And you were just saying you recognize the first
23             one here, right?
24   A.   Yes.
```

```
1                    MR. SORSBY:  Let's get that marked.
2         A.    That's an incident report, date of incident
3               22 January, 2013.  The date the report is filed
4               is 25 February, 2013.  It says, "Location of
5               incident: West hall staff interaction."
6                    MR. SORSBY:  Let's get this marked.
7                    (Exhibit 55 marked for identification.)
8                    MR. SORSBY:  Back on the record.
9         Q.    Do you recognize --
10        A.    I remember hearing about this incident.  I could
11              have seen the report, but --
12        Q.    What incident is this one?
13        A.    This is about a key to Patricelli's office.
14        Q.    Do you remember hearing about that?
15        A.    I remember hearing about that.
16        Q.    Who do you remember hearing that from?
17        A.    It could have been Hal Smith.  It could have been
18              Dunham.
19                   MR. SORSBY:  I want to get that marked.
20                   (Exhibit 56 marked for identification.)
21        A.    This is the one that didn't have anything with
22              it.
23        Q.    What's that one?
24        A.    This is a call he received when he was in Ryan's
```

```
1              office, and I do remember seeing that report.

2    Q.   What's the date on that?

3    A.   It's titled transport.  The date is 8 October,

4         2012 of the incident, and it was filed on

5         25 February 2013.  I still don't understand that,

6         but --

7              MR. SORSBY:  Let's mark that as exhibit 57.

8              (Exhibit 57 marked for identification.)

9    Q.   We just talked about this one.  Now it's marked

10        Exhibit 57.

11   A.   Exhibit 57.

12   Q.   It's the key incident, and the date of the

13        incident is October.  Go ahead.  You were reading

14        from it?

15   A.   The date of the incident is 8 October, 2012.  The

16        date the report was filed is 25 February, 2013,

17        and it is related to a phone call that

18        John Gorman got.

19   Q.   And you remember seeing this?

20   A.   I did.  I remember seeing it, yes.

21   Q.   You've seen this report before?

22   A.   Yes.

23   Q.   And now, do you remember the incident that he's

24        describing?
```

```
 1    A.   I think I saw this report in a whole packet of

 2         reports that were together.  I remember seeing

 3         this report.

 4    Q.   But the actual event happened in October of 2013?

 5    A.   Right.

 6    Q.   Do you remember learning of the event?

 7    A.   Prior to the date this was filed?

 8    Q.   Yes.  Do you remember learning about the event?

 9    A.   I don't remember when I found out about the

10         event.  Like I testified prior to, some of this

11         investigation was done prior to me receiving some

12         of this, and I don't remember where.  I don't

13         remember where I fall in.

14    Q.   I'm trying to help your memory and trying to

15         figure out where you came in.  All right.

16              You read this incident report, and when did

17         you read this?  When do you think you read this

18         report?

19    A.   I would have read it sometime after February 25,

20         2013.  I don't know if I was aware of it prior to

21         that.  I'm not sure, but I do remember seeing

22         this report.

23    Q.   Okay.  So sometime after it was filed?

24    A.   Right.
```

```
 1     Q.   Now, I'm still looking at 57.  It says -- do you
 2          see on there in the narrative, it says, "Thank
 3          you, thank your brother, thank your wife"?  Do
 4          you see that?
 5     A.   "Thank your wife, thank your brother."  Do you
 6          want me to continue reading?
 7     Q.   Yes, please.
 8     A.   "Confused and alarmed.  I asked, What are you
 9          talking about?  Master Sergeant Patricelli then
10          hung up the phone.  I paused a moment, not
11          knowing what exactly had just happened.  I hung
12          up the phone.  I stood at the table for a few
13          minutes, alarmed and concerned, not knowing what
14          else he might do.  Sergeant Rankin asked me if I
15          was okay."  It says, "I told him "no", but I
16          wasn't ready to discuss anything.  Continued with
17          my assigned duties remainder of the shift."
18     Q.   Now, you had stated earlier that you understood
19          that there was -- that Mr. Patricelli --
20          Gorman's sister had broke up with Patricelli.
21          That's what you understood happened?
22     A.   Yes.
23     Q.   Do you know when that happened?
24     A.   No, I don't.
```

```
1              MR. MARTIN:  Did you answer the question

2         about whether or not you knew --

3              THE WITNESS:  No.  I think that might have

4         been the Trooper that was testifying.

5              MR. MARTIN:  I don't think he answered your

6         first question.

7              MR. SORSBY:  Oh, okay.

8    Q.   Did you --

9    A.   I knew at some point in time they weren't

10        together anymore.

11   Q.   Do you know when?

12   A.   I don't recall when, no.

13   Q.   All right.  Having read that, that "thank your

14        wife and thank your brother", what do you think

15        Anthony Patricelli meant by stating that?

16   A.   Well, again, I think -- I think there was --  and

17        I don't know the specifics on this and I don't

18        know -- but I know that -- I think they thought

19        that Mark Gorman, who was the highway patrol

20        deputy, might have told Patricelli's girlfriend,

21        John's sister or whatever, that there was a

22        little something going on.  And maybe that's what

23        he's referring to with "thank your brother."

24             MR. SORSBY:  Let's take a break.
```

```
 1                  (Whereupon, a brief recess was taken.)

 2              MR. SORSBY:  Back on the record.

 3     Q.    All right.  Now, you were looking at an incident

 4           report that had no narrative affixed to it.  Do

 5           you remember that?

 6     A.    It had "transport" on there.  The title of it was

 7           "transport".

 8     Q.    Right.  Just give me one second.  All right.  Now

 9           you're referring to this document, and you said

10           it didn't have a narrative with it.  Do you

11           remember that?

12     A.    That's correct.

13     Q.    I think we may have found the document with the

14           narrative, if you flip it over.  Do you see that

15           narrative?

16     A.    So this should have been two sides.  This didn't

17           make a copy.

18     Q.    That's correct.  Do you see the date on the top?

19     A.    5 November, 2012.

20     Q.    Now, if you flip it over --  if you flip this

21           over, do you see that the date matches the

22           incident report, the date of the incident?

23     A.    This was a form that was filed on 11 November,

24           and it's just referring to the incident on
```

```
 1              5 November, even though this says here on the

 2              back on 5 November.  That was filed on --

 3       Q.     I understand.  You said that a couple times.

 4              Having read both of those, the front and back of

 5              that, do you believe that's the narrative that

 6              goes with --

 7       A.     Yes, I do.

 8       Q.     That's what I'm asking.  I don't want to include

 9              that.  I want to include that, since that's the

10              narrative.

11                   MR. SORSBY:  We will go ahead and have that

12              marked when you're ready.

13                   (Exhibit 58 marked for identification.)

14       Q.     I'm going to show you what's been marked as

15              Exhibit 54.  Let the record reflect I handed you

16              Exhibit 54.  Take a second to look at that.

17       A.     (Witness complied.)

18       Q.     Have you seen this document before?

19       A.     This was, I believe, part of the original packet

20              I looked at when I looked at the incident here.

21              It just --  I don't know if it was in that

22              format, but I guess it was.  I remember.

23       Q.     You've seen this document before?

24       A.     Yes.
```

1    Q.    When do you remember seeing this document?

2    A.    I don't remember.  At some time during the

3          investigation when they were looking into --

4          actually, the same time I saw all of those

5          documents, so I don't remember when.

6    Q.    Now, did there -- I want to have you look at

7          Exhibit 54 again.  Do you see where it says who

8          it's reported to at the top?

9    A.    Chief Vibert.

10   Q.    Now, these incident reports, you said you got

11         them all at the same time.  Did you get them from

12         Chief Vibert?

13   A.    When I got these originally, I think it was when

14         she was investigating the incident.

15   Q.    Okay.

16   A.    When I originally saw these was when she first

17         got them.

18   Q.    Now, before we move on with these documents, I

19         want to talk to you about when Chief Vibert gave

20         you the documents.  I want to clarify that what's

21         been marked Exhibit 58 is the transport one we

22         found the narrative for.  Do you remember this

23         incident being brought to your attention?

24   A.    Give me a minute.

```
1    Q.   Sure.  Do you remember any of the allegations in
2         there?
3    A.   Yeah, I do, something over a key, maybe not
4         signing for a pistol.  I can't remember the
5         specifics.
6    Q.   We can move on from that.  Now, you were given
7         these incident reports by Chief Vibert.  What did
8         you do with them?
9    A.   Originally I was just shown those incident
10        reports by Chief Vibert.  At a certain point in
11        time, she came to me with a packet, and she was
12        upset, and she was upset that the sheriff had
13        told her to shred the report.  I told her we're
14        not shredding anything.
15             So I gave the packet --  I believe I
16        testified in previous depositions, I couldn't
17        remember if I gave it to Marcelle or the Sheriff.
18        I said, "We're not shredding anything."  I think
19        the sheriff believes I gave it to him.  That's
20        what I did, I passed the packet on.
21   Q.   And you said you believe it had the State Police
22        investigation --
23   A.   The report.
24   Q.   That was the report we were talking about earlier
```

```
 1           today?

 2      A.   Yes.

 3      Q.   And let me just --  I just want to make sure what

 4           exhibit number it is.  I want you to take a look

 5           at it.  You were here for that deposition, but we

 6           haven't shown you that.

 7                I'm going to show you what's been marked as

 8           Exhibits 39 and 38.  You probably recall us

 9           discussing this with Investigator Hock today?

10      A.   I think there's another -- actually there's

11           another general form that they --

12      Q.   That's what I'm looking for.  But while we're

13           looking for that, do you recognize the

14           documents --

15      A.   I don't know if these documents were in that

16           packet or not.  I know there was some material

17           from the State Police.  I think it was the

18           initial form you're looking for now.

19      Q.   Exhibit 37?

20      A.   It would have probably been --  it probably would

21           have been that incident report that I noticed in

22           the packet, and there was some other paperwork.

23                MR. MARTIN:  That's the last two pages of

24           Exhibit 37?
```

```
1              THE WITNESS:  Let's see -- one, two, three,

2         four, five, six, seven.  It's the seventh page

3         that I would have recognized.

4              MR. MARTIN:  Just the seventh page?

5              THE WITNESS:  Which I believe was on top.

6         And like I said, there was other material, but I

7         don't know what it was.  And to identify this,

8         it's a New York State incident report.

9    Q.   Right.  You're referring to Exhibit 37, correct?

10   A.   Right.  But for page numbers, we figured Page 7.

11   Q.   All right.  Do you recognize that document?

12   A.   I'm almost positive it was the State Police

13        incident report, when I opened that manila

14        envelope up and pushed everything back in.

15   Q.   You remember seeing something New York State

16        Police?

17   A.   New York State incident report.  Here's what -- I

18        remember seeing the two -- you know.  This would

19        have been by the New York State Police.  So I

20        remember seeing that.  That's their report.

21   Q.   You remember seeing a State Police report.  Okay.

22   A.   Something that indicated it was a State Police

23        report.

24   Q.   I just want to make sure.  Do you remember seeing
```

114

```
 1            this State Police report or you don't?
 2    A.     I believe it was the State Police incident
 3            report.  I would have to say that, yeah, to the
 4            best of my recollection, this is the first thing
 5            I pulled out and pushed everything back.  Are we
 6            good?
 7    Q.     That's fine.  I'll hand it right back to you.  I
 8            just want to see something real quick.
 9                 Now, when did --  when did Chief Vibert come
10            into your office?  You said she came in
11            distraught.  Do you remember what that date was?
12    A.     I don't.
13    Q.     Do you remember if it was right after the
14            incident?
15    A.     No, I can't recall.
16    Q.     If you don't remember, that's okay.  All right.
17            Now, you told her not to shred documents?
18    A.     I told her we're not shredding anything.  Give me
19            those, and I took them from her.
20    Q.     I've read other transcripts where you said
21            basically the same thing, and one of the
22            questions I have is why would you give the --
23            Mr. Gorman's complaint to Sheriff Mahar when
24            Vibert said that he threatened to destroy the
```

```
 1          documents?
 2    A.    She told me that he said for her to shred them.
 3          I didn't hear him tell her that.  That's what she
 4          told me.  I wanted to make sure I gave them back
 5          to -- again, I wasn't sure if I gave them to
 6          Marcelle or the sheriff, but I gave them to
 7          somebody.  And I wanted to make sure that they
 8          knew that I said that we're not going to shred
 9          anything.
10    Q.    Why is it important that the documents not be
11          shredded?
12    A.    They were documents pertaining to an
13          investigation.  Why would we shred them?  We
14          wouldn't want to shred them.
15    Q.    Why didn't you go to Sheriff Mahar and ask him
16          why he was going to shred incident reports?
17          That's a serious offense.
18    A.    I was kind of thinking I didn't give them to him.
19          He thinks I did.  If he wasn't there, I would
20          have talked to him another time.
21    Q.    I understand you don't recall who you gave
22          Mr. Gorman's incident reports to, but did you --
23          I'm trying to understand why you would give the
24          documents to somebody that it's been alleged
```

```
1          they're going to destroy those documents.  Did

2          you think that threat was real?

