1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF NEW YORK

3            Civil Case No 1:14-cv-434

4    ----------------------------------------------------------

5    JOHN GORMAN,

6                        Plaintiff,

7                 -vs-

8    RENSSELAER COUNTY, SHERIFF JACK MAHAR,
     ANTHONY PATRICELLI, UNDERSHERIFF PATRICK RUSSO,
9    COUNTY HUMAN RESOURCES MANAGER TOM HENDRY,
     COUNTY EXECUTIVE KATHLEEN JIMINO,

10                       Defendants.

11   ----------------------------------------------------------

12          EXAMINATION BEFORE TRIAL of defendant, SHERIFF

13   JACK MAHAR, on the 23rd day of June, 2016, at the Law

14   Office of Patrick Sorsby, PLLC, 1568 Central Avenue,

15   Albany, New York, commencing at 10:06 a.m., before SARAH

16   B. DLUGOLECKI, Court Reporter and Notary Public in and

17   for the State of New York

18

19

20

21

22

23

24

```
 1    APPEARANCES:

 2          Attorney for Plaintiff:

 3                LAW OFFICE OF PATRICK SORSBY, PLLC
                  Attorney at Law
 4                1568 Central Avenue, First Floor
                  Albany, New York 12205
 5                (518) 456-4529

 6                      BY:  PATRICK SORSBY, ESQ.
                             Sorsbylaw@gmail.com
 7

 8          Attorneys for Defendants:

 9                MARTIN & RAYHILL, P.C.
                  Attorneys at Law
10                421 Broad Street, Suite 10
                  Utica, New York 13501
11                (315) 507-3765

12                      BY:  KEVIN G. MARTIN, ESQ.
                             Kmartin@martinrayhill.com
13

14    Also present:

15    John Gorman

16

17

18

19

20

21

22

23

24
```

S T I P U L A T I O N S

1

2            IT IS HEREBY STIPULATED AND AGREED, by and

3        Between the attorneys for the respective parties

4    hereto, that filing, sealing, and certifications are

5    hereby waived;

6            IT IS FURTHER STIPULATED AND AGREED, that all

7    objections, except as to the form of the question, shall

8    be reserved to the time of trial;

9            IT IS FURTHER STIPULATED AND AGREED that the

10   within Deposition may be signed before any Notary Public

11   with the same force and effect as though subscribed and

12   sworn to before this Court.

13

14                    *** *** ***

15

16

17

18

19

20

21

22

23

24

```
1                      SHERIFF JACK MAHAR,

2              (having been first duly sworn by the Notary

3         Public, was examined and testified as follows:)

4         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5   BY MR. SORSBY:

6   Q.    Good morning.  How are you doing today?

7   A.    Doing well, thanks.

8   Q.    Have you been to a deposition before, Mr. Mahar?

9   A.    Yes, I have.

10  Q.    The instructions I'm about to give you are

11        probably very familiar, then.

12              I'm going to ask you a series of questions

13        in regard to this case.  And my instructions to

14        you are that you answer the questions to the best

15        of your ability and truthfully, and that you do

16        verbalize your answer.  The stenographer can't

17        record the nodding of your head, whether it be

18        yes or no, so you have to verbalize your answer.

19        Do you understand that?

20  A.    Yes.

21  Q.    And to the extent that you don't understand a

22        question, you can ask me to explain the question.

23        And typically -- well, in all of the depositions

24        in Federal Court, the parties agree in advance
```

1           that the federal rules of civil procedure will

2           apply.  What that means is that your attorney can

3           object to a form of a question, to preserve it

4           for appeal or at trial, but speaking objections,

5           in other words, as to the relevancy of the

6           question are weighed until trial.

7                So you may hear your attorney object to the

8           form of the question, and that's okay.  You will

9           still have to answer the question.  To the

10          extent, of course, that your attorney objects on

11          the grounds of attorney/client privilege, you

12          will not be answering that question if there's a

13          legitimate attorney/client privilege question

14          that I have asked.

15               Do you have any questions as to these

16          instructions?

17     A.   No.

18     Q.   Can you tell us what year you became the sheriff

19          of Rensselaer County?

20     A.   2004.

21     Q.   Where did you work before that?

22     A.   The City of Troy.

23     Q.   What capacity?

24     A.   I was a police officer.

```
1    Q.   How long had you worked there?

2    A.   Approximately, 28 years.

3    Q.   As a police officer, did you ever attain the rank

4         of investigator?

5    A.   Yes.

6    Q.   And what was the last position you had with the

7         Troy Police Department?

8    A.   I was the detective captain.

9    Q.   Is that a supervisory position?

10   A.   Yes, it is.

11   Q.   How many people did you supervise?

12   A.   There, roughly 19.

13   Q.   And in that role, did you take any supervisory

14        courses?

15   A.   In that role specifically?

16   Q.   Yes.

17   A.   No, not in that role, no.

18   Q.   Tell us about your educational background.

19   A.   I have a bachelor's degree.

20   Q.   In what?

21   A.   Public administration.

22   Q.   When did you acquire that?

23   A.   Approximately -- I'm trying to remember.  About

24        1995.
```

```
 1    Q.   Can you tell us who the sheriff was before you?

 2    A.   Sheriff Keating.

 3    Q.   Just want to talk to you briefly about the chain

 4         of command at the sheriff's department, and I'm

 5         talking about during the time frame of 2012/2013.

 6         Do you understand?

 7    A.   Yes.

 8    Q.   Let's start with the basic position and work our

 9         way up.

10              You have corrections officers?

11    A.   Yes.

12    Q.   Who do the corrections officers report to?

13    A.   A sergeant.

14    Q.   And then who do the sergeants report to?

15    A.   A lieutenant.

16    Q.   Who does the lieutenant report to?

17    A.   Captain.

18    Q.   Who does the captain report to?

19    A.   It depends at that time.  It may not have been --

20         it would be either a chief superintendent rank,

21         or if it wasn't one, it would go to the

22         undersheriff.

23    Q.   Now, unless I instruct you otherwise, we're

24         talking about -- the relevant time frame we're
```

```
 1            talking about today is 2012 to 2013, 2014 time

 2            frame when Mr. Gorman was working at the

 3            sheriff's department.  And so do you understand

 4            that that's the time frame we're talking about?

 5    A.    Yes.

 6    Q.    And we were just talking about the chain of

 7            command.  And can you tell me where Chief Vibert

 8            would have fallen into that chain of command?

 9    A.    She would have been the chief of corrections her

10            title was.

11    Q.    And where does that fall between --

12    A.    Above the captain.

13    Q.    And she would report to the undersheriff?

14    A.    Correct.

15    Q.    Now, you have watch commanders as well during

16            that time frame?

17    A.    Corrections officers, some of them are watch

18            commanders on any given day.

19    Q.    That's not necessarily a rank; isn't that true?

20    A.    Well, they would be the rank of sergeant.

21    Q.    Now, can you tell us -- the jail, it's broken up

22            into wings; is that true?

23    A.    Yes.

24    Q.    There's an east wing.  Why don't you -- do me a
```

```
 1              favor.  Tell me what wings there are, were.
 2        A.    Well, I don't know what they call them now.
 3              There's east side, the west side, and then the
 4              new addition, which I believe they call it the
 5              north side.
 6        Q.    And who would have been in charge of the east
 7              wing?
 8        A.    I have no idea at any given day that would be.
 9              Whoever was the watch commander or the supervisor
10              at that given day.  You'd have to look at a
11              particular schedule.
12        Q.    Were there certain sergeants assigned to
13              particular wings?
14        A.    Sergeants were assigned.  I'm not sure exactly
15              how they assign a sergeant.  I don't know if they
16              did it like ownerships -- what they call, quote,
17              ownerships, as they did with the COs.  And they
18              rotated those or they just assigned them on a
19              daily basis.  I'm really not quite sure of that.
20              I never really got involved with that.
21        Q.    Who would have been involved in that?
22        A.    Probably the lieutenant or captain or somebody.
23        Q.    Now, do you know who Anthony Patricelli is?
24        A.    Yes.
```

1      Q.   And when you became sheriff, what rank did he

2           have at that time?

3      A.   He was a sergeant.

4      Q.   And at some point he became a master sergeant; is

5           that true?

6      A.   That is correct.

7      Q.   And he became a -- well, strike that.

8                A master sergeant -- I will strike that, as

9           well.

10               We just discussed the chain of command and

11          we didn't mention a master sergeant.

12               Where does a master sergeant fall in the

13          chain of command?

14     A.   He would be -- Civil Service wise is one

15          question, administratively is another.

16     Q.   Well, let's talk with administratively.

17     A.   He would be above a sergeant.

18     Q.   How about above a lieutenant?

19     A.   No.

20     Q.   Now, what about from a Civil Service standpoint?

21     A.   He'd carry a Civil Service rank of sergeant.

22     Q.   Now, when comparing a sergeant to master

23          sergeant, what distinguishes the master sergeant

24          from a sergeant?

```
 1     A.   Higher rank.

 2     Q.   Perhaps you can explain in terms of

 3          responsibilities between sergeant and master

 4          sergeant.  What's the difference?

 5     A.   For this, it was a technical position

 6          specifically given the authority, because he was

 7          overseeing security of the facility.

 8     Q.   When you say the facility, you mean the entire

 9          jail?

10     A.   The jail, correct.

11     Q.   So he had -- in addition to this added

12          responsibility, did he have additional benefits

13          as a master sergeant compared to a sergeant?

14     A.   You have to be more specific.  I don't know what

15          you mean.

16     Q.   Did he attain a more favorable schedule than a

17          sergeant?

18     A.   I don't know how you would define favorable.

19     Q.   Did he have weekends off?

20     A.   Yes.  Doesn't mean he didn't work weekends, he

21          had weekends scheduled off.

22     Q.   You answered my question.  Thank you.

23              Now, position of master sergeant, that's an

24          appointed position; isn't that true?
```

```
 1    A.   Correct.

 2    Q.   And you appointed Master Sergeant Patricelli to

 3         his position?

 4    A.   Correct.

 5    Q.   Do you recall when you did that?

 6    A.   I really don't recall what year that was.

 7    Q.   Did you do it as soon as you got into the

 8         sheriff's position?

 9    A.   I don't believe it was as soon as I got in.  I

10         believe it was a short time later.  Again, I'm

11         not sure the exact year.

12    Q.   Now, before you became a sheriff, you knew you

13         had -- before you became a sheriff, you had met

14         Anthony Patricelli; isn't that true?

15    A.   That is correct.

16    Q.   And you knew him through the Troy Police

17         Department; isn't that also true?

18    A.   That is correct.

19               MR. MARTIN:  Your voice is a little

20         raspy this morning.

21               THE WITNESS:  It's in my throat now.

22         It's a stomach -- the histamines in your

23         stomach.

24               MR. SORSBY:  We should go off.  I don't
```

```
1                     mean to -- we should go off the record if

2                     we're talking about an ailment you have.  You

3                     probably don't want that all over the world.

4        BY MR. SORSBY:

5           Q.   Now, what was Patricelli's role at the Troy

6                Police Department when you were there?

7           A.   He didn't have a role at the Troy Police

8                Department, per se.  He never worked with the

9                Troy Police Department.

10          Q.   Did he work with the Troy Police Department?

11          A.   He -- the role was -- we did a lot of gang

12               investigations.  And part of the concepts in law

13               enforcement, especially in the community policing

14               era that began, was to establish a relationship

15               with the correctional facilities and to utilize

16               their knowledge of people at the jail who

17               understood and worked with the gangs that would

18               be able to assist in those investigations.

19          Q.   Is that the role he played?

20          A.   That's the role he played.

21          Q.   Now, before Master Sergeant Patricelli took over

22               the security of the jail, who was responsible for

23               the security of the jail?

24          A.   I have no idea.
```

```
 1   Q.   So you testified earlier that when you came in,
 2        he was a sergeant, and then later you appointed
 3        him as a master sergeant.  So I'm asking who was
 4        in charge of security in that time frame?
 5   A.   That was Patricelli's role as a sergeant.
 6   Q.   So you understand that he was in charge of
 7        security when you arrived?
 8   A.   Correct.
 9   Q.   So if he was in charge of security at that time,
10        why is it that you gave him the role of master
11        sergeant if he was already doing security?
12   A.   His duties required him to make decisions
13        regarding prisoners in the facility that were
14        there that might have been related to gangs and
15        such like that.  And due to the fact that he was
16        equal rank with the sergeants, a lot of the
17        sergeant wouldn't really give him the credence
18        that he needed to be able to do what he did.  He
19        came to us explaining the situation.  We spoke
20        with it at the command staff, and we decided to
21        make a rank of master sergeant.
22             It's not uncommon in the sheriff's office,
23        they've had it before.  And we made him the rank
24        of master sergeant with that ability to be able
```

```
1              to do what he needed relative to his job.

2      Q.      So just so I understand, by making him the master

3              sergeant, it put him above the other sergeants so

4              that he can more effectively do his job, as far

5              as monitoring and enforcing security at the jail?

6      A.      Administratively, yes.

7      Q.      And so to accomplish that goal, did he acquire

8              more responsibility and ability to monitor the

9              security at the jail?

10     A.      Yes, he did.

11     Q.      Can you describe?

12     A.      His job was to see to it, of course, gangs and

13             looking for problems inside the workplace,

14             identify prisoners who are potential problems for

15             gangs inside the jail, drugs inside the jail,

16             things like that, weapons inside the jail, and

17             monitor all of that stuff.  That was his role

18             from the beginning.

19                  He needed the tools to be able to accomplish

20             that task, and also he would be the one who

21             monitored all the phones, the phone system.  He

22             worked with that, the inmate phones and all of

23             that.

24                  The inmate phones were then -- he would work
```

```
 1              with the District Attorney's office or other law

 2              enforcement agencies as per request if they

 3              needed information and things like that.

 4      Q.    Would he also have access to all of the video

 5              cameras as well to achieve those goals?

 6      A.    It wouldn't have been until after we completed

 7              the construction of the expansion of the jail

 8              facility.  I'm not exactly sure what year it

 9              opened again.  My guess it was somewhere in

10              November.  I don't know if it was '10 or '11.  I

11              just don't remember.  And when we went from just

12              a few cameras in the jail that weren't really

13              that well to a significant number, and he was

14              given authority to look at those along with the

15              lieutenant in internal affairs.

16      Q.    And so that role as a master sergeant being in

17              charge of security, he would have unrestricted

18              access to the Crutchin (phonetic) Facility; isn't

19              that true?

20      A.    I don't know what you mean by unrestricted.

21      Q.    So are you aware of any restrictions to his

22              access to locations at the jail?

23      A.    No.  He would have the ability to monitor or pull

24              the data that they would need based on complaints
```

```
 1              and stuff like that off the cameras, yes.

 2     Q.    Now, can you tell us what, if any, documents you

 3              may have reviewed or information you may have

 4              looked at when determining that Anthony

 5              Patricelli was suited for the position of master

 6              sergeant?

 7     A.    I didn't review any documents.  I reviewed -- it

 8              came from my prior knowledge of his ability to

 9              work with law enforcement and from the

10              recommendations of the command staff.  That's how

11              it was made the decision.  There was no documents

12              needed to be reviewed.

13     Q.    Now, we will come back to that.  I just want to

14              understand a little bit more about what your

15              responsibilities as sheriff include.  Do you

16              understand?

17     A.    Not really, but go ahead.

18     Q.    Well, as the sheriff, you're responsible for

19              everything that happens at the jail; isn't that

20              true?

21     A.    To a point, I guess.  The buck stops at the top,

22              yes.

23     Q.    You're the highest position at the sheriff's

24              department; isn't that true?
```

1    A.   That is correct.

2    Q.   And so you have supervisory responsibility for

3         everything that happens at the jail?

4    A.   I don't know if that's a correct statement.

5    Q.   Can you tell me who else --

6    A.   I have accountability.  I don't have supervisory

7         responsibility.  There's people who are

8         responsible to do their jobs.

9    Q.   But, as you said, you have the ultimate

10        accountability, you would agree?

11   A.   Yes.

12   Q.   So in your capacity as the sheriff, did you do

13        quarterly reviews or annual reviews of the

14        corrections officers, work reviews?

15   A.   No.  That was done by supervisory and command

16        staff.

17   Q.   And now you were also involved in selecting

18        persons from the Civil Service list for

19        positions; isn't that true?

20   A.   I'm the one who made the appointments.

21   Q.   And so as part of that process of making an

22        appointment, you would look at the person's past

23        employment record; isn't that true?

24   A.   I never did it.  I had -- it depends where they

```
 1              were coming from.  If they were correctional
 2              staff, if they were highway patrol, whatever, the
 3              undersheriff would oversee the interview process
 4              with a ranking officer inside and they would do
 5              the interviews and stuff.  And they would make
 6              recommendations to me.
 7      Q.     And those would be oral recommendations?
 8      A.     Oral.
 9      Q.     And so you would base a decision to hire somebody
10             just based upon an oral recommendation or would
11             you look at other documents?
12      A.     Define what you mean by hire.
13      Q.     Okay.  Your recommendation to hire somebody, that
14             would be based upon -- solely upon an oral
15             recommendation of the undersheriff?
16      A.     Based upon their investigation and they told me
17             who would be the best appointments, who they
18             believe would be the best to meet the position,
19             yes.
20      Q.     And you're saying -- I just want to clarify.  You
21             would not also look at their past employment
22             record if they were corrections officers?
23      A.     No.  You know, we would know.  They take a Civil
24             Service exam, they score on the exam, we look at
```

```
 1              how they are working in the facility.  They're

 2              interviewed by the command staff.  If the command

 3              staff has issues, they would tell me.  But, no, I

 4              did not look personally at them, no.  That wasn't

 5              necessary.

 6        Q.    Now, are you aware of an instant involving

 7              Anthony Patricelli where he brought a gun to a

 8              bar and pointed at the head of another staff

 9              member of the sheriff's department?

10        A.    No.  Well, I shouldn't say that.  To answer that

11              correctly, I became aware of that during a

12              deposition that it was brought to my attention.

13                   So am I aware of it, yes.  When I became

14              aware of it, several months ago.

15        Q.    And so before that deposition you just referred

16              to, had you been aware of that?

17        A.    I'm sorry.

18        Q.    You testified that you became aware of that for

19              the first time at a deposition?

20        A.    That is correct.

21        Q.    And I'm asking you now were you aware -- did you

22              have any knowledge of that incident before that

23              time?

24        A.    I became aware of it during a deposition several
```

```
 1              months ago.

 2      Q.   I understand that, but was that the first time

 3              you became aware of it.

 4      A.   That's the first time I became aware of it.

 5      Q.   That's what I'm asking.  Thanks for answering.

 6              Now, before you appointed Mr. Patricelli as

 7              the master --

 8      A.   I'd like to clarify that.

 9      Q.   What would you like to clarify?

10      A.   I became aware of an accident at a bar with a

11              weapon.  I don't know of what the incident

12              entailed, whether anybody pointed.  I don't want

13              any miscommunication here.  Whether I don't know

14              if Patricelli pointed a gun, I don't know what he

15              was doing.  I have no idea of that.  All I know

16              there was an incident and it was investigated by

17              the sheriff's office --

18      Q.   All right.

19      A.   -- at the time.  And I wasn't there at the

20              sheriff's office.  I think that's important to

21              clarify.

22      Q.   No.  I'm glad you cleared that up.

23              So when did you become aware of that, even

24              though you don't know the exact allegations?
```

```
1     A.    Again, I became aware of that during a
2           deposition.
3     Q.    Okay.  You were just clarifying what you became
4           aware of; is that correct?
5     A.    Correct.
6     Q.    I thought you were indicating that you had known
7           about that before.
8     A.    I never knew about that.
9     Q.    Now, when you appointed Master Sergeant
10          Patricelli, did you at all look at his prior work
11          records at that point?
12    A.    Wasn't necessary, no.
13    Q.    Why not?
14    A.    His recommendation came from the command staff
15          and the others.  And his job -- what he was doing
16          and what he was asked to do, he was doing an
17          exceptional job at what that was.  He was
18          probably, in the Capital Region, the number one
19          person who can understand the gang issues that
20          were going on within Rensselaer County.  He knew
21          every party involved.
22    Q.    How could you know that he was the best person
23          for that job without looking at his job record?
24    A.    We saw his work day in and day out.  It wasn't
```

```
 1              necessary to go back and look at his history.
 2                      MR. SORSBY:  Let's go off the record for
 3              a second.
 4                      (Off the record.)
 5                      MR. SORSBY:  Back on the record.
 6      BY MR SORSBY:
 7      Q.    I'm going to show you what's been marked
 8            previously in this case as Exhibit 52.  These
 9            documents were provided by the defendants in this
10            matter.  Take a brief look at that for me.
11      A.    Okay.
12      Q.    Have you seen this document before?
13      A.    No.
14      Q.    And I'm just going to make sure, just for your
15            benefit, did you see this at that exhibit you
16            were talking about?
17      A.    What exhibit?
18      Q.    Sorry.  Deposition.
19      A.    I don't recall that.  I mean, I don't know
20            whether it was showed to me or not.  I don't
21            remember, but I know it was brought to my
22            attention.
23      Q.    I'm reading from Exhibit 52.  It's dated March
24            14th, 1994.  This is from the county judge,
```

```
 1              County of Rensselaer, Judge McGrath.  Do you know

 2              who that is?

 3        A.    Yes, I know Judge McGrath.

 4        Q.    "Dear Mr. Patricelli, I have been notified by the

 5              sheriff's department about an internal

 6              investigation against you concerning an incident

 7              that occurred on February 28th, 1994.

 8                    "After reviewing all the witness statements,

 9              I'm hereby surrendering your pistol permit,

10              effective immediately.

11                    "The Rensselaer County Sheriff's Department

12              is hereby directed to confiscate your pistol

13              permit and any and all of the handguns in your

14              possession.

15                    "Signed, Judge McGrath."

16                    Now, would this have been put in his

17              personnel file?

18        A.    Probably.

19        Q.    You said probably.  Would it have been county

20              policy to put that into his personnel file?

21                          MR. MARTIN:  At the time that he was the

22                    sheriff?

23                          MR. SORSBY:  Correct.

24        A.    At the time I was sheriff or 1994?
```

```
 1    Q.   I'm talking about the time you were sheriff.

 2    A.   It would have been put in his folder.

 3    Q.   Now, if the sheriff's department receives a

 4         criminal complaint against one of its staff

 5         members, is that to be put into the personnel

 6         file during your time frame?

 7    A.   No.  That's not a correct statement.

 8    Q.   What are you to do with a criminal complaint?

 9    A.   It would become an internal affairs

10         investigation.

11    Q.   It wouldn't ultimately end up in the personnel

12         file?

13    A.   It would probably end up in an internal affairs

14         file.

15    Q.   Okay.

16    A.   And I can't answer what they did back in 1994.

17    Q.   Okay.  I'm going to show you what's been marked

18         as Exhibit 53.  You see where at the top it says

19         "report a personnel change"?

20    A.   Yes, I see it.

21    Q.   So I should tell you that these documents were

22         provided by your attorney in response to one of

23         our discovery requests for Mr. Patricelli's

24         personnel file.
```

1   A.   Sure.

2   Q.   So they were in his personnel file as provided by

3        your attorney.

4             So my question to you is:  You said that you

5        would not look at his personnel file, but here we

6        see that there was a criminal complaint filed

7        against him for misuse of his firearms.  Wouldn't

8        that have been important to know?

9   A.   I think it would have been important to know if

10       it was relevant at the time.  Also, looking at

11       the punishment there, I don't know what the

12       outcome and I don't even know what the incident

13       is.  I still, to this day, don't know what it

14       was.

15            Apparently, he was punished and he paid his

16       punishment and everything else was reinstated.

17       And for ten years after that, he was doing his

18       job and doing it sufficiently and well.

19   Q.   Okay.  Now, Mr. Patricelli was here a couple days

20       ago for a deposition, and he said in form or

21       substance that he went to his house and got a gun

22       and that he pointed it at the head of another

23       staff member at the sheriff's department.  Okay?

24            Now, if you had known that at the time,

```
1              would you have appointed him master sergeant?

2                        MR. MARTIN:  Object to the form of the

3                  question.  You can answer.

4      A.    I don't know what I would have done.  It appears

5              to me that -- again, I had no idea of this,

6              number one.  Number two is I don't know what the

7              outcomes were.  Apparently, there was some type

8              of resolution of the issue.  Again, and ten years

9              later.  I can't answer that question to you.  If

10             you are asking me -- I have no idea what I would

11             have done.  And it was something that was 10

12             years ago.  So this happened 20 years ago.

13     Q.    I'm asking you a hypothetical, Mr. Mahar.  I'm

14             asking you if you know that a person your

15             appointing as a provisional sergeant has been

16             charged with pointing a gun at somebody else's

17             head, would you still hire them as a provisional

18             sergeant?

19                        MR. MARTIN:  Object to the form of the

20                 question.  Still answer.

21     A.    Again, I can't answer that hypothetical.  I don't

22             know that answer.  I don't know what I would do

23             because I don't have all the facts.

24                 Apparently, Sheriff Keating did not have an
```

```
 1              issue with it.  Because Sheriff Keating, who was

 2              the sheriff at the time, apparently had Sergeant

 3              Patricelli in the position, that when I took

 4              over, he was doing it.  So I don't think he had

 5              an issue with it, and why would I have an issue

 6              with it?

 7      Q.      Well, I'm asking if that was determinative in

 8              appointing him as a provisional sergeant?

 9      A.      The answer was, no, it was based on his work and

10              the recommendations of the staff.

11      Q.      You have answered my question.

12                   Can you tell us specifically who Master

13              Sergeant Patricelli reported to?

14      A.      I'm confused of the question.

15      Q.      Who did Master Sergeant Patricelli report to?

16      A.      Any superior officer.

17      Q.      He didn't have a specific person that he reported

18              to?

19      A.      Basically, he would come under whoever would be

20              in charge of the shift at the time.  And the way

21              it had changed a couple of times, but more than

22              likely, the commander that was in charge of the

23              shift in which he worked, which is predominantly

24              the B-line shift.
```

```
 1    Q.    I'm going to come back to the chain of command in

 2          just a little bit.

 3                I just want to talk to you a little bit

 4          about your -- can you tell us a little bit about

 5          your relationship with Anthony outside of work?

 6    A.    We were friends.  We had some common interests.

 7          Like, we like to ride motorcycles and things like

 8          that, and we would go out and ride together and

 9          things like that.  And that's pretty much it.  He

10          was a friend of mine.

11    Q.    And he visited your home several times?

12    A.    Several times, yes.

13    Q.    And you visited his home a couple times?

14    A.    Maybe twice.

15    Q.    And did he go to your vacation home ever, do you

16          know?

17    A.    Never.  I don't have a vacation home.  I never

18          had a vacation home, so --

19    Q.    Then he wouldn't have gone to it?

20    A.    Right.

21    Q.    And you guys would talk about things outside of

22          work while you're at work, maybe on your breaks;

23          is that true?

24    A.    No, that's not true.  I mean, I shouldn't say
```

```
 1              that.  On my breaks, he would come over and see

 2              me, but it had nothing to do with talking about

 3              what's going on outside of work.

 4      Q.   So when would you talk to him about stuff not

 5              related to work, outside of work?

 6      A.   Outside of work.

 7      Q.   So when he did come to see you, it was about

 8              work-related matters?

 9      A.   Mostly.

10      Q.   Well, what was the other part?

11      A.   Like anybody else who was walking by, they might

12              stop and say, "Hello.  How are things going?"

13              Probably 90 percent of the facility.

14      Q.   Do you know if Mr. Patricelli went to one of your

15              campaign fundraisers?

16      A.   He may have.  He didn't get involved much with

17              it.  He may have come to one or two, but he

18              didn't do much with it.  I think he come out once

19              or twice, but he stayed low on that because he

20              was doing other things.

21      Q.   Did you guys ever take, like, overnight trips

22              somewhere to see, like, a race or anything?

23      A.   Never took an overnight trip with him.

24      Q.   Now, you had said that you would speak with
```

```
 1              Patricelli about work-related events.  What did
 2              those discussions include, generally?
 3    A.   When?
 4    Q.   Well, again, we are talking about the time frame
 5              of October 2012 through 2013.
 6    A.   Can I get a clarification on time?
 7    Q.   Sure.
 8                   MR. MARTIN:  Well, can we go off the
 9              record for a second?
10                   MR. SORSBY:  Sure.
11              (Off the record.)
12                   MR. MARTIN:  Back on the record.  And do
13              you know what the question is?  He asked you
14              generally what you would talk about at work
15              with Patricelli. (Directed to the witness)
16                   THE WITNESS:  Most of the stuff is way
17              back probably around 2010 and stuff.  We
18              started developing information through
19              Sergeant Patricelli, Lieutenant Karam, and
20              some other people regarding COs involved in
21              drug trade, patronizing prostitutes, drugs in
22              and out of the jail and some other things.
23              And they started a confidential internal
24              investigation on that.
```

```
 1              It was very difficult how we had to work

 2         with this.  The people involved, some of them

 3         were related to people in the Troy Police

 4         Department, some were related to people in

 5         the District Attorney's Office.  There was a

 6         whole -- very difficult process, so we had to

 7         be very careful in who had access to the

 8         information and the investigation.

 9              In order for me to be able to accomplish

10         this, I spoke with Patricelli and Karam.  I

11         had them begin a small investigation to

12         gather evidence that I needed, took that

13         evidence that we had and I met with the

14         superintendent of the state police at the

15         time.

16              I met with the superintendent, explained

17         to him our situation.  He concurred and said

18         it's a big issue, and he would allow his

19         organization to help us.

20              He set me up to meet with the State

21         Police Special Investigations Unit.  I met

22         with the State Police Special Investigations

23         Unit and they opened up a case.

24              The case was Patricelli was the liaison,
```

```
1              and Karam was the liaison between their
2              organization and our organization for this
3              investigation.  And over the last -- that
4              investigation lasted several years, way
5              beyond what I would liked to have seen.  It
6              was a federal investigation.
7    Q.   And it was going on from 2012/2013?
8    A.   Just finished in '15 and '16.  And he would
9              report information to me on that.
10             After I met with the state police and all
11             that, I informed the undersheriff of what we were
12             doing.  Up until that time, he didn't know,
13             nobody knew.  We didn't want anybody knowing what
14             was going on.  And at that time, it was kept
15             quiet outside of our organization.  And they were
16             to report directly to myself, or if I was
17             unavailable, the undersheriff, the results of
18             that, where we were going with that because of
19             what was going on with the complaint.
20   Q.   Now, as part of that, did Patricelli have access
21             to all of the cameras in the jail as part of that
22             investigation?
23   A.   He would have had the ability to review that
24             along with the lieutenant, yes.
```

```
 1    Q.   Do you know if he had access to all the cameras

 2         in the jail?

 3    A.   I don't know what he specifically -- I didn't --

 4         this wasn't where Jack Mahar stood next to

 5         Patricelli all day long and watched what he did.

 6         I knew he was -- well, he was gathering

 7         information for that along with the lieutenant,

 8         and based on information that the state police

 9         requested from them or other information they

10         gave to them.

11    Q.   Now, a couple days ago when Patricelli was here,

12         he testified, in form or substance, that you had

13         discussions about staff problems from the

14         standpoint of gates being left open, people

15         smoking outside, people taking long breaks.

16    A.   That was not only to him being a supervisor, but

17         to all the command staff.  That was told to all

18         of them because they were very lax in a lot of

19         those things.  And that was addressed for all of

20         them to address the problem, and sergeant

21         Patricelli one of them.

22    Q.   He gave the impression that you wanted him to

23         look into the matter only; is that true?

24    A.   That would be a totally false representation or
```

1        misinterpretation.  I was on the command staff

2        constantly for that, and I had a big problem with

3        my command staff because of that.  They weren't

4        addressing those issues.  And you can ask every

5        one of them, they will tell you that.  So I

6        disagree with that statement.

7    Q.  Did you have a private conversation with him in

8        regard to those issues; leaving the gate open,

9        smoking outside, taking excessive breaks?

10   A.  I may have over the years talked about things

11       like that.  I don't remember specifically for

12       that specific purpose.  But as his supervisor, I

13       may very well said, "Hey, you're responsible,

14       too, to see to it that this is going on, just not

15       the commanders and all of that."

16           It's funny in an organization how everybody

17       wants somebody to do something about the problem

18       but nobody wants to take the problem at hand and

19       do it themselves.  They always push it off to

20       somebody else.

21           And I remember having a conversation with

22       not only Patricelli but other ones, both in a

23       meeting scheduled and also individually with all

24       of those people over things like that.

```
 1     Q.   Did he report back to you in terms of what he was
 2          doing to enforce those or resolve those issues?
 3     A.   I don't remember specifically.  I mean, he may
 4          have said they're taking breaks and stuff.  I
 5          don't remember.  But that stuff would have been
 6          handled.  I told him to handle it at the level in
 7          which it was happening, the shift level, the
 8          supervisors or the lieutenants.
 9     Q.   And from time to time you would also talk to him
10          about other staff issues if the need arose; is
11          that true?
12     A.   What do you mean?
13     Q.   Well, we just covered three types of staff
14          issues, right; leaving the gate open, smoking,
15          extended breaks, but you would also talk to him
16          about other staff issues that may be a problem at
17          the jail?
18     A.   I don't know what you mean.  I really don't.  I'm
19          confused in what you're asking for.
20     Q.   I'm asking you specifically, other than the three
21          issues we just discussed, smoking, taking
22          excessive breaks, leaving gates open, what other
23          staff issues did you discuss with Mr. Patricelli?
24     A.   I don't recall.  I don't know.
```

```
 1    Q.   Do you recall -- you may not recall what those
 2         issues were.  Do you recall talking about other
 3         staff issues?
 4    A.   I don't recall because I talked to so many people
 5         about staff issues, everybody, a lot of
 6         supervisors.  I talked to a lot of command staff.
 7         I just don't recall.
 8    Q.   Now, Mr. Patricelli would come to your office
 9         every week; isn't that true?
10    A.   I don't know if he would come every week.  He'd
11         come -- he would come in -- when he was -- he
12         always did rounds of the jail, always walked
13         around.  And when he walked by your office, he
14         may stop by and say hello, or if he had something
15         specific to tell me regarding what they were
16         looking into with the state police and such, they
17         would tell me.  But beyond that, it was hit or
18         miss during the day.  I was busy with many
19         things.
20    Q.   Did there come a time that he told you that he
21         was directing cameras to monitor people taking
22         breaks?
23    A.   No, I don't remember that at all.
24              MR. SORSBY:  Just give me a quick break.
```

```
 1                         (Off the record.)

 2                    MR. SORSBY:  Back on the record.

 3    BY MR. SORSBY:

 4        Q.   Do you know who David Higgitt is?

 5        A.   He's a sergeant.

 6        Q.   Did there come a time when there was a problem

 7             with him taking an excessive break; isn't that

 8             true?

 9        A.   I don't know.  Maybe yes, maybe no.  I don't

10             know.

11        Q.   Did there come a time -- do you recall having a

12             conversation with Mr. Patricelli about Sergeant

13             Higgitt?

14        A.   Again, I don't recall the incident, so I don't

15             recall the conversation.  Maybe he did, maybe he

16             didn't.  I don't know.

17        Q.   So in regard to the state police investigation we

18             were talking about on that issue, did Patricelli

19             report directly to you?

20        A.   Well, again, it depended.  He was working with

21             the lieutenant.  The lieutenant --

22        Q.   Lieutenant Karam?

23        A.   Yes.  Because it was internal affairs.  And also

24             for security of the facility, Patricelli was
```

```
 1              involved.  Most of that was with them.  Whenever
 2              they had something that might affect something,
 3              they just informed me of what the state police
 4              were asking and what they were doing.
 5     Q.       This investigation was spearheaded by you
 6              initially, though; isn't that true?
 7     A.       That's not a true statement at all.
 8     Q.       Who came up with the idea of this investigation?
 9     A.       I believe it was Karam.  I think Karam initiated
10              the investigation, and possibly Patricelli both
11              around the same time over information that they
12              were receiving about drugs and such.  And that
13              was corroborated by the county court judge
14              complaining about drug testing going on in the
15              facility and stuff, and the incident where they
16              saw drug -- catching people trying to move drugs
17              into the facility and stuff like that.  It was
18              appropriate to investigate all that.
19     Q.       And, now, did Master Sergeant Patricelli follow
20              orders from Chief Vibert?
21     A.       He would have to follow orders from Chief Vibert,
22              yes.
23     Q.       As per the chain of command?
24     A.       As per the chain of command.
```

1    Q.    Okay.

2    A.    Except if it was involved specifically into an

3          internal affairs investigation.  That would be

4          confidential at the time.  I informed her

5          personally of that, and I had the undersheriff

6          speak to her regarding that.  And Patricelli and

7          the lieutenant were all informed that they have

8          to follow her directions on routine,

9          administrative matters, except when it came to

10         the internal affairs confidential investigation.

11         That wasn't to be outside of what was going on so

12         that I can make sure we didn't compromise the

13         integrity of the investigation.

14   Q.    Because who knows, Vibert could have been

15         included.  I'm not saying she was, but she could

16         have been included in that investigation, so they

17         needed to remain neutral from the chain of

18         command; is that true?

19   A.    No information -- to minimize the amount of

20         leakage of what was going on, the less people

21         that know, the better off you are.

22   Q.    And so I just want to know the parameters of that

23         investigation as you knew it.  Basically, anybody

24         employed at the jail could be investigated,

```
 1              right, because the concern was drugs and other

 2              things coming in through correctional officers;

 3              isn't that true?

 4                   It was an investigation of the jail; isn't

 5              that true?

 6       A.     It was an investigation of specific people where

 7              the complaint was; however, on any given day,

 8              it's a responsibility of every correctional

 9              officer and every supervisor to maintain

10              diligence in those areas.  So they had a specific

11              investigation based on a complaint of specific

12              people we were told.

13       Q.     But that investigation could have gone where the

14              facts led?

15       A.     Of course it would have.

16       Q.     Now, are you aware that there came a time when

17              Chief Vibert ordered Patricelli to give a report

18              on gang activity within the facility?

19       A.     I don't remember exactly about it.  I remember

20              she came to me asking him -- saying that he

21              wasn't cooperating or stuff like that.  I told

22              her she was to see to it that it be appropriately

23              done.  And that was the end of that from my

24              perspective.
```

```
 1    Q.   Well, what was she to do if he's not following

 2         orders, other than to come to you as the

 3         superior?

 4    A.   First of all, she shouldn't be coming to me as a

 5         superior.  If she came to me as a superior

 6         complaining about it, she doesn't belong in the

 7         position.  It would have been her job to resolve

 8         an issue.

 9    Q.   But my question to you is that the reporting gang

10         activity, did that fall within the IA

11         investigation?  Because you told her not to --

12         that --

13    A.   No.  It could have depending upon what she was

14         asking for.  But my understanding of it at the

15         time -- and I might be wrong on this -- is that

16         it was mainly over what housing units they were

17         placing gang members and such and why.  And she

18         wanted to know what his reasoning was for how he

19         was placing people.  I think that was it.  But,

20         again, I could be off on that.  But I think

21         that's what it was.  And I told her he had an

22         obligation to explain that to you.

23              Now, common sense would tell you that if it

24         involved -- specifically involved something that
```

```
 1          was going on with that investigation, he would
 2          not be able to tell her, and that it would be
 3          inappropriate for him to do that.  And he would
 4          probably tell the undersheriff or myself of what
 5          was going on so we can clarify that at the
 6          administrative level.  But I don't recall
 7          anything like that.
 8     Q.   Do you recall ever addressing the specific issue
 9          yourself with Mr. Patricelli?
10     A.   What issue?
11     Q.   Again, the failure to give -- again, the report
12          on gang activity.
13     A.   I don't think I personally did that.  I think the
14          undersheriff and I were talking about it.  And
15          I'm pretty sure I told the undersheriff he has
16          to, you know, do what the chief says, and based
17          on the parameters we had just spoken about.
18     Q.   Do you know who Sergeant Marcelli is?
19     A.   Yes.
20     Q.   Who is that?
21     A.   He's a CO at the jail.
22     Q.   And can you tell us about what relationship you
23          had with Sergeant Marcelli outside of work?
24     A.   Who?
```

```
 1      Q.    Sergeant Marcelli.

 2      A.    Who has the relationship?

 3      Q.    You.  I'm talking about you.

 4      A.    A couple times I went on a motorcycle ride with

 5            Patricelli and he came, but that was pretty much

 6            it.  I never really got involved with him

 7            personally other than that.

 8      Q.    Did he ever come to your house?

 9      A.    None that I know of.

10      Q.    Do you know if Sergeant Marcelli is still a

11            sergeant at the sheriff's department?

12      A.    I don't know if he retired or not, to be honest

13            with you.

14      Q.    Was he still a sergeant when you left?

15      A.    Yes, I think he was.

16      Q.    In your time as a sheriff at the Rensselaer

17            County Sheriff's Department, can you tell me how

18            many sergeants have given up their stripes?

19      A.    A few.

20      Q.    Can you name one?

21      A.    I don't know off the top of my head.  I know

22            somebody asked to be set back.  I think we did it

23            twice.  We allowed two to do it.

24      Q.    You allowed two to do it?  Do you remember who
```

```
 1            those were?
 2    A.   I really don't remember the names.
 3    Q.   What's the basis for allowing them to give up
 4         their stripes?
 5    A.   Well, a lot of it is people do things rationally,
 6         and we want to make sure they know what they're
 7         doing, and give them time and make sure it's
 8         their decision and stuff like that.  And if it's
 9         inappropriate that they are doing it, we might
10         feel they are better suited for the county needs
11         to be a supervisor and do the things they knew.
12         Depends, you know --
13    Q.   You said that they'd be better suited to be a
14         supervisor.  We're talking about taking away
15         their supervisory capacity; right?
16    A.   No, we're not talking about taking them away.
17         We're talking about them giving them up.
18    Q.   Giving up their stripes as a sergeant; is that
19         correct?
20    A.   Take them away.
21    Q.   But they are no longer a supervisor; isn't that
22         true?
23    A.   That would be, yes.
24    Q.   And you said something to the effect of being
```

```
 1              irrational.  Can you explain what you meant by

 2              that?

 3     A.       I mean, they might be making a rash decision

 4              based on -- without time to think about it.  The

 5              goal is to make sure they know what they're doing

 6              and why they're doing it, give them reasonable

 7              time to make a decision like that, because there

 8              might be something they regret doing six months

 9              later.

10     Q.       What decisions are we talking about?

11     A.       Correct me if I'm wrong, we are not on the same

12              question of requesting to give up their rank?

13     Q.       Right.  You said you wanted to give them time so

14              there would be a rational -- give them time for

15              what?

16     A.       To think about the decision.

17     Q.       And I asked you under what circumstances would

18              somebody give up their stripes, and you said to

19              give them time.

20     A.       I think that most of them are -- some of them are

21              overtime, they want to make more money.  Some of

22              it would be they can get better hours of where

23              they were work on a shift.  So there could be

24              negatives in a position like that.
```

```
 1    Q.   Has there ever been a staff member that gave up
 2         their stripes in lieu of accepting disciplinary
 3         action?
 4    A.   Yes.
 5    Q.   And who was that person?
 6    A.   Sergeant Desinu (phonetic) had to.  Patricelli,
 7         stripes were taken away.  There might have been
 8         more.  I don't know.
 9    Q.   Okay.  Was there ever a scenario or a situation
10         in which a sergeant did not -- because you said
11         had his stripes taken away and you were
12         referencing Patricelli.  So my question is:  Was
13         there ever a situation where a sergeant
14         voluntarily gave his stripes instead of facing
15         disciplinary action?
16    A.   I don't know.  I don't recall that.  I think
17         there has been people we negotiated a deal for
18         them to do that with the attorneys and the union,
19         yes.
20    Q.   In which case, the stripes were not taken away,
21         they voluntarily gave them up?
22    A.   Well, they give them up.
23    Q.   Instead of having a disciplinary action; correct?
24    A.   Well, that was part of the result of the --
```

```
 1    Q.   And you're saying those persons were Patricelli

 2         and the other person --

 3    A.   Desinu, yes.

 4    Q.   Now, in regard to Patricelli, he voluntarily gave

 5         up his stripes.  Did he do that on more than one

 6         instance?

 7    A.   Patricelli didn't voluntarily give up his

 8         stripes.

 9    Q.   He had them taken away?

10    A.   What do you mean?  I'm talking about after when

11         he was a master sergeant and moved back to

12         sergeant.

13    Q.   Okay.

14    A.   Is there any other time that we are talking

15         about?

16    Q.   Well, I'm asking --

17    A.   No, I'm asking you.

18    Q.   Well, you don't ask the questions here.  I ask

19         the questions.

20    A.   I'm asking you to clarify what you're asking.

21    Q.   And we have been talking all along about removing

22         the sergeant stripes.  And I have asked you are

23         there situations in which a person -- a sergeant

24         has had his stripes removed, okay, instead of
```

1          facing disciplinary action.  And you had

2          testified yes.  And I asked you who, and you said

3          Patricelli and this sergeant.

4     A.   No.  That's an incorrect statement.

5     Q.   Okay, well, clarify the record for us.

6     A.   There's confusion here on this question.  Do me a

7          favor, ask the question so I can try to get a

8          handle on it and answer.

9     Q.   I will ask you again.

10              Do you know of a situation in which a

11         sergeant has given up his stripes rather than

12         face a disciplinary action?

13    A.   Not off the top of my head, no.

14    Q.   Are you aware of a situation in which a sergeant

15         has had his stripes taken away rather than face a

16         disciplinary action?

17    A.   If we count a negotiated settlement with the

18         union based on charges, I think that would be

19         considered a disciplinary action.

20    Q.   Okay.

21    A.   And that's what I would say.  So my answer is I

22         don't recall that, no.

23    Q.   Well, tell us a situation in which there was a

24         negotiated agreement with the union rather than

```
 1              face disciplinary actions where the end result
 2              was a sergeant losing his stripes.
 3      A.      Again, to clarify what you said, the two I
 4              mentioned was through discipline and they both --
 5              and it was a negotiated settlement.
 6      Q.      Tell us about the negotiated settlement involving
 7              Patricelli.
 8      A.      After his plea to his case, he was disciplined
 9              based on the result of the end of the
10              investigation.  And part of that was the union
11              and the labor attorney negotiating a settlement.
12              And part of that was --
13      Q.      Which case are we talking about?
14      A.      The case in which -- the most recent case in
15              which the attorneys had charges on him over the
16              computer incident.
17      Q.      So other than that situation, are you aware of
18              any other situations in which Patricelli's
19              stripes were removed?
20      A.      Not off the top of my head.
21      Q.      Now, do you have nursing staff at the
22              correctional facility?
23      A.      Yes.
24      Q.      Now, there came a time when -- you were talking
```

```
 1            about Sergeant Marcelli, and there came a time

 2            when Sergeant Marcelli faced disciplinary actions

 3            for threatening nursing staff; isn't that true?

 4     A.    I don't know.  I don't recall.  I don't know.  I

 5            don't recall that.  Maybe he did, maybe he

 6            didn't.  I don't recall.

 7     Q.    You're not aware of that?

 8     A.    No.

 9     Q.    Now, when you became a sheriff, can you tell us

10            what, if any, training you had in the beginning

11            as a sheriff?

12     A.    I went to the Sheriff's Institute.

13     Q.    Where is that located?

14     A.    Colorado.

15     Q.    How long of a course is that?

16     A.    I don't know if it was two or three weeks.  I

17            can't remember.

18     Q.    Some of the courses included supervising

19            corrections officers?

20     A.    No, it was moreover other issues involving

21            sheriffs, over the roles and the civil process,

22            because civil is pretty new to a lot of the

23            sheriffs.

24     Q.    When you say civil, are you saying civil
```

```
 1             enforcement of judgments and such?

 2    A.   Judgments and such, yes.

 3    Q.   Did they go into any HR issues?

 4    A.   I don't remember whether they did or didn't.

 5    Q.   Again, this was in the beginning when you became

 6         a sheriff; right?

 7    A.   Yes, 2004.  I don't remember exactly.

 8    Q.   Now, when you first became a sheriff, did you

 9         become aware that there was a workplace violence

10         policy in place?

11    A.   I would assume.  I don't remember exactly when I

12         specifically became aware of the workplace

13         violence policy in Rensselaer County, but there

14         is one, yes.

15    Q.   And when do you understand that that was first

16         implemented?

17    A.   I don't know when it was first implemented.  I

18         have no idea.

19    Q.   Can you tell us when, if, at all, you had any

20         training on the workplace violence policy?

21    A.   From the county?

22    Q.   Correct.

23    A.   I never had any training with the county on it.

24    Q.   How about any other entity?
```

```
 1    A.   About Rensselaer County workplace violence

 2         policy?  No, I personally never had any.

 3    Q.   You have never had any training in regard from

 4         anybody?

 5    A.   Not me personally, no.

 6    Q.   Now, can you tell us when is the first time you

 7         became aware of the workplace violence policy?

 8    A.   I'm not sure.  I think there was a complaint

 9         filed by one of the officers, and I think that

10         was when I became aware of it.  A few years ago.

11    Q.   A few years ago?

12    A.   Yes.

13    Q.   So --

14    A.   I don't know exactly the year, but several years

15         ago on one of the complaints, and I don't

16         remember exactly which year it was.

17    Q.   So you became sheriff in 2004.  Can you tell us

18         when the first time you received a workplace

19         violence complaint?

20    A.   I don't know the exact year and which was the

21         very first one.

22    Q.   Was it shortly after you became a sheriff?

23    A.   I don't think so.  I think it was longer after

24         that, couple years after.  But I don't remember
```

```
 1            the exact which one would have been first.
 2    Q.   Was it before Mr. Gorman's employment?
 3    A.   I don't know what year he come on.
 4    Q.   Was it before 2012?
 5    A.   Probably, yes.
 6    Q.   Do you happen to remember the name of the person?
 7    A.   No.
 8                 MR. SORSBY:  Go off the record for a
 9            second.
10                 (Off the record.)
11                 MR. SORSBY:  I'm going to go back on the
12            record.
13  BY MR. SORSBY:
14    Q.   I just spoke with Mr. Gorman, and he indicates he
15            began his employment at the sheriff's office in
16            2008.  So would the first workplace violence
17            complaint that you saw, would that have been
18            before 2008?
19    A.   Again, I'm not exactly sure the exact year.  I
20            really don't know.
21    Q.   Now, we are going to get into it later, but would
22            it have been before -- would you have seen your
23            first workplace violence complaint before you saw
24            Mr. Gorman's workplace violence complaint?
```

```
1    A.   I think the answer would be yes.

2    Q.   Now, I'm going to hand you what's been marked as

3         Plaintiff's Exhibit 6.  This document was handed

4         over in response to the discovery, but it also

5         may have been provided pursuant to Federal Civil

6         Procedure Rule 26.  It's a document we received

7         from your employer.  I'm going to hand it to you.

8         And, initially, I just want you to take a look at

9         that front page and just let me know, whenever

10        you've had an opportunity to, if you recognize

11        this document.

12             Plaintiff's Exhibit 6, do you recognize this

13        document?

14   A.   Right.

15   Q.   You have to say yes or no, sir.

16   A.   Sorry.  I was reading this.

17   Q.   Take your time.

18   A.   Okay.

19   Q.   You have had a chance to read Plaintiff's Exhibit

20        6?

21   A.   The front page, yes.

22   Q.   Do you recognize the front page, sir?

23   A.   I don't recall.  I may have read it before.  I

24        really don't recall.
```

```
 1    Q.   Let me ask you a more specific question.  Have

 2         you ever read the workplace violence policy for

 3         Rensselaer County?

 4    A.   I don't know if I read it all.

 5    Q.   That wasn't my question, sir.  I asked if you had

 6         ever read the workplace violence policy for

 7         Rensselaer County.

 8    A.   And I said I don't recall.

 9    Q.   Do you know if a copy of this was placed in the

10         county jail?

11    A.   I think they are required to be placed -- I would

12         assume that it was placed.

13    Q.   Sir, you were the sheriff.  I'd like you to tell

14         me how important it is to you to prevent

15         workplace violence.

16    A.   It's important that we all get along.

17    Q.   That wasn't my question.  I said how important is

18         it to you to keep the workplace free from

19         violence?

20    A.   Very important.

21    Q.   Why did you never read the workplace violence

22         policy?

23    A.   It wasn't an issue that come up until when it did

24         come up, that's when we addressed the issue.
```

```
 1          Workplace violence was investigated by human

 2          resources, not the sheriff's office.

 3     Q.   You said when it became an issue.  When did is

 4          become an issue?

 5     A.   I told you there was an incident before involving

 6          someone with I think it was maintenance.  I can't

 7          remember which one.  And it was turned over to

 8          human resources.

 9     Q.   So it became an issue at that point?

10     A.   What do you mean "became an issue"?  It became an

11          understanding.

12     Q.   All right.  But, yet, you still haven't read the

13          workplace violence policy?

14     A.   I just don't remember specifically reading it.

15          I'm not saying I didn't.  I said I just don't

16          remember it.

17     Q.   Fair enough.

18               MR. SORSBY:  Go off the record.

19               (Off the record.)

20               (Plaintiff's Exhibit 93 was marked for

21            identification.)

22  BY MR. SORSBY:

23     Q.   I'm going to hand you what's been marked as

24          Exhibit 93.  Just take a quick look at that.  Let
```

```
 1            me know if you have seen this before.

 2    A.   I may or may not have seen it.  In reviewing

 3         policy, I may have come across it.  I mean --

 4    Q.   So you don't --

 5    A.   I don't specifically recall, but I very well

 6         have, but I don't remember specifically.

 7    Q.   All right.  Put that to the side.

 8            What do you understand a workplace violence

 9         to consist of?

10    A.   A lot of it would be determined by threats made

11         against people and all those other things.

12         Threats, safety.  Mainly threats or a physical

13         action, either/or.

14    Q.   Well, I'm going to read from page six, the second

15         page of it:  "What is Workplace Violence?  To

16         report a workplace violence incident is defined

17         of one or more of the following:  An attempt or

18         threat, whether verbal or physical, to inflict

19         injury upon a person."

20            Do you understand that to be workplace

21         violence?

22    A.   Yes.

23    Q.   I'm skipping to D:  "Harassment of a nature that

24         would give a person a reason to fear excalation
```

```
 1          or make it difficult to pursue a normal work life

 2          or private life when harassment arises out of or

 3          in the course of employment."

 4               Do you understand that to be workplace

 5          violence?

 6     A.   Yes, it could be.

 7     Q.   Now, I'm reading the policy statement back on the

 8          same exhibit, so page one, Exhibit 6, and this is

 9          the second paragraph:  "Any person who makes

10          threats, exhibits threatening behavior, or

11          engages in violent acts on county property may be

12          removed from the premises pending the outcome of

13          an investigation."

14               Do you agree with this part of the policy

15          statement?

16                    MR. MARTIN:  Object to the form.

17     Q.   Do you agree with what I just read from the

18          policy statement as being part of workplace

19          violence?

20                    MR. MARTIN:  Object to the form.  Still

21            answer.

22     A.   Are you asking me should that be in there?  I'm

23          not sure what you're asking me.

24     Q.   We will strike that question.  I have a different
```

1          question for you.

2                  Do you understand the workplace violence

3          policy of Rensselaer County to include threats or

4          threatening behaviors or acts of executed off of

5          county property?

6     A.   Yes, I read that.

7     Q.   Sorry?

8     A.   I read that, yes.

9     Q.   I'm not asking you what you read.  I'm asking did

10         you understand that to be the policy?

11    A.   Could be, yes.

12    Q.   No.  I'm asking did you understand that to be the

13         policy when you were the sheriff?

14    A.   Yes.

15    Q.   So you understood workplace violence to consist

16         of threats that were made off site?

17    A.   Yes.  Proven threats, yes.

18    Q.   I'm reading from the policy statement again,

19         Exhibit 6, second paragraph:  "Off site threats

20         include but are not limited to threats made by

21         telephone, fax, electronic or conventional mail,

22         or any other communication."

23                 Do you agree that workplace violence

24         includes those types of threats made off site?

```
 1    A.    Could be, yes.

 2    Q.    Second to last paragraph, policy statement,

 3          Exhibit 6:  "Employees found in violation of this

 4          policy would be subject to disciplinary action."

 5                Did you understand the workplace violence

 6          policy at Rensselaer County to require

 7          disciplinary action for somebody that's been

 8          found to have violated the policy?

 9    A.    Yes, that would be correct.

10    Q.    That could include termination of employment?

11    A.    Probably could, yes.

12    Q.    When I'm asking your understanding of the policy,

13          would that have included possible termination?

14    A.    If the county work rules allowed termination,

15          then it could have been, yes.

16    Q.    Now, I'm reading the third page of the same

17          exhibit under "employee training".  It says:

18          "The cornerstone of an effective workplace

19          violence prevention plan is appropriate training

20          of all employees, supervisors and department

21          heads."

22                Did you provide training for workplace

23          violence?

24    A.    I would assume it was done.  It was mandated a
```

```
 1            few times, I remember, by the county.  And I
 2            personally don't get involved in training.  It's
 3            done by the respective heads of each of the
 4            divisions, whether it be highway patrol or
 5            correctional bureaus.  It would be up to them to
 6            maintain, to see to it that they meet the
 7            requirements.
 8       Q.   But you're the sheriff.  You're responsible --
 9       A.   The buck stops at my office.  I personally don't
10            see with their training.  I assume they do it
11            when they say they're going to do it.
12       Q.   Do you check that they are going to do it?
13       A.   No.  I assume it's their training.  And most of
14            it they have done very well, including those
15            things in their training.
16       Q.   Reading a little bit further on employee
17            training:  "The mandatory training will be
18            provided during the general new employee
19            orientation, reassignments, and annually for all
20            employees."
21                 The training was mandatory.  Do you know if
22            it was done during orientation for new employees?
23       A.   Probably was.  They are very good.
24       Q.   No.  I'm asking you do you know as the sheriff.
```

```
 1              Do you know if it was done?
 2      A.      I don't know specifically if they did it.  I know
 3              they are supposed to follow the rules.  The
 4              training officer and such are supposed to do
 5              those things.  And I know they pretty much do
 6              what they are supposed to do.
 7      Q.      And what about annually for all employees?  Do
 8              you know if training was provided annually for
 9              all employees?
10      A.      I know we do annual service, and I would assume
11              it's mentioned time during annual service.  How
12              in depth they go, I don't personally know, no.
13      Q.      You're the head of the sheriff's department.  You
14              were a supervisor; isn't that true?
15      A.      You may say I'm a supervisor, but, no, I'm not a
16              day-to-day supervisor, but the buck stops at the
17              sheriff's office.
18      Q.      Were you trained annually on the workplace
19              violence policy?
20      A.      Me, personally, no.
21      Q.      Why is that, sir?
22      A.      Because I'm not a supervisor there like that.
23              I'm an elected official, and I did not attend
24              their training sessions.
```

```
 1    Q.    You're not a supervisor, but, again, you are a

 2          supervisor, are you not?  You supervise people,

 3          true?

 4    A.    Well, I don't know -- I don't get involved in

 5          day-to-day supervision to answer your question,

 6          no.

 7    Q.    Now, of course this is the Rensselaer County

 8          workplace violence policy I have been reading

 9          from.  And, again, just for the record, I'm

10          reading from page three of the exhibit, of

11          Exhibit 6, and it says:  "The cornerstone of an

12          effective workplace violence prevention plan is

13          appropriate training of all employees,

14          supervisors and department heads."

15                Do you not consider yourself a department

16          head?  You're the head of the sheriff's

17          department, are you not?

18    A.    I don't want to get into semantics here.  I

19          really don't.

20    Q.    Sir, are you the head of the sheriff's

21          department?

22    A.    I'm the head of the sheriff's office, yes.

23    Q.    You answered my question.  Thank you.

24                So I'm moving on now.  I'm still on Exhibit
```

1          6, page one, page two, page three, page four, on

2          page five, "post-incident response".  What did

3          you understand the workplace violence policy at

4          Rensselaer County to require for a post-incident

5          response?

6     A.   There would be an investigation done by human

7          resources.

8     Q.   Human resources for the county?

9     A.   Yes.

10              MR. SORSBY:  We are going to take a

11          30-second break.  I just heard somebody come

12          in.

13              (Off the record.)

14   BY MR. SORSBY:

15    Q.   I'm going to turn to what's been labeled as page

16         eight of Exhibit 6, and so that would be page

17         nine of this exhibit.  And I'm going to show you

18         that page.  Tell us what it says at the top,

19         please?

20    A.   "County Workplace Violence Prevention Incident

21         Report".

22    Q.   Do you recognize that?

23    A.   I know they exist, yes.

24    Q.   How do you know they exist?

```
 1      A.   I have seen them.

 2      Q.   Where did you see them?

 3      A.   Through the office.  They get forwarded and then

 4           they get moved.  They come up over to the

 5           undersheriff's office, normally, how they are

 6           supposed to go.  And then they'll go to the

 7           sheriff's assistant and then forward them up to

 8           the human resources office.

 9      Q.   So you understand that this was the form that

10           would to be filled out upon observation of

11           workplace violence?

12      A.   I believe that's a correct statement.

13                   MR. SORSBY:  Just go off the record a

14              second.

15                   (Off the record.)

16   BY MR. SORSBY:

17      Q.   What did you understand the requirement to be

18           pursuant to the workplace violence policy of

19           Rensselaer County in regard to protecting a

20           complaining employee of workplace violence?

21      A.   I'm not sure what you are asking.

22      Q.   If a staff member at the correctional facility

23           makes an allegation that somebody threatened them

24           with violence, what are you supposed to do in
```

```
 1              regard to separating those two individuals during

 2              the investigation?

 3                        MR. MARTIN:  Object to the form.  You

 4                 can answer.

 5      A.    I think there would have to be -- as an

 6              allegation, of course it would be investigated.

 7              And the rule is if it's a workplace violence

 8              incident, it would go to internal affairs.  They

 9              would investigate, determining, waiting for an

10              outcome.

11      Q.    Okay.

12      A.    Depending upon what it was being said was being

13              done or not.  And what is determined the level of

14              threat, it would either be monitored, watched or

15              separated or whatever, depending upon what would

16              determine necessary.

17      Q.    Who determines of level of threat?

18      A.    Come from a lot of different places, I guess.  I

19              don't know if it's -- I guess it's, like, a

20              Supreme Court decision.  You know it when you see

21              it.

22      Q.    Are you responsible for determining the level of

23              threat?

24      A.    Maybe.  I don't know if I'd be responsible,
```

```
 1              depends on the outcome of that and what the

 2              command staff thought what was going on.  If

 3              there was court involvement, what the court

 4              thought.  A lot of things.

 5     Q.       Did you have an open-door policy?  Did you have

 6              an open-door policy at the sheriff's office?

 7     A.       I don't know of any sheriff's that doesn't have

 8              an open-door policy.

 9     Q.       Is it permissible for a person to come to you

10              with a workplace violence complaint?

11     A.       Yes.  It should follow the chain of command, but

12              they can come to me, yes.

13     Q.       Do you feel that you had a responsibility for

14              enforcing the county's workplace violence

15              prevention program?

16     A.       I think the responsibility would have been

17              enforced through our staff, yes.

18     Q.       I didn't hear the last part.

19     A.       Through our staff, yes, absolutely.

20     Q.       I'm asking do you think you had a responsibility

21              to enforce it?

22     A.       Yes, absolutely.

23     Q.       In fact, I'm reading page three of Plaintiff's

24              Exhibit 6.  Actually, that's going to be page
```

```
 1            three, which is marked page three, which is page
 2            four of the exhibit, second paragraph:
 3            "Employees are encouraged to report any incidents
 4            that may involve a violation of any county policy
 5            as designed, provide a safe working environment.
 6            Concerns may be reported to your supervisor or
 7            department head."
 8                 So you had an open-door policy, but do you
 9            understand the workplace violence policy also
10            allowed corrections officers to come to you
11            directly as a department head with a workplace
12            violence complaint?
13     A.     I understand the chain of command can always
14            be -- I specifically don't recall reading that.
15            But in the chain of command, you're always
16            allowed to go to the top if you feel something is
17            necessary.
18     Q.     I'm reading down a little bit further on the
19            fourth paragraph, same page:  "All potential
20            dangerous situations must be reported immediately
21            to the supervisor or department head in the
22            absence of a supervisor.
23                 "When reporting a threat of violence, the
24            employee should be as specific as possible,
```

1        detailed as possible.  The supervisor will

2        conduct swift and thorough investigation of all

3        workplace violence complaints."

4            Do you understand that the policy required a

5        swift investigation of allegations?

6   A.   Yes.

7   Q.   And I believe you testified earlier as to whether

8        or not you should separate somebody that is

9        alleged -- that somebody else made a threat from

10       the person making a threat.  It depends on the

11       threat I think is what you said; is that true?

12  A.   It depends on the circumstance.  Not every

13       circumstance is the same.

14  Q.   What in the circumstances would dictate

15       separating two individuals?

16  A.   It would depend.  If there's been physical

17       activity, it appears it's imminent or something

18       like that, it would be appropriate to separate

19       it.

20  Q.   And if there's a threat of violence?

21  A.   To make it simple?

22  Q.   Sure.

23  A.   If there's a threat that's proven, yes.

24  Q.   So your threshold is that the threat's proven?

```
 1    A.    No.  I'm saying we have to investigate every

 2          allegation.  Not every allegation is proven, so,

 3          therefore, it might not always be necessary to

 4          separate.  To answer your question.

 5    Q.    So if somebody threatens, for example, "I'm going

 6          to break your jaw" to another employee, it's not

 7          necessary to separate those two until the

 8          conclusion of the investigation; is that true?

 9                MR. MARTIN:  Object to the form.  You

10             can answer.

11    A.    It may or may not be.  I'll be honest with you on

12          that, you have to look at history, you have to

13          look at other things, because there could be

14          somebody lying.  I don't know that.  And we got

15          to be careful on how we do things, but the answer

16          would be to make sure and to advise staff to

17          monitor, and, if necessary, separate.

18    Q.    You said that somebody may be lying.  And what is

19          your concern that somebody may be lying?

20    A.    Or the allegation may be -- you got the

21          perceptions.  Everything else is different.  And

22          how someone perceives it versus someone else and

23          all those other things.  That's why you conduct

24          an investigation.
```

```
 1    Q.   And my question to you, sir, is:  What is the

 2         harm in separating the two employees?

 3    A.   It would depend upon the situation.  Again, you

 4         want to be more specific?

 5    Q.   I can give you a specific one.

 6              Of the corrections officers threatens to

 7         break another corrections officer's jaw.  Do you

 8         separate those two individuals?

 9                   MR. MARTIN:  Object to the form.

10    A.   I would probably make sure they have minimal

11         contact, yes.

12    Q.   Would that be before or after the conclusion of

13         your investigation?

14    A.   It would depend on the circumstance, where it

15         occurred, how it occurred, all those other

16         things.

17    Q.   Under what circumstance would you not separate

18         the two?

19    A.   Depends on court orders.  Court orders may not

20         have done it, file court orders, a lot of things.

21         Again, it is subjective.

22    Q.   So if you received a court order, that would

23         compel you to separate the two employees?

24    A.   Absolutely.  We would follow a court order.
```

```
 1      Q.   Is there any circumstance in which an employee

 2           has threatened another employee, or at least

 3           there's an allegation of that, in which you would

 4           not separate the two?

 5      A.   I don't know that.  Again, on its face, more than

 6           likely you would make sure they did not come in

 7           contact with one another.  As the investigation

 8           bores itself out, you may or may not continue

 9           that.

10                So to answer your question, a lot depends on

11           the circumstances of what's going on.

12      Q.   And I just -- for your benefit, I want to keep

13           the record clear because I'm understanding that

14           as to whether or not you separate an alleging

15           employee from another employee depends upon

16           whether or not you believe the allegations are

17           true.

18                     MR. MARTIN:  Object to the form of that

19                question.  You can answer.

20      A.   It depends on the circumstance, yes, we have to

21           verify that.  Yes, we would have to verify it and

22           we'd have to have an opportunity to investigate.

23           Absolutely.

24      Q.   That's my question.  That's what I'm trying to
```

```
1              understand.

2     A.    Yes.

3     Q.    So just to be clear, you would not separate

4           somebody until you did your investigation; is

5           that true?

6                    MR. MARTIN:  Object to the form.

7     A.    We may not separate, but we may also require

8           staff to monitor.

9     Q.    Okay.  But you would not separate them?

10    A.    It would depend upon what the jobs are and a lot

11          of other things.  I mean, I don't want to say yes

12          and no.  It would depend.

13    Q.    On what specifically?

14    A.    On specifically what the jobs were in the jail,

15          where you walk around, where do you go, how many

16          days, are you on different shifts, are you on the

17          same shift, are you on different days off, other

18          things like that.  A lot depends on all of that.

19    Q.    Okay.  All right.  We may revisit this later.

20                   MR. SORSBY:  Off the record.

21               (Off the record.)

22                   MR. SORSBY:  Mr. Martin, I appreciate

23              you helping the witness today, he's your

24              client, but I have noticed that you are
```

```
 1           writing notes on your legal pad while he's

 2           testifying.  And so I would just ask that we

 3           not do this.  He should be testifying from

 4           his own knowledge and memory, not from

 5           whatever you're writing on the legal pad.

 6           Okay?

 7                MR. MARTIN:  He's not testifying from

 8           what I'm writing on the legal pad.

 9                MR. SORSBY:  Well, I would ask since --

10                MR. MARTIN:  I'm taking notes on what

11           he's saying.

12                MR. GORMAN:  Why don't you ask him to

13           read what he has on there?

14                MR. SORSBY:  I would just -- look, I'm

15           not accusing you, but just to keep the

16           record clear, I would appreciate that we

17           don't have the witness looking at your legal

18           pad as you're writing notes.  It's not an

19           accusation, it's just better that you not do

20           that.  Can we just do that going forward?

21                MR. MARTIN:  Sure.

22                MR. SORSBY:  So we are doing to continue

23           on a little bit longer and then we're going

24           to take lunch.
```

```
 1    BY MR. SORSBY:

 2        Q.   Still on the workplace violence policy.  Can you

 3             tell us what duty the sheriff's department has to

 4             investigate allegations of workplace violence?

 5        A.   What duty?  What do you mean by that?  Of course

 6             we investigate allegations of workplace violence.

 7        Q.   And what is involved in that investigation

 8             process, can you tell us?

 9        A.   With us, it's normally a supervisory or command

10             staff ordered to make sure, look into it to see

11             what the status is and report it.  If there's a

12             written complaint filed, forward it to the human

13             resources and let human resources investigate it.

14                  And, normally, the staff are monitored and

15             advised about contact and things like that, to

16             stay away from one another or to be careful, and

17             then the investigation continues.  And the result

18             is what the result will be.

19        Q.   So are you saying that both HR and the sheriff's

20             department conduct an investigation?

21        A.   We allow them to do their investigation, but we

22             look into cursory things and make sure there's no

23             problem or any continuing problem.

24        Q.   So you do some investigation, initially; is that
```

```
 1            true?

 2      A.   If you want to call it an investigation, yes.

 3      Q.   What does that consist of?  Can you tell us?

 4      A.   Most of the time -- back then, it would have been

 5            with Captain Smith.  I would have asked Captain

 6            Smith to look into this, find out what's going

 7            on, determine if there's witnesses and stuff that

 8            can be determined to forward to human resources

 9            to make sure there's nothing else going on, and

10            to make sure the place is safe and they stay safe

11            with one another.

12      Q.   Now, at some point we had Thomas Hendry here

13            under oath.  Do you know who that is?

14      A.   Yes.

15      Q.   And who's that person?

16      A.   He's the director of human resources.

17      Q.   And he said, in form or substance, that he was

18            conducting a parallel investigation with the

19            sheriff's department into the allegations of

20            workplace violence made by Mr. Gorman.  Is that

21            what you're talking about your investigation is?

22      A.   I would probably believe that to be, yes.

23      Q.   Now, I think you had said something about Captain

24            Smith would do an investigation into a workplace
```

```
 1              violence complaint.  Did you say that?
 2       A.    Yes.
 3       Q.    And we're talking about the time frame of 2012 or
 4              2013?
 5       A.    It probably would have been him, yes.
 6       Q.    And so do you know how Smith investigated Mr.
 7              Gorman's workplace violence complaint?
 8       A.    Yes, he did.  He looked into that, and I remember
 9              him reporting to myself and the undersheriff,
10              yes.
11       Q.    And he gave you documents as part of that report?
12       A.    It was verbal.
13       Q.    Verbal report?
14       A.    Yes.  It might be something written.  I don't
15              know if he wrote anything at all.  I really don't
16              recall.  I don't know that.  But I do know I
17              asked him what the result was and what he was
18              establishing.
19       Q.    And as part of that oral report, did he give you
20              any documents to review?
21       A.    I don't recall.  No, I don't think so, no.
22       Q.    Now, isn't it true that Chief Vibert was involved
23              in some cases involving allegations of workplace
24              violence?
```

```
 1    A.   I think she was, yes.

 2    Q.   And, in fact, she worked with Captain Smith to

 3         investigate a workplace violence complaint

 4         concerning a Scott Beitte; right?  Is that how --

 5    A.   I don't know who looked into that.  I thought

 6         Lieutenant Karam was there then.  I really don't

 7         recall.

 8    Q.   Did they report the conclusion of that

 9         investigation to you?

10    A.   I'm not sure if the investigation ever came to a

11         final conclusion.  I believe he resigned.

12    Q.   Scott Beitte?

13    A.   Yes, I think his name was.

14              MR. SORSBY:  For the record, that's

15         B-E-I-T-T-E.

16    Q.   You believe he resigned?

17    A.   I think that was the outcome of that, yes.

18    Q.   Nonetheless, did Chief Vibert and Captain Smith

19         talk to you about how the investigation was

20         going?

21    A.   I don't remember the final -- what the outcomes

22         were.  I know there was a threat made like that

23         and it was being investigated.  And then during

24         that time he resigned on his own.
```

```
 1    Q.   Do you know what the threat was?

 2    A.   Something -- he threatened the supervisor.  I

 3         don't know what the actual threat -- I can't

 4         recall exactly what it was.  The maintenance

 5         supervisor.

 6    Q.   Was he at work at that time when he made the

 7         threat?

 8    A.   Yes.

 9    Q.   Was the maintenance worker at work at that time?

10    A.   Yes.

11    Q.   And were they related in any way?

12    A.   What do you mean related?

13    Q.   The maintenance worker and the person that made

14         the threat.

15    A.   You mean, like, a blood relative?

16    Q.   Correct.

17    A.   I don't know that.  I have no idea.

18              MR. SORSBY:  Just one second.

19              (Off the record.)

20   BY MR. SORSBY:

21    Q.   Now, I just want to go back on a subject we were

22         talking about.  We were talking about the use of

23         cameras at the jail.  Do you understand?

24    A.   Okay.
```

```
1    Q.   Now, did you give Patricelli access to the
2         cameras?  Were you responsible for giving him
3         access?
4    A.   I think it was determined.  You say was I
5         responsible?  I guess everything in the place
6         ends up responsible.  But the answer -- did I
7         specifically direct him?  I think it started out
8         with him working with Lieutenant Karam.  And then
9         when Lieutenant Karam left, Patricelli assumed
10        full responsibility of it.  I think that's how it
11        was.  They were sharing the responsibility at the
12        time.  I believe that's how it went.
13   Q.   Now, isn't it true that Patricelli would follow
14        Lieutenant Karam and Undersheriff Russo with
15        those cameras?
16   A.   I had no idea on that.  I never heard that.
17   Q.   You have no knowledge of that?
18   A.   I have no knowledge of that.  Never heard that.
19   Q.   Now, you're aware that Patricelli's access to the
20        cameras was taken away at some point?
21   A.   Yes.  I don't remember when that specifically
22        was.
23   Q.   And those cameras were taken away, he didn't take
24        them out himself, they were taking away from him;
```

```
 1          isn't that true?
 2    A.    Yes.  Again, I can't remember specifically when
 3          that was.  I don't know.
 4    Q.    And they were taken out because he was following
 5          people around the jail with the cameras; isn't
 6          that true?
 7    A.    I don't believe that's the case at all.  I think
 8          it turned out when he was arrested by the state
 9          police and the investigation goes on, that he was
10          suspended.  It was taken out of his office and
11          Lieutenant Dunham took full control over it.
12    Q.    Now, at the jail facility when equipment is taken
13          out of a part of the jail, like the cameras for
14          instance, a work order has to be placed; isn't
15          that true?
16    A.    Most of the time there's work orders.  Doesn't
17          always have to be if something's done quickly and
18          quick.  You can just tell the maintenance.  I
19          don't know if there's a work order done or not.
20    Q.    Who would have removed those cameras?
21    A.    Probably maintenance under the supervision of
22          Lieutenant Dunham, probably.  I don't know who
23          did it.
24    Q.    It would have been under the supervision of
```

1          Lieutenant Dunham?

2     A.   Probably.  I don't know.

3     Q.   Now, there came a time where Vibert was

4          terminated, yes?

5     A.   Yes.

6     Q.   And after she was terminated, you authorized

7          access to Patricelli to have the cameras again,

8          didn't you?

9     A.   I don't think he ever went back after it was

10         taken away.  I don't recall that.  I don't know.

11         I don't think so.  I think Lieutenant Dunham took

12         full control and he had them from then on.

13    Q.   So after the cameras were taken away from

14         Patricelli, you believe he never received those

15         back again, access to those cameras?

16    A.   Again, over the time frames confuses me.  But,

17         yeah, because I think once he was suspended, he

18         never got that back.  And I just don't know.  I'm

19         pretty sure that would be it, because I believe

20         once they went to Lieutenant Dunham, that's where

21         they stayed.

22    Q.   You would have been the person to have given

23         access back to him; isn't that true?

24    A.   Not necessarily.  If the chief wanted them to

```
 1              have them or if the lieutenant thought it was
 2              appropriate, they could have given him access to
 3              that.  But I don't think that was the case
 4              because, I'll be honest with you, I think I was
 5              gone before Lieutenant Patricelli came back to
 6              work.  I was retired.  I don't remember.
 7         Q.   But don't you also recall that Patricelli was
 8              still working at the jail after Ruth Vibert was
 9              terminated for a period; isn't that true?
10         A.   It might be.  I just don't remember when it was.
11              I don't know.  Give me some time frames.  I don't
12              remember.
13         Q.   Now, isn't it true that it was Ruth Vibert that
14              took away the cameras from Patricelli?
15         A.   I don't recall that.  I don't know.  I don't
16              remember where it was.  I really don't know.
17              Because I think if she did, she probably would
18              have came with the undersheriff or myself to
19              request that.  I don't think she would have
20              unilaterally made it.  She could have and then
21              she would of had to justify her actions to the
22              undersheriff or the sheriff.  But I don't recall
23              exactly how it went down.
24         Q.   So she would have had to sought authorization
```

```
 1              from the undersheriff or you?
 2    A.   Probably, yeah.  No.  I'm saying she could have
 3         done it, but she would have had to explain why so
 4         we know.  If that was going on.  But I don't
 5         recall at the time.  I just don't know the time
 6         frame.
 7    Q.   Now, there came a time when Master Sergeant
 8         Patricelli came to you and made a complaint that
 9         Ruth Vibert was divulging confidential
10         information; isn't that true?
11    A.   That's a correct statement.
12    Q.   And there also came a time when Patricelli called
13         Mr. Gorman at his house and threatened to break
14         his jaw, in words or substance; isn't that true?
15              MR. MARTIN:  Object to the form.
16    Q.   Let me change the phrasing of the question.
17              There's an allegation that Patricelli called
18         Mr. Gorman at his house and threatened to break
19         his jaw.  Do you remember that being February
20         15th, 2013?
21    A.   I don't remember the specific date, but I do
22         remember there was -- that happened, yes.
23    Q.   When Anthony came to you and complained about
24         Ruth divulging confidential information, that was
```

```
 1              before the February 15th phone call to Mr.

 2              Gorman; isn't that true?

 3     A.   When what?

 4     Q.   I'm working on a timeline, and I want to know --

 5              I'm trying to determine when Patricelli came to

 6              you to complain about Ruth divulging confidential

 7              information, if you know the date or the month.

 8     A.   I think that was a couple weeks before that.  I'm

 9              not sure.  I just don't remember.

10     Q.   You understand that that being in January?

11     A.   I don't understand.

12     Q.   You understand it to be shortly before?

13     A.   It might have been before or after.  If you got a

14              timeline.  I know Marcelle put the timelines

15              down.  I can look --

16     Q.   You might look at documents later that might

17              refresh your recollection, but at this point,

18              let's continue.

19              Now, Patricelli came to your office and made

20              the complaint to you about Ruth divulging

21              confidential information.  That's where he filed

22              the complaint with -- at, right, at your office?

23     A.   He come over, made a verbal complaint.  And I

24              said, "You cannot make a verbal complaint.  You
```

```
 1              have to --" I mean, you can make a verbal

 2              complaint but we need something in writing

 3              because we can't look into something and have you

 4              later say I did not say that.  So he filed a

 5              written complaint.

 6       Q.    But what did he tell you verbally when he came

 7              into your office?

 8       A.    He said something about it.  He had a close

 9              relationship with Chief Vibert, and over the

10              time, he divulged confidential stuff, and he said

11              that she gave that information out that caused

12              him problems and stuff like that.

13                   And I said, "Well, what's the problem here?"

14                   And he said, "Well, it's causing big

15              problems and all this stuff in the workplace."

16                   And I said, "Well, let me look at and see if

17              there's any truth to any of this."  So I put it

18              in writing.

19       Q.    So you said, "Let me take a look and see if

20              there's any truth"?

21       A.    Absolutely.

22       Q.    And to assist with that, you asked him to put it

23              into writing?

24       A.    Correct.
```

```
 1    Q.   Now, did he tell you what confidential
 2         information was being released at that time?
 3    A.   He put it into the document.  He wrote some long
 4         document over personal stuff.
 5    Q.   But did he tell you verbally at that time?
 6    A.   He might have.  I don't specifically remember
 7         what he said, that's why I had him put it in
 8         writing.  And the gist, I believe, was probably
 9         in that document that he wrote.
10    Q.   And just to be clear, he was -- the complaint was
11         about releasing confidential information?
12    A.   No, well, confidential -- not confidential.
13    Q.   Private information?
14    A.   Personal information.
15    Q.   Personal information?
16    A.   Private, personal information.
17    Q.   And after that meeting, how long after that
18         meeting did you receive the written complaint
19         that you told him to write up?
20    A.   I don't remember if it was the same day or next
21         day.
22    Q.   And you said it was at least a couple pages?
23    A.   I don't remember if it was one or two.  It might
24         have been a couple pages.
```

```
 1                    MR. SORSBY:  Go off the record.

 2                    (Off the record.)

 3    BY MR. SORSBY:

 4    Q.   Were the pages handwritten or typed on a word

 5         processor?

 6    A.   Good question.  I think they might have been

 7         typed written.  I'm not sure.  I don't remember

 8         there being a problem being legible, so,

 9         probably.  I'm not sure, to be honest with you.

10    Q.   Did he sign it?

11    A.   I think he did sign it.

12    Q.   Did you read it?

13    A.   Yes.

14    Q.   And what do you recall being in there?  What was

15         the substance of the personal information that

16         was being released?

17    A.   There was something about him having contact with

18         Ruth Vibert and that they were friends.  And he

19         said he gave information out to her about him

20         with another person he was with and things like

21         that.  And he claims that she divulged it and

22         that information caused problems for him.

23    Q.   Do you recall in that letter who he indicated it

24         was divulged to?
```

```
 1    A.    I think she said it was -- he said it was
 2          divulged to John Gorman.
 3    Q.    Now, this two-page complaint, it was completely
 4          what he wrote up; is that true?  There's no other
 5          witness statements to that?
 6    A.    Nothing else other than that.
 7    Q.    And it wasn't about the IA -- the New York State
 8          IA investigation about the gang activity, it was
 9          completely about these allegations?
10    A.    That is correct.
11    Q.    And so what did you do with the two-page
12          complaint?
13    A.    I took the report, and based on conversations I
14          had with Ruth -- Chief Vibert -- let's keep it
15          nice -- Chief Vibert at the time.  When I hired
16          Chief Vibert, I specifically told her she's not
17          to fraternize with the troop, get involved with
18          close relationships or anything like that with
19          any of the staff.
20              And then when he told me that they were
21          going out for coffees and going out for
22          breakfasts and doing things like this, and when
23          he was divulging personal information to that, I
24          had a problem with that.
```

1          I said, "I don't want the chief getting

2          involved with things like that," so I said, "I

3          better look into this and see what the truth of

4          this matter is."  The only way I can do that was

5          to ask the people involved in that.  I met with

6          the chief and asked the chief, and I met with

7          John Gorman and asked John Gorman.

8          He alleged, I think, during that that

9          Lieutenant Dunham was a witness to this.  I can't

10         remember off the top of my head without reviewing

11         it again whether he was a witness with John or a

12         witness with the chief.  I can't remember.

13    Q.   And we will get to that.

14         You used the term fraternization?

15    A.   Yes.

16    Q.   Tell me what's the concern with fraternizing with

17         subordinates?

18    A.   I don't want personal relationships with the

19         senior staff members with the other staff

20         creating a workplace problem within the

21         workplace, such as this caused.

22    Q.   But Patricelli's a master sergeant; correct?

23    A.   Patricelli's a sergeant.  He was given the master

24         sergeant rank to accomplish specific goals, which

```
 1              is not uncommon in any law enforcement

 2              organization.  It's very important that there's

 3              technical ranks when a need arises to perform

 4              certain functions, and that function was given to

 5              the position of chief of security.

 6      Q.      And so Ruth Vibert, she was a part of the

 7              administration; isn't that true?

 8      A.      She is a part of the administration.

 9      Q.      So it's not appropriate for her to have personal

10              type relationships with people at the sergeant

11              level; is that true?  I'm trying to understand.

12      A.      On any level, we told her that it was

13              inappropriate.

14      Q.      Let me ask you this question:  If that's the

15              case, why did you have a relationship with

16              Patricelli?

17      A.      I didn't have a relationship with Patricelli.  I

18              had a friendship that I had with many other staff

19              inside the place that I was friends with, no

20              different than common friends.  Some people we go

21              for a bike ride, people would come with that.  We

22              go out to an event, a bunch of people come.

23              There's nothing wrong with that.  It's when it

24              becomes personal and confidential and other
```

```
 1              things might be accused or not accused of.
 2              That's the problem we had.
 3                  So no different than we have now.  The
 4              sheriff has friends.  He has a friend and he
 5              talks with them people.  Doesn't mean he's
 6              divulging his confidential and family stuff and
 7              things like that with them.
 8       Q.     Those are from different things?
 9       A.     That's what I'm saying.
10       Q.     Fraternization and release of private
11              information, those are two different --
12       A.     Well --
13       Q.     -- things, are they not?
14       A.     I guess you can call it when you see it.
15       Q.     Okay.  Kind of like that supreme court decision
16              you mentioned?
17       A.     However you want to say it.
18       Q.     All right.  Now, the complaint that Patricelli
19              gave you, what did you -- after having received
20              it, what did you do with the complaint?
21       A.     I met with the people involved and asked them
22              about the allegation.
23       Q.     Did you give the complaint to the people you met
24              or did you keep it?
```

```
 1   A.   No, I kept it.

 2   Q.   And --

 3   A.   I let them see the complaint.

 4   Q.   Sure.  Right.  I understand.

 5            And what did you ultimately do with that

 6        complaint?

 7   A.   I interviewed them, and I found that I did not

 8        believe the complaint.  I believed the people

 9        when I interviewed them that they denied ever

10        saying anything, ever doing any of that.  And I

11        believed the chief when she told me.  I believed

12        John Gorman, what he told me, and I believed

13        Sergeant Dunham, what he -- it was sergeant at

14        the time.  I can't remember if he's sergeant or

15        lieutenant.  I just don't remember.

16   Q.   Mr. Mahar, that's not what I asked.  I just want

17        to save you time.  I'm asking you what did you

18        actually do with the physical document?

19   A.   Oh, I had it in the office.  I kept that until I

20        interviewed them.  And then after the interview,

21        I then gave it to Marcelle to file it with the

22        records.

23   Q.   And did she file it?

24   A.   She must have because it's in here somewhere.
```

```
 1            She does very good, so I ask her to do something,

 2            I make assumption it's done.  I don't go

 3            physically check to see if it's done.

 4       Q.   You said you assumed it's in here.  You

 5            understand that it was provided in response to

 6            discovery?

 7       A.   I would understand that to be true, yes.

 8       Q.   Why do you understand that?  How do you

 9            understand that?

10       A.   Because I was told it was here.  Marcelle even

11            told me that all the documents were asked for and

12            sent.

13                     MR. MARTIN:  Do you need to get

14                your stuff?

15                     THE WITNESS:  We're getting close.  It

16                is getting to me.  I got to put it on every

17                five, six hours.

18                     MR. SORSBY:  I know I'm pushing it.  I

19                just --

20                     THE WITNESS:  Go ahead.  I'm alright

21                with it.  It's just annoying for me.  Not

22                you, this. (Indicating)

23                     MR. SORSBY:  We will go at 12:30,

24                that's, like, in 15 minutes.  Is that good?
```

```
1                    THE WITNESS:  Yep.  Sorry, it's just
2              very annoying.
3    BY MR. SORSBY:
4         Q.  So you said that you interviewed Chief Vibert,
5              Mr. Gorman, and Sergeant Dunham?
6         A.  Lieutenant or sergeant.  Yes, I interviewed Scott
7              Dunham, yes.
8         Q.  Can you tell me why you interviewed Dunham?
9         A.  Because Patricelli said he witnessed whatever --
10             I can't remember without reading the document
11             again, but it was Vibert -- he allegedly -- Scott
12             Dunham witnessed the chief stating this stuff.
13        Q.  Okay.  Stating it to John Gorman?
14        A.  I can't remember.
15        Q.  To some other party?
16        A.  To someone.  I can't remember specifically
17             without looking at it again.  But, allegedly, he
18             heard the conversation of -- I mean, this is
19             Patricelli saying this.
20        Q.  Sure.  Right.
21        A.  That Scott Dunham heard the chief state this to
22             someone.  And I can't remember if it was to John
23             or to someone else without looking.  I just don't
24             remember.
```

```
 1     Q.   And you know this, and you're basing that

 2          statement on reading his complaint?

 3     A.   Yes.

 4     Q.   That was in this complaint?

 5     A.   I think it was, yes.

 6     Q.   So you interviewed Sergeant Dunham, and did he

 7          confirm that he observed that he witnessed that?

 8     A.   No, he denied it.  He said he remembers them

 9          talking, but he never heard anything like that

10          being said.

11     Q.   And, again, you may have already said this, but

12          it wasn't responsive to the question I was

13          asking.

14     A.   I understand.

15     Q.   And, again, you interviewed Gorman and he said

16          that -- did he --

17     A.   The same thing.  He said none of that is true and

18          he never said anything.

19     Q.   And, of course, you interviewed Chief Vibert and

20          she denied it, as well?

21     A.   She denied it.

22     Q.   And so based upon all that, what was the

23          conclusion of all of this?

24     A.   I told Sergeant Patricelli his complaint is
```

```
 1              unfounded, that there is no proof that anything
 2              occurred.  And I told him, in fact, I believe
 3              that the other people are telling the truth that
 4              they didn't do what you said they did.
 5      Q.      Did you do that orally?
 6      A.      Yes.
 7      Q.      You called him into your office?
 8      A.      I called him into my office, told him that, and
 9              said that's the end of it.  And I told Marcelle
10              to file the complaint, and that was it.  That was
11              the end of it completely.
12      Q.      That was the end of that communication?
13      A.      Yes.
14      Q.      Just really quick.  Where did these interviews
15              take place of Sergeant Dunham and Mr. Gorman?
16      A.      In my office.
17      Q.      Did you send -- how did you contact them?
18      A.      I don't know.  Marcelle might have done that.  I
19              don't recall.
20      Q.      Are there cameras in your office?
21      A.      No.
22      Q.      Now, we were talking about the interview with Mr.
23              Gorman.  Now, you asked Mr. Gorman to make a
24              statement of some kind; isn't that true?
```

```
 1    A.   No, I did not.

 2    Q.   More specifically, isn't it true you had asked

 3         Mr. Gorman to make a statement that Chief Vibert

 4         had given him personal information?

 5    A.   No, I did not.

 6    Q.   I want to talk a little bit more about what

 7         questions you may have asked him.

 8              You told him about the allegation of

 9         Patricelli's complaint?

10    A.   Yes.

11    Q.   And he denied that that was true?

12    A.   No.  I don't know.  The question to him wasn't

13         what was true or not true.  The question to him

14         was did Chief Vibert say anything to him.  That's

15         all.

16    Q.   Were there any additional questions that you

17         asked him?

18    A.   That was all I was asking for really at the time.

19         I just found out if the allegation was true, not

20         whether or not Patricelli did what he was doing,

21         because he confided in Chief Vibert what he was

22         doing and he said that.  But what I'm saying the

23         complaint wasn't what he was doing, the complaint

24         was that Chief Vibert said that.  And I said to
```

1          him, "Did she say anything to you on that?"

2                 And he said, "No."  And basically that was

3          it.

4     Q.   And just to wrap this subject up, that complaint

5          Patricelli made, there were no other allegations

6          other than confidential information was released,

7          private information was released?

8     A.   That's correct.

9     Q.   Now, Mr. Gorman verbalized his response to you.

10         Did you ask him to write a follow-up statement

11         memorializing that statement?

12    A.   No, I did not.

13                MR. SORSBY:  I'm okay with taking lunch

14            so long as we realize that the back end of

15            this will be longer than the front end.

16            That's why I was trying to push lunch out so

17            it would be easier.  Where are you guys at?

18                THE WITNESS:  I don't need lunch.  I

19            just want to spray myself and get this stuff

20            on me.

21                MR. MARTIN:  How long does it take for

22            you to spray the stuff?

23                THE WITNESS:  I can put it on in five

24            minutes.

```
 1                    MR. MARTIN:  Five- or ten-minute break?

 2                    MR. SORSBY:  No.  What difference at

 3              this point is 15 minutes, because we will

 4              probably take lunch at 12:30.  The

 5              stenographer does have to eat and rest.  So

 6              why don't we just do it now rather than have

 7              two breaks.  So why don't we say that.  And

 8              how much time?  Come back at a quarter 'til

 9              then?

10                    MR. MARTIN:  Yes.

11                    (Whereupon, a lunch break was taken.)

12                    MR. SORSBY:  Back on the record.

13   BY MR. SORSBY:

14      Q.    Now, Sheriff Mahar, I'm going to show you a

15              document, have you take a look at that.  It's

16              Plaintiff's Exhibit 91.

17      A.    Okay.

18      Q.    You see the signature at the bottom of that?

19      A.    "Anthony Patricelli".

20      Q.    And at the top, do you see what the type of

21              incident is indicated on this document?

22      A.    It says -- what do you mean?  Oh, informational,

23              yes.

24      Q.    So, now, have you seen this document before?
```

```
 1    A.   Yes.

 2    Q.   And where did you see this document?

 3    A.   Sergeant Patricelli gave that to me.

 4    Q.   What is this document?

 5    A.   I thought it was the one he wrote when he came in

 6         complaining about Chief Vibert releasing personal

 7         information on him.  I think that's what he said

 8         it was.

 9    Q.   Okay.  So earlier today, we testified that

10         Patricelli give you a complaint, typewritten

11         complaint.  You don't remember if it was two

12         pages or one?

13    A.   I didn't say if it was -- I said I can't remember

14         if it was typewritten or --

15    Q.   But he gave you a paper complaint; correct?

16    A.   No.  I asked him to give me a complaint.  He came

17         in verbally, then I asked him to give me a

18         complaint.

19    Q.   And he gave you the complaint?

20    A.   Yes.

21    Q.   Now, and just so I want to be clear, you said

22         that you recognized this document and that you

23         recognized this document as that complaint that

24         we just talked about; correct?
```

```
 1    A.   I assume that's it.

 2    Q.   I don't want you to assume, sir.

 3    A.   I only looked at it that day and then when I

 4         talked to these guys.  Let me take a quick look.

 5    Q.   There's another page after it, too.

 6    A.   Yes.

 7              MR. SORSBY:  While we are on the

 8         record, did you record the time that we

 9         started?

10              THE COURT REPORTER:  Yes.  Do you want

11         the time now?

12              MR. SORSBY:  I'm good.  Thank you.

13    Q.   So I have handed you Exhibit 91, and you have

14         taken some time to read through.  You read

15         through all the pages of this exhibit, I saw; is

16         that true?

17    A.   Yes.

18    Q.   Now, having read every page of this exhibit, do

19         you know what this document is?

20    A.   That was the information that Sergeant Patricelli

21         turned in when he told me about Chief Vibert

22         releasing personal information he confided to

23         her.

24    Q.   So that we're on the same page, this is the
```

```
 1           complaint that you asked Mr. Patricelli to write?
 2      A.   I believe it is.  I assume it is.  You're talking
 3           several years ago, but I believe it is.
 4      Q.   Why do you believe it is?
 5      A.   Because I don't think he gave me any other one.
 6      Q.   And it's important that you answer this question
 7           as best as you can, sir.  I asked you, and I'm
 8           asking you again:  Do you recognize what's been
 9           marked as Exhibit 91?
10      A.   Yes.  I believe I read that before, yes.
11      Q.   And I'm specifically asking you what's been
12           marked as Exhibit 91 -- let me finish the
13           question -- the complaint that you received from
14           Patricelli wherein he alleged that Ruth divulged
15           private information?
16      A.   Yes.
17      Q.   And this is the same complaint that you testified
18           to earlier that Patricelli indicated that
19           Sergeant Dunham witnessed the release of the
20           private information from Ruth Vibert; isn't that
21           true?
22      A.   Yes, he told me.  Sergeant Dunham was the -- he
23           said witnessed it, correct.
24      Q.   Do me a favor, sir, and tell me where --
```

1    A.   I didn't see it in there, either.

2    Q.   Now, you testified earlier that the complaint

3         that you received indicated that Sergeant Dunham

4         had witnessed this?

5    A.   Again, from my recollection, I know it was either

6         when Sergeant Patricelli told me or when Sergeant

7         Patricelli wrote it.  I can't remember.

8         Obviously, I don't remember.  But I know he told

9         me that Sergeant Dunham was a witness to this.

10        That's why I asked and met Sergeant Dunham and

11        asked him if he had witnessed it.

12             Sergeant Dunham admits to being a part of

13        the conversation but he never heard anything as

14        to what Patricelli was alleging.

15   Q.   And, again, you testified earlier today that your

16        interview of Sergeant Dunham and Mr. Gorman and

17        Chief Vibert was before the allegation of

18        February 15th that Patricelli called Mr. Gorman

19        at his house; isn't that true?

20   A.   I'm going to be honest with you, I really don't

21        remember the exact date of that.  I assume it

22        was, but I don't remember exactly the time frames

23        on all of these.  I can look at the time frame

24        sheet that Marcelle wrote up, but I don't

```
1              remember exactly in time frame when everything

2              is.

3      Q.     Now, with what you are alleging is the complaint

4              that you received from Patricelli, you said you

5              went through this with Sergeant Dunham; isn't

6              that true?

7      A.     No.  I asked Sergeant Dunham if he was a witness

8              to Ruth Vibert releasing any information about

9              John Gorman about Patricelli --

10     Q.     I understand --

11     A.     -- and he said no.  He denied that.

12     Q.     I understand your testimony earlier today that

13             you indicated you went over this complaint by

14             Patricelli with the witnesses you investigated?

15     A.     Again, I did.  I explained it to them that I

16             received a complaint from Patricelli.  I don't

17             know if I went into detail with all of that.

18     Q.     Now, I'm looking at the second page of this

19             exhibit.  Did you go over this?  I want you to

20             read that first sentence to me, second paragraph.

21     A.     "On October 1st --"?

22     Q.     Yes.

23     A.     "-- I was advised by Kim Gorman that her brothers

24             John and Mark Gorman gave her information
```

1           pertaining to what my fellow co-workers are

2           accusing me of.  And this led to a lot of

3           problems and resulted in the end of our

4           relationship."

5       Q.  Did you investigate that?

6       A.  No.

7       Q.  Why not?

8       A.  I wasn't -- I was only looking into whether or

9           not the chief was having a fraternization and

10          getting involved personally with people and then

11          using that in ways she should not be.  When it

12          was determined it wasn't, it was closed and that

13          was the end of it.

14      Q.  Why wouldn't you investigate this, sir?  This is

15          in the complaint by your master sergeant.  Why

16          wouldn't you investigate this allegations?

17                  MR. MARTIN:  Object to the form.  You

18              can answer.

19      A.  Which allegation?  Which specific one?

20      Q.  I'm talking about you just read the first

21          sentence of the second paragraph, and I asked you

22          if you had investigated that, and you said no.

23          And my question to you is why wouldn't you

24          investigate that?

```
 1                 MR. MARTIN:  Object to the form.

 2     A.    Again, when Patricelli met with me and he told me

 3           and I asked him to put -- he said that chief --

 4           that the chief gave him -- was releasing personal

 5           information about him in the workplace.  And I

 6           said I will look into that whether she would or

 7           wouldn't be.  And that's all I looked into.  And

 8           that's what I did.

 9                 Once I determined that did not happen, that

10           was the end of it.  And I told Patricelli that

11           did not happen.  And that was the end of the

12           complaint.

13     Q.    So let me go to the next paragraph.  Again, this

14           is the complaint you received, Exhibit 91.  You

15           testified this is the complaint you received from

16           Patricelli.  Third paragraph, second page:  "On

17           November 7th, B-line, I was in the watch

18           commander's office, Sergeants Roy and Marcelli

19           during this time.  Sergeant Marcelli told me he

20           found several discrepancies with the transport

21           gun law without hearing any names of those

22           responsible.  I advised this sergeant to bring it

23           to the captain's attention."

24                 Did you look into this allegation?
```

```
 1    A.   I didn't look into it, the captain did.  And
 2         remember, the Captain Smith looked into
 3         everything.  I don't remember the outcomes of
 4         everything, but Captain Smith was the --
 5    Q.   Can you tell me why you didn't look into that?
 6    A.   Because it's not my job to look personally into
 7         all these things, that's why we have a captain
 8         and that's why the captain did it.  I only looked
 9         into the issue of the chief, whether or not the
10         information was being released.  Period.  That's
11         it.
12              Once I determined that wasn't the case, I
13         told Patricelli, "That's it.  As far as I'm
14         concerned, it never happened."  And that was the
15         end of the complaint.
16              He wanted to have anything further, that
17         would have been the captain to deal with that,
18         not me.
19    Q.   What informs your selection process in
20         determining what allegations you decide to
21         investigate and not investigate?
22    A.   The chief was the third in command of the
23         organization.  That's what determined that.
24         Period.  The rest of that should go over to a
```

1      complaint file.  Patricelli would then go to the

2      lieutenant and/or the captain and go from there.

3  Q.  So all these people were to investigate that, why

4      did you specifically investigate the allegation

5      of releasing of private information?

6  A.  I think I told you that.

7  Q.  No, you didn't.  Tell me now.

8  A.  I did.  I told you it was because it was the

9      chief being the third in command.  I looked into

10     it because I specifically told her from the

11     beginning not to be involved in that stuff.  That

12     was it.  Once I determined that I didn't believe

13     it to be true, that was the end of it.  It was

14     closed from my perspective, and I told Patricelli

15     that.

16 Q.  So if I am to understand, are you saying that you

17     would only get involved if it involved

18     allegations against administrative staff?

19 A.  We have other people to investigate those items.

20     We have an internal affairs unit.  We have the

21     command staff.  That's their job to look into

22     those things.  It's not my job, nor was it ever.

23 Q.  Can you tell me in this three-page document where

24     precisely there's any information in regards to

1           the allegation that Ruth released private

2           information?

3     A.    Patricelli verbally told me that.  He told me

4           that.

5     Q.    Sir, I want you to answer my question.  I'm

6           asking you on this document --

7                     MR. MARTIN:  Objection.

8                     MR. SORSBY:  He can answer the

9                question.

10                    MR. MARTIN:  No, don't answer.

11                    MR. SORSBY:  Why?

12                    MR. MARTIN:  The document speaks for

13               itself.  We can call the judge.

14                    MR. SORSBY:  That's fine.

15                    MR. MARTIN:  You're badgering him.

16                    MR. SORSBY:  I'm not badgering him.  I'm

17               asking --

18                    MR. MARTIN:  The document speaks for

19               itself.

20                    MR. SORSBY:  The document he received,

21               he's indicating --

22                    MR. MARTIN:  You're asking him to read

23               it and say where is something in here or not.

24               The document speaks for itself.

```
 1                  You don't need to answer that question.
 2                  Or you can rephrase it.  "What in there
 3                  prompted you to do something?"  That would be
 4                  fine.
 5       BY MR. SORSBY:
 6       Q.   Now, when you see this three-page document, did
 7            you look through the whole thing?
 8       A.   Just now?
 9       Q.   No.  When you received it initially.
10       A.   Probably, yes.  I can't recall, but probably.
11       Q.   Do you recall looking through the allegations on
12            the first page, the narrative?
13       A.   I probably read it, yes.  Do I recall it?  I
14            don't specifically recall doing it, but I
15            probably did do it.
16       Q.   I'd like to go back in time a little bit to
17            October, 2012.  Do you understand?
18       A.   All right.
19       Q.   Now, during that month, did Anthony talk to you
20            at all about any interaction he had with John
21            Gorman?
22       A.   I have no idea.  He may or may not have.  I don't
23            know what specifically happened in October of
24            2012.  I don't remember what happened October of
```

1             last year.

2     Q.     Do you recall that Anthony Patricelli made a call

3            to the county jail to talk to John Gorman in

4            October of 2012?

5     A.     Maybe, yes.  I think there was something.

6            Whether I read it -- I don't know if he told me

7            it, but I think he told me he did.  I can't

8            remember exactly.

9     Q.     Are you aware that Anthony Patricelli called Mr.

10           Gorman while he was at work and said, "Thank your

11           brother, thank your wife, thank you"?

12    A.     I don't know.  Maybe.  I don't know.  It might

13           have come up somewhere in the testimony before in

14           other things, I just don't remember.  It may

15           have.

16    Q.     Do you recall there being an allegation to that

17           effect during that time period?

18    A.     I don't know if there was or wasn't.

19    Q.     And, again, this is the period, of course, before

20           February 15th that we will get to.

21                So October, November, 2012, did you have any

22           conversations with Patricelli regarding an

23           allegation that he had called Mr. Gorman at

24           home -- or at work?  Excuse me.

1    A.   Did I have what?

2    Q.   Any conversations with Patricelli about that?

3    A.   I don't recall conversations.

4    Q.   Do you recall any conversations with any of your

5         staff regarding an allegation that Anthony called

6         Mr. Gorman while he was at work?

7                   MR. MARTIN:  During October, November?

8                   MR. SORSBY:  Right.  We're going to go

9              in order.

10   A.   I don't specifically recall that.  I may or may

11        not have.  I just don't know.  I can't recall.

12   Q.   Can you tell us, if you know, how long are phone

13        calls kept at the Rensselaer County Sheriff's

14        Department?

15   A.   There should be a specific period of time for

16        that.  But I think it's a pretty long period.  I

17        don't know how long it is, to be honest with you.

18   Q.   Does seven years sound about right?

19   A.   It could, but, again, what we originally expected

20        to be and what it ended up being, I don't know

21        that answer.  Lieutenant Dunham is the one that

22        can answer that.  He handled all the technical

23        stuff for that and how it was supposed to be.

24        And I know we had problems with it and things

```
 1            like that.  So I don't know the exact answer.
 2       Q.   Isn't it true that Sergeant Dunham can set up a
 3            phone to record and not record, as well?
 4       A.   Some phones were recorded and some weren't,
 5            that's correct.
 6       Q.   You would be the one that would handle that?
 7       A.   No.  I think we ended up with the union.  Most of
 8            the phones over there were recorded except for
 9            one that were allowed for union had to be
10            recorded, for union business.  But I don't know
11            the exact time frame of that.
12                 MR. SORSBY:  Off the record for a
13              moment.
14                     (Off the record.)
15                     (Phone call recording playing.)
16    BY MR. SORSBY:
17       Q.   Have you heard this phone call before?
18       A.   Never.
19       Q.   You recognize the voice, the voices?
20       A.   Yes.
21       Q.   You recognize Mr. Gorman's voice?
22       A.   I assumed it was him.
23       Q.   Well, do you recognize Anthony's voice?
24       A.   Yes.
```

1     Q.   I will play it again.

2     A.   No, you don't need to.  I recognize it.

3               MR. SORSBY:  Were you able to hear the

4          conversation or no?  (Directed to the court

5          reporter.)

6               THE COURT REPORTER:  I didn't take it

7          down.  We don't take down recordings.  If

8          you send it to the office, someone can

9          transcribe it for you.

10              MR. SORSBY:  We'll send it to the

11         office.

12    BY MR. SORSBY:

13    Q.   At this point, you haven't heard that?

14    A.   Haven't heard what?

15    Q.   You haven't heard that recording?  That was the

16         first time you heard that recording?

17    A.   Yes, it is.

18    Q.   Were you able to understand what was said?

19    A.   I think I got the gist of what was said.  I don't

20         know if I can repeat it right now.  Just say,

21         "What's up?  Thank you.  Thank your wife, thank

22         you.  For what."  And that was it.  Whatever.

23         "Bye".  Something like that.

24    Q.   Now, Mr. Gorman's brother worked at the sheriff's

```
 1            department; is that true?
 2      A.   Yes, he was a deputy.
 3      Q.   Did Mr. Gorman's wife work at the sheriff's
 4            department?
 5      A.   I don't know.
 6      Q.   Well, you would know, you were the sheriff.
 7      A.   Not necessarily.  I don't know everything.
 8      Q.   You have no knowledge of that?
 9      A.   I have no knowledge of that.
10      Q.   Can you tell us why Master Sergeant Patricelli
11            would call Mr. Gorman to tell him to thank his
12            brother and to thank his wife?
13      A.   I have no idea.  They are family.  I have no
14            idea.
15      Q.   Are you aware of any sheriff department business
16            for making that phone call?
17      A.   I have no idea what the phone call was about.
18            Period.
19      Q.   You heard him say, "Thank your wife, thank your
20            bother"?
21      A.   Yes.
22      Q.   Making that statement, would that have any
23            relation to sheriff business?
24      A.   I have no idea.
```

```
 1     Q.   Did you understand that to have any relation to

 2          sheriff business?

 3     A.   I don't know what it's related to.  Period.

 4     Q.   Okay.

 5                    MR. MARTIN:  Could you go off the record

 6             for just one second?

 7                    MR. SORSBY:  Sure.

 8                    (Off the record.)

 9   BY MR. SORSBY:

10     Q.   Now, I want to -- I'm going to show you what's

11          been previously marked as Exhibit 57.  Quickly

12          look at that narrative on the second page, if you

13          don't mind.

14     A.   Okay.

15     Q.   Sir, you recognize this document, don't you?

16     A.   I don't remember.  I may or may not have seen it

17          before.  I really don't remember.

18     Q.   You recognize the signature at the bottom?

19     A.   I can't even read it.  It says "John Gorman", so

20          I assume that's his signature.

21     Q.   What's the date on the top?

22     A.   8, October.

23     Q.   What do you understand this document to be?  What

24          type of document is this, can you tell us that?
```

```
 1    A.   Well, it says "informational".

 2    Q.   What's an informational?

 3    A.   Apparently, that's what they file over in

 4         corrections.

 5    Q.   Now, do you recall ever receiving this document?

 6    A.   I may or may not have.  I don't recall.  I just

 7         don't know.

 8    Q.   All right.  I'm going to show you what's been

 9         marked Exhibit 58, just note the date at the top.

10    A.   5, November.

11    Q.   Take a look at that and tell me if you recognize

12         that.

13    A.   All right.  I don't recognize it, but --

14    Q.   To save some time, I'm going to ask you:  Do you

15         recall receiving any documents in regard to John

16         Gorman from October, 2012, to January 1st, 2013?

17    A.   I may have, may not have.  I just don't know.

18    Q.   I'm just going to show you this exhibit, and show

19         you the top date and the location of the

20         incident.

21    A.   22, January, '13, west hall staff interaction.

22    Q.   And do you recognize this document?

23    A.   Again, I don't know.  I don't recall.  I just

24         don't recall the document.  I may have seen it, I
```

```
 1              may not have.  I just don't know.
 2     Q.   Now, we discussed earlier that some of the phone
 3              conversations at the jail can be taped.  Do you
 4              recall that conversation?
 5     A.   Yes.
 6     Q.   Do you recall receiving a phone call from a
 7              Marcelle Swanberry, indicating that there was a
 8              request that Mr. Gorman be taken off of key
 9              detail by Patricelli?
10     A.   I don't know if I did or didn't.  I don't recall
11              that.  I don't recall it.
12     Q.   Let's go and identify it for the record.  Who's
13              Marcelle Swanberry?
14     A.   She's the sheriff's confidential assistant.
15     Q.   And does she go by another last name?
16     A.   Well, originally, she was Marcelle Connors.
17     Q.   When did that change?
18     A.   When she got married.
19     Q.   So that's now Swanberry?
20     A.   Yes.
21     Q.   Did that happen while you were the sheriff, that
22              she changed her last name?
23     A.   Yes.
24     Q.   We are still talking about the October to
```

```
 1            December of 2012 time frame.  When did her last
 2            name change?
 3      A.    I don't know.
 4      Q.    Was it early in your administration?
 5      A.    I don't remember.
 6      Q.    Do you recall in October of 2012 that Mr. Gorman
 7            had to take an off-of-key detail?
 8      A.    No, I don't remember when he would of or wouldn't
 9            have been.  He may have been.  I just don't
10            recall the specific dates or times.
11      Q.    I'm not asking about the dates.  I'm asking do
12            you remember if Mr. Gorman was taken off key
13            detail?
14      A.    I don't remember.  He may have or may not have.
15            I don't remember.
16      Q.    And that is an answer.
17      A.    Yes.
18      Q.    Do you recall Patricelli telling you that Mr.
19            Gorman can no longer be trusted?
20      A.    I don't recall that, no.
21      Q.    Do you know anything about how the key detail
22            worked?
23      A.    No.
24      Q.    How keys were made and signed by John Gorman?
```

```
1    A.   I know he was in charge of keys.  I knew that.

2    Q.   Who made him in charge of keys?

3    A.   I think Scott Dunham requested it, or Lieutenant

4         Dunham.  I don't know what he was at the time.

5    Q.   And who has the power to remove him from that

6         detail, do you know?

7    A.   The chief, the lieutenant, the undersheriff,

8         sheriff could.

9    Q.   Master Sergeant Patricelli, could he?

10   A.   No.

11   Q.   Did you ever receive a complaint about Mr.

12        Gorman's work on the key detail?

13   A.   No, not that I recall.

14   Q.   Are you aware that all the facility keys were

15        kept in the watchman, and the watchmans are

16        assigned to administrative staff?

17   A.   I know keys are kept in the Morse Watchman.  I

18        don't know if all are.  There might be a locked

19        safe somewhere, too.  I don't know for sure.

20             MR. MARTIN:  Did you say kept in the

21        Morse Watch?

22             THE WITNESS:  Morse Watchman.  It's a

23        type of device where you have to identify

24        who you are to get a key out.  I think that
```

```
 1                    would be an appropriate way to say that.

 2                         MR. SORSBY:  Off the record.

 3                         (Off the record.)

 4                         MR. SORSBY:  Back on the record.

 5    BY MR. SORSBY:

 6    Q.   Now, we have been talking about October.  We are

 7         going to go to November, 2012.  Do you

 8         understand?

 9    A.   Okay.

10    Q.   So are you aware that there came a time when

11         Master Sergeant Patricelli wrote up Mr. Gorman

12         concerning a firearm logbook?

13    A.   There may or may not have been.  I don't know.  I

14         can't recall.  They may have told me, the captain

15         may have told me.  I don't personally investigate

16         those things.  I don't know.  I may have been

17         told that.  I just don't remember.  And if that's

18         the case if he did do that, it would have been

19         investigated by the command staff.

20    Q.   And, again, I'm just asking if you had knowledge

21         of that.

22    A.   Again, I don't recall.  I may.  You know, so much

23         was going on.  I don't remember all those things.

24         And if I was told it, when was it.
```

```
 1    Q.   But just to be clear, if you don't know and
 2         you're saying you don't know --
 3    A.   I don't remember.  That's correct.
 4    Q.   Now, Mr. Gorman was a provisional sergeant; isn't
 5         that true?
 6    A.   Yes, he was.
 7    Q.   And he had a training officer by the name of
 8         Sergeant Ryan; isn't that's true?
 9    A.   I have no idea.
10    Q.   You have no idea who was training him?
11    A.   No.
12    Q.   Do you know if Sergeant Ryan was a training
13         officer?
14    A.   He was in charge of training, meaning I think he
15         was -- no, he wasn't training.  He was in charge
16         of transports I thought.  Again, I think Sergeant
17         Doper was training.
18    Q.   So to the extent that a corrections officer is
19         being trained to be a sergeant in the transport
20         program, then it would have been Sergeant Ryan
21         that would have --
22    A.   Probably.  He probably -- I guess that might very
23         well be, yes.
24    Q.   Now, we talked about the use of cameras earlier.
```

```
 1              And I just want to ask you specifically:  Are you
 2              aware that Mr. Patricelli followed Mr. Gorman
 3              around the jail with the cameras?
 4       A.     No, I'm not aware of that.
 5       Q.     Are you aware or do you recall a complaint being
 6              made by Mr. Patricelli that Mr. Gorman was
 7              spending too much time in Sergeant Dunham's
 8              office?
 9       A.     I don't know.  May or may not have.  I don't
10              know.  If that were the case, then that would be
11              handled by a lieutenant.
12       Q.     I'm asking if you have knowledge of that.
13       A.     I don't remember.  I really don't recall
14              anything.
15       Q.     And that's all I wanted to know.
16              Were you aware that Mr. Gorman was
17              instructed that he had to get permission to go
18              anywhere in the jail by Sergeant Rankin
19              (phonetic)?
20       A.     No.
21       Q.     Can you tell us when Ruth Vibert was terminated
22              from the sheriff's department?
23       A.     I don't remember the exact date.  It was near the
24              end of her first year of employment.  I don't
```

1            remember.  I think it was March.  I don't

2            remember the exact date, though.

3     Q.    And why was she terminated?

4     A.    She didn't fulfill her requirement, educational

5            requirement.

6     Q.    Now, you had spoken earlier about administration

7            staff fraternizing with insubordinates.  Now, you

8            discussed that problem with Ruth; is that true?

9     A.    Yes, I did.

10    Q.    And what did she say to you when you discussed

11           that with her?

12    A.    Nothing.  It was more of a directive, not a

13           discussion.  It was that she shouldn't be doing

14           that and the reason why.

15    Q.    Did you write her up for that?

16    A.    No.

17    Q.    Did that weigh in at all in your decision to

18           terminate her?

19    A.    Not specifically, no.

20    Q.    Not specifically?

21    A.    Amongst many things, yes.

22    Q.    So it was one of the things, one of the reasons?

23    A.    Yes.

24    Q.    What were some of the other reasons?

```
 1    A.    Again, like I said, the specific reason is that
 2          she did not meet her educational requirement.
 3          When she was interviewed for the job, she wasn't
 4          truthful over certain things, when the complaints
 5          we were getting from the staff that she wouldn't
 6          be able to handle the job.  It was common
 7          knowledge throughout the jail that her ability to
 8          handle it was very subpar, and things along that
 9          nature.
10              They were very uncomfortable how she dealt
11          with them.  And, basically, that was it.  Mainly
12          and specifically was the education.
13    Q.    And now, again, there was an incident where
14          Patricelli called Mr. Gorman at home on February
15          15th.  Was Ruth Vibert terminated before or after
16          that?
17    A.    After.
18    Q.    Do you have an idea how long after?
19    A.    Not exactly.  I don't know.  A month maybe.
20          Maybe somewhere around there it was.  I don't
21          know exactly.
22    Q.    Okay.  Just a quick question about Anthony
23          Patricelli.  Now, do you know who Wendy Vaga is?
24    A.    Yes, I do.
```

1    Q.   Who's that person?

2    A.   She's a CO.

3    Q.   And how about Alexis Johnson?

4    A.   I don't know who Alexis Johnson is.  No, I don't

5         know who she is.  She work there?

6    Q.   Do you understand that she was a CO?

7    A.   She may have been.

8    Q.   Wendy Vaga was a CO, though; right?

9    A.   Yes.

10   Q.   Now, isn't it true that Anthony had a

11        relationship with Wendy Vaga?

12   A.   I have no idea about that.

13   Q.   He never talked to you about that?

14   A.   Never.

15   Q.   Now, Mr. Gorman was a provisional sergeant, and

16        there came a time when he lost that status; isn't

17        that true?

18   A.   That's correct.

19   Q.   And, in fact, that was February 11th, 2013; isn't

20        that true?

21   A.   I don't know the exact date, but whatever it was.

22   Q.   Now, you told Mr. Gorman that he would be

23        promoted as soon as he became reachable; isn't

24        that true?

1    A.    No.  I told Mr. Gorman could be promoted as soon
2          as he come reachable, that he's doing his work
3          fine, everything was going well.  If he continued
4          on that endeavor, we would probably promote him.
5          That's what I said to him.
6    Q.    And you said that before he lost his provisional
7          status?
8    A.    Yes.
9    Q.    Now, how does one become a provisional sergeant?
10   A.    There isn't a current list.  It does not exist in
11         Civil Service, a valid list.  You may promote
12         provisionally until the next exam, and then if
13         the person then becomes reachable, they can be
14         promoted.  They can be.  Doesn't have to be; can
15         be.
16   Q.    So is it fair to say that a person that's
17         appointed as a provisional sergeant remains so
18         until the next test?
19   A.    What do you mean?
20   Q.    When does one lose their provisional status?
21   A.    When we have a valid Civil Service list.
22   Q.    So if they are not reachable at that point, they
23         lose their provisional status?
24   A.    Or we choose not to hire them, either/or.

```
1    Q.   Is there any scenario where they can remain a

2         provisional sergeant after the test?

3    A.   Not when there's a current, valid list.

4    Q.   Because you would have to choose from that list;

5         is that true?

6    A.   The Civil Service Law doesn't allow you to.

7    Q.   Allow you to what?

8    A.   Keep a provisional when you have a valid list.

9    Q.   Now, in terms of -- and you familiar with the

10        rule of three?

11   A.   Yes.

12   Q.   And what do you understand that to be?

13   A.   You may hire -- the appointing authority has the

14        authority to select one of the top three on the

15        list.

16   Q.   And do you understand that to be the top three

17        names or the top three categories by score?

18   A.   The top three scores that are put, yes.  If

19        it's -- depending upon what type of system that

20        they use.

21   Q.   What type of system?

22   A.   Not everybody answers.  Their scores could be in

23        a band, like we do.  Your band, for example, if

24        you are -- say there's three 100s, that would be
```

1          one band.  All the score 95s would be the next

2          band.  You know, all the way down would be a

3          different band.

4               Now, the very top person on the list is

5          number one.  The next person on the list is

6          number two.  The third person on the list,

7          depends how many are in a band.  Say there's a

8          score, like, 100.  Say there's ten of them.  Just

9          say that.  All the rest of the 100s would be

10         number three.  You cannot go into the next band

11         until you have depleted the first band.

12    Q.   So staying with that, if you have five 100s, you

13         have to exhaust that first band before you go to

14         the second band?

15    A.   Not all.  You have to count to the rule of three.

16    Q.   Right.  So I'm asking you if you have one

17         position and you have five 100s --

18    A.   Yes.  You would end up with three 100 scores

19         being promoted.

20    Q.   If you had one position, five 100s in a band,

21         five 95s in the second band, and then five 85s,

22         and you have one position, can you go down into

23         the second band?

24    A.   No, you can't.  You have to pick from the top

```
 1              band before you can go to the next one.
 2    Q.    That's your understanding of how it works?
 3    A.    That's what I've been told is how it works by the
 4              Civil Service, State Civil Service and Civil
 5              Service Authority at the county.
 6    Q.    Is that how you implemented the Civil Service
 7              selection process at the sheriff's department?
 8    A.    That's correct.
 9    Q.    So I'd like to just show you what's been marked
10              as Exhibit 82.  Now, just read the top for us.
11              What's the label on that?
12    A.    "Certificate of Eligibles".
13    Q.    Now, you recognize this type of document?  Let's
14              start there.
15    A.    Well, when we contact Civil Service, this is what
16              they would send us as to who are the eligibles on
17              the list.
18    Q.    And now, let's talk about this Exhibit 82
19              specifically.  Do you see an appointing officer's
20              signature there, sir?
21    A.    Yes.  It's mine.
22    Q.    And what's the date on that?
23    A.    February 5th of 2013.
24    Q.    And again, what do you understand this specific
```

```
1          document to be?

2     A.   Correctional sergeant promotional list.

3     Q.   And how would you utilize this list?

4     A.   I don't know what you mean by that.

5     Q.   I will take it back and I will give it back to

6          you.

7               MR. MARTIN:  It's the same as Exhibit A.

8               It looks like Gorman, but somebody wrote on

9               that after-the-fact.  He can look at it while

10              you're looking at that one?

11              MR. SORSBY:  Yes.  Off the record.

12              (Off the record.)

13              MR. SORSBY:  Let's go back on the

14              record.

15    BY MR. SORSBY:

16    Q.   So we are looking at Exhibit 82.  I'll make sure

17         you're looking at the same.  I know you're using

18         that for reference.

19    A.   We're off the record here; right?  You said we

20         were, right?

21              MR. SORSBY:  Let's go off the record.

22              (Off the record.)

23              MR SORSBY:  Well, hold on.  I need to

24              go on the record.  It's not helpful --
```

```
 1                    THE WITNESS:  Okay.  I want to try and
 2              explain that, that's all it was, because I
 3              think you were asking who wrote that and
 4              when.
 5                    MR. SORSBY:  Let's --
 6                    THE WITNESS:  I'll wait until you ask
 7              the question.  Ask the question.
 8                    MR. SORSBY:  Stay on the record until I
 9              instruct otherwise.  (Directed to the court
10              reporter.)
11                    Well, if we don't have it on the
12              record, it's going to be a long day.
13                    THE WITNESS:  I understand.
14    BY MR. SORSBY:
15      Q.   So looking at Exhibit 82 again, who do you
16           understand wrote the word "permanent" on there?
17      A.   I think it was Marcelle.
18      Q.   And what about the dates, as well?
19      A.   She would have put that down.
20      Q.   And when would she have written this information?
21      A.   When she retuned the list to Civil Service.
22      Q.   And so this document would have come to you
23           without any of this information on it, correct,
24           and then you would have reviewed it and then
```

```
1              Marcelle would have written that information on

2              it before they sent it back?

3       A.    Yes.

4       Q.    Okay.  I understand.

5                   Now, this information that says "permanent",

6              what does that mean?  Can you tell us that?

7       A.    Yes, that means they were appointed permanent.

8       Q.    And the date?

9       A.    Was the date of appointment.

10      Q.    And that's the same throughout wherever it

11             indicates that where it says "permanent", that

12             means they were permanently appointed?

13      A.    Yes.

14      Q.    And where would she have gotten that information

15             from?

16      A.    I don't understand.

17      Q.    You said Marcelle filled that out.  Where would

18             she have gotten this information?

19      A.    The person would have been brought in.  When you

20             make the promotion, you have to fill out a

21             personnel form that explains all of that.  That's

22             where she would have gotten that information from

23             and did it to that, because that goes to human

24             resources, this goes back to the Civil Service.
```

```
 1          (Indicating)

 2     Q.   And I understand that, but I don't know that you

 3          answered the question.  I don't think you

 4          understood my question.  I'm asking:  How did she

 5          know to put "permanent" and the date?  Where is

 6          she getting that information from?

 7     A.   That's the date they were sworn in.

 8     Q.   Okay.

 9     A.   So they were sworn in off the Civil Service list,

10          that makes them permanent.

11     Q.   No.  I understand how to make them permanent.

12          I'm just wondering -- my question is:  Where does

13          she get the information from?

14     A.   She knew it.

15     Q.   Again, so she knew that Mr. Galewski (phonetic)

16          and Mr. Morren (phonetic) were permanently

17          appointed and the date they were permanently

18          appointed?

19     A.   Yes, she would have known that, yes.  She would

20          have typed up the personnel order forms, or

21          whatever they call the form.  I don't know

22          exactly.

23     Q.   All right.  So on this list where it's indicating

24          that these individuals were permanent in
```

```
 1              selecting a person to fill a vacant position,

 2              would you have included those persons?

 3      A.     Please, say that again?

 4      Q.     I'm looking at the first person, Mr. Morren.  He

 5              had a score of 95 percent?

 6      A.     Yes.

 7      Q.     And it says "permanent", and it says "February

 8              15th, 2013"?

 9      A.     Correct.

10      Q.     Would that person have been eligible to be picked

11              for vacancies at the sheriff's department?

12      A.     What do you mean, "would he have been eligible"?

13              Off the list?

14      Q.     Correct.

15      A.     Yes.

16      Q.     And just so I understand, is it that this was the

17              list that was sent, and then from this list, this

18              person was accepted and made permanent, pulled

19              from this list?

20      A.     Yes.

21      Q.     I think I'm understanding now.

22      A.     You're just confusing me.  It's a real simple

23              process, but I'm getting confused over it.

24      Q.     Well, I don't know what to make of that.
```

```
1              So that would mean when another list came

2         out, these individuals would no longer be on the

3         list; isn't that true?

4    A.   Should be, correct.

5    Q.   Okay.  Can you tell us is there a certification

6         date on this document, on Exhibit 82?

7    A.   February 5th of '13.  I think she wrote February

8         15th -- oh, no, certification.  I'm sorry.  I do

9         apologize.

10   Q.   That's all right.

11   A.   January 7th, 2013.

12   Q.   Do you know who Jason Lucy is?

13   A.   No, I never met the guy.  I shouldn't say that.

14        I may have sworn him in, but beyond that, that's

15        all I know about him.

16   Q.   You have a recollection of swearing him in?

17   A.   No.

18   Q.   Maybe this will help your recollection.  Do you

19        recall that Jason Lucy accepted a job with the

20        fire department?

21   A.   Actually, not at the time I didn't, but I was --

22        you know, afterwards I was informed of all of

23        that, yes.

24   Q.   Okay.  So if he accepted a job with another
```

```
 1              government agency, was he entitled to be on a

 2              list for the Rensselaer County Sheriff's

 3              Department?

 4     A.   To answer that question, yes.

 5              I'm waiting to let you ask the questions.

 6     Q.   Would you like to explain how a person that has

 7              accepted employment at another government agency

 8              can remain on a list for a position that's open

 9              with the Rensselaer County Sheriff's Department?

10     A.   Until he leaves for the list, he would be

11              eligible for that list because he can always turn

12              the job down.

13     Q.   So until -- you said until he leaves that

14              position, he can always turn the other job that

15              he's accepted down; is that true?

16     A.   Yes.

17     Q.   And that makes sense when the person's currently

18              employed with the sheriff's department; right?

19     A.   Yes.

20     Q.   But if a person is off on the street, as it were,

21              not employed at the sheriff's department, if he

22              accepts a job at another government agency,

23              should he be on this list still?

24     A.   And leaves?
```

1    Q.   Well, was never there.

2    A.   Probably not.  I agree with that.  No.

3    Q.   Now, I'm just going to ask you a quick question

4         about Exhibit 82 again, just so I can understand

5         what you were talking about banding before.

6    A.   Is this the same one as this? (Indicating)

7    Q.   I can't testify.

8    A.   All right.

9    Q.   Tell me for the 95 percentile --

10   A.   He's number one.

11   Q.   There's no other individual with a 95 score?

12   A.   No.  He'd be number one.

13   Q.   So assuming that person was -- strike that.

14        Your reading of this list, who would be

15        first eligible for an open position?

16   A.   Of this list?

17   Q.   Correct.

18   A.   He would, he would, and all the 85s. (Indicating)

19   Q.   Okay.  So on that, based on that, one can

20        actually go into the 85s and select somebody?

21   A.   It was obvious.  It was done.

22   Q.   Well, I'm asking you.

23   A.   Yes, you can.  I explained that earlier in the

24        rule of three and how the bands work.

```
 1    Q.   Okay.  I'm going to show you Exhibit A now.

 2         Okay?  It's similar but there's more to it, okay,

 3         than Exhibit 82.

 4              Now, if this person, Jason Lucy, doesn't

 5         work for the sheriff's department at this time

 6         but has accepted a job with another government

 7         agency, based on your testimony from before, he

 8         wouldn't be on the list.  Can you tell us how far

 9         down the list we would get for eligibility for

10         one position?

11    A.   Assuming all the facts you say are understood?

12    Q.   Correct.

13    A.   That's a big assumption.

14    Q.   I understand that you're not agreeing with my

15         facts.

16    A.   Based on what you're saying --

17    Q.   Correct.

18    A.   -- Civil Service would not send us this list.  We

19         go by the list that Civil Service sends us.

20         That's the only official document we can go by.

21    Q.   I understand.

22    A.   So you're going to make the assumption he's not

23         here?

24    Q.   Correct.
```

```
1    A.   Eric Morren would be number one, Dave Galewski
2         would be number two, and the rest of the 85s
3         would be number three.
4    Q.   So based on what you just said, you would not get
5         into the 80s; is that correct?
6    A.   You can't legally.
7    Q.   Because what I'm trying -- I understand how the
8         Civil Service Law works, but I'm trying to
9         understand your understanding of it.  Because we
10        talked earlier when we were looking at Exhibit
11        83, you said we would get down into the 85s,
12        correct, that's what you had said?
13   A.   Here?  Let me just look.  One, two -- yes, you
14        can get on the 85s, that's correct.
15   Q.   And so why would you not get into the 80s on this
16        if Mr. Lucy is out?
17   A.   95 is one.
18   Q.   Yes.
19   A.   85 is two.
20   Q.   Okay.
21   A.   The rest of the 85s are three.
22   Q.   Okay.
23   A.   That's the rule of three.
24   Q.   Okay.  It's not that -- you don't go through --
```

```
 1    A.   You have to get down below the 85s before you can

 2         move to the 80s.

 3    Q.   So when you get down into the 85s, can you tell

 4         us between the 85s, what distinguishes one 85

 5         from another in terms of selecting a candidate?

 6    A.   What do you mean, "what distinguishes them"?

 7    Q.   How do you choose amongst the 85s?

 8    A.   It's up -- it's the prerogative of the sheriff's

 9         office for which one of those to pick.  And they

10         are all equal.  I shouldn't say all equal.  They

11         are equal from one, two and three.  And under the

12         law, you may pick one, two or three.  How you

13         establish that will be based on who are the

14         better people that you would want to select to

15         put in the position.

16    Q.   Okay.

17    A.   That's how it does that.

18    Q.   Sir, I just have another quick question on this

19         just so I understand how the banding works.

20         Okay?  If you have one high score, let's say 95

21         percent, and then you have a band of 90s -- you

22         follow me?  95 would be one, do you agree with

23         that?

24    A.   Yes.
```

```
 1    Q.   And in the band of 90s, would you have to

 2         exhaust -- well, let me back up and rephrase

 3         that.

 4              You got one score of 95, and five at 90.

 5         Based on the rule of three, can you get past the

 6         90 band to get to 85?

 7    A.   No.

 8    Q.   You're saying that one is 95, and the next two

 9         are in that next band down; is that correct?

10    A.   How a band works is this:  Depending on the

11         numbers in the band -- I'll give it to you three

12         different ways.

13    Q.   Okay.

14    A.   You got all 100s, five 100s.

15    Q.   Okay.

16    A.   Any ones of them 100s can be promoted.  Okay?

17    Q.   Sure.

18    A.   You can't go beyond that.  The first one is one.

19         The second one is two.  All the rest are three.

20         All the rest are three.

21    Q.   In the band of 100?

22    A.   In the band of 100.

23    Q.   Okay.

24    A.   You can't leave that until you can reach the next
```

1             group as number three.

2    Q.   Okay.

3    A.   So if you have one 100, four 90s, it would be the

4         100 may be taken as number one.

5    Q.   Right.

6    A.   Maybe.  Don't have to, but eligible.

7    Q.   Okay.

8    A.   The first 90 is number two.  All the rest of the

9         90s are number three.  You can't go beyond that

10        until you can reach the next number as number

11        three.

12   Q.   Okay.  And just to be clear on that example on

13        that second band, once you -- go ahead.

14   A.   Just because they are number one, number two and

15        number three, you don't have to take them in that

16        order.  Any one of them can be taken.

17   Q.   Just to make sure we are on the same page, I'm

18        saying if there's one position available.

19   A.   Yes, I understand.

20   Q.   One position available and, as you said, you had

21        100, you could pick the 100 score or you can go

22        down to that band with the 95s, if you choose?

23   A.   Depending on circumstances.  It's the prerogative

24        of the appointing authority on the rule of three

```
 1            how they want to enforce it, utilize it.

 2                 I personally -- it has always been my

 3            policy, unless other circumstances exist, to take

 4            the higher score first.

 5       Q.   As long as you're within the three?

 6       A.   As long as you're within the three.

 7       Q.   Right.  And that's what I wanted to figure out,

 8            because you're saying that you could pick the 100

 9            but you don't have to.  You can go into the 95s

10            band --

11       A.   That's correct, but you can't leave it.

12       Q.   You cannot leave it?

13       A.   If you go beyond it.

14       Q.   So what you're saying is if there's five in the

15            95 band, you cannot leave it because there's

16            other options?

17       A.   It would violate the rule of three in Civil

18            Service rules.  Not my rules, their rules.

19       Q.   All right.

20                 Now, I'm going to show you what's been

21            marked as Exhibit 83.  And, by the way, just so

22            you understood the question, I was trying to get

23            to your understanding and interpretation of the

24            rules.
```

```
 1    A.   I understand that.  I get it.  I understand what
 2         you're doing.  I get it.
 3    Q.   All right.
 4              Now, this is Exhibit 83, and I just want you
 5         to see the date of this certification.  Can you
 6         tell me that?
 7    A.   Where is that?
 8    Q.   Up at the top.
 9    A.   March 1st, 2013.
10    Q.   Now, here we have three different scores; right?
11    A.   Yes.
12    Q.   And looking -- okay.
13              Just so I further understand your
14         interpretation of the rules, can you tell me why
15         there wouldn't be an 80 slot?
16    A.   Civil Service -- because I questioned this before
17         in Civil Service, "Why don't you send me the
18         entire list?"
19              She goes, "You're only making one
20         appointment.  You can only pick from three
21         people.  We're only sending you the three
22         eligibles," and that's what they send us.
23    Q.   Now, you would agree if, in point of fact, as I
24         indicated, Mr. Lucy had never been employed by
```

1          the sheriff's department and accepted a job at

2          another government agency and was thereby not on

3          the list, and if that was true -- you don't

4          necessarily have to agree with that, but if that

5          was true, there would be another band of scores

6          there?

7     A.   There might be, yes.  I don't disagree with that.

8          That might be.  But, again, I can only go by the

9          list that Civil Service brings me, that's number

10         one.  And number two, as I told you before -- and

11         it's always been my policy, all other things

12         being equal, the higher score goes first.

13    Q.   I understand that.

14              Well, let me -- staying on that because you

15         indicated the higher score --

16    A.   All things being equal.

17    Q.   All things being equal?

18    A.   Yes.

19    Q.   Now, Mr. Gorman was a provisional sergeant, and

20         you had indicated he was doing a good job?

21    A.   I indicated he was doing an okay job.  We can

22         debate the particulars of it, but to be honest

23         with you, never had a problem with John Gorman.

24         I always thought he was a fine man.  Work, I

1        thought he was weak in some areas, but it's

2        learning.  I took into account things like he

3        really never spend a lot of time in corrections,

4        so there's some things he would have to learn and

5        do.  But beyond that, I had no reason not to make

6        John Gorman --

7   Q.   In fact, you appointed him as a provisional

8        sergeant; isn't that true?

9   A.   Yes, I did.  Because based on recommendations --

10       everyone will tell you Sergeant Patricelli got

11       his appointment.  Sergeant Patricelli will tell

12       you that.  That is not a true statement.

13       Sergeant Patricelli never had that kind of drag.

14            The command staff told me that he does, he

15       would be a good fit and to do the work that he

16       was doing.  And mainly that came -- I don't know

17       if he's a lieutenant at the time or sergeant.  I

18       think it was Sergeant Dunham when we put him in

19       the transition -- to work in the transition team.

20       That's how that went.

21  Q.   Do you recall the recommendation made to

22       provisional sergeant came from Sergeant Dunham?

23  A.   He was one of them.  Came from the other

24       commanders that were there that we asked.  It

```
 1            wasn't just -- again, I don't personally -- I
 2            have the undersheriff and the command staff at
 3            the jail make their recommendations, and it comes
 4            to me and I make the final decision, of course.
 5       Q.   Based on all of that, assuming Mr. Gorman had
 6            been eligible, would you have appointed him as a
 7            sergeant?
 8       A.   Yes, I have no reason not to.  I would have.  Not
 9            a problem at all with John Gorman.
10       Q.   Now, do you recall that he became reachable at
11            any point?
12       A.   Contrary to what you all may think, I don't pay
13            attention to these things day in and day out.
14            They're not even close on my list of priorities.
15                 When it comes time, I ask Marcelle to -- she
16            takes care of all the paperwork and submits to me
17            all of the eligibles and all those kinds of
18            things.
19                 Marcelle put the timeline down on when he
20            would have been eligible.  And you might have
21            that somewhere.  I don't have the document in
22            front of me.  That's when he would have been
23            eligible.
24       Q.   All right.
```

```
1    A.   And again, all things being equal, I would have
2         made him at that time.  But all things turned out
3         not to be equal.
4    Q.   I'm looking back again at Exhibit 82.  Now, you
5         see by Sergeant Walraed --
6    A.   Yes.
7    Q.   -- it says "permanent".  You see that?
8    A.   Yes.
9    Q.   You see the date that he was made permanent?
10   A.   January 17th of '13.
11   Q.   We were talking about your preference would be to
12        pick somebody at the top of the list with the
13        high score.
14   A.   All things being equal.
15   Q.   I understand.
16   A.   I think that's very -- not just a little, an
17        explanation point, all things being equal.
18        Things aren't equal.
19   Q.   You did testify to that, but I have a different
20        question than what you are anticipating.
21   A.   I'm not anticipating.  I just want to make sure
22        we understand that, this criteria here.
23   Q.   I think your record is clear on that.
24             So my question is -- and this is just to
```

```
 1            crystalize my understanding of what your

 2            understanding of the Civil Service -- looking at

 3            this list, you've got 95, 90 and then you have

 4            the 85s?

 5    A.      That is correct.

 6    Q.      Was he -- was it not -- well, was he eligible in

 7            that band of 85s?

 8    A.      Yes, he's number three.

 9    Q.      Again, just completing by understanding of your

10            understanding of the Civil Service laws.

11                 And, again, I want to -- when you said "all

12            things being equal", can you tell us why -- well,

13            why was Mr. Walraed appointed to the sergeant

14            position above all these other individuals?

15    A.      A, he was provisional.  B, he's one of the best

16            COs and supervisors that were in the place.

17            Period.  Bar none.

18    Q.      That's a good -- that is the answer.

19                 So the fact that he's a provisional

20            sergeant --

21    A.      Yeah --

22    Q.      Let me finish my question.

23                 He's a provisional sergeant, does that weigh

24            significantly compared to somebody off the street
```

```
 1            that's applying?
 2    A.    That wouldn't be a fair assessment "off the
 3            street", because you can never have that.
 4                The fact that he's provisional weighed in
 5            there.  The fact that he was the best was above
 6            that.
 7    Q.    Okay.  But being a provisional -- the status of
 8            being a provisional sergeant plays a role?
 9    A.    Yes.
10    Q.    And in accepting an applicant that was
11            provisional versus another applicant that wasn't,
12            that would be significant to you?
13    A.    I'm sorry?
14    Q.    You have two candidates -- let say you have two
15            candidates in the 85 band.
16    A.    Just two?
17    Q.    We will say the number that we have.  One, two,
18            three, four.
19    A.    We have multiple candidates in 85?
20    Q.    Right.
21    A.    One is provisional, one is not.  Does that affect
22            your decision process in terms of who to hire?
23    Q.    Again, all things being equal, that would weigh
24            significantly.
```

```
 1   Q.   Now, Mr. Walraed, he was the son of the former

 2        sheriff; isn't that true?

 3   A.   No.

 4   Q.   He had no relation whatsoever to any of the

 5        former sheriffs?

 6   A.   No, not to any sheriff that I know of.

 7   Q.   What, if any, connection are you aware of that

 8        Mr. Walraed had to prior staff at the sheriff's

 9        department?

10   A.   He was the undersheriff's son.  Former

11        undersheriff's son.

12   Q.   What was his name, the former undersheriff?

13   A.   I don't know his first name.  Walraed was his

14        name.  I don't remember his first name.

15   Q.   Did you know Mr. Walraed?

16   A.   Yes.

17   Q.   The former undersheriff?

18   A.   Yes, didn't know him close.  Didn't know him.

19        Didn't have a high opinion of him.

20   Q.   Oh, you didn't?

21   A.   No, absolutely not.

22              MR. SORSBY:  Gentleman, I've got to take

23         a 30-second break.

24              (A short break was taken.)
```

```
 1                    (Plaintiff's Exhibit 94 was marked for

 2               identification.)

 3    BY MR. SORSBY:

 4        Q.   So I was asking you earlier if this Jason Lucy

 5             had accepted a job somewhere else --

 6        A.   Yes.

 7        Q.   -- would it affect the list?  And you had

 8             indicated, assuming that it was true, that it

 9             would.  I just want to show you what's been

10             marked as Exhibit 94.  Do you recognize this

11             document?

12        A.   No, I don't recognize it.

13        Q.   For the record, can you indicate what the title

14             is at the top.

15        A.   "New York State Commission of Correction

16             Quarterly Classification Report".

17        Q.   This isn't a document you would receive or

18             review?

19        A.   No.  It gets filled out by the corrections.  I

20             think the chief or the captain would do that.

21        Q.   So you have never seen this document before?

22        A.   No.

23                    MR. SORSBY:  I have to count the pages

24               on this -- so bear with me -- for the
```

```
 1              record.
 2    Q.   I'm going to hand you this back.  I'm on page
 3         nine of this exhibit.  And do you see at the top
 4         it says "staff name, date of separation."
 5    A.   Jason Lucy.
 6    Q.   Do you see his date of separation?
 7    A.   February 1st of '13.
 8    Q.   So we were talking before if he was separated on
 9         that date, should he have been on the list?
10    A.   Probably not, no.
11    Q.   Let's move ahead to February 15th, 2013.
12    A.   Yes.
13    Q.   Do you understand?
14    A.   Yes.
15    Q.   Now, there came a time when you received a phone
16         call from Chief Vibert in regards to an
17         allegation that Mr. Gorman had received a phone
18         call at home from Anthony Patricelli; isn't that
19         true?
20    A.   Yes.
21    Q.   And do you understand that that date was February
22         15th, 2013?
23    A.   I don't recall the exact date, but now --
24         probably was that date.  I mean, I'm sure it
```

```
 1              could be well documented.  I don't remember
 2              specifically, to answer your question.
 3        Q.    It's important for us to be accurate on the date.
 4              So what I will do is I will show you a quick
 5              document that might refresh your recollection.
 6              Okay?
 7                   Just bear with me one second.  I'm going to
 8              hold on to that for a moment.  Let me just ask
 9              you about that conversation.  Do you recall where
10              you were when you got the phone call?
11        A.    Yes, I was at a party.
12        Q.    And do you recall what Ruth said to you?
13        A.    Yes.  She said she was calling me regarding an
14              incident in which John Gorman stated that
15              Sergeant Patricelli had called him on the
16              telephone and threatened him.
17        Q.    Okay.  And what did you say to her?
18        A.    I said to her -- the first question out of my
19              mouth was where did this occur and what, and
20              what's the allegation.  And I go, "What's the
21              proof?  Who are the witnesses?"  And all that
22              kind of stuff.  I was trying to get information
23              quickly.
24                   And she said to me that it occurred
```

1    outside.  It didn't occur at the jail.  It

2    occurred outside somewhere.  I don't know where.

3    But whether he was at his home or Patricelli was

4    at his home.  I don't know.

5         So I said, "Well, what are they doing about

6    it?

7         And she said to me, "Well, he threatened him

8    here."

9         I go, "Yes, but it's not in work."  I go,

10   "And it's he said, she said.  You have no proof

11   of anything."  I said, "Tell them to do whatever

12   he wants to do, if he wants to file a complaint

13   with the police or what he wants to do and go

14   from there."  And that's how the conversation

15   went with her.

16        My understanding then is that a police

17   report was filed, a state police report was

18   filed.  And, to answer that, that's where that

19   went from.

20   Q.   What did she say to you that Anthony Patricelli

21        said to John on the phone?

22   A.   I don't know if I can fully recall the

23        conversation.  I know she said -- I think she

24        said she said he threatened him.  I don't know

```
1         how or anything.  I think she said he threatened

2         him.  And I don't recall.  Maybe she said more,

3         maybe she said less.  I don't remember

4         specifically.

5    Q.   Just a real quick segway.  Has there been a

6         history at the jail where inmates have had their

7         jaws broken where lawsuits were filed in that

8         regard?

9    A.   I think there was an allegation of it once when I

10        was there, but that was not long ago.  And then

11        prior to that, I think before I got there, there

12        was one.

13   Q.   Now, going back to Ruth, did she ultimately give

14        you a copy of the police report?

15   A.   No.  She was bringing a copy of the police report

16        over to me.  And I told her, "I don't need a copy

17        of the police report.  I don't want the copy of

18        the police report."  I said, "I told you, let the

19        outside agency do its investigation."  I said,

20        "And based on what that comes, we will then look

21        at what the action is."

22             I then met Captain Smith.  And I told

23        Captain Smith to monitor the situation, make sure

24        there's no problems in the facility.  And I told
```

```
 1            Patricelli stay away from John Gorman.  And that

 2            was basically it what I told them to do.

 3       Q.   You told Anthony to stay away from John?

 4       A.   Oh, yes, I did.

 5       Q.   Now, you said that she attempted to give you a

 6            police report?

 7       A.   That's correct.

 8       Q.   A state trooper police report?

 9       A.   That's correct.  A copy of a state police trooper

10            report.

11       Q.   And where were you at that time?

12       A.   I was sitting on a chair in Marcelle's office.

13       Q.   And did you tell her to get rid of the documents?

14       A.   No.  I did --

15                 MR. MARTIN:  Object to the form of the

16            question.  You can answer.

17                 MR. SORSBY:  Actually, what is the

18            objection to the form?

19                 MR. MARTIN:  His testimony was that he

20            had received one copy of the state police

21            report, and you asked a question about

22            documents, plural.  Sort of assuming facts

23            not in --

24   BY MR. SORSBY:
```

```
1    Q.   In addition to this state police report, did you

2         receive other documents with that?

3    A.   You're going to have to be specific with the

4         times.

5    Q.   Sure.  When Ruth Vibert came to you --

6    A.   Yes.

7    Q.   -- she attempted to give you a state police

8         report.  Were there other documents with the

9         state police report?

10   A.   It was my understanding that she told me she has

11        a state police report.  And I told her that -- I

12        said, "I told you already to don't bring any of

13        the state police documents in here.  I don't want

14        us to interfere with their investigation.  Let

15        them do an investigation.  Based on that, we will

16        wait for the results and then take any

17        appropriate action based on what the outcomes of

18        that are."

19   Q.   How would it interfere with their investigation

20        if it's outside the jail?  I don't understand

21        what you're saying.

22   A.   To let them investigate it, not us interview

23        witnesses if there are any, not us interview

24        that.  You don't interview multiple people.  You
```

```
1              don't do that, you let them do it.

2     Q.    Sir --

3     A.    I have been in law enforcement for 40 years.

4           Never do you do multiple interviews with

5           witnesses from different agencies.

6     Q.    Sir, we have discussed at length today the

7           workplace violence policy of Rensselaer County.

8           So why would you not have her launch an

9           investigation into workplace violence?

10    A.    The investigation was the state police complaint,

11          way outside there.  And it was just an allegation

12          of family members.  It wasn't an allegation, and

13          that's all I had at the time to believe.  And I

14          said to her, "Let them do the investigation."  I

15          don't believe that anything that has brought us

16          to beyond that point.

17              At the same time, I told Captain Smith to

18          monitor the situation to make sure we don't have

19          any problems, and make sure there's not any truth

20          to any of this.  And I also got a hold of

21          Patricelli and I said to him, "You are not --",

22          which he vehemently denied the allegation.  Not

23          the phone call, the allegation.

24              And I said to him, "You're to stay away from
```

```
 1          him.  Don't bother him."  Staying away meaning if

 2          there's legitimate job stuff, of course you got

 3          to do legitimate job stuff, but you're not to be

 4          annoying a perception of that or anything like

 5          that."  And that's it.

 6              That was the only understanding of the

 7          document that I thought Ruth Vibert had.

 8     Q.   So you've indicated that -- let me ask you this:

 9          What, if any, role did Captain Smith play in

10          investigating this?

11     A.   He would monitor it.  I don't know exactly all

12          the time frames, but, periodically, we would say

13          to him, "What's going on?"

14              He goes, "There's no problems."  He goes,

15          "It's like when they're walking, you will see

16          people looking at each other.  Nobody's saying

17          nothing.  Nobody's doing anything."

18              And I said, "Continue to monitor the

19          situation."  And he was.

20              And that's -- I mean, that's what we did

21          until it excalated later on.  I mean, things

22          changed a little bit when an arrest was made and

23          there was Orders of Protections issued and all

24          that.  Then we changed the dynamic of everything.
```

1          But this was at that initial time frame.

2     Q.   Now, did you call Mr. Gorman into your office to

3          ask him about what this allegation was?

4     A.   No.

5     Q.   Why not?

6     A.   Again, it was the state police investigation and

7          let them do the investigation.  I mean, that's

8          just -- there's no other reason other than that.

9     Q.   And I'm trying to understand.  There's an

10         allegation of a threat of violence, and I'm

11         trying to figure out --

12    A.   There was an allegation that there was a phone

13         call made with a threat made on that.  That was

14         it.  And I didn't know -- I, personally, at the

15         time, I don't remember if I knew really what was

16         said on the phone.  But I do know it was a

17         harassment.  I said, "Let the state police

18         investigate the harassment complaint and we will

19         go from there."

20              And I trust the state police.  Worked for

21         them for many years.  They're a good

22         organization.  I had no reason to disbelieve they

23         would not do a thorough and quick investigation.

24    Q.   And we may have covered this a little bit before,

1          but not really.  What I'm trying to understand is

2          if there's a threat of violence by one worker

3          against another at your department, because

4          you're responsible for everybody there, why would

5          you wait for the police to conduct the

6          investigation?  Why wouldn't you immediately

7          conduct your own investigation to ensure the

8          safety?

9     A.   A, we were -- it was outside, we don't

10         investigate it.  If you are outside of the

11         workplace and your neighbor threatens you, I'm

12         not going to investigate that.  If you were out

13         of the workplace, I don't care if you are two

14         employees and you have an argument with one

15         another because you live next door to one

16         another, it's not my job to investigate that.

17         It's the local agency's job to investigate that.

18    Q.   Okay.  Now, do you remember we were reading over

19         the workplace violence policy?

20    A.   Yes, I did read that.

21    Q.   Do you remember me reading -- I'm reading from

22         Exhibit 6, the first page:  "Threats, threatening

23         behaviors or other acts of violence executed off

24         of county property that are directed at employees

```
 1              are also in violation of this policy."
 2     A.   That's making an assumption it's true.  If it --
 3          if the state police come back and confirmed it,
 4          we would then have initiated our investigation
 5          into a workplace violence issue.
 6     Q.   And I just want to make sure the record's clear.
 7              So what you're saying is if it is an
 8          off-site threat against an employee that is
 9          workplace violence, but you need to determine if
10          it's true first?
11     A.   Not need to determine, need to verify that
12          there's an actual incident, not a he said, she
13          said.  We have had this happen before in other
14          instances, and we did the same thing; to let the
15          outside agency investigate it.  Not the first
16          time we've done that.
17     Q.   So my question is:  How do you prevent your staff
18          from being injured if you are going to wait --
19          let me finish my question, sir.
20     A.   Sure.
21     Q.   So the validity of the accusation is verified,
22          how do you protect the safety if you are going to
23          wait that long?
24     A.   As I told you, I called Captain Smith.  Not call
```

```
 1            him, but Captain Smith come in because he was in

 2            every morning and picks up his record.  We told

 3            him to monitor the situation inside there, that

 4            there was an incident filed with the state

 5            police, and that you are to monitor that

 6            incident.

 7                 Now, that's what I had at the time.  And I

 8            said, "And let us know if there's a problem, and

 9            if there is, we will go from there."

10                 And I got Patricelli and he was specifically

11            told not to bother or go near John Gorman.

12    Q.   Now, when Ruth spoke to you on the phone on or

13            about February 15th after this event, did you

14            express anger with Ruth at all?

15    A.   I don't believe I did, no.

16    Q.   And then when she came to your office to give you

17            documents, did you say to her, "Shred those

18            documents.  Gorman's effing through"?

19    A.   No, I did not.

20                      MR. SORSBY:  Could I have this marked?

21                 (Directed to the court reporter.)

22                      (Plaintiff's Exhibit 95 was marked for

23            identification.)

24                      MR. MARTIN:  95 we are up to?
```

```
 1                  MR. SORSBY:  Correct.

 2   BY MR. SORSBY:

 3   Q.   Now, I'm going to show you what's been marked as

 4        Exhibit 95.  This was provided by the defendants

 5        in this matter, the county, and your attorney.

 6   A.   Okay.  Do you want me to read the whole thing?

 7   Q.   Let's talk about the first page.

 8   A.   Okay.

 9   Q.   Now, can you tell us who this is from?

10   A.   It's from Marcelle.

11   Q.   And who was this sent to?

12   A.   Tom Hendry, human resources.

13   Q.   What's the date on it?

14   A.   March 6th of '13.

15   Q.   And I will have you just read what it says there.

16   A.   "Enclosed, please find documentation received by

17        this office on March 5th, 2013, from John Gorman,

18        relative to a complaint.  Provide confirmation of

19        your receipt of this information.

20             "Thank you very much."

21   Q.   You sent this to Mr. Hendry?

22   A.   No.  Marcelle sent this to Mr. Hendry.

23   Q.   Now, it says:  "Please provide confirmation that

24        you received this."
```

```
 1              Did you get confirmation that he received

 2         it?

 3    A.   You'd have to check with Marcelle.  She's the one

 4         that handles, and she files it and keeps track of

 5         it.

 6    Q.   It's your name on it, though; correct?

 7    A.   I understand.  It comes from my office.  That's

 8         correct.

 9    Q.   So if it has your name on it, you're responsible,

10         are you not?

11    A.   Well, yes, because it's coming from the office as

12         sheriff, and she was directed to send this to Tom

13         Hendry.

14    Q.   By you?

15    A.   Yes.

16    Q.   Now, why did you send it to Tom Hendry?

17    A.   Because when the undersheriff gave me this and

18         explained to me that these -- what these were, I

19         said these have to go to human resources for an

20         investigation into a complaint of workplace

21         violence.  And I said that's where it goes.

22    Q.   Now, looking at the second page, you can see it

23         says "received" at the top?

24    A.   Yes, March 5th, '13.
```

```
 1      Q.   "MMC", is that --

 2      A.   Marcelle Connor.

 3      Q.   That's the last name you were talking about?

 4      A.   Yes.

 5      Q.   Connor?

 6      A.   Yes.  Whenever she got married, I don't know the

 7           date.

 8      Q.   You recognize her initials?

 9      A.   That's MMC or MMS now.

10      Q.   And so you received this and you looked through

11           these documents?

12      A.   Yes.  I got it from -- the undersheriff gave it

13           to me.  And I looked at the documents and I

14           brought them over to Marcelle and said, "Get

15           these up to Tom Hendry."

16      Q.   In fact, the undersheriff came to you almost

17           immediately after you spoke with Vibert?

18      A.   When she left the area, he brought it over to me

19           say, "These here are for you."  He goes, "I don't

20           know if you know what's in them."

21                I go, "It was the state police report."

22                And he goes, "No, there's other complaint

23           forms in there."

24                I go, "I didn't know that."  I go, "She come
```

1           over here telling me she had the state police

2           report."  And I said -- and I already had

3           directed her what to do with that.

4                Now, when they showed me that, I told him,

5           "No.  These have to go up to Tom Hendry's

6           office."

7     Q.    At that time, did you see that in these documents

8           included a misdemeanor -- what appears to be a

9           misdemeanor informational against Anthony

10          Patricelli?

11    A.    Yes.  Apparently, that was his arrest report when

12          he got arrested, when the state police issued him

13          an appearance ticket, I think.

14    Q.    And you understand that he got -- he was

15          arrested?  Do you understand he was arrested?

16    A.    Yes, he was arrested and issued an appearance

17          ticket.

18    Q.    What was the appearance ticket issued for?

19    A.    What do you mean?  For a return date in court.

20    Q.    But for what?

21    A.    For harassment.

22    Q.    Harassment of who?

23    A.    John Gorman.

24    Q.    And at that time, was he suspended or terminated?

1    A.   No, he was not.

2    Q.   And why was that?

3    A.   Again, we are letting it out there with the same

4         admonishment.  Captain Smith and the staff were

5         told to be on watch and make sure there was

6         absolutely no contact or anything until we see

7         what goes on with this case.

8    Q.   Now, did you ever ask for a copy of the state

9         trooper's report, incident report --

10   A.   No.

11   Q.   -- in regards to this case?

12   A.   No.

13   Q.   You ever ask for it?  Did you see it?

14   A.   After the undersheriff gave me the report back, I

15        saw it, yes.

16   Q.   This is dated March 6th.  The sheriff gave you

17        the report packet before this date; isn't that

18        true?

19   A.   Yes.  I don't know.  Probably would have been --

20        I don't know the -- it was in February.

21   Q.   Now, there are other incident reports in these

22        documents here.  Did you look into these matters,

23        the transports, dated October 8th, 2012?

24   A.   No.  Again, Captain Smith was looking -- supposed

```
 1            to be looking, and he was directed to look into

 2            all of those things, yes.

 3       Q.   You directed him?

 4       A.   I don't know if it was myself or the undersheriff

 5            at the time.  I can't remember.

 6       Q.   Now, so you directed Sergeant Smith --

 7       A.   Captain Smith.

 8       Q.   Captain Smith to look into these incident

 9            reports?

10       A.   Right.

11       Q.   Did you get anything in writing, any written

12            report back on those?

13       A.   I think Hal wrote something up.  I'm not sure.  I

14            think he did.  I know he verbally had told, I'm

15            pretty sure, the undersheriff, because we asked

16            him just every day let us know if everything's

17            all right.  And he would come by the office every

18            day to pick up the paperwork, and he would just

19            say, "Everything's fine.  There's no problems,"

20            whatever, like that.

21       Q.   And what oral report did he give you on the

22            transport issue of October, 2012?

23       A.   Again, I don't recall on all of those.  Again, I

24            think we -- also, we were waiting for Tom Hendry
```

```
1              to do his report.  And I think Tom Hendry came

2              back with his report saying that he didn't find

3              anything.

4    Q.   In regards to these incidents?

5    A.   I don't remember which once, but I remember Tom

6              Hendry said on one of them, on something that we

7              sent up to him, because we sent everything up to

8              Tom Hendry.

9    Q.   Well, let's be clear, sir.  The workplace

10             violence complaint you sent up to Tom Hendry?

11   A.   Yes.

12   Q.   These are incident reports.  Did you send those

13             up as well?

14   A.   I think they were part of the package.

15   Q.   Part of the workplace violence?

16   A.   I think so.

17   Q.   Just to be clear, did you have Captain Smith

18             individually investigate these other allegations?

19   A.   I believe he was to investigate each of those.

20   Q.   Are you aware that Mr. Patricelli called the jail

21             to get Mr. Gorman's home phone number?

22   A.   No, I'm not aware of that.  I don't believe I'm

23             aware of that at all.

24   Q.   Is that outside of protocol for a master sergeant
```

```
 1              to call the jail to get Mr. Gorman's phone

 2              number?

 3    A.    No, I don't think it's out of protocol.  I call

 4              people all the time and ask for numbers for them.

 5    Q.    Would it be outside of policy to get his number

 6              from the jail to call him at home and threaten to

 7              break his jaw?

 8    A.    I will answer that question in two parts.  The

 9              first part, no, it wouldn't be out of the

10              ordinary.  If the second part was true, yes, it

11              would be out of the ordinary.

12    Q.    Now, I'm going to show you what's been marked

13              as -- well, actually, give me one second --

14              what's been marked as Exhibit 37.  This has been

15              previously identified as an incident report by

16              Trooper Hawk, and it was written on February

17              16th, 2013.  And I'm getting this by reading the

18              second page of the exhibit.

19                  I'm going to show it to you.  I'm going to

20              ask you if you have seen this before today?

21    A.    I think I did see this report, yes.

22    Q.    And when do you recall seeing this?

23    A.    I think when the undersheriff gave me the

24              paperwork that Ruth Vibert was -- the other
```

```
 1          paperwork where he said there's other paperwork.
 2          I think that was it in it, and I looked at it
 3          then.
 4     Q.   And what conclusions did you draw from reading
 5          this?
 6     A.   I didn't draw any conclusions.  It was an
 7          allegation that was made by Mr. Gorman to the
 8          state police, and she was doing an investigation
 9          into it.
10     Q.   And having read it, did you believe that the
11          allegation that Mr. Gorman had made was true?
12     A.   I didn't believe it one way or another.  I didn't
13          disbelieve it but I didn't believe it either, not
14          until the facts are all in.
15     Q.   Now, you said until all the facts are in -- well,
16          strike that.
17               I'm going to hand back to you Exhibit 37.
18          I'm turning to page three.  Okay?  And I'm going
19          to show you the top here.  Do you see that, sir?
20          Can you read that paragraph to us please?
21     A.   "I contacted Patricelli via his cellphone -- "
22          that one you mean?
23     Q.   Correct, read that paragraph.
24     A.   "-- and he advised me that he did not have a
```

```
 1              conversation with Gorman last night.  He told him

 2              if that if he had a big enough problem with him,

 3              he could come over and break his fucking jaw.

 4                  "I advised Patricelli to cease any further

 5              contact with Gorman.  He agreed with same."

 6     Q.   Sir, I'm actually going to read it to you because

 7          you said that --

 8     A.   I read it wrong?

 9     Q.   Yes.  I'm sorry.  It's okay.

10              You will see here that it says:  "I

11          contacted Patricelli via his cellphone --"

12     A.   Yes.

13     Q.   "-- and advised me that he did have a

14          conversation --"

15     A.   Oh, I said "not".  I read it wrong.

16     Q.   Right.

17     A.   He did have a conversation.  I apologize.

18     Q.   With Gorman that night?

19     A.   Yes.

20     Q.   Continue on.

21     A.   "He told him if he had a big enough problem, he

22          could come over and break his fucking jaw.

23              "I advised Patricelli to cease any further

24          contact with him."
```

```
 1    Q.   All right.  Now, you understand that that is

 2         Trooper Hawk's statement of what Anthony told

 3         her?

 4    A.   Yes.

 5    Q.   And you indicated that you read this after having

 6         received it from Undersheriff Russo.  At that

 7         point having read that statement, an admission by

 8         Anthony Patricelli, what conclusion did you draw

 9         as to whether or not Mr. Gorman's allegations

10         were true?

11              MR. MARTIN:  Object to the form.

12    A.   What admissions?  Are you talking Patricelli?

13    Q.   I will rephrase the question.

14         Having read this statement you just read --

15         okay?  And I will read the statement again.

16         "He told him that if he had a big enough

17         problem with him, he can come over and break his

18         fucking jaw."

19         When you read that, did you believe or not

20         believe Mr. Gorman's allegations?

21              MR. MARTIN:  Object to the form.

22    A.   What I believed was I don't -- from Patricelli's

23         perspective, I understand where he said he did

24         not threaten him.  He said he could have if he
```

1      wanted to, you know, not that he would do it.  He
2      said he could do it.  That might not necessarily
3      be a threat depending on the context of
4      everything.
5              I said let's see where the court determines
6      this is going to go before we find out the truth
7      of this.  And at the same time, again, it was to
8      be monitored closely that there was no problem
9      inside the facility.
10   Q.  So the statement is:  "If he had a big enough
11       problem with him, he can come over and break his
12       fucking jaw."
13              Is there any problem big enough where it
14       would be appropriate for a master sergeant or any
15       sergeant to break another staff member's jaw?
16   A.  I don't think anybody should be saying something
17       like that.  I'm not necessarily saying it was a
18       threat.  It was an idle statement, and I think it
19       was -- it could be perceived -- maybe he did
20       perceive it.  Patricelli's perception was it
21       wasn't a threat and "I wasn't being threatening."
22              I said, "Let's see what the courts
23       determines it for it to be, and at the same time,
24       let's monitor what's going on and keep a close

```
1              eye on it."

2     Q.    What I would like to understand is that you

3           indicate that things were being monitored --

4     A.    Captain Smith said he was watching them both over

5           at the jail every day, and he worked there every

6           single day.

7     Q.    How does that prevent workplace violence by

8           monitoring activities?

9     A.    I don't understand the question.

10    Q.    Sir, isn't the appropriate resolution to a

11          workplace violence threat to remove the person

12          that made the threat until the conclusion of the

13          investigation?

14    A.    I don't think so, because I don't think -- the

15          court agreed with me, also.

16    Q.    Let me ask you this:  We have been talking about

17          the Rensselaer County workplace violence policy,

18          and what I'd like to know is where in that policy

19          does it say you have to wait for a court to

20          conduct an investigation, or a court to come to a

21          resolution?

22    A.    I don't think it specifically says that.

23    Q.    I'm asking you if you understand the policy

24          includes that, sir?
```

```
1    A.   No, I don't understand it to include that.

2    Q.   And, in fact, the workplace violence policy

3         program requires that you conduct your own

4         investigation, doesn't it?

5    A.   Yeah, and we would have when we got to the

6         conclusion.  And, at the same time, I told you

7         Captain Smith was looking into the situation and

8         monitoring it.  He was told to look into it, and

9         he did.

10   Q.   Now, do you understand that Judge Arnold from

11        Schaghticoke Town Court issued a summons for Mr.

12        Patricelli's arrest?

13   A.   Yes.

14   Q.   And do you understand that for in order for him

15        to issue that summons, there had to be probable

16        cause to believe that a crime was committed?

17   A.   Yes, of course.

18   Q.   And looking at the bottom of the page here on

19        this exhibit, do you see where it says "arrest

20        criminal summons"?

21   A.   Yes.

22   Q.   Do you see that a criminal summons was issued in

23        this matter?

24   A.   Yes.
```

1    Q.   And again, you received these documents from

2         Undersheriff Russo.  And having read that, did

3         you understand that the judge believed there was

4         probable cause for arrest in this situation?

5    A.   Obviously, he did because the arrest was made.

6    Q.   Now, when Tom Hendry was here before, he

7         testified that he was conducting a workplace

8         violence investigation, and he was doing it in

9         tandem with another sheriff's department

10        official.  Do you know who that was?

11   A.   Probably Captain Smith.

12   Q.   And I just want to be clear because Tom Hendry

13        also testified that he had interviewed Captain

14        Smith as part of the workplace violence

15        complaint, but that Captain Smith wasn't actually

16        involved with the investigation.  Would there

17        have been another person?

18   A.   There could have been.  Maybe it was someone from

19        the highway patrol, but I really don't know.  I'd

20        have to find out myself.  I'm not sure who else

21        it would be.

22   Q.   Did anybody from the Brunswick State Troopers

23        Barracks contact you in regards to -- to notify

24        you of Patricelli's arrest?

```
 1    A.    I don't think so.  I don't recall it.  I don't

 2          think so.

 3    Q.    We just looked at Trooper Hawk's incident report.

 4          Do you Recall having a conversation with her?

 5    A.    I don't know if I did or didn't.  I really don't

 6          know.

 7    Q.    Do you know if anybody from the Brunswick

 8          barracks contacted anybody at the sheriff's

 9          department to notify the department of his

10          arrest?

11    A.    I think I was told that, and I might be wrong on

12          this, that the Trooper Hawk, or whatever her name

13          is, contacted Chief Vibert and told her that.

14    Q.    Now, when he was arrested, was he suspended at

15          that point?

16    A.    No.  No, I don't think that -- was he suspended

17          at that point in time or was it the other arrest?

18          I don't remember.

19    Q.    Okay.

20    A.    No.  I don't think he was suspended at that time,

21          because the Order of Protection from the judge

22          stated they can work together.  I think if the

23          judge issued the Order of Protection, he

24          couldn't.  Patricelli would have been suspended
```

```
 1              at the time.
 2    Q.   Hold that thought for one moment.
 3              Do you understand what a stay away order is?
 4    A.   Yes.
 5    Q.   What do you understand that to be?
 6    A.   A stay away order?
 7    Q.   Correct.
 8    A.   Zero contact.
 9    Q.   I'm going to show you what's been previously
10         marked at Exhibit 41.
11              Do you recognize this document?
12    A.   It's issued by the judge of what court?  It
13         doesn't even say the court on it.  Schaghticoke
14         Court, yes.
15    Q.   Now, I want to show you real quickly here, do you
16         see that it's -- the box that says "stay away
17         from" is checked?
18    A.   Yes.  And then he says:  "From John Gorman and
19         the home of John Gorman".
20    Q.   So you understand that to mean that he's to stay
21         away from John Gorman?
22    A.   It's my understanding they can work together.  I
23         contacted our attorney at work to review this and
24         to look at this, and he agreed that they can
```

```
 1              work, that they can be in the same facility.
 2      Q.   By the way, who would that attorney be?
 3      A.   Brian Goldburger.
 4      Q.   Real quick, also, just as a clarification on the
 5              record, you have retained Mr. Martin to represent
 6              you individually here; is that correct?
 7      A.   I guess the answer would be yes.  What do you
 8              mean?
 9      Q.   Well, Mr. Martin's not representing you as an
10              employee of the county, but you have a separate
11              agreement with Mr. Martin to represent you
12              individually; correct?
13      A.   He's representing me as the county and to
14              represent me.
15                   MR. SORSBY:  Go off the record.
16                   (Off the record.)
17   BY MR. SORSBY:
18      Q.   So you were saying earlier that Mr. Goldburger
19              reviewed this document?
20      A.   I believe either we explained it to him or he
21              reviewed it.  I don't know which.  I don't
22              recall.
23      Q.   But you do see where it stays "stay away from
24              John Gorman"?
```

1    A.   Yes.

2    Q.   "And from his home"?

3    A.   Okay.

4    Q.   Now, I don't have any questions.  Mr. Martin may

5         very well ask you follow-up questions on things,

6         but --

7    A.   Okay.

8    Q.   -- just as one other additional question:  Did

9         Mr. Patricelli ever talk to you in his capacity

10        as a friend about some of the issues he may have

11        been having with Mr. Gorman?

12   A.   No.  I think when this stuff all started coming

13        up, I told him, "What the hell are you doing?

14        Leave it alone."  And I knew that they were

15        quasi-related.  I don't know how you want to stay

16        it, that they had relations, that they were

17        friends, quasi-family.  His son is his uncle or

18        something like that.  They were somehow related,

19        and those kinds of things.

20             But I said to him, "What the hell are you

21        doing?  You're to stay away from him and cease

22        any activity if it's going on."

23   Q.   Right.

24   A.   And basically, that's what he said, those

```
 1              complaints and those things there.  But he said

 2              that, you know, "He's ruining my life."

 3                     And I said, "No."  I go, "You stay away.

 4              You stay away completely."

 5                     And I told Patricelli he's ruining his own

 6              life.  I personally told him that.  I said to

 7              leave that stuff not at the workplace and don't

 8              get it involved in here.  "You want to deal with

 9              your wife, your girlfriend and everything, do it

10              through the appropriate channels, but not here

11              inside the workplace.  It's not the appropriate

12              place."

13                     And that was advice to him, and that's

14              pretty much the end of the conversation.  Because

15              right after that, we really didn't speak that

16              much.

17      Q.   You and Patricelli?

18      A.   That's correct.

19                     MR. SORSBY:  Just go off the record.

20                     (Off the record.)

21   BY MR. SORSBY:

22      Q.   Do you know who Peter Calitaneo (phonetic) is?

23      A.   I personally don't know him, no.

24      Q.   Do you know who he was?
```

```
 1    A.    Now, I do.  Now, I know because of the incident,

 2          yes, but I didn't know him before that.

 3    Q.    There came a time when Anthony Patricelli

 4          requested a background check on Peter Calitaneo;

 5          is that true?

 6    A.    Yes.

 7    Q.    And do you know who Officer Vaga is?

 8    A.    Yes.

 9    Q.    Just to be specific, do you know what File 15

10          documents are?

11    A.    I believe a criminal history on her.

12    Q.    Okay.

13    A.    On him, I mean.  He asked her to run a criminal

14          on him.

15    Q.    Do you know what a File 15 document is?

16    A.    It's a document off the state police system.

17    Q.    And do you know if Officer Vaga was involved in

18          that?

19    A.    Obviously, she was, yes.

20    Q.    Was there an investigation into his use of that

21          database?

22    A.    Yes, there was.

23    Q.    What was the result of that investigation?

24    A.    By whom?
```

```
 1    Q.    Okay.  Well, let's start with was there an
 2          internal investigation of that?
 3    A.    Yes.
 4    Q.    Who was that conducted by?
 5    A.    Bill Webster.  Deputy William Webster.
 6    Q.    And how did you find out about Patricelli looking
 7          into Mr. Calitaneo's criminal history, who
 8          alerted you to that?
 9    A.    I think it was Detective William Webster who
10          oversees our -- or monitors the compliance on our
11          usage of the e-justice system.
12    Q.    And at some point did DCJS investigate the
13          situation?
14    A.    I would assume they were involved, yes.
15    Q.    Did you receive a notice from DCJS?
16    A.    I may have.
17    Q.    Now, isn't it true that the Rensselaer County
18          DA's Office got involved with this investigation
19          because the sheriff's department wouldn't
20          cooperate with DCJS?
21    A.    That is totally not true.
22    Q.    The Rensselaer County DA's Office did get
23          involved at some point; isn't that true?
24    A.    That's correct.
```

1   Q.   Did you ever have a conversation with Patricelli

2        about his usage of the e-justice system?

3   A.   Yes, I did.

4   Q.   What did you tell him?

5   A.   I told him he was dead wrong and he shouldn't of

6        did it.

7   Q.   At some point, was Patricelli charged with a

8        crime in that matter?

9   A.   Yes, he was, by the District Attorney's Office.

10  Q.   Was he prosecuted for that?

11  A.   There is a settlement, so if that's classified as

12       prosecution.  I'm not an attorney.  I guess the

13       answer would be yes, if you say it that way.

14  Q.   Well, let's be specific.  He was ultimately

15       charged with two felonies; isn't that true?

16  A.   Yes, he was.

17  Q.   And he took a plea deal whereby he accepted a

18       plea to a misdemeanor; isn't that true?

19  A.   That is correct.

20  Q.   And as a result of that, he was terminated?

21  A.   No, he was not.

22  Q.   And why was he not terminated after being

23       convicted of a misdemeanor?

24  A.   You don't have to be terminated after being

```
 1              convicted of a misdemeanor.  If you are convicted
 2              of some felonies, you have to be terminated.
 3     Q.   Are you aware the county has a computer use
 4          policy?
 5     A.   I'm sorry?
 6     Q.   Computer use policy.
 7     A.   The county has a computer use policy, yes.
 8     Q.   And did Patricelli violate that?
 9     A.   Probably in that sense, yes.  I would say
10          probably.  You might want to call it that because
11          he asked something to be done even though he
12          didn't specifically do it.
13     Q.   Okay.  And what penalty, if any, did Patricelli
14          pay from the charges stemming from this event?
15     A.   He lost three months pay.  He lost his technical
16          rank, and he lost his privileges, such as
17          take-home car and things like that.  And he could
18          not work with outside agencies anymore.
19     Q.   He lost his master sergeant status?
20     A.   Yes.  He lost quite a bit.
21     Q.   Do you know whatever became of the charges in
22          this Schaghticoke Town Court involving Mr.
23          Gorman?
24     A.   I'm not -- I think it was ACOD'd.
```

1    Q.   Do you understand that there was a plea deal for

2         those charges and the charges for misuse of the

3         e-justice system?

4    A.   Well, that was the final outcome, yes.

5    Q.   So do you understand that there was a global

6         settlement of those issues?

7    A.   There was a global settlement, yes.

8    Q.   In the form of one plea deal?

9    A.   In the form of one plea deal.

10   Q.   Do you remember where that plea deal was entered?

11        Was that in the Troy City Court?

12   A.   I think it was the Town of Schaghticoke, I think.

13        Or I think because it was -- I believe that they

14        remanded it to the Town of Schaghticoke to be

15        resolved, but don't hold me to that.

16   Q.   You personally investigated the complaint that

17        Mr. Patricelli made against Ruth Vibert, but why

18        didn't you personally investigate the charge of

19        workplace violence made by Mr. Gorman?

20   A.   Because the complaint he made against her was

21        made by the chief of corrections, the top person

22        over there, and there would be nobody over there

23        to investigate that.  And I said, "I will just

24        find out what the validity is to this."

```
1              And, again, I disagreed with Patricelli's

2         assessment and found no fault with anyone

3         involved with that.

4    Q.   But you couldn't have agreed with his assessment

5         until you did the investigation; isn't that true?

6    A.   I was skeptical, but, you're right, I didn't

7         know.  I hadn't asked the questions, yes.

8    Q.   So you wouldn't know whether or not his

9         allegation was valid or not until you

10        investigated it?

11   A.   That's correct.

12   Q.   Now, why wouldn't you have investigated Master

13        Sergeant -- or excuse me.  Strike that.

14             Why wouldn't you have investigated

15        Mr. Gorman's charge of workplace violence against

16        Anthony Patricelli when he is the master sergeant

17        that is involved in an investigation with

18        Lieutenant Karam on allegations of gang

19        involvement, et cetera, at the jail?

20   A.   Because the captain was investigating that, and

21        he has the rank and the credibility to do that.

22   Q.   What I want to know is wouldn't it have been a

23        conflict for anybody other than you to

24        investigate Anthony Patricelli since he had this
```

```
 1            role that was outside of the chain of command
 2            depending on what he was investigating?
 3     A.     No, absolutely not, because that wasn't pertinent
 4            to what that was about.  It had nothing to do
 5            with that investigation.
 6     Q.     But the investigation was to cover involvement of
 7            staff members with gang activity; isn't that
 8            true?
 9     A.     No.  That's not a true statement.  The
10            investigation was involving and it started out to
11            be involving drugs and such.  And that's not --
12            and it did not end up there.  It turned into
13            something totally different over several years
14            the investigation took place.
15     Q.     But again, that investigation could have covered
16            anybody at the jail facility; isn't that true?
17     A.     Not anybody.  No, I disagree with that.  It was
18            specific people who were being looked at.
19     Q.     But you indicated that they were to go wherever
20            the facts would lead, so there was no limitation
21            to the investigation; isn't that true?
22     A.     Of course.
23     Q.     So why wouldn't that have been a conflict to have
24            anybody but you investigate Mr. Gorman's
```

```
 1         complaint?

 2    A.   Because he had nothing to do with that.

 3    Q.   I'm not talking about Mr. Gorman.  I'm talking

 4         about, for example --

 5    A.   The other case had nothing to do with this in any

 6         way, shape or form, never even crossed paths.

 7    Q.   Do you know if -- we're talking about the

 8         investigation of Lieutenant Karam and Master

 9         Sergeant Patricelli.  Did that investigation ever

10         cover Captain Smith?

11    A.   Absolutely not.

12    Q.   I want to show you what's been marked as Exhibit

13         78.  Do you recognize this document?

14    A.   I don't recognize it, no, but I will read it.

15              All right.  Go ahead.

16    Q.   So having looked at this document, do you

17         recognize it?

18    A.   Yes, I do.

19    Q.   How do you recognize this document?

20    A.   I remember it was brought to my attention now

21         after reading it.

22    Q.   Who brought it to your attention?

23    A.   I don't remember.  It might have been the

24         undersheriff, I just don't remember.
```

1    Q.    Okay.

2    A.    Might have been Captain Smith.  I don't remember.

3    Q.    Now, read the first paragraph to me, sir.

4    A.    "This is to formally serve as a workplace

5          violence complaint involving facility staff,

6          Sergeant Marcelli, Sergeant Connell, Sergeant

7          Walraed, Sergeant Gisevich (phonetic), the

8          administrative staff, Lieutenant Hetman, Captain

9          Smith, Undersheriff Russo, Sheriff Mahar, and the

10         Rensselaer County Human Resources Director Tom

11         Hendry."

12   Q.    So if these individuals are in the workplace

13         violence complaint, how is it appropriate that

14         any one of them would be part of the

15         investigation into it?

16   A.    Tom Hendry is the one who investigated it, along

17         with Captain Smith.  That's correct.

18   Q.    And I'm asking if in regards to a workplace

19         violence complaint, if the people that are

20         alleged to have done something are in the

21         complaint, is it appropriate for them to also

22         investigate it?

23   A.    In this particular case, I'd say yes because I

24         don't believe any word of that.  A lot of these

1          people are people of integrity, that I know that

2          that wouldn't be the case.  And I know this was

3          brought to your labor attorney and county

4          attorney asking for advice on what to do.  And I

5          don't recall exactly how we did that, because I

6          said to him that's not true.

7     Q.   Now, do you recall an incident in July of that

8          year where it's alleged that Sergeant Marcelli

9          was involved in allowing a heavy door to hit Mr.

10         Gorman?

11    A.   I remember Captain Smith saying something about

12         that.  I don't remember, but I think he was

13         investigating it.  I don't remember the results.

14         I think he said that something on the cameras

15         or -- it wasn't.  I just don't remember fully on

16         it, no.

17              But I do remember being told, to answer your

18         question, but I forgot what the outcomes were of

19         it.

20    Q.   Do you recall reviewing that video?

21    A.   I don't review the videos, no.

22    Q.   Quickly go through some of these things.  "The

23         retaliation includes Tom Hendry's refusal to

24         properly investigate my first complaint following

```
 1            February 25th, which is still an open

 2            investigation."

 3                 Do you agree with that?

 4     A.    I don't know.  I was under the impression he did.

 5            I don't know.  I'm just saying.

 6     Q.    "It incudes excessive retaliatory work

 7            assignments by Sergeant Connell."

 8                 Do you agree with that?

 9     A.    No.

10     Q.    Let's talk about 207-C.  Can you tell me what

11            207-C is?

12     A.    207-C is the state law in which an individual

13            covered under 207-C gets injured in the line of

14            duty, that the municipality picks up the cost for

15            such.  Basically, that's what it is.

16     Q.    And Mr. Gorman applied for 207-C benefits?

17     A.    Yes, he did.

18     Q.    Now, what role do you play in denying or

19            approving applications for 207-C benefits?

20     A.    For the most part, none.

21     Q.    None?

22     A.    None.  In this case, specifically, absolutely

23            none.

24     Q.    So who would have been involved in that process?
```

```
 1    A.   The undersheriff at the time, who is now Sheriff

 2         Russo.

 3    Q.   So that would be normal practice for him to

 4         handle --

 5    A.   Most of it, he does.

 6    Q.   Are there any times in which you did?

 7    A.   Very few cases when everyone was tied up and they

 8         were simple cases.

 9    Q.   Now, there was a determination as to whether or

10         not he was eligible for 207-C; isn't that true?

11    A.   Yes, there was one.

12    Q.   And did he receive the 207-C benefits?

13    A.   I believe, no.

14    Q.   Do you know why?

15    A.   I believe that it was turned down due to the --

16         again, I wasn't involved in the whole thing, so I

17         don't know.  I wasn't involved in any of it.  But

18         my understanding was that the psychologist that

19         was hired by the county determined that it was

20         not a job-related issue.

21    Q.   Okay.

22    A.   There might be more specific, but that's my

23         understanding.

24    Q.   I'm going to show you what's been previously
```

```
 1              marked as Exhibit C.  And I will tell you that
 2              it's somewhat -- a little worse for wear here,
 3              the original.
 4                   Do you recognize this document, sir?
 5      A.    Which one?  This here?
 6      Q.    Well, no.  Respectfully, it's all one document,
 7              it's just that it's come apart.
 8      A.    This whole thing?
 9      Q.    Yes.
10      A.    Oh, God, no.  I don't recognize that.
11      Q.    You never reviewed this 207-C determination in
12              this case?
13      A.    No.  I was asked specifically by our labor
14              attorney do not get in any involvement.  Period.
15              And I stayed out of it.
16      Q.    That would be Mr. Goldburger?
17      A.    Yes.  The undersheriff handled the entire case.
18      Q.    Now, I'm going to ask you, and I don't want to
19              know what your attorney, Mr. Goldburger, told
20              you.  But what I want to know is do you go to Mr.
21              Goldburger for advice rather than Mr. Pechenik?
22      A.    Yes, completely.
23      Q.    Okay.
24      A.    On a rare occasion, we will go to Mr. Pechenik.
```

```
 1            Because we go to Mr. Pechenik, he will go to Mr.
 2            Goldburger anyway.  So Mr. Goldburger is the one
 3            who we go to all the time for advice.
 4    Q.   And did he also advise you on the filing of Mr.
 5            Gorman's workplace complaint?
 6    A.   What do you mean?
 7    Q.   When Mr. Gorman filed his workplace violence
 8            complaint in regards to the February 15th
 9            incident, did Mr. Goldburger give you advice as
10            to that?
11    A.   No.  We informed of the issue -- well, we got
12            advice, yes.  We informed him of what was going
13            on, and we told him what we were doing.  And he
14            said continue doing what you're doing.
15    Q.   Do me a favor, don't tell me what he said.  I
16            just want to confirm that you consulted with him.
17            I didn't ask you what he said, if you talked to
18            him.  Okay?
19               I just want to know to what extent you were
20            consulting with him during this time.
21    A.   Okay.
22    Q.   So would you consult with him often on major
23            issues like that?
24    A.   Almost every issue in that, we would advise our
```

1          attorneys what actions and what's going on.

2    Q.    Now, just to close up on this particular issue,

3          did Pat -- Undersheriff Russo come to you and ask

4          you for any documents in regards to Mr. Gorman's

5          workplace violence complaint?

6    A.    The undersheriff never consulted me regarding

7          anything he did on that case.

8    Q.    Okay.  All right.

9          Final point.  Do you review any final

10         determinations on 207-C applications, or is it

11         that the undersheriff makes the final

12         determination and you don't even know about it?

13   A.    It depends on the case.  Some of the cases, I may

14         have, but I will do that based on consultations

15         with our labor attorney and where we are going to

16         go with the 207-C case.

17         And just so you understand, there is cases

18         that involve complexities beyond our ability.

19   Q.    Okay.

20   A.    So there are medical cases and such that we rely

21         specifically on both medical and legal expertise.

22         Other cases are open and shut cases.  An inmate

23         punched somebody in the face, it's on camera.  We

24         can go through that.  It's an easy case to deal

```
 1            with.
 2                 That's basically what I'm explaining to you.
 3      Q.   And in this particular case, you didn't give a
 4           final review to the 207-C --
 5      A.   No, not at all.
 6      Q.   Now, do you know who Dr. McIntyre is?
 7      A.   Yes, I do.
 8      Q.   And he has a standing contract with Rensselaer
 9           County to perform psychological examinations?
10      A.   Well, would I call it standing?  Yes.
11      Q.   And did you have any conversations with Dr.
12           McIntyre in regards to Mr. Gorman?
13      A.   No, I did not.
14      Q.   So Dr. McIntyre's evaluations, are those
15           independent?
16      A.   I don't know what you mean.
17      Q.   Dr. McIntyre has a contract with Rensselaer
18           County?
19      A.   Yes.
20      Q.   And so those decisions that he renders would not
21           be independent?
22                     MR. MARTIN:  Object to the form of the
23                question.
24      A.   Dr. McIntyre has a contract with the county to
```

```
1              perform psychological review of potential

2              employees of Rensselaer County.  That's the only

3              contract we have with him.

4         Q.   Okay.  Doesn't that also include for evaluations

5              for 207-C?

6         A.   No, because that was the first time we used him

7              for a 207-C evaluation, to my knowledge.

8         Q.   Is there some other --

9         A.   The selection of doctors for review is not done

10             by the sheriff's office, it's done by -- it's

11             supposed to be done by the Department of Human

12             Resources.  They will advise us who to take and

13             select.  Sometimes, the County Attorney's Office

14             will get involved to do that, but we don't send

15             anybody until they tell us to send them to if

16             it's a psychological review.

17                  If it's a physical thing, we normally use

18             Dr. Bellmanie (phonetic).  Everyone uses Dr.

19             Bellmanie.  Psychological, it's up in the air

20             based on what they tell us and availability and

21             things.

22        Q.   So I just want to understand for the 207-C, then,

23             who is the typical doctor on contract that you

24             guys utilize?
```

1    A.   I don't understand what you mean.  On 207-C?

2    Q.   Yes.  You said McIntyre, you never used him

3         before.  Who would you normally --

4    A.   For psychological?

5    Q.   Yes.

6    A.   We used Judge Wopner (phonetic) once.

7    Q.   Really?  Judge Wopner?

8    A.   Not Wopner.  His name is Wopner, I think.  No,

9         no.  He's a psychiatrist.  I can't think it.  It

10        begins with a W.  Probably it's a Freudian slip

11        there saying Wopner, but it's something like

12        that.

13   Q.   Well, it's okay.  It's somebody other than

14        Dr. McIntyre?

15   A.   Yes.

16   Q.   Are you aware that the county also sent Sal

17        Brecko (phonetic) to McIntyre for an evaluation?

18   A.   Again, Sal Brecko, I had nothing to do with his

19        case whatsoever.

20   Q.   I'm going to show you what's been marked as

21        Exhibit 23.  Do you see who that's from?

22   A.   Patrick Russo.

23   Q.   And it's sent to who?

24   A.   William McIntyre.

1    Q.   Can you tell what he's asking?

2    A.   "Please accept this letter as my request for

3         psychological evaluation of employee John

4         Gorman."  That's who the county told him to go

5         to.

6    Q.   So you're saying -- just for clarification, you

7         had said that the Department of Human Resources

8         or the County Attorney's Office --

9    A.   And they would tell us who to send them to.

10   Q.   I read this as --

11   A.   We have never selected them.  They tell us who --

12   Q.   So you understand that somebody told Undersheriff

13        Russo --

14   A.   That's my understanding.  Again, I wasn't a part

15        of this, so I can't answer what they did.  I can

16        answer the ones I have been involved with.

17   Q.   And that's fair enough.

18             Are you aware that Mr. Gorman applied for

19        Workers' Compensation?

20   A.   I'm not aware of that.  He may very well have.  I

21        don't know.  Again, I totally stayed out of the

22        case.

23   Q.   Well, who was involved in that, do you know?

24   A.   Probably the undersheriff.

```
 1                    MR. SORSBY:  Give me a second.

 2                    (Off the record.)

 3    BY MR. SORSBY:

 4     Q.   I'm going to show you what's been previously

 5          marked as Exhibit D.  This is the State Workers'

 6          Compensation decision for the matter of John

 7          Gorman.  And I want you to turn to the second

 8          page.  Do you see the date of filing of the

 9          decision at the bottom?

10     A.   This date here, June 20th, 2014, is that the one

11          you're talking about?

12     Q.   Correct.

13     A.   Okay.  I see it.

14     Q.   Now, do you see to the left, do you see the date

15          of the accident?

16     A.   To the left of what?  Oh, down here?  July 14th,

17          2013.

18     Q.   Yes, July 14th -- do you see that -- 2013?

19     A.   Yes.

20     Q.   So I'd like you to look up to the almost to the

21          second to last paragraph.  It starts out there as

22          "no doubt".

23     A.   Okay.

24     Q.   Do you see that?
```

```
 1    A.   Yes, I do.

 2    Q.   It says:  "There is no doubt, however, that the

 3         threat's made to the claimant by Patricelli.  I

 4         find that these threats were a major cause of

 5         claimant's illness.  Patricelli had supervisory

 6         authority over claimant.  Patricelli brought a

 7         personal and family dispute into the workplace by

 8         threatening claimant's job status as well as his

 9         personal safety."

10    A.   Okay.

11    Q.   This is the Workers' Compensation judge.

12    A.   Okay.

13    Q.   Do you agree or disagree with that?

14    A.   I don't know if it's true or not.  This here was

15         first I'm seeing this.  Again, I was kept out of

16         all of this.  All decisions regarding this were

17         made by counsel, and whatever they follow.  They

18         follow the advice of counsel and how to deal with

19         that.

20              My understanding Workers' Comp and 207-C

21         aren't the same, and they are separate and not

22         equal.

23    Q.   Do you agree with what the judge said, that

24         Patricelli brought a personal family dispute into
```

```
 1            the workplace by threatening the claimant's job

 2            status?

 3      A.    No, I don't believe he threatened it.  I don't

 4            know of anything about threaten the claimant's

 5            job status.  The judge may say that, but that

 6            don't make it correct.  And I'm sorry, nothing

 7            against John Gorman.  I said I have no beef with

 8            John Gorman.

 9      Q.    Do you agree with the judge's discussion where it

10            indicates it says Patricelli brought a personal

11            and family dispute into the workplace by

12            threatening claimant's job status as well as his

13            personal safety?

14                      MR. MARTIN:  Object.  You can answer.

15      A.    Again, no, I don't.

16      Q.    And I'm focusing on the part where it says

17            personal safety, not on the job status.

18      A.    I understand that.

19                      MR. MARTIN:  Same objection.

20      Q.    Sir, can you tell us when you were informed --

21            when or if you were informed about this decision

22            to award Mr. Gorman Workers' Compensation

23            benefits?

24      A.    I was never informed of it.  I don't know
```

```
 1              anything about it.  Again, the undersheriff and

 2              Attorney Goldburger and probably Steve Pechenik's

 3              office specifically dealt with that and kept me

 4              out of all information and kept me out of the

 5              loop.

 6        Q.    Okay.

 7        A.    First I saw this document.

 8        Q.    That was the first time you have seen that

 9              document?

10        A.    Yes.

11        Q.    Now, you understand that Mr. Gorman was out on

12              leave from the sheriff's office; correct?

13        A.    He was out -- I know he was out of work.  I think

14              he was out on just without pay.

15        Q.    That's what you understand, he was out on unpaid

16              leave?

17        A.    Unpaid leave, I guess you will call it, yes.

18        Q.    And there came a time when there was a letter

19              sent from your office indicating that Mr. Gorman

20              had been out of work -- is going to be out of

21              work for a year or more?

22        A.    Yes.  That wasn't sent from my office.

23        Q.    Was not sent from your office?

24        A.    I believe sent by the undersheriff.
```

```
 1    Q.   I'm going to show you what's been marked as

 2         Exhibit 14.  Okay?

 3    A.   Okay.

 4    Q.   And turn it over to the second page.  Let's start

 5         there first.  Do you see your signature?

 6    A.   It is my signature on there, so maybe I did do

 7         it.  I don't even remember that.

 8    Q.   Well, why don't you take a second to look at

 9         that, then.

10    A.   Sure.  Okay.  It's a Section 73.  It's a form

11         they've done several times.

12    Q.   What's Section 73 there?

13    A.   It's Civil Service Section 73.  If you are out of

14         work for a year -- more than a year, your

15         position will be terminated.  And you have within

16         a year to come back.  You may come back to the

17         position if there's an opening there.

18    Q.   Actually, sir, isn't it true that Section 73 says

19         that if an employee is out of work for more than

20         a year, they may be terminated.  It doesn't say

21         they have to be.

22              MR. MARTIN:  Object to the form of the

23           question.

24    A.   I'm not exactly sure how it says it, to be honest
```

1          with you.  Again, we do this with our legal

2          counsel.  It was done many times.

3     Q.   And I'm asking you because your name's on here.

4     A.   I understand it.  And I pretty much follow the

5          advice that we get from counsel.

6     Q.   And just to clear up, you understand that Section

7          73 required that you must terminate him if he's

8          been out for more than a year?

9     A.   No.  What we normally do if anyone is gone for

10         more than a year is to file a Section 73, to move

11         them off the payroll so we're not paying time and

12         a half for another employee all the time.  That

13         person may come back in.

14    Q.   So to remove them off of payroll, that's not the

15         same as terminating them; isn't that true?

16    A.   Technically it is, but you can't hire a space if

17         the name is there.  Civil Service wise, you

18         can't.

19    Q.   Now, it says here you are entitled to a due

20         process hearing prior to the termination.

21    A.   Under the law, everyone's entitled to a hearing

22         under due process under 73.

23    Q.   And so did you conduct a due process hearing in

24         this matter?

1    A.   I didn't conduct one, no.  I believe he has to

2         request one.  I don't know it was done.

3    Q.   You understand that the due process hearing was

4         scheduled in this matter?

5    A.   I don't recall.

6    Q.   Just quickly show you what's been marked as

7         Exhibit 63.

8              Do you recognize that?

9    A.   It was done apparently, okay.  I know I wasn't a

10        part of that, so I don't recall it.

11   Q.   Well, sir, you wrote the letter on June 23rd,

12        didn't you follow up to find out what happened?

13   A.   No.  I didn't deal with that.  That's a formal

14        letter that goes out.

15   Q.   So just as a further point of clarification, you

16        weren't at the due process hearing?

17   A.   No, I didn't go to no due process hearing.

18   Q.   And did you follow up after August 14th as to the

19        result of that hearing?

20   A.   I don't know if I specifically followed up, but I

21        do remember the undersheriff or Marcelle tell me

22        that -- I don't even remember what, they just

23        said John was relieved on an Article 73.  I don't

24        know if there was the hearing.  I don't know if

```
 1              they completed the hearing, did the hearing or
 2              not.  I just don't know.
 3       Q.     Did you review a transcript of the hearing?
 4       A.     I don't recall reviewing one.
 5       Q.     I'm going to show you what's been marked as
 6              Exhibit 64.
 7       A.     I don't recall.  I may.  I don't recall it.  I
 8              might have directed him to send this letter out
 9              to do that.
10       Q.     He's saying that you reviewed a hearing
11              transcript, sir.
12       A.     I might have reviewed it with Brian Goldburger,
13              speaking with Brian Goldburger telling me the
14              results of that.
15       Q.     Now, I just want to have you look back at 64
16              again.  Do you see it says:  "Based upon your
17              personnel file, your attendance records," do you
18              see all that?  I want you to read that for me,
19              please.
20       A.     It says:  "Based up my review of your transcript
21              and your personnel file --" that's Patrick Russo.
22       Q.     Well, I will have you read it.
23       A.     "-- Including your attendance records, in
24              accordance with applicable provisions, New York
```

1          State Civil Service ---"

2     Q.   You want me to read it?  I can read it to you.

3     A.   I'll read it.  I will start over.

4          "Based upon my review of the transcript and

5          your personnel file, including your attendance

6          records, in accordance with the applicable

7          provisions of the New York State Civil Service

8          Law, your employment with the Rensselaer County

9          Sheriff's Office is hereby terminated, effective

10         October 1st, 2014."

11    Q.   Okay.

12    A.   And I believe that that letter was typed up by

13         Marcelle, probably signed by the sheriff, and I

14         believe she probably used a copy and left a top

15         piece in there.

16    Q.   Top piece?  What are you referring to?

17    A.   Reviewed -- because I don't recall reviewing

18         anything of that.

19    Q.   Now, Section 73 of the Civil Service Law allows

20         for the possible termination of an employee who

21         has been out of work for a year or more on an

22         unrelated work injury.

23         Why, if you had a due process hearing, based

24         on that, can you tell me looking at this why his

```
 1            attendance record and personnel file would have
 2            anything to do with that?
 3     A.     I think looking at the attendance record would
 4            show you have been out for more than a year.
 5            That would be logical.  And a personnel file
 6            would be why you were out and the reasons for
 7            that.  That would sound logical to me.
 8     Q.     Now, wouldn't he also have had to look at the
 9            Workers' Comp decision that was before this that
10            was a part of the file?
11     A.     You're gonna have to ask him.
12     Q.     Well, I'm asking you because --
13     A.     Because I don't know.  I wasn't involved in it.
14            I told you they kept me out of that.
15     Q.     Okay.  And I just want to clarify for the chain
16            of command for purposes of termination.  The
17            undersheriff is empowered to terminate people
18            without your review?
19     A.     Absolutely.
20                    MR. SORSBY:  Have this marked as an
21                exhibit.
22                    (Plaintiff's Exhibit 96 was marked for
23                identification.)
24     BY MR. SORSBY:
```

```
 1    Q.   I'm going to show you what's been marked as
 2         Exhibit 96.  Take a look at that for a second.
 3         Let me know when you recognize this document.
 4    A.   I mean, I don't see -- this document gets filed
 5         by whoever's the chief, the captain, or whoever's
 6         in charge over there at the time.
 7    Q.   Do you see a name at the top, a name of an
 8         employee there?
 9    A.   Peter Palmary (phonetic).
10    Q.   Let me see that real quick and make sure that's
11         the right page, if you don't mind.
12              Do you see the second name?
13    A.   Laura Abbott.
14    Q.   Do you see where it indicates when she went out
15         on leave?
16    A.   July 29th, 2010.
17    Q.   Now, when you left the sheriff's office, she was
18         still employed there; isn't that true?
19    A.   I'm not sure what the status is with her case, to
20         be perfectly honest with you.
21    Q.   In 2012 and 2013, the period in question, she was
22         still employed there; isn't that true?
23    A.   I believe -- well, she might have been on the
24         roster but she wasn't being paid or wasn't
```

```
 1              working.

 2    Q.    But she wasn't terminated; isn't that true?

 3    A.    Based on the advice of legal counsel, I

 4          ordered -- she's under direct order and there's a

 5          letter to establish that to order her back to

 6          work a long time ago, back in probably -- I don't

 7          know, many years ago.  And I said she should be

 8          terminated.  And they told me do not make a move

 9          on it because there's outstanding legal issue

10          going on, and that's where that is.  The last I

11          knew of it and left on it.

12    Q.    Showing you 61.  You can turn the page over, as

13          well.

14    A.    What about it?

15    Q.    Now, having looked at that document, do you

16          believe that she was still employed there as of

17          2015?

18    A.    I didn't say she --

19                  MR. MARTIN:  I object.

20    Q.    I'm asking having read that document, do you

21          believe she was there?

22                  MR. MARTIN:  There?  Object.

23                  MR. SORSBY:  Working at the Rensselaer

24          County Sheriff's Department.
```

```
1    A.   No, she was not working at the Rensselaer County

2         Sheriff's Office.  She hasn't worked there in

3         years.

4    Q.   Was she still on the books?

5    A.   I believe she was probably still on the books.

6         She hadn't left yet, based on the advice of

7         counsel, as I told you.

8    Q.   Okay.  So the decision to continue to keep

9         somebody employed beyond a year when they are out

10        on leave for an unrelated work issue, that

11        decision's made by counsel's office?

12   A.   A lot would be determined by them, yes.  We would

13        inquire to the legal side of where to move on

14        this and how to move on that.  And they will give

15        us the advice on which is appropriate to move.

16             Again, I made the recommendation a long time

17        ago.  She was ordered back to work on direct

18        order in writing to her, a letter.  And I told

19        them that we should move on that.  And I was told

20        do not do anything with that at all.  I was told

21        by the County Attorney and my labor attorney.  So

22        under advice of counsel, that's where that stood.

23   Q.   Okay.

24             MR. SORSBY:  These two marked as
```

```
 1              exhibits. (Directed to the court reporter.)

 2                   (Plaintiff's Exhibits 97 and 98,

 3              respectively, were marked for

 4              identification.)

 5    BY MR. SORSBY:

 6    Q.   Do you know who Chris LaFountain is?

 7    A.   Chris LaFountain is -- I assume we're talking

 8         about the same Chris LaFountain.  There's a CO

 9         named Chris LaFountain.

10    Q.   And do you understand that she was terminated in

11         2014?

12    A.   She may very well have.  I don't know.

13    Q.   Let me show you what's been marked as Exhibit 97.

14    A.   Okay.  Date of separation, 7/15/14.

15    Q.   Does that refresh your recollection as to whether

16         or not she was terminated in that year?

17    A.   I think she went out.  I forget the reason why,

18         what it was.  I really do forget that.  I can't

19         remember.

20    Q.   Do you recall it being for a medical reason?

21    A.   It may very well have.

22    Q.   Was it for a disciplinary reason?

23    A.   I don't think so.  I think it was for a medical.

24         I don't remember exactly.  I can find out.
```

1   Q.   Now, you said she was out, but this says date of

2        separation.  She was actually terminated, wasn't

3        she?

4   A.   I don't know what it was with her.  I can't

5        remember.

6   Q.   You don't know why she was fired?

7   A.   I didn't say she was fired.  I said I don't know

8        why she was separated.  I do know she was brought

9        back.  I don't know.  Again, I forget the whole

10       reason for all of that.

11            I believe, you know, if you are out less

12       than a year, you can bring someone back if they

13       have medical documentation to show they can come

14       back, and they can apply to come back.  So that

15       may very well have been the case.

16  Q.   Let me show you 98.  You see that she was

17       re-hired?

18  A.   Okay.

19  Q.   You said that they brought her back?

20  A.   Yes, they must have brought her back, yes.

21  Q.   So what you were just saying is that somebody

22       could be, through Section 73, separated and

23       brought back later if their medical --

24  A.   That's the law.

1    Q.   I'm asking your understanding.

2    A.   Yes, that's the law.  And I believe it's -- a lot

3         of it's not our choice.  We have to take them

4         back if they are medically cleared and there's an

5         opening, and there's a period of time what that

6         is.  I don't have it off the top of my head.  But

7         there's a period of time where that all has to

8         encompass it.

9    Q.   Now, as the supervisor, the sheriff, if you will,

10        at the sheriff's department, do you understand

11        what the policy is for providing accommodations

12        for the Americans with Disabilities Act?

13   A.   I know you have to provide reasonable

14        accommodation with the ADA.  Normally, when we

15        get involved with that, we ask for legal advice

16        on how to proceed with those and follow

17        directions of legal advice.  It's pretty rare we

18        make that decision on our own without

19        consulting -- we will not make that decision

20        without consulting with our attorneys.

21   Q.   And at the correctional facility, there are light

22        duty positions for persons that need an

23        accommodation?

24   A.   There could be a light duty position, yes.  That

```
 1              would be the answer, yes.

 2     Q.   Okay.  And where do you understand those light

 3          duty positions to be?

 4     A.   Light duty positions are normally specifically

 5          related to 207-C related cases.  We don't give

 6          them for non-207-C related cases, light duty

 7          jobs.  That would open up a Pandora's box.  We

 8          would have nobody working the jail, they'd all be

 9          on light duty jobs.  It's specifically related to

10          207-C cases.

11     Q.   So you would provide light duty accommodations

12          for somebody who receives 207-C?

13     A.   Yes, I believe that's the case.  And I think

14          that's how our counsel told us to do that.

15     Q.   All right.

16                   MR. SORSBY:  Take a five-second break.

17                   (Off the record.)

18                   (Recording playing)

19   BY MR. SORSBY:

20     Q.   Do you recognize that voice?

21     A.   It sounds like Marcelle.  I don't know if it is.

22          It sounds like her.

23                   (Recording playing)

24     Q.   Do you recognize her voice?
```

```
 1    A.    Sound's like Marcelle, yes.

 2    Q.    Do you recognize the male voice at this point?

 3    A.    No, I didn't recognize it.

 4    Q.    Okay.  We will continue on.

 5                (Recording playing)

 6    Q.    Is that true?  Did you go into her office and

 7          start yelling at her?

 8    A.    It wasn't me yelling at her.

 9                MR. GORMAN:  She meant Patricelli.

10    Q.    Sorry for that.

11    A.    That wasn't me.

12    Q.    I just got this recording, so I'm not clear as to

13          who was speaking at that point.

14              Let's continue on.

15                (Recording playing)

16    Q.    Do you agree with that statement?

17    A.    No, I do not agree with that statement.  Never

18          told Patricelli ever to do anything like that.

19          And I don't have any idea where she's getting

20          that from.

21    Q.    I'm giving you an opportunity to respond to what

22          she's saying.

23    A.    I just responded.  That is totally not true,

24          ever.  I have the utmost respect to Hal Smith,
```

```
1              and I never would have done that.
2      Q.     Okay.  Do you recognize the male voice yet at
3              this point?
4      A.     No, I don't.
5      Q.     Let's continue on.
6                      (Recording playing)
7      Q.     True?
8      A.     I never -- no one ever reported -- I had no idea.
9              In fact, I was -- when Jim Karam was running out
10             of sick time, I was flabbergasted how a
11             20-something year man didn't have any time.  I
12             have no idea when he came to work or didn't come
13             to work.  I did not pay attention to that.
14     Q.     So do you now recognize the voice?
15     A.     Yes, it sounds like Karam.
16     Q.     Let's continue.
17                     (Recording playing)
18     Q.     So far, what you just heard, is that true as far
19             as you understand?
20     A.     To be honest, Patricelli had the authority when
21             Troy called him to go out on the Impact thing,
22             that he can go, but he had to report that he was
23             going out to them.  But they're supposed to do
24             the -- Troy, to my understanding, is supposed to
```

```
1              do the grant reimbursement for that because it
2              was Troy's grants.  They got approved on a grant,
3              and they would submit their reimbursement that
4              should come from the county.  I don't know if
5              they got it or not.
6     Q.       Do you understand that Patricelli put in for more
7              overtime and they had availability for it?
8     A.       We knew that he was doing more time that was down
9              there.  That was well understood.  Because a lot
10             of what was Impact -- Troy asked for the
11             cooperation of a correctional officer to help
12             them fight their gang issues.  And they would
13             bring him out on certain cases they would do that
14             with.  And they called and asked permission to do
15             it, and that would be granted.
16    Q.       Let's keep going.
17                       (Recording playing)
18    A.       She is misinterpreting a lot of that grant.  She
19             doesn't understand that, and she's giving out
20             wrong information.
21    Q.       So you disagree with all that she just said?
22    A.       Not all.  I disagree with some of what she said.
23             Some Patricelli did go out with Troy.  The grant
24             was for a correctional person, a correctional
```

1          person.

2     Q.   What about the part where she says, "He

3          absolutely refuses to do anything with our guys"?

4     A.   He got talked to.  There was a disagreement

5          between our staff and their staff because Troy

6          was calling them out when our staff went out to

7          go out and do certain things.  They wouldn't call

8          Tony to go with them, and he felt quote,

9          slighted, by those guys.

10              So he said, "I will just go out with Troy."

11              And I said, "You will go out with who you

12         are told you will go out with.  And I told the

13         captain that you had a deal with that," Captain

14         Pyle who oversaw that stuff.

15    Q.   Let's continue.

16                    (Recording playing)

17    Q.   What do you feel about --

18    A.   That's not a true statement, and that's not true

19         at all.  Patricelli did what he was authorized to

20         do, and if he was brought under reigns, he went

21         under reigns.  What they are saying is not true,

22         and what Karam's saying is totally anything to do

23         to try to make people look bad.

24    Q.   So you agree with that statement:  "Well, people

```
1          have been suspended for less without pay"?

2     A.   No, I don't.

3     Q.   You don't disagree with that statement?

4     A.   I don't agree with that statement.

5     Q.   You don't.  Okay.

6     A.   I disagree with that.  I totally disagree with

7          that statement that he's trying to throw that in

8          there like that.  Sounds like he's baiting

9          Marcelle.

10              MR. SORSBY:  All right.  Are you able to

11           hear the recording from where you are?

12           (Directed to the court reporter.)

13              THE COURT REPORTER:  I am able to hear

14           it, yes.

15              MR. SORSBY:  It might help going forward

16           if you record, if you can, what you hear.

17           And then when I pause it, you can record our

18           dialogue.

19              THE COURT REPORTER:  I will do my best.

20              MR. SORSBY:  And if not, I will read

21           from the transcript what I have.

22              THE COURT REPORTER:  I don't know if you

23           want to maybe refer to the page number and

24           line.
```

```
 1                    MR. SORSBY:  That's true.  That's what
 2              I'll start doing.
 3                    (Recording playing)
 4    BY MR. SORSBY:
 5    Q.   Now, I'm reading from page five of the
 6         transcript, which is a transcript of this
 7         recording.  And you also just heard her say, "Oh,
 8         God, no.  He held a freaking gun to a guy's head
 9         at a bar."  And I just want to clarify from you,
10         had you ever heard of that allegation?
11    A.   I never heard of that.  I was told after one of
12         the depositions.  Never knew that.  I was shocked
13         when I heard that.  I don't even know if that was
14         the truth or not.  I find it hard to believe that
15         that's the total facts of the case, because I
16         honestly doubt Sheriff Keating would have kept
17         anybody an employee if that was the case.
18              I knew there was something that happened on
19         it, but I don't know the final outcomes of it.
20         Now, I know.  I was told after-the-fact.
21                    (Recording playing)
22    Q.   Did you understand that to be the case that Pat
23         told her everything?
24    A.   No.
```

1  Q.   And I just want to be clear, I'm reading on page

2       six, line nine.  She says:  "She doesn't realize

3       that Pat tells me absolutely everything that he

4       knows."

5            Do you understand that she had, quote, that

6       type of close relationship with Undersheriff

7       Russo?

8  A.   No.

9                 (Recording playing)

10 A.   That is an outright, not true statement at all.

11      I will tell you exactly how that statement got

12      said and by.

13           I was sitting in Marcelle's office, Ruth

14      walked in and tried to hand me the state police

15      report and told me, "I have that state police

16      report," and went to hand it to me.

17           I told her, "I don't want that report.  Take

18      that report and get it out of here.  I told you,

19      don't bring it into this facility."

20           And she said to me, she said, "What do you

21      want me to do with the report?"

22           I said, "I don't care what you do with the

23      report.  Get it out of here."

24           She goes, "Well, what am I going to do with

```
1           it?"

2                I said, "I don't care.  Throw it away, burn

3           it, shred it.  I don't care.  If I need it, I

4           will call the state police for it."

5                That's what that conversation was and that's

6           specifically how that went down.

7     Q.    Okay.

8                MR. SORSBY:  Did you record all that he

9           said?

10               THE COURT REPORTER:  I did.

11    A.    That's exactly how it went down.

12    Q.    So you did use the word "shred"?

13    A.    I used shred, not as an order to shred it.  I

14          said, "I don't care what you do with that

15          document.  I can get it any time I want it.  It's

16          a copy of a police report."

17    Q.    I understand what you're saying.

18    A.    Okay.

19    Q.    Now, a little bit earlier in this recording, she

20          says -- and I'm reading from page six of the

21          transcript from the recording:  "And then she

22          came over and he laid into her on the telephone."

23    A.    No.

24    Q.    "And then because he did come in on Tuesday
```

```
 1              morning for about an hour.  And he went in this
 2              office and closed the door and he was yelling at
 3              her."
 4                   Were you yelling at her?
 5         A.   I don't recall yelling at her at all.  I honestly
 6              don't recall that.  In fact, I don't even
 7              remember speaking with -- we're talking about
 8              Chief Vibert, I think.  I don't remember speaking
 9              to her after that.
10         Q.   Okay.  Let's continue.
11                        (Recording playing)
12         Q.   So did she come back many other times?
13         A.   That was the end of it.  Right after she gave
14              that report, after she left that, Marcelle and --
15              I was sitting in Marcelle's office and I was
16              sitting in the chair there.  Right after she
17              tried to give me that, she went into the
18              undersheriff's office.
19                   And how that would be, so you know, like,
20              say I'd be sitting right where that radiator is,
21              Marcelle's desk would be about where you are, and
22              the undersheriff's office was right there.
23              There's a doorway right there, you go in there.
24              There's another doorway on the outside.  She was
```

```
 1              in the hall.  She went into the undersheriff's

 2              office.  She was talking to him for a few

 3              minutes.  She leaves, and the undersheriff walks

 4              out with the folder and says, "Here.  I think you

 5              need to look at this."

 6                   And that's when I looked.  I said, "What is

 7              it?"

 8                   And he said, "It's more than just the report

 9              in there.  It's these other documents."

10                   I said, "I did not know that."  I said, "We

11              have got to send them up to Tom Hendry."  That's

12              how that went down.

13         Q.   So she went to the undersheriff's office because

14              you told her you didn't want to see those

15              documents?

16         A.   No.  The document.

17         Q.   Document?

18         A.   That has to be abundantly clear.  I'm talking

19              about one document here, the only document that I

20              ever was talking about.

21         Q.   Well, but she went right from your office to

22              Russo's office?

23         A.   That's what I believe, and he brought that in to

24              me.
```

```
1    Q.   But you said it was a one-page document?  How did

2         it --

3    A.   No.  I never saw the documents.  When she said,

4         "I have the copy of the police report," that's

5         what I believed she was trying to give me.  It

6         turned out there were other reports there besides

7         that one.

8    Q.   I understand that, but I'm saying you don't know

9         that it was one page because you didn't look at

10        it.

11   A.   No.  I'm only talking about one document, because

12        she said, "I have a copy of the police report for

13        you."

14   Q.   Okay.  All right.

15   A.   And that's what I believed we are talking about.

16        And I said to her, "I told you to keep that out

17        of here."

18   Q.   You don't know how many pages it was --

19   A.   I have no idea.

20   Q.   -- you just know that she said it was a police

21        report?

22   A.   That' correct.

23   Q.   Let's continue.

24                   (Recording playing)
```

```
 1                    (Interruption in the proceedings.)

 2                    MR. SORSBY:  Back on the record.

 3                    (Recording playing)

 4     BY MR. SORSBY:

 5        Q.   There's only ten seconds left.  None of it's

 6             relevant.  No need to continue with that.

 7                  Clearly, that was the first time you had

 8             heard that conversation before, fair to say?

 9        A.   Very fair to say.

10        Q.   All right.  Now, you had been at a deposition

11             involving the matter of Ruth Vibert versus

12             Rensselaer County?

13        A.   Yes.

14        Q.   And that was before Mr. Bob Keach, do you recall

15             that?

16        A.   Yes.

17        Q.   Just so happens that I happen to have the

18             transcript from that deposition.

19        A.   Okay.

20                    MR. SORSBY:  And did we mark this as an

21             exhibit last time?

22                    MR. GORMAN:  That's never been marked,

23             no.  That was my personal copy.

24                    MR. SORSBY:  And do we have an extra
```

```
 1              copy?

 2                      MR GORMAN:  A blank one?  Not at this

 3              time.

 4                      MR. SORSBY:  What we will do is we will

 5              make a copy for you, we will put a sticker on

 6              it, and then we will -- because it's a lot to

 7              copy.

 8                      MR. MARTIN:  As an exhibit, you mean?

 9                      MR. SORSBY:  Correct.  My secretary will

10              be here tomorrow, and she will make the copy.

11                      MR. MARTIN:  What number are we up to?

12              99?

13                      MR. SORSBY:  And rather than mark it

14              right now, I will go ahead and read from it

15              and we will mark it at the end.  Okay?

16                      MR. MARTIN:  Yes.

17     BY MR. SORSBY:

18       Q.   Now, beg your patience, some of these matters we

19              have already covered.  I'm going to do my best to

20              ensure we are not going over the same stuff over

21              again.  Okay?

22                      MR. MARTIN:  Can we just do, like, a

23              page/line type thing?

24                      MR. SORSBY:  Right.  I agree
```

1          wholeheartedly.

2     Q.   Going back to the incident of February 15th where

3          it's alleged that Anthony called Mr. Gorman at

4          his house and threatened to break his jaw, do you

5          know if Ruth Vibert had told John to call the

6          police in regards to that matter?

7     A.   I don't know that.  I don't recall.  I just don't

8          recall.  I don't know if she told me that or

9          what.  I don't know.  I don't remember.

10    Q.   And I'm just going to refresh your recollection.

11         I'm reading from page thirty-seven, line nine:

12         "All right.  So were you of the opinion that Ruth

13         Vibert had told John Gorman to call the police

14         about Mr. Patricelli?

15              "Yes, I was told that, yes."

16              Having just read your transcript, do you now

17         remember?

18    A.   You mean when Ruth called me on the phone?

19    Q.   Yes.  The question was:  "Do you know if Ruth

20         told John to call the police?"

21    A.   I think I told Ruth that if John wanted to call

22         the police to file a report, he should do that.

23         I think that's what I'm trying to say there,

24         because I did tell her that.  Now, did she tell

```
 1              me that he did, I just don't remember.
 2        Q.    Okay.
 3                   MR. SORSBY:  Off the record.
 4                   (Off the record.)
 5    BY MR. SORSBY:
 6        Q.    Now, I'm on page 38 of your transcript -- and
 7              Keach asked you -- and this is line 15:  "How
 8              about the occasion where you acknowledge that --
 9              I think your testimony was you gave a litany of
10              things, instructions you gave to her, and one of
11              them was, 'You can shred it.  I don't care,' is
12              what I recall for your 30-b examination.
13                   "So how about that conversation?  How long
14              after that?"
15                   Do you recall testifying at the 30-b
16              examination as to using the words "shred it" in
17              the way that you testified earlier today?
18        A.    Yes, the same way I testified earlier, yes.
19        Q.    That's what I'm asking.
20        A.    Yes.
21        Q.    So I want to stay on that point for a moment.
22              You heard Ms. Swanberry on the recording, and you
23              denied the way she said it as being correct.
24              Ruth Vibert also testified that you told her to
```

```
 1              shred Mr. Gorman's documents.
 2                   Do you deny that as well?
 3    A.    I didn't give her an order to shred the
 4          documents.  I said to her, "I don't care what you
 5          do with the documents."  I said, "Get them out of
 6          there.  I told you not to keep them here."  It's
 7          not a quote, but just the gist of what I'm trying
 8          to say.
 9                   I said, "I don't care if you throw them
10          away, you burn them, shred them.  Do what you
11          want, but get them out of here.  I can get them
12          when I need them by calling the state police."
13    Q.    Okay.  I wanted to give you the opportunity to --
14    A.    That's exactly what I said.  I'm confident of
15          that.
16    Q.    In just, for clarification of the record, going
17          with what you said, "Get rid of them, shred them,
18          I don't care --"
19    A.    No, I said, "Get rid of it."
20    Q.    Get rid of it.  Okay.  It, them, it.  "Get rid of
21          it, shred it, I don't care"?
22    A.    Yes.
23    Q.    At that point, you had never looked at the
24          documents?
```

1    A.   No.

2    Q.   I'm on page 39, line 15:  "And part of it was

3         that at that time when her role as the chief was

4         to diffuse situations and the worked was staffed,

5         to minimize and to stop these kinds of things

6         that were going on.  She seemed to be more

7         exasperating these things rather than solving

8         them."

9              What do you mean by that?

10   A.   I was talking about her being involved, going out

11        with Patricelli, getting close to him, and doing

12        the -- getting in that argument with him.

13             She was getting involved with too much with

14        the other sergeant in charge of training.  I

15        can't think of his name now.  People were going

16        to her house, she's doing this, she's doing that.

17        And it was starting rumors.  That's the stuff I

18        was talking about.  She wasn't supposed to be

19        doing that stuff.  And I told her in the

20        beginning she's not supposed to be doing those

21        things.

22   Q.   Okay.

23   A.   That's why I was getting frustrated with her.

24             Plus, the complaints that I was getting with the

 1          staff, she's touchy-feely with them, she's

 2          constantly putting her hands on them, things like

 3          that.

 4               And she started doing contract negotiations

 5          with the staff.  I told her she's not supposed to

 6          be doing those things.

 7               And those were the issues that I was talking

 8          about.

 9     Q.   Now, I'm on page 40, line 11:  "Well, I don't

10          understand.  What did she do to fan the flames

11          besides tell Mr. Gorman to call the cops?"

12               Your answer, at line 14:  "She should have

13          asked, got two of them together and try to quell

14          their problems and tell them to keep them outside

15          of the workplace."

16     A.   I think what I was saying to her is any time

17          there's a disagreement between people who are

18          close, you try to get things quiet before you go

19          to the police.  Always try to do that.  If you

20          can't do that, that's why I told her, I said to

21          her on the phone, "If John needs to call the

22          police, tell him to call the police."  I told her

23          that.  But I also believed that things that led

24          up to this that she should be trying to attempt

```
1              to diffuse those things as part of her role in

2              that job.

3         Q.   And why would you try to get two people together

4              where one of the accusations is one is

5              threatening to break the other person's jaw?

6         A.   I'm talking about prior to all this stuff that

7              was coming on.  When Patricelli made the initial

8              complaint about him doing that, the best thing

9              would have been to do, in my humble opinion, was

10             to attempt to get -- to try to resolve it.  If

11             you can't resolve it, then you have to go to

12             other measures.  I understand that.  But that was

13             never attempted by her.  It was strictly, "Let's

14             go, go, do this, do this, do this, do this."

15                  And I said to her, "Ruth, our job is to try

16             to do it at the lowest level possible."

17        Q.   I just want to ask you about what you just said.

18             So you said -- I asked you why would you try to

19             bring those two together after a threat of to

20             break a jaw, and you said you were talking about

21             the earlier complaints by Mr. Gorman.

22        A.   All that stuff.

23        Q.   So what I was asking you is:  So you wanted Ruth

24             to work to bring the two together to solve the
```

```
 1              other issues that Mr. Gorman was complaining

 2              about before they rose to a higher level; is that

 3              what I understand?

 4       A.    It was the frustration, the level I was trying to

 5              get out to them it was going on way before all of

 6              that.  It was her and Karam fighting, her and

 7              somebody else.  She's supposed to be diffusing

 8              situations, not making them worse.  And I told

 9              her that's what she should have been doing.

10                   Never did I ever say if anyone thought or

11              felt threatened not to take appropriate action.

12       Q.    All right.

13                   Now, what I'd like to know is why would you

14              have Ruth attempt to resolve these issues rather

15              than Captain Smith?

16       A.    Well, she didn't -- it wouldn't have been Ruth's

17              job to personally do it.  It would have been

18              Ruth's job to facilitate it, or if she felt

19              necessary, to do it as her role as the chief of

20              the facility.

21                   Her job was to -- this was going on way

22              before Ruth got there.  John will tell you that

23              it was a tough place, people were very sophomoric

24              and they would tease, bust each other's chops,
```

```
1          say stupid things and stuff.  And I told her that
2          stuff was going on and that stuff excalates, and
3          it was her job to start breaking that down.  And
4          she did.  She kept on wanted to write everybody
5          up.  And I told her that's not the way to solve
6          the problem.
7     Q.   Okay.
8               So I'm on page forty-one, question three:
9          "Okay.  So you're aware that Mr. Patricelli
10         called John Gorman on his work-issued cellphone?"
11              Line five:  "Answer:  Yes, he did make the
12         call.  What got said, I have no idea."
13              How did you know he made the call?
14    A.   Because she told me he called him.
15    Q.   You're saying Ruth told you that Patricelli
16         called John?
17    A.   Yes.  And down the road later on, Patricelli told
18         me he called him.  And I told him he made a big
19         mistake.  He shouldn't have done it.  So that's
20         how I knew the call was made when we did this
21         deposition.
22    Q.   How much further down the road?
23    A.   I can't remember that.
24    Q.   Was it before or after his arrest?
```

```
 1    A.    I don't remember, because I laid into -- I ripped

 2          into him over all this crap, and I just don't

 3          remember the time frame of it.  I'm sorry.  I

 4          just don't.

 5    Q.    Was it after the arrest, do you know?

 6    A.    I think it was before the arrest because I told

 7          him he shouldn't have gotten involved with any of

 8          this crap.

 9    Q.    Now, you understand that he called Mr. Gorman on

10          his work-issued cellphone; isn't that true?

11    A.    I did understand that later, yes.  I did not know

12          that at the time, but I found out that later.

13    Q.    And you found that out from?

14    A.    Patricelli.

15    Q.    Was that appropriate to call Mr. Gorman at home

16          on his work-issued cellphone?

17    A.    I mean, I don't want to get real technical.  I

18          knew all of them had cellphones, and I knew they

19          made personal calls on their cellphones.  I

20          wasn't losing sleep over that.  It wasn't costing

21          us any more money than what the county was

22          already paying.

23               If I saw that it would cost us money, I

24          would stop that.  Should he have done that?  No,
```

```
1          he should not have done something like that.  But

2          do I think it was something really egregiously

3          wrong?  No, I don't.

4               I mean, calling John on the phone -- what

5          got said, again, I don't know truly what got

6          said.  Am I upset that he called him on the

7          phone?  No.

8     Q.   Are you upset that he said that if he had a big

9          enough problem with John, he'd come out and break

10         his jaw?

11    A.   If he meant it to be a threat, yes, I am upset

12         over that.  I really to this day don't know the

13         truth of that.  I don't know that truth.  But, I

14         mean, to answer your question, if he did that,

15         absolutely, he'd be wrong.

16    Q.   Okay.  Now, you understand that the Department of

17         Labor came in and investigated Mr. Gorman's

18         complaints?

19    A.   Yes, I do understand that, yes.

20    Q.   Were you present for that investigation?

21    A.   No, I don't believe I had anything to do with

22         that investigation.  No one ever asked me to

23         testify or anything.

24    Q.   Did anybody from the Department of Labor talk to
```

```
1           you?

2    A.    I don't recall that, no.  I really don't recall

3           anybody talking to me on that.

4    Q.    How did you become aware of the Labor Department

5           Investigation?

6    A.    I think through our attorney, Brian Goldburger.

7    Q.    Okay.

8                I'm reading from page forty-three, line

9           eleven.

10               Well, let me give it context.  I'm going to

11          go back up to line seven:  "Question:  So here's

12          what I'm trying to figure out, what did Ruth

13          Vibert -- you tell me the situation between

14          Mr. Patricelli and Mr. Gorman, what did Ruth

15          Vibert do wrong?"

16               Line eleven, your answer:  "Was bringing

17          outside information into the workplace."

18               What do you mean by that?

19   A.    Again, what she was doing wrong was I asked

20          her -- I told her to keep it outside the

21          workplace, let the state police investigate it.

22          And she kept on trying to bring that incident

23          back in.

24               Once I was aware that there was other things
```

```
1              she was trying to bring in, that's when I took

2              that information once it got in my hands and

3              forwarded it up to human resources.  But at the

4              time, I'm only talking about that one call and

5              that one incident.

6    Q.   So when there was only a police report --

7    A.   Yes.

8    Q.   -- that was bringing outside information in?

9    A.   That's correct.

10             And then when there was things that were

11             complaints regarding inside the workplace, they

12             were turned over both to Hal and to Tom Hendry.

13   Q.   And to Hal and Tom handy because they were

14             workplace violence issues?

15   A.   They were claiming that.  Whether they were or

16             not was another issue.

17   Q.   So you understand the workplace violence policy

18             to not cover criminal complaints?

19   A.   No.  I was -- it was an allegation, it wasn't a

20             fact.

21   Q.   Just to further clarify.  The allegation was in

22             the criminal complaint?

23   A.   Right.  There was a complaint filed.

24   Q.   Right.  And then you received the police
```

```
 1            complaint plus additional documents, and that's
 2            when you had --
 3    A.      No.  What do you mean?  I'm confused.  What are
 4            you saying?
 5                 I will let you finish.  Go ahead.
 6    Q.      You understand that Ruth came to you with a
 7            police report, and then, from there, you did not
 8            look through the document.  You didn't receive it
 9            at that time, she went to Undersheriff Russo's
10            office?
11    A.      Yes.
12    Q.      Undersheriff Russo came to your office with that
13            same police report plus additional documents?
14    A.      Right.
15    Q.      And it was at that time that you decided to have
16            Hal Smith and Hendry investigate it?
17    A.      No.  We were having -- it's hard.  Hal Smith was
18            trying to keep perspective over other things that
19            were going on.  And when this come out, when
20            these other allegations come out, Hal Smith was
21            told to look into each one of those complaints
22            that were there, and forwarded -- per our
23            requirement, to send it up to Tom Hendry's office
24            for his review, and to Hal to monitor what the
```

```
1              heck was going on.  Yes.

2         Q.   But, again, only upon receipt of the additional

3              documents plus the police report?

4         A.   Yes, because I didn't know that they were there.

5         Q.   And I'm trying to discern from you the dividing

6              line at which point you decide to launch an

7              investigation into workplace violence complaints.

8                   It seems that for you there has to be

9              incident reports alleging workplace violence at

10             work before you launch that; is that true?

11        A.   No.  If you understand the history of the things

12             that were going on inside the correctional

13             facility and how people handled each other, we

14             wanted some really reasonable suspicion, I guess

15             you can call it, that there were something going

16             on, not just a complaint.

17                  Believe me, in my 40 years of law

18             enforcement and my years down at the sheriff's

19             office, these people would say anything to throw

20             somebody under the bus.  I'm not saying John did

21             that.  I'm saying I had no way of knowing either

22             side of that.  I said let's try to get some facts

23             on this before we jump and move into anything

24             further.
```

1           However, Hal was told to monitor and look

2       into it.  At the same time, we forwarded it up to

3       Tom Hendry's office per the requirement.

4   Q.  And just to be clear, Hal Smith did conduct the

5       workplace violence investigation?

6   A.  He was investigating whether or not there should

7       be a workplace violence investigation.

8   Q.  Okay.  Let's see, so we don't have a written

9       report from Mr. Smith in regards to the

10      investigation to determine whether or not there

11      was -- let me finish the question -- a need for

12      an investigation into the workplace violence

13      complaint.

14          So what I'd like to know is whether or not

15      he found that there was grounds to continue the

16      investigation into workplace violence?

17  A.  From what I can recollect, I don't know if Hal

18      wrote a report or not.  I don't know that.  My

19      gut feeling is if he wrote a report, we would

20      have turned all the documents over.  It wouldn't

21      be sitting somewhere out there.

22          So hopefully, if he did write it, it was

23      turned over.  Secondly, if he didn't, he should

24      have, but I remember asking what was going on.

```
 1              And he said -- what he can find out from

 2         understanding everything, it's he said she said.

 3         That's all, you know.  And a lot of it's

 4         sophomoric, you know, staring at each other,

 5         attitude, and things like that and stuff that we

 6         can't prove or disprove.

 7              And I told him to continue monitoring the

 8         situation.  And at the same time, I knew Tom

 9         Hendry was supposed to be doing his

10         investigation.

11    Q.   Now, you said sophomoric, staring at each other.

12    A.   I meant, like, childish.  What people do in high

13         school and stuff like that.

14    Q.   Did he address the threat to break Mr. Gorman's

15         jaw?

16    A.   No.  That was -- again, I don't believe that was

17         done because that was something else that was

18         being done outside.  And there was no eminent

19         threat of anything like that that they perceived

20         to be inside the facility.  That wasn't being

21         done.

22    Q.   So you said two different things.

23              You understand that the investigation that

24         Hal Smith looked into did not include the
```

```
 1          allegation?

 2     A.   I don't believe -- no, he didn't -- I don't

 3          believe he was investigating that.  He was

 4          investigating the work stuff that was happening

 5          in the workplace.

 6     Q.   And why was he investigating the stuff in the

 7          workplace?

 8     A.   Ha was asked to.

 9     Q.   And why?

10     A.   Because of the complaints that were filed.

11     Q.   So I guess my question is:  Why would he only

12          look into those complaints and not the

13          allegation?

14     A.   The allegation was being looked into by the state

15          police.

16     Q.   Okay.

17     A.   When that was being -- based on what they would

18          have finished doing, we then may or may not have

19          continued with that investigation.  That's how it

20          was being done.  It never got to that point

21          because it was taken out of our hands and a grand

22          jury issue.

23     Q.   Okay.

24     A.   And then it was resolved with the negotiation
```

```
 1            with the union afterwards.  All of that went

 2            under that, just so you understand that.

 3     Q.    And just for further clarification on

 4            forty-seven, line four:  "She was very tight with

 5            Patricelli for a period of time.  Very tight.

 6            Then there was some -- I don't even know what

 7            happened, but there was a falling out.

 8            Eventually, Patricelli filed a complaint."

 9     A.    That's correct.

10                  MR. SORSBY:  Just give me a second.

11                  (Off the record.)

12  BY MR. SORSBY:

13     Q.    I'm on page seventy-two, line six:  "Question:

14            How many convicted criminals work in your

15            department today?

16                  "Answer:  Several.

17                  "Question:  Who are they?

18                  "I don't know off the top of my head, all of

19            them.  There's Laura Pfeiffer, there is

20            Patricelli.  There's a couple that we hired that

21            have convicted records, yes."

22     A.    The question was and the reason for that was he

23            was wondering why Patricelli would come back to

24            work after being convicted of a crime.  And I
```

1           said the law basically is that the law allows you

2           to.  There's other people who have done equally

3           egregious things and they are working inside the

4           facility.  It's all taken into context, work

5           history and all those other things.

6                So there are people there, yes.  We have

7           hired people convicted of crimes, yes.

8      Q.   And Laura Pfeiffer, she was convicted of

9           embezzling money?

10     A.   I don't know what it was.  It might have said

11          embezzling.  It might have been insurance fraud.

12          I don't remember was it was.  But she pled guilty

13          to a misdemeanor on that.

14     Q.   So it's your understanding that persons can

15          remain on the force it they have a criminal

16          record, not including a felony?

17     A.   That's correct.

18     Q.   Are there any misdemeanor crimes that would

19          prevent a person from staying on the force?

20     A.   Yes.  It would depend upon what they would be.

21          Again, there are several things you got to take

22          into context.

23     Q.   Hold that thought for a moment.

24                I'm going to show you -- this is previously

```
 1              marked.  The title is "County Policies".  I'm
 2              going to show you page 13 of 42.
 3        A.    Is this that?
 4        Q.    Yes.  Turn to page 13 real quick.
 5        A.    Thirteen?
 6        Q.    Yes.  Right there.  Do you see number 30 at the
 7              bottom there?
 8        A.    Yes.
 9        Q.    It says:  "Conviction of a crime or engaging in
10              unlawful or improper conduct which affects the
11              employee's ability to perform their job or to
12              report to work, results in superluxinance
13              (phonetic) or refusal of other employees to work
14              with him or her, harms the county's reputation or
15              public trust."
16        A.    Okay.
17        Q.    "First offense, suspension, review for
18              discharge".
19        A.    Yes.
20        Q.    Were you aware of that policy?
21        A.    Yes.
22        Q.    Now, being convicted of embezzlement, would that
23              affect the county's reputation?
24        A.    Who?
```

```
 1    Q.   Any person.

 2    A.   That was way before I got there.  Can't answer

 3         any of that.  That was done long before I got

 4         there.

 5    Q.   How about being convicted of misuse of the

 6         criminal justice database to look up somebody

 7         else's record?

 8    A.   From my knowledge and experience in law

 9         enforcement and the people I've seen, many law

10         enforcement officers were caught doing this.  I

11         don't think their intent was criminal intent.

12    Q.   Sir, are you saying --

13    A.   What I'm saying is that you have to take the

14         totality of the circumstance in there and look at

15         things and then make a decision.  It doesn't say

16         that you will discharge.  It says review for

17         discharge.  It doesn't say terminate.

18    Q.   I asked you would it affect the reputation of the

19         using the criminal justice database to look up

20         somebody's arrest record, like Patricelli did,

21         and you said other people have done that in law

22         enforcement; is that true?  Is that a fair

23         characterization of what you said?

24    A.   Yes.  What I'm saying is -- I'm not saying
```

```
1              that -- first of all, I don't think it hurts the
2              county's reputation at all.  I think what it is
3              is that somebody made a mistake.
4     Q.   Do you understand whose record he looked up?
5     A.   I don't understand what you mean.
6     Q.   Do you understand who Peter Calitaneo was?
7     A.   Yes, I knew who he was.  I don't know who he is.
8              I know what his relationship to why Patricelli
9              did it, yes.
10    Q.   Well, tell me why.
11    A.   I know now.  My understanding is that his ex --
12             common-law wife, I guess for a better term how to
13             appropriate that -- I guess she was dating him
14             after they split up.
15    Q.   So as the sheriff, do you think it's appropriate
16             to use that database?
17    A.   No, I think it was a mistake in judgment, but
18             that's it.  People make mistakes in judgments all
19             the time and we don't crucify them for it.
20    Q.   But, again, you don't think that would have
21             affected the reputation of the county?
22    A.   I don't think so, no.
23    Q.   So what I'm curious about is you kept Patricelli
24             after the conviction of the criminal justice --
```

```
1              using the criminal justice database to look up a
2              person that was having relationships with his
3              common-law wife, I think was the term you used.
4              You didn't fire him for that.  Why did Mr. Gorman
5              get fired under Article 73 when he wasn't
6              required to --
7       A.     First of all, he wasn't fired.  His position --
8              he vacated his position.  And that was -- again,
9              that was done based on the undersheriff's and the
10             County Attorney's investigation and their
11             recommendations.  Best I can tell you on that.
12             Again, I had zero input into that.
13                      MR. MARTIN:  Were you asking a different
14                 question, Patrick?
15                      MR. SORSBY:  No.
16      Q.     Undersheriff Russo, was he the one involved in
17             deciding whether or not to keep Patricelli or was
18             it you after the incident?
19      A.     It was my decision.  And based on us talking with
20             our county attorney, and based on negotiations
21             that we are going to have with the union, so --
22      Q.     Okay.  So you recommended that they remained
23             employed?
24      A.     Yes.
```

```
 1    Q.   Would you have recommended that Mr. Gorman remain

 2         employed?

 3    A.   I have no say.  I believe if Mr. Gorman wanted to

 4         go back to work, he can come back.  He can come

 5         back now if he gets the appropriate approval

 6         through the medical staff.  No one told him he

 7         can never come back to work.

 8              MR. MARTIN:  Are you looking for A and

 9         B?

10              MR. GORMAN:  No, thank you.  I'm not

11         sure what A and B is, though.

12              MR. MARTIN:  Civil Service list.

13   BY MR. SORSBY:

14    Q.   Okay.  I'm on your transcript again.  I'm on page

15         103, and:  "Question:  Okay."

16              Well, let me back up.  That's not really a

17         question.  "Did it upset you?

18              "No.  It upset me the fact that they were

19         doing something over something that no other

20         people -- it was something having to do, they

21         weren't doing it.  It wasn't equal treatment for

22         everybody that committed this type of act.

23              "I thought that was wrong.  I was upset over

24         that, yes."
```

```
 1              Is that kind of what you were indicating
 2         before about --
 3    A.   Yes.
 4    Q.   -- across law enforcement?
 5    A.   Yes.
 6    Q.   It says:  "Question--" I'm on line six, 103:
 7         "-- Okay.
 8              "Answer:  And not that I condone Patricelli
 9         at all, and I told him that I did not condone it,
10         and he knew better.  He should have done things
11         differently.
12              "And I explained to him how he could have
13         done everything he wanted, done legally and
14         appropriately, but he took the wrong action.  And
15         that is the way it would have to be.  And that at
16         the time, I said to him the undersheriff was
17         doing an internal investigation."
18              Did the undersheriff do an internal
19         investigation?
20    A.   He started an investigation himself.  He was in
21         the process of investigating it.  I think he said
22         he was ready to come down with a decision when it
23         was pulled out from under us from the grand jury.
24    Q.   Okay.  I'm going to show you what's been
```

1          previously marked as Exhibit 18.

2                  Do you recognize this document?

3     A.   No, I don't.

4     Q.   Okay.  Now, I will just take that back from you.

5     A.   I don't remember seeing that.  Never saw it.

6     Q.   And I'm reading the second page of this exhibit:

7          "Therefore, we are unable to place you on a

8          preferred list until you submit a correspondence

9          requesting reinstatement to your former

10         position."

11                 I think you discussed earlier that an

12         employee that was removed as a result of Section

13         73 can ask for reinstatement?

14    A.   I think they have to do it pending -- and you

15         have to.  Depending upon the reason why you're

16         out, you need medical review to state you're able

17         to come back, and the county would send you to

18         their doctor to see if you can meet the standard

19         to come back to work.  And if they say you do,

20         you can come back.

21                 I know there's time parameters to that.  I

22         don't know what those time parameters are at the

23         top of my head.  I believe it's within a year.  I

24         might be wrong on that, but I think that's what

```
 1          it is.
 2               And then, of course, if you submit within
 3          that year, then we'd have to give him the
 4          appropriate time to set up the review and the
 5          examinations.
 6     Q.   I'm going to have you look at Exhibit 17.  Do you
 7          see that they are asking that he show that his
 8          disability is terminated before he can come back
 9          to work?
10     A.   I see that, yes.  Go ahead.
11     Q.   Now, so do you understand that they can request
12          that he submit evidence that his disability is
13          terminated before they can bring him back for
14          employment?
15     A.   That's what I understand it to be.  You would
16          have to do -- we would send you to a doctor to
17          verify that.  That's how I understand it to be.
18     Q.   That's how you understood it to be then when you
19          were the sheriff, as well?
20     A.   Yes.  I mean, that's -- I didn't even know these
21          letters existed.
22     Q.   Okay.  I'm on page 111, line 13:  "Question:  And
23          you told her to have the state police handle it?
24               "Answer:  I didn't tell her to have the
```

1           state police take care of it.  I said tell him to

2           do what he wants to do.  It is his choice what to

3           do, not my choice what to do.

4                "And I said I don't care how he wants to do

5           it, whatever, he wants to call the police or

6           whatever he wants to do.  But this was something

7           that occurred between family members, close to

8           family members, I guess you would call them.  And

9           there was something going on there that this was

10          about, that this wasn't about the Rensselaer

11          County Sheriff's Office.  This was about Gorman

12          and Patricelli upset over something that had to

13          do personally between Patricelli and him, and

14          nothing to do with the workplace.

15               "That is what it was, other than two people

16          happen to work there?"

17    A.    And at the time, that's how I perceived it.

18    Q.    Now, so you perceive this to be a family matter,

19          not related to work?

20    A.    I didn't perceive it as being work related.  I

21          perceived it to be a family issue that was going

22          on there, and I didn't know all the facts of the

23          whole thing.  And that's why I said let them

24          investigate it out.  It's uncorroborated

```
 1            testimony.
 2       Q.   Staying on the not work related to work category.
 3            You believe that it wasn't related to work
 4            because why?  Can you tell us why you didn't
 5            think it wasn't related to work?
 6       A.   Because I believed it was going -- about his
 7            family and his relationships with his wife, his
 8            girlfriend and everything.  That's why I thought
 9            it was not related to work.
10       Q.   Do you mean the same subject and topic that
11            Patricelli was complaining to you that Ruth
12            shared with other people, shared with Mr. Gorman?
13       A.   Yes.  That's -- well, that's the whole point.  It
14            was looked into.  Let someone look into it.
15       Q.   So the complaint that Patricelli made to you
16            about Ruth, that wasn't related to work either,
17            was it?
18       A.   Actually, it was.  It was in the workplace if she
19            was undermining the staff inside the facility.
20            This had to do with an incident that occurred
21            outside of the facility.  There's a big
22            difference, in my opinion.  And that's the way I
23            perceived it to be.
24                 What Ruth did -- and I didn't say Ruth did
```

```
 1                it.  I don't want to get this misconstrued here.
 2                But the complaint from Patricelli was, and it was
 3                looked into, was that.  And it wasn't
 4                corroborated; therefore, it was denied.
 5       Q.   The allegation that she told John about
 6                infidelity that occurred outside of the
 7                workplace; isn't that true?
 8       A.   Yes.
 9       Q.   How is that related to work?
10       A.   Because she was telling people inside the
11                workplace using her position as the chief to
12                undermine staff inside the workplace.  That's how
13                it was.  This was allegedly between family
14                members on something that was going really
15                outside of the workplace.  It had nothing to do
16                with inside the workplace.  That's how I
17                perceived it.
18       Q.   Two family members that were employed at the
19                sheriff's department, you would agree?
20       A.   Two people that were employed by the sheriff's
21                office, yes.
22       Q.   And Patricelli called Mr. Gorman on the
23                work-issued cellphone; isn't that true?
24       A.   That's correct.
```

1    Q.   How is that not related to work?

2    A.   It's not a work-related issue.  It would have

3         been, in my opinion, if it was related to issues

4         that were going on at work.  This wasn't.  Other

5         issues started arising complaining of stuff going

6         on at work, and we were looking into it.

7    Q.   So you're saying that the subject matter was

8         related to work, is that what you're saying?

9    A.   I believe if they took the workplace out of it

10        and brought that to the outside and that was the

11        problem that was going on.  But this was

12        perceived to me at the time to be some type of

13        domestic type related incident that I wanted the

14        state police to investigate.

15   Q.   But you now understand today after we've gone

16        over the workplace violence policy of Rensselaer

17        County, that workplace violence includes threats

18        made off site?

19   A.   They could be, yes, I agree with that.

20   Q.   We were looking at Exhibit 95 before.  Remember

21        this?  It's sent to Thomas Hendry, says from you.

22   A.   Okay.

23   Q.   And you indicated that you had received this?

24   A.   Yes.

```
 1    Q.   Now, do you see at the top there, the second
 2         paragraph?  See where it says:  "Patricelli
 3         stated, 'I heard you been talking shit down at
 4         the jail'"?
 5    A.   Yes.
 6    Q.   Now, quote, unquote, talking shit at the jail.
 7         That's related to work, isn't it?
 8    A.   Well, yes, it could be related to work, yes.
 9    Q.   And then:  "I asked him what he was talking
10         about."
11              And, again, I'm reading from the exhibit.
12         I'm reading from the second page of Exhibit 95.
13         Do you see where it says:  "I asked him what he
14         was talking about.  He then said, 'You better
15         keep your mouth shut,' and that a neutral party
16         had told him I'd been talking about him at work."
17              Now, that's work related, isn't it?
18    A.   It could be construed as that, yes.
19    Q.   "I said that there are no neutral parties at the
20         jail, and that the only thing I said about him
21         was that he was my only problem at work.  He then
22         said, 'If I had a big enough problem with you,
23         I'd come over there and break your jaw.'
24              "I asked him if he was threatening me.  He
```

```
 1              replied, 'Listen very carefully to what I said.

 2              If I had a big enough problem with you, I'd come

 3              over there and break your jaw.'"

 4    A.   That wasn't said the night on the telephone call

 5              from Ruth Vibert.  It wasn't to me.  The only

 6              thing that was said to me that he made a threat

 7              against him.

 8    Q.   You see the date at the top, sir?

 9    A.   I can see the date, March 5th.

10    Q.   No, I'm not --

11    A.   Yeah, 3/5.

12    Q.   I'm talking about the date indicated at the

13              very -- maybe you can't see it because of the

14              paper clip.

15    A.   February 15th?

16    Q.   That's the date.

17    A.   Yes.

18    Q.   You said that you hadn't seen this before, but

19              this is the actual complaint document that you

20              received.  We have already testified to that?

21    A.   Yes, I see that.  Received on March 5th.  I

22              understand that.

23    Q.   Right.

24    A.   I understand that.  What I'm saying is on the
```

```
 1              night Ruth Vibert called me, none of this was

 2              given -- this here information was never -- said

 3              anything like this.

 4                   This was turned into an investigation inside

 5              the workplace.  And that was -- Hal Smith was

 6              supposed to be investigating that stuff.

 7                        MR. SORSBY:  Go off the record for a

 8                   minute.

 9                        (Off the record.)

10   BY MR. SORSBY:

11        Q.   So I'm going to have you look at Exhibit 8, page

12              seven.  Actually, let me start off with the front

13              page.  We talked earlier about a labor

14              investigation.  Do you recall that?

15        A.   There are so many of them.  I don't know.

16        Q.   Do you recall a specific investigation by the

17              Department of Labor into your implementation of

18              the workplace violence policy?

19        A.   Not off the top of my head, no.  This is highway

20              patrol.

21        Q.   If you keep looking at that, you will see that

22              Pat Russo --

23        A.   Yes, that's what I'm saying.  I don't remember

24              seeing this but I'm reading it.
```

```
1    Q.   So the next page if you turn over one more page,

2         do you recall receiving this Notice of Violation?

3    A.   I don't recall off the top of my head, I really

4         don't.

5    Q.   Now, you saw Undersheriff Russo's involvement in

6         this investigation; right?

7    A.   Yes.

8    Q.   Now, Undersheriff Russo is your representative;

9         isn't that true?

10   A.   He would be, yes.

11   Q.   Now, you would expect that he would report a

12        Notice of Violation, an order to comply from the

13        Department of Labor, would you not?

14   A.   Yes, he would.

15   Q.   And did he report this to you?

16   A.   I don't recall it.  I'm not saying he didn't do

17        it.  I don't recall it.

18   Q.   Now, we kind of broke up the document.  This is

19        the rest of it, and that's where I kind of want

20        to focus my time right now.

21             See item one there?

22   A.   Item one?  This here?  It says "Rensselaer County

23        Sheriff's Department"?

24   Q.   I will take it from you and hand it back to you,
```

```
 1              because I haven't perfected the skill reading

 2              upside down yet.

 3                   Do you see number A?  Can you read that to

 4              us real quick?

 5      A.      "Rensselaer County Sheriff's Department, the

 6              employer's implementation of a workplace violence

 7              prevention policy was unsuccessful.  One of the

 8              three witnesses named in the April 8th, 2013

 9              letter to the employer was not interviewed.

10                   "The employer in the policy statement says

11              that all active workplace violence against

12              employees will be thoroughly investigated.

13                   "The date which must be abated, August 12th,

14              2013."

15                   That's telling us we have to put a notice of

16              this up all over the facility.  Is that what this

17              is saying?

18      Q.      First of all, I'm asking do you recall receiving

19              that from Undersheriff Russo?

20      A.      I don't recall it, no.  I just don't recall it.

21      Q.      Do you understand that your sheriff's department

22              was sited for --

23      A.      We do keep a log of all reportable occupational

24              injuries, though.  All that is --
```

1     Q.   Do you?

2     A.   Yes.  Every one of them.  Every injury, they're

3          required to file a 207-C form, and that would be

4          it.  But is it written down in another type of

5          log?  I don't know that.  I really don't know

6          that.  But it's something -- I don't recall

7          seeing this.

8     Q.   I'm focusing on the part where it indicates that

9          not all of the witnesses were interviewed for a

10         workplace violence complaint.

11    A.   Yes.  I don't ever remember that, and I don't

12         know what witnesses they're talking about.  This

13         wasn't even addressed to me, and it wasn't

14         addressed to the undersheriff either.

15    Q.   Well, it says he was there.

16    A.   At this meeting, at this event.  But this letter

17         was written after that and it wasn't addressed to

18         us.  It was addressed to the county executive.  I

19         don't ever remember seeing this.

20    Q.   And so just so we're clear on the record, are you

21         indicating to me that the county executive would

22         not have brought it to your attention that your

23         department received a Notice of Violation, an

24         order to comply?

```
 1    A.   What I am saying to you, I don't ever recall
 2         seeing that.
 3    Q.   Okay.
 4    A.   Did someone else get that in lieu of me?  I don't
 5         know that, but I never recall seeing that
 6         document.  I just don't recall it.
 7    Q.   It says:  "The employer did not implement a
 8         written policy statement on the employer's
 9         workplace violence prevention program, goals and
10         objectives."  Is that true?
11                  MR. MARTIN:  It says that?
12                  MR. SORSBY:  It says that.
13                  MR. MARTIN:  It does say that.
14    A.   It does say that.
15    Q.   Do you agree with that?
16    A.   I don't know.  I'd have to look and see what it
17         says in the policy and procedures regarding
18         workplace violence.  I do know we address
19         workplace violence in our manuals.  I don't know
20         what it says.
21                  MR. SORSBY:  Just give me one second.
22                  (Off the record.)
23                  MR. SORSBY:  Okay.  So we are going to
24             go back on the record.
```

```
 1    BY MR. SORSBY:

 2       Q.   And we are going to go back to Exhibit 95, which

 3            is right in front of you, and you're going to

 4            turn the page over to the first page.

 5                 Now, we are going to go through this

 6            document because it's important to know -- to go

 7            over the document that you received from Mr.

 8            Gorman.

 9                 I'm going to start where we left off last.

10            This is midway down, about a quarter of the way

11            down on the front page:  "I asked him if he was

12            threatening me.  He replied, 'Listen very

13            carefully to what I said.  If I had a big enough

14            problem with you, I'd come over there and break

15            your jaw.'

16                 "I told him that I didn't understand why he

17            was threatening me and looking for revenge.  I

18            hadn't done anything to him.  He then said that I

19            ruined his career.

20                 "I said no, that it was him who was out to

21            get me.  I asked him if he had been having

22            Marcelli follow me around to have him written up,

23            like what happened with the transport keys."

24                 Would that be work related if Marcelli was
```

```
1              following him around and having him written up?
2    A.    It would be work related.
3    Q.    "He said he had nothing to do with it.  I said
4              that was interested because his name was
5              mentioned eight times in the informational.
6                   "He said that Marcelli and Roy were in the
7              office, and that Marcelli was crying like a bitch
8              as usual about not signing the keys in.
9                   "So he instructed Marcelli to go see Hal
10             about writing me up, and to come back and let
11             Patricelli know what Hal said."
12                  You would agree that that is work related,
13             yes?
14   A.    If this is all true, yes.
15   Q.    He continues to state that it was his,
16             Patricelli's, job to make sure that Hal does his
17             job because he's weak and doesn't take care of
18             things.
19                  You would agree that that's works related?
20   A.    That could be considered work related if it's
21             true.
22   Q.    "When I said that that showed he did have me
23             written up, he again said no.  I suggested that
24             he should go find the informational.  He said
```

```
 1          what informational?  I told him the one Marcelle
 2          wrote that I've already asked for and no one can
 3          find.
 4              "I then told them I didn't want any trouble
 5          at work.
 6              "He said, 'You betrayed me.  If you were man
 7          enough, you'd stand up and tell the truth and
 8          stop being a pussy.'
 9              "I asked him what was I not telling the
10          truth about.
11              "He said, 'You're the one who told your
12          sister I was cheating and who I was cheating
13          with.
14              "I told him that I didn't know who it was
15          until my sister told me, and that I had nothing
16          it do with my sister finding out."
17              I just want to go back up for a second.  I'm
18          going back up a little but.  "I told him the one
19          Marcelli wrote that I've already asked for and no
20          one can find.  I then told him I didn't want any
21          trouble at work."
22              Would you agree that's work related?
23     A.   If it's true, yes.
24                   MR. SORSBY:  Did you hear that?
```

```
 1                    (Directed to the court reporter.)

 2                         I just want to make sure she's hearing

 3               what you are saying.

 4                    THE WITNESS:  Okay.

 5      Q.   "I said, 'So this is why you tried to take my key

 6               assignment away and I tried to --"  excuse me.

 7               I'm going to read this again.

 8                    "So this is why you tried to take my key

 9               assignment away and tried to start a fight in the

10               west hall that Crystal Fountain witnessed while

11               she sat at the west hall post."

12                    You would agree that that's work related?

13      A.   Again, same statement.

14      Q.   "I told him that he was mad at the wrong person

15               as I had nothing to do with his breakup other

16               than supporting my sister.  He said I said that.

17               I did that.  I was upset.  He continued with

18               saying that he wants revenge.  He wants me to

19               pay.

20                    "I said, 'So you did try to take the keys

21               and start a fight?'  He went to the chief and

22               told her to remove me from the keys."

23                    Work related, you would agree?

24      A.   If that's true, yes.
```

1    Q.    "He said, 'I don't trust you.  You betrayed me.'"

2            Now, he's a master sergeant.  Would you

3          agree that trust is an important component at

4          work amongst co-workers?

5    A.    Yes.

6    Q.    So that would be work related, wouldn't you

7          agree?

8    A.    If this is true, yes.

9    Q.    "He continued with, 'I shouldn't be talking about

10         this because it's an ongoing investigation.  The

11         chief told you everything I told her in

12         confidence.'

13           "I told him that the only thing the chief

14         and I talked about was when she asked how my

15         sister and nephew were doing.  I thanked her for

16         asking and said that they were fine, but I would

17         like to keep that personal, outside of work.  I

18         would like to keep my personal life outside, and

19         work at work.  She agreed.

20           "I then told Patricelli that the reason why

21         I didn't fill any complaints about him at work

22         was out of respect for him and the sheriff.  I

23         didn't want any trouble at work.  I just wanted

24         to do a good job."

1           You would agree that those are work-related

2           concerns, yes?

3      A.   Yes.

4      Q.   "I then tried to remind Patricelli that I had

5           nothing to do with telling my sister, as he

6           called me at work and threatened me in the

7           transport office."

8           You would agree that that's work related,

9           yes?

10     A.   Again, if it's true, yes.

11     Q.   "The day she confronted him, October 8th, 2012,

12          he called from his cellphone and said, 'thank

13          your brother, thank your wife and thank you.'

14          "I told him that day that I didn't know what

15          he was talking about.  I was training with

16          Sergeant Ryan and there were other people in the

17          room.

18          "He said, 'I was mad at you for ruining my

19          life.'

20          "I again told him I had nothing to do with

21          it, and I had nothing to do with work.  He

22          started ranting, 'You think John Gorman got

23          transitioned?  You think John Gorman got keys?

24          You think John Gorman got provisional stripes?  I

1          got you that.'"

2                 You would agree those are all work-related

3          items?

4    A.    Yes, if that's true.

5    Q.    "I interrupted him and asked, 'So going to work

6          and doing a job using no sick time and taking

7          very little time off did nothing?'"

8                 Again, work related, yes?

9    A.    Yes.

10   Q.    "He responded with, 'You think Mark Gorman became

11         a deputy by himself?  I got you and your brother

12         everything.  Everything you have down there is

13         because of me, and now you will get nothing.'"

14                You would agree that that's work related?

15   A.    Yes, if that's true, yes.

16   Q.    "'All you do is put your head down and keep

17         walking.  You don't even talk to me anymore.

18         It's like I disappeared.'

19                "'I told you I was doing that because I

20         didn't want any problems.'  I then asked him what

21         could I do for him and why he was calling.

22                "He asked, 'Do you know where your sister

23         is?'

24                "I said, 'Yes.'

1          "He said, 'She's down there with Peter

2          Calitaneo.'

3          "I told him that my sister's a grown woman

4          and she can do what she wants.

5          "He continued to go on about Peter's past

6          criminal charges, at which time I asked him if he

7          had ever made any mistakes."

8          Now, would Peter's past criminal charges,

9          the charges that Patricelli looked up in the

10         criminal justice database, would that be work

11         related?

12    A.   The fact that he looked them up using the

13         database, yes.

14    Q.   Okay.  "I told him that she can do what she

15         wants, and I will be there if she needs help, at

16         which time he started yelling again that I

17         betrayed him.  I interrupted and asked if we were

18         through.  And this was -- at this time, there was

19         a period of silence and he said, 'Yes, we're

20         through.'"

21         "I hung up the phone.  I felt alone and

22         upset.

23         "After the statements Patricelli made in

24         this phone call, I'm fearful for the safety of

1        myself and my family and the future of my job.

2            "Patricelli's past behavior and actions

3        against me in the last few months have shown that

4        he has a personal vendetta against me.  This does

5        create a hostile work environment and I'm

6        constantly in fear of reprisal from him."

7            Now, sir, we have been reading from what's

8        been marked previously as Exhibit 95, which you

9        identified were documents you received.  And I

10        just want to ask you how much of these two pages

11        did you read when you received these documents?

12   A.   I don't remember how much.  I probably read most

13        of it.  And, again, like I said, this was

14        forwarded to Captain -- Captain Smith was to

15        investigate this and it was forwarded up to Tom

16        Hendry's office to investigate it as workplace

17        violence.

18   Q.   After you had received --

19   A.   After I had received this.

20   Q.   All right.

21            MR. SORSBY:  We are going to take about

22        a minute break.

23            (A short break was taken.)

24            MR. SORSBY:  Counsel, she's indicated we

```
 1              have 20 minutes, which, by my clock over here
 2              puts us at 24 minutes after.  We will call it
 3              at that point wherever we are at.  Sound
 4              fair?
 5                   MR. MARTIN:  Okay.
 6                   MR. SORSBY:  So, at this point, I'm
 7              going to go to the men's room, and I'm
 8              going --
 9                   MR. MARTIN:  When we start, I have a
10              timer on here.
11                   MR. SORSBY:  If you want to be that
12              specific, that's fine by me.
13                   MR. MARTIN:  If it goes over five
14              minutes, I'm not going to cry.
15                   MR. SORSBY:  I'm going to have this
16              marked at the deposition.  This is a
17              transcript from Hal Smith, the Vibert versus
18              Rensselaer County.  And in the deposition
19              transcript, he indicates what, if any,
20              investigation he did to Mr. Gorman's
21              complaint.
22                   So we will let his transcript speak
23              for itself, but I'm going to have it marked
24              and entered into the record.
```

```
 1                    (Plaintiff's Exhibit 100 was marked for

 2              identification.)

 3                    MR. SORSBY:  So we are going to get 99.

 4                    (Plaintiff's exhibit 99 was marked for

 5              identification.)

 6                    MR. SORSBY:  We are not going to dig

 7              into Mr. Smith's transcript, given the time

 8              constraints.  We're just going to let it

 9              speak for itself.

10    BY MR. SORSBY:

11     Q.  So I'm on page 240, and this was a question to

12         you by Mr. Keach:  "Well, I talked to Mr. Hendry,

13         and he indicated that, A, no one at the Civil

14         Service Commission was going to be barking up

15         your tree about what was going on with Ruth

16         Vibert.  They didn't know anything about it.

17         And, B, you pretty much could have done whatever

18         you wanted and made a recommendation to the Civil

19         Service Commission, and they would have followed

20         it."

21              Is that true?

22     A.  What's that?

23     Q.  That you could have made a recommendation to the

24         Civil Service Commission.
```

```
 1    A.   I don't know if that's true.  He might be saying

 2         that.  I don't know that.  My understanding of

 3         the law it that the Civil Service Commission is

 4         the only one who can make that determination.  I

 5         can't make that determination.

 6    Q.   Well, let me be more clear on the record.  Can

 7         you make a recommendation to the Civil Service

 8         Commission in terms of who you would like to

 9         employ?

10    A.   I don't know what you mean by that.

11    Q.   Have you made a recommendation to the Civil

12         Service Commission as to who you would like to

13         employ?

14    A.   As to who?

15    Q.   Yes, correct.

16    A.   No, I think the only time we made a

17         recommendation -- we asked the Civil Service

18         Commission is on job descriptions, not who.

19    Q.   Okay.

20    A.   I don't think they have a matter of who, I think

21         it's their qualification and stuff like that they

22         make a determination on.

23    Q.   Are you familiar with the term "raking" a Civil

24         Service list?
```

```
 1     A.   No.

 2     Q.   Have you heard that before?

 3     A.   No.

 4     Q.   Can you call the Civil Service and ask for a list

 5          of, let's say, just 100s on the list?

 6     A.   I don't know that.

 7     Q.   You don't know that?  I'm asking --

 8     A.   We don't call the Civil Service Commission, we

 9          call the Office of Civil Service.  They're

10          separate.

11     Q.   Can you call the Civil Service Department and ask

12          for a list of all the --

13     A.   No.  I ask for a list of eligibles.  They have

14          always determined who to send.  Can you do it?  I

15          don't know that is my answer.  I don't know if

16          you can or can't.

17     Q.   Okay.

18                    MR. SORSBY:  Go off the record a minute.

19                    (Off the record.)

20   BY MR. SORSBY:

21     Q.   So I'm on page 265.  Actually, strike that, 264,

22          line 21:  "Question:  So the problem isn't that

23          she kept the documents, the problem is that she

24          brought them to you and you didn't want to be
```

1           involved in it; right?

2                   "Well, let me step back.  We already covered

3           that.  But you appear to be pretty angry that she

4           brought that to your attention, am I right?

5                   "Answer:  Not that she brought it to my

6           attention.  When I told her not to bring it and I

7           didn't want them, she brought it back to do it

8           again after I told her not to."

9                   Are you talking about the documents we've

10          been talking about today, what's been marked as

11          Exhibit 95 and the state trooper's report, is

12          that what you're saying?

13     A.   No, it's not what I'm saying.  That's an

14          incorrect statement.

15     Q.   So when you said -- again, I'm on line five:

16          "Not that she brought it to my attention when I

17          told her not to bring it and I didn't want it,

18          that she brought it back to do it again after I

19          told her not to."

20                  What did you mean?  Brought what back?

21     A.   The state police incident report.

22     Q.   So that is what you were referencing?  You didn't

23          want her to bring it back to you again?

24     A.   You said these documents and the state police

```
 1              incident report.  That's an incorrect statement.
 2         Q.   So she attempted to bring the state police report
 3              back to you a second time?
 4         A.   No, not a second time.  The only time that she
 5              tried -- when I told her don't get involved,
 6              don't bring them in, she tried to bring it over
 7              and give it to me, and I told her not to.
 8         Q.   Your answer was:  "Not that she brought it to my
 9              attention.  When I told her not to bring it and I
10              didn't want them, she brought it back to do it
11              again after I told her not to."
12                   What did she bring back to you again?
13         A.   The state police incident report.  When I told
14              her not to bring it here, get rid of it.
15         Q.   So she came back again with it, yes?
16         A.   I don't recall.  I think we're talking about when
17              I told her not to, to let the state police
18              investigate it.  And I told her don't bring it in
19              here.  Don't bring it in, and she brought it in.
20              That's what I believe I'm talking about.
21         Q.   So she came back to you on two occasions?
22         A.   No.  There was only one occasion that she tried
23              to give me reports.
24         Q.   Okay.
```

```
 1    A.   I told her on the phone not to investigate, let

 2         the state police do the investigation, and let

 3         them do it, not us.  And that's when -- when she

 4         come back, I said, "I told you.  Let them do

 5         their investigation.  Don't bring the reports in

 6         here.  If I need the report, I can get it."

 7    Q.   I just want to make sure the record's clear,

 8         because I'm looking at your transcript, and

 9         again, 265, line five:  "Not to bring it to my

10         attention when I told her not to bring it and I

11         didn't want them."

12              Them being --

13    A.   The state police incident report.

14    Q.   She brought it back?

15    A.   That's correct.

16    Q.   So she brought the police report back to you?

17    A.   The only time it was brought to me was one time.

18    Q.   Now, I'm on 267, line five:  "No, I'm not aware

19         of that.  I know he had admitted to making a

20         phone call, but I did not nor do I know any time

21         he admitted to making threats.  He admitted to

22         making the phone call."

23              When did he admit to you making a phone

24         call?
```

1    A.    I don't remember the exact time frame on that.

2          He did tell me that he made the phone call.  And

3          I had asked him, "Did you use a company phone?"

4          And he told me yes.

5              And I told him, I said "First of all, you

6          shouldn't have made the call.  And second of all,

7          you shouldn't have done it on company time."  I

8          said, "You shouldn't be doing any of that stuff."

9          And never did he mention a threat or he denied.

10         To this day, he vehemently denies that.  I

11         shouldn't say "to this day", he don't speak to me

12         anymore.

13   Q.    Was this a different conversation than the

14         conversation you referenced that you had with him

15         earlier when you talked to him about this issue?

16   A.    No.  I only talk to him one time about the phone

17         call, and then one other time, the only other

18         time.  And probably one of the last times I spoke

19         to him was close to when he came to me over when

20         he found out they are investigating him on the

21         Wendy Vaga.

22   Q.    Right.

23   A.    And I told him, I said, "You shouldn't have done

24         it.  Everybody knows you're not supposed to be

1           doing that."  I said, "I told you not to get

2           involved and I told you to stop doing that stuff.

3           Wherever we'll be, we'll be.  That's where the

4           investigation is going."

5      Q.   Now, I'm on page 265 again, and I'm on line 21:

6           "Question:  So what is the problem in being

7           proactive instead of being reactive?  What if

8           Patricelli would have come with a gun and shot

9           Gorman in the face?"

10               Your answer:  "Because there was no proof of

11          anything at this point in time."

12     A.   Okay.

13     Q.   There was no proof?

14     A.   Not proof.  There was nothing to indicate

15          anything that was going on like that.  We didn't

16          have any information that there was something

17          like that going on.

18     Q.   Sir --

19     A.   That was after that.

20     Q.   And I want to grab Exhibit 95.  You're saying the

21          documents in 95 --

22     A.   Yes, is after that date of that.  Not the date.

23          Is after what we're talking about.

24     Q.   So my question to you is:  We read earlier the

1      police report by Trooper Hawk, the incident

2      report.  Remember that?

3   A.  Yes, we looked at that.

4   Q.  And you recall where she indicates that

5      Patricelli told her that if he had a big enough

6      problem with Gorman, he would come down there and

7      break his jaw.  Do you remember that?

8   A.  Yes.

9   Q.  Now, do you agree that that was proof of a

10     threat?

11           MR. MARTIN:  Object to the form.  You

12        can answer if you can.

13  A.  No.  Because I remember asking -- I told to you

14     this earlier.  I asked Patricelli what was going

15     on -- this is after -- and Patricelli stated --

16     I'm pretty sure that's correct -- that -- and I

17     think what it was he never said he was going to

18     do anything.  He said, "If I was going to do

19     something".  To me, it wasn't a threat.

20  Q.  Okay.

21  A.  Meaning, saying, I could have done something if I

22     wanted to, but I wasn't intending to and I didn't

23     do it.  That's what I perceived it to be.

24  Q.  Now, before February 15th when Patricelli called

```
 1            Mr. Gorman, you had a meeting with John Gorman;
 2       is that correct?
 3   A.   Regarding?
 4   Q.   Regarding these allegations here.  Regarding the
 5       allegation of the incident reports that were
 6       filed.
 7            Let me back up.  Hold on.  Let me rephrase
 8       the question.
 9            On February 8th, did you have a meeting with
10       John regarding Patricelli's allegation or
11       complaint that Ruth was sharing private
12       information?  Do you recall having that meeting?
13   A.   I don't know the exact date, but I do remember
14       having a meeting with him, yes.
15   Q.   Do you recall John trying to tell you about the
16       problems that he was having with Mr. Patricelli?
17   A.   No, I really don't recall it.  I recall the
18       meeting in there.  The only thing I was concerned
19       about in there, did he say -- did Ruth Vibert
20       pass on information, because that was
21       Patricelli's complaint to me.
22   Q.   Right.
23   A.   And he told me, "No, there wasn't."  And after
24       that, I had no interest in it no more because I
```

1           didn't believe Patricelli's complaint.

2    Q.    Isn't it true that John brought up -- since you

3           were talking about Patricelli, that John brought

4           up the incidents that where allegations that

5           Patricelli was following him around the jail,

6           things of that nature?

7    A.    I don't recall that at all.

8    Q.    All right.  I'm on page 309, line 14:  "Question:

9           Doesn't the Rensselaer County workplace violence

10          policy come to place when somebody makes an

11          accusation?"

12              Your answer:  "No.  It depends what the

13          accusation is.  There was no accusation of

14          violence."

15   A.    When I first found out that, that's a correct

16          statement.  There was no -- didn't know if there

17          was any accusation or proof of violence.  Later

18          when we found it out, is when I asked Hal Smith

19          to investigate it and send it to Tom Hendry.

20   Q.    And there's no accusation of violence because you

21          didn't actually look at the police report, you

22          refused to look at it; isn't that true?  When

23          Ruth came to give you the police report, you did

24          not look at it?

1    A.    No, I did not.  I told her let the state police

2          do the investigation.  If the state police found

3          that to be true, then we would have acted upon

4          it.

5    Q.    And that's why you had no way of knowing that

6          there was an accusation of violence, right,

7          because you refused to look at the police report?

8    A.    No one told me it either.

9    Q.    Nobody told you it?

10   A.    She just said that he was threatened.  And I

11         said, "And Patricelli vehemently denies it."

12   Q.    So line page 317, line nine:  "Do you think it is

13         important that one of your subordinates, but who

14         also happens to be Mr. Gorman's supervisor, is

15         calling him at his home and making these kinds of

16         threats?"

17             "Answer:  I think it is regardless of who,

18         where he works or anything.  It is not

19         appropriate and shouldn't be done."

20   A.    That would be true, if it's true.

21   Q.    Okay.  "Question:  So, again, I will ask you:  So

22         you would agree with me it is not appropriate for

23         one of your supervisors to make these kinds of

24         threats against one of his subordinates;

```
 1          correct?"

 2    A.    That's correct.

 3    Q.    That is correct.

 4          Do you know if Mr. Gorman was offered an

 5          accommodation before he was taken off the books

 6          at Rensselaer County, as it separated from

 7          Rensselaer County?

 8    A.    I don't know.  I wasn't -- again, I did not

 9          participate in that.  I don't know what the

10          negotiations were between Attorney Goldburger and

11          the undersheriff.  I don't know that.

12    Q.    Do you understand what I mean when I say an

13          accommodation?

14    A.    A reasonable accommodation?

15    Q.    Yes.  You have heard that term before?

16    A.    Yes, I have.

17    Q.    Do you have training on the American Disabilities

18          Act as a supervisor?

19    A.    I went over some of it, I know that.  But I went

20          over some of it.

21    Q.    You had some training on that?

22    A.    Yes, some, yes.

23    Q.    Was that with Goldburger?

24    A.    No.
```

1    Q.   Who was that with?

2    A.   Years ago when I was at the FBI Academy back in

3         the 90s, but, you know, most of that, again, we

4         do legal advice on how to proceed.

5    Q.   And do you understand if somebody is disabled,

6         that an accommodation or reasonable accommodation

7         should be offered?

8    A.   I understand there's parameters with that, yes.

9              MR. SORSBY:  All right.  Mr. Martin,

10             just give me 30 seconds and I'll just --

11             famous last question --

12                 (Off the record.)

13             MR. SORSBY:  So, actually, I just

14             have -- Mr. Martin, I actually have three

15             rapid-fire questions, just in terms -- in

16             terms of our complaint, just to have him --

17             which will probably be denials, but as

18             something just quickly --

19   BY MR. SORSBY:

20   Q.   Do you believe that the county retaliated against

21        Mr. Gorman for -- do you believe that he

22        retaliated against Mr. Gorman for filing a

23        workplace violence complaint?

24   A.   No.

```
 1    Q.    Do you believe that the county retaliated against
 2          Mr. Gorman for filing for Workers' Compensation
 3          benefits?
 4    A.    No.
 5    Q.    Do you believe -- now, I'm talking about the
 6          sheriff's office as well.
 7    A.    Yeah.
 8    Q.    Do you believe that the sheriff's office or the
 9          county retaliated against Mr. Gorman for filing a
10          PESH Labor Department complaint against the
11          county?
12    A.    No.
13    Q.    And do you believe that the county retaliated
14          against Mr. Gorman because he refused to make a
15          statement against Ruth Vibert?
16    A.    No, absolutely not.
17    Q.    And do you believe that Anthony Patricelli
18          intentionally attempted to interfere with Mr.
19          Gorman's familial relationship with his sister by
20          engaging in acts of harassment at work?
21    A.    I don't believe that has been established, no.
22    Q.    And do you believe that the county violated the
23          Americans with Disabilities Act?
24    A.    From what I understand of it, no.
```

```
 1    Q.   Have you read the complaint in this matter?

 2    A.   What complaint?  What specific complaint?

 3    Q.   The federal complaint.  The complaint that

 4         started this matter.  Did you read --

 5    A.   I don't know if I read the whole thing, no.

 6    Q.   We won't go into that.  If you had read it, do

 7         you deny all the allegations in there?

 8              MR. MARTIN:  Object to the form.

 9    A.   I deny the allegations, yes.

10              MR. SORSBY:  We are done.

11         (WHEREUPON, at 6:35 p.m., the

12         examination of SHERIFF JACK MAHAR in the

13         above-entitled matter was concluded.)

14                   * * * * *

15

16

17

18

19

20

21

22

23

24
```

1                    INDEX TO WITNESS

2      EXAMINATION BY MR. SORSBY....................PAGE 4

3

4

5                    INDEX TO EXHIBITS

6      PLAINTIFF'S

7      EXHIBIT NOS.                           PAGE

8      93          Document                   57

9      94          Document                   155

10     95          Document                   167

11     96          Document                   216

12     97          Document                   220

13     98          Document                   220

14     99          Transcript                 285

15     100         Transcript                 285

16

17

18              REQUESTS FOR DOCUMENTATION/INFORMATION

19                         (None)

20

21

22

23

24

1    STATE OF NEW YORK

2

3    I have read the foregoing record of my testimony taken at

4    the time and place noted in the heading hereof and I do

5    hereby acknowledge it to be a true and correct transcript

6    of the same.

7

8

9                                    _____

10                                   SHERIFF JACK MAHAR

11

12   Sworn to before me this

13            day of                    , 2016.

14

15

16   _____

17   Notary Public

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T I O N

 2

 3         I, SARAH B. DLUGOLECKI, Shorthand Reporter and

 4    Notary Public within and for the State of New York, do

 5    hereby CERTIFY that prior to being examined, the witness

 6    named in the foregoing deposition was duly sworn to

 7    testify the truth, the whole truth and nothing but the

 8    truth.

 9         That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter reduced by me to typewritten form and that the

12    same is a true, correct and complete transcript of said

13    proceedings.

14         Before completion of the deposition, review of the

15    transcript was requested.  If requested, any changes made

16    by the deponent (and provided to the reporter) during the

17    period allowed are appended hereto.

18         I further certify that I am not interested in the

19    outcome of this matter.

20         Witness my hand this ____ day of ____, 2016.

21

22

23                            _____

24                                 SARAH B. DLUGOLECKI
```

**'**

**'10** [1] - 16:10
**'11** [1] - 16:10
**'13** [6] - 119:21, 138:7, 151:10, 156:7, 168:14, 169:24
**'15** [1] - 33:8
**'16** [1] - 33:8
**'all** [1] - 281:16
**'Do** [1] - 281:22
**'I** [1] - 281:19
**'If** [1] - 268:22
**'Listen** [2] - 269:1, 275:12
**'So** [3] - 278:5, 278:20, 281:5
**'thank** [1] - 280:12
**'Yes** [2] - 281:24, 282:19
**'You** [5] - 238:11, 268:14, 277:6, 280:22, 281:10
**'You're** [1] - 277:11

**1**

**10** [2] - 2:10, 27:11
**100** [11] - 131:8, 131:18, 144:21, 144:22, 145:3, 145:4, 145:21, 146:8, 285:1, 301:15
**100s** [9] - 130:24, 131:9, 131:12, 131:17, 131:20, 144:14, 144:16, 287:5
**103** [2] - 260:15, 261:6
**10:06** [1] - 1:15
**11** [1] - 241:9
**111** [1] - 263:22
**11th** [1] - 128:19
**12205** [1] - 2:4
**12:30** [2] - 95:23, 101:4
**12th** [1] - 272:13
**13** [3] - 256:2, 256:4, 263:22
**13501** [1] - 2:10
**14** [3] - 211:2, 241:12, 295:8
**14th** [4] - 23:24, 207:16, 207:18, 213:18
**15** [6] - 95:24, 101:3, 188:9, 188:15, 238:7, 240:2
**155** [1] - 301:9
**1568** [2] - 1:14, 2:4

**15th** [14] - 85:20, 86:1, 105:18, 113:20, 127:15, 137:8, 138:8, 156:11, 156:22, 167:13, 201:8, 237:2, 269:15, 293:24
**167** [1] - 301:10
**16th** [1] - 175:17
**17** [1] - 263:6
**17th** [1] - 151:10
**18** [1] - 262:1
**19** [1] - 6:12
**1994** [4] - 23:24, 24:7, 24:24, 25:16
**1995** [1] - 6:24
**1:14-cv-434** [1] - 1:3
**1st** [5] - 106:21, 119:16, 147:9, 156:7, 215:10

**2**

**20** [2] - 27:12, 284:1
**20-something** [1] - 225:11
**2004** [3] - 5:20, 52:7, 53:17
**2008** [2] - 54:16, 54:18
**2010** [2] - 31:17, 217:16
**2012** [16] - 8:1, 31:5, 54:4, 78:3, 112:17, 112:24, 113:4, 113:21, 119:16, 121:1, 121:6, 123:7, 172:23, 173:22, 217:21, 280:11
**2012/2013** [2] - 7:5, 33:7
**2013** [19] - 8:1, 31:5, 78:4, 85:20, 119:16, 128:19, 132:23, 137:8, 138:11, 147:9, 156:11, 156:22, 168:17, 175:17, 207:17, 207:18, 217:21, 272:8, 272:14
**2014** [4] - 8:1, 207:10, 215:10, 220:11
**2015** [1] - 218:17
**2016** [3] - 1:13, 302:13, 303:20
**207-C** [21] - 198:10, 198:11, 198:12, 198:13, 198:16, 198:19, 199:10, 199:12, 200:11, 202:10, 202:16,

203:4, 204:5, 204:7, 204:22, 205:1, 208:20, 223:5, 223:10, 223:12, 273:3
**20th** [1] - 207:10
**21** [2] - 287:22, 292:5
**216** [1] - 301:11
**22** [1] - 119:21
**220** [2] - 301:12, 301:13
**23** [1] - 205:21
**23rd** [2] - 1:13, 213:11
**24** [1] - 284:2
**240** [1] - 285:11
**25th** [1] - 198:1
**26** [1] - 55:6
**264** [1] - 287:21
**265** [3] - 287:21, 290:9, 292:5
**267** [1] - 290:18
**28** [1] - 6:2
**285** [2] - 301:14, 301:15
**28th** [1] - 24:7
**29th** [1] - 217:16

**3**

**3/5** [1] - 269:11
**30** [2] - 256:6, 298:10
**30-b** [2] - 238:12, 238:15
**30-second** [2] - 65:11, 154:23
**309** [1] - 295:8
**315** [1] - 2:11
**317** [1] - 296:12
**37** [2] - 175:14, 176:17
**38** [1] - 238:6
**39** [1] - 240:2

**4**

**4** [1] - 301:2
**40** [3] - 162:3, 241:9, 250:17
**41** [1] - 184:10
**42** [1] - 256:2
**421** [1] - 2:10
**456-4529** [1] - 2:5

**5**

**5** [1] - 119:10
**507-3765** [1] - 2:11
**518** [1] - 2:5
**52** [2] - 23:8, 23:23
**53** [1] - 25:18
**57** [2] - 118:11, 301:8

**58** [1] - 119:9
**5th** [6] - 132:23, 138:7, 168:17, 169:24, 269:9, 269:21

**6**

**6** [11] - 55:3, 55:12, 55:20, 59:8, 60:19, 61:3, 64:11, 65:1, 65:16, 68:24, 165:22
**61** [1] - 218:12
**63** [1] - 213:7
**64** [2] - 214:6, 214:15
**6:35** [1] - 300:11
**6th** [2] - 168:14, 172:16

**7**

**7/15/14** [1] - 220:14
**73** [12] - 211:10, 211:12, 211:13, 211:18, 212:7, 212:10, 212:22, 213:23, 215:19, 221:22, 259:5, 262:13
**78** [1] - 195:13
**7th** [2] - 108:17, 138:11

**8**

**8** [2] - 118:22, 270:11
**80** [1] - 147:15
**80s** [3] - 142:5, 142:15, 143:2
**82** [8] - 132:10, 132:18, 133:16, 134:15, 138:6, 140:4, 141:3, 151:4
**83** [3] - 142:11, 146:21, 147:4
**85** [5] - 142:19, 143:4, 144:6, 153:15, 153:19
**85s** [13] - 131:21, 140:18, 140:20, 142:2, 142:11, 142:14, 142:21, 143:1, 143:3, 143:4, 143:7, 152:4, 152:7
**8th** [4] - 172:23, 272:8, 280:11, 294:9

**9**

**90** [5] - 30:13, 144:4, 144:6, 145:8, 152:3

**90s** [5] - 143:21, 144:1, 145:3, 145:9, 298:3
**91** [5] - 101:16, 103:13, 104:9, 104:12, 108:14
**93** [3] - 57:20, 57:24, 301:8
**94** [3] - 155:1, 155:10, 301:9
**95** [21] - 137:5, 140:9, 140:11, 142:17, 143:20, 143:22, 144:4, 144:8, 146:15, 152:3, 167:22, 167:24, 168:4, 267:20, 268:12, 275:2, 283:8, 288:11, 292:20, 292:21, 301:10
**95s** [4] - 131:1, 131:21, 145:22, 146:9
**96** [3] - 216:22, 217:2, 301:11
**97** [3] - 220:2, 220:13, 301:12
**98** [3] - 220:2, 221:16, 301:13
**99** [4] - 236:12, 285:3, 285:4, 301:14

**A**

**a.m** [1] - 1:15
**abated** [1] - 272:13
**Abbott** [1] - 217:13
**ability** [9] - 4:15, 14:24, 15:8, 16:23, 17:8, 33:23, 127:7, 202:18, 256:11
**able** [12] - 13:18, 14:18, 14:24, 15:19, 32:9, 43:2, 116:3, 116:18, 127:6, 228:10, 228:13, 262:16
**above-entitled** [1] - 300:13
**absence** [1] - 69:22
**absolutely** [15] - 68:19, 68:22, 72:24, 73:23, 87:21, 154:21, 172:6, 194:3, 195:11, 198:22, 216:19, 227:3, 230:3, 246:15, 299:16
**abundantly** [1] -

233:18
**Academy** [1] - 298:2
**accept** [1] - 206:2
**accepted** [9] - 137:18,
138:19, 138:24,
139:7, 139:15,
141:6, 148:1, 155:5,
190:17
**accepting** [2] - 47:2,
153:10
**accepts** [1] - 139:22
**access** [13] - 16:4,
16:18, 16:22, 32:7,
33:20, 34:1, 81:1,
81:3, 81:19, 83:7,
83:15, 83:23, 84:2
**accident** [2] - 21:10,
207:15
**accommodation** [7] -
222:14, 222:23,
297:5, 297:13,
297:14, 298:6
**accommodations** [2]
- 222:11, 223:11
**accomplish** [4] - 15:7,
15:19, 32:9, 91:24
**accordance** [2] -
214:24, 215:6
**account** [1] - 149:2
**accountability** [2] -
18:6, 18:10
**accurate** [1] - 157:3
**accusation** [8] -
75:19, 166:21,
295:11, 295:13,
295:17, 295:20,
296:6
**accusations** [1] -
242:4
**accused** [2] - 93:1
**accusing** [2] - 75:15,
107:2
**achieve** [1] - 16:5
**acknowledge** [2] -
238:8, 302:5
**ACOD'd** [1] - 191:24
**acquire** [2] - 6:22,
15:7
**Act** [3] - 222:12,
297:18, 299:23
**act** [1] - 260:22
**acted** [1] - 296:3
**action** [14] - 47:3,
47:15, 47:23, 49:1,
49:12, 49:16, 49:19,
58:13, 61:4, 61:7,
159:21, 161:17,
243:11, 261:14
**actions** [5] - 50:1,
51:2, 84:21, 202:1,

283:2
**active** [1] - 272:11
**activities** [1] - 180:8
**activity** [7] - 41:18,
42:10, 43:12, 70:17,
90:8, 186:22, 194:7
**acts** [4] - 59:11, 60:4,
165:23, 299:20
**actual** [3] - 80:3,
166:12, 269:19
**ADA** [1] - 222:14
**added** [1] - 11:11
**addition** [3] - 9:4,
11:11, 161:1
**additional** [6] - 11:12,
99:16, 186:8, 249:1,
249:13, 250:2
**address** [3] - 34:20,
252:14, 274:18
**addressed** [6] - 34:19,
56:24, 273:13,
273:14, 273:17,
273:18
**addressing** [2] - 35:4,
43:8
**administration** [5] -
6:21, 92:7, 92:8,
121:4, 126:6
**administrative** [5] -
40:9, 43:6, 110:18,
122:16, 196:8
**administratively** [3] -
10:15, 10:16, 15:6
**admission** [1] - 178:7
**admissions** [1] -
178:12
**admit** [1] - 290:23
**admits** [1] - 105:12
**admitted** [3] - 290:19,
290:21
**admonishment** [1] -
172:4
**advance** [1] - 4:24
**advice** [15] - 187:13,
197:4, 200:21,
201:3, 201:9,
201:12, 208:18,
212:5, 218:3, 219:6,
219:15, 219:22,
222:15, 222:17,
298:4
**advise** [4] - 71:16,
201:4, 201:24,
204:12
**advised** [7] - 76:15,
106:23, 108:22,
176:24, 177:4,
177:13, 177:23
**affairs** [8] - 16:15,
25:9, 25:13, 38:23,

40:3, 40:10, 67:8,
110:20
**affect** [5] - 39:2,
153:21, 155:7,
256:23, 257:18
**affected** [1] - 258:21
**affects** [1] - 256:10
**after-the-fact** [2] -
133:9, 229:20
**afterwards** [2] -
138:22, 254:1
**agencies** [3] - 16:2,
162:5, 191:18
**agency** [7] - 139:1,
139:7, 139:22,
141:7, 148:2,
159:19, 166:15
**agency's** [1] - 165:17
**ago** [15] - 20:14, 21:1,
26:20, 27:12, 34:11,
53:10, 53:11, 53:15,
104:3, 159:10,
218:6, 218:7,
219:17, 298:2
**agree** [35] - 4:24,
18:10, 59:14, 59:17,
60:23, 140:2,
143:22, 147:23,
148:4, 198:3, 198:8,
208:13, 208:23,
209:9, 224:16,
224:17, 227:24,
228:4, 236:24,
266:19, 267:19,
274:15, 276:12,
276:19, 277:22,
278:12, 278:23,
279:3, 279:7, 280:1,
280:8, 281:2,
281:14, 293:9,
296:22
**AGREED** [3] - 3:2, 3:6,
3:9
**agreed** [5] - 177:5,
180:15, 184:24,
193:4, 279:19
**agreeing** [1] - 141:14
**agreement** [2] - 49:24,
185:11
**ahead** [8] - 17:17,
95:20, 145:13,
156:11, 195:15,
236:14, 249:5,
263:10
**ailment** [1] - 13:2
**air** [1] - 204:19
**Albany** [2] - 1:15, 2:4
**alerted** [1] - 189:8
**Alexis** [2] - 128:3,
128:4

**allegation** [40] - 66:23,
67:6, 71:2, 71:20,
73:3, 85:17, 93:22,
99:8, 99:19, 105:17,
107:19, 108:24,
110:4, 111:1,
113:16, 113:23,
114:5, 156:17,
157:20, 159:9,
162:11, 162:12,
162:22, 162:23,
164:3, 164:10,
164:12, 176:7,
176:11, 193:9,
229:10, 248:19,
248:21, 253:1,
253:13, 253:14,
266:5, 294:5, 294:10
**allegations** [22] -
21:24, 70:5, 73:16,
76:4, 76:6, 77:19,
78:23, 90:9, 100:5,
107:16, 109:20,
110:18, 112:11,
174:18, 178:9,
178:20, 193:18,
249:20, 294:4,
295:4, 300:7, 300:9
**alleged** [6] - 70:9,
91:8, 104:14,
196:20, 197:8, 237:3
**allegedly** [3] - 96:11,
96:17, 266:13
**alleging** [4] - 73:14,
105:14, 106:3, 250:9
**allow** [4] - 32:18,
76:21, 130:6, 130:7
**allowed** [7] - 44:23,
44:24, 61:14, 69:10,
69:16, 115:9, 303:17
**allowing** [2] - 45:3,
197:9
**allows** [2] - 215:19,
255:1
**almost** [3] - 170:16,
201:24, 207:20
**alone** [2] - 186:14,
282:21
**alright** [1] - 95:20
**American** [1] - 297:17
**Americans** [2] -
222:12, 299:23
**amount** [1] - 40:19
**AND** [3] - 3:2, 3:6, 3:9
**anger** [1] - 167:14
**angry** [1] - 288:3
**annoying** [3] - 95:21,
96:2, 163:4
**annual** [3] - 18:13,
63:10, 63:11

**annually** [4] - 62:19,
63:7, 63:8, 63:18
**answer** [62] - 4:14,
4:16, 4:18, 5:9,
20:10, 25:16, 27:3,
27:9, 27:20, 27:21,
27:22, 28:9, 49:8,
49:21, 55:1, 59:21,
64:5, 67:4, 71:4,
71:10, 71:15, 73:10,
73:19, 81:6, 104:6,
107:18, 111:5,
111:8, 111:10,
112:1, 114:21,
114:22, 115:1,
121:16, 139:4,
152:18, 157:2,
158:18, 160:16,
175:8, 185:7,
190:13, 197:17,
206:15, 206:16,
209:14, 223:1,
241:12, 244:11,
246:14, 247:16,
254:16, 257:2,
261:8, 263:24,
287:15, 288:5,
289:8, 292:10,
293:12, 295:12,
296:17
**answered** [4] - 11:22,
28:11, 64:23, 136:3
**answering** [2] - 5:12,
21:5
**answers** [1] - 130:22
**Anthony** [24] - 9:23,
12:14, 17:4, 20:7,
29:5, 85:23, 101:19,
112:19, 113:2,
113:9, 114:5,
127:22, 128:10,
156:18, 158:20,
160:3, 171:9, 178:2,
178:8, 188:3,
193:16, 193:24,
237:3, 299:17
**ANTHONY** [1] - 1:8
**Anthony's** [1] - 115:23
**anticipating** [2] -
151:20, 151:21
**anyway** [1] - 201:2
**apart** [1] - 200:7
**apologize** [2] - 138:9,
177:17
**appeal** [1] - 5:4
**appear** [1] - 288:3
**appearance** [3] -
171:13, 171:16,
171:18
**APPEARANCES** [1] -

2:1
**appended** [1] - 303:17
**applicable** [2] -
214:24, 215:6
**applicant** [2] - 153:10,
153:11
**applications** [2] -
198:19, 202:10
**applied** [2] - 198:16,
206:18
**apply** [2] - 5:2, 221:14
**applying** [1] - 153:1
**appointed** [14] -
11:24, 12:2, 14:2,
21:6, 22:9, 27:1,
129:17, 135:7,
135:12, 136:17,
136:18, 149:7,
150:6, 152:13
**appointing** [5] - 27:15,
28:8, 130:13,
132:19, 145:24
**appointment** [4] -
18:22, 135:9,
147:20, 149:11
**appointments** [2] -
18:20, 19:17
**appreciate** [2] - 74:22,
75:16
**appropriate** [23] -
39:18, 61:19, 64:13,
70:18, 84:2, 92:9,
123:1, 161:17,
179:14, 180:10,
187:10, 187:11,
196:13, 196:21,
219:15, 243:11,
245:15, 258:13,
258:15, 260:5,
263:4, 296:19,
296:22
**appropriately** [2] -
41:22, 261:14
**approval** [1] - 260:5
**approved** [1] - 226:2
**approving** [1] - 198:19
**April** [1] - 272:8
**area** [1] - 170:18
**areas** [2] - 41:10,
149:1
**argument** [2] - 165:14,
240:12
**arises** [2] - 59:2, 92:3
**arising** [1] - 267:5
**Arnold** [1] - 181:10
**arose** [1] - 36:10
**arrest** [13] - 163:22,
171:11, 181:12,
181:19, 182:4,
182:5, 182:24,

183:10, 183:17,
244:24, 245:5,
245:6, 257:20
**arrested** [6] - 82:8,
171:12, 171:15,
171:16, 183:14
**arrived** [1] - 14:7
**Article** [2] - 213:23,
259:5
**assessment** [3] -
153:2, 193:2, 193:4
**assign** [1] - 9:15
**assigned** [4] - 9:12,
9:14, 9:18, 122:16
**assignment** [2] -
278:6, 278:9
**assignments** [1] -
198:7
**assist** [2] - 13:18,
87:22
**assistant** [2] - 66:7,
120:14
**assume** [13] - 52:11,
56:12, 61:24, 62:10,
62:13, 63:10, 103:1,
103:2, 104:2,
105:21, 118:20,
189:14, 220:7
**assumed** [3] - 81:9,
95:4, 115:22
**assuming** [5] -
140:13, 141:11,
150:5, 155:8, 160:22
**assumption** [4] - 95:2,
141:13, 141:22,
166:2
**attain** [2] - 6:3, 11:16
**attempt** [4] - 58:17,
241:24, 242:10,
243:14
**attempted** [5] - 160:5,
161:7, 242:13,
289:2, 299:18
**attend** [1] - 63:23
**attendance** [5] -
214:17, 214:23,
215:5, 216:1, 216:3
**attention** [3] - 20:12,
23:22, 108:23,
150:13, 195:20,
195:22, 225:13,
273:22, 288:4,
288:6, 288:16,
289:9, 290:10
**attitude** [1] - 252:5
**attorney** [18] - 5:2,
5:7, 5:10, 25:22,
26:3, 50:11, 168:5,
184:23, 185:2,
190:12, 197:3,

197:4, 200:14,
200:19, 202:15,
219:21, 247:6,
259:20
**Attorney** [5] - 2:2, 2:3,
210:2, 219:21,
297:10
**Attorney's** [6] - 16:1,
32:5, 190:9, 204:13,
206:8, 259:10
**attorney/client** [2] -
5:11, 5:13
**Attorneys** [2] - 2:8,
2:9
**attorneys** [5] - 3:3,
47:18, 50:15, 202:1,
222:20
**August** [2] - 213:18,
272:13
**Authority** [1] - 132:5
**authority** [7] - 11:6,
16:14, 130:13,
130:14, 145:24,
208:6, 225:20
**authorization** [1] -
84:24
**authorized** [2] - 83:6,
227:19
**availability** [2] -
204:20, 226:7
**available** [2] - 145:18,
145:20
**Avenue** [2] - 1:14, 2:4
**award** [1] - 209:22
**aware** [45] - 16:21,
20:6, 20:11, 20:13,
20:14, 20:16, 20:18,
20:21, 20:24, 21:3,
21:4, 21:10, 21:23,
22:1, 22:4, 41:16,
49:14, 50:17, 51:7,
52:9, 52:12, 53:7,
53:10, 81:19, 113:9,
117:15, 122:14,
123:10, 125:2,
125:4, 125:5,
125:16, 154:7,
174:20, 174:22,
174:23, 191:3,
205:16, 206:18,
206:20, 244:9,
247:4, 247:24,
256:20, 290:18

**B**

**B-E-I-T-T-E** [1] - 79:15
**B-line** [2] - 28:24,
108:17
**bachelor's** [1] - 6:19

background [2] -
6:18, 188:4
**bad** [1] - 227:23
**badgering** [2] -
111:15, 111:16
**baiting** [2] - 219:21,
219:23
**band** [29] - 130:23,
131:1, 131:2, 131:3,
131:7, 131:10,
131:11, 131:13,
131:14, 131:20,
131:21, 131:23,
132:1, 143:21,
144:1, 144:6, 144:9,
144:10, 144:11,
144:21, 144:22,
145:13, 145:22,
146:10, 146:15,
148:5, 152:7, 153:15
**banding** [2] - 140:5,
143:19
**bands** [1] - 140:24
**bar** [4] - 20:8, 21:10,
152:17, 229:9
**barking** [1] - 285:14
**Barracks** [1] - 182:23
**barracks** [1] - 183:8
**base** [1] - 19:9
**based** [36] - 16:24,
19:10, 19:14, 19:16,
28:9, 34:8, 41:11,
43:16, 46:4, 49:18,
50:9, 90:13, 97:22,
140:19, 141:7,
141:16, 142:4,
143:13, 144:5,
149:9, 150:5,
159:20, 161:15,
161:17, 202:14,
204:20, 214:16,
214:20, 215:4,
215:23, 218:3,
219:6, 253:17,
259:9, 259:19,
259:20
**basic** [1] - 7:8
**basing** [1] - 97:1
**basis** [2] - 9:19, 45:3
**bear** [2] - 155:24,
157:7
**became** [31] - 5:18,
10:1, 10:4, 10:7,
12:12, 12:13, 20:11,
20:13, 20:18, 20:24,
21:3, 21:4, 21:10,
22:1, 22:3, 51:9,
52:5, 52:8, 52:12,
53:7, 53:10, 53:17,
53:22, 57:3, 57:9,
57:10, 128:23,

150:10, 191:21,
281:10
**become** [6] - 21:23,
25:9, 52:9, 57:4,
129:9, 247:4
**becomes** [2] - 92:24,
129:13
**beef** [1] - 209:7
**BEFORE** [1] - 1:12
**beg** [1] - 236:18
**began** [2] - 13:14,
54:15
**begin** [1] - 32:11
**beginning** [5] - 15:18,
51:10, 52:5, 110:11,
240:20
**begins** [1] - 205:10
**behavior** [2] - 59:10,
283:2
**behaviors** [2] - 60:4,
165:23
**Beitte** [2] - 79:4, 79:12
**bellmanie** [1] - 204:18
**Bellmanie** [1] - 204:19
**belong** [1] - 42:6
**below** [1] - 143:1
**benefit** [2] - 23:15,
73:12
**benefits** [6] - 11:12,
198:16, 198:19,
199:12, 209:23,
299:3
**best** [11] - 4:14, 19:17,
19:18, 22:22, 104:7,
152:15, 153:5,
228:19, 236:19,
242:8, 259:11
**betrayed** [3] - 277:6,
279:1, 282:17
**better** [10] - 40:21,
45:10, 45:13, 46:22,
75:19, 91:3, 143:14,
258:12, 261:10,
268:14
**between** [12] - 3:3,
8:11, 11:3, 33:1,
143:4, 227:5,
241:17, 247:13,
264:7, 264:13,
266:13, 297:10
**beyond** [10] - 33:5,
37:17, 138:14,
144:18, 145:9,
146:13, 149:5,
162:16, 202:18,
219:9
**big** [16] - 32:18, 35:2,
87:14, 141:13,
177:2, 177:21,
178:16, 179:10,

179:13, 244:18,
246:8, 265:21,
268:22, 269:2,
275:13, 293:5
**bike** [1] - 92:21
**Bill** [1] - 189:5
**bit** [13] - 17:14, 29:2,
29:3, 29:4, 62:16,
69:18, 75:23, 99:6,
112:16, 163:22,
164:24, 191:20,
231:19
**bitch** [1] - 276:7
**blank** [1] - 236:2
**blood** [1] - 80:15
**Bob** [1] - 235:14
**books** [3] - 219:4,
219:5, 297:5
**bores** [1] - 73:8
**bother** [3] - 117:20,
163:1, 167:11
**bottom** [5] - 101:18,
118:18, 181:18,
207:9, 256:7
**box** [2] - 184:16, 223:7
**break** [29] - 37:24,
38:7, 65:11, 71:6,
72:7, 85:13, 85:18,
101:1, 101:11,
154:23, 154:24,
175:7, 177:3,
177:22, 178:17,
179:11, 179:15,
223:16, 237:4,
242:5, 242:20,
246:9, 252:14,
268:23, 269:3,
275:14, 283:22,
283:23, 293:7
**breakfasts** [1] - 90:22
**breaking** [1] - 244:3
**breaks** [9] - 29:22,
30:1, 34:15, 35:9,
36:4, 36:15, 36:22,
37:22, 101:7
**breakup** [1] - 278:15
**Brecko** [2] - 205:17,
205:18
**Brian** [4] - 185:3,
214:12, 214:13,
247:6
**brief** [1] - 23:10
**briefly** [1] - 7:3
**bring** [24] - 108:22,
161:12, 221:12,
226:13, 230:19,
242:19, 242:24,
247:22, 248:1,
263:13, 288:6,
288:17, 288:23,

289:2, 289:6, 289:9,
289:12, 289:14,
289:18, 289:19,
290:5, 290:9, 290:10
**bringing** [3] - 159:15,
247:16, 248:8
**brings** [1] - 148:9
**Broad** [1] - 2:10
**broke** [1] - 271:18
**broken** [2] - 8:21,
159:7
**brother** [5] - 113:11,
116:24, 117:12,
280:13, 281:11
**brothers** [1] - 106:23
**brought** [36] - 20:7,
20:12, 23:21,
135:19, 162:15,
170:14, 170:18,
195:20, 195:22,
197:3, 208:6,
208:24, 209:10,
221:8, 221:19,
221:20, 221:23,
227:20, 233:23,
267:10, 273:22,
287:24, 288:4,
288:5, 288:7,
288:16, 288:18,
288:20, 289:8,
289:10, 289:19,
290:14, 290:16,
290:17, 295:2, 295:3
**Brunswick** [2] -
182:22, 183:7
**buck** [3] - 17:21, 62:9,
63:16
**bunch** [1] - 92:22
**bureaus** [1] - 62:5
**burn** [2] - 231:2,
239:10
**bus** [1] - 250:20
**business** [4] - 115:10,
117:15, 117:23,
118:2
**bust** [1] - 243:24
**busy** [1] - 37:18
**BY** [44] - 2:6, 2:12, 4:4,
4:5, 13:4, 23:6, 38:3,
54:13, 57:22, 65:14,
66:16, 76:1, 80:20,
89:3, 96:3, 101:13,
112:5, 115:16,
116:12, 118:9,
123:5, 133:15,
134:14, 155:3,
160:24, 168:2,
185:17, 187:21,
207:3, 216:24,
220:5, 223:19,

229:4, 235:4,
236:17, 238:5,
254:12, 260:13,
270:10, 275:1,
285:10, 287:20,
298:19, 301:2
**Bye"** [1] - 116:23

# C

**Calitaneo** [4] - 187:22,
188:4, 258:6, 282:2
**Calitaneo's** [1] - 189:7
**camera** [1] - 202:23
**cameras** [22] - 16:5,
16:12, 17:1, 33:21,
34:1, 37:21, 80:23,
81:2, 81:15, 81:20,
81:23, 82:5, 82:13,
82:20, 83:7, 83:13,
83:15, 84:14, 98:20,
124:24, 125:3,
197:14
**campaign** [1] - 30:15
**candidate** [1] - 143:5
**candidates** [3] -
153:14, 153:15,
153:19
**cannot** [4] - 86:24,
131:10, 146:12,
146:15
**capacity** [4] - 5:23,
18:12, 45:15, 186:9
**Capital** [1] - 22:18
**captain** [16] - 6:8,
7:17, 7:18, 8:12,
9:22, 109:1, 109:7,
109:8, 109:17,
110:2, 123:14,
155:20, 180:4,
193:20, 217:5,
227:13
**Captain** [31] - 77:5,
77:23, 79:2, 79:18,
109:2, 109:4,
159:22, 159:23,
162:17, 163:9,
166:24, 167:1,
172:4, 172:24,
173:7, 173:8,
174:17, 181:7,
182:11, 182:13,
182:15, 195:10,
196:2, 196:8,
196:17, 197:11,
227:13, 243:15,
283:14
**captain's** [1] - 108:23
**car** [1] - 191:17
**care** [14] - 150:16,

165:13, 230:22,
231:2, 231:3,
231:14, 238:11,
239:4, 239:9,
239:18, 239:21,
264:1, 264:4, 276:17
**career** [1] - 275:19
**careful** [3] - 32:7,
71:15, 76:16
**carefully** [2] - 269:1,
275:13
**carry** [1] - 10:21
**Case** [1] - 1:3
**case** [36] - 4:13, 23:8,
32:23, 32:24, 47:20,
50:8, 50:13, 50:14,
82:7, 84:3, 92:15,
109:12, 123:18,
125:10, 172:7,
172:11, 195:5,
196:23, 197:2,
198:22, 200:12,
200:17, 202:7,
202:13, 202:16,
202:24, 203:3,
205:19, 206:22,
217:19, 221:15,
223:13, 229:15,
229:17, 229:22
**cases** [12] - 78:23,
199:7, 199:8,
202:13, 202:17,
202:20, 202:22,
223:5, 223:6,
223:10, 226:13
**catching** [1] - 39:16
**categories** [1] -
130:17
**category** [1] - 265:2
**caught** [1] - 257:10
**caused** [3] - 87:11,
89:22, 91:21
**causing** [1] - 87:14
**cease** [3] - 177:4,
177:23, 186:21
**cellphone** [7] -
176:21, 177:11,
244:10, 245:10,
245:16, 266:23,
280:12
**cellphones** [2] -
245:18, 245:19
**Central** [2] - 1:14, 2:4
**certain** [5] - 9:12,
92:4, 127:4, 226:13,
227:7
**certificate** [1] - 132:12
**certification** [3] -
138:5, 138:8, 147:5
**certifications** [1] - 3:4

**CERTIFY** [1] - 303:5
**certify** [1] - 303:18
**cetera** [1] - 193:19
**chain** [14] - 7:3, 8:6,
8:8, 10:10, 10:13,
29:1, 39:23, 39:24,
40:17, 68:11, 69:13,
69:15, 194:1, 216:15
**chair** [2] - 160:12,
232:16
**chance** [1] - 55:19
**change** [4] - 25:19,
85:16, 120:17, 121:2
**changed** [4] - 28:21,
120:22, 163:22,
163:24
**changes** [1] - 303:15
**channels** [1] - 187:10
**characterization** [1] -
257:23
**charge** [15] - 9:6, 14:4,
14:6, 14:9, 16:17,
28:20, 28:22, 122:1,
122:2, 124:14,
124:15, 192:18,
193:15, 217:6,
240:14
**charged** [3] - 27:16,
190:7, 190:15
**charges** [9] - 49:18,
50:15, 191:14,
191:21, 192:2,
282:6, 282:8, 282:9
**cheating** [2] - 277:12
**check** [4] - 62:12,
95:3, 169:3, 188:4
**checked** [1] - 184:17
**chief** [28] - 7:20, 8:9,
43:16, 83:24, 91:1,
91:6, 91:12, 92:5,
94:11, 96:12, 96:21,
107:9, 108:3, 108:4,
109:9, 109:22,
110:9, 122:7,
155:20, 192:21,
217:5, 240:3,
243:19, 266:11,
278:21, 279:11,
279:13
**Chief** [22] - 8:7, 39:20,
39:21, 41:17, 78:22,
79:18, 87:9, 90:14,
90:15, 90:16, 96:4,
97:19, 99:3, 99:14,
99:21, 99:24, 102:6,
103:21, 105:17,
156:16, 183:13,
232:8
**childish** [1] - 252:12
**choice** [3] - 222:3,

264:2, 264:3
**choose** [4] - 129:24,
130:4, 143:7, 145:22
**chops** [1] - 243:24
**Chris** [4] - 220:6,
220:7, 220:8, 220:9
**circumstance** [7] -
70:12, 70:13, 72:14,
72:17, 73:1, 73:20,
257:14
**circumstances** [5] -
46:17, 70:14, 73:11,
145:23, 146:3
**City** [2] - 5:22, 192:11
**Civil** [45] - 1:3, 10:14,
10:20, 10:21, 18:18,
19:23, 55:5, 129:11,
129:21, 130:6,
132:4, 132:6,
132:15, 134:21,
135:24, 136:9,
141:18, 141:19,
142:8, 146:17,
147:16, 147:17,
148:9, 152:2,
152:10, 211:13,
212:17, 215:1,
215:7, 215:19,
260:12, 285:13,
285:18, 285:24,
286:3, 286:7,
286:11, 286:17,
286:23, 287:4,
287:8, 287:9, 287:11
**civil** [5] - 5:1, 51:21,
51:22, 51:24
**claimant** [2] - 208:3,
208:6
**claimant's** [5] - 208:5,
208:8, 209:1, 209:4,
209:12
**claiming** [1] - 248:15
**claims** [1] - 89:21
**clarification** [6] - 31:6,
185:4, 206:6,
213:15, 239:16,
254:3
**clarify** [11] - 19:20,
21:8, 21:9, 21:21,
43:5, 48:20, 49:5,
50:3, 216:15, 229:9,
248:21
**clarifying** [1] - 22:3
**Classification** [1] -
155:16
**classified** [1] - 190:11
**clear** [20] - 73:13,
74:3, 75:16, 88:10,
102:21, 124:1,
145:12, 151:23,

166:6, 174:9,
174:17, 182:12,
212:6, 224:12,
230:1, 233:18,
251:4, 273:20,
286:6, 290:7
**cleared** [2] - 21:22,
222:4
**clearly** [1] - 235:7
**client** [1] - 74:24
**clip** [1] - 269:14
**clock** [1] - 284:1
**close** [12] - 87:8,
90:18, 95:15,
150:14, 154:18,
179:24, 202:2,
230:6, 240:11,
241:18, 264:7,
291:19
**closed** [3] - 107:12,
110:14, 232:2
**closely** [1] - 179:8
**CO** [5] - 43:21, 128:2,
128:6, 128:8, 220:8
**co** [2] - 107:1, 279:4
**co-workers** [2] -
107:1, 279:4
**coffees** [1] - 90:21
**Colorado** [1] - 51:14
**coming** [6] - 19:1,
41:2, 42:4, 169:11,
186:12, 242:7
**command** [32] - 7:4,
8:7, 8:8, 10:10,
10:13, 14:20, 17:10,
18:15, 20:2, 22:14,
29:1, 34:17, 35:1,
35:3, 37:6, 39:23,
39:24, 40:18, 68:2,
68:11, 69:13, 69:15,
76:9, 109:22, 110:9,
110:21, 123:19,
149:14, 150:2,
194:1, 216:16
**commander** [2] - 9:9,
28:22
**commander's** [1] -
108:18
**commanders** [4] -
8:15, 8:18, 35:15,
149:24
**commencing** [1] -
1:15
**Commission** [9] -
155:15, 285:14,
285:19, 285:24,
286:3, 286:8,
286:12, 286:18,
287:8
**committed** [2] -

181:16, 260:22
**common** [6] - 29:6,
42:23, 92:20, 127:6,
258:12, 259:3
**common-law** [2] -
258:12, 259:3
**communication** [2] -
60:22, 98:12
**community** [1] - 13:13
**Comp** [2] - 208:20,
216:9
**company** [2] - 291:3,
291:7
**compared** [2] - 11:13,
152:24
**comparing** [1] - 10:22
**compel** [1] - 72:23
**Compensation** [5] -
206:19, 207:6,
208:11, 209:22,
299:2
**complain** [1] - 86:6
**complained** [1] -
85:23
**complaining** [7] -
39:14, 42:6, 66:20,
102:6, 243:1,
265:11, 267:5
**complaint** [106] - 25:4,
25:8, 26:6, 33:19,
41:7, 41:11, 53:8,
53:19, 54:17, 54:23,
54:24, 68:10, 69:12,
76:12, 78:1, 78:7,
79:3, 85:8, 86:20,
86:22, 86:23, 86:24,
87:2, 87:5, 88:10,
88:18, 90:3, 90:12,
93:18, 93:20, 93:23,
94:3, 94:6, 94:8,
97:2, 97:4, 97:24,
98:10, 99:9, 99:23,
100:4, 102:10,
102:11, 102:15,
102:16, 102:18,
102:19, 102:23,
104:1, 104:13,
104:17, 105:2,
106:3, 106:13,
106:16, 107:15,
108:12, 108:14,
108:15, 109:15,
110:1, 122:11,
125:5, 158:12,
162:10, 164:18,
168:18, 169:20,
170:22, 174:10,
182:15, 192:16,
192:20, 195:1,
196:5, 196:13,

196:19, 196:21,
197:24, 201:5,
201:8, 202:5, 242:8,
248:22, 248:23,
249:1, 250:16,
251:13, 254:8,
265:15, 266:2,
269:19, 273:10,
284:21, 294:11,
294:21, 295:1,
298:16, 298:23,
299:10, 300:1,
300:2, 300:3
**complaints** [15] -
16:24, 53:15, 70:3,
127:4, 187:1,
240:24, 242:21,
246:18, 248:11,
248:18, 249:21,
250:7, 253:10,
253:12, 279:21
**complete** [1] - 303:12
**completed** [2] - 16:6,
214:1
**completely** [5] - 90:3,
90:9, 98:11, 187:4,
200:22
**completing** [1] - 152:9
**completion** [1] -
303:14
**complexities** [1] -
202:18
**compliance** [1] -
189:10
**comply** [2] - 271:12,
273:24
**component** [1] - 279:3
**compromise** [1] -
40:12
**computer** [4] - 50:16,
191:3, 191:6, 191:7
**concepts** [1] - 13:12
**concern** [3] - 41:1,
71:19, 91:16
**concerned** [2] -
109:14, 294:18
**concerning** [3] - 24:6,
79:4, 123:12
**concerns** [2] - 69:6,
280:2
**concluded** [1] -
300:13
**conclusion** [8] - 71:8,
72:12, 79:8, 79:11,
97:23, 178:8,
180:12, 181:6
**conclusions** [2] -
176:4, 176:6
**concurred** [1] - 32:17
**condone** [2] - 261:8,

261:9
**conduct** [11] - 70:2,
71:23, 76:20, 165:5,
165:7, 180:20,
181:3, 212:23,
213:1, 251:4, 256:10
**conducted** [1] - 189:4
**conducting** [2] -
77:18, 182:7
**confided** [2] - 99:21,
103:22
**confidence** [1] -
279:12
**confident** [1] - 239:14
**confidential** [16] -
31:23, 40:4, 40:10,
85:9, 85:24, 86:6,
86:21, 87:10, 88:1,
88:11, 88:12, 92:24,
93:6, 100:6, 120:14
**confirm** [2] - 97:7,
201:16
**confirmation** [3] -
168:18, 168:23,
169:1
**confirmed** [1] - 166:3
**confiscate** [1] - 24:12
**conflict** [2] - 193:23,
194:23
**confronted** [1] -
280:11
**confused** [4] - 28:14,
36:19, 137:23, 249:3
**confuses** [1] - 83:16
**confusing** [1] - 137:22
**confusion** [1] - 49:6
**connection** [1] - 154:7
**Connell** [2] - 196:6,
198:7
**Connor** [2] - 170:2,
170:5
**Connors** [1] - 120:16
**consider** [1] - 64:15
**considered** [2] -
49:19, 276:20
**consist** [3] - 58:9,
60:15, 77:3
**constantly** [3] - 35:2,
241:2, 283:6
**constraints** [1] - 285:8
**construction** [1] -
16:7
**construed** [1] - 268:18
**consult** [1] - 201:22
**consultations** [1] -
202:14
**consulted** [2] -
201:16, 202:6
**consulting** [3] -
201:20, 222:19,

222:20
**contact** [1] - 72:11, 73:7, 76:15, 89:17, 98:17, 132:15, 172:6, 177:5, 177:24, 182:23, 184:8
**contacted** [5] - 176:21, 177:11, 183:8, 183:13, 184:23
**context** [4] - 179:3, 247:10, 255:4, 255:22
**continue** [16] - 73:8, 75:22, 86:18, 177:20, 201:14, 219:8, 224:4, 224:14, 225:5, 225:16, 227:15, 232:10, 234:23, 235:6, 251:15, 252:7
**Continue** [1] - 163:18
**continued** [5] - 129:3, 253:19, 278:17, 279:9, 282:5
**continues** [2] - 76:17, 276:15
**continuing** [1] - 76:23
**contract** [6] - 203:8, 203:17, 203:24, 204:3, 204:23, 241:4
**contrary** [1] - 150:12
**control** [2] - 82:11, 83:12
**conventional** [1] - 60:21
**conversation** [22] - 35:7, 35:21, 38:12, 38:15, 96:18, 105:13, 116:4, 120:4, 157:9, 158:14, 158:23, 177:1, 177:14, 177:17, 183:4, 187:14, 190:1, 231:5, 235:8, 238:13, 291:13, 291:14
**conversations** [7] - 90:13, 113:22, 114:2, 114:3, 114:4, 120:3, 203:11
**convicted** [10] - 190:23, 191:1, 254:14, 254:21, 254:24, 255:7, 255:8, 256:22, 257:5
**Conviction** [1] - 256:9
**conviction** [1] -

258:24
**cooperate** [1] - 189:20
**cooperating** [1] - 41:21
**cooperation** [1] - 226:11
**cops** [1] - 241:11
**copy** [17] - 56:9, 159:14, 159:15, 159:16, 159:17, 160:9, 160:20, 172:8, 215:14, 231:16, 234:4, 234:12, 235:23, 236:1, 236:5, 236:7, 236:10
**cornerstone** [2] - 61:18, 64:11
**correct** [81] - 8:14, 10:6, 11:10, 12:1, 12:4, 12:15, 12:18, 14:8, 18:1, 18:4, 20:20, 22:4, 22:5, 25:7, 45:19, 46:11, 47:23, 52:22, 61:9, 66:12, 80:16, 85:11, 87:24, 90:10, 91:22, 100:8, 102:15, 102:24, 104:23, 115:5, 124:3, 128:18, 132:8, 134:23, 137:9, 137:14, 138:4, 140:17, 141:12, 141:17, 141:24, 142:5, 142:12, 142:14, 144:9, 146:11, 152:5, 160:7, 160:9, 168:1, 169:6, 169:8, 176:23, 184:7, 185:6, 185:12, 187:18, 189:24, 190:19, 193:11, 196:17, 207:12, 209:6, 210:12, 234:22, 236:9, 238:23, 248:9, 254:9, 255:17, 266:24, 286:15, 290:15, 293:16, 294:2, 295:15, 297:1, 297:2, 297:3, 302:5, 303:12
**Correct** [1] - 24:23
**Correction** [1] - 155:15
**correctional** [13] - 13:15, 19:1, 41:2, 41:8, 50:22, 62:5,

66:22, 133:2, 222:21, 226:11, 226:24, 250:12
**corrections** [15] - 7:10, 7:12, 8:9, 8:17, 18:14, 19:22, 51:19, 69:10, 72:6, 72:7, 119:4, 124:18, 149:3, 155:19, 192:21
**correctly** [1] - 20:11
**correspondence** [1] - 262:8
**corroborated** [2] - 39:13, 266:4
**COs** [3] - 9:17, 31:20, 152:16
**cost** [2] - 198:14, 245:23
**costing** [1] - 245:20
**counsel** [9] - 208:17, 208:18, 212:2, 212:5, 218:3, 219:7, 219:22, 223:14, 283:24
**COUNSEL** [1] - 4:4
**counsel's** [1] - 219:11
**count** [3] - 49:17, 131:15, 155:23
**county** [40] - 23:24, 24:19, 39:13, 45:10, 52:21, 52:23, 56:10, 59:11, 60:5, 61:14, 62:1, 65:8, 65:20, 69:4, 113:3, 132:5, 165:24, 168:5, 185:10, 185:13, 191:3, 191:7, 197:3, 199:19, 203:24, 205:16, 206:4, 226:4, 245:21, 258:21, 259:20, 262:17, 273:18, 273:21, 298:20, 299:1, 299:9, 299:11, 299:13, 299:22
**COUNTY** [3] - 1:8, 1:9, 1:9
**County** [42] - 5:19, 22:20, 24:1, 24:11, 44:17, 52:13, 53:1, 56:3, 56:7, 60:3, 61:6, 64:7, 65:4, 66:19, 114:13, 139:2, 139:9, 162:7, 180:17, 189:17, 189:22, 196:10, 203:9, 203:18, 204:2, 204:13,

206:8, 215:8, 218:24, 219:1, 219:21, 235:12, 256:1, 259:10, 264:11, 267:17, 271:22, 272:5, 284:18, 295:9, 297:6, 297:7
**county's** [4] - 68:14, 256:14, 256:23, 258:2
**couple** [10] - 26:19, 28:21, 29:13, 34:11, 44:4, 53:24, 86:8, 88:22, 88:24, 254:20
**course** [15] - 5:10, 15:12, 41:15, 51:15, 59:3, 64:7, 67:6, 76:5, 97:19, 113:19, 150:4, 163:2, 181:17, 194:22, 263:2
**courses** [2] - 6:14, 51:18
**COURT** [7] - 1:1, 103:10, 116:6, 228:13, 228:19, 228:22, 231:10
**court** [22] - 39:13, 68:3, 72:19, 72:20, 72:22, 72:24, 93:15, 116:4, 134:9, 167:21, 171:19, 179:5, 180:15, 180:19, 180:20, 184:12, 184:13, 220:1, 228:12, 278:1
**Court** [8] - 1:16, 3:12, 4:24, 67:20, 181:11, 184:14, 191:22, 192:11
**courts** [1] - 179:22
**cover** [3] - 194:6, 195:10, 248:18
**covered** [6] - 36:13, 164:24, 194:15, 198:13, 236:19, 288:2
**crap** [2] - 245:2, 245:8
**create** [1] - 283:5
**creating** [1] - 91:20
**credence** [1] - 14:17
**credibility** [1] - 193:21
**crime** [4] - 181:16, 190:8, 254:24, 256:9
**crimes** [2] - 255:7, 255:18
**criminal** [19] - 25:4, 25:8, 26:6, 181:20, 181:22, 188:11,

188:13, 189:7, 248:18, 248:22, 255:15, 257:6, 257:11, 257:19, 258:24, 259:1, 282:6, 282:8, 282:10
**criminals** [1] - 254:14
**criteria** [1] - 151:22
**crossed** [1] - 195:6
**crucify** [1] - 258:19
**Crutchin** [1] - 16:18
**cry** [1] - 284:14
**crying** [1] - 276:7
**Crystal** [1] - 278:10
**crystalize** [1] - 152:1
**curious** [1] - 258:23
**current** [2] - 129:10, 130:3
**cursory** [1] - 76:22

**D**

**DA's** [1] - 189:18, 189:22
**daily** [1] - 9:19
**dangerous** [1] - 69:20
**data** [1] - 16:24
**database** [7] - 188:21, 257:6, 257:19, 258:16, 259:1, 282:10, 282:13
**date** [42] - 85:21, 86:7, 105:21, 118:21, 119:9, 119:19, 125:23, 126:2, 128:21, 132:22, 135:8, 135:9, 136:5, 136:7, 136:17, 138:6, 147:5, 151:9, 156:4, 156:6, 156:9, 156:21, 156:23, 156:24, 157:3, 168:13, 170:7, 171:19, 172:17, 207:8, 207:10, 207:14, 220:14, 221:1, 269:8, 269:9, 269:12, 269:16, 272:13, 292:22, 294:13
**dated** [3] - 23:23, 172:16, 172:23
**dates** [3] - 121:10, 121:11, 134:18
**dating** [1] - 258:13
**Dave** [1] - 142:1
**David** [1] - 38:4
**day-to-day** [2] - 63:16, 64:5
**days** [4] - 26:19,

34:11, 74:16, 74:17
**DCJS** [3] - 189:12, 189:15, 189:20
**dead** [1] - 190:5
**deal** [12] - 47:17, 109:17, 187:8, 190:17, 192:1, 192:8, 192:9, 192:10, 202:24, 208:18, 213:13, 227:13
**dealt** [2] - 127:10, 210:3
**Dear** [1] - 24:4
**debate** [1] - 148:22
**December** [1] - 121:1
**decide** [2] - 109:20, 250:6
**decided** [2] - 14:20, 249:15
**deciding** [1] - 259:17
**decision** [21] - 17:11, 19:9, 45:8, 46:3, 46:7, 46:16, 67:20, 93:15, 126:17, 150:4, 153:22, 207:6, 207:9, 209:21, 216:9, 219:8, 222:18, 222:19, 257:15, 259:19, 261:22
**decision's** [1] - 219:11
**decisions** [4] - 14:12, 46:10, 203:20, 208:16
**defendant** [1] - 1:12
**defendants** [2] - 23:9, 168:4
**Defendants** [2] - 1:10, 2:8
**define** [2] - 11:18, 19:12
**defined** [1] - 58:16
**degree** [1] - 6:19
**denials** [1] - 298:17
**denied** [10] - 94:9, 97:8, 97:20, 97:21, 99:11, 106:11, 162:22, 238:23, 266:4, 291:9
**denies** [2] - 291:10, 296:11
**deny** [3] - 239:2, 300:7, 300:9
**denying** [1] - 198:18
**Department** [24] - 6:7, 12:17, 13:6, 13:8, 13:9, 13:10, 24:11, 32:4, 44:17, 114:14, 139:3, 139:9,

204:11, 206:7, 218:24, 246:16, 246:24, 247:4, 270:17, 271:13, 271:23, 272:5, 287:11, 299:10
**department** [42] - 7:4, 8:3, 17:24, 20:9, 24:5, 25:3, 26:23, 44:11, 61:20, 63:13, 64:14, 64:15, 64:17, 64:21, 69:7, 69:11, 69:21, 76:3, 76:20, 77:19, 117:1, 117:4, 117:15, 125:22, 132:7, 137:11, 138:20, 139:18, 139:21, 141:5, 148:1, 154:9, 165:3, 182:9, 183:9, 189:19, 222:10, 254:15, 266:19, 272:21, 273:23
**depended** [1] - 38:20
**depleted** [1] - 131:11
**deponent** [1] - 303:16
**Deposition** [1] - 3:10
**deposition** [16] - 4:8, 20:12, 20:15, 20:19, 20:24, 22:2, 23:18, 26:20, 235:10, 235:18, 244:21, 284:16, 284:18, 303:6, 303:9, 303:14
**depositions** [2] - 4:23, 229:12
**depth** [1] - 63:12
**Deputy** [1] - 189:5
**deputy** [2] - 117:2, 281:11
**describe** [1] - 15:11
**descriptions** [1] - 286:18
**designed** [1] - 69:5
**Desinu** [2] - 47:6, 48:3
**desk** [1] - 232:21
**detail** [7] - 106:17, 120:9, 121:7, 121:13, 121:21, 122:6, 122:12
**detailed** [1] - 70:1
**detective** [1] - 6:8
**Detective** [1] - 189:9
**determination** [6] - 199:9, 200:11, 202:12, 286:4, 286:5, 286:22
**determinations** [1] - 202:10
**determinative** [1] -

28:7
**determine** [6] - 67:16, 77:7, 86:5, 166:9, 166:11, 251:10
**determined** [12] - 58:10, 67:13, 77:8, 81:4, 107:12, 108:9, 109:12, 109:23, 110:12, 199:19, 219:12, 287:14
**determines** [3] - 67:17, 179:5, 179:23
**determining** [4] - 17:4, 67:9, 67:22, 109:20
**developing** [1] - 31:18
**device** [1] - 122:23
**dialogue** [1] - 228:18
**dictate** [1] - 70:14
**difference** [3] - 11:4, 101:2, 265:22
**different** [18] - 59:24, 67:18, 71:21, 74:16, 74:17, 92:20, 93:3, 93:8, 93:11, 131:3, 144:12, 147:10, 151:19, 162:5, 194:13, 252:22, 259:13, 291:13
**differently** [1] - 261:11
**difficult** [3] - 32:1, 32:6, 59:1
**diffuse** [2] - 240:4, 242:1
**diffusing** [1] - 243:7
**dig** [1] - 285:6
**diligence** [1] - 41:10
**direct** [3] - 81:7, 218:4, 219:17
**directed** [15] - 24:12, 31:15, 116:4, 134:9, 165:24, 167:21, 169:12, 171:3, 173:1, 173:3, 173:6, 214:8, 220:1, 228:12, 278:1
**directing** [1] - 37:21
**directions** [2] - 40:8, 222:17
**directive** [1] - 126:12
**directly** [3] - 33:16, 38:19, 69:11
**director** [1] - 77:16
**Director** [1] - 196:10
**Disabilities** [3] - 222:12, 297:17, 299:23
**disability** [2] - 263:8, 263:12
**disabled** [1] - 298:5

**disagree** [9] - 35:6, 148:7, 194:17, 208:13, 226:21, 226:22, 228:3, 228:6
**disagreed** [1] - 193:1
**disagreement** [2] - 227:4, 241:17
**disappeared** [1] - 281:18
**disbelieve** [2] - 164:22, 176:13
**discern** [1] - 250:5
**discharge** [2] - 257:16, 257:17
**discharge"** [1] - 256:18
**disciplinary** [12] - 47:2, 47:15, 47:23, 49:1, 49:12, 49:16, 49:19, 50:1, 51:2, 61:4, 61:7, 220:22
**discipline** [1] - 50:4
**disciplined** [1] - 50:8
**discovery** [3] - 25:23, 55:4, 95:6
**discrepancies** [1] - 108:20
**discuss** [1] - 36:23
**discussed** [7] - 10:10, 36:21, 120:2, 126:8, 126:10, 162:6, 262:11
**discussion** [2] - 126:13, 209:9
**discussions** [2] - 31:2, 34:13
**disprove** [1] - 252:6
**dispute** [3] - 208:7, 208:24, 209:11
**distinguishes** [3] - 10:23, 143:4, 143:6
**District** [3] - 16:1, 32:5, 190:9
**DISTRICT** [2] - 1:1, 1:2
**dividing** [1] - 250:5
**divisions** [1] - 62:4
**divulged** [5] - 87:10, 89:21, 89:24, 90:2, 104:14
**divulging** [6] - 85:9, 85:24, 86:6, 86:20, 90:23, 93:6
**DLUGOLECKI** [3] - 1:16, 303:3, 303:24
**doctor** [3] - 204:23, 262:18, 263:16
**doctors** [1] - 204:9
**document** [71] - 23:12, 55:3, 55:6, 55:11, 55:13, 88:3,

88:4, 88:9, 94:18, 96:10, 101:15, 101:21, 101:24, 102:2, 102:4, 102:22, 102:23, 103:19, 110:23, 111:6, 111:12, 111:18, 111:20, 111:24, 112:6, 118:15, 118:23, 118:24, 119:5, 119:22, 119:24, 132:13, 133:1, 134:22, 138:6, 141:20, 150:21, 155:11, 155:17, 155:21, 157:5, 163:7, 184:11, 185:19, 188:15, 188:16, 195:13, 195:16, 195:19, 200:4, 200:6, 210:7, 210:9, 217:3, 217:4, 218:15, 218:20, 231:15, 233:16, 233:17, 233:19, 234:1, 234:11, 249:8, 262:2, 269:19, 271:18, 274:6, 275:6, 275:7
**Document** [6] - 301:8, 301:9, 301:10, 301:11, 301:12, 301:13
**documentation** [2] - 168:16, 221:13
**DOCUMENTATION/ INFORMATION** [1] - 301:18
**documented** [1] - 157:1
**documents** [42] - 17:2, 17:7, 17:11, 19:11, 23:9, 25:21, 78:11, 78:20, 86:16, 95:11, 119:15, 160:13, 160:22, 161:2, 161:8, 161:13, 167:17, 167:18, 170:11, 170:13, 171:7, 172:22, 182:1, 188:10, 202:4, 233:9, 233:15, 234:3, 239:1, 239:4, 239:5, 239:24, 249:1, 249:13, 250:3, 251:20, 283:9, 283:11, 287:23, 288:9,

288:24, 292:21
**domestic** [1] - 267:13
**done** [51] - 18:15,
27:4, 27:11, 41:23,
61:24, 62:3, 62:14,
62:22, 63:1, 65:6,
67:13, 72:20, 82:17,
82:19, 85:3, 95:2,
95:3, 98:18, 140:21,
166:16, 191:11,
196:20, 204:9,
204:10, 204:11,
211:11, 212:2,
213:2, 213:9, 225:1,
244:19, 245:24,
246:1, 252:17,
252:18, 252:21,
253:20, 255:2,
257:3, 257:21,
259:9, 261:10,
261:13, 275:18,
285:17, 291:7,
291:23, 293:21,
296:19, 300:10
**door** [7] - 68:5, 68:6,
68:8, 69:8, 165:15,
197:9, 232:2
**doorway** [2] - 232:23,
232:24
**Doper** [1] - 124:17
**doubt** [2] - 208:2,
229:16
**doubt"** [1] - 207:22
**down** [38] - 69:18,
84:23, 86:15, 116:7,
131:2, 131:22,
134:19, 139:12,
139:15, 141:9,
142:11, 143:1,
143:3, 144:9,
145:22, 150:19,
199:15, 207:16,
226:8, 231:6,
231:11, 233:12,
244:3, 244:17,
244:22, 250:18,
261:22, 268:3,
272:2, 273:4,
275:10, 275:11,
281:12, 281:16,
282:1, 293:6, 303:9
**Dr** [8] - 203:6, 203:11,
203:14, 203:17,
203:24, 204:18,
205:14
**drag** [1] - 149:13
**draw** [3] - 176:4,
176:6, 178:8
**drug** [3] - 31:21,
39:14, 39:16

**drugs** [6] - 15:15,
31:21, 39:12, 39:16,
41:1, 194:11
**due** [9] - 14:15,
199:15, 212:19,
212:22, 212:23,
213:3, 213:16,
213:17, 215:23
**duly** [2] - 4:2, 303:6
**Dunham** [29] - 82:11,
82:22, 83:1, 83:11,
83:20, 91:9, 94:13,
96:5, 96:7, 96:8,
96:12, 96:21, 97:6,
98:15, 104:19,
104:22, 105:3,
105:9, 105:10,
105:12, 105:16,
106:5, 106:7,
114:21, 115:2,
122:3, 122:4,
149:18, 149:22
**Dunham's** [1] - 125:7
**during** [19] - 7:5, 8:15,
20:11, 20:24, 22:1,
25:6, 37:18, 62:18,
62:22, 63:11, 67:1,
79:23, 91:8, 108:19,
112:19, 113:17,
114:7, 201:20,
303:16
**duties** [1] - 14:12
**duty** [10] - 76:3, 76:5,
198:14, 222:22,
222:24, 223:3,
223:4, 223:6, 223:9,
223:11
**dynamic** [1] - 163:24

---

**E**

---

**e-justice** [3] - 189:11,
190:2, 192:3
**early** [1] - 121:4
**easier** [1] - 100:17
**east** [3] - 8:24, 9:3, 9:6
**easy** [1] - 202:24
**eat** [1] - 101:5
**education** [1] - 127:12
**educational** [3] - 6:18,
126:4, 127:2
**effect** [3] - 3:11,
45:24, 113:17
**effective** [4] - 24:10,
61:18, 64:12, 215:9
**effectively** [1] - 15:4
**effing** [1] - 167:18
**egregious** [1] - 255:3
**egregiously** [1] -
246:2

**eight** [2] - 65:16,
276:5
**either** [10] - 7:20,
67:14, 105:1, 105:5,
176:13, 185:20,
250:21, 265:16,
273:14, 296:8
**either/or** [2] - 58:13,
129:24
**elected** [1] - 63:23
**electronic** [1] - 60:21
**eleven** [2] - 247:9,
247:16
**eligibility** [1] - 141:9
**eligible** [10] - 137:10,
137:12, 139:11,
140:15, 145:6,
150:6, 150:20,
150:23, 152:6,
199:10
**eligibles** [4] - 132:16,
147:22, 150:17,
287:13
**Eligibles"** [1] - 132:12
**embezzlement** [1] -
256:22
**embezzling** [2] -
255:9, 255:11
**eminent** [1] - 252:18
**employ** [2] - 286:9,
286:13
**employed** [12] - 40:24,
139:18, 139:21,
147:24, 217:18,
217:22, 218:16,
219:9, 259:23,
260:2, 266:18,
266:20
**employee** [19] - 61:17,
62:16, 62:18, 66:20,
69:24, 71:6, 73:1,
73:2, 73:15, 166:8,
185:10, 206:3,
211:19, 212:12,
215:20, 217:8,
229:17, 262:12
**employee's** [1] -
256:11
**employees** [15] - 61:3,
61:20, 62:20, 62:22,
63:7, 63:9, 64:13,
69:3, 72:2, 72:23,
165:14, 165:24,
204:2, 256:13,
272:12
**employer** [4] - 55:7,
272:9, 272:10, 274:7
**employer's** [2] -
272:6, 274:8
**employment** [10] -

18:23, 19:21, 54:2,
54:15, 59:3, 61:10,
125:24, 139:7,
215:8, 263:14
**empowered** [1] -
216:17
**enclosed** [1] - 168:16
**encompass** [1] -
222:8
**encouraged** [1] - 69:3
**end** [22] - 25:11,
25:13, 41:23, 50:1,
50:9, 98:9, 98:11,
98:12, 100:14,
100:15, 107:3,
107:13, 108:10,
108:11, 109:15,
110:13, 125:24,
131:18, 187:14,
194:12, 232:13,
236:15
**endeavor** [1] - 129:4
**ended** [2] - 114:20,
115:7
**ends** [1] - 81:6
**enforce** [3] - 36:2,
68:21, 146:1
**enforced** [1] - 68:17
**enforcement** [11] -
13:13, 16:2, 17:9,
52:1, 92:1, 162:3,
250:18, 257:9,
257:10, 257:22,
261:4
**enforcing** [2] - 15:5,
68:14
**engages** [1] - 59:11
**engaging** [2] - 256:9,
299:20
**ensure** [2] - 165:7,
236:20
**entailed** [1] - 21:12
**entered** [2] - 192:10,
284:24
**entire** [3] - 11:8,
147:18, 200:17
**entitled** [4] - 139:1,
212:19, 212:21,
300:13
**entity** [1] - 52:24
**environment** [2] -
69:5, 283:5
**equal** [16] - 14:16,
143:10, 143:11,
148:12, 148:16,
148:17, 151:1,
151:3, 151:14,
151:17, 151:18,
152:12, 153:23,
208:22, 260:21

**equally** [1] - 255:2
**equipment** [1] - 82:12
**era** [1] - 13:14
**Eric** [1] - 142:1
**especially** [1] - 13:13
**ESQ** [2] - 2:6, 2:12
**establish** [3] - 13:14,
143:13, 218:5
**established** [1] -
299:21
**establishing** [1] -
78:18
**et** [1] - 193:19
**evaluation** [3] - 204:7,
205:17, 206:3
**evaluations** [2] -
203:14, 204:4
**event** [4] - 92:22,
167:13, 191:14,
273:16
**events** [1] - 31:1
**eventually** [1] - 254:8
**evidence** [3] - 32:12,
32:13, 263:12
**ex** [1] - 258:11
**exact** [14] - 12:11,
21:24, 53:20, 54:1,
54:19, 105:21,
115:1, 115:11,
125:23, 126:2,
128:21, 156:23,
291:1, 294:13
**exactly** [23] - 9:14,
16:8, 41:19, 52:7,
52:11, 53:14, 53:16,
54:19, 80:4, 84:23,
105:22, 106:1,
113:8, 127:19,
127:21, 136:22,
163:11, 197:5,
211:24, 220:24,
230:11, 231:11,
239:14
**exam** [3] - 19:24,
129:12
**EXAMINATION** [3] -
1:12, 4:4, 301:2
**examination** [3] -
238:12, 238:16,
300:12
**examinations** [2] -
203:9, 263:5
**examined** [2] - 4:3,
303:5
**example** [4] - 71:5,
130:23, 145:12,
195:4
**exasperating** [1] -
240:7
**excalated** [1] - 163:21

**excalates** [1] - 244:2
**excalation** [1] - 58:24
**except** [4] - 3:7, 40:2, 40:9, 115:8
**exceptional** [1] - 22:17
**excessive** [4] - 35:9, 36:22, 38:7, 198:6
**excuse** [3] - 113:24, 193:13, 278:6
**executed** [2] - 60:4, 165:23
**EXECUTIVE** [1] - 1:9
**executive** [2] - 273:18, 273:21
**exhaust** [2] - 131:13, 144:2
**EXHIBIT** [1] - 301:7
**Exhibit** [63] - 23:8, 23:23, 25:18, 55:3, 55:12, 55:19, 57:20, 57:24, 59:8, 60:19, 61:3, 64:11, 64:24, 65:16, 68:24, 101:16, 103:13, 104:9, 104:12, 108:14, 118:11, 119:9, 132:10, 132:18, 133:7, 133:16, 134:15, 138:6, 140:4, 141:1, 141:3, 142:10, 146:21, 147:4, 151:4, 155:1, 155:10, 165:22, 167:22, 168:4, 175:14, 176:17, 184:10, 195:12, 200:1, 205:21, 207:5, 211:2, 213:7, 214:6, 216:22, 217:2, 220:13, 262:1, 263:6, 267:20, 268:12, 270:11, 275:2, 283:8, 285:1, 288:11, 292:20
**exhibit** [20] - 23:15, 23:17, 59:8, 61:17, 64:10, 65:17, 69:2, 103:15, 103:18, 106:19, 119:18, 156:3, 175:18, 181:19, 216:21, 235:21, 236:8, 262:6, 268:11, 285:4
**exhibits** [2] - 59:10, 220:1
**Exhibits** [1] - 220:2
**EXHIBITS** [1] - 301:5

**exist** [4] - 65:23, 65:24, 129:10, 146:3
**existed** [1] - 263:21
**expansion** [1] - 16:7
**expect** [1] - 271:11
**expected** [1] - 114:19
**experience** [1] - 257:8
**expertise** [1] - 202:21
**explain** [7] - 4:22, 11:2, 42:22, 46:1, 85:3, 134:2, 139:6
**explained** [6] - 32:16, 106:15, 140:23, 169:18, 185:20, 261:12
**explaining** [2] - 14:19, 203:2
**explains** [1] - 135:21
**explanation** [1] - 151:17
**express** [1] - 167:14
**extended** [1] - 36:15
**extent** [4] - 4:21, 5:10, 124:18, 201:19
**extra** [1] - 235:24
**eye** [1] - 180:1

## F

**face** [6] - 49:12, 49:15, 50:1, 73:5, 202:23, 292:9
**faced** [1] - 51:2
**facilitate** [1] - 243:18
**facilities** [1] - 13:15
**Facility** [1] - 16:18
**facility** [28] - 11:7, 11:8, 14:13, 16:8, 20:1, 30:13, 38:24, 39:15, 39:17, 41:18, 50:22, 66:22, 82:12, 122:14, 159:24, 179:9, 185:1, 194:16, 196:5, 222:21, 230:19, 243:20, 250:13, 252:20, 255:4, 265:19, 265:21, 272:16
**facing** [2] - 47:14, 49:1
**fact** [19] - 14:15, 68:23, 79:2, 98:2, 128:19, 133:9, 147:23, 149:7, 152:19, 153:4, 153:5, 170:16, 181:2, 225:9, 229:20, 232:6, 248:20, 260:18,

282:12
**facts** [11] - 27:23, 41:14, 141:11, 141:15, 160:22, 176:14, 176:15, 194:20, 229:15, 250:22, 264:22
**failure** [1] - 43:11
**fair** [8] - 57:17, 129:16, 153:2, 206:17, 235:8, 235:9, 257:22, 284:4
**fall** [3] - 8:11, 10:12, 42:10
**fallen** [1] - 8:8
**falling** [1] - 254:7
**false** [1] - 34:24
**familial** [1] - 299:19
**familiar** [3] - 4:11, 130:9, 286:23
**family** [15] - 93:6, 117:13, 162:12, 186:17, 208:7, 208:24, 209:11, 264:7, 264:8, 264:18, 264:21, 265:7, 266:13, 266:18, 283:1
**famous** [1] - 298:11
**fan** [1] - 241:10
**far** [5] - 15:4, 109:13, 141:8, 225:18
**fault** [1] - 193:2
**favor** [4] - 9:1, 49:7, 104:24, 201:15
**favorable** [2] - 11:16, 11:18
**fax** [1] - 60:21
**FBI** [1] - 298:2
**fear** [2] - 58:24, 283:6
**fearful** [1] - 282:24
**February** [23] - 24:7, 85:19, 86:1, 105:18, 113:20, 127:14, 128:19, 132:23, 137:7, 138:7, 156:7, 156:11, 156:21, 167:13, 172:20, 175:16, 198:1, 201:8, 237:2, 269:15, 293:24, 294:9
**Federal** [2] - 4:24, 55:5
**federal** [3] - 5:1, 33:6, 300:3
**feely** [1] - 241:1
**fellow** [1] - 107:1
**felonies** [2] - 190:15, 191:2

**felony** [1] - 255:16
**felt** [4] - 227:8, 243:11, 243:18, 282:21
**few** [8] - 16:12, 44:19, 53:10, 53:11, 62:1, 199:7, 233:2, 283:3
**fight** [3] - 226:12, 278:9, 278:21
**fighting** [1] - 243:6
**figure** [3] - 146:7, 164:11, 247:12
**file** [24] - 24:17, 24:20, 25:6, 25:12, 25:14, 25:24, 26:2, 26:5, 72:20, 94:21, 94:23, 98:10, 110:1, 119:3, 158:12, 212:10, 214:17, 214:21, 215:5, 216:1, 216:5, 216:10, 237:22, 273:3
**File** [2] - 188:9, 188:15
**filed** [15] - 26:6, 53:9, 76:12, 86:21, 87:4, 158:17, 158:18, 159:7, 167:4, 201:7, 217:4, 248:23, 253:10, 254:8, 294:6
**files** [1] - 169:4
**filing** [6] - 3:4, 201:4, 207:8, 298:22, 299:2, 299:9
**fill** [3] - 135:20, 137:1, 279:21
**filled** [3] - 66:10, 135:17, 155:19
**final** [9] - 79:11, 79:21, 150:4, 192:4, 202:9, 202:11, 203:4, 229:19
**fine** [7] - 111:14, 112:4, 129:3, 148:24, 173:19, 279:16, 284:12
**finish** [5] - 104:12, 152:22, 166:19, 249:5, 251:11
**finished** [2] - 33:8, 253:18
**fire** [3] - 138:20, 259:4, 298:15
**firearm** [1] - 123:12
**firearms** [1] - 26:7
**fired** [4] - 221:6, 221:7, 259:5, 259:7
**First** [2] - 2:4, 291:5
**first** [49] - 4:2, 20:19, 21:2, 21:4, 42:4, 52:8, 52:15, 52:17, 53:6, 53:18, 53:21,

54:1, 54:16, 54:23, 106:20, 107:20, 112:12, 116:16, 125:24, 131:11, 131:13, 137:4, 140:15, 144:18, 145:8, 146:4, 148:12, 154:13, 154:14, 157:18, 165:22, 166:10, 166:15, 168:7, 175:9, 196:3, 197:24, 204:6, 208:15, 210:7, 210:8, 211:5, 235:7, 256:17, 258:1, 259:7, 272:18, 275:4, 295:15
**fit** [1] - 149:15
**five** [19] - 65:2, 95:17, 100:23, 101:1, 131:12, 131:17, 131:20, 131:21, 144:4, 144:14, 146:14, 223:16, 229:5, 244:11, 284:13, 288:15, 290:9, 290:18
**five-second** [1] - 223:16
**flabbergasted** [1] - 225:10
**flames** [1] - 241:10
**Floor** [1] - 2:4
**focus** [1] - 271:20
**focusing** [2] - 209:16, 273:8
**folder** [2] - 25:2, 233:4
**follow** [17] - 39:19, 39:21, 40:8, 63:3, 68:11, 72:24, 81:13, 100:10, 143:22, 186:5, 208:17, 208:18, 212:4, 213:12, 213:18, 222:16, 275:22
**follow-up** [2] - 100:10, 186:5
**followed** [3] - 125:2, 213:20, 285:19
**following** [6] - 42:1, 58:17, 82:4, 197:24, 276:1, 295:5
**follows** [1] - 4:3
**FOR** [2] - 4:4, 301:18
**force** [3] - 3:11, 255:15, 255:19
**foregoing** [2] - 302:3, 303:6
**forget** [3] - 220:17,

220:18, 221:9
**forgot** [1] - 197:18
**form** [35] - 3:7, 5:3,
 5:8, 26:20, 27:2,
 27:19, 34:12, 59:16,
 59:20, 66:9, 67:3,
 71:9, 72:9, 73:18,
 74:6, 77:17, 85:15,
 107:17, 108:1,
 135:21, 136:21,
 160:15, 160:18,
 178:11, 178:21,
 192:8, 192:9, 195:6,
 203:22, 211:10,
 211:22, 273:3,
 293:11, 300:8,
 303:11
**formal** [1] - 213:13
**formally** [1] - 196:4
**former** [6] - 154:1,
 154:5, 154:10,
 154:12, 154:17,
 262:9
**forms** [2] - 136:20,
 170:23
**forty** [3] - 244:8,
 247:8, 254:4
**forty-one** [1] - 244:8
**forty-seven** [1] - 254:4
**forty-three** [1] - 247:8
**forward** [5] - 66:7,
 75:20, 76:12, 77:8,
 228:15
**forwarded** [6] - 66:3,
 248:3, 249:22,
 251:2, 283:14,
 283:15
**Fountain** [1] - 278:10
**four** [5] - 65:1, 69:2,
 145:3, 153:18, 254:4
**fourth** [1] - 69:19
**frame** [17] - 7:5, 7:24,
 8:2, 8:4, 8:16, 14:4,
 25:6, 31:4, 78:3,
 85:6, 105:23, 106:1,
 115:11, 121:1,
 164:1, 245:3, 291:1
**frames** [4] - 83:16,
 84:11, 105:22,
 163:12
**fraternization** [3] -
 91:14, 93:10, 107:9
**fraternize** [1] - 90:17
**fraternizing** [2] -
 91:16, 126:7
**fraud** [1] - 255:11
**freaking** [1] - 229:8
**free** [1] - 56:18
**Freudian** [1] - 205:10
**friend** [3] - 29:10,

93:4, 186:10
**friends** [6] - 29:6,
 89:18, 92:19, 92:20,
 93:4, 186:17
**friendship** [1] - 92:18
**front** [8] - 55:9, 55:21,
 55:22, 100:15,
 150:22, 270:12,
 275:3, 275:11
**frustrated** [1] - 240:23
**frustration** [1] - 243:4
**fucking** [4] - 177:3,
 177:22, 178:18,
 179:12
**fulfill** [1] - 126:4
**full** [5] - 81:10, 82:11,
 83:12
**fully** [2] - 158:22,
 197:15
**function** [1] - 92:4
**functions** [1] - 92:4
**fundraisers** [1] - 30:15
**funny** [1] - 35:16
**FURTHER** [2] - 3:6,
 3:9
**future** [1] - 283:1

## G

**Galewski** [2] - 136:15,
 142:1
**gang** [10] - 13:11,
 22:19, 41:18, 42:9,
 42:17, 43:12, 90:8,
 193:18, 194:7,
 226:12
**gangs** [4] - 13:17,
 14:14, 15:12, 15:15
**gate** [2] - 35:8, 36:14
**gates** [2] - 34:14,
 36:22
**gather** [1] - 32:12
**gathering** [1] - 34:6
**general** [1] - 62:18
**generally** [2] - 31:2,
 31:14
**gentleman** [1] -
 154:22
**girlfriend** [2] - 187:9,
 265:8
**Gisevich** [1] - 196:7
**gist** [3] - 88:8, 116:19,
 239:7
**given** [15] - 8:18, 9:8,
 9:10, 11:6, 16:14,
 41:7, 44:18, 49:11,
 83:22, 84:2, 91:23,
 92:4, 99:4, 270:2,
 285:7
**glad** [1] - 21:22

**global** [2] - 192:5,
 192:7
**goal** [2] - 15:7, 46:5
**goals** [3] - 16:5, 91:24,
 274:9
**God** [2] - 200:10,
 229:8
**Goldburger** [12] -
 185:3, 200:19,
 200:21, 201:2,
 201:9, 210:2,
 214:12, 214:13,
 247:6, 297:10,
 297:23
**goldburger** [2] -
 185:18, 200:16
**gonna** [1] - 216:11
**Gorman** [113] - 2:15,
 8:2, 54:14, 77:20,
 85:13, 85:18, 86:2,
 90:2, 91:7, 94:12,
 96:5, 96:13, 97:15,
 98:15, 98:23, 99:3,
 100:9, 105:16,
 105:18, 106:9,
 106:23, 106:24,
 112:21, 113:3,
 113:10, 113:23,
 114:6, 117:11,
 118:19, 119:16,
 120:8, 121:6,
 121:12, 121:19,
 121:24, 123:11,
 124:4, 125:2, 125:6,
 125:16, 127:14,
 128:15, 128:22,
 129:1, 133:8,
 148:19, 148:23,
 149:6, 150:5, 150:9,
 156:17, 157:14,
 160:1, 164:2,
 167:11, 168:17,
 171:23, 176:7,
 176:11, 177:1,
 177:5, 177:18,
 184:18, 184:21,
 185:24, 186:11,
 191:23, 192:19,
 195:3, 197:10,
 198:16, 201:7,
 203:12, 206:4,
 206:18, 207:7,
 209:7, 209:8,
 209:22, 210:11,
 210:19, 237:3,
 237:13, 241:11,
 242:21, 243:1,
 244:10, 245:9,
 245:15, 247:14,
 259:4, 260:1, 260:3,

264:11, 265:12,
 266:22, 275:8,
 280:22, 280:23,
 280:24, 281:10,
 292:9, 293:6, 294:1,
 297:4, 298:21,
 298:22, 299:2,
 299:9, 299:14
**GORMAN** [6] - 1:5,
 75:12, 224:9,
 235:22, 236:2,
 260:10
**Gorman"** [1] - 184:19
**Gorman's** [22] - 54:2,
 54:24, 78:7, 115:21,
 116:24, 117:3,
 122:12, 167:18,
 174:21, 175:1,
 178:9, 178:20,
 193:15, 194:24,
 201:5, 202:4, 239:1,
 246:17, 252:14,
 284:20, 296:14,
 299:19
**government** [5] -
 139:1, 139:7,
 139:22, 141:6, 148:2
**grab** [1] - 292:20
**grand** [2] - 253:21,
 261:23
**grant** [4] - 226:1,
 226:2, 226:18,
 226:23
**granted** [1] - 226:15
**grants** [1] - 226:2
**grounds** [2] - 5:11,
 251:15
**group** [1] - 145:1
**grown** [1] - 282:3
**guess** [16] - 16:9,
 17:21, 67:18, 67:19,
 81:5, 93:14, 124:22,
 185:7, 190:12,
 210:17, 250:14,
 253:11, 258:12,
 258:13, 264:8
**guilty** [1] - 255:12
**gun** [7] - 20:7, 21:14,
 26:21, 27:16,
 108:21, 229:8, 292:8
**gut** [1] - 251:19
**guy** [1] - 138:13
**guys** [7] - 29:21,
 30:21, 100:17,
 103:4, 204:24,
 227:3, 227:9

## H

**Hal** [18] - 173:13,

224:24, 248:12,
 248:13, 249:16,
 249:17, 249:20,
 249:24, 251:1,
 251:4, 251:17,
 252:24, 270:5,
 276:9, 276:11,
 276:16, 284:17,
 295:18
**half** [1] - 212:12
**hall** [4] - 119:21,
 233:1, 278:10,
 278:11
**hand** [10] - 35:18,
 55:2, 55:7, 57:23,
 156:2, 176:17,
 230:14, 230:16,
 271:24, 303:20
**handed** [2] - 55:3,
 103:13
**handguns** [1] - 24:13
**handle** [7] - 36:6,
 49:8, 115:6, 127:6,
 127:8, 199:4, 263:23
**handled** [5] - 36:6,
 114:22, 125:11,
 200:17, 250:13
**handles** [1] - 169:4
**hands** [3] - 241:2,
 248:2, 253:21
**handwritten** [1] - 89:4
**handy** [1] - 248:13
**harassment** [7] -
 58:23, 59:2, 164:17,
 164:18, 171:21,
 171:22, 299:20
**hard** [2] - 229:14,
 249:17
**harm** [1] - 72:2
**harms** [1] - 256:14
**Hawk** [3] - 175:16,
 183:12, 293:1
**Hawk's** [2] - 178:2,
 183:3
**head** [23] - 4:17, 20:8,
 26:22, 27:17, 44:21,
 49:13, 50:20, 63:13,
 64:16, 64:20, 64:22,
 69:7, 69:11, 69:21,
 91:10, 222:6, 229:8,
 254:18, 262:23,
 270:19, 271:3,
 281:16
**heading** [1] - 302:4
**heads** [3] - 61:21,
 62:3, 64:14
**hear** [7] - 5:7, 68:18,
 116:3, 228:11,
 228:13, 228:16,
 277:24

**heard** [23] - 65:11, 81:16, 81:18, 96:18, 96:21, 97:9, 105:13, 115:17, 116:13, 116:14, 116:15, 116:16, 117:19, 225:18, 229:7, 229:10, 229:11, 229:13, 235:8, 238:22, 268:3, 287:2, 297:15
**hearing** [15] - 108:21, 212:20, 212:21, 212:23, 213:3, 213:16, 213:17, 213:19, 213:24, 214:1, 214:3, 214:10, 215:23, 278:2
**heavy** [1] - 197:9
**heck** [1] - 250:1
**held** [1] - 229:8
**hell** [2] - 186:13, 186:20
**Hello** [1] - 30:12
**hello** [1] - 37:14
**help** [5] - 32:19, 138:18, 226:11, 228:15, 282:15
**helpful** [1] - 133:24
**helping** [1] - 74:23
**HENDRY** [1] - 1:9
**Hendry** [3] - 77:12, 168:12, 168:21, 168:22, 169:13, 169:16, 170:15, 173:24, 174:1, 174:6, 174:8, 174:10, 182:6, 182:12, 196:11, 196:16, 233:11, 248:12, 249:16, 252:9, 267:21, 285:12, 295:19
**Hendry's** [5] - 171:5, 197:23, 249:23, 251:3, 283:16
**HEREBY** [1] - 3:2
**hereby** [6] - 3:5, 24:9, 24:12, 215:9, 302:5, 303:5
**hereof** [1] - 302:4
**hereto** [2] - 3:4, 303:17
**Hetman** [1] - 196:8
**Higgitt** [2] - 38:4, 38:13
**high** [4] - 143:20, 151:13, 154:19, 252:12

**higher** [5] - 11:1, 146:4, 148:12, 148:15, 243:2
**highest** [1] - 17:23
**highway** [4] - 19:2, 62:4, 182:19, 270:19
**himself** [3] - 81:24, 261:20, 281:11
**hire** [8] - 19:9, 19:12, 19:13, 27:17, 129:24, 130:13, 153:22, 212:16
**hired** [5] - 90:15, 199:19, 221:17, 254:20, 255:7
**histamines** [1] - 12:22
**history** [7] - 23:1, 71:12, 159:6, 188:11, 189:7, 250:11, 255:5
**hit** [2] - 37:17, 197:9
**hold** [7] - 133:23, 157:8, 162:20, 184:2, 192:15, 255:23, 294:7
**home** [17] - 29:11, 29:13, 29:15, 29:17, 29:18, 113:24, 127:14, 156:18, 158:3, 158:4, 174:21, 175:6, 184:19, 186:2, 191:17, 245:15, 296:15
**honest** [10] - 44:12, 71:11, 84:4, 89:9, 105:20, 114:17, 148:22, 211:24, 217:20, 225:20
**honestly** [2] - 229:16, 232:5
**hopefully** [1] - 251:22
**hostile** [1] - 283:5
**hour** [1] - 232:1
**hours** [2] - 46:22, 95:17
**house** [7] - 26:21, 44:8, 85:13, 85:18, 105:19, 237:4, 240:16
**housing** [1] - 42:16
**HR** [2] - 52:3, 76:19
**Human** [3] - 196:10, 204:11, 206:7
**human** [13] - 57:1, 57:8, 65:6, 65:8, 66:8, 76:12, 76:13, 77:8, 77:16, 135:23, 168:12, 169:19, 248:3

**HUMAN** [1] - 1:9
**humble** [1] - 242:9
**hung** [1] - 282:21
**hurts** [1] - 258:1
**hypothetical** [2] - 27:13, 27:21

---

**I**

**IA** [3] - 42:10, 90:7, 90:8
**idea** [23] - 9:8, 13:24, 21:15, 27:5, 27:10, 39:8, 52:18, 80:17, 81:16, 112:22, 117:13, 117:14, 117:17, 117:24, 124:9, 124:10, 127:18, 128:12, 224:19, 225:8, 225:12, 234:19, 244:12
**identification** [7] - 57:21, 155:2, 167:23, 216:23, 220:4, 285:2, 285:5
**identified** [2] - 175:15, 283:9
**identify** [3] - 15:14, 120:12, 122:23
**idle** [1] - 179:18
**illness** [1] - 208:5
**immediately** [4] - 24:10, 69:20, 165:6, 170:17
**imminent** [1] - 70:17
**Impact** [2] - 225:21, 226:10
**implement** [1] - 274:7
**implementation** [2] - 270:17, 272:6
**implemented** [3] - 52:16, 52:17, 132:6
**important** [13] - 21:20, 26:8, 26:9, 56:14, 56:16, 56:17, 56:20, 92:2, 104:6, 157:3, 275:6, 279:3, 296:13
**impression** [2] - 34:22, 198:4
**improper** [1] - 256:10
**inappropriate** [3] - 43:3, 45:9, 92:13
**Incident** [1] - 65:20
**incident** [42] - 20:22, 21:11, 21:16, 24:6, 26:12, 38:14, 39:15, 50:16, 57:5, 58:16, 65:2, 65:4, 67:8, 101:21, 119:20,

127:13, 157:14, 166:12, 167:4, 167:6, 172:9, 172:21, 173:8, 174:12, 175:15, 183:3, 188:1, 197:7, 201:9, 237:2, 247:22, 248:5, 250:9, 259:18, 265:20, 267:13, 288:21, 289:1, 289:13, 290:13, 293:1, 294:5
**incidents** [3] - 69:3, 174:4, 295:4
**include** [8] - 17:15, 31:2, 60:3, 60:20, 61:10, 181:1, 204:4, 252:24
**included** [6] - 40:15, 40:16, 51:18, 61:13, 137:2, 171:8
**includes** [4] - 60:24, 180:24, 197:23, 267:17
**including** [3] - 62:14, 215:5, 255:16
**Including** [1] - 214:23
**incorrect** [3] - 49:4, 288:14, 289:1
**incudes** [1] - 198:6
**independent** [2] - 203:15, 203:21
**INDEX** [2] - 301:1, 301:5
**indicate** [3] - 155:13, 180:3, 292:14
**indicated** [17] - 89:23, 101:21, 104:18, 105:3, 106:13, 147:24, 148:15, 148:20, 148:21, 155:8, 163:8, 178:5, 194:19, 267:23, 269:12, 283:24, 285:13
**indicates** [7] - 54:14, 135:11, 209:10, 217:14, 273:8, 284:19, 293:4
**indicating** [11] - 22:6, 95:22, 111:21, 120:7, 136:1, 136:23, 140:6, 140:18, 210:19, 261:1, 273:21
**individual** [2] - 140:11, 198:12
**individually** [4] - 35:23, 174:18,

185:6, 185:12
**individuals** [7] - 67:1, 70:15, 72:8, 136:24, 138:2, 152:14, 196:12
**infidelity** [1] - 266:6
**inflict** [1] - 58:18
**information** [61] - 16:3, 17:3, 31:18, 32:8, 33:9, 34:7, 34:8, 34:9, 39:11, 40:19, 85:10, 85:24, 86:7, 86:21, 87:11, 88:2, 88:11, 88:13, 88:14, 88:15, 88:16, 89:15, 89:19, 89:22, 90:23, 93:11, 99:4, 100:6, 100:7, 102:7, 103:20, 103:22, 104:15, 104:20, 106:8, 106:24, 108:5, 109:10, 110:5, 110:24, 111:2, 134:20, 134:23, 135:1, 135:5, 135:14, 135:18, 135:22, 136:6, 136:13, 157:22, 168:19, 210:4, 226:20, 247:17, 248:2, 248:8, 270:2, 292:16, 294:12, 294:20
**informational** [6] - 101:22, 119:2, 171:9, 276:5, 276:24, 277:1
**informational"** [1] - 119:1
**informed** [10] - 33:11, 39:3, 40:4, 40:7, 138:22, 201:11, 201:12, 209:20, 209:21, 209:24
**informs** [1] - 109:19
**initial** [2] - 164:1, 242:7
**initials** [1] - 170:8
**initiated** [2] - 39:9, 166:4
**injured** [2] - 166:18, 198:13
**injuries** [1] - 272:24
**injury** [3] - 58:19, 215:22, 273:2
**inmate** [3] - 15:22, 15:24, 202:22
**inmates** [1] - 159:6
**input** [1] - 259:12

**inquire** [1] - 219:13
**inside** [18] - 15:13,
15:15, 15:16, 19:4,
92:19, 167:3, 179:9,
187:11, 248:11,
250:12, 252:20,
255:3, 265:19,
266:10, 266:12,
266:16, 270:4
**instance** [2] - 48:6,
82:14
**instances** [1] - 166:14
**instant** [1] - 20:6
**instead** [4] - 47:14,
47:23, 48:24, 292:7
**Institute** [1] - 51:12
**instruct** [2] - 7:23,
134:9
**instructed** [2] -
125:17, 276:9
**instructions** [4] -
4:10, 4:13, 5:16,
238:10
**insubordinates** [1] -
126:7
**insurance** [1] - 255:11
**integrity** [2] - 40:13,
197:1
**intending** [1] - 293:22
**intent** [2] - 257:11
**intentionally** [1] -
299:18
**interaction** [2] -
112:20, 119:21
**interest** [1] - 294:24
**interested** [2] - 276:4,
303:18
**interests** [1] - 29:6
**interfere** [3] - 161:14,
161:19, 299:18
**internal** [13] - 16:15,
24:5, 25:9, 25:13,
31:23, 38:23, 40:3,
40:10, 67:8, 110:20,
189:2, 261:17,
261:18
**interpretation** [2] -
146:23, 147:14
**interrupted** [2] -
281:5, 282:17
**interruption** [1] -
235:1
**interview** [7] - 19:3,
94:20, 98:22,
105:16, 161:22,
161:23, 161:24
**interviewed** [14] -
20:2, 94:7, 94:9,
94:20, 96:4, 96:6,
96:8, 97:6, 97:15,

97:19, 127:3,
182:13, 272:9, 273:9
**interviews** [3] - 19:5,
98:14, 162:4
**investigate** [43] -
39:18, 67:9, 71:1,
73:22, 76:4, 76:6,
76:13, 79:3, 107:5,
107:14, 107:16,
107:24, 109:21,
110:3, 110:4,
110:19, 123:15,
161:22, 164:18,
165:10, 165:12,
165:16, 165:17,
166:15, 174:18,
174:19, 189:12,
192:18, 192:23,
193:24, 194:24,
196:22, 197:24,
247:21, 249:16,
264:24, 267:14,
283:15, 283:16,
289:18, 290:1,
295:19
**investigated** [16] -
21:16, 40:24, 57:1,
67:6, 78:6, 79:23,
106:14, 107:22,
123:19, 192:16,
193:10, 193:12,
193:14, 196:16,
246:17, 272:12
**investigating** [11] -
163:10, 193:20,
194:2, 197:13,
251:6, 253:3, 253:4,
253:6, 261:21,
270:6, 291:20
**Investigation** [1] -
247:5
**investigation** [111] -
19:16, 24:6, 25:10,
31:24, 32:8, 32:11,
33:3, 33:4, 33:6,
33:22, 38:17, 39:5,
39:8, 39:10, 40:3,
40:10, 40:13, 40:16,
40:23, 41:4, 41:6,
41:11, 41:13, 42:11,
43:1, 50:10, 59:13,
65:6, 67:2, 70:2,
70:5, 71:8, 71:24,
72:13, 73:7, 74:4,
76:7, 76:17, 76:20,
76:21, 76:24, 77:2,
77:18, 77:21, 77:24,
79:9, 79:10, 79:19,
82:9, 90:8, 159:19,
161:14, 161:15,

161:19, 162:9,
162:10, 162:14,
164:6, 164:7,
164:23, 165:6,
165:7, 166:4,
169:20, 176:8,
180:13, 180:20,
181:4, 182:8,
182:16, 188:20,
188:23, 189:2,
189:18, 193:5,
193:17, 194:5,
194:6, 194:10,
194:14, 194:15,
194:21, 195:8,
195:9, 196:15,
198:2, 246:20,
246:22, 250:7,
251:5, 251:7,
251:10, 251:12,
251:16, 252:10,
252:23, 253:19,
259:10, 261:17,
261:19, 261:20,
270:4, 270:14,
270:16, 271:6,
279:10, 284:20,
290:2, 290:5, 292:4,
296:2
**investigations** [2] -
13:12, 13:18
**Investigations** [2] -
32:21, 32:22
**investigator** [1] - 6:4
**involve** [2] - 69:4,
202:18
**involved** [48] - 9:20,
9:21, 18:17, 22:21,
30:16, 31:20, 32:2,
39:1, 40:2, 42:24,
44:6, 62:2, 64:4,
76:7, 78:22, 90:17,
91:2, 91:5, 93:21,
107:10, 110:11,
110:17, 182:16,
187:8, 188:17,
189:14, 189:18,
189:23, 193:3,
193:17, 197:9,
198:24, 199:16,
199:17, 204:14,
206:16, 206:23,
216:13, 222:15,
240:10, 240:13,
245:7, 259:16,
288:1, 289:5, 292:2
**involvement** [5] -
68:3, 193:19, 194:6,
200:14, 271:5
**involving** [10] - 20:6,

50:6, 51:20, 57:5,
78:23, 191:22,
194:10, 194:11,
196:5, 235:11
**irrational** [1] - 46:1
**IS** [3] - 3:2, 3:6, 3:9
**issue** [30] - 27:8, 28:1,
28:5, 32:18, 38:18,
42:8, 43:8, 43:10,
56:23, 56:24, 57:3,
57:4, 57:9, 57:10,
109:9, 166:5,
173:22, 181:15,
199:20, 201:11,
201:24, 202:2,
218:9, 219:10,
248:16, 253:22,
264:21, 267:2,
291:15
**issued** [12] - 163:23,
171:12, 171:16,
171:18, 181:11,
181:22, 183:23,
184:12, 244:10,
245:10, 245:16,
266:23
**issues** [25] - 20:3,
22:19, 35:4, 35:8,
36:2, 36:10, 36:14,
36:16, 36:21, 36:23,
37:2, 37:3, 37:5,
51:20, 52:3, 186:10,
192:6, 201:23,
226:12, 241:7,
243:1, 243:14,
248:14, 267:3, 267:5
**IT** [3] - 3:2, 3:6, 3:9
**item** [2] - 271:21,
271:22
**items** [2] - 110:19,
281:3
**itself** [6] - 73:8,
111:13, 111:19,
111:24, 284:23,
285:9

## J

**JACK** [5] - 1:8, 1:13,
4:1, 300:12, 302:10
**Jack** [1] - 34:4
**jail** [50] - 8:21, 11:9,
11:10, 13:16, 13:22,
13:23, 15:5, 15:9,
15:15, 15:16, 16:7,
16:12, 16:22, 17:19,
18:3, 31:22, 33:21,
34:2, 36:17, 37:12,
40:24, 41:4, 43:21,
56:10, 74:14, 80:23,

82:5, 82:12, 82:13,
84:8, 113:3, 120:3,
125:3, 125:18,
127:7, 150:3, 158:1,
159:6, 161:20,
174:20, 175:1,
175:6, 180:5,
193:19, 194:16,
223:8, 268:6,
268:20, 295:5
**jail'** [1] - 268:4
**January** [5] - 86:10,
119:16, 119:21,
138:11, 151:10
**Jason** [5] - 138:12,
138:19, 141:4,
155:4, 156:5
**jaw** [19] - 71:6, 72:7,
85:14, 85:19, 175:7,
177:3, 177:22,
178:18, 179:12,
179:15, 237:4,
242:5, 242:20,
246:10, 252:15,
268:23, 269:3,
275:15, 293:7
**jaws** [1] - 159:7
**Jim** [1] - 225:9
**JIMINO** [1] - 1:9
**job** [47] - 15:1, 15:4,
15:12, 22:15, 22:17,
22:23, 26:18, 42:7,
109:6, 110:21,
110:22, 127:3,
127:6, 138:19,
138:24, 139:12,
139:14, 139:22,
141:6, 148:1,
148:20, 148:21,
155:5, 163:2, 163:3,
165:16, 165:17,
199:20, 208:8,
209:1, 209:5,
209:12, 209:17,
242:2, 242:15,
243:17, 243:18,
243:21, 244:3,
256:11, 276:16,
276:17, 279:24,
281:6, 283:1, 286:18
**job-related** [1] -
199:20
**jobs** [5] - 18:8, 74:10,
74:14, 223:7, 223:9
**John** [54] - 2:15, 90:2,
91:7, 91:11, 94:12,
96:13, 96:22, 106:9,
106:24, 112:20,
113:3, 118:19,
119:15, 121:24,

148:23, 149:6,
150:9, 157:14,
158:21, 160:1,
160:3, 167:11,
168:17, 171:23,
184:18, 184:19,
184:21, 185:24,
206:3, 207:6, 209:7,
209:8, 213:23,
237:5, 237:13,
237:20, 237:21,
241:21, 243:22,
244:10, 244:16,
246:4, 246:9,
250:20, 266:5,
280:22, 280:23,
280:24, 294:1,
294:10, 294:15,
295:2, 295:3
**JOHN** [1] - 1:5
**Johnson** [2] - 128:3,
128:4
**judge** [11] - 23:24,
39:13, 111:13,
182:3, 183:21,
183:23, 184:12,
205:7, 208:11,
208:23, 209:5
**Judge** [5] - 24:1, 24:3,
24:15, 181:10, 205:6
**judge's** [1] - 209:9
**judgment** [1] - 258:17
**judgments** [3] - 52:1,
52:2, 258:18
**July** [4] - 197:7,
207:16, 207:18,
217:16
**jump** [1] - 250:23
**June** [3] - 1:13,
207:10, 213:11
**jury** [2] - 253:22,
261:23
**justice** [8] - 189:11,
190:2, 192:3, 257:6,
257:19, 258:24,
259:1, 282:10
**justify** [1] - 84:21

## K

**Karam** [15] - 31:19,
32:10, 33:1, 38:22,
39:9, 79:6, 81:8,
81:9, 81:14, 193:18,
195:8, 225:9,
225:15, 243:6
**Karam's** [1] - 227:22
**KATHLEEN** [1] - 1:9
**Keach** [3] - 235:14,
238:7, 285:12

**Keating** [4] - 7:2,
27:24, 28:1, 229:16
**keep** [21] - 56:18,
73:12, 75:15, 90:14,
93:24, 130:8,
179:24, 219:8,
226:16, 234:16,
239:6, 241:14,
247:20, 249:18,
259:17, 268:15,
270:21, 272:23,
279:17, 279:18,
281:16
**keeps** [1] - 169:4
**kept** [16] - 33:14, 94:1,
94:19, 114:13,
122:15, 122:17,
122:20, 208:15,
210:3, 210:4,
216:14, 229:16,
244:4, 247:22,
258:23, 287:23
**KEVIN** [1] - 2:12
**key** [8] - 120:8, 121:7,
121:12, 121:21,
122:12, 122:24,
278:5, 278:8
**keys** [10] - 121:24,
122:1, 122:2,
122:14, 122:17,
275:23, 276:8,
278:20, 278:22,
280:23
**Kim** [1] - 106:23
**kind** [7] - 93:15, 98:24,
149:13, 157:22,
261:1, 271:18,
271:19
**kinds** [3] - 150:17,
186:19, 240:5,
296:15, 296:23
kmartin@
martinrayhill.com
[1] - 2:12
**knowing** [3] - 33:13,
250:21, 296:5
**knowledge** [13] -
13:16, 17:8, 20:22,
75:4, 81:17, 81:18,
117:8, 117:9,
123:20, 125:12,
127:7, 204:7, 257:8
**known** [3] - 22:6,
26:24, 136:19
**knows** [3] - 40:14,
230:4, 291:24

## L

**label** [1] - 132:11

**labeled** [1] - 65:15
**Labor** [6] - 246:17,
246:24, 247:4,
270:17, 271:13,
299:10
**labor** [6] - 50:11,
197:3, 200:13,
202:15, 219:21,
270:13
**LaFountain** [4] -
220:6, 220:7, 220:8,
220:9
**laid** [2] - 231:22, 245:1
**last** [17] - 6:6, 33:3,
61:2, 68:18, 113:1,
120:15, 120:22,
121:1, 170:3, 177:1,
207:21, 218:10,
235:21, 275:9,
283:3, 291:18,
298:11
**lasted** [1] - 33:4
**launch** [2] - 162:8,
250:6, 250:10
**Laura** [3] - 217:13,
254:19, 255:8
**law** [21] - 13:12, 16:1,
17:9, 92:1, 108:21,
143:12, 162:3,
198:12, 212:21,
221:24, 222:2,
250:17, 255:1,
257:8, 257:9,
257:21, 258:12,
259:3, 261:4, 286:3
**Law** [7] - 1:13, 2:3,
2:9, 130:6, 142:8,
215:8, 215:19
**LAW** [1] - 2:3
**laws** [1] - 152:10
**lawsuits** [1] - 159:7
**lax** [1] - 34:18
**lead** [1] - 194:20
**leakage** [1] - 40:20
**learn** [1] - 149:4
**learning** [1] - 149:2
**least** [2] - 73:2, 88:22
**leave** [11] - 144:24,
146:11, 146:12,
146:15, 186:14,
187:7, 210:12,
210:16, 210:17,
217:15, 219:10
**leaves** [4] - 139:10,
139:13, 139:24,
233:3
**leaving** [3] - 35:8,
36:14, 36:22
**led** [3] - 41:14, 107:2,
241:23

**left** [13] - 34:14, 44:14,
81:9, 170:18,
207:14, 207:16,
215:14, 217:17,
218:11, 219:6,
232:14, 235:5, 275:9
**legal** [12] - 75:1, 75:5,
75:8, 75:17, 202:21,
212:1, 218:3, 218:9,
219:13, 222:15,
222:17, 298:4
**legally** [2] - 142:6,
261:13
**legible** [1] - 89:8
**legitimate** [3] - 5:13,
163:2, 163:3
**length** [1] - 162:6
**less** [4] - 40:20, 159:3,
221:11, 228:1
**letter** [11] - 89:23,
206:2, 210:18,
213:11, 213:14,
214:8, 215:12,
218:5, 219:18,
272:9, 273:16
**letters** [1] - 263:21
**letting** [1] - 172:3
**level** [11] - 36:6, 36:7,
43:6, 67:13, 67:17,
67:22, 92:11, 92:12,
242:16, 243:2, 243:4
**liaison** [2] - 32:24,
33:1
**lieu** [2] - 47:2, 274:4
**Lieutenant** [16] -
31:19, 79:6, 81:8,
81:9, 81:14, 82:11,
82:22, 83:1, 83:11,
83:20, 84:5, 91:9,
122:3, 193:18,
195:8, 196:8
**lieutenant** [19] - 7:15,
7:16, 9:22, 10:18,
16:15, 33:24, 34:7,
38:21, 38:22, 40:7,
84:1, 94:15, 96:6,
110:2, 114:21,
122:7, 125:11,
149:17
**lieutenants** [1] - 36:8
**life** [6] - 59:1, 59:2,
187:2, 187:6,
279:18, 280:19
**light** [7] - 222:21,
222:24, 223:2,
223:4, 223:6, 223:9,
223:11
**likely** [2] - 28:22, 73:6
**limitation** [1] - 194:20
**limited** [1] - 60:20

**line** [27] - 28:24,
108:17, 198:13,
228:24, 230:2,
237:11, 238:7,
240:2, 241:9,
241:12, 244:11,
247:8, 247:11,
247:16, 250:6,
254:4, 254:13,
261:6, 263:22,
287:22, 288:15,
290:9, 290:18,
292:5, 295:8, 296:12
**list** [49] - 18:18,
129:10, 129:11,
129:21, 130:3,
130:4, 130:8,
130:15, 131:4,
131:5, 131:6,
132:17, 133:2,
133:3, 134:21,
136:9, 136:23,
137:13, 137:17,
137:19, 138:1,
138:3, 139:2, 139:8,
139:10, 139:11,
139:23, 140:14,
140:16, 141:8,
141:9, 141:18,
141:19, 147:18,
148:3, 148:9,
150:14, 151:12,
152:3, 155:7, 156:9,
260:12, 262:8,
286:24, 287:4,
287:5, 287:12,
287:13
**litany** [1] - 238:9
**live** [1] - 165:15
**local** [1] - 165:17
**located** [1] - 51:13
**location** [1] - 119:19
**locations** [1] - 16:22
**locked** [1] - 122:18
**log** [2] - 272:23, 273:5
**logbook** [1] - 123:12
**logical** [2] - 216:5,
216:7
**look** [70] - 9:10, 16:14,
18:22, 19:11, 19:21,
19:24, 20:4, 22:10,
23:1, 23:10, 26:5,
34:23, 55:8, 57:24,
71:12, 71:13, 75:14,
76:10, 76:22, 77:6,
86:15, 86:16, 87:3,
87:16, 87:19, 91:3,
101:15, 103:4,
105:23, 108:6,
108:24, 109:1,

109:5, 109:6,
110:21, 112:7,
118:12, 119:11,
133:9, 142:13,
159:20, 172:22,
173:1, 173:8, 181:8,
184:24, 207:20,
211:8, 214:15,
216:8, 217:2,
227:23, 233:5,
234:9, 249:8,
249:21, 251:1,
253:12, 257:6,
257:14, 257:19,
259:1, 263:6,
265:14, 270:11,
274:16, 295:21,
295:22, 295:24,
296:7
**looked** [25] - 17:4,
78:8, 79:5, 103:3,
108:7, 109:2, 109:8,
110:9, 170:10,
170:13, 176:2,
183:3, 194:18,
195:16, 218:15,
233:6, 239:23,
252:24, 253:14,
258:4, 265:14,
266:3, 282:9,
282:12, 293:3
**looking** [34] - 15:13,
22:23, 26:10, 37:16,
75:17, 96:17, 96:23,
106:18, 107:8,
112:11, 133:10,
133:16, 133:17,
134:15, 137:4,
142:10, 147:12,
151:4, 152:2,
163:16, 169:22,
172:24, 173:1,
181:7, 181:18,
189:6, 215:24,
216:3, 260:8, 267:6,
267:20, 270:21,
275:17, 290:8
**looks** [1] - 133:8
**loop** [1] - 210:5
**lose** [2] - 129:20,
129:23
**losing** [2] - 50:2,
245:20
**lost** [7] - 128:16,
129:6, 191:15,
191:16, 191:19,
191:20
**low** [1] - 30:19
**lowest** [1] - 242:16
**Lucy** [7] - 138:12,

138:19, 141:4,
142:16, 147:24,
155:4, 156:5
**lunch** [6] - 75:24,
100:13, 100:16,
100:18, 101:4,
101:11
**lying** [3] - 71:14,
71:18, 71:19

# M

**mad** [2] - 278:14,
280:18
**Mahar** [6] - 4:8, 27:13,
34:4, 94:16, 101:14,
196:9
**MAHAR** [5] - 1:8, 1:13,
4:1, 300:12, 302:10
**mail** [1] - 60:21
**maintain** [2] - 41:9,
62:6
**maintenance** [6] -
57:6, 80:4, 80:9,
80:13, 82:18, 82:21
**major** [2] - 201:22,
208:4
**male** [2] - 224:2, 225:2
**man** [3] - 148:24,
225:11, 277:6
**MANAGER** [1] - 1:9
**mandated** [1] - 61:24
**mandatory** [2] - 62:17,
62:21
**manuals** [1] - 274:19
**Marcelle** [26] - 86:14,
94:21, 95:10, 98:9,
98:18, 105:24,
120:7, 120:13,
120:16, 134:17,
135:1, 135:17,
150:15, 150:19,
168:10, 168:22,
169:3, 170:2,
170:14, 213:21,
215:13, 223:21,
224:1, 228:9,
232:14, 277:1
**Marcelle's** [4] -
160:12, 230:13,
232:15, 232:21
**Marcelli** [16] - 43:18,
43:23, 44:1, 44:10,
51:1, 51:2, 108:18,
108:19, 196:6,
197:8, 275:22,
275:24, 276:6,
276:7, 276:9, 277:19
**March** [9] - 23:23,
126:1, 147:9,

168:14, 168:17,
169:24, 172:16,
269:9, 269:21
**mark** [3] - 235:20,
236:13, 236:15
**Mark** [2] - 106:24,
281:10
**marked** [42] - 23:7,
25:17, 55:2, 57:20,
57:23, 69:1, 104:9,
104:12, 118:11,
119:9, 132:9,
146:21, 155:1,
155:10, 167:20,
167:22, 168:3,
175:12, 175:14,
184:10, 195:12,
200:1, 205:20,
207:5, 211:1, 213:6,
214:5, 216:20,
216:22, 217:1,
219:24, 220:3,
220:13, 235:22,
256:1, 262:1, 283:8,
284:16, 284:23,
285:1, 285:4, 288:10
**married** [2] - 120:18,
170:6
**Martin** [2] - 74:22,
185:11
**martin** [5] - 185:5,
186:4, 284:9, 298:9,
298:14
**MARTIN** [59] - 2:9,
2:12, 12:19, 24:21,
27:2, 27:19, 31:8,
31:12, 59:16, 59:20,
67:3, 71:9, 72:9,
73:18, 74:6, 75:7,
75:10, 75:21, 85:15,
95:13, 100:21,
101:1, 101:10,
107:17, 108:1,
111:7, 111:10,
111:12, 111:15,
111:18, 111:22,
114:7, 118:5,
122:20, 133:7,
160:15, 160:19,
167:24, 178:11,
178:21, 203:22,
209:14, 209:19,
211:22, 218:19,
218:22, 236:8,
236:11, 236:16,
236:22, 259:13,
260:8, 260:12,
274:11, 274:13,
284:5, 284:13,
293:11, 300:8

**martin's** [1] - 185:9
**master** [27] - 10:4,
10:8, 10:11, 10:12,
10:22, 10:23, 11:3,
11:13, 11:23, 14:3,
14:10, 14:21, 14:24,
15:2, 16:16, 17:5,
21:7, 27:1, 48:11,
91:22, 91:23,
107:15, 174:24,
179:14, 191:19,
193:16, 279:2
**Master** [12] - 12:2,
13:21, 22:9, 28:12,
28:15, 39:19, 85:7,
117:10, 122:9,
123:11, 193:12,
195:8
**matter** [18] - 23:10,
34:23, 91:4, 168:5,
181:23, 190:8,
207:6, 212:24,
213:4, 235:11,
237:6, 264:18,
267:7, 286:20,
300:1, 300:4,
300:13, 303:19
**matters** [4] - 30:8,
40:9, 172:22, 236:18
**McGrath** [3] - 24:1,
24:3, 24:15
**McIntyre** [8] - 203:6,
203:12, 203:17,
203:24, 205:2,
205:14, 205:17,
205:24
**McIntyre's** [1] - 203:14
**mean** [56] - 11:8,
11:15, 11:20, 13:1,
16:20, 19:12, 23:19,
29:24, 36:3, 36:12,
36:18, 46:3, 48:10,
57:10, 58:3, 74:11,
76:5, 80:12, 80:15,
87:1, 93:5, 96:18,
101:22, 129:19,
133:4, 135:6,
137:12, 138:1,
143:6, 156:24,
163:20, 163:21,
164:7, 171:19,
176:22, 184:20,
185:8, 188:13,
201:6, 203:16,
205:1, 217:4, 236:8,
237:18, 240:9,
245:17, 246:4,
246:14, 247:18,
249:3, 258:5,
263:20, 265:10,

286:10, 288:20,
297:12
**meaning** [3] - 124:14,
163:1, 293:21
**means** [3] - 5:2, 135:7,
135:12
**meant** [4] - 46:1,
224:9, 246:11,
252:12
**measures** [1] - 242:12
**medical** [8] - 202:20,
202:21, 220:20,
220:23, 221:13,
221:23, 260:6,
262:16
**medically** [1] - 222:4
**meet** [5] - 19:18,
32:20, 62:6, 127:2,
262:18
**meeting** [9] - 35:23,
88:17, 88:18,
273:16, 294:1,
294:9, 294:12,
294:14, 294:18
**member** [4] - 20:9,
26:23, 47:1, 66:22
**member's** [1] - 179:15
**members** [9] - 25:5,
42:17, 91:19,
162:12, 194:7,
264:7, 264:8,
266:14, 266:18
**memorializing** [1] -
100:11
**memory** [1] - 75:4
**men's** [1] - 284:7
**mention** [2] - 10:11,
291:9
**mentioned** [4] - 50:4,
63:11, 93:16, 276:5
**met** [13] - 12:13,
32:13, 32:16, 32:21,
33:10, 91:5, 91:6,
93:21, 93:23,
105:10, 108:2,
138:13, 159:22
**midway** [1] - 275:10
**might** [40] - 14:14,
30:11, 39:2, 42:15,
45:9, 46:3, 46:8,
47:7, 71:3, 78:14,
84:10, 86:13, 86:16,
88:6, 88:23, 89:6,
93:1, 98:18, 113:12,
122:18, 124:22,
148:7, 148:8,
150:20, 157:5,
179:2, 183:11,
191:10, 195:23,
196:2, 199:22,

214:8, 214:12,
217:23, 228:15,
255:10, 255:11,
262:24, 286:1
**mind** [2] - 118:13,
217:11
**mine** [2] - 29:10,
132:21
**minimal** [1] - 72:10
**minimize** [2] - 40:19,
240:5
**minute** [4] - 101:1,
270:8, 283:22,
287:18
**minutes** [7] - 95:24,
100:24, 101:3,
233:3, 284:1, 284:2,
284:14
**miscommunication**
[1] - 21:13
**misconstrued** [1] -
266:1
**misdemeanor** [7] -
171:8, 171:9,
190:18, 190:23,
191:1, 255:13,
255:18
**misinterpretation** [1] -
35:1
**misinterpreting** [1] -
226:18
**miss** [1] - 37:18
**mistake** [3] - 244:19,
258:3, 258:17
**mistakes** [2] - 258:18,
282:7
**misuse** [3] - 26:7,
192:2, 257:5
**MMC** [2] - 170:1, 170:9
**MMS** [1] - 170:9
**moment** [5] - 115:13,
157:8, 184:2,
238:21, 255:23
**money** [4] - 46:21,
245:21, 245:23,
255:9
**monitor** [15] - 15:8,
15:17, 16:23, 37:21,
71:17, 74:8, 159:23,
162:18, 163:11,
163:18, 167:3,
167:5, 179:24,
249:24, 251:1
**monitored** [5] - 15:21,
67:14, 76:14, 179:8,
180:3
**monitoring** [4] - 15:5,
180:8, 181:8, 252:7
**monitors** [1] - 189:10
**month** [3] - 86:7,

112:19, 127:19
**months** [5] - 20:14,
21:1, 46:8, 191:15,
283:3
**moreover** [1] - 51:20
**morning** [4] - 4:6,
12:20, 167:2, 232:1
**Morren** [3] - 136:16,
137:4, 142:1
**Morse** [3] - 122:17,
122:21, 122:22
**most** [12] - 31:16,
39:1, 46:20, 50:14,
62:13, 77:4, 82:16,
115:7, 198:20,
199:5, 283:12, 298:3
**mostly** [1] - 30:9
**motorcycle** [1] - 44:4
**motorcycles** [1] - 29:7
**mouth** [2] - 157:19,
268:15
**move** [10] - 39:16,
143:2, 156:11,
212:10, 218:8,
219:13, 219:14,
219:15, 219:19,
250:23
**moved** [2] - 48:11,
66:4
**moving** [1] - 64:24
**MR** [191] - 4:5, 12:19,
12:24, 13:4, 23:2,
23:5, 23:6, 24:21,
24:23, 27:2, 27:19,
31:8, 31:10, 31:12,
37:24, 38:2, 38:3,
54:8, 54:11, 54:13,
57:18, 57:22, 59:16,
59:20, 65:10, 65:14,
66:13, 66:16, 67:3,
71:9, 72:9, 73:18,
74:6, 74:20, 74:22,
75:7, 75:9, 75:10,
75:12, 75:14, 75:21,
75:22, 76:1, 79:14,
80:18, 80:20, 85:15,
89:1, 89:3, 95:13,
95:18, 95:23, 96:3,
100:13, 100:21,
101:1, 101:2,
101:10, 101:12,
101:13, 103:7,
103:12, 107:17,
108:1, 111:7, 111:8,
111:10, 111:11,
111:12, 111:14,
111:15, 111:16,
111:18, 111:20,
111:22, 112:5,
114:7, 114:8,

115:12, 115:16,
116:3, 116:10,
116:12, 118:5,
118:7, 118:9,
122:20, 123:2,
123:5, 133:7,
133:11, 133:13,
133:15, 133:21,
133:23, 134:5,
134:8, 134:14,
154:22, 155:3,
155:23, 160:15,
160:17, 160:19,
160:24, 167:20,
167:24, 168:1,
168:2, 178:11,
178:21, 185:15,
185:17, 187:19,
187:21, 203:22,
207:1, 207:3,
209:14, 209:19,
211:22, 216:20,
216:24, 218:19,
218:22, 218:23,
219:24, 220:5,
223:16, 223:19,
224:9, 228:10,
228:15, 228:20,
229:1, 229:4, 231:8,
235:2, 235:4,
235:20, 235:22,
235:24, 236:2,
236:4, 236:8, 236:9,
236:11, 236:13,
236:16, 236:17,
236:22, 236:24,
238:3, 238:5,
254:10, 254:12,
259:13, 259:15,
260:8, 260:10,
260:12, 260:13,
270:7, 270:10,
274:11, 274:12,
274:13, 274:21,
274:23, 275:1,
277:24, 283:21,
283:24, 284:5,
284:6, 284:9,
284:11, 284:13,
284:15, 285:3,
285:6, 285:10,
287:18, 287:20,
293:11, 298:9,
298:13, 298:19,
300:8, 300:10, 301:2
**multiple** [3] - 153:19,
161:24, 162:4
**municipality** [1] -
198:14
**must** [5] - 69:20,
94:24, 212:7,

221:20, 272:13

# N

**name** [23] - 44:20,
54:6, 79:13, 120:15,
120:22, 121:2,
124:7, 154:12,
154:13, 154:14,
156:4, 169:6, 169:9,
170:3, 183:12,
205:8, 212:17,
217:7, 217:12,
240:15, 276:4
**name's** [1] - 212:3
**named** [4] - 220:9,
272:8, 303:6, 303:10
**names** [3] - 45:2,
108:21, 130:17
**narrative** [1] - 112:12,
118:12
**nature** [1] - 58:23,
127:9, 295:6
**near** [2] - 125:23,
167:11
**necessarily** [6] - 8:19,
83:24, 117:7, 148:4,
179:2, 179:17
**necessary** [20] - 20:5,
22:12, 23:1, 67:16,
69:17, 71:3, 71:7,
71:17, 243:19
**need** [21] - 16:24,
36:10, 87:2, 92:3,
95:13, 100:18,
112:1, 116:2,
133:23, 159:16,
166:9, 166:11,
222:22, 231:3,
233:5, 235:6,
239:12, 251:11,
262:16, 290:6
**needed** [7] - 14:18,
15:1, 15:19, 16:3,
17:12, 32:12, 40:17
**needs** [3] - 45:10,
241:21, 282:15
**negatives** [1] - 46:24
**negotiated** [5] - 47:17,
49:17, 49:24, 50:5,
50:6
**negotiating** [1] - 50:11
**negotiation** [1] -
253:24
**negotiations** [3] -
241:4, 259:20,
297:10
**neighbor** [1] - 165:11
**nephew** [1] - 279:15
**neutral** [3] - 40:17,

268:15, 268:19
**never** [55] - 9:20, 13:8,
18:24, 22:8, 29:17,
30:23, 44:6, 52:23,
53:2, 53:3, 56:21,
81:16, 81:18, 83:14,
83:18, 97:9, 97:18,
105:13, 109:14,
115:18, 128:13,
128:14, 138:13,
140:1, 147:24,
148:23, 149:3,
149:13, 153:3,
155:21, 162:4,
195:6, 200:11,
202:6, 205:2,
206:11, 209:24,
224:17, 225:1,
225:8, 229:11,
229:12, 234:3,
235:22, 239:23,
242:13, 243:10,
253:20, 260:7,
262:5, 270:2, 274:5,
291:9, 293:17
**NEW** [2] - 1:2, 302:1
**new** [4] - 9:4, 51:22,
62:18, 62:22
**New** [9] - 1:15, 1:17,
2:4, 2:10, 90:7,
155:15, 214:24,
215:7, 303:4
**next** [15] - 34:4, 88:20,
108:13, 129:12,
129:18, 131:1,
131:5, 131:10,
132:1, 144:8, 144:9,
144:24, 145:10,
165:15, 271:1
**nice** [1] - 90:15
**night** [4] - 177:1,
177:18, 269:4, 270:1
**nine** [5] - 65:17, 156:3,
230:2, 237:11,
296:12
**nobody** [5] - 33:13,
35:18, 192:22,
223:8, 296:9
**nobody's** [2] - 163:16,
163:17
**non-207-C** [1] - 223:6
**None** [1] - 301:19
**none** [9] - 44:9, 97:17,
152:17, 198:20,
198:21, 198:22,
198:23, 235:5, 270:1
**nonetheless** [1] -
79:18
**normal** [2] - 59:1,
199:3

**normally** [8] - 66:5, 76:9, 76:14, 204:17, 205:3, 212:9, 222:14, 223:4
**north** [1] - 9:5
**NORTHERN** [1] - 1:2
**NOS** [1] - 301:7
**not"** [1] - 177:15
**Notary** [5] - 1:16, 3:10, 4:2, 302:17, 303:4
**note** [1] - 119:9
**noted** [1] - 302:4
**notes** [3] - 75:1, 75:10, 75:18
**nothing** [23] - 30:2, 77:9, 90:6, 92:23, 126:12, 163:17, 194:4, 195:2, 195:5, 205:18, 209:6, 264:14, 266:15, 276:3, 277:15, 278:15, 280:5, 280:20, 280:21, 281:7, 281:13, 292:14, 303:7
**notice** [2] - 189:15, 272:15
**Notice** [3] - 271:2, 271:12, 273:23
**noticed** [1] - 74:24
**notified** [1] - 24:4
**notify** [2] - 182:23, 183:9
**November** [6] - 16:10, 108:17, 113:21, 114:7, 119:10, 123:7
**number** [32] - 16:13, 22:18, 27:6, 131:5, 131:6, 131:10, 140:10, 140:12, 142:1, 142:2, 142:3, 145:1, 145:4, 145:8, 145:9, 145:10, 145:14, 145:15, 148:9, 148:10, 152:8, 153:17, 174:21, 175:2, 175:5, 228:23, 236:11, 256:6, 272:3
**numbers** [2] - 144:11, 175:4
**nursing** [2] - 50:21, 51:3

## O

**oath** [1] - 77:13
**object** [24] - 5:3, 5:7, 27:2, 27:19, 59:16, 59:20, 67:3, 71:9,

72:9, 73:18, 74:6, 85:15, 107:17, 108:1, 160:15, 178:11, 178:21, 203:22, 209:14, 211:22, 218:19, 218:22, 293:11, 300:8
**objection** [3] - 111:7, 160:18, 209:19
**objections** [2] - 3:7, 5:4
**objectives** [1] - 274:10
**objects** [1] - 5:10
**obligation** [1] - 42:22
**observation** [1] - 66:10
**observed** [1] - 97:7
**obvious** [1] - 140:21
**obviously** [3] - 105:8, 182:5, 188:19
**occasion** [3] - 200:24, 238:8, 289:22
**occasions** [1] - 289:21
**occupational** [1] - 272:23
**occur** [2] - 157:19, 158:1
**occurred** [9] - 24:7, 72:15, 98:2, 157:24, 158:2, 264:7, 265:20, 266:6
**October** [17] - 31:5, 106:21, 112:17, 112:23, 112:24, 113:4, 113:21, 114:7, 118:22, 119:16, 120:24, 121:6, 123:6, 172:23, 173:22, 215:10, 280:11
**OF** [3] - 1:2, 2:3, 302:1
**off-of-key** [1] - 121:7
**off-site** [1] - 166:8
**offense** [1] - 256:17
**offered** [2] - 297:4, 298:7
**OFFICE** [1] - 2:3
**office** [66] - 14:22, 16:1, 21:17, 21:20, 37:8, 37:13, 54:15, 57:2, 62:9, 63:17, 64:22, 66:3, 66:5, 66:8, 68:6, 82:10, 86:19, 86:22, 87:7, 94:19, 98:7, 98:8, 98:16, 98:20, 108:18, 116:8, 116:11, 125:8,

143:9, 160:12, 164:2, 167:16, 168:17, 169:7, 169:11, 171:6, 173:17, 204:10, 210:3, 210:12, 210:19, 210:22, 210:23, 217:17, 219:11, 224:6, 230:13, 232:2, 232:15, 232:18, 232:22, 233:2, 233:13, 233:21, 233:22, 249:10, 249:12, 249:23, 250:19, 251:3, 266:21, 276:7, 280:7, 283:16, 299:6, 299:8
**Office** [11] - 1:14, 32:5, 189:18, 189:22, 190:9, 204:13, 206:8, 215:9, 219:2, 264:11, 287:9
**officer** [10] - 5:24, 6:3, 19:4, 28:16, 41:9, 63:4, 124:7, 124:13, 124:18, 226:11
**Officer** [2] - 188:7, 188:17
**officer's** [2] - 72:7, 132:19
**officers** [11] - 7:10, 7:12, 8:17, 18:14, 19:22, 41:2, 51:19, 53:9, 69:10, 72:6, 257:10
**official** [3] - 63:23, 141:20, 182:10
**often** [1] - 201:22
**once** [12] - 30:18, 83:17, 83:20, 108:9, 109:12, 110:12, 145:13, 159:9, 174:5, 205:6, 247:24, 248:2
**one** [146] - 7:21, 10:14, 15:20, 18:20, 22:18, 25:4, 25:22, 27:6, 30:14, 30:17, 34:21, 35:5, 44:20, 48:5, 52:14, 53:9, 53:15, 53:21, 54:1, 57:7, 58:17, 59:8, 65:1, 72:5, 73:7, 76:16, 77:11, 80:18, 88:23, 102:5, 102:12, 104:5, 107:19, 114:21, 115:6,

115:9, 118:6, 126:22, 129:9, 129:20, 130:14, 131:1, 131:5, 131:16, 131:20, 131:22, 132:1, 133:10, 140:6, 140:10, 140:12, 140:19, 141:10, 142:1, 142:13, 142:17, 143:4, 143:9, 143:11, 143:12, 143:20, 143:22, 144:4, 144:8, 144:18, 144:19, 145:3, 145:4, 145:14, 145:16, 145:18, 145:20, 147:19, 148:10, 149:23, 152:15, 153:17, 153:21, 157:7, 159:12, 160:20, 165:2, 165:14, 165:15, 169:3, 174:6, 175:13, 176:12, 176:22, 184:2, 186:8, 192:8, 192:9, 196:14, 196:16, 199:11, 200:5, 200:6, 201:2, 207:10, 213:1, 213:2, 214:4, 225:8, 229:11, 233:19, 234:1, 234:7, 234:9, 234:11, 236:2, 238:10, 242:4, 244:8, 246:22, 248:4, 248:5, 249:21, 259:16, 260:6, 271:1, 271:21, 271:22, 272:7, 273:2, 274:21, 277:1, 277:2, 277:11, 277:18, 277:20, 285:13, 286:4, 289:22, 290:17, 291:16, 291:17, 291:18, 296:8, 296:13, 296:23, 296:24
**one-page** [1] - 234:1
**ones** [3] - 35:22, 144:16, 206:16
**ongoing** [1] - 279:10
**open** [13] - 34:14, 35:8, 36:14, 36:22, 68:5, 68:6, 68:8, 69:8, 139:8, 140:15, 198:1, 202:22, 223:7

**open-door** [4] - 68:5, 68:6, 68:8, 69:8
**opened** [2] - 16:9, 32:23
**opening** [2] - 211:17, 222:5
**opinion** [5] - 154:19, 237:12, 242:9, 265:22, 267:3
**opportunity** [4] - 55:10, 73:22, 224:21, 239:13
**options** [1] - 146:16
**oral** [6] - 19:7, 19:8, 19:10, 19:14, 78:19, 173:21
**orally** [1] - 98:5
**Order** [2] - 183:21, 183:23
**order** [18] - 32:9, 72:22, 72:24, 82:14, 82:19, 114:9, 136:20, 145:16, 181:14, 184:3, 184:6, 218:4, 218:5, 219:18, 231:13, 239:3, 271:12, 273:24
**ordered** [4] - 41:17, 76:10, 218:4, 219:17
**Orders** [1] - 163:23
**orders** [7] - 39:20, 39:21, 42:2, 72:19, 72:20, 82:16
**ordinary** [2] - 175:10, 175:11
**organization** [8] - 32:19, 33:2, 33:15, 35:16, 92:2, 109:23, 164:22
**orientation** [2] - 62:19, 62:22
**original** [1] - 200:3
**originally** [2] - 114:19, 120:16
**otherwise** [2] - 7:23, 134:9
**outcome** [7] - 26:12, 59:12, 67:10, 68:1, 79:17, 192:4, 303:19
**outcomes** [6] - 27:7, 79:21, 109:3, 161:17, 197:18, 229:19
**outright** [1] - 230:10
**outside** [34] - 29:5, 29:21, 30:3, 30:5, 30:6, 33:15, 34:15, 35:9, 40:11, 43:23, 158:1, 158:2,

159:19, 161:20,
162:11, 165:9,
165:10, 166:15,
174:24, 175:5,
191:18, 194:1,
232:24, 241:14,
247:17, 247:20,
248:8, 252:18,
265:21, 266:6,
266:15, 267:10,
279:17, 279:18
**outstanding** [1] -
218:9
**overnight** [2] - 30:21,
30:23
**oversaw** [1] - 227:14
**oversee** [1] - 19:3
**overseeing** [1] - 11:7
**oversees** [1] - 189:10
**overtime** [2] - 46:21,
226:7
**own** [6] - 75:4, 79:24,
165:7, 181:3, 187:5,
222:18
**ownerships** [2] - 9:16,
9:17

**P**

**P.C** [1] - 2:9
**p.m** [1] - 300:11
**package** [1] - 174:14
**packet** [1] - 172:17
**pad** [4] - 75:1, 75:5,
75:8, 75:18
**page** [75] - 55:9,
55:21, 55:22, 58:14,
58:15, 59:8, 61:16,
64:10, 65:1, 65:2,
65:15, 65:16, 65:18,
68:23, 68:24, 69:1,
69:19, 90:3, 90:11,
103:5, 103:18,
103:24, 106:18,
108:16, 110:23,
112:6, 112:12,
118:12, 145:17,
156:2, 165:22,
168:7, 169:22,
175:18, 176:18,
181:18, 207:8,
211:4, 217:11,
218:12, 228:23,
229:5, 230:1,
231:20, 234:1,
234:9, 237:11,
238:6, 240:2, 241:9,
244:8, 247:8,
254:13, 256:2,
256:4, 260:14,

262:6, 263:22,
268:12, 270:11,
270:13, 271:1,
275:4, 275:11,
285:11, 287:21,
292:5, 295:8, 296:12
**PAGE** [1] - 301:7
**page/line** [1] - 236:23
**pages** [8] - 88:22,
88:24, 89:4, 102:12,
103:15, 155:23,
234:18, 283:10
**paid** [2] - 26:15,
217:24
**Palmary** [1] - 217:9
**Pandora's** [1] - 223:7
**paper** [2] - 102:15,
269:14
**paperwork** [5] -
150:16, 173:18,
175:24, 176:1
**paragraph** [14] - 59:9,
60:19, 61:2, 69:2,
69:19, 106:20,
107:21, 108:13,
108:16, 176:20,
176:23, 196:3,
207:21, 268:2
**parallel** [1] - 77:18
**parameters** [5] -
40:22, 43:17,
262:21, 262:22,
298:8
**part** [32] - 13:12,
18:21, 30:10, 33:20,
33:21, 47:24, 50:10,
50:12, 59:14, 59:18,
68:18, 78:11, 78:19,
82:13, 92:6, 92:8,
105:12, 174:14,
174:15, 175:9,
175:10, 182:14,
196:14, 198:20,
206:14, 209:16,
213:10, 216:10,
227:2, 240:2, 242:1,
273:8
**participate** [1] - 297:9
**particular** [5] - 9:11,
9:13, 196:23, 202:2,
203:3
**particulars** [1] -
148:22
**parties** [3] - 3:3, 4:24,
268:19
**parts** [1] - 175:8
**party** [4] - 22:21,
96:15, 157:11,
268:15
**pass** [1] - 294:20

**past** [6] - 18:22, 19:21,
144:5, 282:5, 282:8,
283:2
**Pat** [4] - 202:3,
229:22, 230:3,
270:22
**paths** [1] - 195:6
**patience** [1] - 236:18
**PATRICELLI** [1] - 1:8
**Patricelli** [180] - 9:23,
12:2, 12:14, 13:21,
17:5, 20:7, 21:6,
21:14, 22:10, 24:4,
26:19, 28:3, 28:13,
28:15, 30:14, 31:1,
31:15, 31:19, 32:10,
32:24, 33:20, 34:5,
34:11, 34:21, 35:22,
36:23, 37:8, 38:12,
38:18, 38:24, 39:10,
39:19, 40:6, 41:17,
43:9, 44:5, 47:6,
47:12, 48:1, 48:4,
48:7, 49:3, 50:7,
81:1, 81:9, 81:13,
83:7, 83:14, 84:5,
84:7, 84:14, 85:8,
85:12, 85:17, 86:5,
86:19, 92:16, 92:17,
93:18, 96:9, 96:19,
97:24, 99:20, 100:5,
102:3, 102:10,
103:20, 104:1,
104:14, 104:18,
105:6, 105:7,
105:14, 105:18,
106:4, 106:9,
106:14, 106:16,
108:2, 108:10,
108:16, 109:13,
110:1, 110:14,
111:3, 113:2, 113:9,
113:22, 114:2,
117:10, 120:9,
121:18, 122:9,
123:11, 125:2,
125:6, 127:14,
127:23, 149:10,
149:11, 149:13,
156:18, 157:15,
158:3, 158:20,
160:1, 162:21,
167:10, 171:10,
174:20, 176:21,
177:4, 177:11,
177:23, 178:8,
178:12, 183:24,
186:9, 187:5,
187:17, 188:3,
189:6, 190:1, 190:7,

191:8, 191:13,
192:17, 193:16,
193:24, 195:9,
208:3, 208:5, 208:6,
208:24, 209:10,
224:9, 224:18,
225:20, 226:6,
226:23, 227:19,
237:14, 240:11,
242:7, 244:9,
244:15, 244:17,
245:14, 247:14,
254:5, 254:8,
254:20, 254:23,
257:20, 258:8,
258:23, 259:17,
261:8, 264:12,
264:13, 265:11,
265:15, 266:2,
266:22, 268:2,
276:11, 279:20,
280:4, 282:9,
282:23, 292:8,
293:5, 293:14,
293:15, 293:24,
294:16, 295:3,
295:5, 296:11,
299:17
**Patricelli'** [1] - 101:19
**Patricelli's** [17] - 13:5,
14:5, 25:23, 50:18,
81:19, 91:22, 91:23,
99:9, 178:22,
181:12, 182:24,
193:1, 276:16,
283:2, 294:10,
294:21, 295:1
**patricelli's** [1] -
179:20
**PATRICK** [3] - 1:8,
2:3, 2:6
**Patrick** [4] - 1:14,
205:22, 214:21,
259:14
**patrol** [4] - 19:2, 62:4,
182:19, 270:20
**patronizing** [1] - 31:21
**pause** [1] - 228:17
**pay** [7] - 150:12,
191:14, 191:15,
210:14, 225:13,
228:1, 278:19
**paying** [2] - 212:11,
245:22
**payroll** [2] - 212:11,
212:14
**Pechenik** [3] - 200:21,
200:24, 201:1
**Pechenik's** [1] - 210:2
**penalty** [1] - 191:13

**pending** [2] - 59:12,
262:14
**people** [66] - 6:11,
13:16, 18:7, 31:20,
32:2, 32:3, 32:4,
34:14, 34:15, 35:24,
37:4, 37:21, 39:16,
40:20, 41:6, 41:12,
42:19, 45:5, 47:17,
58:11, 64:2, 82:5,
91:5, 92:10, 92:20,
92:21, 92:22, 93:5,
93:21, 93:23, 94:8,
98:3, 107:10, 110:3,
110:19, 143:14,
147:21, 161:24,
163:16, 175:4,
194:18, 196:19,
197:1, 216:17,
227:23, 227:24,
240:15, 241:17,
242:3, 243:23,
250:13, 250:19,
252:12, 255:2,
255:6, 255:7, 257:9,
257:21, 258:18,
260:20, 264:15,
266:2, 266:10,
266:20, 280:16
**per** [6] - 13:8, 16:2,
39:23, 39:24,
249:22, 251:3
**perceive** [3] - 179:20,
264:18, 264:20
**perceived** [8] -
179:19, 252:19,
264:17, 264:21,
265:23, 266:17,
267:12, 293:23
**perceives** [1] - 71:22
**percent** [3] - 30:13,
137:5, 143:21
**percentile** [1] - 140:9
**perception** [2] - 163:4,
179:20
**perceptions** [1] -
71:21
**perfected** [1] - 272:1
**perfectly** [1] - 217:20
**perform** [4] - 92:3,
203:9, 204:1, 256:11
**perhaps** [1] - 11:2
**period** [17] - 84:9,
109:10, 109:24,
113:17, 113:19,
114:15, 114:16,
117:18, 118:3,
125:17, 200:14,
217:21, 222:5,
222:7, 254:5,

282:19, 303:17
**periodically** [1] -
163:12
**permanent** [11] -
134:16, 135:5,
135:7, 135:11,
136:5, 136:10,
136:11, 136:24,
137:7, 137:18, 151:9
**permanent"** [1] -
151:7
**permanently** [3] -
135:12, 136:16,
136:17
**permissible** [1] - 68:9
**permission** [2] -
125:17, 226:14
**permit** [2] - 24:9,
24:13
**person** [42] - 22:19,
22:22, 27:14, 28:17,
47:5, 48:2, 48:23,
54:6, 58:19, 58:24,
59:9, 68:9, 70:10,
77:15, 80:13, 83:22,
89:20, 128:1,
129:13, 129:16,
131:4, 131:5, 131:6,
135:19, 137:1,
137:4, 137:10,
137:18, 139:6,
139:20, 140:13,
141:4, 180:11,
182:17, 192:21,
212:13, 226:24,
227:1, 255:19,
257:1, 259:2, 278:14
**person's** [3] - 18:22,
139:17, 242:5
**personal** [24] - 88:4,
88:14, 88:15, 88:16,
89:15, 90:23, 91:18,
92:9, 92:24, 99:4,
102:6, 103:22,
108:4, 208:7, 208:9,
208:24, 209:10,
209:13, 209:17,
235:23, 245:19,
279:17, 279:18,
283:4
**personally** [22] - 20:4,
40:5, 43:13, 44:7,
53:2, 53:5, 62:2,
62:9, 63:12, 63:20,
107:10, 109:6,
123:15, 146:2,
150:1, 164:14,
187:6, 187:23,
192:16, 192:18,
243:17, 264:13

**personnel** [15] -
24:17, 24:20, 25:5,
25:11, 25:19, 25:24,
26:2, 26:5, 135:21,
136:20, 214:17,
214:21, 215:5,
216:1, 216:5
**persons** [5] - 18:18,
48:1, 137:2, 222:22,
255:14
**perspective** [4] -
41:24, 110:14,
178:23, 249:18
**pertaining** [1] - 107:1
**pertinent** [1] - 194:3
**PESH** [1] - 299:10
**Peter** [5] - 187:22,
188:4, 217:9, 258:6,
282:1
**Peter's** [2] - 282:5,
282:8
**Pfeiffer** [2] - 254:19,
255:8
**phone** [33] - 15:21,
86:1, 114:12, 115:3,
115:15, 115:17,
117:16, 117:17,
120:2, 120:6,
156:15, 156:17,
157:10, 158:21,
162:23, 164:12,
164:16, 167:12,
174:21, 175:1,
237:18, 241:21,
246:4, 246:7,
282:21, 282:24,
290:1, 290:20,
290:22, 290:23,
291:2, 291:3, 291:16
**phones** [5] - 15:21,
15:22, 15:24, 115:4,
115:8
**phonetic** [10] - 16:18,
47:6, 125:19,
136:15, 136:16,
187:22, 196:7,
205:6, 205:17,
256:13
**phonetic)** [2] - 204:18,
217:9
**phrasing** [1] - 85:16
**physical** [5] - 58:12,
58:18, 70:16, 94:18,
204:17
**physically** [1] - 95:3
**pick** [8] - 131:24,
143:9, 143:12,
145:21, 146:8,
147:20, 151:12,
173:18

**picked** [1] - 137:10
**picks** [2] - 167:2,
198:14
**piece** [2] - 215:15,
215:16
**pistol** [2] - 24:9, 24:12
**place** [13] - 52:10,
77:10, 81:5, 92:19,
98:15, 152:16,
187:12, 194:14,
243:23, 262:7,
295:10, 302:4,
303:10
**placed** [4] - 56:9,
56:11, 56:12, 82:14
**places** [1] - 67:18
**placing** [2] - 42:17,
42:19
**PLAINTIFF** [1] - 4:4
**Plaintiff** [2] - 1:6, 2:2
**Plaintiff's** [8] - 55:3,
55:12, 55:19, 68:23,
101:16, 216:22,
220:2, 285:1
**PLAINTIFF'S** [1] -
301:6
**plaintiff's** [4] - 57:20,
155:1, 167:22, 285:4
**plan** [2] - 61:19, 64:12
**play** [3] - 116:1, 163:9,
198:18
**played** [2] - 13:19,
13:20
**playing** [15] - 115:15,
223:18, 223:23,
224:5, 224:15,
225:6, 225:17,
226:17, 227:16,
229:3, 229:21,
230:9, 232:11,
234:24, 235:3
**plays** [1] - 153:8
**plea** [7] - 50:8, 190:17,
190:18, 192:1,
192:8, 192:9, 192:10
**pled** [1] - 255:12
**PLLC** [2] - 1:14, 2:3
**plural** [1] - 160:22
**plus** [4] - 240:24,
249:1, 249:13, 250:3
**point** [33] - 10:4,
17:21, 22:11, 57:9,
77:12, 81:20, 86:17,
101:3, 116:13,
129:22, 147:23,
150:11, 151:17,
162:16, 178:7,
183:15, 183:17,
189:12, 189:23,
190:7, 202:9,

213:15, 224:2,
224:13, 225:3,
238:21, 239:23,
250:6, 253:20,
265:13, 284:3,
284:6, 292:11
**pointed** [4] - 20:8,
21:12, 21:14, 26:22
**pointing** [1] - 27:16
**police** [77] - 5:24, 6:3,
32:14, 33:10, 34:8,
37:16, 38:17, 39:3,
82:9, 158:13,
158:16, 158:17,
159:14, 159:15,
159:17, 159:18,
160:6, 160:8, 160:9,
160:20, 161:1,
161:7, 161:9,
161:11, 161:13,
162:10, 164:6,
164:17, 164:20,
165:5, 166:3, 167:5,
170:21, 171:1,
171:12, 176:8,
188:16, 230:14,
230:15, 231:4,
231:16, 234:4,
234:12, 234:20,
237:6, 237:13,
237:20, 237:22,
239:12, 241:19,
241:22, 247:21,
248:6, 248:24,
249:7, 249:13,
250:3, 253:15,
263:23, 264:1,
264:5, 267:14,
288:21, 288:24,
289:2, 289:13,
289:17, 290:2,
290:13, 290:16,
293:1, 295:21,
295:23, 296:1,
296:2, 296:7
**Police** [9] - 6:7, 12:16,
13:6, 13:7, 13:9,
13:10, 32:3, 32:21,
32:22
**Policies"** [1] - 256:1
**policing** [1] - 13:13
**policy** [58] - 24:20,
52:10, 52:13, 52:20,
53:2, 53:7, 56:2,
56:6, 56:22, 57:13,
58:3, 59:7, 59:14,
59:18, 60:3, 60:10,
60:13, 60:18, 61:2,
61:4, 61:6, 61:8,
61:12, 63:19, 64:8,

65:3, 66:18, 68:5,
68:6, 68:8, 69:4,
69:8, 69:9, 70:4,
76:2, 146:3, 148:11,
162:7, 165:19,
166:1, 175:5,
180:17, 180:18,
180:23, 181:2,
191:4, 191:6, 191:7,
222:11, 248:17,
256:20, 267:16,
270:18, 272:7,
272:10, 274:8,
274:17, 295:10
**position** [34] - 6:6,
6:9, 7:8, 11:5, 11:23,
11:24, 12:3, 12:8,
17:5, 17:23, 19:18,
28:3, 42:7, 46:24,
92:5, 131:17,
131:20, 131:22,
137:1, 139:8,
139:14, 140:15,
141:10, 143:15,
145:18, 145:20,
152:14, 211:15,
211:17, 222:24,
259:7, 259:8,
262:10, 266:11
**positions** [4] - 18:19,
222:22, 223:3, 223:4
**possession** [1] -
24:14
**possible** [5] - 61:13,
69:24, 70:1, 215:20,
242:16
**possibly** [1] - 39:10
**post** [3] - 65:2, 65:4,
278:11
**post-incident** [2] -
65:2, 65:4
**potential** [3] - 15:14,
69:19, 204:1
**power** [1] - 122:5
**practice** [1] - 199:3
**precisely** [1] - 110:24
**predominantly** [1] -
28:23
**preference** [1] -
151:11
**preferred** [1] - 262:8
**premises** [1] - 59:12
**prerogative** [2] -
143:8, 145:23
**present** [2] - 2:14,
246:20
**preserve** [1] - 5:3
**pretty** [14] - 29:9,
43:15, 44:5, 51:22,
63:5, 83:19, 114:16,

173:15, 187:14,
212:4, 222:17,
285:17, 288:3,
293:16
**prevent** [4] - 56:14,
166:17, 180:7,
255:19
**Prevention** [1] - 65:20
**prevention** [5] - 61:19,
64:12, 68:15, 272:7,
274:9
**previously** [9] - 23:8,
118:11, 175:15,
184:9, 199:24,
207:4, 255:24,
262:1, 283:8
**priorities** [1] - 150:14
**prisoners** [2] - 14:13,
15:14
**private** [11] - 35:7,
59:2, 88:13, 88:16,
93:10, 100:7,
104:15, 104:20,
110:5, 111:1, 294:11
**privilege** [2] - 5:11,
5:13
**privileges** [1] - 191:16
**proactive** [1] - 292:7
**probable** [2] - 181:15,
182:4
**problem** [34] - 34:20,
35:2, 35:17, 35:18,
36:16, 38:6, 76:23,
87:13, 89:8, 90:24,
91:20, 93:2, 126:8,
148:23, 150:9,
167:8, 177:2,
177:21, 178:17,
179:8, 179:11,
179:13, 244:6,
246:9, 267:11,
268:21, 268:22,
269:2, 275:14,
287:22, 287:23,
292:6, 293:6
**problems** [15] - 15:13,
15:14, 34:13, 87:12,
87:15, 89:22, 107:3,
114:24, 159:24,
162:19, 163:14,
173:19, 241:14,
281:20, 294:16
**Procedure** [1] - 55:6
**procedure** [1] - 5:1
**procedures** [1] -
274:17
**proceed** [2] - 222:16,
298:4
**proceedings** [2] -
235:1, 303:13

**process** [18] - 18:21,
19:3, 32:6, 51:21,
76:8, 109:19, 132:7,
137:23, 153:22,
198:24, 212:20,
212:22, 212:23,
213:3, 213:16,
213:17, 215:23,
261:21
**processor** [1] - 89:5
**program** [4] - 68:15,
124:20, 181:3, 274:9
**promote** [2] - 129:4,
129:11
**promoted** [5] -
128:23, 129:1,
129:14, 131:19,
144:16
**promotion** [1] -
135:20
**promotional** [1] -
133:2
**prompted** [1] - 112:3
**proof** [8] - 98:1,
157:21, 158:10,
292:10, 292:13,
292:14, 293:9,
295:17
**properly** [1] - 197:24
**property** [3] - 59:11,
60:5, 165:24
**prosecuted** [1] -
190:10
**prosecution** [1] -
190:12
**prostitutes** [1] - 31:21
**protect** [1] - 166:22
**protecting** [1] - 66:19
**Protection** [2] -
183:21, 183:23
**Protections** [1] -
163:23
**protocol** [2] - 174:24,
175:3
**prove** [1] - 252:6
**proven** [4] - 60:17,
70:23, 70:24, 71:2
**provide** [6] - 61:22,
69:5, 168:18,
168:23, 222:13,
223:11
**provided** [9] - 23:9,
25:22, 26:2, 55:5,
62:18, 63:8, 95:5,
168:4, 303:16
**providing** [1] - 222:11
**provisional** [24] -
27:15, 27:17, 28:8,
124:4, 128:15,
129:6, 129:9,

129:17, 129:20,
129:23, 130:2,
130:8, 148:19,
149:7, 149:22,
152:15, 152:19,
152:23, 153:4,
153:7, 153:8,
153:11, 153:21,
280:24
**provisionally** [1] -
129:12
**provisions** [2] -
214:24, 215:7
**psychiatrist** [1] -
205:9
**psychological** [6] -
203:9, 204:1,
204:16, 204:19,
205:4, 206:3
**psychologist** [1] -
199:18
**public** [2] - 6:21,
256:15
**Public** [5] - 1:16, 3:10,
4:3, 302:17, 303:4
**pull** [1] - 16:23
**pulled** [2] - 137:18,
261:23
**punched** [1] - 202:23
**punished** [1] - 26:15
**punishment** [2] -
26:11, 26:16
**purpose** [1] - 35:12
**purposes** [1] - 216:16
**pursuant** [2] - 55:5,
66:18
**pursue** [1] - 59:1
**push** [2] - 35:19,
100:16
**pushing** [1] - 95:18
**pussy** [1] - 277:8
**put** [24] - 15:3, 24:16,
24:20, 25:2, 25:5,
58:7, 86:14, 87:17,
87:22, 88:3, 88:7,
95:16, 100:23,
108:3, 130:18,
134:19, 136:5,
143:15, 149:18,
150:19, 226:6,
236:5, 272:15,
281:16
**puts** [1] - 284:2
**putting** [1] - 241:2
**Pyle** [1] - 227:14

## Q

**qualification** [1] -
286:21

**quarter** [2] - 101:8,
275:10
**Quarterly** [1] - 155:16
**quarterly** [1] - 18:13
**quasi** [2] - 186:15,
186:17
**quasi-family** [1] -
186:17
**quasi-related** [1] -
186:15
**quell** [1] - 241:13
**questioned** [1] -
147:16
**questions** [12] - 4:12,
4:14, 5:15, 48:18,
48:19, 99:7, 99:16,
139:5, 186:4, 186:5,
193:7, 298:15
**quick** [15] - 37:24,
57:24, 82:18, 98:14,
103:4, 127:22,
140:3, 143:18,
157:4, 159:5,
164:23, 185:4,
217:10, 256:4, 272:4
**quickly** [7] - 82:17,
118:11, 157:23,
184:15, 197:22,
213:6, 298:18
**quiet** [2] - 33:15,
241:18
**quite** [2] - 9:19,
191:20
**quote** [5] - 9:16,
227:8, 230:5, 239:7,
268:6

## R

**race** [1] - 30:22
**radiator** [1] - 232:20
**raking** [1] - 286:23
**rank** [14] - 6:3, 7:20,
8:19, 8:20, 10:1,
10:21, 11:1, 14:16,
14:21, 14:23, 46:12,
91:24, 191:16,
193:21
**Rankin** [1] - 125:18
**ranking** [1] - 19:4
**ranks** [1] - 92:3
**ranting** [1] - 280:22
**rapid** [1] - 298:15
**rapid-fire** [1] - 298:15
**rare** [2] - 200:24,
222:17
**rash** [1] - 46:3
**raspy** [1] - 12:20
**rather** [8] - 49:11,
49:15, 49:24, 101:6,

200:21, 236:13,
240:7, 243:14
**rational** [1] - 46:14
**rationally** [1] - 45:5
**RAYHILL** [1] - 2:9
**re** [1] - 221:17
**re-hired** [1] - 221:17
**reach** [2] - 144:24,
145:10
**reachable** [5] -
128:23, 129:2,
129:13, 129:22,
150:10
**reactive** [1] - 292:7
**read** [63] - 55:19,
55:23, 56:2, 56:4,
56:6, 56:21, 57:12,
58:14, 59:17, 60:6,
60:8, 60:9, 75:13,
89:12, 103:14,
103:18, 104:10,
106:20, 107:20,
111:22, 112:13,
113:6, 118:19,
132:10, 165:20,
168:6, 168:15,
176:10, 176:20,
176:23, 177:6,
177:8, 177:15,
178:5, 178:7,
178:14, 178:15,
178:19, 182:2,
195:14, 196:3,
206:10, 214:18,
214:22, 215:2,
215:3, 218:20,
228:20, 236:14,
237:16, 272:3,
278:7, 283:11,
283:12, 292:24,
300:1, 300:4, 300:5,
300:6, 302:3
**reading** [32] - 23:23,
55:16, 57:14, 59:7,
60:18, 61:16, 62:16,
64:8, 64:10, 68:23,
69:14, 69:18, 96:10,
97:2, 140:14,
165:18, 165:21,
175:17, 176:4,
195:21, 229:5,
230:1, 231:20,
237:11, 247:8,
262:6, 268:11,
268:12, 270:24,
272:1, 283:7
**ready** [1] - 261:22
**real** [8] - 137:22,
159:5, 184:15,
185:4, 217:10,

245:17, 256:4, 272:4
**realize** [2] - 100:14, 230:2
**really** [37] - 9:19, 9:20, 12:6, 14:17, 16:12, 17:17, 36:18, 44:6, 45:2, 54:20, 55:24, 64:19, 78:15, 79:6, 84:16, 98:14, 99:18, 105:20, 118:17, 125:13, 149:3, 164:15, 165:1, 182:19, 183:5, 187:15, 205:7, 220:18, 246:2, 246:12, 247:2, 250:14, 260:16, 266:14, 271:3, 273:5, 294:17
**reason** [14] - 58:24, 126:14, 127:1, 149:5, 150:8, 164:8, 164:22, 220:17, 220:20, 220:22, 221:10, 254:22, 262:15, 279:20
**reasonable** [5] - 46:6, 222:13, 250:14, 297:14, 298:6
**reasoning** [1] - 42:18
**reasons** [3] - 126:22, 126:24, 216:6
**reassignments** [1] - 62:19
**receipt** [2] - 168:19, 250:2
**receive** [7] - 88:18, 122:11, 155:17, 161:2, 189:15, 199:12, 249:8
**received** [33] - 53:18, 55:6, 72:22, 83:14, 93:19, 104:13, 105:3, 106:4, 106:16, 108:14, 108:15, 111:20, 112:9, 156:15, 156:17, 160:20, 168:16, 168:24, 169:1, 169:23, 170:10, 178:6, 182:1, 248:24, 267:23, 269:20, 269:21, 273:23, 275:7, 283:9, 283:11, 283:18, 283:19
**receives** [2] - 25:3, 223:12
**receiving** [6] - 39:12,

119:5, 119:15, 120:6, 271:2, 272:18
**recent** [1] - 50:14
**recognize** [34] - 55:10, 55:12, 55:22, 65:22, 104:8, 115:19, 115:21, 115:23, 116:2, 118:15, 118:18, 119:11, 119:13, 119:22, 132:13, 155:10, 155:12, 170:8, 184:11, 195:13, 195:14, 195:17, 195:19, 200:4, 200:10, 213:8, 217:3, 223:20, 223:24, 224:2, 224:3, 225:2, 225:14, 262:2
**recognized** [2] - 102:22, 102:23
**recollect** [1] - 251:17
**recollection** [7] - 86:17, 105:5, 138:16, 138:18, 157:5, 220:15, 237:10
**recommendation** [11] - 19:10, 19:13, 19:15, 22:14, 149:21, 219:16, 285:18, 285:23, 286:7, 286:11, 286:17
**recommendations** [7] - 17:10, 19:6, 19:7, 28:10, 149:9, 150:3, 259:11
**recommended** [2] - 259:22, 260:1
**record** [89] - 4:17, 13:1, 18:23, 19:22, 22:23, 23:2, 23:4, 23:5, 31:9, 31:11, 31:12, 38:1, 38:2, 49:5, 54:8, 54:10, 54:12, 57:18, 57:19, 64:9, 65:13, 66:13, 66:15, 73:13, 74:20, 74:21, 75:16, 79:14, 80:19, 89:1, 89:2, 101:12, 103:8, 115:3, 115:12, 115:14, 118:5, 118:8, 120:12, 123:2, 123:3, 123:4, 133:11, 133:12, 133:14, 133:19, 133:21, 133:22,

133:24, 134:8, 134:12, 151:23, 155:13, 156:1, 167:2, 185:5, 185:15, 185:16, 187:19, 187:20, 207:2, 216:1, 216:3, 223:17, 228:16, 228:17, 231:8, 235:2, 238:3, 238:4, 239:16, 254:11, 255:16, 257:7, 257:20, 258:4, 270:7, 270:9, 273:20, 274:22, 274:24, 284:24, 286:6, 287:18, 287:19, 288:12, 302:3
**record's** [2] - 166:6, 290:7
**recorded** [3] - 115:4, 115:8, 115:10
**Recording** [1] - 229:3
**recording** [22] - 115:15, 116:15, 116:16, 223:18, 223:23, 224:5, 224:12, 224:15, 225:6, 225:17, 226:17, 227:16, 228:11, 229:7, 229:21, 230:9, 231:19, 231:21, 232:11, 234:24, 235:3, 238:22
**recordings** [1] - 116:7
**records** [6] - 22:11, 94:22, 214:17, 214:23, 215:6, 254:21
**reduced** [1] - 303:11
**refer** [1] - 228:23
**reference** [1] - 133:18
**referenced** [1] - 291:14
**referencing** [2] - 47:12, 288:22
**referred** [1] - 20:15
**referring** [1] - 215:16
**refresh** [4] - 86:17, 157:5, 220:15, 237:10
**refusal** [2] - 197:23, 256:13
**refused** [3] - 295:22, 296:7, 299:14
**refuses** [1] - 227:3
**regard** [9] - 4:13, 35:8, 38:17, 48:4, 53:3,

66:19, 67:1, 119:15, 159:8
**regarding** [15] - 14:13, 31:20, 37:15, 40:6, 113:22, 114:5, 157:13, 202:6, 208:16, 248:11, 274:17, 294:3, 294:4, 294:10
**regardless** [1] - 296:17
**regards** [11] - 110:24, 156:16, 172:11, 174:4, 182:23, 196:18, 201:8, 202:4, 203:12, 237:6, 251:9
**Region** [1] - 22:18
**regret** [1] - 46:8
**reigns** [2] - 227:20, 227:21
**reimbursement** [2] - 226:1, 226:3
**reinstated** [1] - 26:16
**reinstatement** [2] - 262:9, 262:13
**related** [47] - 14:14, 30:5, 30:8, 31:1, 32:3, 32:4, 80:11, 80:12, 118:3, 186:15, 186:18, 199:20, 223:5, 223:6, 223:9, 264:19, 264:20, 265:2, 265:3, 265:5, 265:9, 265:16, 266:9, 267:1, 267:2, 267:3, 267:8, 267:13, 268:7, 268:8, 268:17, 275:24, 276:2, 276:12, 276:19, 276:20, 277:22, 278:12, 278:23, 279:6, 280:1, 280:8, 281:2, 281:8, 281:14, 282:11
**relation** [3] - 117:23, 118:1, 154:4
**relations** [1] - 186:16
**relationship** [12] - 13:14, 29:5, 43:22, 44:2, 87:9, 92:15, 92:17, 107:4, 128:11, 230:6, 258:8, 299:19
**relationships** [5] - 90:18, 91:18, 92:10, 259:2, 265:7
**relative** [3] - 15:1,

80:15, 168:18
**release** [2] - 93:10, 104:19
**released** [6] - 88:2, 89:16, 100:6, 100:7, 109:10, 111:1
**releasing** [6] - 88:11, 102:6, 103:22, 106:8, 108:4, 110:5
**relevancy** [1] - 5:5
**relevant** [3] - 7:24, 26:10, 235:6
**relieved** [1] - 213:23
**rely** [1] - 202:20
**remain** [5] - 40:17, 130:1, 139:8, 255:15, 260:1
**remained** [1] - 259:22
**remains** [1] - 129:17
**remanded** [1] - 192:14
**remember** [122] - 6:23, 16:11, 23:21, 35:11, 35:21, 36:3, 36:5, 37:23, 41:19, 44:24, 45:2, 51:17, 52:4, 52:7, 52:11, 53:16, 53:24, 54:6, 57:7, 57:14, 57:16, 58:6, 62:1, 78:8, 79:21, 81:21, 82:2, 84:6, 84:10, 84:12, 84:16, 85:19, 85:21, 85:22, 86:9, 88:6, 88:20, 88:23, 89:7, 91:10, 91:12, 94:14, 94:15, 96:10, 96:14, 96:16, 96:22, 96:24, 102:11, 102:13, 105:7, 105:8, 105:21, 105:22, 106:1, 109:2, 109:3, 112:24, 113:8, 113:14, 118:16, 118:17, 121:5, 121:8, 121:12, 121:14, 121:15, 123:17, 123:23, 124:3, 125:13, 125:23, 126:1, 126:2, 154:14, 157:1, 159:3, 164:15, 165:18, 165:21, 173:5, 174:5, 183:18, 192:10, 195:20, 195:23, 195:24, 196:2, 197:11, 197:12, 197:13, 197:15, 197:17, 211:7, 213:21,

213:22, 220:19, 220:24, 221:5, 232:7, 232:8, 237:9, 237:17, 238:1, 244:23, 245:1, 245:3, 251:24, 255:12, 262:5, 267:20, 270:23, 273:11, 273:19, 283:12, 291:1, 293:2, 293:7, 293:13, 294:13
**remembers** [1] - 97:8
**remind** [1] - 280:4
**remove** [4] - 122:5, 180:11, 212:14, 278:22
**removed** [5] - 48:24, 50:19, 59:12, 82:20, 262:12
**removing** [1] - 48:21
**renders** [1] - 203:20
**RENSSELAER** [1] - 1:8
**Rensselaer** [37] - 5:19, 22:20, 24:1, 24:11, 44:16, 52:13, 53:1, 56:3, 56:7, 60:3, 61:6, 64:7, 65:4, 66:19, 114:13, 139:2, 139:9, 162:7, 180:17, 189:17, 189:22, 196:10, 203:8, 203:17, 204:2, 215:8, 218:23, 219:1, 235:12, 264:10, 267:16, 271:22, 272:5, 284:18, 295:9, 297:6, 297:7
**repeat** [1] - 116:20
**rephrase** [4] - 112:2, 144:2, 178:13, 294:7
**replied** [2] - 269:1, 275:12
**report** [86] - 7:12, 7:14, 7:16, 7:18, 8:13, 25:19, 28:15, 33:9, 33:16, 36:1, 38:19, 41:17, 43:11, 58:16, 69:3, 76:11, 78:11, 78:13, 78:19, 79:8, 90:13, 158:17, 159:14, 159:15, 159:17, 159:18, 160:6, 160:8, 160:10, 160:21, 161:1, 161:8, 161:9, 161:11, 170:21, 171:2, 171:11,

172:9, 172:14, 172:17, 173:12, 173:21, 174:1, 174:2, 175:15, 175:21, 183:3, 225:22, 230:15, 230:16, 230:17, 230:18, 230:21, 230:23, 231:16, 232:14, 233:8, 234:4, 234:12, 234:21, 237:22, 248:6, 249:7, 249:13, 250:3, 251:9, 251:18, 251:19, 256:12, 271:11, 271:15, 288:11, 288:21, 289:1, 289:2, 289:13, 290:6, 290:13, 290:16, 293:1, 293:2, 295:21, 295:23, 296:7
**Report"** [2] - 65:21, 155:16
**reportable** [1] - 272:23
**reported** [5] - 28:13, 28:17, 69:6, 69:20, 225:8
**reporter** [7] - 116:5, 134:10, 167:21, 220:1, 228:12, 278:1, 303:16
**REPORTER** [6] - 103:10, 116:6, 228:13, 228:19, 228:22, 231:10
**Reporter** [2] - 1:16, 303:3
**reporting** [3] - 42:9, 69:23, 78:9
**reports** [8] - 172:21, 173:9, 174:12, 234:6, 250:9, 289:23, 290:5, 294:5
**represent** [3] - 185:5, 185:11, 185:14
**representation** [1] - 34:24
**representative** [1] - 271:8
**representing** [2] - 185:9, 185:13
**reprisal** [1] - 283:6
**reputation** [5] - 256:14, 256:23, 257:18, 258:2, 258:21
**request** [6] - 16:2,

84:19, 120:8, 206:2, 213:2, 263:11
**requested** [5] - 34:9, 122:3, 188:4, 303:15
**requesting** [2] - 46:12, 262:9
**requests** [1] - 25:23
**REQUESTS** [1] - 301:18
**require** [3] - 61:6, 65:4, 74:7
**required** [6] - 14:12, 56:11, 70:4, 212:7, 259:6, 273:3
**requirement** [6] - 66:17, 126:4, 126:5, 127:2, 249:23, 251:3
**requirements** [1] - 62:7
**requires** [1] - 181:3
**reserved** [1] - 3:8
**resigned** [3] - 79:11, 79:16, 79:24
**resolution** [3] - 27:8, 180:10, 180:21
**resolve** [5] - 36:2, 42:7, 242:10, 242:11, 243:14
**resolved** [2] - 192:15, 253:24
**resources** [13] - 57:2, 57:8, 65:7, 65:8, 66:8, 76:13, 77:8, 77:16, 135:24, 168:12, 169:19, 248:3
**Resources** [3] - 196:10, 204:12, 206:7
**RESOURCES** [1] - 1:9
**respect** [2] - 224:24, 279:22
**respectfully** [1] - 200:6
**respective** [2] - 3:3, 62:3
**respectively** [1] - 220:3
**respond** [1] - 224:21
**responded** [2] - 224:23, 281:10
**response** [5] - 25:22, 55:4, 65:5, 95:5, 100:9
**response"** [1] - 65:2
**responsibilities** [2] - 11:3, 17:15
**responsibility** [10] - 11:12, 15:8, 18:2, 18:7, 41:8, 68:13,

68:16, 68:20, 81:10, 81:11
**responsible** [13] - 13:22, 17:18, 18:8, 35:13, 62:8, 67:22, 67:24, 81:2, 81:5, 81:6, 108:22, 165:4, 169:9
**responsive** [1] - 97:12
**rest** [9] - 101:5, 109:24, 131:9, 142:2, 142:21, 144:19, 144:20, 145:8, 271:19
**restrictions** [1] - 16:21
**result** [10] - 47:24, 50:1, 50:9, 76:17, 76:18, 78:17, 188:23, 190:20, 213:19, 262:12
**resulted** [1] - 107:3
**results** [5] - 33:17, 161:16, 197:13, 214:14, 256:12
**retained** [1] - 185:5
**retaliated** [5] - 298:20, 298:22, 299:1, 299:9, 299:13
**retaliation** [1] - 197:23
**retaliatory** [1] - 198:6
**retired** [2] - 44:12, 84:6
**retuned** [1] - 134:21
**return** [1] - 171:19
**revenge** [2] - 275:17, 278:18
**review** [21] - 17:7, 33:23, 78:20, 155:18, 184:23, 197:21, 202:9, 203:4, 204:1, 204:9, 204:16, 214:3, 214:20, 215:4, 216:18, 249:24, 256:17, 257:16, 262:16, 263:4, 303:14
**reviewed** [10] - 17:3, 17:7, 17:12, 134:24, 185:19, 185:21, 200:11, 214:10, 214:12, 215:17
**reviewing** [6] - 24:8, 58:2, 91:10, 197:20, 214:4, 215:17
**reviews** [3] - 18:13, 18:14
**revisit** [1] - 74:19
**rid** [6] - 160:13, 239:17, 239:19,

239:20, 289:14
**ride** [4] - 29:7, 29:8, 44:4, 92:21
**ripped** [1] - 245:1
**road** [2] - 244:17, 244:22
**role** [19] - 6:13, 6:15, 6:17, 13:5, 13:7, 13:11, 13:19, 13:20, 14:5, 14:10, 15:17, 16:16, 153:8, 163:9, 194:1, 198:18, 240:3, 242:1, 243:19
**roles** [1] - 51:21
**room** [2] - 280:17, 284:7
**rose** [1] - 243:2
**roster** [1] - 217:24
**rotated** [1] - 9:18
**roughly** [1] - 6:12
**rounds** [1] - 37:12
**routine** [1] - 40:8
**Roy** [2] - 108:18, 276:6
**ruined** [1] - 275:19
**ruining** [3] - 187:2, 187:5, 280:18
**rule** [8] - 67:7, 130:10, 131:15, 140:24, 142:23, 144:5, 145:24, 146:17
**Rule** [1] - 55:6
**rules** [8] - 5:1, 61:14, 63:3, 146:18, 146:24, 147:14
**rumors** [1] - 240:17
**run** [1] - 188:13
**running** [1] - 225:9
**RUSSO** [1] - 1:8
**Russo** [15] - 81:14, 178:6, 182:2, 196:9, 199:2, 202:3, 205:22, 206:13, 214:21, 230:7, 249:12, 259:16, 270:22, 271:8, 272:19
**Russo's** [3] - 233:22, 249:9, 271:5
**Ruth** [51] - 84:8, 84:13, 85:9, 85:24, 86:6, 86:20, 89:18, 90:14, 92:6, 104:14, 104:20, 106:8, 111:1, 125:21, 126:8, 127:15, 157:12, 159:13, 161:5, 163:7, 167:12, 167:14, 175:24, 192:17,

230:13, 235:11,
237:5, 237:12,
237:18, 237:19,
237:21, 238:24,
242:15, 242:23,
243:14, 243:22,
244:15, 247:12,
247:14, 249:6,
265:11, 265:16,
265:24, 269:5,
270:1, 285:15,
294:11, 294:19,
295:23, 299:15
**Ruth's** [2] - 243:16,
243:18
**Ryan** [4] - 124:8,
124:12, 124:20,
280:16

## S

**safe** [4] - 69:5, 77:10,
122:19
**safety** [7] - 58:12,
165:8, 166:22,
208:9, 209:13,
209:17, 282:24
**Sal** [2] - 205:16,
205:18
**SARAH** [3] - 1:15,
303:3, 303:24
**sat** [1] - 278:11
**save** [2] - 94:17,
119:14
**saw** [11] - 22:24,
39:16, 54:17, 54:23,
103:15, 172:15,
210:7, 234:3,
245:23, 262:5, 271:5
**scenario** [2] - 47:9,
130:1
**Schaghticoke** [5] -
181:11, 184:13,
191:22, 192:12,
192:14
**schedule** [2] - 9:11,
11:16
**scheduled** [3] - 11:21,
35:23, 213:4
**school** [1] - 252:13
**score** [13] - 19:24,
130:17, 131:1,
131:8, 137:5,
140:11, 143:20,
144:4, 145:21,
146:4, 148:12,
148:15, 151:13
**scores** [5] - 130:18,
130:22, 131:18,
147:10, 148:5

**Scott** [6] - 79:4, 79:12,
96:6, 96:11, 96:21,
122:3
**se** [1] - 13:8
**sealing** [1] - 3:4
**second** [43] - 23:3,
31:9, 54:9, 58:14,
59:9, 60:19, 61:2,
66:14, 69:2, 80:18,
106:18, 106:20,
107:21, 108:16,
118:6, 118:12,
131:14, 131:21,
131:23, 144:19,
145:13, 157:7,
169:22, 175:10,
175:13, 175:18,
207:1, 207:7,
207:21, 211:4,
211:8, 217:2,
217:12, 223:16,
254:10, 262:6,
268:1, 268:12,
274:21, 277:17,
289:3, 289:4, 291:6
**secondly** [1] - 251:23
**seconds** [2] - 235:5,
298:10
**secretary** [1] - 236:9
**Section** [9] - 211:10,
211:12, 211:13,
211:18, 212:6,
212:10, 215:19,
221:22, 262:12
**security** [12] - 11:7,
13:22, 13:23, 14:4,
14:7, 14:9, 14:11,
15:5, 15:9, 16:17,
38:24, 92:5
**see** [81] - 15:12, 23:15,
25:18, 25:20, 26:6,
30:1, 30:7, 30:22,
35:14, 41:22, 62:6,
62:10, 66:2, 67:20,
76:10, 87:16, 87:19,
91:3, 93:14, 94:3,
95:3, 101:18,
101:20, 102:2,
105:1, 112:6,
132:19, 147:5,
151:5, 151:7, 151:9,
156:3, 156:6,
163:15, 169:22,
171:7, 172:6,
172:13, 175:21,
176:19, 177:10,
179:5, 179:22,
181:19, 181:22,
184:16, 185:23,
205:21, 207:8,

207:13, 207:14,
207:18, 207:24,
211:5, 214:16,
214:18, 217:4,
217:7, 217:10,
217:12, 217:14,
221:16, 233:14,
251:8, 256:6,
262:18, 263:7,
263:10, 268:1,
268:2, 268:13,
269:8, 269:9,
269:13, 269:21,
270:21, 271:21,
272:3, 274:16, 276:9
**seeing** [8] - 175:22,
208:15, 262:5,
270:24, 273:7,
273:19, 274:2, 274:5
**segway** [1] - 159:5
**select** [4] - 130:14,
140:20, 143:14,
204:13
**selected** [1] - 206:11
**selecting** [3] - 18:17,
137:1, 143:5
**selection** [3] - 109:19,
132:7, 204:9
**semantics** [1] - 64:18
**send** [20] - 98:17,
116:8, 116:10,
132:16, 141:18,
147:17, 147:22,
169:12, 169:16,
174:12, 204:14,
204:15, 206:9,
214:8, 233:11,
249:23, 262:17,
263:16, 287:14,
295:19
**sending** [1] - 147:21
**sends** [1] - 141:19
**senior** [1] - 91:19
**sense** [3] - 42:23,
139:17, 191:9
**sent** [16] - 95:12,
135:2, 137:17,
168:11, 168:21,
168:22, 174:7,
174:10, 205:16,
205:23, 210:19,
210:22, 210:23,
210:24, 267:21
**sentence** [2] - 106:20,
107:21
**separate** [16] - 70:8,
70:18, 71:4, 71:7,
71:17, 72:8, 72:17,
72:23, 73:4, 73:14,
74:3, 74:7, 74:9,

185:10, 208:21,
287:10
**separated** [5] - 67:15,
156:8, 221:8,
221:22, 297:6
**separating** [3] - 67:1,
70:15, 72:2
**separation** [4] - 156:4,
156:6, 220:14, 221:2
**Sergeant** [57] - 12:2,
13:21, 22:9, 28:2,
28:13, 28:15, 31:19,
38:12, 39:19, 43:18,
43:23, 44:10, 51:1,
51:2, 85:7, 94:13,
96:5, 97:6, 97:24,
98:15, 103:20,
104:19, 104:22,
105:3, 105:6, 105:9,
105:10, 105:12,
105:16, 106:5,
106:7, 115:2,
117:10, 122:9,
123:11, 124:8,
124:12, 124:16,
124:20, 125:7,
125:18, 149:10,
149:18, 149:22,
151:5, 157:15,
173:6, 193:13,
195:9, 196:6, 196:7,
197:8, 198:7, 280:16
**sergeant** [87] - 7:13,
8:20, 9:15, 10:3,
10:4, 10:8, 10:11,
10:12, 10:17, 10:21,
10:22, 10:23, 10:24,
11:3, 11:4, 11:13,
11:17, 11:23, 14:2,
14:3, 14:5, 14:11,
14:17, 14:21, 14:24,
15:3, 16:16, 17:6,
27:1, 27:15, 27:18,
28:8, 34:20, 38:5,
44:1, 44:11, 44:14,
45:18, 47:6, 47:10,
47:13, 48:11, 48:12,
48:22, 48:23, 49:3,
49:11, 49:14, 50:2,
91:22, 91:23, 91:24,
92:10, 94:13, 94:14,
96:6, 102:3, 107:15,
108:19, 108:22,
124:4, 124:19,
128:15, 129:9,
129:17, 130:2,
133:2, 148:19,
149:8, 149:11,
149:13, 149:17,
149:22, 150:7,

152:13, 152:20,
152:23, 153:8,
174:24, 179:14,
179:15, 191:19,
193:16, 240:14,
279:2
**Sergeants** [1] - 108:18
**sergeants** [6] - 7:14,
9:12, 9:14, 14:16,
15:3, 44:18
**series** [1] - 4:12
**serve** [1] - 196:4
**Service** [43] - 10:14,
10:20, 10:21, 18:18,
19:24, 129:11,
129:21, 130:6,
132:4, 132:5, 132:6,
132:15, 134:21,
135:24, 136:9,
141:18, 141:19,
142:8, 146:18,
147:16, 147:17,
148:9, 152:2,
152:10, 211:13,
212:17, 215:1,
215:7, 215:19,
260:12, 285:14,
285:19, 285:24,
286:3, 286:7,
286:12, 286:17,
286:24, 287:4,
287:8, 287:9, 287:11
**service** [2] - 63:10,
63:11
**sessions** [1] - 63:24
**set** [4] - 32:20, 44:22,
115:2, 263:4
**settlement** [7] - 49:17,
50:5, 50:6, 50:11,
190:11, 192:6, 192:7
**seven** [5] - 114:18,
237:11, 247:11,
254:4, 270:12
**seventy** [1] - 254:13
**seventy-two** [1] -
254:13
**several** [12] - 20:14,
20:24, 29:11, 29:12,
33:4, 53:14, 104:3,
108:20, 194:13,
211:11, 254:16,
255:21
**shall** [1] - 3:7
**shape** [1] - 195:6
**shared** [2] - 265:12
**sharing** [2] - 81:11,
294:11
**sheet** [1] - 105:24
**Sheriff** [6] - 27:24,
28:1, 101:14, 196:9,

199:1, 229:16
**SHERIFF** [5] - 1:8,
1:12, 4:1, 300:12,
302:10
**sheriff** [41] - 5:18, 7:1,
7:2, 10:1, 12:12,
12:13, 17:15, 17:18,
18:12, 24:22, 24:24,
25:1, 28:2, 44:16,
51:9, 51:11, 52:6,
52:8, 53:17, 53:22,
56:13, 60:13, 62:8,
62:24, 84:22, 93:4,
117:6, 117:15,
117:23, 118:2,
120:21, 122:8,
154:2, 154:6,
169:12, 172:16,
215:13, 222:9,
258:15, 263:19,
279:22
**sheriff's** [50] - 7:4, 8:3,
12:8, 14:22, 17:23,
20:9, 21:17, 21:20,
24:5, 25:3, 26:23,
44:11, 54:15, 57:2,
63:13, 63:17, 64:16,
64:20, 64:22, 66:7,
68:6, 68:7, 76:3,
76:19, 77:19,
116:24, 117:3,
120:14, 125:22,
132:7, 137:11,
139:18, 139:21,
141:5, 143:8, 148:1,
154:8, 182:9, 183:8,
189:19, 204:10,
210:12, 217:17,
222:10, 250:18,
266:19, 266:20,
272:21, 299:6, 299:8
**Sheriff's** [12] - 24:11,
44:17, 51:12,
114:13, 139:2,
139:9, 215:9,
218:24, 219:2,
264:11, 271:23,
272:5
**sheriffs** [3] - 51:21,
51:23, 154:5
**shift** [6] - 28:20,
28:23, 28:24, 36:7,
46:23, 74:17
**shifts** [1] - 74:16
**shit** [2] - 268:3, 268:6
**shocked** [1] - 229:12
**short** [3] - 12:10,
154:24, 283:23
**Shorthand** [1] - 303:3
**shorthand** [1] -

303:10
**shortly** [2] - 53:22,
86:12
**shot** [1] - 292:8
**show** [35] - 23:7,
25:17, 65:17,
101:14, 118:10,
119:8, 119:18,
132:9, 141:1,
146:20, 155:9,
157:4, 168:3,
175:12, 175:19,
176:19, 184:9,
184:15, 195:12,
199:24, 205:20,
207:4, 211:1, 213:6,
214:5, 216:4, 217:1,
220:13, 221:13,
221:16, 255:24,
256:2, 261:24, 263:7
**showed** [3] - 23:20,
171:4, 276:22
**showing** [1] - 218:12
**shown** [1] - 283:3
**Shred** [1] - 167:17
**shred** [11] - 231:3,
231:12, 231:13,
238:11, 238:16,
239:1, 239:3,
239:10, 239:17,
239:21
**shut** [2] - 202:22,
268:15
**sick** [2] - 225:10,
281:6
**side** [6] - 9:3, 9:5,
58:7, 219:13, 250:22
**sign** [2] - 89:10, 89:11
**signature** [6] - 101:18,
118:18, 118:20,
132:20, 211:5, 211:6
**signed** [4] - 3:10,
24:15, 121:24,
215:13
**significant** [2] - 16:13,
153:12
**significantly** [2] -
152:24, 153:24
**signing** [1] - 276:8
**silence** [1] - 282:19
**similar** [1] - 141:2
**simple** [3] - 70:21,
137:22, 199:8
**single** [1] - 180:6
**sister** [8] - 277:12,
277:15, 277:16,
278:16, 279:15,
280:5, 281:22,
299:19
**sister's** [1] - 282:3

**site** [5] - 60:16, 60:19,
60:24, 166:8, 267:18
**sited** [1] - 272:22
**sitting** [6] - 160:12,
230:13, 232:15,
232:16, 232:20,
251:21
**situation** [18] - 14:19,
32:17, 47:9, 47:13,
49:10, 49:14, 49:23,
50:17, 72:3, 159:23,
162:18, 163:19,
167:3, 181:7, 182:4,
189:13, 247:13,
252:8
**situations** [5] - 48:23,
50:18, 69:20, 240:4,
243:8
**six** [7] - 46:8, 58:14,
95:17, 230:2,
231:20, 254:13,
261:6
**skeptical** [1] - 193:6
**skill** [1] - 272:1
**skipping** [1] - 58:23
**sleep** [1] - 245:20
**slighted** [1] - 227:9
**slip** [1] - 182:10
**slot** [1] - 147:15
**small** [1] - 32:11
**Smith** [42] - 77:5, 77:6,
77:24, 78:6, 79:2,
79:18, 109:2, 109:4,
159:22, 159:23,
162:17, 163:9,
166:24, 167:1,
172:4, 172:24,
173:6, 173:7, 173:8,
174:17, 180:4,
181:7, 182:11,
182:14, 182:15,
195:10, 196:2,
196:9, 196:17,
197:11, 224:24,
243:15, 249:16,
249:17, 249:20,
251:4, 251:9,
252:24, 270:5,
283:14, 284:17,
295:18
**Smith's** [1] - 285:7
**smoking** [4] - 34:15,
35:9, 36:14, 36:21
**solely** [1] - 19:14
**solve** [2] - 242:24,
244:5
**solving** [1] - 240:7
**someone** [11] - 57:6,
71:22, 96:16, 96:22,
96:23, 116:8,

182:18, 221:12,
265:14, 274:4
**something"** [1] -
293:19
**something's** [1] -
82:17
**sometimes** [1] -
204:13
**somewhat** [1] - 200:2
**somewhere** [10] -
16:9, 30:22, 94:24,
113:13, 122:19,
127:20, 150:21,
155:5, 158:2, 251:21
**son** [4] - 154:1,
154:10, 154:11,
186:17
**soon** [4] - 12:7, 12:9,
128:23, 129:1
**sophomoric** [3] -
243:23, 252:4,
252:11
**sorry** [12] - 20:17,
23:18, 55:16, 60:7,
96:1, 138:8, 153:13,
177:9, 191:5, 209:6,
224:10, 245:3
**Sorsby** [1] - 1:14
**SORSBY** [130] - 2:3,
2:6, 4:5, 12:24, 13:4,
23:2, 23:5, 23:6,
24:23, 31:10, 37:24,
38:2, 38:3, 54:8,
54:11, 54:13, 57:18,
57:22, 65:10, 65:14,
66:13, 66:16, 74:20,
74:22, 75:9, 75:14,
75:22, 76:1, 79:14,
80:18, 80:20, 89:1,
89:3, 95:18, 95:23,
96:3, 100:13, 101:2,
101:12, 101:13,
103:7, 103:12,
111:8, 111:11,
111:14, 111:16,
111:20, 112:5,
114:8, 115:12,
115:16, 116:3,
116:10, 116:12,
118:7, 118:9, 123:2,
123:4, 123:5,
133:11, 133:13,
133:15, 133:21,
133:23, 134:5,
134:8, 134:14,
154:22, 155:3,
155:23, 160:17,
160:24, 167:20,
168:1, 168:2,
185:15, 185:17,

187:19, 187:21,
207:1, 207:3,
216:20, 216:24,
218:23, 219:24,
220:5, 223:16,
223:19, 228:10,
228:15, 228:20,
229:1, 229:4, 231:8,
235:2, 235:4,
235:20, 235:24,
236:4, 236:9,
236:13, 236:17,
236:24, 238:3,
238:5, 254:10,
254:12, 259:15,
260:13, 270:7,
270:10, 274:12,
274:21, 274:23,
275:1, 277:24,
283:21, 283:24,
284:6, 284:11,
284:15, 285:3,
285:6, 285:10,
287:18, 287:20,
298:9, 298:13,
298:19, 300:10
**SORSBY...................
.PAGE** [1] - 301:2
**sorsbylaw@gmail.
com** [1] - 2:6
**sort** [1] - 160:22
**sought** [1] - 84:24
**sound** [3] - 114:18,
216:7, 284:3
**sound's** [1] - 224:1
**sounds** [4] - 223:21,
223:22, 225:15,
228:8
**space** [1] - 212:16
**speaking** [5] - 5:4,
214:13, 224:13,
232:7, 232:8
**speaks** [3] - 111:12,
111:18, 111:24
**spearheaded** [1] -
39:5
**Special** [2] - 32:21,
32:22
**specific** [27] - 11:14,
28:17, 35:12, 37:15,
41:6, 41:10, 41:11,
43:8, 56:1, 69:24,
72:4, 72:5, 85:21,
91:24, 107:19,
114:15, 121:10,
127:1, 132:24,
161:3, 188:9,
190:14, 194:18,
199:22, 270:16,
284:12, 300:2

**specifically** [48] -
6:15, 11:6, 28:12,
34:3, 35:11, 36:3,
36:20, 40:2, 42:24,
52:12, 57:14, 58:5,
58:6, 63:2, 69:14,
74:13, 74:14, 81:7,
81:21, 82:2, 88:6,
90:16, 96:16, 99:2,
104:11, 110:4,
110:10, 112:14,
112:23, 114:10,
125:1, 126:19,
126:20, 127:12,
132:19, 157:2,
159:4, 167:10,
180:22, 191:12,
198:22, 200:13,
202:21, 210:3,
213:20, 223:4,
223:9, 231:6
**spend** [1] - 149:3
**spending** [1] - 125:7
**split** [1] - 258:14
**spoken** [2] - 43:17,
126:6
**spray** [2] - 100:19,
100:22
**staff** [63] - 14:20,
17:10, 18:16, 19:2,
20:2, 20:3, 20:8,
22:14, 25:4, 26:23,
28:10, 34:13, 34:17,
35:1, 35:3, 36:10,
36:13, 36:16, 36:23,
37:3, 37:5, 37:6,
47:1, 50:21, 51:3,
66:22, 68:2, 68:17,
68:19, 71:16, 74:8,
76:10, 76:14, 90:19,
91:19, 92:18,
110:18, 110:21,
114:5, 119:21,
122:16, 123:19,
126:7, 127:5,
149:14, 150:2,
154:8, 156:4,
166:17, 172:4,
179:15, 194:7,
196:5, 196:8, 227:5,
227:6, 241:1, 241:5,
260:6, 265:19,
266:12
**staffed** [1] - 240:4
**stand** [1] - 277:7
**standard** [1] - 262:18
**standing** [2] - 203:8,
203:10
**standpoint** [2] - 10:20,
34:14

**staring** [2] - 252:4,
252:11
**start** [13] - 7:8, 132:14,
189:1, 211:4, 215:3,
224:7, 229:2, 244:3,
270:12, 275:9,
278:9, 278:21, 284:9
**started** [12] - 31:18,
31:23, 81:7, 103:9,
186:12, 194:10,
241:4, 261:20,
267:5, 280:22,
282:16, 300:4
**starting** [1] - 240:17
**starts** [1] - 207:21
**STATE** [1] - 302:1
**State** [11] - 1:17,
32:20, 32:22, 90:7,
132:4, 155:15,
182:22, 207:5,
215:1, 215:7, 303:4
**state** [51] - 32:14,
33:10, 34:8, 37:16,
38:17, 39:3, 82:8,
96:21, 158:17,
160:8, 160:9,
160:20, 161:1,
161:7, 161:9,
161:11, 161:13,
162:10, 164:6,
164:17, 164:20,
166:3, 167:4,
170:21, 171:1,
171:12, 172:8,
176:8, 186:16,
198:12, 230:14,
230:15, 231:4,
239:12, 247:21,
253:14, 262:16,
263:23, 264:1,
267:14, 276:15,
288:11, 288:21,
288:24, 289:2,
289:13, 289:17,
290:2, 290:13,
296:1, 296:2
**statement** [42] - 18:4,
25:7, 35:6, 39:7,
49:4, 59:7, 59:15,
59:18, 60:18, 61:2,
66:12, 85:11, 97:2,
98:24, 99:3, 100:10,
100:11, 117:22,
149:12, 178:2,
178:7, 178:14,
178:15, 179:10,
179:18, 194:9,
224:16, 224:17,
227:18, 227:24,
228:3, 228:4, 228:7,

230:10, 230:11,
272:10, 274:8,
278:13, 288:14,
289:1, 295:16,
299:15
**statements** [3] - 24:8,
90:5, 282:23
**STATES** [1] - 1:1
**stating** [2] - 96:12,
96:13
**status** [13] - 76:11,
128:16, 129:7,
129:20, 129:23,
153:7, 191:19,
208:8, 209:2, 209:5,
209:12, 209:17,
217:19
**stay** [16] - 76:16,
77:10, 134:8, 160:1,
160:3, 162:24,
184:3, 184:6,
184:16, 184:20,
185:23, 186:15,
186:21, 187:3,
187:4, 238:21
**stayed** [4] - 30:19,
83:21, 200:15,
206:21
**staying** [5] - 131:12,
148:14, 163:1,
255:19, 265:2
**stays** [1] - 185:23
**stemming** [1] - 191:14
**stenographer** [2] -
4:16, 101:5
**step** [1] - 288:2
**Steve** [1] - 210:2
**sticker** [1] - 236:5
**still** [19] - 5:9, 26:13,
27:17, 27:20, 44:10,
44:14, 57:12, 59:20,
64:24, 76:2, 84:8,
120:24, 139:23,
198:1, 217:18,
217:22, 218:16,
219:4, 219:5
**STIPULATED** [3] - 3:2,
3:6, 3:9
**stomach** [2] - 12:22,
12:23
**stood** [2] - 34:4,
219:22
**stop** [6] - 30:12,
37:14, 240:5,
245:24, 277:8, 292:2
**stops** [3] - 17:21,
62:9, 63:16
**Street** [1] - 2:10
**street** [3] - 139:20,
152:24, 153:3

**strictly** [1] - 242:13
**strike** [7] - 10:7, 10:8,
59:24, 140:13,
176:16, 193:13,
287:21
**stripes** [18] - 44:18,
45:4, 45:18, 46:18,
47:2, 47:7, 47:11,
47:14, 47:20, 48:5,
48:8, 48:22, 48:24,
49:11, 49:15, 50:2,
50:19, 280:24
**stuff** [47] - 15:17, 17:1,
19:5, 30:4, 31:16,
31:17, 36:4, 36:5,
39:15, 39:17, 41:21,
45:8, 77:7, 87:10,
87:12, 87:15, 88:4,
93:6, 95:14, 96:12,
100:19, 100:22,
110:11, 114:23,
157:22, 163:2,
163:3, 186:12,
187:7, 227:14,
236:20, 240:17,
240:19, 242:6,
242:22, 244:1,
244:2, 252:5,
252:13, 253:4,
253:6, 267:5, 270:6,
286:21, 291:8, 292:2
**stupid** [1] - 244:1
**subject** [5] - 61:4,
80:21, 100:4,
265:10, 267:7
**subjective** [1] - 72:21
**submit** [4] - 226:3,
262:8, 263:2, 263:12
**submits** [1] - 150:16
**subordinates** [3] -
91:17, 296:13,
296:24
**subpar** [1] - 127:8
**subscribed** [1] - 3:11
**substance** [5] - 26:21,
34:12, 77:17, 85:14,
89:15
**sufficiently** [1] - 26:18
**suggested** [1] -
276:23
**Suite** [1] - 2:10
**suited** [3] - 17:5,
45:10, 45:13
**summons** [4] -
181:11, 181:15,
181:20, 181:22
**superintendent** [3] -
7:20, 32:14, 32:16
**superior** [4] - 28:16,
42:3, 42:5

**superluxinance** [1] -
256:12
**supervise** [2] - 6:11,
64:2
**supervising** [1] -
51:18
**supervision** [3] - 64:5,
82:21, 82:24
**supervisor** [22] - 9:9,
34:16, 35:12, 41:9,
45:11, 45:14, 45:21,
63:14, 63:15, 63:16,
63:22, 64:1, 64:2,
69:6, 69:21, 69:22,
70:1, 80:2, 80:5,
222:9, 296:14,
297:18
**supervisors** [6] - 36:8,
37:6, 61:20, 64:14,
152:16, 296:23
**supervisory** [6] - 6:9,
6:13, 18:2, 18:6,
18:15, 45:15, 76:9,
208:5
**supporting** [1] -
278:16
**supposed** [17] - 63:3,
63:4, 63:6, 66:6,
66:24, 114:23,
172:24, 204:11,
225:23, 225:24,
240:18, 240:20,
241:5, 243:7, 252:9,
270:6, 291:24
**supreme** [1] - 93:15
**Supreme** [1] - 67:20
**surrendering** [1] -
24:9
**suspended** [8] -
82:10, 83:17,
171:24, 183:14,
183:16, 183:20,
183:24, 228:1
**suspension** [1] -
256:17
**suspicion** [1] - 250:14
**Swanberry** [4] - 120:7,
120:13, 120:19,
238:22
**swearing** [1] - 138:16
**swift** [2] - 70:2, 70:5
**sworn** [6] - 3:12, 4:2,
136:7, 136:9,
138:14, 303:6
**Sworn** [1] - 302:12
**system** [7] - 15:21,
130:19, 130:21,
188:16, 189:11,
190:2, 192:3

# T

**take-home** [1] - 191:17
**talks** [1] - 93:5
**tandem** [1] - 182:9
**taped** [1] - 120:3
**task** [1] - 15:20
**team** [1] - 149:19
**tease** [1] - 243:24
**technical** [5] - 11:5, 92:3, 114:22, 191:15, 245:17
**technically** [1] - 212:16
**telephone** [4] - 60:21, 157:16, 231:22, 269:4
**ten** [5] - 26:17, 27:8, 101:1, 131:8, 235:5
**ten-minute** [1] - 101:1
**term** [5] - 91:14, 258:12, 259:3, 286:23, 297:15
**terminate** [4] - 126:18, 212:7, 216:17, 257:17
**terminated** [21] - 83:4, 83:6, 84:9, 125:21, 126:3, 127:15, 171:24, 190:20, 190:22, 190:24, 191:2, 211:15, 211:20, 215:9, 218:2, 218:8, 220:10, 220:16, 221:2, 263:8, 263:13
**terminating** [1] - 212:15
**termination** [6] - 61:10, 61:13, 61:14, 212:20, 215:20, 216:16
**terms** [8] - 11:2, 36:1, 130:9, 143:5, 153:22, 286:8, 298:15, 298:16
**test** [2] - 129:18, 130:2
**testified** [17] - 4:3, 14:1, 20:18, 34:12, 49:2, 70:7, 102:9, 104:17, 105:2, 105:15, 108:15, 182:7, 182:13, 238:17, 238:18, 238:24, 269:20
**testify** [4] - 140:7, 151:19, 246:23, 303:7
**testifying** [4] - 75:2,

75:3, 75:7, 238:15
**testimony** [7] - 106:12, 113:13, 141:7, 160:19, 238:9, 265:1, 302:3
**testing** [1] - 39:14
**thanked** [1] - 279:15
**that'** [1] - 234:22
**THE** [19] - 4:4, 12:21, 31:16, 95:15, 95:20, 96:1, 100:18, 100:23, 103:10, 116:6, 122:22, 134:1, 134:6, 134:13, 228:13, 228:19, 228:22, 231:10, 278:4
**themselves** [1] - 35:19
**thereafter** [1] - 303:11
**thereby** [1] - 148:2
**therefore** [3] - 71:3, 262:7, 266:4
**therein** [1] - 303:11
**they've** [2] - 14:23, 211:11
**third** [5] - 61:16, 108:16, 109:22, 110:9, 131:6
**thirteen** [1] - 256:5
**thirty** [1] - 237:11
**thirty-seven** [1] - 237:11
**Thomas** [2] - 77:12, 267:21
**thorough** [2] - 70:2, 164:23
**thoroughly** [1] - 272:12
**threat** [32] - 58:18, 67:14, 67:17, 67:23, 69:23, 70:9, 70:10, 70:11, 70:20, 70:23, 79:22, 80:1, 80:3, 80:7, 80:14, 164:10, 164:13, 165:2, 166:8, 179:3, 179:18, 179:21, 180:11, 180:12, 242:19, 246:11, 252:14, 252:19, 269:6, 291:9, 293:10, 293:19
**threat's** [2] - 70:24, 208:3
**threaten** [3] - 175:6, 178:24, 209:4
**threatened** [14] - 66:23, 73:2, 80:2, 85:13, 85:18, 157:16, 158:7,

158:24, 159:1, 209:3, 237:4, 243:11, 280:6, 296:10
**threatening** [12] - 51:3, 59:10, 60:4, 165:22, 179:21, 208:8, 209:1, 209:12, 242:5, 268:24, 275:12, 275:17
**threatens** [3] - 71:5, 72:6, 165:11
**threats** [16] - 58:10, 58:12, 59:10, 60:3, 60:16, 60:17, 60:19, 60:20, 60:24, 165:22, 208:4, 267:17, 290:21, 296:16, 296:24
**three** [48] - 36:13, 36:20, 51:16, 64:10, 65:1, 68:23, 69:1, 110:23, 112:6, 130:10, 130:14, 130:16, 130:17, 130:18, 130:24, 131:10, 131:15, 131:18, 140:24, 142:3, 142:21, 142:23, 143:11, 143:12, 144:5, 144:11, 144:19, 144:20, 145:1, 145:9, 145:11, 145:15, 145:24, 146:5, 146:6, 146:17, 147:10, 147:20, 147:21, 152:8, 153:18, 176:18, 191:15, 244:8, 247:8, 272:8, 298:14
**three-page** [2] - 110:23, 112:6
**threshold** [1] - 70:24
**throat** [1] - 12:21
**throughout** [2] - 127:7, 135:10
**throw** [4] - 228:7, 231:2, 239:9, 250:19
**ticket** [3] - 171:13, 171:17, 171:18
**tied** [1] - 199:7
**tight** [2] - 254:4, 254:5
**timeline** [3] - 86:4, 86:14, 150:19
**timelines** [1] - 86:14
**timer** [1] - 284:10
**title** [3] - 8:10, 155:13,

256:1
**TO** [2] - 301:1, 301:5
**today** [12] - 4:6, 8:1, 74:23, 102:9, 105:15, 106:12, 162:6, 175:20, 238:17, 254:15, 267:15, 288:10
**together** [7] - 29:8, 183:22, 184:22, 241:13, 242:3, 242:19, 242:24
**TOM** [1] - 1:9
**Tom** [23] - 168:12, 169:12, 169:16, 170:15, 171:5, 173:24, 174:1, 174:5, 174:8, 174:10, 182:6, 182:12, 196:10, 196:16, 197:23, 233:11, 248:12, 248:13, 249:23, 251:3, 252:8, 283:15, 295:19
**tomorrow** [1] - 236:10
**Tony** [1] - 227:8
**took** [14] - 13:21, 28:3, 30:23, 32:12, 82:11, 83:11, 84:14, 90:13, 149:2, 190:17, 194:14, 248:1, 261:14, 267:9
**tools** [1] - 15:19
**top** [36] - 17:21, 25:18, 44:21, 49:13, 50:20, 65:18, 69:16, 91:10, 101:20, 118:21, 119:9, 119:19, 130:14, 130:16, 130:17, 130:18, 131:4, 131:24, 132:10, 147:8, 151:12, 155:14, 156:3, 169:23, 176:19, 192:21, 215:14, 215:16, 217:7, 222:6, 254:18, 262:23, 268:1, 269:8, 270:19, 271:3
**topic** [1] - 265:10
**total** [1] - 129:15
**totality** [1] - 257:14
**totally** [7] - 34:24, 189:21, 194:13, 206:21, 224:23, 227:22, 228:6
**touchy** [1] - 241:1
**touchy-feely** [1] -

241:1
**tough** [1] - 243:23
**Town** [4] - 181:11, 191:22, 192:12, 192:14
**track** [1] - 169:4
**trade** [1] - 31:21
**trained** [2] - 63:18, 124:19
**training** [27] - 51:10, 52:20, 52:23, 53:3, 61:19, 61:22, 62:2, 62:10, 62:13, 62:15, 62:17, 62:21, 63:4, 63:8, 63:24, 64:13, 124:7, 124:10, 124:12, 124:14, 124:15, 124:17, 240:14, 280:15, 297:17, 297:21
**training"** [1] - 61:17
**transcribe** [1] - 116:9
**transcript** [20] - 214:3, 214:11, 214:20, 215:4, 228:21, 229:6, 231:21, 235:18, 237:16, 238:6, 260:14, 284:17, 284:19, 284:22, 285:7, 290:8, 302:5, 303:12, 303:15
**Transcript** [2] - 301:14, 301:15
**transition** [2] - 149:19
**transitioned** [1] - 280:23
**transport** [5] - 108:20, 124:19, 173:22, 275:23, 280:7
**transports** [2] - 124:16, 172:23
**treatment** [1] - 260:21
**tree** [1] - 285:15
**TRIAL** [1] - 1:12
**trial** [3] - 3:8, 5:4, 5:6
**tried** [10] - 230:14, 232:17, 278:5, 278:6, 278:8, 278:9, 280:4, 289:5, 289:6, 289:22
**trip** [1] - 30:23
**trips** [1] - 30:21
**troop** [1] - 90:17
**trooper** [2] - 160:8, 160:9
**Trooper** [5] - 175:16, 178:2, 183:3, 183:12, 293:1
**trooper's** [2] - 172:9,

288:11
**Troopers** [1] - 182:22
**trouble** [3] - 277:4,
277:21, 279:23
**Troy** [15] - 5:22, 6:7,
12:16, 13:5, 13:7,
13:9, 13:10, 32:3,
192:11, 225:21,
225:24, 226:10,
226:23, 227:5,
227:10
**Troy's** [1] - 226:2
**true** [135] - 8:19, 8:22,
10:5, 11:24, 12:14,
12:17, 16:19, 17:20,
17:24, 18:19, 18:23,
29:23, 29:24, 34:23,
36:11, 37:9, 38:8,
39:6, 39:7, 40:18,
41:3, 41:5, 45:22,
51:3, 63:14, 64:3,
70:11, 71:8, 73:17,
74:5, 77:1, 78:22,
81:13, 82:1, 82:6,
82:15, 83:23, 84:9,
84:13, 85:10, 85:14,
86:2, 90:4, 92:7,
92:11, 95:7, 97:17,
98:24, 99:2, 99:11,
99:13, 99:19,
103:16, 104:21,
105:19, 106:6,
110:13, 115:2,
117:1, 124:5, 124:8,
126:8, 128:10,
128:17, 128:20,
128:24, 130:5,
138:3, 139:15,
148:3, 148:5, 149:8,
149:12, 154:2,
155:8, 156:19,
166:2, 166:10,
172:18, 175:10,
176:11, 178:10,
188:5, 189:17,
189:21, 189:23,
190:15, 190:18,
193:5, 194:8, 194:9,
194:16, 194:21,
197:6, 199:10,
208:14, 211:18,
212:15, 217:18,
217:22, 218:2,
224:6, 224:23,
225:7, 225:18,
227:18, 227:21,
229:1, 230:10,
245:10, 250:10,
257:22, 266:7,
266:23, 271:9,

274:10, 276:14,
276:21, 277:23,
278:24, 279:8,
280:10, 281:4,
281:15, 285:21,
286:1, 295:2,
295:22, 296:3,
296:20, 302:5,
303:12
**truly** [1] - 246:5
**trust** [4] - 164:20,
256:15, 279:1, 279:3
**trusted** [1] - 121:19
**truth** [14] - 87:17,
87:20, 91:3, 98:3,
162:19, 179:6,
229:14, 246:13,
277:7, 277:10,
303:7, 303:8
**truthful** [1] - 127:4
**truthfully** [1] - 4:15
**try** [12] - 49:7, 134:1,
227:23, 241:13,
241:18, 241:19,
242:3, 242:10,
242:15, 242:18,
250:22, 278:20
**trying** [25] - 6:23,
39:16, 73:24, 86:5,
92:11, 100:16,
142:7, 142:8,
146:22, 157:22,
164:9, 164:11,
165:1, 228:7, 234:5,
237:23, 239:7,
241:24, 243:4,
247:12, 247:22,
248:1, 249:18,
250:5, 294:15
**Tuesday** [1] - 231:24
**turn** [9] - 65:15,
139:11, 139:14,
207:7, 211:4,
218:12, 256:4,
271:1, 275:4
**turned** [11] - 57:7,
82:8, 103:21, 151:2,
194:12, 199:15,
234:6, 248:12,
251:20, 251:23,
270:4
**turning** [1] - 176:18
**twice** [3] - 29:14,
30:19, 44:23
**two** [51] - 27:6, 30:17,
44:23, 44:24, 50:3,
51:16, 65:1, 67:1,
70:15, 71:7, 72:2,
72:8, 72:18, 72:23,
73:4, 88:23, 90:3,

90:11, 93:11, 101:7,
102:11, 131:6,
142:2, 142:13,
142:19, 143:11,
143:12, 144:8,
144:19, 145:8,
145:14, 148:10,
153:14, 153:16,
153:17, 165:13,
175:8, 190:15,
219:24, 241:13,
242:3, 242:19,
242:24, 252:22,
254:13, 264:15,
266:18, 266:20,
283:10, 289:21
**two-page** [2] - 90:3,
90:11
**type** [14] - 27:7, 92:10,
101:20, 118:24,
122:23, 130:19,
130:21, 132:13,
230:6, 236:23,
260:22, 267:12,
267:13, 273:4
**typed** [4] - 89:4, 89:7,
136:20, 215:12
**types** [2] - 36:13,
60:24
**typewritten** [1] -
102:10, 102:14,
303:11
**typical** [1] - 204:23
**typically** [1] - 4:23

## U

**ultimate** [1] - 18:9
**ultimately** [4] - 25:11,
94:5, 159:13, 190:14
**unable** [1] - 262:7
**unavailable** [1] -
33:17
**uncle** [1] - 186:17
**uncomfortable** [1] -
127:10
**uncommon** [2] -
14:22, 92:1
**uncorroborated** [1] -
264:24
**under** [21] - 28:19,
46:17, 61:17, 72:17,
77:13, 82:21, 82:24,
143:11, 198:4,
198:13, 212:21,
212:22, 218:4,
219:22, 227:20,
227:21, 250:20,
254:2, 259:5, 261:23
**undermine** [1] -

266:12
**undermining** [1] -
265:19
**undersheriff** [42] -
7:22, 8:13, 19:3,
19:15, 33:11, 33:17,
40:5, 43:4, 43:14,
43:15, 78:9, 84:18,
84:22, 85:1, 122:7,
150:2, 154:12,
154:17, 169:17,
170:12, 170:16,
172:14, 173:4,
173:15, 175:23,
195:24, 199:1,
200:17, 202:6,
202:11, 206:24,
210:1, 210:24,
213:21, 216:17,
233:3, 249:12,
259:16, 261:16,
261:18, 273:14,
297:11
**Undersheriff** [11] -
81:14, 178:6, 182:2,
196:9, 202:3,
206:12, 230:6,
249:9, 271:5, 271:8,
272:19
**UNDERSHERIFF** [1] -
1:8
**undersheriff's** [8] -
66:5, 154:10,
154:11, 232:18,
232:22, 233:1,
233:13, 259:9
**understood** [7] -
13:17, 60:15, 136:4,
141:11, 146:22,
226:9, 263:18
**unfounded** [1] - 98:1
**unilaterally** [1] - 84:20
**union** [9] - 47:18,
49:18, 49:24, 50:10,
115:7, 115:9,
115:10, 254:1,
259:21
**Unit** [2] - 32:21, 32:23
**unit** [1] - 110:20
**UNITED** [1] - 1:1
**units** [1] - 42:16
**unlawful** [1] - 256:10
**unless** [2] - 7:23,
146:3
**unpaid** [2] - 210:15,
210:17
**unquote** [1] - 268:6
**unrelated** [2] - 215:22,
219:10
**unrestricted** [2] -

16:17, 16:20
**unsuccessful** [1] -
272:7
**up** [101] - 7:9, 8:21,
21:22, 25:11, 25:13,
32:20, 32:23, 33:12,
39:8, 44:18, 45:3,
45:17, 45:18, 46:12,
46:18, 47:1, 47:21,
47:22, 48:5, 48:7,
49:11, 56:23, 56:24,
62:5, 66:4, 66:7,
81:6, 88:19, 90:4,
100:4, 100:10,
105:24, 113:13,
114:20, 115:2,
115:7, 116:21,
123:11, 126:15,
131:18, 136:20,
143:8, 144:2, 147:8,
167:2, 167:24,
170:15, 171:5,
173:13, 173:18,
174:7, 174:10,
174:13, 186:5,
186:13, 194:12,
198:14, 199:7,
202:2, 204:19,
207:20, 212:6,
213:12, 213:18,
213:20, 214:20,
215:12, 223:7,
233:11, 236:11,
241:24, 244:5,
247:11, 248:3,
249:23, 251:2,
257:6, 257:19,
258:4, 258:14,
259:1, 260:16,
263:4, 271:18,
272:16, 275:22,
276:1, 276:10,
276:23, 277:7,
277:17, 277:18,
282:9, 282:12,
282:21, 283:15,
285:14, 294:7,
295:2, 295:4
**upset** [9] - 246:6,
246:8, 246:11,
260:17, 260:18,
260:23, 264:12,
278:17, 282:22
**upside** [1] - 272:2
**usage** [2] - 189:11,
190:2
**uses** [1] - 204:18
**usual** [1] - 276:8
**Utica** [1] - 2:10
**utilize** [4] - 13:15,

133:3, 146:1, 204:24
**utmost** [1] - 224:24

## V

**vacancies** [1] - 137:11
**vacant** [1] - 137:1
**vacated** [1] - 259:8
**vacation** [3] - 29:15,
29:17, 29:18
**Vaga** [6] - 127:23,
128:8, 128:11,
188:7, 188:17,
291:21
**valid** [5] - 129:11,
129:21, 130:3,
130:8, 193:9
**validity** [2] - 166:21,
192:24
**vehemently** [3] -
162:22, 291:10,
296:11
**vendetta** [1] - 283:4
**verbal** [6] - 58:18,
78:12, 78:13, 86:23,
86:24, 87:1
**verbalize** [2] - 4:16,
4:18
**verbalized** [1] - 100:9
**verbally** [5] - 87:6,
88:5, 102:17, 111:3,
173:14
**verified** [1] - 166:21
**verify** [4] - 73:21,
166:11, 263:17
**versus** [4] - 71:22,
153:11, 235:11,
284:17
**via** [2] - 176:21,
177:11
**Vibert** [51] - 8:7,
39:20, 39:21, 40:14,
41:17, 78:22, 79:18,
83:3, 84:8, 84:13,
85:9, 87:9, 89:18,
90:14, 90:15, 90:16,
92:6, 96:4, 96:11,
97:19, 99:3, 99:14,
99:21, 99:24, 102:6,
103:21, 104:20,
105:17, 106:8,
125:21, 127:15,
156:16, 161:5,
163:7, 170:17,
175:24, 183:13,
192:17, 232:8,
235:11, 237:5,
237:13, 238:24,
247:13, 247:15,
269:5, 270:1,

284:17, 285:16,
294:19, 299:15
**video** [2] - 16:4,
197:20
**videos** [1] - 197:21
**violate** [2] - 146:17,
191:8
**violated** [2] - 61:8,
299:22
**Violation** [3] - 271:2,
271:12, 273:23
**violation** [3] - 61:3,
69:4, 166:1
**violence** [99] - 52:9,
52:13, 52:20, 53:1,
53:7, 53:19, 54:16,
54:23, 54:24, 56:2,
56:6, 56:15, 56:19,
56:21, 57:1, 57:13,
58:8, 58:16, 58:21,
59:5, 59:19, 60:2,
60:15, 60:23, 61:5,
61:19, 61:23, 63:19,
64:8, 64:12, 65:3,
66:11, 66:18, 66:20,
66:24, 67:7, 68:10,
68:14, 69:9, 69:12,
69:23, 70:3, 70:20,
76:2, 76:4, 76:6,
77:20, 78:1, 78:7,
78:24, 79:3, 162:7,
162:9, 164:10,
165:2, 165:19,
165:23, 166:5,
166:9, 169:21,
174:10, 174:15,
180:7, 180:11,
180:17, 181:2,
182:8, 182:14,
192:19, 193:15,
196:5, 196:13,
196:19, 201:7,
202:5, 248:14,
248:17, 250:7,
250:9, 251:5, 251:7,
251:12, 251:16,
267:16, 267:17,
270:18, 272:6,
272:11, 273:10,
274:9, 274:18,
274:19, 283:17,
295:9, 295:14,
295:17, 295:20,
296:6, 298:23
**Violence** [2] - 58:15,
65:20
**violent** [1] - 59:11
**visited** [2] - 29:11,
29:13
**voice** [9] - 12:19,

115:19, 115:21,
115:23, 223:20,
223:24, 224:2,
225:2, 225:14
**voices** [1] - 115:19
**voluntarily** [4] - 47:14,
47:21, 48:4, 48:7
**vs** [1] - 1:7

## W

**wait** [6] - 134:6,
161:16, 165:5,
166:18, 166:23,
180:19
**waiting** [3] - 67:9,
139:5, 173:24
**waived** [1] - 3:5
**walk** [1] - 74:15
**walked** [3] - 37:12,
37:13, 230:14
**walking** [3] - 30:11,
163:15, 281:17
**walks** [1] - 233:3
**Walraed** [7] - 151:5,
152:13, 154:1,
154:8, 154:13,
154:15, 196:7
**wants** [13] - 35:17,
35:18, 158:12,
158:13, 264:2,
264:4, 264:5, 264:6,
278:18, 282:4,
282:15
**watch** [5] - 8:15, 8:17,
9:9, 108:17, 172:5
**Watch** [1] - 122:21
**watched** [2] - 34:5,
67:14
**watching** [1] - 180:4
**watchman** [1] -
122:15
**Watchman** [2] -
122:17, 122:22
**watchmans** [1] -
122:15
**ways** [2] - 107:11,
144:12
**weak** [2] - 149:1,
276:17
**weapon** [1] - 21:11
**weapons** [1] - 15:16
**wear** [1] - 200:2
**Webster** [3] - 189:5,
189:9
**week** [2] - 37:9, 37:10
**weekends** [3] - 11:19,
11:20, 11:21
**weeks** [2] - 51:16,
86:8

**weigh** [3] - 126:17,
152:23, 153:23
**weighed** [2] - 5:6,
153:4
**Wendy** [4] - 127:23,
128:8, 128:11,
291:21
**west** [4] - 9:3, 119:21,
278:10, 278:11
**whatsoever** [2] -
154:4, 205:19
**whereby** [1] - 190:17
**wherein** [1] - 104:14
**WHEREUPON** [1] -
300:11
**whoever's** [2] - 217:5
**whole** [10] - 32:6,
112:7, 168:6,
199:16, 200:8,
221:9, 264:23,
265:13, 300:5, 303:7
**wholeheartedly** [1] -
237:1
**wife** [10] - 113:11,
116:21, 117:3,
117:12, 117:19,
187:9, 258:12,
259:3, 265:7, 280:13
**William** [3] - 189:5,
189:9, 205:24
**wing** [2] - 8:24, 9:7
**wings** [3] - 8:22, 9:1,
9:13
**wise** [2] - 10:14,
212:17
**witness** [12] - 24:8,
31:15, 74:23, 75:17,
90:5, 91:9, 91:11,
91:12, 105:9, 106:7,
303:5, 303:20
**WITNESS** [13] - 12:21,
31:16, 95:15, 95:20,
96:1, 100:18,
100:23, 122:22,
134:1, 134:6,
134:13, 278:4, 301:1
**witnessed** [8] - 96:9,
96:12, 97:7, 104:19,
104:23, 105:4,
105:11, 278:10
**witnesses** [8] - 77:7,
106:14, 157:21,
161:23, 162:5,
272:8, 273:9, 273:12
**woman** [2] - 282:3
**wondering** [2] -
136:12, 254:23
**Wopner** [5] - 205:6,
205:7, 205:8, 205:11
**word** [4] - 89:4,

134:16, 196:24,
231:12
**words** [3] - 5:5, 85:14,
238:16
**work-issued** [4] -
244:10, 245:10,
245:16, 266:23
**work-related** [5] -
30:8, 31:1, 267:2,
280:1, 281:2
**worker** [3] - 80:9,
80:13, 165:2
**workers** [2] - 107:1,
279:4
**Workers'** [7] - 206:19,
207:5, 208:11,
208:20, 209:22,
216:9, 299:2
**Workplace** [2] - 58:15,
65:20
**workplace** [117] -
15:13, 52:9, 52:12,
52:20, 53:1, 53:7,
53:18, 54:16, 54:23,
54:24, 56:2, 56:6,
56:15, 56:18, 56:21,
57:1, 57:13, 58:8,
58:16, 58:20, 59:4,
59:18, 60:2, 60:15,
60:23, 61:5, 61:18,
61:22, 63:18, 64:8,
64:12, 65:3, 66:11,
66:18, 66:20, 67:7,
68:10, 68:14, 69:9,
69:11, 70:3, 76:2,
76:4, 76:6, 77:20,
77:24, 78:7, 78:23,
79:3, 87:15, 91:20,
91:21, 108:5, 162:7,
162:9, 165:11,
165:13, 165:19,
166:5, 166:9,
169:20, 174:9,
174:15, 180:7,
180:11, 180:17,
181:2, 182:7,
182:14, 187:7,
187:11, 192:19,
193:15, 196:4,
196:12, 196:18,
201:5, 201:7, 202:5,
208:7, 209:1,
209:11, 241:15,
247:17, 247:21,
248:11, 248:14,
248:17, 250:7,
250:9, 251:5, 251:7,
251:12, 251:16,
253:5, 253:7,
264:14, 265:18,

266:7, 266:11,
266:12, 266:15,
266:16, 267:9,
267:16, 267:17,
270:5, 270:18,
272:6, 272:11,
273:10, 274:9,
274:18, 274:19,
283:16, 295:9,
298:23
**works** [7] - 132:2,
132:3, 142:8,
143:19, 144:10,
276:19, 296:18
**world** [1] - 13:3
**worse** [2] - 200:2,
243:8
**wrap** [1] - 100:4
**write** [6] - 88:19,
100:10, 104:1,
126:15, 244:4,
251:22
**writing** [11] - 75:1,
75:5, 75:8, 75:18,
87:2, 87:18, 87:23,
88:8, 173:11,
219:18, 276:10
**written** [16] - 76:12,
78:14, 87:5, 88:18,
89:7, 134:20, 135:1,
173:11, 175:16,
251:8, 273:4,
273:17, 274:8,
275:22, 276:1,
276:23
**wrote** [18] - 78:15,
88:3, 88:9, 90:4,
102:5, 105:7,
105:24, 123:11,
133:8, 134:3,
134:16, 138:7,
173:13, 213:11,
251:18, 251:19,
277:2, 277:19

## Y

**year** [27] - 5:18, 12:6,
12:11, 16:8, 53:14,
53:16, 53:20, 54:3,
54:19, 113:1,
125:24, 197:8,
210:21, 211:14,
211:16, 211:20,
212:8, 212:10,
215:21, 216:4,
219:9, 220:16,
221:12, 225:11,
262:23, 263:3
**years** [21] - 6:2, 26:17,

27:8, 27:12, 33:4,
35:10, 53:10, 53:11,
53:14, 53:24, 104:3,
114:18, 162:3,
164:21, 194:13,
218:7, 219:3,
250:17, 250:18,
298:2
**yelling** [6] - 224:7,
224:8, 232:2, 232:4,
232:5, 282:16
**YORK** [2] - 1:2, 302:1
**York** [9] - 1:15, 1:17,
2:4, 2:10, 90:7,
155:15, 214:24,
215:7, 303:4
**yourself** [2] - 43:9,
64:15

## Z

**zero** [2] - 184:8,
259:12