UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN GORMAN,

                         Plaintiff,

        -against-                                    1:14-CV-0434 (LEK/DJS)

RENSSELAER COUNTY, *et al.*,

                         Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Plaintiff John Gorman commenced the present action against defendants Rensselaer

County, Jack Mahar, Anthony Patricelli, Patrick Russo, Tom Hendry, and Kathleen Jimino,

alleging civil rights violations under 42 U.S.C. § 1983, disability discrimination in violation of

both the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the New

York Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and other state law

claims, Dkt. No. 53 ("Second Amended Complaint"). Presently before the Court is Defendants'

motion for summary judgment. Dkt. No. 97 ("Motion"). Gorman responded, Dkt. No. 105

("Response"), and Defendants filed a reply, Dkt. No. 112 ("Reply"). For the following reasons,

the Court grants Defendants' Motion.

## II.    BACKGROUND

### A.  Factual Background[1]

Gorman began his employment with the Rensselaer County Sheriff's Department in July 2008. Second Am. Compl. ¶ 2. From 2008 until October 2012, Gorman had an impeccable work record and received numerous performance awards. Id. ¶ 15. Gorman attained the rank of provisional sergeant and was on the civil service list to become a permanent sergeant. Id. ¶ 16.

Patricelli was the Master Sergeant of the Rensselaer County Sheriff's Department. Dkt. No. 97-1 ("Defendants' Statement of Material Facts") ¶ 2; Second Am. Compl. ¶ 10. Patricelli had been in a relationship with Gorman's sister for twenty-seven years until October 8, 2012, when Gorman's brother informed their sister that Patricelli had been cheating on her. Second Am. Compl. ¶¶ 18–19. Gorman's sister confronted Patricelli and ended the relationship. Defs.' SMF ¶ 1; Second Am. Compl. ¶ 19.

Later that day, Patricelli called Gorman at work and, according to Gorman, said, "thank your wife, thank your brother, thank you, you'll pay." Dkt. No. 109-3 ("Gorman Deposition") at 24:3–6; Defs.' SMF ¶ 3; Second Am. Compl. ¶ 21. Patricelli asserts that he did not threaten Gorman during this call, though he does not say what he told Gorman. Dkt. No. 98-2 ("Patricelli Affidavit") ¶ 4. According to Gorman, throughout October 2012, Patricelli followed his every move at work using the facility camera system. Gorman Dep. at 45:4–5; Second Am. Compl. ¶ 30. Patricelli denies this. Patricelli Aff. ¶ 20. Gorman also states that Patricelli would frequently pass by Gorman's work assignment area and shake his head and smile in an aggressive

---

[1]  Because the parties' statements of material facts give an incomplete picture of the events in this case, the Court draws on the Second Amended Complaint to provide relevant background.

way, Gorman Dep. at 44:18–21; Second Am. Compl. ¶¶ 31, 35, though again Patricelli disputes this, Patricelli Aff. ¶¶ 2, 4, 18. Patricelli was not Gorman's direct supervisor, but according to Gorman, Patricelli would unnecessarily check Gorman's work. Gorman Dep. at 45:19–22; Second Am. Compl. ¶¶ 33–35. Once again, Patricelli says this never happened. Patricelli Aff. ¶ 2.

From October 2012 through June 2013, Patricelli allegedly continued to harass Gorman during work and at meals, Second Am. Compl. ¶¶ 36–38, 46, 50, 52, 57, 91, though Patricelli claims he "always acted professionally towards [Gorman] at work," Patricelli Aff. ¶ 2. On February 15, 2013, Patricelli called Gorman at home and allegedly threatened to break his jaw. Gorman Dep. at 72:11–16; Second Am. Compl. ¶¶ 69, 77. Patricelli says he simply meant to convey that if he had wanted to, he could have broken Gorman's jaw some time ago, but he had no desire to do so now, and in fact he wanted to "keep this out of the workplace." Patricelli Aff. ¶ 14.

Sometime before February 8, 2013, Sheriff Jack Mahar, a defendant in this case, spoke to Gorman about a complaint Patricelli had filed against Chief of Corrections Ruth Vibert. Gorman Dep. at 52:3–53:5; Second Am. Compl. ¶ 60. Patricelli alleged that Vibert had revealed to Gorman confidential information about Patricelli's "personal issues and relationship with [Gorman]." Second Am. Compl. ¶ 61. Gorman reports that Mahar asked him to write a statement corroborating Patricelli's allegations. Gorman Dep. at 54:13–19. Gorman told Mahar that he would not give a statement because Vibert had not told him anything about Patricelli's issues. Id. at 54:24–55:12. Mahar was persistent; the meeting lasted "about 40 minutes," and "he asked [Gorman] pretty much the same question over and over and over again." Id. at 54:20–22. Gorman

continued to refuse to corroborate the allegations. Id. at 54:24–55:1. In his Second Amended

Complaint, Gorman suggests that Mahar was asking him to lie, Second Am. Compl. ¶ 64, though

Gorman has not pointed to any evidence in the record suggesting that Mahar knew Patricelli's

allegations were false.

On February 11, 2013, Mahar informed Gorman that "he would no longer be a

provisional Sergeant because he was not reachable [for a promotion to permanent sergeant] due

to his score on the [civil service] test and that as soon as he is reachable he would be promoted."

Id. ¶ 65; see also Gorman Dep. at 56:5–13. Gorman claims that his being unreachable was an

oversight, since one applicant on the list—Jason Lucey—was in fact ineligible for the promotion,

having resigned on February 1. Gorman Dep. at 57:23–58:8. Gorman alleges that several of the

defendants "maliciously withheld information regarding the noneligibility of this applicant from

the certifying authority in order to retaliate against [him]." Second Am. Compl. ¶ 67. Yet

Gorman has not pointed to any evidence in the record corroborating this allegation. And

according to Mahar's undisputed testimony, the list of candidates he received was forwarded to

him by the Civil Service Commission. Dkt. No. 98-1 ("Mahar Affidavit") ¶¶ 4–5.

Gorman filed numerous workplace complaints about the harassment to which he was

subjected, as well as criminal complaints against Patricelli, id. ¶¶ 25–26, 59, 72, 74, 82, 93, 103,

150, 153, against whom he eventually received an order of protection from the Schaghiticoke

Town Court, Gorman Dep. at 79:16–22; Second Am. Compl. ¶ 113. Around February 17, 2013,

Gorman filed a criminal complaint against Patricelli with the Schaghticoke police, Defs.' SMF

¶ 13; Dkt. No. 106 ("Gorman Statement of Material Facts") ¶ 13, though the case was apparently

adjourned in contemplation of dismissal, Dkt. No. 109-12 ("Patricelli Deposition") at 190:17–19.