3               MR. MARTIN:  Object to the form of the

4          question.

5     A.   No.  I didn't believe -- I didn't think that, if

6          I gave them back to the sheriff, he would shred

7          the documents, especially if I said I told her

8          we're not shredding anything.

9               I later one time had a conversation with

10         him, and he was saying how, when he had the

11         conversation with her, he was saying, I didn't

12         want the State Police documents, and that's what

13         he was referring to.  We don't want them.  So

14         that's what he claimed he thought she had.

15    Q.   Now, do you recall when you gave the documents to

16         either the secretary or the sheriff, did you

17         relay the threat that you had heard?

18    A.   Yes.

19    Q.   And what did you --

20    A.   Well, I don't remember who I gave them to, so I

21         really can't recall what the response was, but I

22         know at some point in time I had a conversation

23         with the sheriff.  And he said, "I didn't tell

24         her to shred them.  I told her to get rid of the
```

outside agency report. We don't need it."
Q. That was his response to you?
A. Yes, at some point in time.
Q. All right. Okay. Now, did you -- can you tell us, having received the incident reports from Vibert, and you gave the documents at some point to Sheriff Mahar's secretary, what did you do at that point in terms of investigating these complaints?
A. I don't remember at that point if I was the person investigating. I think Hal Smith had a part of investigating at the time. Ruth had a part of investigating at the time. And I don't know if it was at that point in time where I was going to do the investigation, or if they were conducting the investigation and they were going to bring me the results. Things changed down there in a certain amount of time pretty fast in terms of who was doing what. I don't recall. That was a while -- a couple years ago.
Q. So it's not clear to you who was tasked with investigating the incidents?
A. I know they were looking into the situation. I know Hal was looking into an incident where

```
 1              Mr. Gorman claimed he was hit by a door, somebody
 2              slammed a door into him, and I think Dave Hetman
 3              might have been looking into that.
 4       Q.     Now, can you tell us if you followed up with
 5              Chief Vibert at all?  She came to your office
 6              with the documents.  Did you followup with her as
 7              far as what happened with the investigation?
 8       A.     At some point in time, Chief Vibert was let go.
 9              So I don't recall when that period was or where
10              the investigation was in that timeframe where she
11              was let go.
12                   So it may have been not until she was let go
13              that I actually said where this was going.  I
14              think at that point in time there might have been
15              an arrest made, and the case was in the courts
16              and we were waiting to see where the criminal
17              case went first.  A lot of things happened in a
18              short period of time.
19       Q.     Now, did there come a time when you were
20              contacted by Mr. Tom Hendry in regards to
21              Mr. Gorman?
22       A.     I think he contacted me or I contacted him.
23       Q.     Okay.  All right.  I'm going to ask -- I'll talk
24              to you a little about that time when he contacted
```

```
 1            you.  I just want to segue back.

 2                 As part of the documents you were given,

 3            were you --  I'm going to show you what's been

 4            marked as Exhibit 41.  We talked about this

 5            earlier.  It's the -- it's an Order of

 6            Protection.  Do you recognize this?

 7       A.   Yes.

 8       Q.   Did you see this document before, this specific

 9            document?

10       A.   I don't believe I did.

11       Q.   You were never given a copy of the Order of

12            Protection in regards to Mr. Gorman?

13       A.   I myself was not.  Could it have been in that

14            packet of documents?  It could have been, but

15            this is the first time I've seen it.

16       Q.   And just to understand, when she gave you a

17            packet of documents, did you look through all the

18            documents?

19       A.   No.

20       Q.   All right.  And just --  now, I understand you

21            haven't seen this document before, but did there

22            come a time you understood there was an Order of

23            Protection against Anthony Patricelli?

24       A.   Yes.
```

```
1    Q.   Who brought that to your attention?

2    A.   It might have been the sheriff that said there's

3         an Order of Protection issued.

4    Q.   Do you have a recollection of having a

5         conversation with Mr. Hal Smith in regards to

6         that?

7    A.   I had several conversations with Hal Smith, but I

8         don't recall what they were.

9    Q.   You don't recall the substance of those

10        conversations?

11   A.   No, relative to Mr. Gorman.  I had different

12        conversations with Hal, but I can't remember if

13        one of them pertained to the Order of Protection.

14   Q.   You came to understand there was an Order of

15        Protection?

16   A.   Yes.

17   Q.   Do you remember how you came to understand that?

18   A.   No.

19   Q.   Now, I was talking to you earlier about your

20        contact with Mr. Hendry.  The first time he --

21        did he reach out to you?

22   A.   I don't know if he initiated it or I initiated

23        the contact, but I did have a conversation with

24        him.
```

1    Q.   In regards to Mr. Gorman?

2    A.   In regards to Mr. Gorman.

3    Q.   Okay.  Now, did there come a time --  do you

4         understand there came a time when Mr. Gorman

5         filed a workplace violence complaint?

6    A.   Yes.

7    Q.   Do you remember when that was?

8    A.   I don't.

9    Q.   Do you remember that to be in February, 2013?

10   A.   I believe that packet you had here, maybe Item 54

11        or 57, was that.

12            MR. SORSBY:  Off the record for a moment.

13            (Discussion off the record.)

14            MR. SORSBY:  Back on the record.

15   Q.   We were discussing earlier whether or not you

16        came to understand there was a workplace violence

17        complaint filed by Mr. Gorman, and you said

18        "yes".  I'm going to show you Exhibit 54.  We've

19        looked at this before.

20   A.   Mm-hmm.

21   Q.   Having looked at that again, do you recall now

22        the first time you became aware of a workplace

23        violence complaint being filed by Mr. Gorman?

24   A.   I'm not aware of the date.  I'm aware one was

```
1          filed.

2     Q.   Do you recall becoming aware of it around this

3          time?

4     A.   Yeah.  It probably would be around this time.

5     Q.   And now, was that included in that packet that

6          you were given by --

7     A.   That I don't know.  Like I testified before, I

8          saw the State Police thing.  I don't know what

9          else was in there.

10    Q.   All right.  Now, did you investigate his

11         workplace violence complaint?

12    A.   I believe Tom Hendry did.  He was the head of

13         human resources.  I did have conversations with

14         him.

15    Q.   He contacted you, you said?

16    A.   I contacted him or he contacted me, but we did

17         make contact.

18    Q.   Do you recall the first time he made contact with

19         you?

20    A.   I don't.

21    Q.   Do you remember what you talked about?

22    A.   We talked about the incident, and he had

23         paperwork provided to him on the incident.  And

24         he was looking for, I believe, phone call --  the
```

```
 1            recording of a phone call that was made, and we
 2            provided him with that.
 3       Q.   How did you provide a copy of that to him?
 4       A.   I believe that went through Hal Smith.  Hal Smith
 5            may have gotten -- Hal Smith or Dave Hetman may
 6            have gotten that for him.
 7       Q.   Now, do you know if that phone conversation has
 8            been preserved?
 9       A.   I do not.
10       Q.   Anything else he discussed with you on that phone
11            call?
12       A.   I think just the case basically in general.  You
13            know.
14       Q.   Did you discuss, at that time, the incident
15            reports that you had reviewed, that you had
16            received from Chief Vibert?
17       A.   I'm trying to think.  We discussed about the, you
18            know, saying hello and not saying hello, and
19            making a funny face, and smiling and not smiling.
20            We discussed that.  We discussed maybe the door
21            incident where John was claiming to be hit,
22            somebody slammed a door on him.  We might have
23            discussed that, but I don't recall the whole
24            conversation.  We did discuss John Gorman's
```

```
1              complaint.

2    Q.    All right.  Was that the only conversation you

3          had with him regarding --

4    A.    I might have talked to him a couple times.  I

5          talked to Tom from time to time, and that may

6          have come up in a conversation, it may not have.

7          How are we doing with this or --

8    Q.    Now -- all right.  Did there -- excuse me.  Now,

9          there came a time in June of 2013 when you met

10         with Mr. Gorman; isn't that true?

11   A.    Well, I don't know the date.  I did meet with him

12         at some point in time.

13   Q.    You don't recall the date.  Where did you meet

14         him?

15   A.    I believe he came to my office.

16   Q.    And do you recall --  give me one second.  All

17         right.  So he came to your office.  Do you have a

18         recollection of him informing you that Mr. Hendry

19         was telling him that information wasn't being

20         released to Hendry so he could complete his

21         investigation, something like that?

22   A.    I don't recall the conversation.  He came to my

23         office on what date?

24   Q.    I don't know, but I'm asking, do you have a
```

1          recollection of around June?

2     A.   That he said that Tom Hendry wasn't getting the

3          information he needed?

4     Q.   Did there come a time when Mr. Gorman came to

5          your office and he informed you that Mr. Hendry

6          was not getting the information he needed from

7          the sheriff's office to complete his

8          investigation?

9     A.   He may have.  I don't know why we wouldn't give

10         Tom Hendry the information.  We always would

11         provide the information the county needs.

12    Q.   Was there a problem with the release of the phone

13         call that Mr. Patricelli made to Mr. Gorman?

14    A.   If there was a problem with the release of the

15         call, it probably would have been a problem

16         getting the call.  I don't think if we had the

17         call -- if we had the call, I don't think we -- I

18         don't see any reason why we wouldn't give it to

19         him.  So maybe it was a problem, we couldn't get

20         the call or find the call on the system.  I don't

21         know how the system works.

22    Q.   Do you know if the phone calls, the entire phone

23         calls, were released without any edits?

24    A.   I do not know.

```
 1    Q.   What, if anything, do you remember about the
 2         conversation you had with Mr. Gorman?
 3    A.   I don't --  I don't hardly remember the
 4         conversation.  He said he came to my office and
 5         asked me why information wasn't being released.
 6         He may have asked me that.  There would be no
 7         reason for us to stall in releasing the
 8         information.  It wouldn't be to our benefit to do
 9         that.
10    Q.   So are you aware that the sheriff's office was
11         not releasing the tape of the phone call between
12         Patricelli and Gorman?
13              MR. MARTIN:  Object to the form.
14              MR. SORSBY:  You can still answer.
15    A.   You're saying the sheriff was not releasing it?
16    Q.   Correct.  Are you aware that the sheriff was not
17         releasing the tape?
18    A.   I don't know if that's true and I was not aware
19         of it.
20    Q.   All right.  Now, Undersheriff Russo, did there
21         come a time you when were aware there was a
22         Department of Labor investigation into the
23         sheriff's department, which would be a PESH
24         investigation?
```

```
 1     A.   Refresh my recollection.

 2     Q.   It would be a violation of failure to adhere to

 3          the requirements for workplace violence?

 4     A.   I vaguely remember an investigation from Labor.

 5     Q.   Do you remember being a part of that

 6          investigation?

 7     A.   No.  Maybe our counsel handled the investigation.

 8          I don't know.  If you have some paperwork that

 9          would refresh my memory, I'd love to see it.

10     Q.   I very well may.  I show you Exhibit 8.  Have you

11          had a chance to look at that?  Is it starting to

12          come back to you now?

13     A.   I have.  I'm still looking it over, but I do

14          remember somebody from the New York State

15          Department of Health coming and speaking to

16          myself, John Panichi and Walt Spallane.

17     Q.   So there was an investigation by the New York

18          State Labor, Public Employment Safety and Health?

19     A.   Mm-hmm.  Right.

20     Q.   Were you at the investigation?

21     A.   I was at the initial meeting where they told us

22          what was happening, what they were investigating.