Around February 25, 2013, Gorman "filed a workplace violence complaint with Defendant Tom Hendry, Rensselaer County Director of Human Resources." Defs.' SMF ¶ 15. He appears to have filed the same complaint with Vibert and Captain Hal Smith. Gorman Dep. at 30:21–31:1. Hendry conducted the investigation and found that none of the witnesses could corroborate Gorman's allegations of harassment. Dkt. No. 97-8 ("Hendry Affidavit") ¶ 3. Gorman points to several individuals who have suggested that Gorman told them about harassment he had experienced from Patricelli, though he does not indicate whether these witnesses were interviewed by Hendry. Gorman SMF ¶ 18.

On February 25, 2013, Mahar met with Vibert to discuss her concerns about, among other things, Gorman's safety. Dkt. No. 109-14 ("Vibert Deposition") at 28:11–16. She tried to get Mahar to read one of Gorman's complaints, but he "instructed [her] to shred the documents and made a statement, 'Gorman's fucking done, you see to it.'" Id. at 28:17–21. Mahar appears to dispute this account of the meeting. He claims that he "had not discussed those papers [with Vibert]" during the meeting, and that when he did receive them, he immediately sent them to Human Resources. Mahar Aff. ¶ 12. He admits that he asked her to "remove" certain documents, but he asserts that the documents were "State Police investigative materials" that Vibert had no business looking at because she was not supposed to "get into a parallel investigation." Id. ¶¶ 10–11. Vibert refused to shred the documents, and she was fired "within days" of this incident. Vibert Dep. at 77:22–78:7.

On March 27, 2013, Gorman received a response to one of his workplace violence complaints indicating that his allegations could not be substantiated. Gorman Dep. at 92:3–5; Defs.' SMF ¶ 17; Gorman SMF ¶ 17. After he received this response, Gorman attempted to set

up a meeting with County Executive Kathy Jimino, a defendant in this case, to discuss his complaints. Second Am. Compl. ¶ 97. Gorman was told that "'someone' would get back to him," id. ¶ 98, and on April 1, 2013, Hendry called him and said he was "returning [Gorman's] call on [Jimino's] behalf to answer any questions [he] might have," id. ¶ 109. One week later, Gorman wrote Jimino a letter expressing his dissatisfaction with Hendry's handling of the investigation; Jimino never responded. Id. ¶¶ 110–11. The Assistant County Executive, Chris Meyer, later called Gorman and told him that he was following up on his workplace violence complaint. Id. ¶¶ 117–19. Jimino says that she "was not involved in the investigations into Mr. Gorman's various complaints," Dkt. No. 97-9 ("Jimino Affidavit") ¶ 4, and that when she received Gorman's letters, she "immediately delegated to the appropriate department for response," id. ¶ 5.

In March 2013, Gorman informed "Deputy Webster"—the "auditor of the e-justice computer system"—that Patricelli had used the system to do a background check on Peter Colantonio. Second Am. Compl. ¶ 100; Gorman Dep. at 95:2–6. "Background check" is Gorman's phrasing, and Patricelli says that he was simply checking for outstanding warrants. Patricelli Dep. at 62:9–20. Patricelli ran Colantonio's name because he believed that Colantonio was seeing Gorman's sister, Second Am. Compl. ¶ 101, but according to Patricelli it was not simple jealousy. Colantonio had a criminal record, and Patricelli claims that he was primarily concerned that the son he had with Gorman's sister might be in danger. Patricelli Dep. at 172:1–13. Webster investigated Gorman's complaint, and he apparently told Gorman and Gorman's brother—a deputy at the Sheriff's Department, Gorman Dep. at 49:1–4—that the Sheriff's Department would be reluctant to punish anyone involved, so if they wanted something to be done, they would need to notify the Division of Criminal Justice Services ("DCJS"), id.

at 95:19–96:11. Gorman and his brother called DCJS and informed them of Patricelli's misconduct, id. at 96:7–11, which eventually led to Patricelli's being suspended from work and facing criminal charges, Second Am. Compl. ¶ 103.

Gorman links his involvement in the eJustice case to harassment he later experienced at hands of Patricelli's friends. Resp. at 21. He alleges that Sergeants Maselli, Walraed, and Gececwicz—none of whom is a defendant in this case—began to harass him after he reported Patricelli's misconduct. Gorman Dep. at 97:8–12. For example, they ordered him to "take deliveries of milk trucks or bread deliveries" during his lunch break, and they asked him to strip-search inmates. Id. at 98:8–17. On July 6, 2013, Maselli allegedly let a heavy metal door hit Gorman. Second Am. Compl. ¶ 142. Maselli was "leaning against" the door, and "then he just walked away from the door," allowing the door to hit Gorman. Gorman Dep. at 128:21–129:4.[2] These are the only instances of harassment Gorman points to as resulting from his decision to bring to light Patricelli's misuse of the eJustice system. Resp. at 19–20.

Around the same time that Gorman reported Patricelli's misuse of the eJustice system, Gorman filed a complaint with the New York Department of Labor, Health, and Safety, alleging that the Rensselaer County Sheriff's Department had failed to adequately investigate his workplace violence complaint. Gorman Dep. at 92:9–16; Second Am. Compl. ¶ 99. On May 7, 2013, the Department of Labor performed an on-site investigation of the Sheriff's Department, Second Am. Compl. ¶ 125, and on June 27, 2013, Rensselaer County received a citation "for not

---

[2] Gorman also claims that the "west hall incident" happened after he reported Patricelli's misuse of the eJustice system. Resp. at 21. Yet he testified in his deposition that the "west hall incident" took place in January 2013, well before he learned of Patricelli's misconduct. Gorman Dep. at 50:4–5, 50:16.

implementing [its] workplace violence program by not thoroughly investigating the workplace violence complaint," id. ¶ 139. According to Gorman, the Department of Labor found that Hendry had failed to interview all parties with relevant information. Gorman Dep. at 92:19–22.

Undersheriff Patrick Russo, one of the defendants in this case, was "present" during the Department of Labor investigation. Second Am. Compl. ¶ 126. Gorman accuses Russo of "intentionally impeding the investigation by not releasing . . . information," including the recording of Patricelli's October 8 phone call. Id. ¶¶ 132–33. Russo, for his part, says that he assisted Hendry in investigating Gorman's workplace violence complaints, and "did nothing to impede that investigation." Dkt. No. 99-1 ("Russo Affidavit") ¶ 2. Russo could not substantiate Gorman's allegations of harassment. Id. ¶ 3. For instance, "investigation and review of facility video" confirmed that Maselli did not intentionally allow the heavy metal door to hit Gorman. Id. ¶ 4. Gorman's problem with Russo is essentially that he "had . . . knowledge of everything that was going on," yet he "did nothing." Gorman Dep. at 123:4–5. Gorman attempts to establish Russo's knowledge by pointing to Vibert's testimony that she told Russo about her conversation with Mahar, in which Mahar told her to shred Gorman's complaints and stated that "Gorman's fucking done, you see to it." Vibert Dep. at 29:10–17.