23          I believe they talked to us a little bit.  They

24          were told that Tom Hendry was investigating the
```

```
 1              complaint.  And I believe the inspector or
 2              investigator, whatever he was, was going to go up
 3              and speak with Tom Hendry.  We must have gotten
 4              some kind of report back from them.
 5         Q.   You're looking at --
 6         A.   This is the report from them?
 7         Q.   Yes.  If you turn the first page over, it's right
 8              there.  One more.
 9         A.   This is a notice of violation.  I'm looking for
10              some kind of report back from them.
11         Q.   I think the whole thing is the report.  Okay.
12                   I'm going to show you another exhibit.
13              Maybe this is the exhibit you're looking for.
14              This is Exhibit 7.
15         A.   Okay.  This looks like they reported and said
16              they needed another person interviewed.
17         Q.   Let me ask you.  Have you seen these documents
18              before?
19         A.   Well, I know I probably --  I mean, I was at this
20              meeting, so whatever we got prior to that meeting
21              I would have seen.  I probably -- if this was
22              prior to that meeting, notice of violation, I
23              probably would have seen that.  I attended this
24              meeting, and I do not know if I saw the followup
```

```
1              investigation.  Did it go to Tom Hendry?  No, it
2              came to us.
3         Q.   What did you understand the violation to be?
4         A.   Well, they told us we did not implement a written
5              policy statement on the employer's workplace
6              violence prevention program and goals and
7              objectives, and I think Tom Hendry corrected
8              that.
9                   And then the other one is separate line of
10             recordable occupational illnesses and injuries
11             were not maintained, and I think we rectified
12             that situation.
13                  MR. SORSBY:  Mr. Martin, I'm going to
14             borrow that back so we can keep the process going
15             here.
16        Q.   I just want you to read the second to last page
17             of Exhibit 8 and paragraph (a), lower case (a)?
18        A.   "Rensselaer County sheriff's department, the
19             employer's implementation of a workplace violence
20             prevention policy was unsuccessful.  One of the
21             three witnesses named in the April 8, 2013 letter
22             to the employer was not interviewed.  The
23             employer's policy statement says that all acts of
24             workplace violence against employees will be
```

```
1              thoroughly investigated."  So this says that one
2              person was not interviewed.
3    Q.        Does it also say the requirement is all witnesses
4              were to be interviewed?
5    A.        Yes.
6    Q.        Did you understand that to be the workplace
7              violence policy, as well, that all witnesses are
8              to be interviewed?
9    A.        I think that any -- I don't know if I understood
10             that to be the workplace, but I would think you
11             would interview all witnesses.
12   Q.        All right.  Now, you said you were present at
13             this -- at the first time the investigators from
14             PESH came.  So that would have been --  do you
15             have an idea when that would have been, the date
16             of that when the investigators first came?
17   A.        I believe we had a date of 5/7/2013.  That may be
18             the date -- it says Rensselaer County Sheriff's
19             Department, 4000 Main Street, date of
20             investigation, 5/7/2013 and it's got an
21             inspection number.  And they received their
22             complaint on April 11th.
23                  So, you know, I don't know for sure, but I
24             would say that's probably the timeframe when they
```

```
 1              came.
 2      Q.      What did you do when you became aware that the
 3              sheriff's department was cited for -- by PESH for
 4              failing to interview all witnesses?
 5      A.      I personally didn't do anything.  I know we were
 6              --  Tom Hendry, I believe, was going to --  they
 7              may have gone back and interviewed the other
 8              witness at that time, but whatever the violations
 9              were, we were going to correct them.
10      Q.      Now, do you have --  do you know when Mr. Hendry
11              completed his investigation into the workplace
12              violence?
13      A.      That's a question for Tom Hendry.  I don't know.
14      Q.      Now, do you have --  do you know --  you said
15              this was dated around May of 2013.  Do you know
16              if at that time he still conducted his
17              investigation?
18      A.      That I don't know.  I don't recall.
19      Q.      Now, you said you had a meeting with Mr. Gorman.
20              Just for clarification, do you recall at that
21              conversation, during that conversation,
22              Mr. Gorman mentioned that Tom Hendry was
23              investigating a workplace violence complaint?
24      A.      Well, I think earlier you said that Mr. Gorman
```

```
 1          complained that Tom Hendry was not getting the

 2          information he needed.  So he would have had to

 3          tell me that he was investigating a workplace

 4          violence complaint if he wasn't getting the

 5          information he needed.

 6               So I guess based on what you're telling me,

 7          my answer would be that we had to know Tom Hendry

 8          was investigating workplace violence.

 9     Q.   I appreciate you drawing a conclusion, but I just

10          want to know, do you know --

11     A.   If I knew Tom Hendry was investigating a

12          workplace violence at that point?

13     Q.   Yes.

14     A.   Yes.

15     Q.   All right.  Can you just tell us why Mr. Hendry

16          would be investigating Mr. Gorman's workplace

17          violence complaints in June of 2013 when these

18          incidents all happened, it would appear, from

19          February of that year backwards?  Why would he

20          still be investigating this in June?

21     A.   Can I just look?

22     Q.   Sure.  If you don't know --

23     A.   I wanted to see.  I remember we had a question on

24          when the incident happened and when it was
```

```
 1              reported.  Is that these?

 2     Q.    I don't know.

 3     A.    I don't -- the simple answer is I don't know.

 4     Q.    That's all right.  That's an acceptable answer.

 5            If you don't know, you don't know.  All right.

 6            We can move on from that line of questioning at

 7            this point.

 8                 Now, can you tell us, are you familiar with

 9            general obligations law 207-c?

10     A.    No, I'm not.

11     Q.    Are you familiar with 207-c as it relates to the

12            collective bargaining agreement?

13     A.    Yes.

14     Q.    What's your understanding of 207-c?

15     A.    If somebody files for 207-c, they have an

16            obligation to bring you all the information to

17            determine whether you are --  you base your

18            determination on what you have in front of you at

19            the time.

20     Q.    Who makes that determination?

21     A.    The sheriff can make it.  At one point in time he

22            was making it.  I was making it on some cases.

23            Whoever he tasked with it made it, and that would

24            be me in the case of Mr. Gorman.
```

1    Q.    Now, how do you make the determination who is

2          eligible for 207-c benefits?

3    A.    They file for 207-c.  They bring -- they have a

4          hearing where they bring in paperwork that's

5          related to their -- to justify their asking for

6          207-c, and then you make a determination based on

7          information they have or information they provide

8          you.  Some may be medical, some of it may be

9          internal reports, whatever they have.

10   Q.    So you receive documents from the claimant, the

11         one making a claim for 207-c, and then you make a

12         decision.

13            So what I want to know is how do you

14         determine if someone is eligible for 207-c

15         benefits, as you understand it?

16   A.    Well, I'd have to see what they're claiming.  It

17         would be like an on-the-job injury, something

18         related or caused by their performance of duty in

19         the sheriff's office.

20   Q.    So it has to be caused by their performance of

21         duty, that's what you understand to be the

22         criteria for 207-c eligibility?

23   A.    Yes.

24   Q.    And did you --  so now Mr. Gorman made an

```
 1              application for 207-c benefits?

 2    A.   Yes.

 3    Q.   And you received that application?

 4    A.   Yes.

 5    Q.   And you received medical documents, as well?

 6    A.   Yes.

 7    Q.   From Mr. Gorman and his doctor?

 8    A.   Yes.

 9    Q.   And what was the conclusion of those medical

10         documents?

11    A.   Well, ultimately his 207-c was denied.

12    Q.   I understand.  You received medical documents as

13         part of the application?

14    A.   I'd have to look at it.  If you have the 207-c

15         packet, I can look at it.

16    Q.   Do you recall his doctor indicated he had a

17         psychological injury?

18    A.   His doctor indicated he had a psychological

19         injury.  I don't know if it indicated it was a

20         cause of his job.  I know Mr. Gorman was

21         interviewed by a different psychologist and he

22         came --

23    Q.   Why would his doctor make a determination if it

24         was related to work?  Isn't that a determination
```

1            you would make?

2    A.   Well, he has to give us some reason why he thinks

3         he has the problem that he thinks.  I mean, you

4         would have to -- you'd have to give me some

5         reason why -- if I came to you and I said, I have

6         a concussion.  And -- well, where did you get it?

7         At work.  Well, wouldn't a doctor say, "Well, he

8         has a concussion because he hit his head on the

9         wall at work"?

10   Q.   I'm asking you.  What informs --  we're going to

11        come back to that.

12             Who gave you or delineated to you the

13        requirements for 207-c eligibility?

14   A.   I think all our 207-c's are looked at by the

15        county attorney, so we're kept on track or

16        steered by the county attorney.

17   Q.   In Mr. Gorman's case, did you get your definition

18        of 207-c eligibility from the county?

19   A.   We conferred with the county attorney on

20        Mr. Gorman's case, I know that.

21   Q.   Did you look at any regulations?

22   A.   I may have at the time, but I'm not sure.

23   Q.   You don't know if you actually looked at the

24        general municipal law 207-c?

1    A.   No, I did not.

2    Q.   And I just want to narrow this down.  How is it

3         you were able to determine he was not eligible

4         for 207-c?

5    A.   I made that determination based on the material

6         in front of me at the time I made the

7         determination.  And Dr. McIntyre stated he

8         believed Mr. Gorman had some psychological

9         issues, but they were not caused by his

10        employment at the sheriff's office.

11   Q.   They were not caused by.  Okay.  And is there any

12        policy or guidelines that you read before

13        granting 207-c benefits or denying them?

14   A.   I would confer with the county attorney.  If I'm

15        not mistaken, I think we went to a hearing on

16        this and were upheld on our decision.

17   Q.   I'm focusing right now on how you come to the

18        determination that somebody's eligible for 207-c.

19   A.   Dr. McIntyre's report had a lot of weight to it.

20        I know you know, but I think an arbitrator held

21        up my decision for the denial of 207-c.  I'm sure

22        that's what happened.  I just don't want you to

23        get the impression that I did this because I

24        don't like Mr. Gorman.  That's not the case.  I

```
 1              never really had a problem with him.  I'm just

 2              saying I think I was on pretty good ground when

 3              an arbitrator rules in my favor.

 4       Q.     That may be.  I'm trying to get to and trying to

 5              understand how you come to the determination

 6              somebody is eligible for 207-c.  And you said the

 7              criteria you used is whether or not it was caused

 8              by work.  And I asked you whether or not you read

 9              general municipal law 207-c before you made

10              Mr. Gorman's determination, and you said no.

11              It's important to know how you come to that

12              determination.

13       A.     Along the route, we confer with the county

14              attorney.

15       Q.     Why would you confer with the county attorney?

16       A.     Because they're the ones that are ultimately

17              going to pay the 207-c, the county.

18       Q.     Again, you didn't read the general municipal law

19              207-c?

20       A.     I did not, no.

21       Q.     So why would you talk to the county attorney?

22       A.     Why would I talk to the county attorney?

23       Q.     Yes.

24       A.     Because the county has an interest in 207-c.
```

```
 1     Q.   I know the county does, but the county attorney,
 2          did you --
 3     A.   The county attorney represents the county.  He
 4          should know whatever general law --
 5     Q.   207-c.  That's what we're talking about, 207-c
 6          benefits.  Did your determination, denial of his
 7          207-c benefits, was that reviewed by the county
 8          attorney?
 9     A.   I believe so, yeah.
10               MR. SORSBY:  I might need to clarify.  It's
11          an outside attorney, right, who is hired by the
12          county that does these?
13               MR. MARTIN:  Yes.
14               THE WITNESS:  He's not the county attorney.
15          Brian Goldberger is a deputy county attorney or
16          part-time county attorney.  He gets paid as
17          part-time county attorney.  He's the one that we
18          deal with all the time.
19               MR. SORSBY:  Let's keep this on the record.
20     Q.   So who is Pechenik?
21     A.   He is the county attorney.
22     Q.   And who is Goldberger?
23     A.   He's an assistant county attorney.
24     Q.   So when you were talking about the county
```

```
 1            attorney, you weren't talking about Pechenik?

 2    A.   No.

 3            MR. SORSBY:  Let's get this marked.

 4            (Exhibit 59 marked for identification.)

 5    Q.   I show this to you, Exhibit 59.  Have you had a

 6         chance to look at it?

 7    A.   Yes.

 8    Q.   What is it?

 9    A.   207-c packet.

10    Q.   Do you recognize this document?

11    A.   My answer to John Gorman on his 207-c

12         application, and attached is medical

13         documentation to go along with it.

14    Q.   Did Mr. Gorman meet with you in person regarding

15         his application for 207-c?

16    A.   I believe we had a meeting in my office on the

17         initial -- on his initial hearing.

18    Q.   Okay.  All right.  And did he give you --  did he

19         give you documents at that time?