By July 2013, the events just recounted had taken a significant toll on Gorman's physical and mental health. On July 14, 2013, Gorman called in sick. Gorman Dep. at 132:23–133:1; Second Am. Compl. ¶ 145. He "felt exhausted and had severe tightness in his chest," and he was "suffering great depression." Second Am. Compl. ¶ 146. The next day, Gorman was admitted to St. Peter's Hospital, where he asked for a psychiatric evaluation "because he was having dark thoughts." Id. ¶ 147. He stayed at the hospital for three or four days, and he has not returned to

work since then. Gorman Dep. at 133:16, 134:7–11. Gorman "has been diagnosed with acute stress disorder, posttraumatic stress, depression, and anxiety." Second Am. Compl. ¶ 254.

Gorman applied for 207-c benefits on July 18, 2013. Gorman Dep. at 134:12–18; Second Am. Compl. ¶ 148. It appears that Gorman's application for 207-c benefits was denied. Second Am. Compl. ¶ 194; Defs.' SMF ¶ 28. Sometime between January and May 2014, Gorman applied for workers' compensation benefits. Second Am. Compl. ¶ 178; Gorman Dep. at 199:11–18. On June 23, 2014, Gorman began receiving workers' compensation benefits, which the Workers' Compensation Board granted him because his "condition was caused by [his] employment, specifically by the actions of . . . Patricelli." Gorman Dep. at 202:9–14. By March 2014, Gorman "had exhausted all of his annual sick and vacation leave time," and "[f]rom that point forward the Defendants denied [him] any accrual of sick or vacation time." Second Am. Compl. ¶ 173. And by January 2014, Defendants had also deprived Gorman "of his bidding rights so that even if his Doctor permitted him to return to work he would have no means by which to bid on another job." Id. ¶ 175; see also Gorman Dep. at 141:16–21. Gorman filed a grievance about the denial of his bidding rights, which was denied. Gorman Dep. at 142:8–15.

On June 23, 2014, Russo sent Gorman a letter notifying him that his "employment [would] be terminated effective July 15, 2014." Dkt. No. 109-26 ("Notice of Termination") at 1. The letter went on to say that Gorman was being let go because he had "been absent from employment with the County for a cumulative period exceeding one year due to a non-work related injury or disease." Id. The New York Civil Service Law allows an employee to be fired in this situation, but the employee may be reinstated if she can show that she is medically able to return to duty. Id. The letter also informed Gorman that he was "entitled to a due process hearing

9

prior to termination." Id. It asked Gorman to request the hearing by July 1, 2014, and if he did not want a hearing, "the effective date of [his] termination [would] be [July 15, 2014]." Id.

Gorman requested a hearing, which took place on August 14, 2014. Second Am. Compl. ¶¶ 182–83. Gorman's union representative, relying on the decision issued by the Workers' Compensation Board, argued that Gorman's injury was in fact related to his job. Id. ¶ 183. The position of the Sheriff's Department was apparently that the Worker's Compensation Board's decision was irrelevant "because they were appealing it." Gorman Dep. at 148:9. A decision stemming from the due process hearing was not issued until October 1, 2014, when Gorman received a letter from Russo informing him that he was fired effective that day. Dkt. No. 109-24 ("Termination Letter") at 1. Gorman appealed the decision to the County Civil Service Commission. Second Am. Compl. ¶ 185. On July 3, 2015, the Commission upheld the decision and told Gorman that if "a doctor determined that he c[ould] return to his prior job . . . the county would take him back." Id. ¶ 189.

On May 28, 2015, Gorman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 109-25 ("EEOC Letter") at 2. On June 23, 2015, the EEOC responded to the charge by noting that it was not timely filed, since "the most recent date of harm was June 24, 2014," and the charge was filed on May 28, 2015, more than 300 days after the last instance of alleged discrimination. Id. at 1–2. The EEOC therefore dismissed the charge as untimely and gave Gorman a right to sue within 90 days of receiving the letter. Id.[3]

---

[3] Gorman states that it is "not true that the EEOC dismissed the complaint as untimely." Gorman SMF ¶ 32. This denial is frivolous. The title of the EEOC Letter is "Dismissal and Notice of Rights." EEOC Letter at 1. And the Second Circuit has described the very same type of letter as one that "dismissed the plaintiff's charge as untimely." Palummo v. St. Vincent's Med. Ctr., 4 F. App'x 99, 100 (2d Cir. 2001); see also Bissada v. Ark. Children's Hosp., 639 F.3d 825,

### B. Procedural History

Gorman commenced this case on April 16, 2014. Dkt. No. 1 ("Complaint"). He filed an Amended Complaint on May 31, 2014, Dkt. No. 15 ("Amended Complaint"), and on March 19, 2015, this Court dismissed all claims against Public Safety Psychology PLLC and Dr. William McIntyre, Dkt. No. 31 ("March Decision") at 13. Gorman filed his Second Amended Complaint on August 20, 2015, adding disability discrimination claims. Second Am. Compl. ¶¶ 247–71. The Second Amended Complaint alleges that Defendants retaliated against Gorman in violation of the First Amendment, id. ¶¶ 199–236, infringed on his right to intimate association, id. ¶¶ 191–98, violated his right to equal protection under the law, id. ¶¶ 237–40, violated New York state laws prohibiting retaliation against whistleblowers, id. ¶¶ 241–46, and discriminated against him on the basis of disability in violation of the ADA and related New York state law, id. ¶¶ 247–71. After almost a year of discovery, Defendants moved for summary judgment on July 29, 2016. Mot.[4]

---

830 (8th Cir. 2011) ("The EEOC properly dismissed this charge as untimely."); Hutson v. Wells Dairy, Inc., 578 F.3d 823, 825 (8th Cir. 2009) ("In May 2008, the EEOC notified [the plaintiff] that her charge was dismissed because it was not timely filed."); Hedrich v. Bd. of Regents of Univ. of Wis. Sys., 274 F.3d 1174, 1181 (7th Cir. 2001) ("Later in September of 1998, [the plaintiff] filed [her] charges with the EEOC. The EEOC . . . dismissed her complaint as untimely."). The Court wishes to remind Gorman's counsel that "asserting frivolous objections [should not be] confused with zealous advocacy of a client's interests." Christensen v. Credit Payment Servs., Inc., No. 12-CV-528, 2014 WL 6675748, at *5 (D. Nev. Nov. 25, 2014).