20    A.   I don't remember what documents he gave me.  I'm

21         not sure he gave me an application.  I'm not sure

22         what documents.  Some documents were obtained

23         from other sources, and he may have provided

24         some.  I don't recall.
```

```
 1    Q.   Now, you testified earlier that you had received
 2         from Ruth Vibert incident reports regarding --
 3         incident reports that Mr. Gorman had filed, and
 4         that you gave them back along with the State
 5         Trooper's report, and you gave them to Marcelle
 6         or Sheriff Russo?
 7    A.   Mahar.
 8    Q.   Sorry.  You are Undersheriff Russo.  Did you
 9         include those documents as part of your
10         investigation?
11    A.   No.
12    Q.   Why didn't you include those as part of your
13         investigation?
14    A.   My understanding of 207-c is it's related to a
15         medical situation, and those documents really
16         didn't have anything -- other than -- I don't
17         even know what was in there, but the fact he was
18         claiming he got hit by the door might have been
19         some part of medical.
20    Q.   Now, why didn't you think that -- you said you
21         didn't think -- only medical was relevant.
22         Wouldn't the incident reports describing
23         incidents at work be relevant to whether or not,
24         I think in your words, it was caused by work?
```

```
 1    A.   I think he had the opportunity, when he spoke to
 2         the psychiatrist, to lay all that out, and
 3         apparently the psychiatrist said he does have a
 4         problem but it's not connected to work.
 5              And like I testified before, apparently the
 6         arbitrator felt the same way, because he affirmed
 7         my decision.
 8    Q.   You keep saying that, but I want to focus on you.
 9    A.   To answer your question, the incident reports, I
10         did not include those documents in there.
11    Q.   Well -- and I'm asking, did you not feel they
12         were relevant to whether or not it was caused by
13         work?
14    A.   I think it was John's obligation, when he talked
15         the psychiatrist, to make that well known.  And
16         if the psychiatrist wanted to refer to that, he
17         could do that.
18    Q.   Which psychiatrist?
19    A.   Either one, McIntyre or --
20    Q.   So you are relying on his report to determine
21         whether or not it was caused by work, related by
22         work?
23    A.   That's what I basically made, put a lot of weight
24         in my decision, on Dr. McIntyre's report.
```

```
 1              Now, we send people to Dr. McIntyre all the
 2         time.  Sometimes we like what Dr. McIntyre says
 3         and sometimes we don't like what Dr. McIntyre
 4         says.  He says stuff that isn't in our favor.
 5         It's kind of like when we send them there, we're
 6         looking for a professional opinion.  Whatever way
 7         the chips fall, they fall.  In Mr. Gorman's case,
 8         they didn't fall in his favor, but I have no
 9         control over that.
10    Q.   All right.  Now again, who is tasked with making
11         the determination that an individual is eligible
12         for 207-c benefits?  Is it the medical
13         professional, or is it your job to do that
14         ultimately?
15    A.   Well, I ultimately would --  I shouldn't say "I".
16         The sheriff or whoever he tasks can ultimately
17         make a decision on 207-c.  Right now, in the
18         correctional facility, the chief is handling the
19         207-c.  I did a few of them.  The sheriff did a
20         few of them.  I base my decision on the
21         information I have in front of me at the time,
22         which is this packet of information here.
23    Q.   Didn't you also have the incident reports?
24    A.   They were filed with the department.  I don't
```

```
1              know if I had every one.

2      Q.   You had access to them?

3      A.   Yes.

4      Q.   You said you base it on the information you have.

5           Why didn't you refer to the incident reports?

6      A.   Well, if I referred to the incident reports, or

7           what I knew of them, it probably wouldn't have

8           made a difference because, for example, on the

9           incident report of where John Gorman claimed he

10          got slammed with the door, basically that

11          investigation proved that or showed that the door

12          basically closed on him.  It wasn't like somebody

13          slammed the door on him.  I had the captain in my

14          office demonstrating how the door closed on him.

15          That probably wouldn't have put a weight onto the

16          fact --  that wasn't a situation where harassment

17          or violence occurred.

18               A couple other where you're walking down the

19          hall, somebody doesn't say hello, somebody

20          doesn't smile at you.  I base my decision on the

21          professional that we send somebody to, to make a

22          professional --  professional conclusion of where

23          the problem lies.

24     Q.   What about the February incident of aggravated
```

```
 1          harassment?

 2     A.   On the phone?

 3     Q.   Sure.  We had a State Trooper here this morning.

 4          You didn't include that in there, did you?

 5     A.   No, but I think he talked to the psychiatrist

 6          about that and he --

 7     Q.   I'm not asking that.  I'm asking if you included

 8          that in your report?

 9     A.   No, I didn't include that in my report.

10     Q.   Why did you not include that in your report?

11     A.   It wasn't necessary.

12     Q.   Why?

13     A.   It wasn't necessary.  All my report is based on

14          is what the doctor said and the --  the

15          information I had in front of me at the time,

16          which is Mr. Gorman's obligation to provide.

17               And again, my decision was upheld, affirmed

18          by an arbitrator, which I think that speaks

19          volumes.

20     Q.   Again, I want to know how you came to your

21          determination?

22     A.   I think, so we can wrap that question up, my

23          determination was based on information I received

24          from Dr. McIntyre's office, which I previously
```

```
 1              testified to.  And basically it says I found

 2              Dr. McIntyre's assessment to be based on a

 3              comprehensive review of the issues raised in

 4              Gorman's GML 207-c application and documents

 5              submitted in support thereof.

 6                   Dr. McIntyre clearly concluded that while

 7              Officer Gorman may have psychological issues,

 8              they are not related to the performance of his

 9              duties.  And that's what I based my decision on.

10      Q.      As opposed to the numerous incident reports that

11              you looked at?

12      A.      That's my answer.  I think you're beating a dead

13              horse.

14      Q.      I'm not beating a dead horse.

15      A.      I think we're going around and around.

16      Q.      Let me ask you a question.  Do you think you have

17              a duty to review all the documents you have

18              access to when you do your investigation for a

19              207-c report?

20      A.      I have a duty to review what the applicant

21              provides us, and I was aware of a lot of the

22              documents.  I don't know if I had every one, but

23              I was aware of them.  And I don't think that

24              would change at all as far as my ruling on it.
```

```
1              MR. SORSBY:  Could you mark this?
2              (Exhibit 60 marked for identification.)
3    Q.   Well, first, let's establish -- do you recognize
4         the collective bargaining agreement for the
5         sheriff's department?
6    A.   Yes.
7    Q.   If you could turn to the page that's tabbed.
8         Could you read the highlighted section for us?
9    A.   "The sheriff or the sheriff's designee shall
10        promptly review an application timely made and
11        other pertinent information, documents, or
12        evidence available in reaching his or her
13        determination in each case.  The sheriff or the
14        sheriff's designee may consider relevant arbitral
15        or judicial decisions or any other information
16        which may be available."
17   Q.   Do you see where it says "any information
18        available at the time"?
19   A.   Right.
20   Q.   Do you remember reading that?
21   A.   Yes.
22   Q.   All right.  So do you not believe that there was
23        a requirement, according to the collective
24        bargaining agreement, that you had to review all
```

```
 1              the information that was relevant at the time or
 2              available at the time?
 3      A.      Well, I think at some point in time I read the
 4              information.  It's not contained in this packet,
 5              but anything that I read, I'm sure was in my mind
 6              when I made this decision.
 7      Q.      And you said something to this effect earlier.  I
 8              just want to clarify it.  You believe that
 9              although the incident reports weren't included as
10              part of you 207-c determination, you don't
11              believe that they would have changed the
12              determination; is that true?
13      A.      No, because I have the psychiatrist that says he
14              has some psychological issues, but they're not
15              related.
16      Q.      That's what I wanted to know.  So they would not
17              have changed the decision had you included them
18              as part of your determination?
19      A.      No, I don't believe so.  No.
20      Q.      Now, you were relying on the doctor's
21              determination that it was not related to work,
22              correct?
23      A.      Yes.
24      Q.      Now, the incident in February where
```

```
 1              Sergeant Patricelli called Mr. Gorman and
 2              threatened to break his fucking jaw, as is
 3              recorded on the State Trooper's report, you don't
 4              believe that occurred during -- as part of his
 5              employment?
 6      A.      I don't -- he called him when he was in the
 7              office.  That's the one you're talking about?
 8      Q.      Yes.
 9                      MR. MARTIN:  Object to the form.
10      A.      It may have -- I don't believe that --  I don't
11              believe that phone call, if --  and I don't know
12              the gist of that phone call, but I don't believe
13              that phone call in itself would cause you to have
14              psychological problems.  I'm not a psychiatrist.
15              Apparently Dr. McIntyre took that into
16              consideration.
17      Q.      I understand that, and he's a doctor, and he made
18              that determination.  I'm asking you --
19      A.      I mean, if somebody called me up and said that to
20              me, am I going -- you know, you might say, He
21              shouldn't have said that or whatever, but it's
22              not going to cause me psychological problems.
23      Q.      You're answering a question I haven't posed to
24              you.  I'm asking you, is that not work-related?
```

```
 1    A.   Well, it happened at work, but it's not

 2         work-related in the sense that it's between

 3         John Gorman's sister, and John and Mark Gorman,

 4         and Tony Patricelli.  They have a child together.

 5         I don't know if you would call it common law.

 6              So there's a lot of outside factors.  The

 7         incident happened at work, but work wasn't the

 8         driving factor of it.  It wasn't like, "Hey, I

 9         want to be the master sergeant and

10         not Patricelli.", or "Hey, you're not going to be

11         the master sergeant."  This is all personal

12         issues that the phone call happened to be made

13         when he was at work, but it wasn't a work-related

14         issue.  I guess that's my best answer.

15    Q.   So it happened at work but it's not related to

16         work; is that what you're saying?

17    A.   Yeah.  No.  So the phone call happened to happen

18         to take place at work, but the backbone of the

19         phone call or the driving factor of the phone

20         call, whatever, was personal issues outside the

21         scope of employment.

22    Q.   All of these incidents, all the incident reports

23         that you reviewed today, all of the incidents

24         happened at work, correct?
```

```
 1    A.    No.  I think he had a phone call at his house.

 2    Q.    Your position is if an incident happened at work,

 3          if it's not related to work specifically, it's

 4          not caused by work; is that your understanding?

 5          That's your belief?

 6    A.    That's Dr. McIntyre's belief.

 7    Q.    Well, what's your belief?

 8    A.    My belief was I based my decision on the

 9          information I had in front of me at the time, and

10          that's what my belief would be.

11    Q.    Okay.

12                MR. SORSBY:  Let's take a thirty-second

13          break real quick.

14                (Whereupon, a brief recess was taken.)

15                MR. SORSBY:  Back on the record.

16    Q.    Now, I'm going to show you -- we were looking at

17          Exhibit 59 earlier.  This is Mr. Gorman's initial

18          207-c application.  Do you recognize that?

19    A.    Right.

20    Q.    Do you see in the body it says "workplace

21          violence"?

22    A.    Yeah.

23    Q.    All right.  Now, did you include Mr. Gorman's

24          workplace violence complaints in your 207-c
```

```
 1           determination?

 2     A.    Did I include them in this packet?

 3     Q.    Correct.

 4     A.    No.

 5     Q.    Did you review them before you made your

 6           determination?

 7     A.    I was aware of them for the most part.  I don't

 8           know if I was aware of all of them, but the ones

 9           I saw I was aware of.

10     Q.    You're aware of the one in February.  Again, this

11           is the one --  let me see what exhibit this is.

12           It is --

13                 MR. MARTIN:  It starts with 54, I think.

14                 MR. SORSBY:  That's okay.  We'll find it.

15     Q.    When you made your determination for 207-c

16           eligibility, you said you were aware of the

17           February workplace violence complaint?

18     A.    I said I was aware of some of them.  We've got to

19           find the February one so I can take a look, or

20           you can tell me which one it was.

21     Q.    Here's Exhibit 54.  Do you remember we were

22           talking about that?

23     A.    Yes.

24     Q.    Well, were you aware of that incident, that
```

```
 1              workplace violence complaint?

 2       A.    That he --  that Mr. Patricelli called him at his

 3              residence?

 4       Q.    Yes.

 5       A.    Correct.

 6       Q.    You said you recall seeing a State Trooper's

 7              incident report that Chief Vibert gave you?

 8       A.    Yes.

 9       Q.    Did you consider that State Police report and

10              that workplace violence complaint when you made

11              your determination for 207-c eligibility?

12       A.    This occurred at his residence?

13       Q.    Yes.

14       A.    Basically, I made my determination based on

15              Dr. McIntyre's conclusion, that it is not due to

16              his job as a corrections officer.

17                   This all --  all this all has to do with

18              Mark Gorman, John Gorman, Kim Gorman,

19              Tony Patricelli, and the baby they all have in

20              common, off-duty.  And there happens to be some

21              incident or some of the issues occur when they're

22              working, but the gist -- the problems that caused

23              the psychological issues are family inner

24              whatever -- inner circle problems and not the
```

1          work as the correctional officer.  I mean, this

2          is what Dr. McIntyre is saying.  He's the

3          professional.  That's what I base it on.

4              I know, you know, if somebody slams the door

5          into you and you perceive that as being violent,

6          but the people that were there said that's not

7          what happened.  The door closed on him, it wasn't

8          like somebody slammed it on him.  It was John's

9          perception over the people that witnessed it

10         there.

11             Do I know it happened?  Yes.  Does it weigh

12         a lot into my decision to grant 207-c?  No.

13    Q.   You didn't believe those were work-related; is

14         that what you're saying?

15    A.   Let's take the one with the door again, where the

16         door closes on him.  First of all --  and the

17         captain demonstrated it several times.  The door

18         just closed on him.  It didn't hit him hard

19         enough to do -- now, he's not claiming 207-c

20         because he's got an injury from the door.  He's

21         claiming a psychological injury.  Well, a door

22         closing on you is not going to cause a

23         psychological injury unless you're paranoid

24         enough to perceive that somebody is trying to

```
 1              kill you with a door or something.  I think that
 2              the psychiatrist asked him all these questions.
 3         Q.   Since we're talking about the reason he's asking
 4              for 207-c, let's look at his application if you
 5              don't mind.  If you want to open it up and look
 6              at his application again?
 7         A.   Yes.
 8         Q.   Does it not say, "Related to retaliation from
 9              workplace violence complaint"?
10         A.   That's his impression of it.  This isn't a doctor
11              saying it.  This is an employee's statement.
12              "Officer went to primary care physician due to
13              chest pains and elevated blood pressure due to
14              work related stress, work related -- retaliation
15              from workplace violence."  That's John going to
16              the hospital and saying, "I have chest pains from
17              workplace violence."  He can't determine why he
18              has chest pain.  Maybe he's having a massive
19              coronary.
20         Q.   I'm asking you how you made the determination and
21              what evidence you looked at, and I'm asking you
22              what he asked for -- for 207-c?  Okay.  And what
23              that -- what were the allegations he made?  So
24              that's why I had you look at that.
```

```
 1    A.   I have a packet here.  It has a lot of documents

 2         from St. Peter's Hospital, medical chart, it

 3         looks like EKG.