[4] Gorman's Response does not address his claims under the Equal Protection Clause, New York Labor Law § 740, or New York Civil Service Law § 75-b, Resp., even though Defendants moved for summary judgment on them, Dkt. No. 97-10 ("Memorandum") at 10–11, 21–22. Thus, the Court deems those claims waived. See Avillan v. Donahoe, No. 13-CV-509, 2015 WL 728169, at *7 (S.D.N.Y. Feb. 19, 2015) ("Where a party fails to raise an 'argument in his opposition to summary judgment,' that 'argument has been waived.'" (quoting Palmieri v. Lynch, 392 F.3d 73, 87 (2d Cir. 2004))).

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736,

742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  Disability Discrimination in Violation of the ADA

"In New York, a plaintiff seeking to pursue a federal employment discrimination suit under the ADA must have filed a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice or challenged discriminatory act." <u>Lee v. Verizon</u>, No. 15-CV-523, 2016 WL 737916, at *2 (E.D.N.Y. Feb. 23, 2016) (citing 42 U.S.C. § 12117(a)). "A claim under the ADA accrues when the plaintiff 'knew or had reason to know of the injury serving as the basis for his claim.'" <u>O'Leary v. Town of Huntington</u>, No. 11-CV-3754, 2012 WL 3842567, at *4 (E.D.N.Y. Sept. 5, 2012). "When determining the accrual date for a discriminatory termination claim, 'the limitations period begins to run on the date that the employer gives definite notice of that decision to the employee.'" <u>Cutler v. City of New York</u>, No. 09-CV-5335, 2010 WL 3469474, at *6 (S.D.N.Y. Aug. 16, 2010) (quoting <u>Flaherty v. Metromail Corp.</u>, 235 F.3d 133, 137 (2d Cir. 2000)). "[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." <u>Arias-Mieses v. CSX Transp., Inc.</u>, 630 F. Supp. 2d 328, 332 (S.D.N.Y. 2009) (alteration in original) (quoting <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250, 257 (1980)).

Gorman's ADA claim is time barred because he filed his charge with the EEOC on May 28, 2015, over 300 days after June 24, 2014, the date he received his notice of termination and therefore the last date of allegedly discriminatory action in this case. EEOC Letter at 2. True, the

Notice of Termination stated that Gorman could request a due process hearing, and that if he could show he was medically fit to resume work, he would be reinstated. Notice of Termination at 1. But "the mere possibility that the decision might be reversed [is] not enough to label it advisory or ineffective for time-bar purposes." Int'l Telephone & Telegraph Corp. v. Miller, 755 F.2d 20, 24 (2d Cir. 1985); see also Dykstra v. Wyeth Pharm., Inc., No. 08-CV-7432, 2010 WL 8906889, at *2 (S.D.N.Y. Sept. 16, 2010) (finding that the mere fact that "the grievance procedure could have resulted in [the plaintiff's] reinstatement" did not "extend the time within which her discrimination claim could be filed"); Syrkin v. State Univ. of N.Y., No. 04-CV-4336, 2005 WL 2387819, at *6 (E.D.N.Y. Sept. 29, 2005) ("That the decision 'is subject to a grievance procedure, administrative review, and possible reversal' does not delay the start of the 300-day period." (quoting Joseph v. N.Y.C. Bd. of Educ., 171 F.3d 87, 91 (2d Cir. 1999))). Thus, Gorman did not toll the limitations period by requesting a hearing on his termination, and his ADA claim is untimely.

Gorman does not discuss this point in his Response, though he appears to contest it in his Statement of Material Facts. Gorman SMF ¶ 32. He points out that "the right to sue letter states Mr. Gorman can sue in federal court in 90 days." Id. That of course is irrelevant to the question whether Gorman's EEOC charge itself was timely. See Phillips v. Gen. Dynamics Corp., 811 F. Supp. 788, 794 (N.D.N.Y. 1993) ("The 90 day clock began to run when Plaintiff received the right-to-sue letter. The 300 day clock is wholly separate, and it begins to run on the date of the last unlawful act. These are two separate requirements under [the ADA]."). He also points to the date on which he was eventually terminated, October 1, 2014. Gorman SMF ¶ 32. Again, that date is beside the point, for the "[t]he clock begins to run on the date the employee receives

notice of his discharge, and not on the date of actual termination." Cheng v. Metro. Life Ins. Co., No. 94-CV-808, 1995 WL 37843, at *2 (S.D.N.Y. Jan. 31, 1995) (citing Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 59 (2d Cir. 1986)).

Gorman makes no attempt to show that his ADA claim should be rescued via equitable tolling, and nothing in the record indicates that equitable tolling would be appropriate here. Courts deciding whether to equitably toll a plaintiff's discrimination claim consider whether the plaintiff "(1) has 'acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80–81 (2d. Cir. 2003) (quoting Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 512 (2d Cir. 2002)). "Generally, circumstances that have been held worthy of the application of equitable tolling are those where the plaintiff has a mental or physical disability, or where he has been misled by a state agency or the EEOC." Jacobsen v. N.Y.C. Health & Hosps. Corp., No. 12-CV-7460, 2013 WL 4565037, at *4 (S.D.N.Y. Aug. 28, 2013). There is no evidence that Gorman was acting diligently during the time period in question, and there is no reason to think extraordinary circumstances got in the way of his timely filing a charge with the EEOC. Thus, the Court will not equitably toll Gorman's ADA claim, and it must be dismissed.

### B. First Amendment Retaliation

The First Amendment protects a public employee's speech from retaliation only where the employee spoke "on a matter of public concern." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). "Speech touches upon a matter of public concern when it relates to a matter of political, social or other concern to

the community." <u>Giachetto v. Patchogue-Medford Union Free Sch. Dist.</u>, No. 15-CV-3152, 2016

WL 5477605, at *2 (E.D.N.Y. Sept. 29, 2016) (citing <u>Connick v. Myers</u>, 461 U.S. 138, 146

(1983)). Thus, speech that "primarily concerns an issue that is 'personal in nature and generally

related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary,

does not address matters of public concern." <u>Jackler v. Byrne</u>, 658 F.3d 225, 236 (2d Cir. 2011)

(alteration in original) (quoting <u>Ezekwo v. N.Y. City Health & Hosps. Corp.</u>, 940 F.2d 775, 781

(2d Cir. 1991)); <u>see also</u> <u>Agard v. N.Y.S. Dep't of Taxation & Fin.</u>, No. 10-CV-4726, 2012 WL

601474, at *6 n.7 (E.D.N.Y. Feb. 23, 2012) ("[R]etaliation against the airing of generally

personal grievances is not brought within the protection of the First Amendment by 'the mere

fact that one or two of [a public employee's] comments could be construed broadly to implicate

matters of public concern.'" (alteration in original) (quoting <u>Ruotolo</u>, 514 F.3d at 190)). In

determining whether speech touches on a matter of public concern, courts must "examin[e] the

'content, form, and context of a given statement, as revealed by the whole record.'" <u>Jackler</u>, 658

F.3d at 235 (quoting <u>Connick</u>, 461 U.S. at 147–48).