 4    Q.   Did you look at any documents from Dr. Thalmann,

 5         Mr. Gorman's doctor?

 6    A.   Whatever documents were here.

 7    Q.   Let's show you what's been marked Exhibit 31.

 8    A.   I mean, this is Dr. Thalmann's --

 9    Q.   Let's stop for a minute.

10    A.   Okay.

11    Q.   Have you seen this document before?

12    A.   I believe.  I believe we were all through this

13         when we went through the 207-c hearing.  Go

14         ahead.

15    Q.   You seen this document before.  How do you

16         recognize this document?

17    A.   It's from James Thalmann.

18    Q.   Did you include this document as part of the

19         207-c packet?

20    A.   If it's in the packet.

21    Q.   I'm asking you if you have a recollection?

22    A.   A recollection of seeing it?  If it was --  my

23         best answer is if the doctor provided it to us,

24         or John provided it to us, it should have been
```

```
 1           part of this packet and it would be in there.
 2    Q.    Let's have you look at the third page on this,
 3           Exhibit 59.  Now, see that first paragraph?
 4    A.    The third page is blank.  Hold on.  One, two,
 5           three.  The third page is blank.
 6    Q.    Let's see here.
 7    A.    St. Peter's Hospital page.
 8    Q.    We're looking at your report, so we're looking at
 9           this page.  Do you see it at the top?
10    A.    Yes.
11    Q.    Do you see the second sentence that says, "The
12           letters from -- "?
13    A.    Mm-hmm.
14    Q.    It says, "The letters from Dr. Thalmann,
15           furnished by claimant, indicate that he has
16           symptoms.  But do not connect those symptoms with
17           Officer Gorman's performance of his duties as a
18           correctional officer."
19    A.    Right.
20    Q.    All right.  Now, can you do me a favor, and
21           looking at Exhibit 31, can you read the
22           highlighted part for me?
23    A.    "Mr. Gorman related a fear of returning to work,
24           particularly focused on work-related stress.
```

```
 1              While numerous details were related, he feels
 2              that an issue about his sister's long-term
 3              personal relationship with the master sergeant
 4              began the events that directed against him.  He
 5              is fearful to return to work, citing safety
 6              issues in the correctional facility."
 7        Q.   I'll take that back from you.  Now, do you see --
 8              by reading the back of that page, do you see
 9              Dr. Thalmann's letter of August 1, 2013?  You had
10              just read that, right?
11        A.   Yes.
12        Q.   Now, just to keep the record clear, the date on
13              this letter -- can you read the date on the
14              letter?
15        A.   November 18, 2013.
16        Q.   So the letter is dated after the August letter
17              that you reviewed as part of this; isn't that
18              true?
19        A.   Yeah.  It appears to be, yes.  So we did not have
20              --  I mean, this should have been in before this
21              determination was made.  The doctor never sent us
22              this, is that what you're saying?
23        Q.   Let me ask the question.  Did you receive this
24              document?  Do you recall receiving this?
```

```
 1    A.   I don't recall receiving it.  We could have
 2         received it.  If we received it, we would have
 3         had it.  I don't know.  I don't know if I
 4         received it or not.
 5    Q.   You issued this determination in January 2014,
 6         correct?
 7    A.   It appears so, yes.
 8    Q.   Now --
 9    A.   Oh, wait a minute.  So this -- this letter did
10         come in before the determination.  Okay.  I'm
11         good with that.  The letter did come in before
12         the determination was made.  So we would have had
13         this letter or should have had this letter based
14         upon --  okay.  That's better.  That's good.  I
15         thought we were going the other way.  I thought
16         you were trying to tell me we had the letter
17         after.
18    Q.   And I'll just have to take that back.
19    A.   That's all right.
20    Q.   Now, having read that, did you agree with his
21         determination that Mr. Gorman had a fear of
22         work-related threats?
23    A.   Well, this is basically what Mr. Gorman is
24         relaying to him.  Mr. Gorman relayed a fear of
```

1           returning to work.  Here it says he's fearful to

2           return to work due to safety issues in the

3           correctional facility.  It's probably the safest

4           place to be.  John Gorman worked in an office

5           making keys.  He had a sergeant and everybody all

6           around him.  How is somebody going to attack him?

7           There's correctional officers all over.

8      Q.   I ask the questions, you give the answers, but

9           remember there was an allegation of that -- well,

10          not an allegation.  It was shown that someone --

11          that Mr. Patricelli called Mr. Gorman and

12          threatened to break his fucking jaw.

13               So to the extent we're going to have a

14          debate on safety, that's an open debate, but

15          that's not going to happen because I'm going to

16          ask the questions and you're going to give the

17          answers, if you have them.

18               MR. MARTIN:  You did ask him if he agreed.

19     A.   I mean, basically this here -- to answer your

20          question, Mr. Gorman relayed a fear of returning

21          to work.  He's relaying this to Dr. Thalmann.

22          Dr. Thalmann is not saying Mr. Gorman is

23          traumatized by work, because here's the reason

24          this is.  I don't see that.  "He remains fearful

```
 1              of returning to work and tends to dwell on events

 2              leading up to present circumstances."  If I were

 3              to read that, I would put more weight on

 4              Dr. McIntyre's report.

 5                   And like I said before, Dr. McIntyre always

 6              doesn't agree with us.  We've had Dr. McIntyre

 7              rule against us in situations.  So it's not like

 8              we're going to Dr. McIntyre because we know he's

 9              our buddy.  We go to him because we're looking

10              for a professional opinion.

11     Q.     Now, Mr. Gorman, was he -- his status at this

12              time, was he a provisional sergeant?

13                   MR. MARTIN:  At what time?

14                   MR. SORSBY:  We're talking from the period

15              of October 2012 to February.

16     Q.     Do you understand he had a provisional status?

17     A.     I don't know his status, but I know Mr. Gorman

18              was a provisional sergeant at one time.  He was

19              appointed provisional, along with another

20              correctional officer that was appointed

21              provisional.  You know, they had to take the

22              sergeant's test, civil service sergeant's test

23              and pass that to where they were eligible to be

24              reached to keep the position.
```

```
 1              So I don't know if, at the time we're

 2         talking about, if Gorman was provisional or not.

 3         I know he did not pass the sergeant's test in the

 4         manner where we could get him, where he was

 5         eligible to be promoted, so we had to move him

 6         back to correctional officer.

 7    Q.   I'm going to show you a different exhibit now.

 8         I'm going to show you what's been marked as

 9         Exhibit 21.

10    A.   Yeah.

11    Q.   Did there come a time Dr. McIntyre had a

12         conversation with you regarding the 207-c

13         application?

14    A.   I believe Dr. McIntyre might have had a

15         conversation with us when we submitted the

16         paperwork, but I don't recall what it was.

17              Let me --  is that -- can you explain what

18         that is?

19    Q.   Well, these have been marked as an exhibit.  This

20         is notes from Dr. McIntyre from his

21         investigations, okay?  So this was marked during

22         his deposition.  And so this would have been

23         notes of a conversation he had.

24              It says Pat Russo, Brian Goldberger.  It
```

```
 1              says, "John Gorman, chosen one."  Do you
 2              understand what that meant?  Did you use that
 3              term or did somebody else use that term?
 4        A.    Give me a second.
 5        Q.    That's fine.
 6        A.    I want to look this over and see if I can make
 7              any sense out of it.
 8        Q.    Again, these are his notes.
 9        A.    I would be guessing.  Maybe he was chosen to be a
10              sergeant and not come off a list.
11        Q.    I don't want you to speculate.  If you don't
12              know, that's an answer, too.
13        A.    I don't know.  That's a question for
14              Dr. McIntyre, right?
15        Q.    Again -- all right.  Now, is -- do you have a
16              doll in your closet that you bring out when
17              individuals come to you, stress-related issues,
18              like a doll?
19        A.    I have -- I don't remember the name of it.  I had
20              it in my office at the Troy P.D., but I don't
21              bring it out when people come to my office for
22              stress.
23        Q.    What is it?  It's a doll?
24        A.    I don't even know if it's a doll.  I guess it's a
```

```
 1              thing with like a long, long skinny neck.  And it

 2              makes noise when you shake it and it kind-of

 3              sounds like a turkey.  I don't --

 4        Q.    Did you ever indicate that you would shake it and

 5              say, "This is how I resolve stress"?

 6        A.    Up in my old office I would say, "Here's my

 7              stress reliever" and shake it.  It would be like

 8              a squeeze ball.

 9        Q.    Did you take that out when Mr. Gorman came to

10              file 207-c benefits with you?

11        A.    I don't think I would ever do that.

12        Q.    You don't recall ever taking that out in his

13              presence?

14        A.    No.  I mean, I don't think, no.

15        Q.    All right.  So that's -- do you know who

16              Lenny Smith is?

17        A.    Lenny Smith was a corrections officer that used

18              to work for us.

19        Q.    And was Mr. Smith at an interview regarding

20              Mr. Gorman's 207-c application?

21        A.    I believe Lenny Smith did come over on behalf of

22              John Gorman at one point, yeah.

23        Q.    And he came to visit you?

24        A.    Yes.
```

```
1    Q.   All right.  And who else was at that meeting?

2    A.   I don't recall.  I don't even recall the meeting,

3         but now that you said Lenny Smith, I think he did

4         come over on John's behalf.  And I don't remember

5         if he was a union representative at the time or

6         just somebody that wanted to come over.

7    Q.   What was the purpose of the interview?

8    A.   I can't remember.

9    Q.   And at that time, were you told the 207-c

10        application was work-related?  Do you recall

11        that?

12   A.   Are you saying Lenny Smith told me it was

13        related?

14   Q.   Yes.

15   A.   I don't recall that, no.

16   Q.   Were there any other --  any other interviews

17        that Lenny Smith was at with regards to the 207-c

18        application, Mr. Gorman's 207-c application, or

19        is that the only one you recall?

20   A.   I recall seeing him once, but it could have been

21        more.