     Gorman argues that he engaged in three instances of protected speech: (1) filing a

criminal complaint against Patricelli after he threatened to break his jaw, (2) refusing to make

false statements about Vibert's disclosing confidential information regarding Patricelli to him,

and (3) reporting Patricelli's misuse of the eJustice system. Resp. at 18–20.[5] The first two

instances of speech are not protected because they do not involve matters of public concern. The

third instance may involve a matter of public concern, but the law on this issue was ambiguous

---

    [5] In his Second Amended Complaint, Gorman divides these instances of allegedly
protected speech into three separate causes of action. Second Am. Compl. ¶¶ 199–214, 223–29.

enough at the time of the events in question that a reasonable officer could have concluded that it did not touch on a matter of public concern. Thus, the individual defendants receive qualified immunity with respect to Gorman's reporting Patricelli's abuse of the eJustice system.

Gorman filed the criminal complaint against Patricelli because he was afraid for his safety. See Gorman Dep. at 74:18–23 ("I still wanted to have a career at the Sheriff's Department. But at the same time, I had to weigh the options for my family. So I initially filed a complaint and then changed it to a criminal complaint . . . ."). A plaintiff's motive for saying something is "not, standing alone, dispositive or conclusive," but it "may be one factor" in deciding whether the speech involves a matter of public concern. Sousa v. Roque, 578 F.3d 164, 175 (2d Cir. 2009). Gorman himself has admitted that he pursued criminal charges because he wanted to "protect [his] family and [him]self," Gorman Dep. at 79:5, so this factor weighs against finding this speech to be protected. And even aside from Gorman's motive, there is no reason to think that the public would have a legitimate interest in the ongoing feud between him and Patricelli. See Gordon v. City of New York, 612 F. App'x 629, 631 (2d Cir. 2015) ("[T]he complaint contains no plausible allegation that [the plaintiff's] statement to the police was anything more than a simple, individualized assault report."). Thus, Gorman's filing criminal charges against Patricelli does not involve a matter of public concern and is not protected by the First Amendment.[6]

Gorman says that he refused to obey Mahar's request that he corroborate false allegations Patricelli had made against Vibert. Gorman Dep. at 54:13–19. Patricelli alleged that Vibert had

---

[6] This analysis is equally applicable to Gorman's workplace violence complaints about Patricelli, though Gorman does not suggest in his Response that those complaints constitute protected speech.

revealed to Gorman confidential information about Patricelli's "personal issues and relationship with [Gorman]." Second Am. Compl. ¶ 61. As this Court has previously noted, "speech questioning an order to lie is not inherently protected." Rother v. N.Y. State Dep't of Corrs. & Cmty. Supervision, 970 F. Supp. 2d 78, 98 (N.D.N.Y. 2013) (Kahn, J.). Thus, Gorman's refusal to obey Mahar's alleged instruction to lie involves a matter of public concern only if the public would have a legitimate interest in the question whether Vibert had in fact disclosed personal information about Patricelli to Gorman. Compare, e.g., Jackler, 658 F.3d at 236–37 (finding that a police officer's refusal to falsify a report involved a matter of public concern because the report concerned "police malfeasance consisting of the use of excessive force"), with Negron v. City of New York, No. 10-CV-2757, 2011 WL 4737068, at *16 (E.D.N.Y. Sept. 14, 2011) (finding that the plaintiff's refusal to lie about "attempt[ing] to visit Lil' Wayne in the Two and Three Upper housing unit [at Rikers Island]" did not involve a matter of public concern), adopted by 2011 WL 4729754 (E.D.N.Y. Oct. 6, 2011).

The Court fails to see how Vibert's decision to reveal (or not reveal) personal information about one coworker to another coworker would be "'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." Jackler, 658 F.3d at 236 (quoting City of San Diego v. Roe, 543 U.S. 77, 83–84 (2004)). De Los Santos v. City of New York, 482 F. Supp. 2d 346 (S.D.N.Y. 2007), is instructive here. In that case, the plaintiff, a "City Custodial Assistant" at the Police Department of the City of New York, told her superiors at the Department that she had observed two police officers in a locker room "engaged in a sexual act while in uniform." Id. at 347–48. The court held that this speech did not involve a matter of public concern because, among other things, it was "devoid of any social commentary,

and d[id] not suggest an endemic problem that might impact the public or warrant its concern." Id. at 353–54. Just as a single incident of inappropriate sexual conduct between two police officers implicates only "internal personnel disputes and working conditions," Hellstrom v. U.S. Dep't of Veterans Affairs, 46 F. App'x 651, 655 (2d Cir. 2002), so the alleged exchange of personal information concerning Patricelli between Vibert and Gorman involves a dispute internal to the Sheriff's Department, see Ruotolo, 514 F.3d at 190 ("A generalized public interest in the fair or proper treatment of public employees is not enough."). Thus, Gorman's refusal to corroborate Patricelli's allegations against Vibert does not touch on a matter of public concern, and it does not receive First Amendment protection.

Whether Gorman's reporting Patricelli's misuse of the eJustice system constitutes protected speech is a closer question. But the Court need not reach the merits of this issue because Defendants have raised the affirmative defense of qualified immunity, Mem. at 12–13, and it was not clearly established at the time of the events in this case that Gorman's complaint about Patricelli's abuse of the eJustice system touched on a matter of public concern.

Qualified immunity shields government officials from civil damages liability as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); see also Pearson v. Callahan, 555 U.S. 223, 231 (2009); Sudler v. City of New York, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity

if they make "reasonable mistakes" about the lawfulness of their conduct. Sudler, 689 F.3d at 174 (citing Saucier v. Katz, 533 U.S. 194, 206 (2001), abrogated on other grounds by Pearson, 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts, taken in the light most favorable to the plaintiff, show (1) that the conduct at issue violated a statutory or constitutional right, and (2) that the right "was clearly established at the time of the challenged conduct." Terebesi v. Torreso, 764 F.3d 217, 230 (2d Cir. 2014) (citing Reichle, 132 S. Ct. at 2093). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236. Accordingly, the Court addresses the question whether it was clearly established at the time of the allegedly unlawful conduct that reporting a single incident of a law enforcement officer's misusing a database to run a background check on a civilian constituted speech on a matter of public concern.

"To be clearly established, a right must be sufficiently clear 'that every "reasonable official would [have understood] that what he is doing violates that right."'" Reichle, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. at 2093 (quoting al-Kidd, 563 U.S. at 741). In order to place a question beyond debate, there need not be a case exactly on point "so long as preexisting law 'clearly foreshadow[s] a particular ruling on the issue.'" Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (quoting Tellier v. Fields, 280 F.3d

69, 84 (2d Cir. 2000)). Qualified immunity "affords officials 'breathing room to make reasonable but mistaken judgments' without fear of potentially disabling liability." <u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 389 (2d Cir. 2013) (quoting <u>Messerschmidt v. Millender</u>, 565 U.S. 535, 546 (2012)). "Indeed, the standard is sufficiently forgiving that it protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Turkmen v. Hasty</u>, 789 F.3d 218, 281 (2d Cir. 2015) (quoting <u>al-Kidd</u>, 563 U.S. at 743).