22   Q.   All right.  Do you know a Lora Seabury?

23   A.   Was that Lora Abbott?

24   Q.   I think her prior name was Abbott.
```

```
 1    A.    Oh.  She used to work at the sheriff's office,
 2          too.
 3    Q.    Is she still employed there?
 4    A.    She had a -- I believe there was a suit pending
 5          against the county.
 6    Q.    A suit pending against the county by Lora Abbott?
 7    A.    Right.  I think she won a judgment against the
 8          county, I believe.  Probably Goldberger would be
 9          the one to answer that question.
10    Q.    Do you know what the suit was involved with?
11    A.    It was a sexual harassment suit, I believe.
12    Q.    Was there a time she went out on leave?
13    A.    I don't recall.  I definitely wasn't handling
14          corrections.  That's when we first came in, I
15          believe.  What year was that?
16    Q.    I don't know.  It looks like July of 2010.
17                MR. SORSBY:  I'll have this marked as an
18          exhibit.
19                (Exhibit 61 marked for identification.)
20    Q.    I'm going to show you what's been marked
21          Exhibit 61.  Take a look at that.
22    A.    (Witness complied.)
23    Q.    Having looked at that exhibit, do you understand
24          Lora Abbott is still employed by the sheriff's
```

```
 1          department?
 2     A.   Let me look at this a minute.  I know
 3          she's saying -- let's see.  "9/13/2015, I,
 4          Lora Seabury, affirm that as of 10/13/15, I have
 5          not been officially advised of any termination
 6          from the Rensselaer County sheriff's department."
 7          I don't know if that's true or not.
 8     Q.   Can you tell, is that a notarized statement?
 9     A.   Yes, it is.
10     Q.   Can you flip over that page?  What is that?
11     A.   It looks like a paycheck in the amount of
12          nothing.
13     Q.   Who is it from?
14     A.   Rensselaer County Bureau of Finance.
15     Q.   And you don't believe -- do you believe she's
16          still employed after reading that?
17     A.   Well, I don't know - you know - if it's something
18          that didn't come out of the computer.  I'd have
19          to research that before I gave you an answer.
20     Q.   Do you know when she stopped working, physically,
21          at the jail?
22     A.   No, I don't.
23     Q.   Do you understand that --  okay.  Okay.  All
24          right.
```

```
 1              Now, did you understand that there came a
 2         time where Mr. Gorman went out on unpaid leave?
 3    A.   I believe there was.
 4    Q.   And what do you understand the reason for him
 5         going out on leave to be?
 6    A.   I believe at some point in time, he was brought
 7         back to the facility to work.  And he didn't want
 8         to do the work, and then he was put out.  I'd
 9         have -- I don't know without looking at some
10         paperwork.  The gist of it is I think he came
11         back to work in the facility.  He didn't want to
12         work and he wasn't ready to come back, but I
13         don't know for sure.
14    Q.   Do you understand he went out for a medical
15         reason?
16    A.   Not 207-c.
17    Q.   No, I understand that, but he was out on unpaid
18         leave, but do you understand the reason for him
19         not being at work was a medical reason?
20    A.   Was he claiming psychological stress?
21    Q.   I'm asking you.
22    A.   I don't know.  I'd have to look at something.
23    Q.   Okay.
24              MR. SORSBY:  I'll have this marked as an
```

```
 1              exhibit.
 2                    (Exhibit 62 marked for identification.)
 3        Q.    I'm going to show you what's been marked as
 4              Exhibit 62.
 5        A.    Okay.
 6        Q.    Do you recognize this document?
 7        A.    It's a letter to John Gorman from Sheriff Jack
 8              Mahar.
 9        Q.    This letter is from you.  What is the purpose of
10              this letter?
11        A.    It's to tell Mr. Gorman that his employment is
12              going to be terminated effective July 14, 2014,
13              basically.
14        Q.    Did the sheriff direct you to send this letter?
15        A.    It's actually from the sheriff.  He signed it.
16        Q.    I thought you had signed it?
17        A.    No.
18        Q.    My apologies.  Did the sheriff consult with you
19              or talk with you about the letter before he sent
20              it?
21        A.    I'm sure we talked about it.  If you're going to
22              terminate somebody, we're going to talk about it,
23              but I don't recall the gist of the conversation
24              other than we talked about the case.
```

```
 1      Q.   When you read it to yourself, did you read

 2           something about a right to a due process hearing?

 3      A.   Yes.

 4      Q.   And do you know if Mr. Gorman requested a due

 5           process hearing?

 6      A.   I do not.

 7      Q.   All right.  You can put that down.

 8                MR. SORSBY:  I'll have this marked as the

 9           next exhibit.

10                (Exhibit 63 marked for identification.)

11      Q.   So you don't recall the due process --

12           scheduling a due process hearing for Mr. Gorman?

13      A.   Do you have a written request from him, a copy of

14           a written request from him?

15      Q.   Why don't you look at Exhibit 63?

16      A.   Okay.

17      Q.   Can you tell us if you recognize this document?

18      A.   Apparently it's a letter that we sent out to

19           Mr. Gorman advising him that a due process

20           hearing is scheduled for August 15, 2014.

21      Q.   Who sent this letter?

22      A.   I signed the letter.  Marcelle probably sent it

23           out.  We copied Matthew Ryan and New York State

24           Law Enforcement Association, Council 82.
```

```
 1    Q.   So you wrote this letter -- do you know if you
 2         wrote this letter?
 3    A.   No, I didn't write it.  Brian Goldberger or maybe
 4         Marcelle wrote it.  I signed it.
 5    Q.   It's signed by you.  So you reviewed it, yes?
 6    A.   Yes.  I reviewed it.
 7    Q.   I'll take that back from you real quick.  Now, it
 8         says that due process is scheduled for
 9         August 14th at 9:30.  Were you at that due
10         process hearing?
11    A.   I don't believe so.  I don't recall.
12    Q.   Now, what is your understanding of Section 73 of
13         the civil service law in regards to?
14    A.   Termination?
15    Q.   Yes.
16    A.   I based my decision on advice of counsel,
17         Brian Goldberger.  I depend on him for advice on
18         matters of that nature.
19    Q.   Okay.  So you're saying whether somebody is
20         terminable under Section 73 of the civil service
21         law, you --
22    A.   Brian Goldberger will give me a determination on
23         that.  I mean, if you had to research a law, I
24         know how to research a law, but I mean, in cases
```

```
 1          like this, we work along with Brian and he

 2          advises us.

 3    Q.    It's ultimately the sheriff's decision to

 4          terminate somebody, is it not?

 5    A.    Yes.

 6    Q.    It's also your decision in some cases to

 7          terminate an employee, isn't it?

 8    A.    It could be, but I can't think of a situation

 9          where I would make a determination without

10          consulting with the sheriff.  For the most part,

11          unless he was dead or incapacitated, I probably

12          would defer to him.

13               MR. SORSBY:  Let's mark this.

14               (Exhibit 64 marked for identification.)

15    Q.    Now, I just want to be clear.

16               MR. SORSBY:  Well, go ahead and get this

17          marked as an exhibit, too.

18               (Exhibit 65 marked for identification.)

19    Q.    You testified before you don't recall being at

20          the due process hearing.  I want you to look

21          under "also present".

22    A.    Okay.

23    Q.    Do you see your name there?

24    A.    Yes, I do.
```

```
 1    Q.   Now, having read that, do you now recall whether
 2         or not you were at the due process hearing?
 3    A.   Well, I apparently was, because I have some
 4         testimony here.
 5    Q.   So you do now remember you were at the due
 6         process hearing?
 7    A.   I was there, yes.
 8    Q.   Okay.  I'll take it back from you, and then I'll
 9         ask you questions and I'll show it to you.
10              Now, are you aware Mr. Gorman filed for
11         Workers' Compensation benefits?
12    A.   I believe so.
13    Q.   You were at this hearing.  Are you aware that the
14         decision by the Workers' Compensation Board was
15         introduced as part of the record?
16    A.   I don't recall that.  If it's there, it probably
17         was.
18    Q.   Do you recall that the Workers' Compensation
19         Board determined that Mr. Gorman was eligible for
20         Workers' Compensation benefits?
21    A.   I remember something to that effect, but I don't
22         recall specifics.
23    Q.   Do you recall reviewing the decision from the
24         Workers' Compensation Board?
```

1    A.    No.

2    Q.    Okay.  Now, I'm going to show you what's been

3          marked as Exhibit 64.  Do you recognize this

4          document?

5    A.    It's the document from me to Mr. Gorman.

6    Q.    Go ahead and read it.

7    A.    (Witness complied.)  Okay.  Do you want me to

8          read the whole letter?

9    Q.    Yes, please.  It's a short letter.

10   A.    "Dear Mr. Gorman:  The sheriff has directed me

11         and authorized me to send this correspondence to

12         you.  The sheriff has reviewed the transcript of

13         the hearing that was held on August 14, 2014.

14         Based upon my review of the transcript and your

15         personnel file, including your attendance

16         records, and in accordance with the applicable

17         provisions of the New York State Civil Service

18         Law, your employment with the Rensselaer County

19         sheriff's office is hereby terminated effective

20         October 1, 2014."  And it's signed by me.

21   Q.    So I just want to clarify.  It says, "The Sheriff

22         has directed and authorized me to send this

23         correspondence to you."  "The sheriff has

24         reviewed the transcript of the hearing which was

```
 1            held on August 14th."  And then it says, "Based
 2            on my review of the transcript and your personnel
 3            file."  Is that your review or is that the
 4            sheriff's review?
 5       A.   I believe this was an overall --  and I believe
 6            that Brian Goldberger drafted the letter and I
 7            signed the letter, but it was based upon the
 8            decision to terminate Mr. Gorman.  And I sent him
 9            the termination letter.
10       Q.   I understand that.  It says you were directed by
11            the sheriff.  The next paragraph.  Who is the
12            "I", is it you or the sheriff?
13       A.   Again, the termination would come ultimately from
14            the sheriff.  I could decide to terminate
15            somebody and he could say no, we're not
16            terminating.  If he decides to terminate
17            somebody, I can't say no and not terminate them.
18            So that's the difference.  And I think that's why
19            we put the wording in, authorized by the sheriff.
20       Q.   You don't understand the second paragraph, the
21            "I" to be you, you understand that to be the
22            sheriff?
23       A.   Right.
24       Q.   Because you did not terminate Mr. Gorman, it was
```

```
1              the sheriff; is that true or not?
2       A.    Yeah.  The sheriff has the ultimate decision.
3       Q.    He directed you to send the letter, but he
4              decided to terminate Mr. Gorman?
5       A.    That's correct.  I mean, I think it was based
6              upon advice from counsel, also.
7       Q.    I know, but I want to be clear who in the letter
8              is speaking, because it's not clear.  So I wanted
9              you on the record to say "yes" or "no" if you
10             believed that to be your words in the second
11             paragraph, and you don't believe they are?
12      A.    I believe the sheriff had the ultimate power to
13             terminate, and I think this letter reflected the
14             sheriff had.  Does that suffice?
15      Q.    We're going to have the sheriff here later.  I
16             want to finish this up and make it crystal clear.
17             I want to make sure who's talking here, review of
18             the transcript, personnel files and attendance
19             records?
20      A.    I'm sure at some time I looked them over, too,
21             but --
22      Q.    And again, to my question as to who do you think
23             you were referring to in that second paragraph
24             where it says "I", you said you believe
```

```
 1            Sheriff Mahar -- and I understand that, but I
 2            just want to make -- go ahead.
 3       A.   See where it says "based on my review"?
 4       Q.   Is that you or Sheriff Mahar?
 5       A.   I probably did review all the material also, but
 6            to simplify, I think the ultimate decision has to
 7            come from the sheriff, but I probably did review
 8            all the transcripts and -- or the transcript and
 9            personnel file, as did probably our counsel,
10            also.
11       Q.   Okay.
12       A.   Because it says, "Based upon my review, your
13            employment is being terminated."
14       Q.   Okay.  This says, "Based upon my review of the
15            transcript and personnel file, your employment
16            will be terminated."  So you may have reviewed
17            the transcript, but again, that doesn't mean that
18            you terminated him just because it says --
19       A.   I think we established that.  It says, "The
20            sheriff has directed and authorized me to
21            send -- ".  So the sheriff is authorizing me to
22            tell him.
23       Q.   I got it.
24       A.   Okay?
```

```
 1   Q.   Yes.  Do you recall reviewing potentially -- or
 2        you may have reviewed Mr. Gorman's attendance
 3        records.  Did Mr. Gorman have any attendance
 4        problems?
 5   A.   I can't remember.  I don't remember what the
 6        records --
 7   Q.   And were there any --  you reviewed his personnel
 8        file.  Were there any incidents in his personnel
 9        file that would be terminable, subject to
10        termination?
11   A.   Nothing that stand out, other than --  I don't
12        think there was much there, other than when we
13        started having these problems, but I don't
14        recall.
15   Q.   Now, you're the undersheriff.  Do you know if
16        Mr. Gorman was ever disciplined?
17   A.   I can't say for sure.  I don't think so, but I
18        don't know for sure.
19   Q.   What is it in Mr. Gorman's personnel file that
20        would subject him to termination, if you know?
21   A.   I don't know.
22   Q.   Do you know if -- kind of getting away from this
23        for a moment.  Do you know if Mr. Patricelli was
24        ever disciplined for being --  for tardiness or
```

```
 1              for attendance issues?

 2    A.    I don't know.

 3    Q.    Do you know if he was disciplined for any other

 4          reasons?

 5    A.    I'm not sure, no.

 6    Q.    Now, are you aware that Section 73 of the civil

 7          service law indicates that the sheriff's office

 8          may terminate an employee that's been out of work

 9          for a year or more?

10    A.    I'm not that familiar with the law.  I'd have to

11          rely on counsel for advice in that situation.

12    Q.    All right.  Do you know --  can you tell us --

13          are you aware of employees of the sheriff's

14          department that have been out for more than a

15          year on unpaid leave?

16    A.    Offhand, I couldn't.  Offhand, I don't know.

17    Q.    All right.  Are you familiar with --  strike

18          that.  Let me ask a different question.  Do you

19          know if Mr. Gorman was provided an accommodation

20          of any kind so he could come back to work?  He

21          was out on unpaid leave, but was he provided an

22          accommodation?