At the time of the events of this case, it was clear that "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." <u>Jackler</u>, 658 F.3d at 236 (quoting <u>Branton v. City of Dallas</u>, 272 F.3d 730, 740 (5th Cir. 2001)). For example, in <u>Jackler</u>, the plaintiff, a probationary police officer, witnessed another police officer use excessive force against a civilian. <u>Id.</u> at 230. The plaintiff filed a report corroborating the victim's account of the incident, but he was later asked to withdraw the report and refile a new one that concealed the illegal conduct. <u>Id.</u> at 230–31. The court found that this was the kind of official misconduct that touched on a matter of public concern, in part because "[t]he Fourth Amendment to the United States Constitution, which applies to the States through the Fourteenth Amendment, prohibits the use of excessive force by policemen in the course of an arrest." <u>Id.</u> at 236. Excessive use of force by police clearly implicates "public safety and welfare," in addition to raising concerns about "preservation of the public fisc." <u>Id.</u> <u>Jackler</u> therefore lends some support to Gorman's position. Gorman went out of his way to expose official misconduct, and the public might legitimately be concerned about a law enforcement officer such as Patricelli abusing his authority to run background checks on civilians.

But not all instances of official misconduct involve matters of public concern. Consider the facts of <u>Nagle v. Marron</u>, 663 F.3d 100 (2d Cir. 2011). There, the plaintiff, a special education teacher, informed several people at the school that her signature had been forged on a "teaching observation report of her class." <u>Id.</u> at 103. It turned out that an assistant principal had signed the plaintiff's name on the document. <u>Id.</u> The court held that the forgery did not touch on a matter of public concern, because "[t]he forgery of [the plaintiff's] signature, *even if such conduct were criminal*, had no practical significance to the general public." <u>Id.</u> at 107 (emphasis added). The court emphasized that the plaintiff did "not claim that the forgery revealed an ongoing pattern of conduct or even a particularly important instance of bad judgment on [the assistant principal's] part that might have elevated the forgery to a matter of public concern." <u>Id.</u> at 108. <u>Nagle</u>, then, suggests that Gorman's complaint about Patricelli's abuse of the eJustice system did not involve a matter of public concern. While Patricelli faced criminal charges for his conduct, Gorman's complaint involved only a single incident rather than "pervasive or systemic misconduct by a public agency or public officials." <u>Saulpaugh v. Monroe Comm. Hosp.</u>, 4 F.3d 134, 143 (2d Cir. 1993) (quoting <u>Yatvin v. Madison Metro. Sch. Dist.</u>, 840 F.2d 412, 420 (7th Cir. 1988)). And though it is true that a single incident of egregious official misconduct can touch on a matter of public concern, <u>Jackler</u>, 658 F.3d at 236, Patricelli's conduct is a far cry from the use of excessive force recounted in <u>Jackler</u>. After all, Gorman has not pointed to any evidence in the record suggesting that Patricelli did anything with the information he obtained about Colantonio. Finally, the context of Gorman's decision to report Patricelli's misconduct—an ongoing personal dispute between Gorman, Patricelli, and Gorman's sister—provides further reason to doubt the broader significance of Gorman's speech. See <u>Porr v.</u>

<u>Daman</u>, 299 F. App'x 84, 85 (2d Cir. 2008) ("The district court correctly noted that the context of [the plaintiff's] grievances was the ongoing personal dispute between [the plaintiff] and [his coworker].").

Given the conflicting strands in the case law, a reasonable official in the individual defendants' position would not find it clear that Gorman engaged in protected speech by reporting Patricelli's abuse of the eJustice system. Moreover, "'officers of reasonable competence could disagree' on the legality of the action at issue in [this] particular factual context." <u>Walczyk v. Rio</u>, 496 F.3d 139, 154 (2d Cir. 2007) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). Thus, the individual defendants are entitled to qualified immunity with respect to this speech.

**C. Right to Intimate Association**

The Due Process Clause of the Fourteenth Amendment "guarantees an individual the choice of entering into an intimate relationship free from undue intrusion by the state." <u>Sanitation & Recycling Indus. v. City of New York</u>, 107 F.3d 985, 996 (2d Cir. 1997) (citing <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 617–18 (1984)). To state a claim for infringement of the right to intimate association, a plaintiff must show that the allegedly unconstitutional act was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." <u>Anthony v. City of New York</u>, 339 F.3d 129, 143 (2d Cir. 2003) (quoting <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 600 (2d Cir. 1999)). The standard for evaluating intimate association claims is unclear. "Sometimes court opinions suggest that an intimate association right is not violated unless the challenged action has the likely effect of ending the protected relationship." <u>Adler v. Pataki</u>, 185 F.3d 35, 43 (2d Cir. 1999). Yet in

other cases, the question is whether the "action alleged to burden an intimate association is arbitrary" or represents an unwarranted invasion by the state into the intimate relationship. Id. at 43–44. Further, "[t]he sibling relationship is one long recognized as warranting protection" under the right to intimate association. Miron v. Town of Stratford, 881 F. Supp. 2d 280, 289 (D. Conn. 2012); see also Patel v. Searle, 305 F.3d 130, 136 (2d Cir. 2002) ("[W]e conclude that the relationships at issue in this case—those between [the plaintiff] and his father, *siblings*, wife, and children—receive the greatest degree of protection because they are among the most intimate of relationships." (emphasis added)).[7]

Several courts in this circuit, in addition to the majority of our sister circuits, have "limited intimate association claims to situations where the state action intentionally targets the family relationship." Phillips v. County of Orange, 894 F. Supp. 2d 345, 380 n.32 (S.D.N.Y. 2012) (collecting cases). These courts distinguish "between a state actor that intentionally targets the intimate associations of a person, which is a protected right in this circuit, and circumstances . . . whereby a state actor allegedly commits actions that indirectly affect those

---

[7] Defendants appear to think that Gorman brought this claim under the First Amendment. Mem. at 7. The Court disagrees. "Intimate association cases brought pursuant to the First Amendment typically arise when a plaintiff's family member exercises their right to free speech, resulting in adverse action being taken against the plaintiff." Maco v. Baldwin Union Free Sch. Dist., No. 15-CV-3958, 2016 WL 4028274, at *4 (E.D.N.Y. July 26, 2016) (collecting cases). Gorman's sister did not exercise her right to free speech by breaking up with Patricelli, because ending a relationship cannot plausibly be characterized as conduct that is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." Spence v. Washington, 418 U.S. 405, 409 (1974). Thus, this claim is properly analyzed under the Fourteenth Amendment's Due Process Clause. See Garten v. Hochman, No. 08-CV-9425, 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010) ("Where the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns, . . . the Second Circuit has employed an analysis under the framework of the Fourteenth Amendment right to substantive due process.").