23    A.    I don't know.

24    Q.    Okay.
```

```
1              MR. SORSBY:  I'm going to take a quick
2         minute break to see where we're at.  I'll be right
3         back.
4              (Whereupon, a brief recess was taken.)
5              MR. SORSBY:  Back on the record.
6    Q.   Now, can you tell us, Undersheriff Russo, why
7         Anthony Patricelli, after being convicted of a
8         crime for looking up the E-justice system, after
9         being charged with making a threat to Mr. Gorman,
10        after the disciplinary matters we discussed
11        earlier today, why is it that Mr. Patricelli was
12        not fired and Mr. Gorman was?
13   A.   It's a question for the sheriff.
14   Q.   Okay.  Now, you said earlier, however, you're
15        responsible for everybody the sheriff is
16        responsible for?
17   A.   Yes.  Generally speaking, yes.
18   Q.   You weren't responsible for that decision?
19   A.   No.  I think that decision, again, like I
20        testified before, termination or whatever, would
21        come from the sheriff.  I can make a decision and
22        he can override it.  He can make a decision and I
23        can't override his.
24   Q.   You had all the information in regards to the
```

```
 1           E-justice system?

 2     A.    Some of it.  Like I testified to before, also,

 3           they were reporting to the sheriff.  I didn't

 4           know all the facts, but I knew the gist of it.

 5     Q.    You had all the incident reports in regards to

 6           Mr. Gorman, and you seen the State Police report

 7           regarding the threat Mr. Patricelli made against

 8           Mr. Gorman.  Did you make a recommendation to the

 9           sheriff that Anthony Patricelli be terminated?

10                 MR. MARTIN:  Object to the form.

11     A.    I don't believe so.

12     Q.    And would it be permissible for you to make such

13           a recommendation?

14     A.    I guess it would be possible to do that.

15     Q.    And why, in this case, did you not make a

16           recommendation for termination?

17     A.    I don't know.  I didn't, I guess.

18     Q.    Did you -- now, did you believe that termination

19           was warranted for Mr. Patricelli?

20     A.    I didn't know all the facts.  I knew some of the

21           facts.  So I wouldn't answer that question unless

22           I knew all the facts.

23     Q.    Do you believe he should have been terminated for

24           the misuse of the E-justice system?
```

```
 1    A.   I didn't know all the facts of the investigation,

 2         so I wouldn't make that decision.

 3    Q.   You did say that you were there at the PESH

 4         investigation, the first one?

 5    A.   Right.

 6    Q.   And you did see the PESH investigative record and

 7         their conclusions, correct?

 8    A.   Right.

 9    Q.   And I recall earlier you testified that you

10         believe the violation of the E-justice system

11         violated DCJS regulations and FBI regulations,

12         correct?

13    A.   Yes.

14    Q.   You're saying you didn't have enough facts, but

15         you had sufficient facts to know he committed a

16         crime; isn't that true?

17    A.   Right.

18    Q.   He was convicted of that?

19    A.   Yes.

20    Q.   So based on the fact that he was convicted of a

21         misdemeanor for abuse of the E-justice system, do

22         you believe he should have been terminated?

23              MR. MARTIN:  Object to the form.

24    A.   Yeah.  I don't have an opinion at this time.
```

```
1     Q.   Do you believe that he should have been --
2          Mr. Patricelli should have been terminated for
3          calling Mr. Gorman at work and threatening to
4          break his jaw?
5               MR. MARTIN:  Object to the form.
6     A.   I, again, don't -- I don't know.  I don't know.
7          I would say "no" for that.  I probably would say
8          "no".  No.  I mean, people argue.  People have
9          disagreements all the time at work.  I don't know
10         if that was an actual "I'm going to break your
11         jaw" or "I could break your jaw" or whatever,
12         without getting back into that and looking at the
13         investigation report over again.  I really said
14         I'd be leaning toward "no" for termination for
15         that incident itself.
16    Q.   While we're on that, do you recall that you were
17         here for the deposition of Trooper Hock?
18    A.   Yes.
19    Q.   Do you recall she spoke to Mr. Patricelli and she
20         recorded what she said?
21    A.   Right.  She did a written record.
22    Q.   Right.  And he said, "If I had a problem big
23         enough, I would come and break your fucking jaw",
24         right?
```

```
1    A.    Right.

2    Q.    Now, you're the undersheriff.  Under what

3          circumstances is it okay to break one of the

4          employee's of the sheriff's department's jaw for

5          a problem?

6    A.    It's not, but again, what she wrote down, "If I

7          had a problem, I would come and break" -- that's

8          leaning --  that's kind of leaning me to believe,

9          like, I don't have a problem, or if I did, I

10         would do that.  That's not like, "I'm going to

11         come over there and break your jaw."  That's

12         like, "If I've got a problem, I can come over

13         there.  I have the capability if I have a

14         problem, but I don't have a problem, so I'm not

15         going to do that."

16              That's how you can imply from that both

17         ways, and that's why I said I don't think it's a

18         situation where termination --  I wouldn't have

19         recommended termination in that case.

20   Q.    So he's saying if there was a problem big enough,

21         he would come over there and --

22   A.    That's what I think the Trooper had in her

23         report.  I don't have that in front of me right

24         now.
```

```
1    Q.   We'll get it out.  What I'm asking you is he's
2         saying is if there was a problem big enough, he
3         could come down and break his fucking jaw.  I'm
4         saying is there a problem big enough that
5         justified Mr. Patricelli breaking Mr. Gorman's
6         jaw?
7    A.   No, but I don't know if that's an implied threat
8         that I'm coming over to break your jaw.  You
9         know.  That's almost saying I'm not going to do
10        it, but if I wanted to do it, I would do it.
11            Let me see what we have here on paper, but
12        that's what I think my impression was of that
13        when it first happened, and that's kind-of what I
14        was reading from today when I listened to the
15        Trooper, what she said.  You know.
16            MR. MARTIN:  I don't have it here, I don't
17        think.
18            MR. SORSBY:  That's okay.  We'll find it.
19            MR. MARTIN:  I've got the internal incident
20        report.
21            MR. SORSBY:  Off the record.
22            (Discussion off the record.)
23   Q.   Handing you back Exhibit 37.  Do you see
24        Trooper Hock there at the top?
```

```
 1    A.   I'm looking for your exhibit number.

 2    Q.   I'm handing you what's been marked Exhibit 37.

 3         We looked at this earlier.

 4    A.   "If I had a big enough problem with you, I would

 5         come over there and break your jaw."

 6    Q.   Right.  That's what Gorman said, but below that,

 7         do you see that?

 8    A.   Yes.

 9    Q.   What does it say?

10    A.   "Contacted Patricelli."

11    Q.   Keep going.

12    A.   "He said if he had a big enough problem with him,

13         he would come over there and break his fucking

14         jaw."

15              So it's the same thing Gorman said, so at

16         least they're both on the same page as telling

17         what was said.

18              So I would say, when I read that, I would

19         read into that, If I had a big enough problem

20         with you.  It's not, I'm going to come over there

21         and break you jaw.  It's if I had a big enough

22         problem with you, I'd come over there and break

23         your jaw.

24    Q.   And you said that a couple times, and I'm not
```

```
 1              asking about your understanding of whether or not
 2              it was a threat.  I'm asking if any one of the
 3              people that you're responsible for as the
 4              undersheriff says that if the problem is big
 5              enough, they can come and commit acts of violence
 6              against another employee, is that --
 7      A.      Something that I would terminate somebody?  No.
 8              We would probably take some kind of disciplinary
 9              action, but I don't think it would rise to the
10              level of termination.
11                   Nothing's justified, and I know zero
12              tolerance for violence in the workplace, but you
13              have to remember, it's a correctional facility.
14              It's not kindergarten class.  So a lot of guys
15              know that that is --  they're going to encounter
16              some of that along the way, as with police
17              departments and fire departments and so forth.
18              You're going to be in a different environment
19              than you would be in a school.
20      Q.      So what you're saying is some of it has to be
21              tolerated; is that what you're saying?
22      A.      No. I'm saying some of it's going to happen
23              probably more often than not.  You still have to
24              maintain your zero tolerance policy and
```

```
 1              discipline when appropriate, but you're not going
 2              to get as much of it reported, I think, as you
 3              would because people are just used to that
 4              environment.  And that came -- that had been
 5              around for a while.  You know.
 6      Q.      So now do you believe that Mr. Gorman should have
 7              been terminated?
 8      A.      Again, I'd have to --  it was done and it was
 9              done on advice of counsel, so I believe it was a
10              proper decision.
11      Q.      But what I'm asking is do you have an opinion as
12              to whether or not --
13      A.      No, I don't have an opinion at this point, no.
14      Q.      Do you have -- what was your analysis of
15              Mr. Gorman's performance while he was at the
16              jail?
17      A.      I didn't have a lot to do with Mr. Gorman.  Like
18              I said, I wasn't involved in the correctional
19              side that much.  I ran into him a few times.  He
20              was making --  he was in charge of keys, making
21              keys.  I know he is --  I think that was a good
22              job for him, because he didn't have to interact
23              with a lot of people.  So he could take care of
24              the key, make the keys he was suppose to make,
```

1       but he didn't have to interact with inmates that

2       much or other CO's.

3   Q.  Why was that important?

4   A.  I think he has trouble interacting with people.

5       I never had anything against John, but I always

6       thought John was a little like standoff-ish or

7       came across like he isn't easily engaged in

8       conversation.  You know.

9           And again, I don't have any -- I don't have

10      anything against him.  I know that some of the

11      people would say -- like some of the supervisors

12      over there would say John wasn't the best dealing

13      with prisoners or dealing with other people, or

14      he really didn't handle people well while he was

15      sergeant.  I don't know that to be true.  I never

16      had any complaints on him.  I didn't have any

17      problems with him.  I think the key job was

18      perfect for him.

19  Q.  When was the key job given to him?

20  A.  I think when he came back from sergeant.  Maybe

21      before.

22  Q.  Isn't it true that you made him provisional

23      sergeant?

24  A.  You mean appointed him as provisional sergeant?

1    Q.   Correct.

2    A.   Sure, John and Aaron Smart.  I don't know if I

3         swore him in, but I'm sure it was the sheriff's

4         decision to promote him.

5    Q.   You said before you hadn't had much interaction

6         with John?

7    A.   I have lately, but --

8    Q.   I'm talking about --  I'm trying to figure out

9         how you came to the impression that Mr. Gorman

10        doesn't --  your impression that he's kind of

11        standoff-ish?  Is that based on what others told

12        you or your own --

13   A.   Based on --  I never had any real complaints,

14        just what other people said.  And I like to deal

15        with the facts, so -- you know, I never had any

16        complaints.  I never had a problem with him.

17   Q.   Okay.  Did you ever have an opportunity to look

18        at any performance appraisals of Mr. Gorman?

19   A.   I may have.  Sometimes they would do them and

20        forward them over.  Sometimes the colonel would.

21        At the time, Bob Loveridge would have a lineup on

22        his desk.

23   Q.   Why would you look at his performance appraisals?

24   A.   They would come over in a bundle sometimes to be

```
1              filed.  So if they were there and I happened to
2              look through them, I'd look through them.
3      Q.      Was it your duty to look through them?
4      A.      I would say no, because, like I said, at one time
5              I wasn't focused much on the correctional side,
6              but I have from time to time seen them there and
7              looked through them.
8                      MR. SORSBY:  Off the record.
9                      (Discussion off the record.)
10                     MR. SORSBY:  Back on the record.
11     Q.      Now, you do you know who Jeff Rankin is?
12     A.      Jeff Rankin is a lieutenant.
13     Q.      Where was he in the chain of command?
14     A.      At one time, Jeff was a sergeant and then he
15             became lieutenant.  So I don't remember where he
16             was at certain times, but as a lieutenant he
17             would be over --
18     Q.      Now, I'm going to show you what's been marked
19             Exhibit 3.  This is a performance appraisal.  I
20             bring your attention to the narrative of it by
21             Jeff Rankin.
22     A.      Okay.
23                     MR. MARTIN:  What exhibit number is that?
24                     MR. SORSBY:  Exhibit Number 3.
```

1    Q.    Can you do me a favor?  Can you read it into the
2          record for us?
3    A.    "C.O. Gorman had been a provisional supervisor
4          from 4/30/12 until 2/15/13.  He was a provisional
5          supervisor for most of this review period until
6          other officers were promoted from the civil
7          service list and he returned to the rank of
8          officer.  It was a pleasure to have worked with
9          him in the capacity of a supervisor.  I feel he
10         was doing a very good job and made sure that
11         staff had what they needed to get their job done.
12         He answered inmate's questions in a timely
13         manner.  He was firm, fair and consistent.  He
14         didn't overlook officer behavior that violated
15         rules and was not afraid to enforce the rules.
16         He was there to support officers and other
17         supervisors.  He still has a lot to learn, but is
18         making a lot of progress.  C.O. Gorman has been
19         doing a good job since returning to the rank of
20         officer.  He assists with extra details with
21         Sergeant Dunham, when available.  These details
22         include replacing keys and helping with computer
23         issues.  He has a good work ethic and I look
24         forward to working with him in the future.

1          C.O. Gorman was given an oral warning on 11/23/12

2          for not having his auxiliary weapon signed for

3          when he returned."

4    Q.    Now, sergeant -- excuse me -- Provisional

5          Sergeant Gorman, at that time, reported to

6          Sergeant Rankin?

7    A.    I think he reported to Sergeant Rankin when he

8          returned back to an officer.  So I think what

9          Jeff Rankin signed this for is because he

10         returned back to an officer.

11              And it says it was a pleasure to have worked

12         with him in his capacity as a supervisor.  So I

13         think when Jeff -- when Gorman was supervisor and

14         Jeff was a supervisor, he's saying it was a

15         pleasure to work with him.

16   Q.    Do you understand Mr. Rankin was training

17         Mr. Gorman as a provisional sergeant?

18   A.    He may have been.  I don't know.

19   Q.    But again, you had limited interaction with

20         Mr. Gorman, correct?

21   A.    I did.  I never had a problem with him.

22   Q.    All right.  Do you see the date on that, the

23         period for the review?

24   A.    It looks like October 1, 2012 to February 13,