relationships." Laureano v. Goord, No. 06-CV-7845, 2007 WL 2826649, at *12 (S.D.N.Y. Aug. 31, 2007), adopted by 2007 WL 2852770 (S.D.N.Y. Sept. 28, 2007); accord Grenier v. City of West Haven, No. 11-CV-808, 2012 WL 4092587, at *3 (D. Conn. Sept. 17, 2012) ("[T]he majority of Circuits, and district courts within this Circuit, have 'expressly declined to find a violation of the familial liberty interest where the state action at issue was not aimed specifically at interfering with the relationship.'" (quoting Russ v. Watts, 414 F.3d 783, 787–88 (7th Cir. 2005))); Campos v. Weissman, No. 07-CV-1263, 2009 WL 7771872, at *7 (N.D.N.Y. Sept. 10, 2009) ("Though this question remains unanswered by the Second Circuit, district courts within our Circuit consistently follow the direction of virtually all other Circuit Courts and hold that when it comes to asserting claims of governmental interference with intimate familial relationships with an adult son/daughter/sibling, a plaintiff must allege that a particular defendant's actions were undertaken for the purpose of interfering with such relationship . . . ." (collecting cases)), adopted by 2011 WL 1204839 (N.D.N.Y. Mar. 29, 2011).

Gorman has failed to point to any evidence suggesting that any of the defendants intended to interfere with his relationship with his sister. Patricelli harassed and apparently threatened Gorman, but a reasonable jury could not infer that Patricelli intended by his harassment to damage Gorman's relationship with his sister. At best, a reasonable jury could infer that the abuse Gorman received at the hands of Patricelli "indirectly affect[ed]" his relationship with his sister, Laureano, 2007 WL 2826649, at *12, though even that is a stretch, since Gorman has not cited any evidence in the record about the impact of the harassment he experienced on his relationship with his sister. Even if Gorman had cited such evidence, an indirect effect on the familial relationship cannot give rise to a claim for violation of the right to intimate association.

Id. Gorman points to the phone call he received from Patricelli the day of the break-up, in which Patricelli said "thank your wife, thank your brother, thank you, you'll pay." Gorman Dep. at 24:3–6. This shows that Patricelli wanted to exact revenge on Gorman—hence the line, "you'll pay." Perhaps it also suggests that Patricelli wanted to get back at Gorman's sister, though this is less clear. The problem for Gorman is that this conversation suggests nothing about Patricelli's desire to interfere with Gorman's relationship with his sister.

Gorman mentions that "Patricelli pleaded with [Gorman] to help him mend the relationship with [Gorman's] sister." Resp. at 13.[8] If anything, this implies that Patricelli wanted Gorman and his sister to remain close, because if the two siblings grew apart, Gorman would presumably be less able to assist Patricelli in winning back his sister. Gorman points to the allegation in his Second Amended Complaint that "Patricelli used his position with the Sherriff s Department and his friendship with Defendant Sheriff Mahar to intrude into [Gorman's] relationship with his sister by retaliating against [Gorman]." Second Am. Compl. ¶ 193. Yet it is well established that an unverified complaint, such as Gorman's Second Amended Complaint, "cannot support a motion in opposition to summary judgment." Zayas v. Caring Cmty. of Conn., No. 11-CV-442, 2012 WL 4512760, at *4 (D. Conn. Oct. 1, 2012) (collecting cases). And in any case, this allegation is conclusory. Finally, Gorman notes that "when Patricelli called [him] and threatened to break his jaw[,] he also [asked Gorman where his sister was]." Resp. at 16. Again, a reasonable jury could not infer an intent to target the relationship itself from these words. Read in the light most favorable to Gorman, they indicate Patricelli's desire to harm Gorman's sister, but

---

[8] Gorman does not cite any evidence in the record supporting this assertion.

that is a separate question from Patricelli's intent to interfere with the siblings' relationship. Thus, Gorman's intimate association claim fails.

### D. Municipal Liability

The Court held above that the individual defendants enjoy qualified immunity with respect to Gorman's reporting Patricelli's abuse of the eJustice system. The Court reasoned that the law defining public concern in the First Amendment retaliation context was too ambiguous to provide a reasonable officer with fair warning that Gorman had engaged in protected speech. Yet Gorman sued Rensselaer County in addition to the individual defendants, and "the entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is . . . irrelevant to the liability of the municipality." Askins v. Doe No. 1, 727 F.3d 248, 254 (2d Cir. 2013). Unfortunately for Gorman, even if he could make a plausible showing that he suffered a constitutional violation because of the retaliation he allegedly experienced for reporting Patricelli's misconduct in connection with the eJustice system, his claim against Rensselaer County would fail.

To establish municipal liability under § 1983, a plaintiff must plead and prove that the deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of

his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). A

plaintiff must demonstrate that the municipality, through its own deliberate conduct, was the

"moving force" behind the alleged injury. Roe v. City of Waterbury, 42 F.3d 31, 37 (2d Cir.

2008). A plaintiff can demonstrate the existence of a municipal policy or custom by showing

> (1) a formal policy officially endorsed by the municipality; (2) actions
> or decisions made by municipal officials with decision-making
> authority; (3) a practice so persistent and widespread that it
> constitutes a custom of which policymakers must have been aware;
> or (4) a failure by policymakers to properly train or supervise their
> subordinates, such that the policymakers exercised "deliberate
> indifference" to the rights of the plaintiff and others encountering
> those subordinates.

McLennan v. City of New York, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016).

Gorman argues that Sheriff Mahar, "who has final policy-making authority[,] retaliated

against [Gorman] through his own conduct or by directing other County employees." Resp. at 24.

"The critical characteristic of final policymakers when employment is at issue is whether the

municipal official has authority to formulate the rules governing personnel decisions rather than

authority to make decisions pursuant to those rules—e.g., the hiring and firing of subordinates."