```
 1         2013.
 2    Q.   All right.  I'll take it back from you.  Thank
 3         you.
 4              Do you recall being deposed in a matter of
 5         Ruth Vibert versus Rensselaer County?
 6    A.   Yeah.  I was deposed with Vibert, yeah.
 7    Q.   And do you remember saying at that deposition
 8         that Vibert lost control of the Patricelli-Gorman
 9         situation?
10    A.   I'd have to look at my testimony, if you have a
11         copy of my testimony.
12              MR. SORSBY:  Mark this as an exhibit.
13              (Exhibit 66 marked for identification.)
14    Q.   Exhibit 66, do you see where the blue marker is,
15         so it would be Line 15?
16    A.   Mm-hmm.  Okay.
17    Q.   Could you tell us how she lost control?
18    A.   I think there were a lot of contributing factors.
19         I know at one time she was very tight with
20         Patricelli, they got along very good, and then
21         she got along fairly good with John.  And you
22         know, she might have been not --  she might have
23         let emotions there interfere with some decisions,
24         so I think she was losing control in that sense.
```

```
 1     Q.   Okay.  All right.  I'll take that back from you.

 2               MR. SORSBY:  I'll have this marked as an

 3          exhibit.

 4               (Exhibit 67 marked for identification.)

 5     Q.   All right.  I'm going to hand you Exhibit 67,

 6          starting at Line 15.  Can you start reading that

 7          to us, please?

 8     A.   Let me see what we got here.  Starting at

 9          Line 15?

10     Q.   Yes.

11     A.   Okay.  "I think it was -- well, I guess there

12          were a lot of, again, cliques that come into play

13          there.  I don't know if she actually lost control

14          of it, but it seemed to get sidelined.  I know

15          that she tried to talk to the sheriff several

16          times about that situation.  I saw some

17          frustration on her part as far as the situation.

18          We could not allow violence in the workplace, so

19          we were trying to do whatever we had to do to

20          stop any escalation, I should say."

21     Q.   You can keep reading.

22     A.   You mean on the back here?

23     Q.   Mm-hmm.

24     A.   Okay.  "Patrick Russo by Mr. Keach:  But it got
```

```
 1              to be almost ridiculous.  You know, somebody

 2              walking down the hall and he'll say, oh, he

 3              looked at me and smiled at me, or he's saying,

 4              you know, he gave me a nasty glance or said "good

 5              morning" to me.  You know.  It got ridiculous in

 6              my opinion."

 7    Q.        Now, you just read how it was important to you to

 8              prevent workplace violence?

 9    A.        Right.

10    Q.        And then it said it's ridiculous.  What did you

11              mean by that, people walking down the halls?

12    A.        It was ridiculous, the fact that people would

13              consider somebody giving them a smile or not

14              saying "hello" or walking by them with their head

15              down as workplace violence.  That was kind of

16              like ridiculous to consider that workplace

17              violence.  I mean, if I walk by you and I happen

18              to be in a bad mood, and you say "hello" and I

19              don't say "hello" to you, is that workplace

20              violence?  That's where we were headed.

21    Q.        What people are you talking about when you say

22              "people"?

23    A.        All people.  That's what we were referring to.

24    Q.        Okay.  You said it was getting ridiculous because
```

```
1              people were walking down the hallways and they
2              thought that that was workplace violence, and
3              you're saying that that --
4        A.    It got to be almost ridiculous.  You know,
5              somebody would be walking down the hall and they
6              would say "hello" and he looked at me and smiled
7              at me, or he said, you know, he gave me a nasty
8              glance.
9        Q.    Was that based upon an investigation that you
10             did?
11       A.    Part of it was where John, you didn't have
12             somebody say "hello" or --
13       Q.    I'm sorry.  What --  you did an investigation
14             where there's an allegation where somebody didn't
15             say "hello"?
16       A.    Let's go back.  We need the exhibits for the
17             complaints that John had.
18       Q.    I tell you what --
19       A.    Can we go back to them?
20       Q.    No.
21       A.    I'd like to see those again before I answer.
22       Q.    You don't have to.  I tell you what, your answer
23             speaks for itself.  You've already answered that.
24             We have other questions for you, okay?
```

1    A.   Okay.  Good.

2              MR. SORSBY:  Let's mark this, please.

3              (Exhibit 68 marked for identification.)

4    Q.   All right.  So I'm going to give you what's been

5         marked Exhibit 68.  Now, do you see on Line 9 --

6    A.   Yes.

7    Q.   It says that --  can you go ahead and read from

8         Line 9 down for us?

9    A.   "The question:  When Ms. Vibert, on the evening

10        that Mr. Gorman had brought to her attention

11        about Mr. Patricelli's threats, did she tell you

12        that the sheriff had flipped out on the phone?"

13             "I believe there was a conversation to that

14        effect.  You know."

15             "All right.  What?"

16             "I know it was, I mean, how long ago.  I

17        don't know the exact conversation."

18             "Tell me what you remember?"

19             "I remember her saying that she got into an

20        argument with the sheriff on the phone and he

21        didn't want to bring that into the workplace.  I

22        don't recall at the time she told me she was

23        going to have him go to the police and have a

24        police report filed, but I would have suggested

```
 1              that.  I would have said, "Have a police report
 2              done", but I don't recall, it was so long ago."
 3         Q.   Now, why did the sheriff blow up, in your words?
 4         A.   I think what he was saying is that wasn't --
 5              don't bring the outside -- the outside drama into
 6              the sheriff's office.
 7         Q.   It says there was a disagreement between Vibert
 8              and the sheriff.  Do you recall that?
 9         A.   Yes.  I think she was trying to call him to tell
10              him about the incident where Patricelli had
11              called John, and he didn't want to bring that.
12              He's saying that has nothing to do with the
13              sheriff's office.  Don't bring that into the
14              workplace.
15                   I told her -- and I mean, by looking at
16              this, I seem to say that here.  I one time said
17              to her -- I said, he can go and make a criminal
18              complaint for aggravated harassment, and that's
19              what she advised him to do, to go to the troopers
20              and make a criminal complaint.  I advised her to
21              tell him to do that.  She did tell him to do
22              that, and I'm sure she did advise him.
23         Q.   Now, you believe it's because he didn't want what
24              is, in his mind, an unrelated work incident to be
```

```
1              brought into work; is that what you're saying?

2    A.    That's what I believe the question is.

3    Q.    You don't believe it's because

4          Sergeant Patricelli and Sheriff Mahar were close

5          friends?

6    A.    I mean, I don't think so, because it was going to

7          happen anyway.  So he just didn't want it to be

8          brought into the sheriff's office.

9    Q.    What was going to happen anyway?

10   A.    The complaint.  It was going to happen anyway.

11         If he went to the police, what's the difference?

12         Because Patricelli is the sheriff's friend, if he

13         went to the police, he's still going to be the

14         sheriff's friend.

15   Q.    I'm asking you whether or not you believe the

16         sheriff was upset because there's an allegation

17         that his friend threatened Mr. Gorman, another

18         employee?

19              MR. MARTIN:  Object to the form.

20   A.    Yeah.  I don't know.  I mean, I don't know how to

21         answer it.  I can't answer for the sheriff, but I

22         don't think -- the sheriff had no control over

23         Patricelli, so Patricelli's actions were his own

24         actions.
```

```
 1    Q.   You said he has no control over Patricelli.  He
 2         was his boss.  He has a significant amount of
 3         control, does he not?
 4              MR. MARTIN:  Object to the form.
 5    Q.   What kind of control did the sheriff have over
 6         Anthony Patricelli as his supervisor?
 7    A.   Yeah, but we're talking about Patricelli calling
 8         him at his house.  The sheriff doesn't have -- I
 9         don't want to get into defending the sheriff,
10         Patricelli, anybody here, but what I'm just
11         saying is how much control do you have over a
12         person?  You know.  I'm people down there's boss
13         too, and do I have control over somebody that
14         goes home tonight and happens to shoot their wife
15         or shoot their husband?  I have no control over
16         that.
17    Q.   You read the workplace violence policy for
18         Rennselaer County earlier, and you said it
19         includes violence or allegations of violence
20         outside of work?
21    A.   Yeah.
22    Q.   And so do you not believe that the sheriff has
23         the ability to terminate people that make threats
24         of violence against workers of the sheriff's
```

```
 1              department?
 2       A.     All the way at the opposite end --  I mean, I'm
 3              sure the sheriff has the ability to terminate
 4              somebody.  It's easier said than done.  I don't
 5              think the fact that you say I -- if I had a
 6              problem with you, I could come over there and do
 7              this.  I don't think that's a situation where
 8              somebody should be terminated for that.
 9                  I myself, and this is my opinion, but I
10              don't perceive that as a threat that he says,
11              "I'm going to come over and break your jaw."
12              It's, "If I have a problem with you, I'm going to
13              break your jaw."  If you perceive that as a
14              threat, we have different opinions of a threat.
15              It's not a situation where you terminate somebody
16              for it, and that's my own opinion.
17       Q.     So again, you didn't believe that that was a
18              legitimate threat; is that what I'm
19              understanding?
20       A.     I didn't believe it was a legitimate threat.  If
21              he would have went over there and showed up at
22              the house or something to follow through with a
23              threat like that -- I don't think the fact that
24              you say, if I had a problem with you, I'd let you
```

```
 1            know.  If I had a problem with you, I'd let you
 2            know.  Is that a threat?  I don't think so, in my
 3            opinion.
 4     Q.     It sounds like you understand a threat requires
 5            some type of affirmative action in addition to
 6            it?
 7                 MR. MARTIN:  Object to the form.
 8                 MR. SORSBY:  You can still answer.
 9     A.     What I'm saying is -- here's my thoughts on that.
10            If I said, If I had a problem with you, I'd let
11            you know.  I don't perceive that as a threat.  I
12            mean, maybe you do, and that's why everybody has
13            different opinions.
14                 But getting back to answering your question,
15            I don't think that situation warranted
16            termination, and that's my opinion.
17     Q.     All right.  Do you believe that it was a
18            violation of the county's workplace violence
19            policy?
20                 MR. MARTIN:  Object to the form.
21     A.     It probably was.  It probably could be.
22                 MR. SORSBY:  Since we have been talking
23            about the transcript, I'm going to have the
24            transcript itself marked as an exhibit.
```

1           (Exhibit 69 marked for identification.)

2           MR. SORSBY:  I'm going to take a quick

3     two-minute break and then we'll wrap up.

4           (Whereupon, a brief recess was taken.)

5           MR. SORSBY:  So go ahead and call this for

6     today, 5:27 p.m..  So we finished with

7     thirty-three minutes left.

8           (Whereupon, the Examination concluded at

9     5:27 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1    STATE OF NEW YORK

2    COUNTY OF_____

3

4         I have read the foregoing record of my testimony

5    taken at the time and place noted in the heading hereof

6    and I do hereby acknowledge it to be a true and correct

7    transcript of the same.

8

9

10                               _____

11                               UNDERSHERIFF PATRICK RUSSO

12

13

14   Sworn to before me this

15   _____ day of _____, 2015.

16

17

18   _____

19   Notary Public

20

21

22

23

24
```

1                    C E R T I F I C A T I O N

2

3          I, NORA B. LAMICA, a Shorthand Reporter and

4    Notary Public within and for the State of New York, do

5    hereby CERTIFY that prior to being examined, the witness

6    named in the foregoing deposition was duly sworn to

7    testify the truth, the whole truth, and nothing but the

8    truth.

9          That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter reduced by me to typewritten form and that the

12   same is true, correct, and complete of said proceedings.

13         Before completion of the deposition, review of the

14   transcript was requested.  If requested, any changes made

15   by the deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17         I further certify that I am not interested in the

18   outcome of this matter.

19         Witness my hand this 18th day of November, 2015.

20

21                         ---------------------------

22                         NORA B. LAMICA

23

24