Chin v. N.Y.C. Hous. Auth., 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008) (citing Pembaur v. City

of Cincinnati, 475 U.S. 469, 483 n.12 (1986) (plurality opinion))."A plaintiff bears the burden of

establishing an official's status as a final policymaker with proof of the official's scope of

employment and his role within the municipal or corporate organization." Pignone v. Village of

Pelham Manor, No. 10-CV-2589, 2014 WL 929805, at *4 (S.D.N.Y. Mar. 6, 2014) (citing Jeffes

v. Barnes, 208 F.3d 49, 57–58 (2d Cir. 2000)); accord Cruz v. Liberatore, 582 F. Supp. 2d 508,

521 (S.D.N.Y. 2008) ("The plaintiff bears the burden of establishing that a claimed official is the

'final policymaker'—not merely a 'policymaker'—with respect to the relevant conduct." (quoting <u>Kempkes v. Downey</u>, No. 07-CV-1298, 2008 WL 852765, at *9 (S.D.N.Y. Mar. 31, 2008))). "Whether or not a single individual possesses final policymaking authority is an issue of state law." <u>Baity v. Kralik</u>, 51 F. Supp. 3d 414, 436–37 (S.D.N.Y. 2014) (quoting <u>Chin</u>, 575 F. Supp. 2d at 562).

Gorman has not come close to satisfying his burden of "adduc[ing] . . . proof that the actions of which [he] complains were taken by a person to whom final policy making authority had been delegated." <u>Flanagan v. N.Y.C. Dep't of Educ.</u>, No. 13-CV-8456, 2016 WL 7156765, at *2 (S.D.N.Y. Dec. 7, 2016). Gorman alleges that Mahar engaged in retaliatory employment-related conduct toward him, Resp. at 23–24, but that is insufficient to show that Mahar was a final policymaker, <u>see</u> <u>Manemeit v. Town of Branford</u>, No. 04-CV-1353, 2009 WL 1743749, at *5 (D. Conn. June 18, 2009) ("The fact that the Fire Chief has the authority (and duty) to make personnel decisions . . . does not give rise to municipal liability for his actions because the Fire Chief's discretion in personnel matters is limited by the final authority of the Board."); <u>Davis v. City of Hartford</u>, 601 F. Supp. 2d 488, 492 (D. Conn. 2009) ("[I]t is clear that mere discretionary authority is not sufficient to impose municipal liability for the conduct of a subordinate official without final [policymaking] authority."). Further, Gorman has not pointed to any state law defining the scope of Mahar's authority over employment decisions. That alone is fatal to his attempt to establish municipal liability based on Mahar's alleged final policymaking authority. <u>See</u> <u>Canner v. City of Long Beach</u>, No. 12-CV-2611, 2014 WL 2862791, at *11 (E.D.N.Y. June 23, 2014) ("As plaintiffs do not reference any state law supporting their claim that [one of the defendants] was a final policymaker, the <u>Monell</u> claim does not survive.").

Gorman's other theory of municipal liability is that Mahar's failure to intervene in the harassment he faced shows that Rensselaer County failed to properly train or supervise its employees. Resp. at 24–25. "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). To show deliberate indifference, a plaintiff must prove that "a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 563 U.S. 51, 61 (2011) (quoting Bd. of Comm'rs v. Brown, 520 U.S. 397, 410 (1997)). A single incident of unconstitutional conduct may give rise to municipal liability where it reflects a failure to provide training in circumstances where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under § 1983 without proof of a pre-existing pattern of violations." Id. at 64; see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) ("An obvious need [for better training or supervision] may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.").

As discussed above, Gorman has pointed to at most one instance of a constitutional violation—the retaliation he experienced after reporting Patricelli's misuse of the eJustice system. Given that "there is some doubt as to . . . [the] continued vitality" of the single-incident theory of liability, Pedros v. City of New York, No. 13-CV-1890, 2014 WL 99997, at *11 (S.D.N.Y. Jan. 9, 2014) (citing Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 392

(S.D.N.Y. 2013)), Gorman's failure to show anything resembling a pattern of constitutional violations at the Sheriff's Department may be fatal to his failure-to-train claim, see Davis v. City of Hartford, 601 F. Supp. 2d 488, 493 (D. Conn. 2009) ("Reduced to its essence, [the plaintiff's] basis for imposing municipal liability focuses on only the circumstances of her particular case. With no evidence of the involvement of a policy-making official with final authority, or of a custom, policy, or pattern of misconduct, there is no basis on which a jury could impose municipal liability."). Even if the single-incident theory of liability remains viable, there is no reason to think that the Sheriff's Department's supposed failure to conduct a thorough investigation into Gorman's allegations of harassment following his reporting Patricelli's abuse of the eJustice system reflects a failure to train its employees so as to prevent obvious "unconstitutional consequences." Connick, 563 U.S. at 64. That kind of neglect may lead to unpleasantness for Sheriff's Department employees, but it cannot be said that "the inadequacy [is very] likely to result in the violation of constitutional rights." Canton, 489 U.S. at 390. Thus, Gorman's failure-to-train claim fails.

### E.  The NYSHRL Claims

Gorman's remaining claims allege disability discrimination in violation of New York state law. Second Am. Compl. ¶¶ 262–71. Since the Court has dismissed all of Gorman's federal claims, the question is whether it should exercise supplemental jurisdiction over his remaining state-law claims. The decision whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) is subject to the district court's discretion. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) ("[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order

to decide whether to exercise [supplemental] jurisdiction . . . ." (citing <u>United Mine Workers of</u> <u>Am. v. Gibbs</u>, 383 U.S. 715, 726–27 (1966)); <u>Mauro v. S. New England Telecom., Inc.</u>, 208 F.3d 384, 388 (2d Cir. 2000) (noting that the courts of appeals "review a district court's exercise of supplemental jurisdiction for abuse of discretion," and finding such jurisdiction proper in that case).

The Court declines to exercise supplemental jurisdiction over Gorman's remaining state-law claims. "[I]n the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state . . . law is a question best left to the courts of the State of New York." <u>Giordano v. City of</u> <u>New York</u>, 274 F.3d 740, 754 (2d Cir. 2001); <u>see also</u> <u>Sykes v. N. Fork Bank</u>, No. 07-CV-1102, 2009 WL 5042531, at *2 (E.D.N.Y. Dec. 16, 2009) (declining to exercise supplemental jurisdiction over the plaintiff's remaining NYSHRL disability discrimination claims because "the NYSHRL 'defines disability more broadly than does the ADA'" (quoting <u>Reeves v. Johnson</u> <u>Controls World Servs., Inc.</u>, 140 F.3d 144, 154 (2d Cir. 1998))). Further, "[w]hile discovery has been completed and the instant case has proceeded to the summary judgment stage, it does not appear that any discovery would need to be repeated if [Gorman's] pendent claims were brought in state court." <u>Tishman v. Associated Press</u>, No. 05-CV-4278, 2007 WL 4145556, at *9 (S.D.N.Y. Nov. 19, 2007) (collecting cases). Thus, the Court dismisses Gorman's state-law discrimination claims without prejudice to his renewing the claims in state court.

V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 97) is

**GRANTED without prejudice** to Gorman's renewing his state-law disability discrimination

clams in state court; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     March 24, 2017
               Albany, New York

                               Lawrence E. Kahn
                               U.S. District Judge